**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **VEROBLUE FARMS USA, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 3:19-cv-00764-L** |
| **LESLIE A. WULF, BRUCE A. HALL,** | § | |
| **JAMES REA, JOHN E. REA, and KEITH** | § | |
| **DRIVER** | § | |
| | § | |
| **Defendant.** | § | |

---

**INDEX TO APPENDIX TO DEFENDANT KEITH DRIVER'S BRIEF IN SUPPORT OF
12(b)(6) MOTION TO DISMISS**

---

Exhibit A:     Amended Complaint ................................................................. APP0003

Exhibit B:     Declaration of Defendant Keith Driver in Support of 12(b)(6)
Motion to Dismiss................................................................... APP0031

Exhibit C:     Employment Agreement ....................................................... APP0033

Exhibit D:     Business Relationship Restructuring Agreement  ................................ APP0049

---

Respectfully submitted,


By: ___*/s/ Stacie M . Codr*_____
      Stacie M. Codr
      scodr@finleylaw.com
      **Finley Law Firm, P.C.**
      699 Walnut Street, Suite 1700
      Des Moines, IA  50309
      Telephone: (515) 288-0145


      R. Heath Cheek
      State Bar No. 24053141
      hcheek@bellnunnally.com
      Katie R. Beaird
      Texas Bar No. 24092099
      kbeaird@bellnunnally.com
      *Pro Hac Vice Pending*
      **Bell Nunnally & Martin LLP**
      2323 Ross Avenue, Suite 1900
      Dallas, TX 75201
      Telephone:  (214) 740-1400
      Telecopy:  (214) 740-1499

**ATTORNEYS FOR DEFENDANT
KEITH DRIVER**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing was served upon counsel of records for all parties via ECF Service.

**DATED** this 10th day of April, 2019.


      */s/ Heath Cheek*_____
      R. Heath Cheek

4161889_1.docx // 10700.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | | |
|---|---|---|
| VEROBLUE FARMS USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. Case 3:18-cv-03047-CJW |
| v. | ) | |
| | ) | |
| LESLIE A. WULF, BRUCE A. HALL, | ) | |
| JAMES REA, JOHN E. REA, | ) | |
| and KEITH DRIVER, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff, VeroBlue Farms USA, Inc. ("VBF"), through its undersigned counsel, complain of Defendants, Leslie A. Wulf ("Wulf"), Bruce A. Hall ("Hall"), James Rea ("James Rea"), John E. ("Ted") Rea ("Ted Rea"), and Keith Driver ("Driver") (collectively, "Defendants"), as follows:

### Introduction

Defendants controlled VBF for almost three years from 2014 through 2017. VBF recently discovered that Defendants, while serving as VBF officers and/or directors, misappropriated millions of dollars from VBF and otherwise wasted VBF assets. This suit seeks recovery of damages due VBF and other relief.

### Parties and Jurisdiction

1.      VBF is a Nevada corporation with its principal place of business in Webster City, Iowa.

2.      All Defendants are Canadian citizens, except for Hall.

3.      Driver, upon information and belief, resides in Calgary, Alberta, Canada. Driver served as an officer and employee (and/or contractor) of VBF from October 1, 2014 through on or about January 13, 2017, when VBF terminated his employment and officer status.

4.      James Rea, upon information and belief, has permanent resident alien status in the United States.  James Rea served as a director, officer and employee (and/or consultant) of VBF October 1, 2014 through on or about January 8, 2018 when VBF terminated his employment (and/or contractor), director, and officer status.

5.      Ted Rea, upon information and belief, has permanent resident alien status in the United States.  Ted Rea served as a director, officer and employee (and/or consultant) of VBF from October 1, 2014 through on or about October 27, 2017 when VBF terminated his employment (and/or contractor), director, and officer status.

6.      Hall, upon information and belief, is a U.S. citizen and a citizen of Texas.  Hall served as a director, officer and employee (and/or consultant) of VBF from October 1, 2014 through on or about October 27, 2017 when VBF terminated his employment (and/or contractor), director, and officer status.

7.      Wulf, upon information and belief, has permanent resident alien status in the United States.  Wulf served as a director, officer and employee (and/or contractor) of VBF from October 1, 2014 through on or about November 6, 2017, when VBF terminated his employment (and/or consultant), director, and officer status.

8.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(3) as all Defendants except Hall are citizens of a foreign state, Hall is not a citizen of the same state as VBF, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

APP0004

9.      Venue in this District is proper because the transactions and associated misconduct at issue in this case occurred in whole or in part in Hamilton County, in the Northern District of Iowa.

10.     This Court has personal jurisdiction over Defendants pursuant to Iowa Code § 617.3 as the Defendants committed torts in part in Iowa, and against an Iowa resident, VBF.

**Defendants' Misappropriations Of VBF Cash And Other Assets**

11.     VBF was incorporated on September 5, 2014, and operates a sustainable fish farm ("Farm") business in Webster City, Iowa.  Its website can be found at http://verobluefarms.com/.

12.     Defendants, shortly thereafter, came into control of VBF, starting October 1, 2014.

13.     VBF conducted an investigation through which VBF, by March 2018, discovered the misappropriations and other misconduct alleged herein.  VBF did not know, nor could it have known, of Defendants' misconduct until that time, especially since Defendants fraudulently concealed their misconduct from VBF, as further alleged herein.

14.     VBF has discovered at least ten schemes consummated by the Defendants to accomplish this misconduct over a time period of approximately three years.  Defendants accomplished these schemes without the approval of disinterested VBF directors with knowledge and notice of such schemes.

**BAJJER Stock Scheme**

15.     BAJJER LLC ("BAJJER") is owned and controlled by some or all Defendants or their affiliates.  On September 18, 2014, Defendants directed VBF to transfer 1,250,000 shares of VBF's Canadian affiliate to BAJJER, for a grand total of $1.25.  A true and correct copy of documentation regarding this transaction is attached hereto and incorporated herein as Exhibit A.

16.      Such stock was sold to others around that same time for $0.90 per share, meaning that Defendants received at least $1,125,000 worth of stock for free.  Unfortunately, due to Defendants' misconduct, stock in VBF and its affiliates has since lost significant value.

**American Growth Funding Loan Scheme**

17.      BAJJER II, LCC ("BAJJER II") is also owned and controlled by some or all Defendants or their affiliates (and third parties). American Growth Funding, LLC ("AGF") loaned $78,000 to BAJJER II, which grew to $101,000, with interest, and which AGF wrote off as bad debt on or before December 31, 2016.  AGF is a factoring/finance company, and its affiliates have been sued for fraud by the United States Securities and Exchange Commission, in the United States District Court for the Southern District of New York, as summarized in this press release: https://www.sec.gov/news/pressrelease/2016-21.html.

18.      AGF loaned BAJJER another $200,000, which BAJJER transferred to VBF.

19.      On July 8, 2016, the Defendants directed VBF to pay AGF $375,000, even though VBF never had a direct borrowing relationship with AGF.  Upon information and belief, this $375,000 amount encompasses not only the $200,000 referenced in paragraph 18 above, but also the $101,000 amount referenced in paragraph 17 above.

20.      Therefore, Defendants utilized VBF funds to repay an alleged debt to AGF representing funds that did not benefit VBF, but instead that benefitted Defendants personally.

**Wulf Lake House Scheme**

21.      Wulf owns, or owned at relevant times, a vacation home on a lake in Texas ("Wulf Lake House").  The Wulf Lake House was destroyed by a fire in early 2015.

22.      Wulf rebuilt the Wulf Lake House from in or around May 2015 through in or around July 2017.

4

APP0006

23.     VBF employee Tracy Arbanas ("Arbanas") oversaw the reconstruction of the Wulf Lake House, and VBF paid her to do so at an annual cost to VBF of approximately $97,500, which represented Arbanas' compensation and benefits.  Further, VBF funded housing for Arbanas close to the lake house, and refreshments for the construction crew on this project.  All told, VBF incurred approximately $107,490.51 for compensation and benefits to Arbanas.

**Sedun Stock Scheme**

24.     Gregg Sedun ("Sedun"), upon information and belief, has had social and/or business relationships with the Defendants outside of VBF, and preexisting VBF's incorporation.

25.     On December 11, 2015, Sedun loaned $200,000 to VBF, and Sedun loaned another $50,000 to VBF through an entity owned and controlled by Sedun, Alcaron Capital Corp. ("Alcaron") on June 23, 2016.

26.     On July 12, 2016, VBF paid Alcaron $326,056, representing about $76,000 in interest on $250,000 in loans made only months before the repayment.  That same day, July 12, 2016, Wulf authorized VBF to issue 1,500,000 shares of VBF to Alcaron, purportedly for Sedun's procurement of other investment in VBF, with Alcaron paying nothing for this stock (again, the stock was valued at $0.90/share at the time, rendering this allotment of stock to be worth about $1,350,000 at the time.)  Two days later, on July 14, 2016, Sedun loaned Wulf $225,000 for the Wulf Lake House and Wulf promoted Sedun to be a VBF director.

**Compensation Scheme**

27.     The five Defendants set their own compensation from VBF at $400,000 annually for each Defendant besides Driver, who made $325,000 annually, for a total for all five Defendants of $1,925,000 per year.  For the sake of reference, there is now one person that has replaced

5

APP0007

Defendants as VBF's President, and VBF pays him $250,000 per year.  Therefore, Defendants were overpaying themselves at least, and approximately, $1,675,000 per year.

28.     Additionally, at Defendants' direction, and for no good reason, VBF paid the five Defendants twice their monthly compensation in July 2016.

**Christine Gagne Scheme**

29.     Christine Gagne ("Gagne") is Wulf's daughter. Gagne is a Canadian citizen without any legal immigration status to work in the United States.  VBF, at Wulf's direction, purportedly employed Gagne or contracted with her for alleged services. Gagne would often drive from Canada allegedly to work at VBF in Webster City, Iowa.

30.     VBF, at Wulf's direction, paid Gagne not under her real name, but under the name "Ronnie O'Brien" to conceal VBF's payments to her.

31.     Gagne abruptly left VBF in November 2017, when VBF terminated Wulf's employment and other statuses with VBF.  At that time, Gagne said the following words to those present at VBF's Webster City, Iowa facility at the time, in recognition of the misconduct represented by her relationship with VBF as fostered by some or all Defendants: "None of you have ever seen me and you do not know who I am."

32.     VBF incurred approximately $52,264.28 for compensation and benefits to Gagne. Further, this and other schemes demonstrate the general manner with which the Defendants played "fast and loose" with applicable laws and regulations.

**Tractor-Trailer Scheme**

33.     VBF has sold live fish to its customers at all relevant times, from its Webster City, Iowa facility.  Per industry standard, it is the customer's obligation to arrange for the pick-up and

6

APP0008

transport of the live fish from the facility, not VBF's.  Therefore, VBF generally does not need any tractor-trailers.

34.     Regardless, in or around July and August 2016, some or all Defendants orchestrated VBF's purchase of six (6) tractor-trailers at a total cost to VBF of approximately $375,237.77. These tractor-trailers sat dormant at VBF's Webster City, Iowa facilities.  Ultimately, after Defendants were terminated by VBF, VBF sold one tractor-trailer.  VBF is attempting to use two of the tractor-trailers, and the other three have sat dormant at VBF's facilities, despite VBF's attempts to sell them.

35.     At a minimum, this large purchase with VBF funds demonstrates the general recklessness with which Defendants handled VBF's money.

### OFA Scheme

36.     Defendants incorporated Opposing Flows Aquaculture, Inc. ("OFA") on July 31, 2014 in anticipation of VBF's operations.  VBF grows its fish in tanks that are housed at the Farm ("Tanks").

37.     The Defendants formed OFA to buy Tanks from a third-party, and then to resell Tanks to VBF at a profit to OFA and the Defendants ("OFA Scheme").

38.     Of course, it was more beneficial to VBF not to pay OFA a profit as an unnecessary "middleman."  Instead, VBF could buy directly from the third party without paying any amount to OFA, which VBF ultimately has done.  Upon information and belief, VBF did not engage in any transactions with OFA, but, through its count for an equitable accounting, VBF seeks a full accounting of OFA from Defendants.

7

**Other Misappropriations Of VBF Funds For Personal Use**

39.   Defendants engaged in a variety of other schemes through which they orchestrated VBF's expenditure of its funds or other assets for Defendants' personal benefit, not VBF's, including, but not limited to, the following:

a.   travel and other expenses relating to a July 2014 trip by some or all Defendants to Denver, Colorado in relation to a non-VBF business known as ChipMeds, Inc.;

b.   Wulf's personal cell phone bills well beyond a reasonable amount, or even the amount expensed by the other Defendants;

c.   James Rea's personal living expenses in Ames, Iowa, about forty miles from Webster City, Iowa in or around August 2017;

d.   exorbitant travel expenses for the Defendants to travel to or from Canada or Texas to Webster City, Iowa;

e.   the unnecessary leasing of twenty-two company vehicles, including Ford Explorers for Defendants' personal use;

f.   payment of personal travel expenses for Defendants and some or all of Defendants' friends and family, including trips to Australia and Norway;

g.   directing VBF's controller to perform accounting services for the Defendants' non-VBF business ventures while on VBF company time and while he was being paid by VBF;

h.   $310,000 for the purchase of a house in Webster City, Iowa, when the house was worth $240,000, if not less, and the home was not necessary for legitimate business reasons given Defendants' maintenance of their residence in Texas or Canada.  Indeed, VBF, through Hall and possibly other Defendants, purchased this home on August 9, 2016 for $310,000 and VBF sold this home on May 25, 2018 for $232,000. True and correct copies of the relevant closing statements are attached as Exhibit B; and,

i.   other improper expenditures of VBF funds for some or all of Defendants' personal expenses.

8

APP0010

**Other Mismanagement Of VBF**

40.     Defendants' misappropriations of VBF funds and assets are alleged above.

41.     Further, Defendants violated their fiduciary duty of due care by mismanaging VBF, including, but not limited to, overbuilding its facilities, presenting highly flawed and intentionally manipulated business plans, mismanaging technology, mismanaging capital expenditures (CapEx), mismanaging other financial and operational issues, purchasing unnecessary real and personal property, overpaying for real and personal property, and otherwise, in a period of three years, squandering what had been an investment of approximately $100,000,000 in debt and equity in VBF.  Just one example is VBF's purchase, at the direction of some or all Defendants, of a building and underlying property unnecessary to VBF's business and located in Webster City for $400,000 on July 28, 2016, which VBF sold for $135,000 on April 13, 2018.  True and correct copies of the relevant closing statements are attached as Exhibit C.

42.     Consequently, due to Defendants' mismanagement and waste of corporate assets, above and beyond their misappropriations alleged above, the value of VBF has plummeted from about $0.90 per share to a dramatically lower value.

## COUNT I-BREACH OF FIDUCIARY DUTY-ALL DEFENDANTS

43.     VBF adopts and reincorporates paragraphs 1 through 42.

44.     Defendants owed fiduciary duties to VBF from in or around October 1, 2014, when they came to control VBF, through and including January 2018, when the last of the Defendants was terminated as an employee, contractor, officer, and/or director of VBF.

45.     Defendants' fiduciary duties to VBF included, but were not limited to, those of obedience, loyalty, honesty, good faith, and due care.

46.     Defendants breached their fiduciary duties to VBF in one ore more of the following ways:

    a.    by misappropriating VBF funds for Defendants' personal benefit;

    b.    by misappropriating other VBF assets for Defendants' personal benefit;

    c.    by self-dealing and by concealing their self-dealing from VBF;

    d.    by mismanagement and other waste of corporate assets that led to a dramatic devaluation of VBF to be determined at trial; and

    e.    by otherwise breaching their fiduciary duties to VBF, including but not limited through misconduct that led to a devaluation of VBF.

47.     VBF suffered injuries as a direct and proximate result of Defendants' breaches of fiduciary duty, and Defendants gained a personal benefit from such breaches. VBF's compensatory damages are millions of dollars for Defendants' misappropriations, and are an additional millions of dollars for Defendants' mismanagement and other waste of VBF corporate assets, thereby devaluing VBF.

48.     Further, Defendants' breaches of fiduciary duty were willful and egregious, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial. Additionally, Defendants' self-dealing transactions with VBF are presumed invalid, and the burden of proof lays with Defendants to prove the fairness of such transactions by clear and convincing evidence. Also, Defendants Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

WHEREFORE, Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

## COUNT II-FRAUDULENT CONCEALMENT-ALL DEFENDANTS

49.     VBF adopts and reincorporates paragraphs 1 through 48.

50.     Defendants concealed material facts from VBF, including, but not limited to, the following, as alleged *supra*:

    a.      the BAJJER stock scheme;

    b.      the American Growth Funding Loan scheme;

    c.      the Wulf Lake House scheme;

    d.      the Sedun stock scheme;

    e.      the compensation scheme;

    f.      the Gagne scheme;

    g.      the tractor-trailer scheme;

    h.      the OFA Scheme;

    i.      Defendants' other misappropriations of VBF funds or other assets for personal use;

    j.      Defendants' devaluation of VBF's stock through their misconduct and other breaches of their duties of due care; and,

    k.      other material facts that would have revealed the existence of Defendants' misconduct.

11

APP0013

51.     Defendants, as fiduciaries to VBF, owed VBF a duty to disclose these material facts to VBF.

52.     Defendants knew that VBF lacked knowledge of these concealed material facts until after Defendants were ousted from their positions at VBF by January 2018.  Alternatively, Defendants intended to induce VBF and its shareholders to refrain from attempting to halt Defendants' misconduct, mismanagement, and corporate waste by concealing these material facts from VBF.

53.     Defendants knowingly failed to disclose these material facts to VBF, also knowing full well that VBF would not approve of Defendants' blatant misconduct.

54.     VBF justifiably relied on Defendants' failure to disclose these material facts given Defendants' status as fiduciaries to VBF and its shareholders.  Further, VBF did not have opportunities equal to Defendants to discover Defendants' misconduct until after Defendants were ousted from their positions at VBF.

55.     VBF suffered injuries as a direct and proximate result of Defendants' fraudulent concealment.  VBF's compensatory damages are millions of dollars for Defendants' misappropriations, in addition to millions of dollars representing the devaluation of VBF caused by Defendants' mismanagement and other corporate waste.

56.     Further, Defendants' fraudulent concealment was willful and egregious, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial.  Also, Defendants Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

APP0014

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

### COUNT III-FRAUDULENT MISREPRESENTATION-ALL DEFENDANTS

57.     VBF adopts and reincorporates paragraphs 1 through 56.

58.     Pleading in the alternative, Defendants' silence in the face of their duties to disclose their misconduct alleged herein to VBF and its shareholders, constitutes fraudulent misrepresentation of the material facts alleged in Count II.

59.     Defendants knew that their failures to disclose these material facts, and therefore what are deemed to be misrepresentations in light of Defendants' duties of disclosure to VBF and its shareholders, were false or alternatively in reckless disregard of the truth.

60.     Defendants intended to deceive VBF and its shareholders and to induce them to refrain from attempting to halt Defendants' misconduct by misrepresenting material facts to VBF.

61.     VBF and its shareholders justifiably and detrimentally relied on Defendants' misrepresentations given Defendants' status as fiduciaries to VBF and its shareholders.

62.     VBF suffered injuries as a direct and proximate result of Defendants' fraudulent misrepresentation.  VBF's compensatory damages are millions of dollars for Defendants'

APP0015

misappropriations, in addition to millions of dollars representing the devaluation of VBF caused by Defendants' mismanagement and other corporate waste.

63.     Further, Defendants' fraudulent misrepresentation was willful and egregious, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial.

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial,  as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

## <u>COUNT IV-CONSTRUCTIVE FRAUD-ALL DEFENDANTS</u>

64.     VBF adopts and reincorporates paragraphs 1 through 63.

65.     Defendants' misconduct, committed while they were fiduciaries to VBF, constitutes constructive fraud regardless of Defendants' intent.

66.     VBF suffered injuries as a direct and proximate result of Defendants' constructive fraud.  VBF's compensatory damages are millions of dollars for Defendants' misappropriations, in addition to millions of dollars representing the devaluation of VBF caused by Defendants' mismanagement and other corporate waste.

67.     Further, Defendants' fraudulent concealment was willful and egregious, or at least wanton, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial.

APP0016

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

## <u>COUNT V-CIVIL CONSPIRACY-ALL DEFENDANTS</u>

68.     VBF adopts and reincorporates paragraphs 1 through 67.

69.     From the outset of their misconduct alleged herein, Defendants had a meeting of the minds and agreed to engage in the breaches of fiduciary duties and fraud alleged herein, for their personal benefit, to cause harm to VBF, while concealing the same from VBF and its shareholders (the "<u>Conspiracy</u>").

70.     Defendants' aim, through the Conspiracy, was to accomplish the unlawful objective of personally benefiting Defendants at the expense of VBF, while concealing the same from VBF, and/or making fraudulent misrepresentations to VBF and its shareholders in the face of Defendants' duties of disclosure.

71.     Through the Conspiracy, the Defendants facilitated and accomplished their breaches of fiduciary duty, fraudulent concealment, constructive fraud, and fraudulent misrepresentation.

72.     VBF suffered injuries as a direct and proximate result of Defendants' Conspiracy. VBF's compensatory damages are millions of dollars for Defendants' misappropriations, in

addition to millions of dollars representing the devaluation of VBF caused by Defendants' mismanagement and other corporate waste.

73.     Further, Defendants' misconduct was willful and egregious, or at least wanton, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial.

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

## COUNT VI-AIDING AND ABETTING-ALL DEFENDANTS

74.     VBF adopts and reincorporates paragraphs 1 through 73.

75.     From the outset of their misconduct alleged herein, Defendants knowingly and substantially assisted each other in their breaches of fiduciary duties alleged herein, for their personal benefit, while concealing the same from VBF and its shareholders.

76.     VBF suffered injuries as a direct and proximate result of Defendants' aiding and abetting.  VBF's compensatory damages are millions of dollars for Defendants' misappropriations, in addition to millions of dollars representing the devaluation of VBF caused by Defendants' mismanagement and other corporate waste.

APP0018

77.     Further, Defendants' misconduct was willful and egregious, or at least wanton, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial.

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial,  as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

### COUNT VII-UNJUST ENRICHMENT-ALL DEFENDANTS

78.      Plaintiffs adopt and reincorporate paragraphs 1 through 77.

79.     VBF has conferred millions of dollars' worth of benefit upon Defendants for which Defendants have not compensated VBF.  It would be unjust and contrary to principles of equity and good conscience to allow Defendants to retain this benefit conferred upon them by VBF without just consideration as Defendants have been unjustly enriched at VBF's expense.

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, plus costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

### COUNT VIII-EQUITABLE ACCOUNTING-ALL DEFENDANTS

80.     Plaintiffs adopt and reincorporate paragraphs 1 through 79.

APP0019

81.    As a result of Defendants' fiduciary duties to account to VBF, breaches of fiduciary duties, fraud, and unjust enrichment, as well as the existence of complex mutual accounts and the need for discovery, VBF is entitled to an order requiring Defendants to account for every dollar deposited, received, or otherwise transferred to or from VBF or any of its affiliates and Defendants from on or before October 1, 2014 through January 2018, and entering a judgment against Defendants as to any amounts for which Defendants cannot account, or which are shown by the accounting to have been misappropriated by Defendants.

82.    Pleading in the alternative, money damages are inadequate to VBF because VBF cannot fully learn the extent of Defendants' misconduct, of which Defendants' have superior knowledge, without an accounting.

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, requiring Defendants to produce an equitable accounting detailing every dollar deposited, received, or otherwise transferred to or from VBF or any of its affiliates and Defendants from on or before October 1, 2014 through January 31, 2018, and entering a judgment against Defendants as to any amounts for which Defendants cannot account, or which are shown by the accounting to have been misappropriated by Defendants, plus costs, allowable pre-judgment interest, and other relief deemed just.

## COUNT IX-DECLARATORY JUDGMENT-ALL DEFENDANTS

83.    Plaintiffs adopt and reincorporate paragraphs 1 through 82.

84.    VBF disputes the validity of any and all transactions wherein Defendants personally benefitted, or which were otherwise improper, including the funds and other assets

APP0020

that were misappropriated, and the stock that was transferred to Sedun and BAJJER for grossly inadequate consideration.

85.     Pursuant to 22 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and Defendants on the other hand, as to such transactions, wherein VBF asserts that all such transactions should be declared null and void *ab initio*, whereas Defendants presumably seek to uphold these transactions.

WHEREFORE, VeroBlue Farms USA, Inc., respectfully requests that this Court enter a declaratory judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, plus costs, allowable pre-judgment interest, and other relief deemed just.

Dated: August 15, 2018

**JURY TRIAL DEMANDED**

/s/ Matthew E. Laughlin_____
Matthew E. Laughlin  AT0004515
Holly M. Logan  AT0004710
Katelynn T. McCollough  AT0013443
DAVIS, BROWN, KOEHN, SHORS
  & ROBERTS, P.C.
215 10th Street, Suite 1300
Des Moines, IA 50309
Telephone: 515-288-2500
Email:  MattLaughlin@davisbrownlaw.com
            HollyLogan@davisbrownlaw.com
            KatelynnMccollough@davisbrownlaw.com

ATTORNEYS FOR PLAINTIFF

APP0021

EXHIBIT

A

TO:        VEROBLUE FARMS INC.

and to the directors thereof

The undersigned hereby subscribes for and agrees to take up 1,250,000 common shares in the capital of VeroBlue Farms Inc. and tenders herewith the sum of $1.25 in full payment of the subscription price for such shares.

The undersigned hereby requests that the said shares be allotted to the undersigned or to such persons as the undersigned may in writing direct, that such shares be issued as fully paid and non-assessable and that a certificate or certificates representing such shares be issued in the name of the undersigned or as the undersigned may, in writing, direct.

DATED as of the 18th day of September, 2014.

**BAJJER, LLC**

Per: _____

Authorized Signing Officer

I have authority to bind the corporation

EXHIBIT

3

TO:        VEROBLUE FARMS INC.
(the "**Corporation**")

and to the directors thereof.

The undersigned, the Chief Executive Officer of the Corporation, hereby certifies that the Corporation has duly received from Bajjer, LLC (the "**Shareholder**") the sum of $1.25 pursuant to a subscription of shares dated as of the date hereof, which $1.25 is the consideration for the issuance by the Corporation of 1,250,000 common shares in the capital of the Corporation to the Shareholder as contemplated in a resolution passed by the board of directors of the Corporation today.

DATED as of the 18th day of September, 2014.

_____

Leslie Wulf

APP0023



EXHIBIT

B

exhibitsticker.com



711 Second St
Webster City, IA
50595
PH 515-832-3364
Fax 515-832-3374

**Buyers Closing Statement**

706 1st Ave North
Fort Dodge, IA
50501
PH 515-576- 2012
Fax 515-576-1223

1507 Willson Ave Webster City

8/9/2016

|  | | Credits | Debits |
|---|---|---|---|
|  | | | (buyer owes) |
| Purchase Price | | $0.00 | $300,000.00 |
| Tax: | Annual Taxes $3604 Paid in full | | |
| Tax Prorate | July 1 2015 to August 9th 2016 Credit to buyer | $3,998.96 | $0.00 |
| Earnest Money | | $2,000.00 | |
| Revenue Stamps | Credit to Buyer | $479.20 | $0.00 |
| Recording Fee | Paid out of closing | $0.00 | $0.00 |
| Legal Fees | Paid out of closing | | |
| Interest Adjustment | | | |
| Moving Allowance | | $0.00 | $10,000.00 |
| Inspections | | | $0.00 |
| Appraisal Fee | | | |

| | |
|---|---|
| Total Debits: | $310,000.00 |
| Total Credits: | $6,478.16 |
| Due from Buyer: | $303,521.84 |

Amount due from Buyer to be wired to Neighborhood Realty on behalf of the seller.......
**Buyer responsible for taxes due September 1 2016 and all subsequent taxes.**

SELLERS

Scot and April Ely

BUYERS

Veroblue Farms USA inc.

See attached signature page

x ~~Bru Hall~~

BRUCE A. HALL, CFO

APP0024

<u>**Closing Statement Signature Page Addendum**</u>
Scot and April Ely Sale to Iowa's First, Inc.
1507 Willson Avenue, Webster City, IA

**PURCHASER:**

IOWA'S FIRST, <u>INC</u>., an Iowa corporation

By: _____

Name: _BRUCE A. HALL, AS CFO_

Title: _CHIEF FINANCIAL OFFICER_

APP0025

# Closing Disclosure

## Closing Information

**Date Issued**
**Closing Date** 5-25-18
**Disbursement Date** 5-25-18
**Settlement Agent** Ryan J. Mahoney
**File #** 4112.000
**Property** 1507 Willson Ave.
Webster City, IA 50595
**Sale Price** 232,000

## Transaction Information

**Borrower** Joella M. Grossoehme
10603 Hinterland Dr.
Fishers, IN 46038
**Seller** Iowa's First, Inc.
401 Des Moines St.
Webster City, IA 50595

## Summaries of Transactions

**SELLER'S TRANSACTION**

| M. Due to Seller at Closing | | | **$232,000.00** |
|---|---|---|---|
| 01 Sale Price of Property | | | $232,000.00 |
| 02 Sale Price of Any Personal Property Included in Sale | | | |
| 03 | | | |
| 04 | | | |
| 05 | | | |
| 06 | | | |
| 07 | | | |
| 08 | | | |
| **Adjustments for Items Paid by Seller in Advance** | | | |
| 09 City/Town Taxes | to | | $ 0.00 |
| 10 County Taxes | to | | $ 0.00 |
| 11 Assessments | to | | $ 0.00 |
| 12 | to | | $ 0.00 |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| **N. Due from Seller at Closing** | | | **$189,185.31** |
| 01 Excess Deposit | | | |
| 02 Closing Costs Paid at Closing (J) | | | $15,019.90 |
| 03 Existing Loan(s) Assumed or Taken Subject to | | | |
| 04 Payoff of First Mortgage Loan to First State Bank | | | 165,152.79 |
| 05 Payoff of Second Mortgage Loan to Broadmoor Financial | | | 4,757.19 |
| 06 Mortgage Payoff fee to USPS | | | 24.70 |
| 07 Recording Fee for Release | | | 10.00 |
| 08 Seller Credit | | | $ 0.00 |
| 09 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| **Adjustments for Items Unpaid by Seller** | | | |
| 14 City/Town Taxes | to | | $ 0.00 |
| 15 County Taxes | 7-1-17 to | 5-25-18 | 4220.73 |
| 16 Assessments | to | | $ 0.00 |
| 17 | to | | $ 0.00 |
| 18 | | | |
| 19 | | | |
| **CALCULATION** | | | |
| Total Due to Seller at Closing (M) | | | $232,000.00 |
| Total Due from Seller at Closing (N) | | | ($189,185.31) |
| Cash ☐ From ☒ To Seller | | | **$42,814.69** |

## Contact Information

| REAL ESTATE BROKER (B) | |
|---|---|
| Name | **Abens Realty** |
| Address | **1988 Superior St.** |
| | **Webster City, IA 50595** |
| __License ID | **F05703000** |
| Contact | **Tyler Abens** |
| Contact __License ID | **B43670000** |
| Email | |
| Phone | **515-297-0755** |
| REAL ESTATE BROKER (S) | |
| Name | **Neighborhood Realty** |
| Address | **711 2nd St.** |
| | **Webster City, IA 50595** |
| __License ID | **T05081000** |
| Contact | **Stacy Wearda** |
| Contact __License ID | **B44605000** |
| Email | |
| Phone | |
| SETTLEMENT AGENT | |
| Name | **Ryan J. Mahoney** |
| Address | **615 Story St.** |
| | **Boone, IA 50036** |
| __License ID | **ITG3731** |
| Contact | **Ryan J. Mahoney** |
| Contact __License ID | **AT4948** |
| Email | **ryan@jordanmahoney.com** |
| Phone | **515-432-4510** |



**Questions?** If you have questions about the loan terms or costs on this form, use the contact information below. To get more information or make a complaint, contact the Consumer Financial Protection Bureau at
**www.consumerfinance.gov/mortgage-closing**

APP 0026

## Closing Cost Details

| Loan Costs | | Seller-Paid | |
|---|---|---|---|
| | | At Closing | Before Closing |
| **A. Origination Charges** | | | |
| 01 | .147% of Loan Amount (Points) | | |
| 02 | Processing fee | | |
| 03 | | | |
| 04 | | | |
| 05 | | | |
| 06 | | | |
| 07 | | | |
| 08 | | | |
| **B. Services Borrower Did Not Shop For** | | | |
| 01 | Appraisal Fee | | |
| 02 | Credit Report Fee | | |
| 03 | Flood Certification fee | | |
| 04 | UP front MIP | | |
| 05 | | | |
| 06 | | | |
| 07 | | | |
| 08 | | | |
| 09 | | | |
| 10 | | | |
| **C. Services Borrower Did Shop For** | | | |
| 01 | Abstracting to Hamilton County Abstracting Services | 320.00 | |
| 02 | Courier Fees to USPS | | |
| 03 | Lender's insurance to Iowa Title Guaranty | | |
| 04 | Settlement fee to Jordan & Mahoney Law Firm, P.C. | | |
| 05 | Title Examination to Jordan & Mahoney Law Firm, P.C. | | |
| 06 | | | |
| 07 | | | |
| 08 | | | |

| Other Costs | | | |
|---|---|---|---|
| **E. Taxes and Other Government Fees** | | | |
| 01 | Recording Fees          Deed:  17.00          Mortgage:  82.00 | | |
| 02 | Transfer Tax      to: Hamilton County Recorder | 370.40 | |
| **F. Prepaids** | | | |
| 01 | Homeowner's Insurance Premium (  mo.) to: | | |
| 02 | Mortgage Insurance Premium (  mo.) to: | | |
| 03 | Prepaid Interest                     per day from              to | | |
| 04 | Property Taxes (  mo.) to: | | |
| 05 | | | |
| **G. Initial Escrow Payment at Closing** | | | |
| 01 | Homeowner's Insurance                     per month for              mo. | | |
| 02 | Mortgage Insurance                     per month for              mo. | | |
| 03 | Property Taxes                     per month for              mo. | | |
| 04 | | per month for              mo. | | |
| 05 | | per month for              mo. | | |
| 06 | | per month for              mo. | | |
| 07 | | | |
| 08 | Aggregate Adjustment | | |
| **H. Other** | | | |
| 01 | Real Estate Commission          6960.00  to:  Neighborhood Realty | $6,960.00 | |
| 02 | Real Estate Commission          6960.00  to:  Abens Realty | $6,960.00 | |
| 03 | | | |
| 04 | Deed Prep to Malloy Law Firm, LLP | 409.50 | |
| 05 | Attorney Fees for POA preparation | | |
| 06 | Recording Fees for Power of Attorney to Hamilton Co. Recorder | | |
| 07 | | | |
| 08 | | | |
| 09 | | | |
| 10 | | | |
| 11 | | | |

| J. TOTAL CLOSING CLOSTS | $15,019.90 | $  0.00 |
|---|---|---|

Case 3:18-cv-03047-CJW   Document 9-2   Filed 08/15/18   Page 4 of 5

APP0027

**CERTIFICATION**

I have carefully reviewed this Closing Disclosure and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the Closing Disclosure form.

_____ Seller
            Iowa's First, Inc.

To the best of my knowledge the Closing Disclosure which I have prepared is true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____ Settlement Agent   _____ Date
            Ryan J. Mahoney

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

APP0028Forms.com

EXHIBIT

C

exhibitsticker.com



**NEIGHBORHOOD** R E A L T Y

711 Second St
Webster City, IA
50595
PH 515-832-3364
Fax 515-832-3374

706 1st Ave North
Fort Dodge, IA
50501
PH 515-576- 2012
Fax 515-576-1223

## Buyers Closing Statement

207 Commerce Drive Webster City

7/28/2016

| | | **Credits** | **Debits** (buyer owes) |
|---|---|---|---|
| **Purchase Price** | Land $120,000. Improvements $209,800. Goodwill $70,200. | $0.00 | $400,000.00 |
| **Tax:** | Annual Taxes $9752 Paid in full | | |
| **Tax Prorate** | July 1 2015 to July 28th 2016 Credit to buyer | $10,500.09 | $0.00 |
| **Earnest Money** | | $0.00 | |
| **Revenue Stamps** | Credit to buyer | $639.20 | $0.00 |
| **Recording Fee** | Paid out of closing | | $0.00 |
| **Real Estate Taxes - Special** | | | |
| **Interest Adjustment** | | | |
| **Rebate to Buyers** | | $0.00 | $0.00 |
| **Inspections** | | | $0.00 |
| **Appraisal Fee** | | | |

| | |
|---|---|
| Total Debits: | $400,000.00 |
| Total Credits: | $11,139.29 |
| Due from Buyer: | $388,860.71 |

**Amount due from Buyer to be wired to Neighborhood Realty on behalf of the seller.......**
**Buyer responsible for taxes due September 1 2016 and all subsequent taxes.**

SELLERS

Larry Hinderks Estate

BUYERS

Iowa's First Inc

See attached signature page

BRUCE A HALL, AS CFO

## CLOSING STATEMENT

| | |
|---|---|
| **SELLER:** | **Iowa's First, Inc.** |
| **BUYER:** | **John A. Ruppel** |
| **LEGAL DESCRIPTION:** | **Auditor's Parcel Letter "A of Lot 1", Southeast Development Park #4 in Webster City, Iowa, per Survey Cabinet Slide 118A, page 10 filed on September 9, 2009.** |
| **CLOSING DATE:** | **April 13, 2018** |

---

| | | |
|---|---|---|
| Purchase Price | $ | 135,000.00 |
| Less earnest money (held in Davis Brown Law Firm Trust Account) | - | 10,000.00 |
| Less prorated real estate taxes covering period 07/01/17 through 04/12/18 ($8,550 [full year] x 286 days ÷ 365 days) | - | 6,699.45 |
| Plus deed recording | + | 15.00 |
| Balance due at closing (payable to and held in Johnson Law Firm Trust Account) | $ | 118,315.55 |

| | | |
|---|---|---|
| ***Total amount held in Johnson Law Firm Trust Account*** | ***$*** | ***118,315.55*** |

Less expenses:

| | | |
|---|---|---|
| • Johnson Law Firm (e-record) – revenue stamps | - | 215.20 |
| • Johnson Law Firm (e-record) – deed recording fee | - | 15.00 |
| • Johnson Law Firm (e-record) – partial mortgage release recording fee | - | 15.00 |
| • Hamilton County Abstracting Services, Inc. – abstracting | - | P.O.C. |
| • Davis Brown Law Firm – Seller's legal fees | - | P.O.C. |
| Net proceeds to Davis Brown Law Firm Trust Account | $ | 118,070.35 |

Note:  Johnson Law Firm to prepare 1099.

**Agreed to:**

      **"SELLER"**                           **"BUYER"**

**Iowa's First, Inc.**

**By**_____      _____

                                                   **John A. Ruppel**

APP0030

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| **VEROBLUE FARMS USA, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 18-CV-3047** |
| **LESLIE A. WULF, BRUCE A. HALL,** | § | |
| **JAMES REA, JOHN E. REA, and KEITH** | § | |
| **DRIVER** | § | |
| | § | |
| **Defendants.** | | |

### DECLARATION OF DEFENDANT KEITH DRIVER IN SUPPORT OF 12(b)(6) MOTION TO DISMISS AND MOTION TO TRANSFER VENUE

Pursuant to 28 U.S.C. § 1746, I, Keith Driver, hereby state and declare as follows:

1.      "My name is Keith Driver.  I am over eighteen (18) years of age and have never been convicted of a felony.  I have personal knowledge of the facts set forth herein, and am otherwise competent to testify to the facts stated in this Declaration.  I have personal knowledge of the facts set forth below and could and would testify competently to them if called upon to do so.

2.      I performed services for VeroBlue Farms USA, Inc. ("VeroBlue") as a designated representative of Seven Hours Holding Company, Inc., an independent contractor of VeroBlue's.  On July 1, 2016, VeroBlue and I entered into an Employment Agreement, which terminated my role as an independent contractor and put me into the position of Chief Operating Officer of VeroBlue. A true and correct copy of the Employment Agreement is attached hereto as **Exhibit 1**.  The primary focus of this position was the day-to-day operations of the production facilities for the company.

3.      On January 13, 2017, VeroBlue and Driver entered into a Business Relationship Restructuring Agreement (the "Release Agreement"), which terminated Driver's Employment Agreement with Plaintiff and re-established his consulting relationship with the company. A true and correct copy of the Release Agreement is attached hereto as **Exhibit 2**. My sole duties during this period were to answer any questions relating to events during my period as an employee. I was only an employee of VeroBlue for six months.

4.      After January 13, 2017, I had no involvement with the management decisions of VeroBlue.

5.      As of January 13, 2017 and for years prior to that, VeroBlue's principal place of business was in Plano, Texas.

6.       Leslie Wulf, Bruce Hall, James Rea, and John Rea all reside in the Northern District of Texas.

7.      I declare under penalty of perjury under the laws of the United States of America and the State of Texas that the foregoing is true and correct."

EXECUTED on October___13th___, 2018, by

_____
**KEITH DRIVER**

# EMPLOYMENT AGREEMENT

This Employment Agreement (this "***Agreement***"), dated as of July 1, 2016 (the "***Effective Date***"), is by and between Keith Driver (the "***Employee***"), and VeroBlue Farms USA, Inc., a Nevada corporation (the "***Company***").  Employee and the Company are sometimes each referred to herein as a "***Party***" and collectively, as the "***Parties***".

## RECITALS

**WHEREAS**, Employee performed services for the Company as a designated representative of Seven Hours Holding Company, Inc., an independent contractor ("***Consultant***") under that certain Management Services Agreement (the "***MSA***") among the Company, Consultant and the Company's parent, VeroBlue Farms Inc., a corporation incorporated under the laws of the Province of Ontario, Canada ("***Parent Corporation***");

**WHEREAS**, the Parties desire to terminate the MSA pursuant to that certain Termination and Payoff Agreement of even date herewith and replace it with this Agreement whereby the Company desires to employ Employee on the terms and conditions set forth herein, and Employee desires to accept such employment terms;

**NOW, THEREFORE**, in consideration of the mutual covenants, promises and obligations set forth herein, the Parties agree as follows:

1.   <u>Employment</u>.

   (a)   <u>Title and Duties</u>.   The Company hereby employs Employee, and Employee hereby accepts such employment, to serve as Chief Operating Officer of the Company.  Subject to the provisions of this Agreement, the Company and Employee agree that Employee's employment constitutes "at-will" employment. Employee's duties, responsibilities and authority shall be consistent with Employee's position and title at the Company and shall include such other duties, responsibilities and authority as may be assigned to Employee by the Board of Directors of the Company (the "***Board***").  Employee shall report to the Chief Executive Officer of the Company.

   (b)   <u>Services and Exclusivity of Services</u>.  Employee shall devote Employee's full business time and shall use Employee's best efforts, energy and ability exclusively toward advancing the business, affairs and interests of the Company, and matters related thereto. Employee will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Board. Except as prohibited by <u>Section 4</u>, nothing in this Agreement shall preclude Employee from serving or participating on a board of or in trade organizations, charitable, community, school or religious activities or participating in other business endeavors, so long as such activities do not interfere with his duties and responsibilities hereunder or conflict with the interests of the Company.

   (c)   <u>Location of Office</u>.  The Company shall make available to Employee an office and support services in Dallas, Texas, or at another location pursuant to the

1

4133982.8

recommendation of the Chief Executive Officer and the Board. Employee's main office shall be at such location; provided, however, that Employee will travel from time to time as business needs arise.

2.    Term. The term of this Agreement shall commence on the Effective Date and shall continue indefinitely until terminated pursuant to Section 5 below (the "**Term**").

3.    Compensation.

(a)    Base Salary. During the Term, the Company will pay to Employee a base salary at the rate of $325,000 per year, payable in accordance with the Company's practices in effect from time to time ("**Base Salary**"). Amounts payable shall be reduced by standard withholdings and other authorized deductions. Such Base Salary shall be reviewed during the Term for adjustment in the sole discretion of the Board, or such individual, group or committee that the Board may select as its delegate, not less frequently than annually during the Term; provided that no decrease may be made to Base Salary unless a corresponding percentage decrease in base salary is being made to all similarly situated employees of the Company. In conducting any such review, the Board or such delegate shall consider and take into account, among other things, any change in Employee's responsibilities, performance of Employee, the compensation of other similarly situated employees of comparable companies and other pertinent factors.

(b)    Car Allowance. Employer will pay Employee a car allowance of $1,500 per calendar month, payable on the first day of each month.

(c)    Bonuses, Savings and Retirement Plans; Benefit Plans. Employee shall be entitled to participate in all annual and long-term bonuses, savings and retirement plans generally available to other similarly situated employees of the Company. The decision to provide any bonus and the amount and terms of any bonus shall be in the sole and absolute discretion of the Board. Employee, and Employee's family as the case may be, and to the extent Employee and such family member are eligible, may participate in and receive all benefits under health benefit plans, practices, programs and policies provided to employees of the Company. The Company reserves the right to modify, suspend or discontinue any and all of its benefits referred to in this Section 3(b) at any time in its sole discretion without recourse by Employee so long as such action is taken generally with respect to other employees and does not single out Employee.

(d)    Reimbursement of Expenses. The Company shall promptly reimburse Employee for any reasonable and necessary out-of-pocket expenses incurred by him in connection with the performance of Employee's duties hereunder, provided that Employee furnishes to the Company in a timely manner appropriate documentation in accordance with the Company's expense reimbursement policies and procedures and such other reasonable documentation and accounting as the Company, from time to time, may reasonably request.

(e)    Vacation. Employee shall provide services for 48 out of every 52 week period during the Term (e.g., the equivalent of four (4) weeks of paid vacation).

4.    Representations; Confidential Information; Non-Competition; Non-Solicitation.

(a)    Representations. In order to induce the Company to enter into this Agreement, Employee represents and warrants to the Company that neither the execution nor the performance of this Agreement by Employee will violate or conflict in any way with any other agreement by which Employee may be bound, or with any other duties imposed upon Employee by corporate or other statutory or common law.

(b)    Confidentiality. Employee acknowledges that during his employment and as a result of his past, present and future relationship with the Company, Employee has obtained and will obtain knowledge of, and has been given and will be given access to, information concerning the Company and Parent Corporation and their respective affiliates, including, but not limited to, information regarding the business, operations, services, proposed services, business processes, business and marketing strategies, advertising, marketing and promotional plans and materials, pricing strategies and policies, financial information, stockholders and other trade secrets, confidential information and proprietary material of the Company, including information and material originated, discovered or developed in whole or in part by Employee (collectively referred to herein as "*Confidential Information*"). The term "*Confidential Information*" does not include any information which (i) at the time of disclosure is generally available to the public (other than as a result of a disclosure by Employee in breach of this Agreement), or (ii) was available to Employee on a non-confidential basis from a source (other than the Company or its representatives) that is not and was not prohibited from disclosing such information to Employee by a contractual, legal or fiduciary obligation. Employee agrees that during the Term and, to the fullest extent permitted by law, thereafter, Employee will, in a fiduciary capacity for the benefit of the Company, hold all Confidential Information strictly in confidence and will not directly or indirectly reveal, report, disclose, publish or transfer any of such Confidential Information to any person or entity, or utilize any of the Confidential Information for any purpose, except in furtherance of Employee's employment under this Agreement and except to the extent that Employee may be required by law to disclose any Confidential Information. Employee acknowledges that the Company is providing Employee additional Confidential Information that Employee was not given prior to execution of this Agreement, as further consideration to Employee for executing this Agreement, including the promises and covenants made by Employee in this Section 4.

(c)    Non-Competition and Non-Solicitation. In further consideration of the compensation to be paid to Employee hereunder, Employee acknowledges that during the course of his employment and prior service with the Company, he has, and will, become familiar with the trade secrets of the Company and with other Confidential Information concerning the Company and that his services have been and shall continue to be of special, unique and extraordinary value to the Company. Therefore, Employee agrees that, during Employee's employment hereunder and for one year after the date of termination of employment (the "*Restricted Period*"), he shall not directly or indirectly: (i) own any interest in, manage, control, participate in, consult with, render services for, be employed in an executive, managerial or administrative capacity by, or in any manner engage in, any Competing Business (as defined below); (ii) solicit, request or induce any employee, consultant or agent of the Company or Parent Corporation or any of their respective affiliates to terminate his or her employment or relationship with such company, nor hire any employee, or consultant of the Company or Parent

3

the Company, or any of its customers or suppliers; (ii) a breach of this Agreement by Employee and/or Employee's gross neglect of Employee's duties hereunder which is not cured to the Board's reasonable satisfaction within fifteen (15) days after notice thereof is given to Employee by the Board; and (iii) damage to or misappropriation or conversion of any funds or assets of the Company.

(iii) *"Non-Egregious Cause"* shall mean (i) engaging in conduct bringing the Company into public disgrace or disrepute or causing economic harm; (ii) material or repeated failure to perform Employee's duties as directed by the Board following notice of such breach and failure to cure such breach within fifteen (15) days of such notice; and (iii) Employee's failure to follow the Company's policies or applicable law in connection with the performance of Employee's duties, and such failure is not cured by Employee within fifteen (15) days following Employee's receipt of written notice from the Company specifying such failure.

(iv) *"Cause"* shall mean either Egregious Cause or Non-Egregious Cause.

(v) *"Voluntary Termination"* shall mean a termination of employment by Employee on Employee's own initiative other than (i) a termination due to death or Disability or (ii) a termination for Good Reason (as defined below).

(d) <u>Termination by the Company without Cause or by Employee for Good Reason</u>. The Company may terminate Employee's employment hereunder without Cause and Employee shall be permitted to terminate Employee's employment hereunder for Good Reason (as hereinafter defined) prior to the end of the Term. If the Company terminates Employee's employment hereunder without Cause, other than due to death or Disability, or if Employee effects a termination for Good Reason, Employee shall be entitled to receive the payments and benefits set forth in this <u>Section 5(d)</u>.

(i) So long as Employee has not breached any of the terms contained in <u>Section 4</u>, Employee shall be entitled to each of the following:

(A) Employee's Accrued Employment Entitlements;

(B) Except as otherwise modified pursuant to <u>Section 4(c)</u>, Employee's annual Base Salary in effect as of the date of such termination, payable in accordance with the Company's normal payroll practices for a period of one (1) year ("*Severance Term*") following such termination; and

(C) the actual bonus, if any, he would have received in respect of the fiscal year in which his termination occurs, prorated by a fraction, the numerator of which is the number of days in such fiscal year prior to the date of Employee's termination and the denominator of which is 365, payable at the same time as any such bonus payments are made to

7

Corporation or any of their respective affiliates, or (iii) solicit, request, or induce or attempt to solicit, request, or induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or Parent Corporation or any of their respective affiliates to cease doing business with, or modify its business relationship with the Company or Parent Corporation or any of their respective affiliates, or in any way interfere with or hinder the relationship between any such customer, supplier, licensee or business relation and the Company or Parent Corporation or any of their respective affiliates, as applicable; provided that with respect to this Section 4(c), the Company shall have the option, but not the obligation, in its sole discretion, to extend the Restricted Period from a period of one (1) year to a period of two (2) years from the date of Employee's termination by agreeing in writing within one (1) month of such termination to extend the Severance Term provided in Section 5(d)(i)(B) from (1) year to two (2) years from the date following termination. For purposes hereof, "**_Competing Business_**" means a business that competes with the Company or Parent Corporation, or any of their respective affiliates in any geographic territory in which the Company, Parent Corporation, or any such affiliate conducts, sells or markets its business or plans to conduct, sell or market its business. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of a corporation that is publicly traded, so long as Employee has no active participation in the business of such corporation.

(d)    Proprietary Interest.  All correspondence, communications (electronic or otherwise), data, reports, software, systems, databases, methodology, processes, programs, templates, procedures, know-how, inventions, discoveries, creations, designs, improvements, patents, copyrights, discoveries or ideas which Employee conceives, develops, or produces (whether before the Effective Date during his past services, as part of his employment obligations and/or duties, solely or jointly with others, or otherwise), which relate to the business of the Company (collectively, the "**_Work Product_**"), including trade secrets, data, methodology, processes, programs, templates, and information concerning proprietary technology developed for the business, or for any interests of the Company, shall belong solely and exclusively to the Company, together with any intellectual property rights associated with such Work Product (the "**_IP Rights_**"). Employee acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) during his prior services or within the scope of his employment with the Company and which are protectable by copyright laws are "works made for hire," pursuant to the United States Copyright Act (17 U.S.C., Section 101), and that such works made for hire shall constitute part of the IP Rights. Employee shall assist the Company or its designees to obtain, and from time to time enforce, United States and foreign IP Rights in any and all countries.  To that end, Employee shall execute, verify, and deliver such documents and perform such other acts (including appearing as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such IP Rights and the assignment thereof.  In addition, Employee will execute, verify, and deliver assignments of such IP Rights to the Company or its designee.  Employee's obligation to assist the Company with respect to IP Rights shall continue beyond Employee's employment with the Company.  Employee hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which Employee now or may hereafter have for infringement of any IP Rights assigned hereunder to the Company.

(e)    Return of Materials.  Employee expressly acknowledges that all physical property, data, books, records and other Confidential Information of the Company obtained in

4

connection with the Company's business is the exclusive property of the Company and that upon the termination of Employee's employment by the Company, Employee will immediately surrender and return to the Company all such items and all other property belonging to the Company then in the possession of Employee, and Employee shall not make or retain any copies thereof.

(f)     Property of the Company.  Employee acknowledges that from time to time in the course of providing past services and future services pursuant to this Agreement, Employee shall have had and will have the opportunity to inspect and use certain property, both tangible and intangible, of the Company and Employee hereby agrees that such property shall remain the exclusive property of the Company.  Employee shall have no right or proprietary interest in such property, whether tangible or intangible.

(g)     Reasonable in Scope and Duration; Consideration.  Employee agrees and acknowledges that the restrictions contained in this Section 4 are reasonable in scope and duration and are necessary to protect the business interests and Confidential Information of the Company after the Effective Date, and Employee further agrees and acknowledges that he has reviewed the provisions of this Agreement with his legal counsel.  Employee acknowledges and agrees that Employee will receive substantial, valuable consideration from the Company for the covenants contained in this Section 4, including without limitation, compensation and other benefits.

(h)     Non-Disparagement.  Following separation of employment:

(i)     Employee agrees not to make to any person, including but not limited to customers of the Company, any statement that disparages the Company, Parent Corporation and its stockholders, or the Company's affiliates, or which reflects negatively upon the Company, Parent Corporation and its stockholders or the Company's affiliates, including but not limited to statements regarding the Company's or Parent Corporation's financial condition, its officers, managers, stockholders, employees and affiliates; and

(ii)     The Company agrees not to make to any person any statement that disparages Employee, or which reflects negatively upon Employee.

(i)     Enforcement.   If, at the time of enforcement of Section 4 of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the Parties hereto agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law.

(j)     Extension of Restricted Periods.  In addition to the remedies the Company may seek and obtain pursuant to this Agreement, the applicable restricted periods set forth herein shall be extended by any and all periods during which Employee shall be found by a court of competent jurisdiction to have been in violation of the covenants contained herein.

16603225v.1

APP0038

5. <u>Termination</u>.

(a) <u>Termination Prior to Expiration of Term</u>. Notwithstanding anything to the contrary contained in <u>Section 2</u>, Employee's employment may be terminated prior to the expiration of the Term only as provided in this <u>Section 5</u>. Employee's employment with the Company shall cease effective on such termination date, and except as provided in this <u>Section 5</u>, the Company shall have no further obligations to Employee.

(b) <u>Death or Disability</u>.

(i) The Company may terminate Employee's employment hereunder due to death or Disability (as defined below). If Employee's employment hereunder is terminated as a result of death or Disability, Employee (or Employee's estate or personal representative in the event of death) shall be entitled to receive: (i) all Base Salary due to Employee through the date of termination; (ii) any previously vested benefits, such as retirement benefits and vacation pay, in accordance with the terms of the plan or agreement pursuant to which such benefits were granted to Employee; (items (i) and (ii) above collectively referred to as "*Accrued Employment Entitlements*"); and (iii) any benefits payable to Employee or Employee's beneficiaries, as applicable, in accordance with the terms of the applicable benefit plan.

(ii) As used herein, "*Disability*" shall mean a determination by the Company, in its reasonable discretion, that the Employee is unable to engage in the customary duties and responsibilities of his position by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of at least six (6) months. Employee's Disability shall be determined by the Company, in good faith, based upon information supplied by Employee and/or a physician mutually agreed upon by the Company and Employee. Employee agrees to submit to physical exams and diagnostic tests reasonably recommended by such physician.

(c) <u>Termination by the Company for Cause or by Employee because of a Voluntary Termination</u>.

(i) Employee's employment hereunder may be terminated by the Company for Cause (as hereinafter defined) or, subject to <u>Section 5(d)</u> hereof, by Employee under a Voluntary Termination (as hereinafter defined). If Employee's employment hereunder is terminated under this <u>Section 5(c)</u>, Employee shall be entitled to receive Employee's Accrued Employment Entitlements. Except as specifically set forth in this <u>Section 5(c)</u>, the Company shall have no further obligations to Employee following a termination for Cause, or a Voluntary Termination.

(ii) "*Egregious Cause*" shall mean (i) commission by Employee of a felony or crime involving moral turpitude, or the commission by Employee of any other willful act or willful omission involving dishonesty or fraud with respect to

6

APP0039

other similarly situated active employees pursuant to the terms of the bonus plan and subject to satisfaction of the performance targets for such fiscal year; provided that, any such bonus payment shall be paid to Employee in the fiscal year following the fiscal year in which the termination of employment occurred;

(ii)     "*Good Reason*" means and shall be deemed to exist if, without the prior written consent of Employee, (i) Employee suffers a reduction in Base Salary of greater than ten percent (10%) or a material reduction in duties, responsibilities or effective authority associated with Employee's title and position as set forth and described in this Agreement or is otherwise assigned any duties or responsibilities inconsistent in any material respect therewith (other than to the extent any such reduction in Base Salary is commensurate with a reduction of the salaries of other senior management of the Company); provided that, the foregoing shall not apply to any material reduction in duties following notice being provided of a termination for Cause, Disability or under a Voluntary Termination; (ii) the Company fails to pay Employee any amounts required to be paid or provided under this Agreement or is otherwise in material breach of this Agreement; or (iii) the office where Employee is required to report for work is moved more than fifty (50) miles from its current location. No termination by Employee shall be for "Good Reason" unless written notice of such termination setting forth in particular the event(s) constituting Good Reason is delivered to the Company within thirty (30) days following the date on which the event constituting Good Reason occurs and the Company fails to cure or remedy the event(s) identified in the notice within thirty (30) days after receipt of such notice, and Employee actually terminates employment within thirty (30) days following the end of the Company's cure period.

(e)     Rights and Conditions Regarding Termination.

(i)     Any payments made to Employee pursuant to this Section 5 shall be in lieu of any rights under any severance plan or policy being utilized for or provided to the Company's other officers and employees, if applicable. Reporting of and withholding on any payment under this subsection for tax purposes shall be at the discretion of the Company in conformance with applicable tax laws. If a claim is made against the Company for any additional tax or withholding in connection with or arising out of any payment pursuant to this subsection, Employee shall pay any such claim within thirty (30) days of being notified by the Company and agrees to indemnify the Company and hold it harmless against such claims, including, but not limited to, any taxes, attorneys' fees, penalties, and/or interest, which are or become due from the Company.

(ii)     Employee's receipt of any pay under this Section 5 shall be subject to the execution by Employee of, and terms of, a general release of claims, substantially in a form to be provided by the Company to Employee within ten (10) days following such termination, and the non-revocation of such release by

Employee pursuant to any revocation rights afforded by applicable law. The general release must be executed and become irrevocable no later than sixty (60) days following the date of such termination, otherwise Employee shall forfeit any and all rights to such pay.

(iii)    If the sixty (60)-day period described in Section 5(e)(ii) begins in one calendar year and ends in a second calendar year (a "***Crossover 60-Day Period***") and if there are any payments under this Section 5 due Employee that are: (i) conditioned on Employee signing and not revoking a release of claims and (ii) otherwise due to be paid during the portion of the Crossover 60-Day Period that falls within the first year, then such payments will be delayed and paid in a lump sum during the portion of the Crossover 60-Day Period that falls within the second year.

(f)    Transfers of Equity Prior to and Following Termination of Employment. During the term of Employee's employment hereunder, neither Employee nor any of his affiliates shall be entitled to assign, sell, pledge, mortgage, hypothecate, encumber, dispose of or otherwise transfer ("***Transfer***") any shares of common stock or other equity of the Company or Parent Corporation owned by Employee or such affiliate (excluding any common stock or other equity that Employee or such affiliate receives pursuant to the 2016 Stock Option Plan of the Company) (collectively, the "***Employee Equity***") except by operation of law upon Employee's or such affiliate's death. Following the termination of Employee's employment hereunder for any reason, neither Employee nor any of his affiliates shall be entitled to Transfer any Employee Equity except by operation of law upon Employee's or such affiliate's death or in accordance with this Section 5(f):

(i)    At any time when the Majority Series A Holder (as defined in the Articles of Incorporation of the Company, as amended, including by the Certificate of Voting Powers, Designations, Preferences, Limitations, Restrictions, Relative Rights and Distinguishing Designation of Series A Preferred Stock of the Company) (the "***Majority Series A Holder***") owns less than fifty-one percent (51%) of the aggregate common stock and preferred stock (on an as-converted basis) of the Company then outstanding, neither Employee nor any of his affiliates may Transfer any Employee Equity without (A) first providing the Majority Series A Holder the right of first refusal to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms reasonably acceptable to the Majority Series A Holder, which right of first refusal shall be exercisable for a period of at least fifteen (15) business days after the Majority Series A Holder receives written notice of the desired transfer and the purchase price determined in accordance with Section 5(f)(iii); (B) if the Majority Series A Holder does not exercise such right of first refusal, then providing each other holder of shares of Series A preferred stock of the Company a secondary refusal right to purchase (on a pro rata basis in accordance with their respective ownership of Series A preferred stock of the Company or in such other proportions agreed to by such stockholders) all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such

9

APP0041

holders of Series A preferred stock than those offered to the Majority Series A Holder, which secondary refusal right shall be exercisable for a period of at least fifteen (15) business days; and (C) if the Majority Series A Holder and the other holders of Series A preferred stock of the Company do not exercise their rights pursuant to the preceding clauses (A) and (B), then providing the Company a tertiary refusal right to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to the Company than those offered to the Majority Series A Holder, which tertiary refusal right shall be exercisable for a period of at least fifteen (15) business days.  If none of the foregoing persons exercises its refusal right in connection with such proposed Transfer, then for a period of ninety (90) days after the end of the Company's fifteen (15)-day exercise period, Employee or such affiliate shall be entitled to Transfer all, but not less than all, of such Employee Equity that was offered to the foregoing persons to any third-party purchaser, for a purchase price equal to or greater than the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such third-party purchaser than those offered to the Majority Series A Holder (or at any lesser purchase price or on more favorable terms, provided that such purchase price and more favorable terms are first offered to the Majority Series A Holder and, if applicable, the other holders of Series A preferred stock of the Company and, if applicable, the Company, in accordance with this Section 5(f)(i)), subject to compliance with applicable law and subject to such third-party purchaser's execution of a joinder agreement to each stockholders agreement (or the equivalent) of the Company or Parent Corporation by which Employee or such transferring affiliate is bound with respect to the transferred Employee Equity; provided that if such Transfer is not consummated within such ninety (90)-day period, such Transfer shall again become subject to the refusal rights set forth in this Section 5(f).

(ii)     At any time when the Majority Series A Holder owns at least fifty-one percent (51%) of the aggregate common stock and preferred stock (on an as-converted basis) of the Company then outstanding, neither Employee nor any of his affiliates may Transfer any Employee Equity without (A) first providing the Company the right of first refusal to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms reasonably acceptable to the Company, which right of first refusal shall be exercisable for a period of at least fifteen (15) business days after the Company receives written notice of the desired transfer and the purchase price determined in accordance with Section 5(f)(iii); (B) if the Company does not exercise such right of first refusal, then providing the Majority Series A Holder the secondary refusal right to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms reasonably acceptable to the Majority Series A Holder, which secondary refusal right shall be exercisable for a period of at least fifteen (15) business days; (C) if the Company and the Majority Series A Holder do not exercise their rights pursuant to the preceding clauses (A) and (B), then providing each other holder of shares of Series A preferred stock of the Company a tertiary refusal right to purchase (on a

10

pro rata basis in accordance with their respective ownership of Series A preferred stock of the Company or in such other proportions agreed to by such stockholders) all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such holders of Series A preferred stock than those offered to the Majority Series A Holder, which tertiary refusal right shall be exercisable for a period of at least fifteen (15) business days; and (D) if the Company, the Majority Series A Holder and the other holders of Series A preferred stock of the Company do not exercise their rights pursuant to the preceding clauses (A), (B) and (C), then providing the other stockholders of the Company a quaternary refusal right to purchase (on a pro rata basis in accordance with their respective ownership of common stock of the Company or in such other proportions agreed to by such stockholders) all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to the other stockholders than those offered to the Majority Series A Holder, which quaternary refusal right shall be exercisable for a period of at least fifteen (15) business days.  If none of the foregoing persons exercises its refusal right in connection with such proposed Transfer, then for a period of ninety (90) days after the end of the fifteen (15)-day exercise period provided for in the preceding clause (D), Employee or such affiliate shall be entitled to Transfer all, but not less than all, of such Employee Equity that was offered to the foregoing persons to any third-party purchaser, for a purchase price equal to or greater than the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such third-party purchaser than those offered to the Majority Series A Holder (or at any lesser purchase price or on more favorable terms, provided that such purchase price and more favorable terms are first offered to the Company and, if applicable, the Majority Series A Holder and, if applicable, the other holders of Series A preferred stock of the Company and, if applicable, the other stockholders of the Company, in accordance with this Section 5(f)(ii)), subject to compliance with applicable law and subject to such third-party purchaser's executing a joinder agreement to each stockholders agreement (or the equivalent) of the Company or Parent Corporation by which Employee or such transferring affiliate is bound with respect to the transferred Employee Equity; provided that if such Transfer is not consummated within such ninety (90)-day period, such Transfer shall again become subject to the refusal rights set forth in this Section 5(f).

(iii)     The purchase price at which Employee or his affiliate shall first offer to sell any Employee Equity to the Majority Series A Holder, other stockholders of the Company or the Company, as applicable, pursuant to this Section 5(f) shall be determined as follows: (A) if Employee's employment hereunder was terminated for Egregious Cause, such purchase price shall be an amount determined by the Board, which shall be no less than the cost-basis for such Employee Equity and no more than the Fair Market Value (as defined below) of such Employee Equity, less in either case all applicable withholding taxes; and (B) if Employee's employment hereunder was terminated for any reason other than for Egregious Cause, such purchase price shall be an amount equal to the Fair Market Value of such Employee Equity, less all applicable

11

withholding taxes.  "*Fair Market Value*" means as of any date, the value of the Employee Equity determined as follows: (x) If the Employee Equity is listed on any established stock exchange, the Fair Market Value of a share of common stock shall be the closing sales price for such stock as quoted on such exchange (or the exchange with the greatest volume of trading in the common stock) on the last market trading day prior to the day of determination, as reported in *The Wall Street Journal* or such other source as the Board deems reliable, or (y) in the absence of such markets for the Employee Equity, the Fair Market Value shall be determined in good faith by the Board in accordance with Section 409A and the regulations and other guidance promulgated thereunder.

(iv)    Employee acknowledges and agrees that any purchaser of Employee Equity pursuant to this Section 5(f) shall be entitled to pay and/or withhold from the applicable purchase price therefor, any amount with respect to taxes that such purchaser (in its sole discretion) determines is required to be paid or withheld or advisable to pay or withhold under applicable law, and any amount so paid or withheld shall be treated for purposes of this Section 5(f) as an amount paid to Employee or its affiliate, as applicable, with respect to the purchased Employee Equity purchased.  **EMPLOYEE FURTHER ACKNOWLEDGES AND AGREES THAT HE SHALL BE SOLELY RESPONSIBLE AND LIABLE FOR ANY TAXES AND TAX CONSEQUENCES WITH RESPECT TO THE OWNERSHIP OR DISPOSITION BY EMPLOYEE OF ANY EMPLOYEE EQUITY AND WITH RESPECT TO THE PROVISIONS OF THIS SECTION 5(F) AND THE TRANSACTIONS CONTEMPLATED HEREBY.   NEITHER THE COMPANY NOR PARENT CORPORATION NOR ANY OF THEIR RESPECTIVE STOCKHOLDERS MAKES ANY REPRESENTATIONS, WARRANTIES OR COVENANTS REGARDING SUCH TAXES OR TAX CONSEQUENCES OF EMPLOYEE, AND THE COMPANY, PARENT CORPORATION AND THEIR RESPECTIVE STOCKHOLDERS SHALL HAVE NO LIABILITY THEREFOR.  EMPLOYEE ACKNOWLEDGES THAT HE IS AWARE THAT THE TAX CONSEQUENCES ARISING FROM THE OWNERSHIP AND DISPOSITION BY EMPLOYEE OF ANY EMPLOYEE EQUITY AND THE TAX CONSEQUENCES ARISING IN CONNECTION WITH THE PROVISIONS OF THIS SECTION 5(F) AND THE TRANSACTIONS CONTEMPLATED HEREBY ARE COMPLEX AND THAT EMPLOYEE HAS BEEN ENCOURAGED TO SEEK INDEPENDENT PROFESSIONAL GUIDANCE OR COUNSEL WITH RESPECT TO SUCH TAX CONSEQUENCES.   EMPLOYEE ACKNOWLEDGES THAT HE HAS EITHER SOUGHT SUCH GUIDANCE OR COUNSEL OR DETERMINED AFTER REVIEWING THIS AGREEMENT CAREFULLY THAT HE WILL WAIVE SUCH RIGHT.**

(v)    Notwithstanding anything to the contrary herein, (A) the Majority Series A Holder may assign any or all of its rights under this Section 5(f) at any time to any Person and (B) the Company may assign any or all of its rights under

12

APP0044

this Section 5(f) with respect to any proposed Transfer of common stock or other equity of Parent Corporation to Parent Corporation, in either case with written notice to Employee of any such assignment.

(vi)    The Majority Series A Holder and the other stockholders of the Company are express third-party beneficiaries of this Section 5(f), and this Section 5(f) may not be amended without the written consent of the Majority Series A Holder.

6.    Notices.  Any notice or other communications relating to this Agreement shall be in writing and delivered personally or mailed by certified mail, return receipt requested, or sent by overnight courier, to the Party concerned at the address set forth below:

If to Company:          VeroBlue Farms USA, Inc.
                        1507 Capital Avenue, Suite 101
                        Plano, TX  75074


If to Employee:         Keith Driver
                        1507 Capital Avenue, Suite 101
                        Plano, TX  75074

Either Party may change the address for the giving of notices at any time by written notice given to the other Party under the provisions of this Section 6. If notice is given by personal delivery or overnight courier, said notice shall be conclusively deemed given at the time of such delivery or upon receipt of such couriered notice.  If notice is given by mail, such notice shall be conclusively deemed given upon deposit thereof in the United States mail.

7.    Assignment.    Except as otherwise provided in Section 5(f)(v), neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party hereto without the prior written consent of the other Party hereto.  In the event of the assignment of this Agreement pursuant to the provisions of this Section 7, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors and permitted assigns.

8.    Remedies.  Employee acknowledges that the services Employee is to render under this Agreement are of a unique and special nature, and because Employee has access to Confidential Information, the loss of which cannot reasonably or adequately be compensated for in monetary damages, and that irreparable injury and damage will result to the Company in the event of any default or breach of this Agreement by Employee.   The Parties agree and acknowledge that the breach by Employee of any of the terms of this Agreement will cause irreparable damage to the Company, and upon any such breach, the Company shall be entitled to injunctive relief, specific performance, or other equitable relief (without posting a bond or other security); provided, however, that this shall in no way limit any other remedies which the Company may have (including, without limitations, the right to seek monetary damages).

9.    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties and supersedes all prior written and oral and all contemporaneous oral agreements, understandings and negotiations with respect to the subject matter hereof.  Without limiting the

13

APP0045

generality of the foregoing sentence, this Agreement supersedes any prior employment agreement, oral or written which shall terminate and be cancelled as of the Effective Date, except for any breaches thereof by Employee prior to the Effective Date which shall survive such termination. This Agreement may not be changed orally, but only by an agreement in writing signed by both Parties.

10. <u>Governing Law; Construction</u>. This Agreement shall be governed under and construed in accordance with the laws of the State of Texas, without regard to the principles of conflicts of laws. The paragraph headings and captions contained herein are for reference purposes and convenience only and shall not in any way affect the meaning or interpretation of this Agreement. It is intended by the Parties that this Agreement be interpreted in accordance with its fair and simple meaning, not for or against either Party, and neither Party shall be deemed to be the drafter of this Agreement.

11. <u>Severability</u>. The Parties agree that if any provision of this Agreement as applied to any Party or to any circumstance is adjudged by a court or arbitrator to be invalid or unenforceable, the same will in no way affect any other circumstance or the validity or enforceability of this Agreement. Without limiting the generality of the foregoing, in particular, if any provision in <u>Section 4</u>, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the Parties agree that the court or arbitrator making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases, and in its reduced form, such provision shall then be enforceable and shall be enforced. In addition, in the event of a breach or violation by Employee of <u>Section 4</u>, the Restricted Period shall be automatically extended respectively by the amount of time between the initial occurrence of the breach or violation and when such breach or violation has been duly cured.

12. <u>Counterparts/Electronic Signatures</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail or other electronic medium shall have the same force and effect as an original signature.

13. <u>Dollars</u>. Unless otherwise provided in this Agreement, all dollar amounts referenced in this Agreement are United States dollars.

14. <u>Withholding</u>. The Company shall be entitled to withhold from any payments or benefits made or provided under this Agreement all applicable federal, state, city or other applicable taxes.

15. <u>Survival</u>. Sections <u>4</u>, <u>5(e)</u>, <u>6</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u>, <u>11</u>, <u>12</u>, <u>13</u>, <u>14</u> and this <u>Section 15</u> shall survive the termination of this Agreement and shall continue in full force and effect according to their terms.

16. <u>Section 409A</u>.

(a)    This Agreement is intended to comply with or be exempt from Section 409A of the Internal Revenue Code of 1986, as amended ("***Section 409A***") and shall be construed accordingly. It is the intention of the Parties that payments or benefits payable under

14



APP0046

this Agreement not be subject to the additional tax or interest imposed pursuant to Section 409A. To the extent such potential payments or benefits are or could become subject to Section 409A, the Parties shall cooperate to amend this Agreement with the goal of giving Employee the economic benefits described herein in a manner that does not result in such tax or interest being imposed.  However, in no event shall the Company be liable to Employee for any taxes, interest, or penalties due as a result of the application of Section 409A to any payments or benefits provided hereunder.

(b)     Each payment provided for in this Agreement shall, to the extent permissible under Section 409A, be deemed a separate payment for purposes of Section 409A, and any payment to be made in installments shall be treated as a series of separate payments.

(c)     Payments or benefits pursuant to this Agreement shall be treated as exempt from Section 409A to the maximum extent possible under Treasury Regulation Section 1.409A-1(b)(9)(v), and/or under any other exemption that may be applicable, and this Agreement shall be construed accordingly.  For purposes of Section 5, phrases such as "termination of employment" shall refer to Employee's "separation from service," as defined for purposes of Section 409A.

(d)     All taxable expenses or other reimbursements or in-kind benefits under this Agreement shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by Employee.  Any such taxable reimbursement or any taxable in-kind benefits provided in one calendar year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year.

(e)     Employee shall have no right to designate the date of any payment hereunder.

15

APP0047

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the day and year first above written.

COMPANY:

VEROBLUE FARMS USA, INC.

By: _____

Leslie Wulf, Chief Executive Officer


EMPLOYEE:

_____

Keith Driver

*Signature Page to Employment Agreement*

APP0048

# BUSINESS RELATIONSHIP RESTRUCTURING AGREEMENT

This Business Relationship Restructuring Agreement (this "**Agreement**") is made and entered into as of January 13, 2017 (the "**Effective Date**"), by and among VeroBlue Farms Inc., a Canadian corporation ("**VBF Canada**"), VeroBlue Farms USA, Inc., a Nevada corporation ("**VBF USA**"), Keith Driver, a resident of Calgary, Canada ("**Driver**"), and Seven Hours Holding Company, Inc., a Canadian corporation, which is one hundred percent (100%) owned by Driver ("**Driver Co.**"). VBF Canada, VBF USA, Driver and Driver Co. are sometimes each referred to herein as a "**Party**" and collectively, as the "**Parties**".

## W I T N E S E T H :

**WHEREAS**, Driver and VBF USA are parties to that certain Employment Agreement, dated as of July 1, 2016 (the "**Employment Agreement**"); and

**WHEREAS**, Driver Co. owns 2,500,000 common shares of VBF Canada (the "**VBF Canada Shares**"); and

**WHEREAS**, on November 16, 2016, Driver delivered to VBF USA a letter providing notice that VBF USA was in breach of the Agreement and such breach constituted "Good Reason" under the Employment Agreement allowing Driver to terminate the Employment Agreement if such breach was not cured within thirty (30) days after such notice (the "**Good Reason Claims**"); and

**WHEREAS**, VBF USA denies that Driver has "Good Reason" to terminate the Employment Agreement, and VBF USA has claims against Driver that he has breached the Employment Agreement because, among other things, Driver has failed to maintain his main office in Dallas, Texas, and Driver has engaged in other business interests and engagements outside of VBF USA (the "**Egregious Cause Claims**"); and

**WHEREAS** without admitting any liability on the part of any Party, and in order to resolve their claims against each other, the Parties desire to restructure their business relationship to the extent provided herein;

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Termination of Employment Agreement, Stock Option Agreement and Stock Option Grant</u>. Effective as of the Effective Date: (i) the Employment Agreement is hereby terminated and of no further force or effect; (ii) that certain Stock Option Agreement, dated as of July 14, 2016, by and between VBF USA and Driver (the "**Stock Option Agreement**") is hereby terminated and of no further force or effect; and (iii) that certain Stock Option Grant Notice, dated as of July 14, 2016, by and between VBF USA and Driver (the "**Stock Option Grant Notice**") is hereby terminated and of no further force or effect; it being agreed and understood that all obligations of the Driver and VBF USA under the Employment Agreement (payment or otherwise), the Stock Option Agreement and the Stock Option Grant Notice are terminated in their entirety.

APP0049

2.     Execution and Delivery of Consulting Agreement. Simultaneously with the execution and delivery of this Agreement by the Parties, Driver and VBF USA shall execute and deliver a Consulting Agreement, a copy of which is attached hereto as Exhibit A (the "**Consulting Agreement**").

3.     Cancellation of VBF Canada Shares. Effective as of the Effective Date, the VBF Canada Shares shall be deemed to be cancelled, and Driver hereby grants to Leslie Wulf a power-of-attorney, which is coupled with an interest, to execute and deliver any and all documentation required by TSX Trust, VBF Canada's transfer agent, to cancel the VBF Canada Shares.

4.     Confidentiality; Agreement Not-To Compete.

(a)     Driver acknowledges that during his employment and as a result of his past, relationship with VBF USA, Driver has obtained, and has been given access to, information concerning VBF USA and Parent Corporation and their respective affiliates, including, but not limited to, information regarding the business, operations, services, proposed services, business processes, business and marketing strategies, advertising, marketing and promotional plans and materials, pricing strategies and policies, financial information, stockholders and other trade secrets, confidential information and proprietary material of VBF USA, including information and material originated, discovered or developed in whole or in part by Driver (collectively referred to herein as "**Confidential Information**"). The term "**Confidential Information**" does not include any information which (i) at the time of disclosure is generally available to the public (other than as a result of a disclosure by Driver in breach of the Employment Agreement), or (ii) was available to Driver on a non-confidential basis from a source (other than VBF USA or its representatives) that is not and was not prohibited from disclosing such information to Driver by a contractual, legal or fiduciary obligation. Driver agrees that, to the fullest extent permitted by law, Driver will, in a fiduciary capacity for the benefit of VBF USA, hold all Confidential Information strictly in confidence and will not directly or indirectly reveal, report, disclose, publish or transfer any of such Confidential Information to any person or entity, or utilize any of the Confidential Information for any purpose, except in furtherance of Driver's duties under the Consulting Agreement and except to the extent that Driver may be required by law to disclose any Confidential Information.

(b)     For a period of five (5) years after the Effective Date (the "**Restricted Period**"), he shall not directly or indirectly: (i) own any interest in, manage, control, participate in, consult with, render services for, be employed in an executive, managerial or administrative capacity by, or in any manner engage in, any Competing Business (as defined below); (ii) solicit, request or induce any adviser, consultant or agent of the VBF USA or any of its affiliates to terminate his or her employment or relationship with such company, nor hire any adviser, or consultant of VBF USA or any of its affiliates, or (iii) solicit, request, or induce or attempt to solicit, request, or induce or attempt to induce any customer, supplier, licensee or other business relation of VBF USA or any of its affiliates to cease doing business with, or modify its business relationship with VBF USA or any of its affiliates, or in any way interfere with or hinder the relationship between any such customer, supplier, licensee or business relation and VBF USA or and of its affiliates, as applicable. For purposes hereof, "**Competing Business**" means a business that, directly or indirectly, cultures and/or hatches finfish or shrimp; excluding however, a business that cultures and/or hatches shrimp located in Alberta, Canada or British Colombia, Canada solely for sales and resales to persons and entities in Alberta, Canada and British Colombia, Canada. Nothing herein shall prohibit Driver from being a

APP0050

passive owner of not more than five percent (5%) of the outstanding stock of any class of a corporation that is publicly traded, so long as Driver has no active participation in the business of such corporation. In addition, during the Restricted Period, prior to accepting any position, or becoming involved, any person or entity that is potentially a Competing Business, Driver agrees to inform such person or entity, as the case may be, of the provisions of this Agreement, and specifically the provisions of this Section 4.

(c)     Driver agrees and acknowledges that the restrictions contained in this Section 4 are reasonable in scope and duration and are necessary to protect the business interests and confidential information of VBF USA, and Driver further agrees and acknowledges that he has reviewed the provisions of this Agreement with his legal counsel.

(d)     If any provision in this Section 4, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the Parties agree that the court or arbitrator making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases, and in its reduced form, such provision shall then be enforceable and shall be enforced. In addition, in the event of a breach or violation by Driver of Section 4, the Restricted Period shall be automatically extended respectively by the amount of time between the initial occurrence of the breach or violation and when such breach or violation has been duly cured.

5.    Releases.

(a)     As a material inducement to VBF USA and VBF Canada to enter into this Agreement, and except for the covenants and agreements of VBF USA and VBF Canada provided for in this Agreement, Driver and Driver Co., on their own behalf and on behalf of their respective equityholders, directors, managers, officers, affiliates, heirs, dependents, successors and assigns, or any of them (collectively, the "**Driver Releasers**") hereby irrevocably and unconditionally release, acquit and forever discharge VBF USA and VBF Canada and each of their respective successors, assigns, agents, members, managers, officers, employees, representatives, subsidiaries and affiliates and all persons acting by, through, under or in concert with any of them (collectively, the "**VBF Releasees**"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown ("**Driver Claim**" or "**Driver Claims**") which the Driver Releasers now have, own, hold, or which the Driver Releasers at any time heretofore had, owned or held against each of the VBF Releasees including, but not limited to: (i) all Driver Claims under the Age Discrimination in Employment Act of 1967, as amended; (ii) all Driver Claims under Title VII of the Civil Rights Act of 1964, as amended; (iii) all Driver Claims under the Employee Retirement Income Security Act of 1974, as amended; (iv) all Driver Claims arising under the Americans With Disabilities Act of 1990, as amended; (v) all Driver Claims arising under the Family and Medical Leave Act of 1993, as amended; (vi) all Driver Claims related to Driver's employment or engagement with the VBF Releasees; (vii) all Driver Claims of unlawful discrimination based on age, sex, race, religion, national origin, handicap, disability, equal pay, sexual orientation or otherwise; (viii) all Driver Claims of wrongful discharge, breach of an implied or express employment contract, negligent or intentional infliction of emotional distress, libel, defamation, breach of privacy, fraud, breach of any implied covenant of good faith and fair dealing and any other

APP0051

federal, state, or local common law or statutory claims, whether in tort or in contract; (xi) all Driver Claims related to unpaid wages, salary, deferred compensation, overtime compensation, bonuses, severance pay, vacation pay or other compensation or benefits arising out of Driver's employment or engagement with any VBF Releasee; (x) all Driver Claims arising under any federal, state or local regulation, law, code or statute; (xi) all Driver Claims of discrimination arising under any state or local law or ordinance; (xii) all Driver Claims that the Driver Releasers have pertaining to the purchase, holding and cancellation of the VBF Canada Shares; (xiii) the Good Reason Claims; and (xiv) all Driver Claims relating to any agreement, arrangement or understanding that the Driver Releasers have, or may have, with any VBF Releasee (but specifically excluding this Agreement) for anything occurring prior to the Effective Date. The Driver Releasers represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Driver Claim or any portion thereof or interest therein.

(b)     As a material inducement to Driver and Driver Co. to enter into this Agreement, and except for the covenants and agreements of Driver and Driver Co. provided for in this Agreement, VBF USA and VBF Canada, on their own behalf and on behalf of the other VBF Releasees, hereby irrevocably and unconditionally release, acquit and forever discharge the Driver Releasers from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (the "**VBF Releasee Claims**") which the VBF Releasees now have, own, hold, or to which the VBF Releasees at any time heretofore had, owned or held against each of the Driver Releasers, including, without limitation, the Egregious Cause Claims. The VBF Releasees represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any VBF Releasee Claim or any portion thereof or interest therein.

(c)     Driver, on his own behalf and on behalf of the other Driver Releasers, agrees not to make any disparaging or negative statements, written or verbal, regarding any of the VBF USA Releasees at any time in the future, whether such statement is true or false, except as required by law or in defense of any legal action brought by any VBF USA Releasee against any Driver Releaser in violation of this Agreement. VBF USA, on its own behalf and on behalf of the other VBF USA Releasees, agrees not to make any disparaging or negative statements, written or verbal, regarding any of the Driver Releasers at any time in the future, whether such statement be true or false, except as required by law or in defense of any legal action brought by any Driver Releaser against any VBF USA Releasee in violation of this Agreement.

6.    Settlement Consideration.

(a)     In consideration of the matters described in Sections 1-5 above, VBF USA agrees to make the following payments to Driver:

(i)     a payment of $550,000 on the Effective Date ($500,000 of which is for the cancellation of the VBF Canada Shares as described in Section 3 above, and the remaining $50,000 of which is for severance pay);

APP0052

(ii)     a payment of $100,000 on the first anniversary of the Effective Date, which amount shall be allocated to the non-compete provisions of Section 4(b) above;

(iii)    a payment of $100,000 on the second anniversary of the Effective Date, which amount shall be allocated to the non-compete provisions of Section 4(b) above;

(iv)    a payment of $100,000 on the third anniversary of the Effective Date, which amount shall be allocated to the non-compete provisions of Section 4(b) above;

(v)     a payment of $100,000 on the fourth anniversary of the Effective Date, which amount shall be allocated to the non-compete provisions of Section 4(b) above; and

(vi)    a payment of $100,000 on the fifth anniversary of the Effective Date, which amount shall be allocated to the non-compete provisions of Section 4(b) above.

Notwithstanding anything in this Agreement to the contrary, in the event that Driver breaches any of the provisions of Section 4, than any and all payments to be made in subitems (b) – (d) above that have not been made shall be deemed to be cancelled in their entirety, in addition to any and all rights and remedies that VBF USA may have under law or in equity; it being agreed and understood that the cancellation of any such payments shall not preclude VBF USA from pursuing a claim against Driver for any such breach.

(b)     For all amounts that are owed to Consultant by the Company as of the Effective Date, (including, without limitation, unpaid salary, PTO and expenses), on the Effective Date, the Company will pay Consultant $7,001.05.

7.     Representations and Warranties. Each Party hereby represents and warrants to each other Party that the following representations and warranties are true and correct as of the date hereof: (a) such Party is fully competent to execute, deliver and perform this Agreement; (ii) this Agreement has been duly executed and delivered by such Party and constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally or the availability of equitable remedies; and (iii) neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby or thereby will: (1) conflict with, or result in a violation or breach of the terms, conditions or provisions of, or constitute a default under any agreement, indenture or other instrument under which such Party is bound or subject; or (2) violate or conflict with any judgment, decree, order, statute, rule or regulation of any court or any public, governmental or regulatory agency or body having jurisdiction over such Party.

8.     Miscellaneous.

(a)     Any notice or communication hereunder must be in writing and given by depositing the same in the United States or Canadian mail, addressed to the Party to be notified, postage prepaid and registered or certified with return receipt requested, or by delivering the same in person. Such notice shall be deemed received on the date on which it is hand-delivered, or delivered by Federal Express or on the third business day following the date on which it is so mailed. For purposes of notice, the addresses of the Parties shall be as follows:

If to VBF Canada or VBF USA:          c/o VeroBlue Farms USA, Inc.
                                       3369 Premier Drive, Suite 300
                                       Plano, Texas  75023
                                       Attn:  Chief Executive Officer

If to Driver or Driver Co.:            c/o Keith Driver
                                       5858 Dalcastle Drive NW
                                       Calgary, Alberta, Canada  T3A-1Z3

Any Party may change its address for notice by written notice given to the other party in accordance with this Section.

(b)     This Agreement (including the Consulting Agreement) contains the entire agreement among the Parties relating to the subject matter hereof and supersedes any prior agreement, arrangement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

(c)     All dollar amounts used herein are United States dollars, and all amounts payable hereunder shall be paid in United States dollars.

(d)     VBF USA shall be entitled to withhold from any payments or benefits made or provided under this Agreement all applicable federal, state, city or other applicable taxes.

(e)     No alterations, amendments, waiver, or any other change in any term or provision of this Agreement shall be valid or binding on any Party unless the same shall have been agreed to in writing by all of the Parties. No waiver or default of any term of this Agreement shall be deemed a waiver of any subsequent breach or default of the same or similar nature. This Agreement may not be changed except by written agreement signed by all Parties.

(f)     Each Party acknowledges that a refusal by such Party to perform any covenant or agreement contained in this Agreement may cause irreparable harm to one or more of the other Parties, for which there may be no adequate remedy at law and for which the ascertainment of damages would be difficult. Therefore, the Parties agree that in any such case, the other Party or Parties shall be entitled, in addition to, and without having to prove the inadequacy of, other remedies at law, to specific performance of this Agreement, as well as injunctive relief (without being required to post bond or other security).

(g)     In the event it becomes necessary to bring suit to enforce any provision of this Agreement, the prevailing Party shall be entitled to recover, in addition to any other award, reasonable legal costs, including court costs and attorney's fees, from the non-prevailing Party or Parties.

APP0054

(h)    If any provision of this Agreement is held to be unenforceable or invalid, the remaining provisions of this Agreement will remain in effect.

(i)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, regardless of the laws that might otherwise govern under applicable principles of conflicts of law thereof. Each Party irrevocably submits to the exclusive jurisdiction of the Federal District Court for the Northern District of Texas (the "**District Court**") for the purposes of any suit, action or other proceeding arising out of this Agreement. Each Party agrees to commence any action, suit or proceeding relating to this Agreement in the District Court. Each Party further agrees that service of any process, summons, notice or document by registered mail to such Party's respective address set forth in Section 8(a) above shall be effective service of process. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the District Court, and hereby further irrevocably and unconditionally waives and shall not assert by way of motion, defense, or otherwise, in any such Proceeding, any claim that it is not subject personally to the jurisdiction of the District Court, that its property is exempt or immune from attachment or execution, that such proceeding is brought in an inconvenient forum, that the venue of the proceeding is improper, or that the Agreement may not be enforced in or by the District Court.

(j)    The paragraph headings and captions contained herein are for reference purposes and convenience only and shall not in any way affect the meaning or interpretation of this Agreement. It is intended by the Parties that this Agreement be interpreted in accordance with its fair and simple meaning, not for or against any Party, and no Party shall be deemed to be the drafter of this Agreement.

(k)    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail or other electronic medium shall have the same force and effect as an original signature.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

VEROBLUE FARMS, INC.

By: _____
Leslie Wulf,
Chief Executive Officer


VEROBLUE FARMS USA, INC.

By: _____
Leslie Wulf,
Chief Executive Officer

17516316v.5

7

APP0055

Keith Driver

SEVEN HOURS HOLDING COMPANY,
INC.

By:

Keith Driver, President

8

APP0056

## EXHIBIT A

## **Form of Consulting Agreement**

[See attached document]

APP0057

## CONSULTING AGREEMENT

This Consulting Agreement (this "**Agreement**"), dated as of January 13, 2017 (the "**Effective Date**") is by and between VeroBlue Farms USA, Inc., a Nevada corporation (the "**Company**"), and Keith Driver, a resident of Calgary, Alberta ("**Consultant**").  The Company and Consultant are sometimes each referred to herein as a "**Party**" and collectively, as the "**Parties**."

**WHEREAS,** the Company desires to engage Consultant as an independent contractor to perform certain services for the Company, and Consultant desires to be retained by the Company to perform such services;

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the Parties hereby agree as follows:

1.   <u>Services</u>.  The Company hereby retains Consultant to serve as an independent contractor to the Company to consult and provide the Company and its subsidiaries with advice and assistance in the following areas: water treatment, permitting, technical services and general research and development (the "**Services**").  Consultants shall only be required to spend sixty (60) hours per month in providing the Services to the Company; it being agreed and understood that Consultant shall be required to receive pre-approval from an executive officer of the Company to provide the Services in any month over the sixty (60) hour requirement, and if such approval is received, Consultant will be compensated by the Company at the rate of $150/hour.

2.   <u>Compensation</u>.  As compensation for performing the Services, the Company shall pay Consultant the following compensation:

(a)   A fee of $100,000 per annum, payable in installments of $8,333.33 per month, in arrears, on the first day of each calendar month; and

(b)   During the term of this Agreement, the Company shall reimburse Consultant for all reasonable and necessary out-of-pocket travel and other expenses incurred by Consultant in rendering Services hereunder, on a monthly basis upon submission of a detailed monthly statement and reasonable documentation; it being agreed and understood that all expenses over $1,000 must be approved in advance by the Company.

The compensation set forth above will be the sole compensation payable to Consultant for performing the Services under the Agreement, and no additional compensation or fee will be payable by the Company to Consultant by reason of any benefit gained by the Company directly or indirectly through Consultant performing the Services, nor shall the Company be liable in any way for any additional compensation or fee for Consultant's performing the Services, unless the Company shall have expressly agreed thereto in writing.

1

APP0058

3.    Status as Independent Contractor.

(a)    The Parties acknowledge and covenant that (i) Consultant will act exclusively as an independent contractor, and not as an employee, of the Company in performing the Services, and (ii) the Parties do not intend, and will not hold out that there exists, any joint venture, undertaking for a profit or other form of business venture or any employment relationship between the Parties other than that of an independent contractor relationship. Consultant is not entitled to the benefits provided by the Company to its employees, including but not limited to Workmen's Compensation Insurance, unemployment insurance, and health and welfare benefits.

(b)    In performing the Services, Consultant is obligated to provide quality service within industry standards. The manner and means of conducting the work are under Consultant's exclusive control. Consultant is solely responsible for his own conduct during the performance of this Agreement.

4.    Confidential Information; Intellectual Property.

(a)    Consultant, while engaged by the Company hereunder or at any time thereafter, will not, without the express written consent of the Company, directly or indirectly communicate or divulge, or use for the benefit of Consultant, or of any other person, firm or association, any of the Company's trade secrets, proprietary data or other confidential information, which trade secrets and confidential information were communicated to or otherwise learned or acquired by Consultant in the course of Consultant's engagement with the Company and that is not otherwise generally known within the Company's industry, except that Consultants may disclose such matters to the extent that disclosure is required pursuant to any deposition, interrogatory, request for documents, subpoena, civil investigative demand, or similar process. Consultant agrees not to any such trade secrets or confidential information in any way or in any capacity other than as an independent contractor of the Company and to further the Company's interests.

(b)    Consultant recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that Consultant owes the Company and such third parties, during the term of Consultant's engagement hereunder and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or company (except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party) or to use it for the benefit of anyone other than for the Company or such third party (consistent with the Company's agreement with such third party) without the prior consent of an authorized representative of the Company.

(c)    To the extent that, during the term of this Agreement, Consultant jointly or solely conceives, develops or reduces to practice any new inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable or registerable under copyright or similar laws or other intellectual property

2

APP0059

(collectively, "**Intellectual Property**"), then all rights, titles and interests in, to any under such Intellectual Property shall be deemed to be exclusively owned by the Company. The Company shall exclusively own all U.S. and international rights, title and interest in and to the Intellectual Property, including, but no limited to all graphical, textual and other contents, and all copyrights and any other intellectual property rights therein (e.g., patent and trademark rights). Consultant hereby assigns to the Company all rights, title and interest in and to the Intellectual Property, and Consultant agrees to promptly execute and deliver, and to cause its employees and/or contractors to promptly execute and deliver, any and all documentation or instruments that the Company reasonably believes is necessary to transfer all rights, titles and interests in and to such Intellectual Property to the Company. The Company and its successors and assigns shall have the right to obtain and hold in its own name all copyright or trademark registrations and other evidence of rights that may be available for the deliverables and any portion(s) thereof. Consultant agrees that the Intellectual Property shall be considered a "work made for hire" as that term is defined under the copyright laws of the United States and other countries.

 (d) Notwithstanding anything herein to the contrary, the Parties understand and agree that the provisions of Section 4(c) shall not apply to the shrimp culturing system which have been developed by Consultant, Sheriff and/or their affiliates independently of the provision of Services hereunder.

 5. Indemnification. The Company agrees to indemnify and hold harmless Consultant from and against any and all losses, claims, damages, liabilities and expenses, and all actions, inquiries, proceedings and investigations in respect thereof, to which Consultant may become subject arising in any manner out of or in connection with Consultant's engagement under this Agreement; provided, however, that the Company shall not be responsible to indemnify Consultant under this Section 5 to the extent that such loss, claim, damage, liability or expense has been finally judicially determined to have resulted primarily and directly from actions taken or omitted to be taken by Consultant due to his gross negligence or willful misconduct. To the extent that any prior indemnification payment the Company made to Consultant is determined to have been improper by reason of Consultant's gross negligence or willful misconduct, Consultant will promptly pay the Company such amount.

 6. Term of Agreement; Termination.

 (a) This Agreement shall commence as of the Effective Date and shall continue until terminated by either Party upon written notice to the other Party, which written notice may not be given by the Company before December 28, 2017.

 (b) Notwithstanding anything herein to the contrary, the provisions of Section 4 and 5 above, this subsection (b) and Section 7 below, shall survive the termination of the Term and this Agreement.

 7. Miscellaneous Provisions.

 (a) The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

17520018v.4

3

(b)     This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.   The Parties agree that the exclusive jurisdiction of any case or controversy arising under or out of this Agreement shall be in the state of federal courts located in Dallas, Texas, and each of the Parties hereby consents to the jurisdiction of such courts.

(c)     The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

(d)     This Agreement may not be modified, amended, altered or supplemented except upon the execution and delivery of a written agreement executed by both of the Parties.

(e)     This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof.

(f)     All dollar amount used herein are United States dollars.

(g)     All notices provided under this Agreement by any Party to any other Party shall be in writing, and shall be delivered in person or sent by an internationally recognized overnight express courier service, by first class certified or registered mail (return receipt requested), or by email or facsimile transmission (confirmed by mailing a copy thereof to the recipient in accordance with this Section 7(g)) to such Party's address, email address or facsimile number set out below. Any such notice shall be effective (i) immediately (if delivered in person or sent by confirmed email or facsimile), (ii) on the third business day after delivery to an internationally recognized overnight express courier service or (iii) five days after mailing (if sent by mail), and in proving same it shall be sufficient to show that the envelope containing the same was delivered to the courier or postal service and duly addressed, or that receipt of a facsimile was confirmed by the recipient as provided above.   The addresses and facsimile numbers of the Parties for purposes of this Agreement are:

If the notice is to the Company:

VeroBlue Farms USA, Inc.
3369 Premier Drive, Suite 300
Plano, Texas  75023
Attn:  Leslie Wulf, Chief Executive Officer
Email:  les.wulf@verobluefarms.com

APP0061

If the notice is to the Consultant:

Keith Driver
5858 DalCastle Drive NW
Calgary, Alberta, Canada  T3A-1Z3
Email:  _KDRIVER@DRIVERPROJECTS.COM_

     (h)    This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

    **EXECUTED** as of the Effective Date.

VEROBLUE FARMS USA, INC.

By: _____
       Leslie Wulf,
      Chief Executive Officer

_____
      Keith Driver

17520018v.4

APP0062

## RESOLUTION

On motion duly made and seconded, it is unanimously resolved THAT the:

President is hereby authorized and empowered on behalf of the Company to accept and convey, assign, transfer or otherwise dispose of all or any shares, stocks, bonds, debentures, or debenture stock and other securities of every description now or hereafter registered in the name of the Company or held or owned by the Company and to make, sign and execute on behalf of the Company all and any instruments of acceptance, assignment and transfer and documents whenever necessary or proper to effectuate the same with full power to appoint in their place and stead an attorney or attorneys with full power of substitution therein, and that any and all instruments of acceptance, assignment and transfer and other documents in connection therewith and heretofore signed and executed on behalf of the Company in accordance with the authority set out above are hereby ratified and confirmed.

## CERTIFICATE

I hereby certify that the foregoing is a true and correct copy of a Resolution duly passed at a meeting of the Directors of Seven Hours Holding Company Inc. regularly held on the 12ʳ day of ___January___, 2017 and that the said Resolution is now in full force and effect. I further certify that the following is a list of all Directors, officers and employees of the Company authorized by this Resolution to do any act or thing with a true specimen of their signatures. I further certify that the following persons still hold their respective offices at the present time.

WITNESS my hand and seal of the Company this 12ʳ day of ___January___, 20 17.

PER: _____
      *(Secretary)*


Keith Driver    President    _____
                             *(Please Sign)*

## DIRECTION TO CANCEL

**TO:**    **TMX Trust Company ("TMX Trust")**
       **Toronto, Ontario**

**RE:**    **DIRECTION TO CANCEL**

You are authorized and directed, as transfer agent and registrar of VeroBlue Farms Inc. to cancel from the securityholder register share certificate the following certificate and reduce the share capital of VeroBlue Farms Inc. accordingly.

| Certificate Number | Total Number of Shares | Registration (exactly as it appears on certificate) |
|---|---|---|
| 9 | 2,500,000 | Seven Hours Holding Company Inc. 534 WENTWORTH PL SW CALGARY AB T3H 4N8 |

I certify that the return to treasury of these securities is not in violation of any applicable laws or regulations, including applicable securities laws and regulations, and exchange regulations.

VeroBlue Farms Inc. agrees to indemnify and hold harmless TMX Trust, its successors and assigns, and each of their respective directors, officers, employees and agents (the "Indemnified Parties") against any demands, claims, assessments, proceedings, suits, actions, costs, judgments, penalties, interest, liabilities, losses, damages, expenses and disbursements (including legal fees and disbursements on a substantial indemnity or solicitor and client basis) that the Indemnified Parties, or any of them , in consequence of, arising from or in any way relating to acting on this direction.

*[Signature page follows]*

Dated as of the _____ day of January, 2017.

**VEROBLUE FARMS INC.**

Per: _____

Leslie Wulf
Chief Executive Officer