# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| VEROBLUE FARMS USA INC., | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| LESLIE A. WULF, BRUCE A. HALL, JAMES | § | |
| REA, JOHN REA, and KEITH DRIVER, | § | |
| Defendants/Third Party Plaintiffs, | § | CIVIL ACTION NO. 3:19-CV-00764-L |
| | § | |
| v. | § | |
| | § | |
| EVA EBSTEIN, JENS HAARKOETTER, BJORN | § | |
| THELANDER, ANDERS WESTER, NORMAN | § | |
| MCCOWAN, DR. OTTO HAPPEL and ALDER | § | |
| AQUA, LTD. | § | |
| Third-Party Defendants | § | |

---

## DEFENDANTS/THIRD-PARTY PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO THIRD-PARTY DEFENDANT BJORN THELANDER'S MOTION TO DISMISS THIRD-PARTY CLAIMS

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iv

FACTUAL BACKGROUND ............................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.    **The Court Maintains Personal Jurisdiction over Thelander Based on Years of Activities Directed Toward VBF's Operations in Texas. (FRCP 12(b)(2)) ........................ 4**

  A.  **Thelander Purposefully Directed Activities at VBF's Offices, Personnel, and Operations in this District. ............................................................................. 6**

    *1)   July 6, 2016 – Unanimous Written Consent of the Board of Directors and the Sole Shareholder of VBF IP, Inc. (Exhibit A-7). .................................................... 6*

    *2)   July 7, 2016 – VeroBlue Farms, USA Inc. Series A Preferred Stock Purchase Agreement (Exhibit A-1). ................................................................................. 7*

    *3)   August 3, 2016 – Amended and Restated Certificate of Formation of VBF IP, Inc. (Exhibit A-8). ................................................................................. 7*

    *4)   August 3, 2016 – Restated Articles of Incorporation of Iowa's First, Inc. (Exhibit A-9). ........ 8*

    *5)   September 20-21, 2016 – Minutes of the Meeting of the Board of Directors of VeroBlue Farms USA, Inc. (Exhibit A-10). ............................................................ 8*

    *6)   December 6, 2016 – Iowa's First Inc.'s Application for Authority to Transact Business in Illinois (Exhibit A-11). .............................................................. 8*

    *7)   October 24, 2017 - Minutes of the Meeting of the Board of Directors of VeroBlue Farms USA, Inc. (Exhibit A-12). ......................................................... 9*

    *8)   October 27, 2017 – Hall and T. Rea Termination Agreements (Exhibits A-4, A-5). ............... 9*

    *9)   November 6, 2017 – E-mail Correspondence between Ebstein, Thelander, and Wester (Exhibit A-6). ................................................................................. 10*

    *10)  November 9, 2017 – November 22, 2018 – E-mail Correspondence between Wulf and Thelander (Exhibit A-14). ................................................................. 11*

    *11)  December 1, 2017 – Wulf Termination Agreement (Exhibit A-3). ........................................ 11*

  B.  **Founders' Claims "Arise out of or Relate To" The Thelander's Activities With the Northern District of Texas. .................................................................. 12**

  C.  **The Northern District of Texas Exercising Jurisdiction Would Not be Unreasonable ....................................................................................... 13**

II.    **Founders Have Alleged Adequate Facts to State a Claim for Tortious Interference Against Thelander. (FRCP 12(b)(6)) ..................................................... 14**

  A.  **Thelander Was Acting for His Personal Self Interest, and not as Agent for VBF, in Encouraging VBF to Breach its Contracts with Founders. ............................. 14**

  D.  **Thelander Cannot Assert VBF's "Justification" in Breaching its Contacts with Founders as a Basis for Dismissal ....................................................... 16**

*1.   The Releases in the Termination Agreements Act as a Bar to VBF's Claims against T. Rea and Hall* ................................................................................................................. *16*

*2.   Whether Egregious Cause Existed Under the Employment Agreement Justifying VBF's Termination of James Rea is A Question of Fact* ......................................................... *18*

**E.   VBF's Confirmation Plan Explicitly Carved Out Founders' Claims against Thelander and the Third-Party Defendants from Release and Discharge** .................... **18**

**F.   Thelander Actively Participated in VBF's Breach of Founders' Contracts** ........... **21**

**III.  Founders' Damages and Prayer for Attorneys' Fees are Well Plead** ........................ **22**

**CONCLUSION** ................................................................................................................. **26**

## TABLE OF AUTHORITIES

**Cases**

*AFTG–TG, LLC v. Nuvoton Tech. Corp.*,
  689 F.3d 1358 (Fed. Cir. 2012) .......................................................................... 3, 5
*Akro Corp. v. Luker*,
  45 F.3d 1541 (Fed. Cir. 1995) ................................................................................ 4
*Alma Group, LLC v. Palmer*,
  143 S.W.3d 840 (Tex. App. 2004) ........................................................................ 24
*Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*,
  566 F.3d 1012 (Fed. Cir. 2009) .......................................................................... 4, 5
*Bell Atlantic Corp v. Twombly*,
  550 U.S. 540 (2007) ............................................................................................... 3
*Conley v. Gibson*,
  335 U.S. 41 (1957) ................................................................................................. 3
*Cypress Engine Access., LLC v. HDMS Ltd. Co*,
  283 F. Supp. 3d 580 (S.D. Tex. 2017) ............................................................ 16, 17
*Daimler AG v. Bauman*,
  —U.S.——, 134 S. Ct. 746 (2014) ........................................................................ 5
*Ed Rachel Foundation v. D'Unger*,
  117 S.W.3d 348 (Tex.App. Corpus Christi,2003) ............................................ 24, 25
*Elecs. for Imaging*,
  340 F.3d 1344 (Fed. Cir. 2003) .................................................................... 3, 4, 5
*Ganske v.  WRS Group, Inc.*,
  Cause No. 10-06-00050-CV, 2007 WL 1147357 (Tex. App. – Waco April 18, 2007, no pet.)
  ............................................................................................................ 17, 20, 23
*Grober v. Mako Prods., Inc.*,
  686 F.3d 1335 (Fed. Cir. 2012) .......................................................................... 4, 5
*Hanson v. Denckla*,
  357 U.S. 235 (1958) ............................................................................................... 4
*Holloway v. Skinner*,
  898 S.W.2d 793 (Tex. 1995) ................................................................................ 14
*In re Chinese-Manufactured Drywall Products Liab. Litig.*,
  753 F.3d 521 (5th Cir. 2014) .......................................................................... 12, 13
*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ........................................................................................... 4, 5
*ITL Int'l, Inc. v. Constenla, S.A.*,
  669 F.3d 493 (5th Cir. 2012) ................................................................. 6, 10, 11, 12
*J. McIntyre Mach., Ltd. v. Nicastro*,
  — U.S. —, 131 S. Ct. 2780 (2011) ........................................................................ 4
*Luv n' care, LTD. v. Insta-mix, Inc.*,
  438 F.3d 465 (5th Cir. 2006) ................................................................................ 13
*McFadin v. Gerber*,
  587 F.3d 753 (5th Cir. 2009) ................................................................................. 6
*National Property Holdings, L.P. v.  Westergren*,
  453 S.W.3d 419 (Tex. 2015) ................................................................................ 16

*Nuance Commc'ns, Inc. v. Abbyy Software House*,
   626 F.3d 1222 (Fed. Cir. 2010) .................................................................. 5
*Religious Tech. Ctr. v. Liebreich*,
   339 F.3d 369 (5th Cir. 2003) ................................................................... 4
*Schlobohm v. Schapiro*,
   784 S.W.2d 355 (Tex. 1990) .................................................................... 4
*Silent Drive, Inc. v. Strong Indus., Inc.*,
   326 F.3d 1194 (Fed. Cir. 2003) .................................................................. 6
*Sterner v. Marathon Oil Co.*,
   767 S.W.2d 686 (Tex. 1989) .................................................................. 16
*Stuart v. Spademan*,
   772 F.2d 1185 (5th Cir. 1985) .................................................................. 3
*Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*,
   563 F.3d 1285 (Fed. Cir. 2009) .................................................................. 6
*Wien Air Alaska, Inc. v. Brandt*,
   195 F.3d 208 (5th Cir. 1999) .................................................................. 13
*World–Wide Volkswagon Corp. v. Woodson*,
   444 U.S. 286 (1984) .............................................................................. 5

## Statutes

Bankruptcy Code §§ 524(e) and 1129 (a) .............................................. 19
Tex. Civ. Prac. & Rem. Code § 38.011 .................................................. 24
Texas Civ. Prac. & Rem. Code § 38.001 ........................................ 24, 25

## Rules

FRCP 12(b)(2) ...................................................................................... 3, 4
FRCP 12(b)(6) .................................................................................... 3, 14
FRCP 8(c)(1) ......................................................................................... 16

v

Defendants/Third Party Plaintiffs, Leslie A. Wulf ("**Wulf**"), Bruce A. Hall ("**Hall**"), John E. "Ted" Rea ("**T. Rea**"), and James Rea ("**J. Rea**") (collectively "**Founders**"), hereby respond to Third Party Defendant, Bjorn Thelander's ("**Thelander**") Motion to Dismiss Third Party Claims Pursuant to Rules 12(b)(2) & 12(b)(6) (the "**MTD**") [Dkt. No. 145]. Thelander, as a director of VBF and a representative of VBF's controlling shareholder, personally directed the termination of all of the Founders, negotiated the agreements governing their termination, and then immediately obliged VBF to breach the binding contracts it negotiated with the Founders.  These actions, which (1) all took place against Texas residents, (2) from an office based in Plano, Texas, (3) involving agreements selecting Texas courts as the proper forum, subject Thelander to the jurisdiction of this Court. In further opposition to Thelander's Motion, Founders state the following:

## FACTUAL BACKGROUND

Founders were the founders, officers, and directors of VeroBlue Farms, USA, Inc. ("**VBF**"), and were among its original shareholders and officers: CEO (Wulf), CFO (Hall), COO (T. Rea) and Construction Director (J. Rea). At various times between 2014 and 2016, each of the Founders served as Directors on VBF's Board as well.  In July 2016, Alder Capital International Ltd., ("**Alder**" which later became Alder Aqua, Ltd.), and FishDish LLC, an Iowa investor group ("**FishDish**"), together invested $34,000,000 in VBF through a purchase of preferred stock.[1]  Third Party Defendant Thelander was one of two directors that Alder appointed as its representatives to VBF's Board in July 2016.  Thelander served as director of VBF until sometime in early 2018.  At the same time, it invested equity into VBF, Alder extended a line of credit to VBF, through its

---

[1] *See* July 9, 2016 VeroBlue Farms USA Inc. Series A Preferred Stock Purchase Agreement ("**Series A Ag.**"). attached as **Exhibit A-1** to Affidavit of Leslie Wulf, dated September 17, 2019, Exhibit A hereto ("**Wulf Aff.**").

1

affiliate, Amstar Funds ("**Amstar**"), and in exchange, VBF issued warrants to Alder that could be exercised to obtain additional shares, via a separate agreement.

Within a year of Alder's investment, in July 2017, VBF had drawn down on the Amstar loan and Alder exercised certain warrant rights, which resulted in Alder owning a controlling interest (54%) in VBF. Within weeks, Thelander, along with Alder representative and VBF board member, Jens Haarkoetter, and Alder principals, Otto Happel ("**Happel**") and his daughter Eva Ebstein ("**Ebstein**"), began serially terminating Founders from their positions with VBF. (Third Party Complaint, Dkt. No. 66 ("TPC"), ¶¶ 25-30, 34-35,39, 47-48.) Since then, Founders have discovered that Thelander and the other Third-Party Defendants participated in a scheme to oust Founders from management, falsely accuse them of a litany of misdeeds, and avoid, or otherwise breach VBF's contractual obligations to the Founders. Specifically, Thelander and the other Third-Party Defendants negotiated termination agreements between three of the four Founders and VBF, and then directed VBF to fabricate reasons to avoid its obligations to Founders under such agreements.[2] This was succinctly stated by Ebstein in an email to Thelander before terminating Mr. Wulf: "[A]nyone terminated by Les received a lovely golden parachute of other people's money. *We need to try and avoid this, if legally permissibl*e." (Wulf Aff., Ex. A-6.)

On July 31, 2018, VBF filed suit against Founders claiming they had misappropriated funds and committed other misdeeds while officers and directors of the company.[3] On April 10, 2019, the Founders filed their Third-Party Complaint ("**TPC**") against Thelander and six other directors and investors in VBF. [Dkt. No. 66.] In the TPC, each Founder asserts that Thelander

---

[2] Founders' respective agreements with VBF are defined as they are in the TPC. (*See* Wulf Aff., Exs. A-2 thru A-5.)
[3] Shortly thereafter, on September 21, 2018, VBF filed for Chapter 11 bankruptcy protection in the Northern District of Iowa (*In re: VeroBlue Farms USA, Inc.*, Case No. 18-01297 (Bankr. N.D. Iowa) ("In re VBF"). Alder, through Thelander, Harkoetter, Ebstein and the other Third-Party Defendants, controlled VBF's reorganization, first as the sole DIP lender and now, as the sole shareholder of the reorganized entity.

and the other Third-Party Defendants used their leverage as Alder's representatives on VBF's Board to tortiously interfere with his respective agreement with VBF, which led to VBF breaching its obligations to the Founders under these contracts. Founders allege that each and every action taken by Thelander was directed against Founders in their positions as officers of VBF, whose principal office was located in Plano, Texas. Thelander's actions were repeatedly made in or directed at people, entities, activities and contracts located in and governed by Texas law. This Court unquestionably has jurisdiction over Thelander in this matter, and Founders claims are adequately pled and should proceed.

## ARGUMENT

Thelander's Motion is brought under two separate grounds: (1) that this Court lacks personal jurisdiction over him under FRCP 12(b)(2); and (2) that Founders' Third-Party Complaint fails to state a claim under FRCP 12(b)(6). To survive Thelander's jurisdictional claim under Rule 12(b)(2), in the absence of jurisdictional discovery or an evidentiary hearing, Founders need only make a *prima facie* showing of jurisdiction.[4] In evaluating that showing, a court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."[5] Uncontroverted allegations in the plaintiff's complaint must be accepted as true, and any factual conflicts in the parties' evidence must be resolved in the plaintiff's favor.[6]

Thelander's motion to dismiss under Rule 12(b)(6) should be granted *only* if it appears beyond a doubt that Founders can prove *no set of facts* in support of its claim which would entitle them to relief.[7] Such a motion merely tests the legal sufficiency of a complaint, requiring a court

---

[4] *AFTG–TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1360 (Fed. Cir. 2012) (citing *Elecs. for Imaging*, 340 F.3d at 1349)).
[5] *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).
[6] *AFTG–TG*, 689 F.3d at 1360.
[7] *Conley v. Gibson*, 335 U.S. 41, 48 (1957) (emphasis added); *see also* Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp v. Twombly*, 550 U.S. 540, 570 (2007).

to construe the complaint liberally, assume all facts as true, and draw all reasonable inferences in favor of the plaintiff.[8] A complaint should never be dismissed because the court is doubtful that the plaintiff will be able to prove all of the factual allegations contained therein. *Id.*

## I.     The Court Maintains Personal Jurisdiction over Thelander Based on Years of Activities Directed Toward VBF's Operations in Texas. (FRCP 12(b)(2))

In the Federal Circuit, "[a] personal jurisdiction determination for an out-of-state defendant is a two-step inquiry: (1) whether a forum state's long-arm statute permits service of process and (2) whether assertion of personal jurisdiction violates due process."[9] The Texas long-arm statute, which governs here, is coextensive with the limits of federal due process.[10]  For that reason, the personal jurisdiction analysis narrows to one inquiry: whether an exercise of personal jurisdiction comports with the Due Process Clause of the U.S. Constitution.[11]

To satisfy the Due Process Clause, a defendant must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[12]  As a general matter, the sovereign's exercise of judicial power requires some act by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protections of its laws."[13]  In that manner, due process principles "give a degree of predictability to the legal system that allows

---

[8] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).

[9] *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012) (quoting *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017 (Fed. Cir. 2009)) (internal quotation marks omitted).

[10] *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990); *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003).

[11] *See Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003).

[12] *Akro Corp. v. Luker*, 45 F.3d 1541, 1545 (Fed. Cir. 1995) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[13] *J. McIntyre Mach., Ltd. v. Nicastro*, — U.S. —, 131 S. Ct. 2780, 2787 (2011) (plurality opinion) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."[14]

There are two types of minimum contacts: (1) those giving rise to "general" personal jurisdiction, and (2) those giving rise to "specific" personal jurisdiction.[15] General jurisdiction exists only if the defendant's "continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities."[16] Specific jurisdiction, by contrast, is "based on activities that arise out of or relate to the cause of action, and can exist even if the defendant's contacts are not continuous or systematic."[17]

As described *infra,* Thelander has held himself out to multiple governmental authorities as being officed in or otherwise located in Plano, Texas. He certainly wanted those authorities to believe he was "essentially at home" in Texas, as required to establish general jurisdiction.[18] But even without general jurisdiction, it is clear this Court can exercise specific jurisdiction over Thelander. The Federal Circuit applies a three-factor test to determine if specific personal jurisdiction exists: (1) whether the defendant "purposefully directs" his activities at residents of the forum state, (2) whether the claim "arises out of or relates to" the defendant's activities with the forum state, and (3) whether assertion of personal jurisdiction is "reasonable and fair."[19] "The plaintiff has the burden of proving parts one and two of the test, and then the burden shifts to the defendant to prove that personal jurisdiction is unreasonable."[20] "Under this test, a court may

---

[14] *World–Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1984).

[15] *AFTG–TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1360 (Fed. Cir. 2012).

[16] *Daimler AG v. Bauman*, —U.S.—, 134 S. Ct. 746, 754 (2014) (quoting *Int'l Shoe Co.*, 326 U.S. 310, 316 (1945)).

[17] *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1346 (Fed. Cir. 2012) (quoting *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017 (Fed. Cir. 2009)).

[18] *Daimler* 134 S. Ct. at 754.

[19] *AFTG–TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1361 (Fed. Cir. 2012) (citing *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1231 (Fed. Cir. 2010)).

[20] *Grober*, 686 F.3d at 1356 (citing *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1350 (Fed. Cir. 2003)).

properly assert specific jurisdiction, even if the contacts are isolated and sporadic, so long as the cause of action arises out of or relates to those contacts."[21]

### A.    Thelander Purposefully Directed Activities at VBF's Offices, Personnel, and Operations in this District.

The "touchstone" of the minimum contacts test under the first prong "is whether the defendant's conduct shows that it 'reasonably anticipates being haled into court."[22] "This requirement can be satisfied by showing that the defendant purposefully directed [his] activities toward the forum state or purposely availed [himself] of the privileges of conducting activities there."[23] While specific jurisdiction is possible even if the defendant's forum contacts are only isolated or sporadic, the relevant contacts "must be more than random, fortuitous, or attenuated, or of the unilateral activity of another party or third person."[24] What follows is a nonexclusive, chronological account of Thelander's contacts with the State of Texas that unambiguously reveal Thelander is acutely aware he could be "haled into" this Court.

*1) July 6, 2016 – Unanimous Written Consent of the Board of Directors and the Sole Shareholder of VBF IP, Inc. (Exhibit A-7).*[25]

VBF IP, Inc. is a Texas corporation. VBF is the sole shareholder of VBF IP, Inc. The July 6, 2016 Unanimous Written Consent appointed Thelander to serve as an "Investor Director" on the Board of VBF IP, Inc. This Consent also specified that the principal office of VBF IP, Inc. would be in Plano, Collin County, Texas, and required VBF IP to maintain a list of shareholders in accordance with the Texas Business Organizations Code ("TBOC"). The TBOC is invoked an additional four (4) times in the July 6, 2016 Unanimous Written Consent. By agreeing to serve as

---

[21] *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*, 563 F.3d 1285, 1297 (Fed. Cir. 2009) (citing *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1200 (Fed. Cir. 2003)).

[22] *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009)

[23] *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 498 (5th Cir. 2012)

[24] *Id.* at 498-99.

[25] *See* Wulf Aff., Ex. A, ¶ 18, for a description of all exhibits referenced herein.

6

an Investment Director on the board of a Texas corporation, with a principal office in Plano, Texas, that was governed by the TBOC, Thelander unquestionably directed his activities towards the Northern District of Texas.

2) *July 7, 2016 – VeroBlue Farms, USA Inc. Series A Preferred Stock Purchase Agreement (Exhibit A-1).*

Alder's equity investment into VBF is documented, in part, by the Series A Agreement. In that Agreement, Thelander is identified as one of two "Lead Investor Directors" of VBF. (Series A Ag., Ex. A-1, § 1.5(y).)  This Agreement clearly identifies VBF's offices as 1507 Capital Avenue, Suite 101, Plano, Texas 75074, and requires notice to be provided to VBF's counsel, Jackson Walker, in Dallas. (*Id.*, §7.5) Moreover, the Series A Agreement required Thelander to execute an Indemnification Agreement with VBF as part of the equity transaction. (*Id.*, §4.2(h).) Accordingly, Thelander was specifically named as Alder's representative to a Board of a company (VBF) that had its named office located in Texas, and Thelander entered into an indemnification agreement with that same company for his acts as one of its directors. Thelander not only sits on the board of two companies with principal offices in Texas, but he has been indemnified by at least one of them for his acts as director.

3) *August 3, 2016 – Amended and Restated Certificate of Formation of VBF IP, Inc. (Exhibit A-8).*

Shortly after Thelander's installation as director of VBF IP, that company submitted an Amended and Restated Certificate of Formation to the Texas Secretary of State.  In this Certificate, Thelander lists his address as 1507 Capital Avenue, Suite 101, Plano, Texas 75074. This was not merely a statement of where the company was located, but where he personally, as a director, was located.  Thelander essentially reported to the Texas Secretary of State that he could be found in Plano, Texas - a plainly purposeful and directed activity towards this forum.

7

4) *August 3, 2016 – Restated Articles of Incorporation of Iowa's First, Inc. (Exhibit A-9).*

Iowa's First, Inc. is another entity owned by VBF. Thelander also sits on its Board of Directors. Although Iowa's First is an Iowa corporation, in its restated Articles of incorporation, submitted to the Iowa Secretary of State, Thelander again lists his address as 1507 Capital Avenue, Suite 101, Plano, Texas 75074. Even in other states, Thelander affirmatively holds himself out as having a continuing presence in Plano, Texas.

5) *September 20-21, 2016 – Minutes of the Meeting of the Board of Directors of VeroBlue Farms USA, Inc. (Exhibit A-10).*

Thelander participated in quarterly meetings of VBF's Board of Directors. (Wulf Aff., Ex. A, ¶¶ 10-11.) Several of these meetings took place via telephone calls initiated by VBF's executive personnel in Plano, Texas. However, ***Thelander was also physically present at VBF's offices in Plano, Texas*** for at least one Board of Directors meeting on September 20 – 21, 2016. (*Id.*, ¶ 11, Ex. A-10). Also, the minutes of this meeting name Thelander as a member of VBF's Governance and Compensation Committee, which was directed from VBF's corporate office in Plano, Texas.

6) *December 6, 2016 – Iowa's First Inc.'s Application for Authority to Transact Business in Illinois (Exhibit A-11).*

On December 6, 2016, Iowa's First, filed an Application for Authority to Transact Business in Illinois. On the last page of the Application, Thelander is listed, again, as a director of Iowa's First. However, Thelander now lists his address as 3369 Premier Drive, Suite 300, Plano, Texas 75023. Via this filing, Thelander claimed two distinct addresses within the jurisdictional limits of the Northern District of Texas.

7) *October 24, 2017 - Minutes of the Meeting of the Board of Directors of VeroBlue Farms USA, Inc. (Exhibit A-12).*

On October 24, 2017, VBF's Board of Directors met by telephone to discuss two matters at the heart of Founders' Third-Party Complaint: 1) termination of Defendants' T. Rea and Hall; and 2) the harassment allegations against Alder Director Haarkoetter. The minutes of this meeting indicate that Thelander was present telephonically.  But more importantly, these minutes illustrate Thelander's detailed involvement in Founders' termination and negotiation of the very agreements that VBF later breached with them.  The minutes also disclose that the "terms of their [T. Rea and Hall] severance was one year of salary each with a full release. This release was being circulated to Bjorn Thelander and Les [Wulf] today for finalization." The minutes go on to provide that "Bjorn Thelander commented on the skills required for a CFO in a startup such as VBF including tight expense controls, the ability to challenge assumptions and financial acumen – Bruce was lacking in these skills." The notes from this meeting indicate that Thelander was not merely a board member of VBF, he was active, and the apparent leader of the efforts to terminate two executives who officed out of VBF's Plano, Texas office. Not only that, but Thelander was actively participating in the negotiation of the Termination Agreements for Hall and T. Rea. (Wulf Aff., Ex. A, ¶¶ 11, 13-14.) Thelander availed himself to the jurisdiction of this Court far beyond the "more than random, fortuitous, or attenuated" standard applied by this Court.

8) *October 27, 2017 – Hall and T. Rea Termination Agreements (Exhibits A-4, A-5).*

Hall and T. Rea's Termination Agreements were executed on October 27, 2017. Thelander was actively involved in negotiating these Termination Agreements and was undeniably aware of the contents of each. (Wulf Aff., Ex. A, ¶ 13). Included in Hall and T. Rea's Termination Agreements is a provision that they would be governed by and construed in accordance with the

9

laws of the State of Texas. (*Id.*, ¶ 14). Additionally, the Termination Agreements contain the provision that "[e]ach Party irrevocably submits to the exclusive jurisdiction of the Federal District Court for the Northern District of Texas for the purpose of any suit, action, or other proceeding arising out of this Agreement." (*Id.,* Ex. A-4, ¶ 7(l) and Ex. A-5, ¶ 7(l)).  On November 14, 2017, in an effort to clarify certain provisions of the Termination Agreements, Thelander sent Hall and T. Rea an e-mail stating that it was "good speaking with you just now," and that "if you can sign and return this attachment electronically, we will process the payment immediately." (Wulf Aff., ¶ 13, Ex. A-13). The "attachment" referenced is a release letter designed to clarify the Termination Agreements, and from the e-mail, it appears Thelander was withholding payments due under the Termination Agreement until Hall and Ted signed an additional release. (*Id.*) Thelander inserted himself in the negotiation and clarification of the Termination Agreements, and from his e-mail, had the power and authority to control payments due under the Termination Agreements. As such, Thelander was unquestionably aware that his conduct in interfering with the Termination Agreements would subject him to the jurisdiction of this Court.

> 9) *November 6, 2017 – E-mail Correspondence between Ebstein, Thelander, and Wester (Exhibit A-6).*

Within two weeks of terminating Hall and T. Rea, and on the very same day that Wulf was terminated as VBF's CEO, Ebstein was communicating with Thelander and other Third-party Defendants to cement their scheme to gin up allegations and pretenses under which VBF could avoid the very contractual obligations to Founders that Thelander was tasked with negotiating.  As quoted in the Third-Party Complaint, Ebstein conveyed to Thelander and others her dismay that "anyone terminated by Les received a lovely golden parachute of other people's money." (Ex. A-6). She then suggested that she, Thelander and others: "need to try and avoid this, if legally permissible." (*Id.*) At this point in time, both Hall and T. Rea had been "terminated by Les [Wulf]"

and Thelander had just been tasked, days before, with negotiating and executing their Termination Agreements. This e-mail provides direct evidence that Thelander was part of a scheme attempting to reach into the Northern District of Texas and breach legally binding contracts with the Founders. When Thelander agreed to participate in this scheme, and then actually carried it out, he forfeited any jurisdictional argument he potentially had.

> 10) *November 9, 2017 – November 22, 2018 – E-mail Correspondence between Wulf and Thelander (Exhibit A-14).*

Just days after Wulf was terminated, Thelander emailed him to discuss the particulars of Wulf's Termination Agreement. (Wulf Aff., Ex. A, ¶¶ 11-17.) In the emails, Thelander states (1) "I promise to follow up with the lawyers today and see where we stand" in regards to editing and finalizing Wulf's Termination Agreement; and (2) "I have been pushing from my side to settle this as soon as possible, and have no desire to delay or draw anything out. I will again do my best to push the lawyers. (*Id.*, Ex. A-14.) These communications expose that Thelander was intimately and substantially involved in negotiating, finalizing, and executing Wulf's Termination Agreement. As previously discussed, Wulf was the CEO of VBF and officed exclusively out of VBF's Plano office. These communications between Thelander and Wulf therefore show Thelander actively participating in the termination of a senior level executive working in the Northern District of Texas. This action alone is sufficient to put Thelander on notice that he should "anticipate being haled into" this Court.

> 11) *December 1, 2017 – Wulf Termination Agreement (Exhibit A-3).*

In the same vein, Wulf's Termination Agreement included a provision that the Agreement would be governed by Texas law and a provision designating the Northern District of Texas as the exclusive jurisdiction for any disputes regarding that agreement.  Coupled with the prior correspondence, Wulf's Termination Agreement clearly illustrates that Thelander was well aware

11

that any interference with that Agreement would be litigated in this Court. Founders have provided more than sufficient evidence that Thelander not only tortiously interfered with the Termination Agreements, but knew that this interference would be litigated in the Northern District of Texas.

Thelander served on the Board of Directors of a company whose principal office was located in Plano, Texas; he represented to three different state government bodies that he could be personally located at an address in Plano, Texas; he visited Texas for at least one Board meeting and participated in numerous others telephonically with the officers there; communicated weekly with VBF's CEO and employees about the company's operations, and he personally negotiated with the Founders over the very contracts that are now the subject of Founders' claims against him.  Through all these activities, Thelander "purposefully directed" his activities at residents of Texas, specifically the Northern District and is subject to this Court's jurisdiction.

### B.   Founders' Claims "Arise out of or Relate To" The Thelander's Activities With the Northern District of Texas.

The second factor in assessing specific jurisdiction is whether Founders' claims are based on "alleged injuries that arise out of or relate to those activities" on which the Thelander's minimum contacts are established.[26] In other words, there must be a sufficient "nexus between the defendants' contacts with [the forum state] and the plaintiffs' [underlying] claims."[27] The Fifth Circuit has suggested that this flexible standard aims to both ensure a "causal nexus between the [alleged] conduct and the purposeful contact" and account for "the foreseeability and fundamental fairness principles forming the foundation upon which the specific jurisdiction doctrine rests."[28]

Thelander's directed contacts with the Northern District of Texas all relate to actions he took as a director of VBF and/or one of its subsidiaries.  His closest contacts: personal attendance

---

[26] *In re Chinese-Manufactured Drywall Products Liab. Litig.*, 753 F.3d 521, 540 (5th Cir. 2014)
[27] *ITL Int'l*, 669 F.3d at 500.
[28] *Chinese-Manufactured Drywall Products*, 753 F.3d at 543.

at a VBF Board meeting, emails with Ebstein and Wulf about Founders' termination, and negotiation of the Founders' Termination Agreements, establish some of the very actions that Founders claim constitute interference in their contractual agreements.  Thelander was directly involved in negotiating agreements with the Founders that he later worked with Ebstein and the other Third Party Defendants to sabotage.[29]  While Thelander may challenge the validity of Founders' claim for tortious interference, this Court's inquiry is simply "whether the plaintiff's cause of action arises out of or results from the defendant's forum related contacts, ***whatever the claims ultimate merits***.[30]

Accordingly, Founders have shown that Thelander purposely availed himself of the privileges of conducting activities in the Northern District of Texas. He did so by claiming an address at two different locations in this district, attending company board meetings here, negotiating contracts and agreements in Texas, advising on VBF's hiring and firing decisions in this district (Wulf Aff. Ex. A, ¶¶ 10-17), and scheming to breach a number of those agreements here in Texas. Thelander's ability to tortiously interfere with Founders' Agreement arises out of and relates to his business dealings with the Founders in the Northern District of Texas.

### C.     The Northern District of Texas Exercising Jurisdiction Would Not be Unreasonable

Lastly, at step three of the jurisdictional analysis, "the burden of proof shifts to the defendant to show that the exercise of jurisdiction would be unreasonable."[31]  For a defendant to carry his burden at this step, he "must make a compelling case."[32] Thelander fails even to argue that the exercise of jurisdiction would be unreasonable and therefore cannot carry this

---

[29] In fact, it was these very agreements that Thelander negotiated, and the forum selection provisions they contained, that lead the Iowa District Court to transfer this case to the Northern District of Texas.
[30] *Id*. at 549.
[31] *Luv n' care, LTD. v. Insta-mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006)
[32] *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)

burden.  Accordingly, this Court may lawfully assert personal jurisdiction over Founders' tortious interference claims asserted against Thelander.

## II.   Founders Have Alleged Adequate Facts to State a Claim for Tortious Interference Against Thelander. (FRCP 12(b)(6))

As a separate matter, Thelander argues that Founders' separate claims for tortious interference against him fail to allege sufficient facts. The elements for tortious interference with an existing contract under Texas law include: (1) an existing contract subject to interference and (2) a willful and intentional act of interference with the contract (3) that proximately caused the plaintiff's injury and (4) caused actual damages or loss.  Founders have alleged more than adequate facts to establish each of these elements and their claims should proceed accordingly.

### A.   Thelander Was Acting for His Personal Self Interest, and not as Agent for VBF, in Encouraging VBF to Breach its Contracts with Founders.

Thelander first suggests that element two was not met because, as a director of VBF, Thelander was an agent of VBF and not legally capable of tortious interference with VBF's contracts. (MTD, p. 12.) To be legally capable of tortious interference, Thelander must be a "stranger to the contract" with which he allegedly interfered.[33] A corporation's agent is not a stranger to the contract and cannot tortiously interfere with the corporation's contract, ***unless the agent is acting in his or her own self-interest***.[34]

Founders have alleged that Thelander was acting to benefit himself and the other Alder Defendants, namely Alder, not VBF, in directing VBF to breach their respective termination and employment agreements.   One of the first acts that VBF director Ebstein asked Thelander to

---

[33] *Holloway v. Skinner*, 898 S.W.2d 793, 795-95 (Tex. 1995) (emphasis added) (recognizing the fundamental principle that a party to a contract cannot tortiously interfere with its own contract.)

[34] *Id.* at 795-96 (holding that for an agent to be liable for tortious interference, the plaintiff had to show that the agent acted so contrary to the principal's best interests that his actions could only have been motivated by personal interests).

undertake was to consult with legal counsel to find a way to avoid the obligations to the Founders due to their "political agendas," notably, not due to their performance as officers. (TPC, ¶ 36 and Ex. A-6). Ebstein was not an officer of VBF when she sent this email, but purportedly an independent director (and the daughter of the largest shareholder). Thus, in following her direction, Thelander was acting in his own self-interest, and that of the majority shareholder, not of VBF.

Additionally, Thelander engaged *Alder's counsel*, Davis Graham & Stubbs ("**DGS**"), instead of VBF's corporate counsel, Jackson Walker, to negotiate and document Wulf's Separation Agreement, (TPC, ¶ 34, 35). Refusing to utilize VBF's corporate counsel in negotiating the removal of a senior level is a curious decision. If Thelander was truly acting as an agent of VBF, as he alleges in his Motion to Dismiss, it would follow that he would use VBF resources in exercising his duties to VBF. Thelander's decision to engage Alder's law firm to remove Wulf from his position as CEO certainly raises questions regarding who Thelander was representing in this transaction. It could have been Alder, the entity that appointed Thelander to the Board of Directors of VBF in the first place (TPC, ¶ 19), it could have been Happel, who Forbes lists as the 838th richest man in the world (TPC, ¶ 14), it could have been to protect his fellow Alder board representative Haarkoetter, who Founders discovered and revealed had sexually harassed multiple employees of VBF (TPC, ¶ 48). In short, Thelander was acting as an agent for, and in the interests of multiple parties, but he did not even attempt to distinguish among those interests.

When Founders Complaint is construed liberally, when all facts therein are assumed true, and when all reasonable inferences are made in favor of Founders, the Complaint undeniably would tend to support Founders' claim for relief. Founders' allegations are sufficient to permit Founders to pursue a tortious interference claim against Thelander, even though he was a director of VBF, as Thelander's loyalties, at the very least, were conflicted.

### D.     Thelander Cannot Assert VBF's "Justification" in Breaching its Contacts with Founders as a Basis for Dismissal.

Next, Thelander argues that Founders did not allege sufficient facts to demonstrate that Thelander actively persuaded VBF to breach the Termination Agreements. Specifically, Thelander asserts that VBF had a contractual right to take the actions it did (invoking the justification defense). Legal justification is an affirmative defense, which requires the defendant to show that the interference: (1) was done in a bona fide exercise of the defendant's own rights, or (2) the defendant's interest in the contract's subject matter was equal or superior to the plaintiff's.[35] Thelander appears to argue only the first type of justification: that VBF was within its rights to terminate J. Rea and to file suit against Hall and T. Rea, despite having previously released them. (MTD, p. 13-15.)[36]   Thelander then claims that VBF was "justified" in bringing suit, despite the broad releases in T. Rea's and Hall's Termination Agreements, because those contracts did not include a covenant not to sue. (MTD, p. 13.) Neither of these arguments are compelling.

#### 1.   *The Releases in the Termination Agreements Act as a Bar to VBF's Claims against T. Rea and Hall.*

Thelander cites *National Property Holdings, L.P. v. Westergren,* 453 S.W.3d 419, 428-29 (Tex. 2015) for the proposition that a release is not a covenant not to sue. (MTD, p. 14.)   But whether a release or settlement agreement operates as a covenant not to sue depends on the particular language used.  In *Westergren*, the parties simply agreed to "release all liability" related to a lis pendens and related claims in a pending lawsuit, and the release specifically provided that it could be plead as an affirmative defense. *Id.* at 422. Similarly, in *Cypress Engine Access., LLC v. HDMS Ltd. Co*, 283 F. Supp. 3d 580 (S.D. Tex. 2017), also cited by Thelander, the parties could

---

[35] *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 691 (Tex. 1989).
[36] Part of this argument relies on VBF's claim that the Termination Agreements are not enforceable because they were fraudulently procured. (*Id.*) But invalidity of a contract is a separate defense from justification. FRCP 8(c)(1).

not even agree on what constituted their settlement agreement, disputing what portion of a series of emails and a one-page outline was the final agreement. *Id.* at 583. That case also related to claims already pending in a lawsuit. The releases granted by VBF to Hall and T. Rea each are much broader and clearly evidence the parties' intent not to sue each other in the future. VBF not only agreed to "release, acquit and forever discharge" Hall and T. Rea from "claims" and "liabilities" but also from "***charges, complaints, actions, causes of action, suits***." (Exhibit A-4, ¶ 4(a), Exhibit A-5, ¶ 4(a)) (emphasis supplied).) This language clearly encompasses more than merely a release of potential liability or pending claims, but an agreement to discharge the right to bring a "charge," "complaint," (like the Amended Complaint), "cause of action" or "suit."

To that end, this case is more on point with *Ganske v. WRS Group, Inc.*, Cause No. 10-06-00050-CV, 2007 WL 1147357 (Tex. App. – Waco April 18, 2007, no pet.), where a company was found liable for breach of the release in a settlement agreement with its former officer by bringing suit (and the former officer was awarded attorneys' fees incurred in enforcing the release as compensatory damages). Although *Ganske* was decided before *Westergren*, the Texas Supreme Court did not overrule *Ganske* in its decision and as noted by the district court in *Cypress Engine*, the language in the *Ganske* release was more specific.[37] As the *Ganske* court found: "There could be no more foreseeable consequence of a breach of the settlement agreement that the cost of litigation than it was specifically designed to avoid."[38] Hall and T. Rea did not merely agree to a defense to any claim by VBF, but negotiated to avoid any "***charges, complaints, actions, causes of action, [and] suits***" from VBF. This language constitutes more than a release, but a complete

---

[37] *Cypress Engine*, 283 F. Supp. 3d at 587. The language in the *Ganske* release included a statement that it was intended to "buy his peace and avoid costly and time costing [sic] litigation" by the company's former president. *Ganske*, 2007 WL 1147357 at *3. Similar to the situation at bar, in *Ganske*, the company's majority shareholder chose to ignore the negotiated release with the former president and filed suit for various business torts. *Id.* at *1, *4.
[38] *Id.*, 2007 WL 1147357 at * 3.

discharge of any action against them.  By bringing the Amended Complaint against Hall and T.

Rea, VBF has breached that obligation and Thelander is liable for inducing VBF to do so.

    2. *Whether Egregious Cause Existed Under the Employment Agreement Justifying VBF's Termination of James Rea is A Question of Fact*.

    Also, Thelander claims VBF was justified in denying J. Rea amounts due to him under his

Employment Agreement, because that contract permitted termination for Egregious Cause.  (MTD,

p. 14.)  J. Rea and the Founders have alleged how VBF's "Egregious Cause" was fabricated, after

the fact, as part of Thelander's and the other Alder Defendants' plan to come up with any legal

reason to avoid payments to J. Rea and the Founders under their respective contracts.  (TPC, ¶¶

42-43, 47-51.)  Regardless, this defense is fact-dependent, and cannot be ruled upon at the pleading

stage.  This defense requires an inquiry into VBF's ability to terminate the relevant contracts, and

VBF's impetus to terminate and/or breach the agreements.  The ultimate decision will reside with

the jury and cannot be resolved via this motion.

    **E.**    **VBF's Confirmation Plan Explicitly Carved Out Founders' Claims against Thelander and the Third-Party Defendants from Release and Discharge.**

    Thelander urges this Court to dismiss Founders claims against both himself and the other

Third-Party Defendants because they were encompassed in the discharge in VBF's Reorganization

Plan.  (MTD, pp. 15-16.)  This ignores several specific modifications that Founders negotiated

with VBF's counsel in the bankruptcy proceeding (and with VBF's litigation counsel, who was

present at the bankruptcy confirmation hearing) that carved out Founders' claims from the

discharge and releases in the Reorganization Plan.  The only appearance that Founders made in

VBF's Chapter 11 proceeding was to object to the non-debtor releases in the Reorganization Plan

to the extent they could apply to the affirmative defenses against VBF and claims against all Third-

Party Defendants, including Thelander, plead here.[39]  Founders' TPC was already pending against Thelander and the Alder Defendants when VBF's Reorganization Plan was set for confirmation. To that end, Founders objected to VBF's plan, arguing that its releases of certain non-debtor third parties, including all of the Third-Party Defendants, violated Bankruptcy Code §§ 524(e) and 1129 (a), as well improperly deprived Founders of their right to assert claims against Third Party Defendants and seek set off and recoupment against VBF.  (Founders Plan Obj., Dkt. No. 446, ¶¶ 3, 4, 11, 14, 15, 16.)  Founders explicitly objected to the discharge in § 9.13 of the Plan, the very section that VBF relies upon, on these grounds. (Founders Plan Obj., Dkt. No. 466, ¶ 2.)

During the confirmation hearing on VBF's Reorganization Plan, held before the Bankruptcy Court in the Northern District of Iowa on April 17-18, 2019, Founders raised these objections.  The parties, including VBF and both sets of its counsel, and Alder, agreed to certain modifications to VBF's Reorganization Plan to address Founders' objections, and VBF submitted these to the Court as part of its final Reorganization Plan. (*In re VBF,* Bankr. Dkt. No. 511 (the "**Modification**"), attached as part of MTD, Ex. 2, p.144-45 thereto.)   The Modification was included in Exhibit 2 to Thelander's Motion to Dismiss, but is wholly ignored in his argument. As relevant to Thelander's claims, the VBF Reorganization Plan, as clarified by the agreed Modification, provides:

- As to Section 9.15 of the Plan, which released Thelander and the other Alder Defendants, the parties agreed: "For the avoidance of doubt, ***Section 9.15 does not apply to the claims of any party to the litigation pending as 19-cv-764 in the United Stated District Court for the Northern District of Texas***, provided that such party does not receive payment or distribution under the Plan. (Modification, MTD, Ex. 2, p. 144, ¶ 2 (emphasis supplied).)

---

[39] *See* Objection of [Founder Defendants] to Amended Joint Chapter 11 Plan of Reorganization of VeroBlue Farms USA, Inc. and its Affiliated Debtors, filed April 12, 2019, in *In re VBF,* Dkt. No. 446 and Supplement to Objection of [Founder Defendants] Amended Joint Chapter 11 Plan of Reorganization of VeroBlue Farms USA, Inc. and its Affiliated Debtors, filed April 15, 2019 (*In re VBF,*  Dkt. No. 466). Together, the Bankruptcy Docket Items 446 and 466 filed by Founders are referred to as "**Founders' Plan Obj.**"

- The parties agreed to add a statement: "***Notwithstanding any*** provision ***in the Plan,*** upon entry of the Confirmation Order, parties in the litigation pending as 19-cv-764, in the United States District Court for the Northern District of Texas, may to the full extent the Bankruptcy Code permits, plead any and all defenses for an amount up to but not exceeding any recovery that may be obtained by the Debtors, without prejudice to each parties' right to dispute such claims" (*Id.*, MTD Ex. 2, pp. 144-45, ¶ 4.)

The Confirmation Order signed by the Bankruptcy Court recites that Founders' Plan Objections were resolved via the Modification and that document was incorporated into the Confirmation Order. (MTD, Ex. 2, pp. 1, 8, ¶ L.)  As Modification ¶ 2 provides, any release of Thelander or any of the other Third-Party Defendants provided in VBF's Reorganization Plan does not apply to Founders' claims in this litigation, as long as they do not receive distributions or payments under the Plan.  Thelander did not inform the Court of this provision and did not argue that it did not apply because any of the Founders received distributions or payments under the Plan.[40]

But Thelander asks this Court to circumvent the Modification by arguing the discharge of VBF, provided in § 9.13 of the Plan, makes it impossible for Founders to allege breach against VBF and therefore, makes it impossible to allege tortious interference against Thelander. (MTD, pp. 16.)  This is precisely why Founders objected to VBF's discharge, to the extent it would affect their defenses to VBF's Complaint and the TPC and why they insisted on the additional language in Paragraphs 2 and 4 of the Modification.

These provisions apply ***notwithstanding any provision of the plan*** and allows Founders to assert defenses against VBF in this litigation. This provision was specifically included to address Founders' affirmative defenses against VBF, which allege breach of Founders' various agreements with VBF, and seek set off and/or recoupment against VBF for any such breach. (Ans., Dkt. No. 66, Third, Fourth, Sixth, Seventh Aff. Def.)  Thus, VBF's Reorganization Plan, as clarified by the

---

[40] In fact, Founders did not submit proofs of claim in VBF's Chapter 11 proceeding and will not receive any distributions under VBF's Reorganization Plan.

Modification, specifically contemplated and permits Founders to allege that VBF breached its contracts with Founders, and to seek setoff from VBF for any such breach.  It follows then, that any such breach by VBF, even if in the nature of setoff only, can then also serve as the basis for a finding that Thelander induced that breach through his tortious interference. The Modification was negotiated to address these very claims and the Plan does not discharge VBF's liability, or Thelander's liability to Founders for these same claims.

### F.     Thelander Actively Participated in VBF's Breach of Founders' Contracts.

Thelander argues Founders' claims must be dismissed because he did not take an "active role" in persuading VBF to breach the agreements. (MTD, p. 17.)  Founders alleged multiple facts to the contrary, including:

- Thelander directed Wulf and McCowan to avoid delivering contractually bargained for payments to Hall and T. Rea. (TPC, ¶ 31.)

- Thelander sent Alder's lawyers, DGS, instead of VBF's longtime counsel, Jackson Walker, to terminate Wulf and J. Rea. (TPC, ¶ 34), and also engaged DGS to negotiate Wulf's Termination Agreement (TPC, ¶ 35.)

- Thelander was engaged in the scheme with Ebstein and Wester where the three discuss coming up with a plan regarding "hiring and firing," to consult with legal counsel "with respect to the requirements of severance payments" and "to try and avoid this." (*Id.*, ¶ 35, Ex. A-6.)

- Thelander discussed ways to terminate a separate VBF employee due to his "willing collusion with the political agendas" of Founders. (*Id.*, ¶ 37, Ex. A-6.)

- Discussed ways to have Ebstein and Wester established in a management positions of VBF to enable one of them to have "direct engagement with the business," without being officially employed, since neither was authorized to work in the U.S. (*Id.*, ¶ 38.)

- Thelander specifically approved McCowan's execution of Wulf's Separation Agreement (*Id.*, ¶ 41).

- After Wulf executed the Separation Agreement, VBF began ginning up reasons to avoid paying him the amounts due, consistent with Ebstein's, Thelander's and Wester's communications and Haarkoetter's directions. (*Id.*, ¶ 42).

21

- Thelander participated in a campaign to clean house at VBF of anyone who would reveal Haarkoetter's continued harassment and inappropriate behavior and who would keep both him and Ebstein from shadow management of VBF (*Id.*, ¶ 48)

- Thelander initiated a sham investigation into Wulf and Rea in order to create what appeared to be legally permissible reasons to avoid VBF's obligations to Wulf and J. Rea under their respective agreements with the company. (*Id.*, ¶ 51)

- Thelander intentionally induced VBF to file suit against Hall in breach of Hall's Termination Agreement, in order to cover up Haarkoetter's harassment and enable Ebstein and Wester to insert themselves into VBF's management. (*Id.*, ¶ 60)

- Thelander intentionally induced VBF to file suit against T. Rea in breach of T. Rea's Termination Agreement, in order to cover up Haarkoetter's harassment and enable Ebstein and Wester to insert themselves into VBF's management (*Id.*, ¶ 69)

- Thelander intentionally induced VBF to breach Wulf's Separation Agreement, in order to cover up Haarkoetter's harassment and enable Ebstein and Wester to insert themselves into VBF's management. (*Id.*, ¶ 80)

- Thelander intentionally induced VBF to breach J. Rea's Separation Agreement, in order to cover up Haarkoetter's harassment and enable Ebstein and Wester to insert themselves into VBF's management. (*Id.*, ¶ 80).

All these facts establish that Thelander actively participated in not merely a contract violation, but a plan between himself and the other Alder Defendants to ignore Founders' legal rights and embroil them in litigation.

### III.   Founders' Damages and Prayer for Attorneys' Fees are Well Plead

Thelander argues against three aspects of Founders' requested relief: 1) that Hall and T. Rea cannot seek attorneys' fees as damages, 2) that none of the Founders are entitled to attorneys' fees separately, and 3) there is no basis for exemplary damages. (MTD pp. 18-21.)

Addressing these in turn, Thelander first asserts that Hall and T. Rea cannot recover attorneys' fees they incur in defending themselves from VBF's claims against them in the Amended Complaint because that is not a separate lawsuit with a third party. (MTD, p. 14.)  Hall and T. Rea negotiated full and complete releases from VBF in their Termination Agreements.

22

Thelander, along with the other Third-Party Defendants, induced VBF to breach these contracts and sue Hall and T. Rea on a plethora of matters that are clearly encompassed by the releases. If not for Thelander's interference with Hall's and T. Rea's agreements with VBF and the releases contained therein, Hall and T. Rea would not have been pursued by VBF.  This is not an instance where Hall and Rea are trying to recover fees from Thelander in *a case brought by him against them*.  He is not a party to the Termination Agreements, and he has not brought claims against Hall or T. Rea.  This is not a cross claim against VBF for its breach of the agreements.  It is a third-party claim and involves Thelander's individual liability to Hall and T. Rea deriving from VBF's liability to them under the agreements. Thus, this is the precise type of exception in which attorneys' fees are recoverable as damages:  Thelander's tortious acts, which were outside of his position as a VBF director, lead Hall and T. Rea to be sued by VBF.  The fees Hall and T. Rea incur in defending against VBF's claims are therefore, damages resulting from Thelander's individual torts and recoverable as damages.[41]

Separately, Thelander claims that he cannot be liable for attorney's fees to Wulf or J. Rea under TEXAS CIV. PRAC. & REM. CODE § 38.001 resulting from his tortious interference with their respective Separation and Employment Agreements. Thelander argues Texas law does not have a statute providing for such recovery, and that there is no contract between Wulf and/or J. Rea, on the one hand, and Thelander, on the other, permitting the recovery of attorney's fees.  (MTD, pp.19-20.)   It is important to note Founders' requests for attorneys' fees under their agreements and TEX. CPRC § 38.001 is different from those requested by Hall and T. Rea in Counts 1 and 2.  In their claims for tortious interference, Hall and T. Rea seek the attorneys' fees that they have incurred (and continued to incur) *in defending against VBF's claims* against them in the Amended

---

[41] *Ganske*, 2007 WL 1147357 at * 3 ("There could be no more foreseeable consequence of a breach of the settlement agreement than the cost of litigation that it was specifically designed to avoid.").

Complaint.  Those attorneys' fees flow as consequential *damages* from; i) VBF's breach of its obligations under the release provisions of Hall's and T. Rea's Termination Agreements, and ii) Thelander's inducement of VBF's breach (his tortious interference).

All four Founders also seek recovery of the attorneys' fees they incur *in pursuing their third-party claims against Thelander and the other third-party defendants*, pursuant to the provisions of their respective agreements (Hall, T. Rea, Wulf) and under TEX. CIV. PRAC. & REM. CODE § 38.011 (J. Rea).  Again, to the extent Thelander induced VBF to breach those agreements, then the Founders are entitled to recover attorneys' fees for that breach.  VBF's agreements with Hall, T. Rea and Wulf all contain specific provisions awarding attorney's fees for a breach.  And § 38.001 allows for the recovery of attorneys' fees "if the claim is for … (8) an oral or written contract."  The statute does not specify that the contract breached must be one between the same parties to the litigation.  It follows then, that a party who tortiously interferes with another party's contract, and thereby causes that contract to be breached, should bear the full cost of inducing such breach, including contractually provided attorneys' fees. Otherwise, the victim would be deprived of part of relief for which he contracted.

None of the cases Thelander cites address this particular issue. In both cases cited, the court found that a breach of the underlying contract had *not* been established and there was no separate basis for the recovery of attorneys' fees.[42] Here, if Founders were to prevail, they would have established a breach of multiple written contracts, and § 38.001 would apply to permit the recovery of their fees incurred pursuing that breach.

---

[42] (MTD, p. 19; *Alma Group, LLC v. Palmer*, 143 S.W. 3d 840, 845 (Tex. App. – Corpus Christi – Edinburg 2004) (defendant failed to prove breach of contract or tortious interference); *Ed Rachel Foundation v. D'Unger*, 117 S.W. 3d 348,  (Tex. App. – Corpus Christi – Edinburg 2003) (defendant failed to recover damages on breach of contract claim).

Finally, Thelander claims Founders have not adequately alleged fraud, malice, or gross negligence on his part to justify an award of punitive damages. (MTD, p. 20-21.)  Thelander points to Founders' allegations that his conduct, along with that of the other Defendants, was "intentional, malicious, and vindictive" and states that such a conclusion is insufficient. (*Id.*) But this ignores multiple other factual allegations in the TPC, including:

- The Alder Defendants (including Thelander) withheld funds from VBF's credit facility until the Founders were terminated (evidence of fraud) (TPC, ¶ 25);

- Thelander imposed additional conditions on Hall and T. Rea's severance payments after the fact (vindictiveness) (TPC, ¶ 31);

- Thelander planned to create ways to avoid payments due to Founders under their agreements (malice) (TPC, ¶ 36);

- Thelander, along with the other Alder Defendants, knew that Wulf's wife had multiple sclerosis and  agreed to a provision in Wulf's Separation Agreement to pay his health insurance for 12 months, but then failed to make these payments, resulting in Wulf and his wife being denied medical coverage (fraud and malice) (TPC, ¶¶ 40, 45);

- Thelander along with the Alder Defendants engaged an outside firm to investigate Haarkoetter's behavior and later, James Rea's expenditures, but then refused to share the results of these reports with anyone but themselves, (fraud and malice) (TPC, ¶¶ 43, 51); and

- Thelander and the Alder Defendants considered Founders to have a "political agenda" with regard to Haarkoetter and wanted to terminate anyone who "willing[ly] collude[d]" with them in that agenda (malice) (TPC, ¶ 37).

The campaign Founders allege in the TPC is not merely a soured business relationship or sharp-elbowed economic competition. This was a premeditated, intentional, vindictive plan to punish Founders for trying to protect their employees from a harassing and bullying director and owner, and to enable the Alder Defendants to usurp control of VBF to the exclusion of hundreds of other investors.  There are more than sufficient allegations of fraud and malice, just based on the information that Founders know today, to support their claims for exemplary damages.

25

## CONCLUSION

For all the reasons set forth herein, Third-Part Plaintiffs, Leslie Wulf, John E. (Ted) Rea, Bruce Hall, and James Rea, respectfully request that this Court deny Bjorn Thelander's Motion to Dismiss Third Party Claims Pursuant to Rules 12(b)(2) & 12(b)(6), and award them any and all other relief that it deems necessary and just.

Date:    September 17, 2019

LESLIE WULF, BRUCE HALL,

JOHN (TED) REA, JAMES REA

By: */s/ Kimberly D. Annello*
　　　Kimberly D. Annello
　　　Texas Bar No. 24093704
　　　Eli D. Pierce
　　　Texas Bar No. 24092972
　　　David Campbell
　　　Texas Bar No. 0369850
　　　Underwood Perkins, P.C.
　　　5420 LBJ Freeway, Suite 1900
　　　Dallas, Texas 75240
　　　Phone: 972.661.5114
　　　Email: kannello@uplawtx.com
　　　　　　epierce@uplawtx.com
　　　　　　dcampbell@uplawtx.com

**Attorneys for Defendants, Leslie Wulf, Bruce Hall, John (Ted) Rea, and James Rea**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 17th day of September, 2019 a true and correct copy of the above and foregoing was served upon counsel of records for all parties via ECF Service.

*/s/ Eli D. Pierce*
Eli D. Pierce

27

**Exhibit "A"**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| VEROBLUE FARMS USA INC.,<br>    Plaintiff | §<br>§<br>§ | |
| v. | §<br>§ | |
| LESLIE A. WULF, BRUCE A. HALL, JAMES<br>REA, JOHN REA, and KEITH DRIVER,<br>    Defendants/Third Party Plaintiffs, | §<br>§<br>§<br>§ | CIVIL ACTION NO. 3:19-CV-00764-L |
| v. | §<br>§ | |
| EVA EBSTEIN, JENS HAARKOETTER, BJORN<br>THELANDER, ANDERS WESTER, NORMAN<br>MCCOWAN, DR. OTTO HAPPEL and ALDER<br>AQUA, LTD.<br>    Third-Party Defendants | §<br>§<br>§<br>§<br>§ | |

---

## AFFIDAVIT OF LESLIE A. WULF

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF COLLIN | § |

I, Leslie A. Wulf, hereby declare, pursuant to 28 U.S.C. § 1746 as follows:

1.     My name is Leslie A. Wulf. I am over twenty-one years of age, of sound mind, and otherwise competent to make this declaration. I submit this Affidavit in support of Defendants/Third Party Plaintiffs ("**Founders**") Response and Brief in Opposition to Third-Party Defendant Bjorn Thelander's Motion to Dismiss Third-Party Claims ("**Response**").

2.     I have reviewed the Response and the factual statements contained therein are within my personal knowledge and are true and correct.

3.      I am one of the Defendants/Third-Party Plaintiffs in the above-captioned matter. From October 2014 until January 2018, I served as employee, officer, and director of Plaintiff, VeroBlue Farms USA, Inc. ("**VBF**").  As a former officer of VBF, I have personal knowledge of each fact stated below, and each statement contained in this Affidavit is true and correct.

4.      From October 2014 until July 2016, I served as Chief Executive Officer of VBF. In July 2016, Swiss national, Dr. Otto Happel ("**Happel**"), via his entities, Alder Aqua, Ltd. ("**Alder**") and Amstar Group, LLC ("**Amstar**"), invested over $57M dollars of debt and equity, into VBF.

5.      In July 2016, I entered into an Employment Agreement with VBF.  It is governed by Texas law.

6.      I continued to serve as CEO of VBF from July 2016 until November 2017 pursuant to the Employment Agreement.  In that capacity, I managed all executive operations of VBF, made strategic decisions and communicated with VBF's Board of Directors, lenders (including Amstar) and shareholders, including Alder.

7.      Pursuant to my Employment Agreement, VBF provided me an office and support services in Plano, Texas.  The entire time that I served as one of VBF's officers, its principal corporate offices were located in Plano, Texas, near where I and the other executive officers of VBF lived.  During this time, all of the books and records of VBF were located in the Plano, Texas office and 10 employees worked there.  The only other locations where VBF had operations were Webster City, Iowa, where the primary fish farms and nursery were located and New Athens, Illinois where a single fish farm was located.

8.      My Employment Agreement as well as VBF's corporate filings with the Nevada Secretary of State from 2014 through 2017 reflected that its principal office was in Plano, Texas.

2

I only learned that VBF's principal office was listed as Webster City, Iowa, in 2018, after this lawsuit was filed.

9.      Also, as part of Alder's investment in VBF in 2016, it appointed two members to VBF's board of directors:    Bjorn Thelander (**"Thelander"**), and Jens Haarkoetter (**"Haarkoetter"**).  In June 2017, once Alder attained 51% ownership of VBF, it appointed a third director: Eva Ebstein (**"Ebstein"**) (Dr. Happel's daughter).

10.     During the time I served as CEO of VBF (July 2016 until November 2017), Thelander was involved in a substantial portion of the activities that took place in VBF's Plano office. He approved multiple resolutions by VBF's Board of Directors which approved many capital expenditures that are the subject of Plaintiff's Amended Complaint.

11.     As a VBF Director, Thelander visited the Plano office for a meeting of the VBF Board of Directors on September 19-21, 2016. Thelander was also involved in the hiring and termination of employees who worked in the Plano office.

12.     For instance, Thelander was involved in the search for an interview of candidates for the following positions (1) Vice-President of Internal Control and Strategy; (2) In-house counsel; (3) IT Manager; and (4) Financial Modeling Manager. These positions were discussed on a teleconference with the VBF Board of Directors on July 31, 2017. Thelander called into the Plano office to discuss the candidates' resumes and to scheduling interviews for appealing individuals. Thelander also participated in the interviews for at least two (2) of the individuals via video conference with the Plano office.

13.     Additionally, Thelander was closely involved in negotiating Bruce Hall (**"Hall"**) and Ted Rea's (**"T. Rea"**) Termination Agreements. On Tuesday November 14, 2017, in an effort to clarify certain provisions of the Termination Agreements, Thelander sent Hall and T. Rea an e-

mail stating that it was "good speaking with you just now," and that "if you can sign and return this attachment electronically, we will process the payment immediately." The "attachment" is a release letter designed to clarify the Termination Agreements, and from the e-mail, it appears Thelander was withholding payments due under the Termination Agreement until Hall and T. Rea signed an additional release.

14.    Hall and T. Rea's Termination Agreements are both governed by and construed in accordance with the laws of the State of Texas. Additionally, the Termination Agreements contain the provision that "[e]ach Party irrevocably submits to the exclusive jurisdiction of the Federal District Court for the Northern District of Texas for the purpose of any suit, action, or other proceeding arising out of this Agreement."

15.    Furthermore, when I was terminated by VBF in November of 2017, I also entered into a Termination Agreement with VBF. Thelander was again heavily involved in negotiating the terms and conditions of my termination, and my Termination Agreement contained the same provisions regarding jurisdiction as Hall and T. Rea's. Namely, that my Termination Agreement would be governed by and construed in accordance with the laws of the State of Texas, and that that the Parties to the Termination Agreement "irrevocably submit to the exclusive jurisdiction of the Federal District Court for the Northern District of Texas for the purpose of any suit, action, or other proceeding arising out of this Agreement."

16.    In summary, Thelander took a leading role in negotiating and executing three termination agreements with Texas employees, that are governed by Texas law, and list the Northern District of Texas as having exclusive jurisdiction of any suit rising out of the Termination Agreements.

4

17.     Thelander involved himself in the daily operations of the VBF Plano office on a consistent basis from at least July 2016 through November 2018. Thelander sent hundreds of e-mails to employees located at the Plano office during this time, and made countless phone calls to the Plano office during the same time to both direct and oversee VBF operations. I dealt with Thelander on a weekly basis while serving as CEO of VBF and I was not allowed to perform a number of my responsibilities without some form of input from Thelander.

18.     The exhibits listed below are attached to this Affidavit and are referenced throughout Founders' Response. The exhibits are records and documents of VBF, and were kept by VBF in the regular course of business, and it was the regular course of business for me and any employee or representative of VBF with knowledge of the act, event, condition, or opinion recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.

Exhibit A-1:    July 8, 2016 VeroBlue Farms USA, Inc. Series A Preferred Stock Purchase Agreement

Exhibit A-2:    July 1, 2016 Employment Agreement between James Rea and VBF

Exhibit A-3:    December 1, 2017 Separation Agreement between Leslie Wulf and VBF

Exhibit A-4:    October 27, 2017 Separation Agreement between Bruce Hall and VBF

Exhibit A-5:    October 27, 2017 Separation Agreement between John E. "Ted" Rea and VBF

Exhibit A-6:    November 6, 2017 E-mail Correspondence between Ebstein, Thelander, and Anders Wester

Exhibit A-7:    July 6, 2016 Unanimous Written Consent of the Board of Directors and the Sole Shareholder of VBF IP, Inc.

Exhibit A-8:    August 3, 2016 Amended and Restated Certificate of Formation of VBF IP, Inc.

Exhibit A-9:    August 3, 2016 Restated Articles of Incorporation of Iowa's First, Inc.

Exhibit A-10:   September 20-21, 2016 Minutes of the Meeting of the Board of Directors of VeroBlue Farms USA, Inc.

Exhibit A-11:   December 6, 2016 Iowa's First Inc.'s Application for Authority to Transact Business in Illinois

Exhibit A-12:   October 24, 2017 Minutes of the Meeting of the Board of Directors of VeroBlue Farms USA, Inc.

Exhibit A-13:   November 14, 2017 E-mail Correspondence between Thelander, Hall, and T. Rea.

Exhibit A-14:   November 9, 2017 – November 22, 2018 E-mail Correspondence between Wulf and Thelander

I have read the foregoing statement of facts. Such statement is within my personal knowledge and is true and correct.

FURTHER AFFIANT SAYETH NOT.

Dated: September 17, 2019

_____
                                            Leslie A. Wulf

**Exhibit "A-1"**

EXECUTION VERSION

# VEROBLUE FARMS USA, INC.

## SERIES A PREFERRED STOCK PURCHASE AGREEMENT

16500435v.8

4133768.17

#13682.1

## TABLE OF CONTENTS

**Page**

1.   Purchase and Sale of Series A Preferred Stock. .................................................1
   1.1.   Sale and Issuance of Series A Preferred Shares and Penalty Rights; Warrants; Debt Offering. ...........................................................................1
   1.2.   Closing; Delivery. .............................................................................2
   1.3.   Sale of Additional Units ....................................................................3
   1.4.   Use of Proceeds. ..............................................................................4
   1.5.   Certain Defined Terms Used in this Agreement ....................................4

2.   Representations and Warranties of the Company ...............................................9
   2.1.   Organization, Good Standing, Corporate Power and Qualification ............9
   2.2.   Capitalization. ..................................................................................9
   2.3.   Subsidiaries ...................................................................................11
   2.4.   Authorization .................................................................................12
   2.5.   Valid Issuance of Shares ..................................................................12
   2.6.   Governmental Consents and Filings ...................................................13
   2.7.   Litigation ......................................................................................13
   2.8.   Intellectual Property .......................................................................13
   2.9.   Compliance with Other Instruments ...................................................14
   2.10.  Agreements; Actions. ......................................................................15
   2.11.  Certain Transactions .......................................................................15
   2.12.  Rights of Registration and Voting Rights ...........................................16
   2.13.  Assets ...........................................................................................16
   2.14.  Owned Real Property ......................................................................16
   2.15.  Leased Real Property ......................................................................16
   2.16.  Financial Statements .......................................................................17
   2.17.  Changes. .......................................................................................17
   2.18.  Employee Matters ..........................................................................18
   2.19.  Tax Matters ...................................................................................20
   2.20.  Insurance .......................................................................................20
   2.21.  [Intentionally Omitted] ....................................................................20
   2.22.  Permits .........................................................................................20
   2.23.  Corporate Documents .....................................................................20
   2.24.  Real Property Holding Corporation ...................................................21
   2.25.  Environmental and Safety Laws ........................................................21
   2.26.  Business Plan .................................................................................21
   2.27.  Disclosure .....................................................................................22
   2.28.  Foreign Corrupt Practices Act ..........................................................22

3.   Representations and Warranties of the Investors..............................................22
   3.1.   Organization, Good Standing, Corporate Power and Qualification of Investors ..22
   3.2.   Authorization .................................................................................23
   3.3.   Purchase Entirely for Own Account ...................................................23
   3.4.   Disclosure of Information .................................................................23
   3.5.   Restricted Securities. .......................................................................23

4133768.14

**#13682.2**

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| 3.6. | No Public Market | 24 |
| 3.7. | Legends | 24 |
| 3.8. | Accredited Investor | 24 |
| 3.9. | Foreign Investor | 24 |
| 3.10. | No General Solicitation | 24 |
| 3.11. | Residence | 24 |
| 3.12. | Governmental Consents and Filings | 25 |
| 4. | Closing Deliveries | 25 |
| 4.1. | Deliveries of the Company at the Initial Closing | 25 |
| 4.2. | Deliveries of Parent at the Initial Closing | 27 |
| 4.3. | Deliveries of the Investors at Initial Closing | 27 |
| 4.4. | Conditions to Lead Investor's Obligations at each Repurchase Closing | 28 |
| 4.5. | Conditions of the Company's Obligations at each Repurchase Closing | 29 |
| 5. | Certain Covenants of the Company | 29 |
| 5.1. | Restructuring; Redomestication | 29 |
| 5.2. | Share Repurchase Program | 29 |
| 5.3. | USRPHC Reporting | 30 |
| 5.4. | Execution of Stockholders Agreement | 30 |
| 5.5. | Confidential Information Agreements | 30 |
| 5.6. | Other Post-Initial Closing Covenants | 31 |
| 6. | Indemnification | 31 |
| 6.1. | Survival | 31 |
| 6.2. | Indemnification by Parent and Company | 31 |
| 6.3. | Indemnification by the Investors | 31 |
| 6.4. | Indemnification Procedure | 31 |
| 6.5. | Certain Limitations | 33 |
| 6.6. | Materiality Qualifications | 34 |
| 6.7. | Indemnification as Sole Remedy | 34 |
| 6.8. | Investigation | 34 |
| 6.9. | Purchase Price Adjustment | 35 |
| 7. | Miscellaneous | 35 |
| 7.1. | Successors and Assigns; Assignment | 35 |
| 7.2. | Governing Law | 35 |
| 7.3. | Counterparts | 35 |
| 7.4. | Titles and Subtitles; Currency | 35 |
| 7.5. | Notices | 35 |
| 7.6. | Finder's Fees | 37 |
| 7.7. | Fees and Expenses | 37 |
| 7.8. | Attorneys' Fees | 37 |
| 7.9. | Amendments and Waivers | 37 |
| 7.10. | Severability | 37 |
| 7.11. | Delays or Omissions | 38 |

#13682.3

**TABLE OF CONTENTS**
(continued)

Page

7.12.   Entire Agreement ...................................................................38
7.13.   Dispute Resolution ...............................................................38
7.14.   No Commitment for Additional Financing...........................39
7.15.   Non-Reliance .......................................................................39
7.16.   Representation......................................................................39

Exhibit A -      FORM OF CERTIFICATE OF DESIGNATION

Exhibit B -      FORM OF OPTION AGREEMENT

Exhibit C -      [RESERVED]

Exhibit D -      USE OF PROCEEDS

Exhibit E -      FORM OF INDEMNIFICATION AGREEMENT

Exhibit F -      FORM OF PENALTY RIGHTS AGREEMENT

Exhibit G -      FORM OF REGISTRATION RIGHTS AGREEMENT

Exhibit H -      FORM OF VOTING AGREEMENT

Exhibit I -      DISCLOSURE SCHEDULES

Exhibit J -      FORM OF EMPLOYMENT AGREEMENT

Exhibit K -      FORM OF CONSULTING AGREEMENT

Exhibit L -      [RESERVED]

Exhibit M -      FORM OF MAINSTREAM AMENDMENT

Exhibit N -      FORM OF STOCKHOLDERS AGREEMENT

Exhibit O -      FORM OF LEAD INVESTOR WARRANT

Exhibit P -      FORM OF MANAGEMENT OPTION AGREEMENT

Exhibit Q -      FORM OF TANK MANUFACTURING AGREEMENT

Exhibit R -      BUSINESS PLANS

Schedule I -     INVESTOR DETAILS

4133768.14

**#13682.4**

# VEROBLUE FARMS USA, INC.

## SERIES A PREFERRED STOCK PURCHASE AGREEMENT

THIS SERIES A PREFERRED STOCK PURCHASE AGREEMENT (this "**Agreement**"), is made as of the 7th day of July, 2016 by and between VeroBlue Farms Inc., a Canadian corporation (the "**Parent**"), VeroBlue Farms USA, Inc., a Nevada corporation (the "**Company**"), Alder Capital International Ltd., a British Virgin Islands Business Company ("**Lead Investor**"), and FishDish, LLC, an Iowa limited liability company ("**Fish Dish**"). Each of Lead Investor and Fish Dish are sometimes individually known as an "**Investor**" and collectively as the "**Investors**".

The parties hereby agree as follows:

1.    <u>Purchase and Sale of Series A Preferred Stock.</u>

    1.1.    <u>Sale and Issuance of Series A Preferred Shares and Penalty Rights; Warrants; Debt Offering</u>.

        (a)    The Company shall (i) adopt and file with the Nevada Secretary of State before the Initial Closing (as defined below) Amended and Restated Articles of Incorporation, duly adopted by the stockholders of the Company, authorizing the issuance of shares of preferred stock with terms to be determined by the Board (as amended by the Certificate of Designation, the "**Restated Certificate**") and (ii) adopt and file with the Nevada Secretary of State at or prior to the Initial Closing a Certificate of Designation to the Company's Articles of Incorporation in the form of <u>Exhibit A</u> attached to this Agreement (the "**Certificate of Designation**"), and such Restated Certificate and Certificate of Designation shall remain in full force and effect unmodified as of the Initial Closing.

        (b)    Subject to the terms and conditions of this Agreement, at the Initial Closing the Company agrees to sell and issue to the Investors 34,000,000 shares of Series A Preferred Stock, par value $0.01, of the Company (each, a "**Series A Preferred Share**"), together with 34,000,000 Penalty Rights (one Series A Preferred Share together with one Penalty Right being one "**Unit**"; <u>provided</u>, that the definition of Unit shall be subject to appropriate adjustment in the event of any stock split, combination or other similar recapitalization with respect to the Series A Preferred Shares), and the Company will sell and issue to Lead Investor warrants exercisable by Lead Investor for the purchase of Preferred Shares (the "**Warrant Shares**") as provided in the Warrant Agreement, the form of which is attached hereto as <u>Exhibit O</u> (the "**Lead Investor Warrants**"). Each Investor agrees severally, but not jointly, to purchase from the Company the number of Units listed next to such Investor's name on <u>Schedule I</u> and, in the case of Lead Investor, the Lead Investor Warrants, for an aggregate purchase price of US$34,000,000 (the "**Purchase Price**") with each Investor's share of the Purchase Price listed next to such Investor's name on <u>Schedule I</u> (each such Investor's share, a "**Purchase Price Share**"). The Series A Preferred Shares issued pursuant to this Agreement, the Option Agreement and the Lead Investor Warrants (including any Option Shares, Penalty Shares,

4133768.14

**#13682.5**

Warrant Shares and Repurchase Shares (as each are defined below)) are referred to herein as "**Shares**".

(c)     Simultaneously with the Initial Closing, certain promissory notes issued by the Parent and the Company, each of which is set forth on Schedule 1.1(c) (including the name of the holder (each a "**Note Holder**"), the country of residence or organization of the holder, the issuer, the issue date, the principal and accrued interest, the number of shares that such holder has irrevocable committed to convert into and retain, if any, the cash consideration being paid to such holder as of the Initial Closing, if any, and any tax withholding of cash or Note Shares to be made by the Company, if any) (the "**Promissory Notes**"), shall be converted to 4,078,889 Common Shares (the "**Note Shares**", with each Promissory Note holder receiving Note Shares being a "**Converting Note Holder**"), with an aggregate $4,551,388 being paid to the Note Holders as payoff amounts, which, together with the issuance of the Note Shares to such holders, shall constitute full satisfaction of the Promissory Notes (with such conversions and payments being referred to herein as the "**Note Conversions and Payoffs**"). The Company shall cause each Converting Note Holder to become a party to the Stockholders Agreement as a condition to issuance of the Note Shares. The Company covenants and agrees that any payment of cash or Note Shares to a Note Holder in the Note Conversions and Payoffs shall be made net of any withholding required by or advisable under applicable law, including but not limited to under Section 1445 of the Code (a "**FIRPTA Withholding**") or other withholding requirements for income paid to foreign persons. If a FIRPTA Withholding is made by the Company, it shall hold any such withholding in escrow, apply to the IRS for an appropriate withholding certificate and notify the Note Holders from whom proceeds were withheld of such application as required by the Code.

(d)     Simultaneously with the Initial Closing, Lead Investor and Parent shall enter into that certain Series A Preferred Share Purchase Agreement (the "**Parent Preferred Share Purchase Agreement**"), pursuant to which Lead Investor shall purchase from Parent, and Parent shall issue to Lead Investor, one (1) Series A Preferred Share of Parent.

(e)     Simultaneously with the Initial Closing, VBF Operations Holding Inc., Iowa's First, Inc. and the other Subsidiaries will enter into a Credit Agreement (the "**Credit Agreement**") with Amstar Group, LLC as agent and lender, whereby VBF Operations Holding Inc. and Iowa's First, Inc. may borrow up to US$29,000,000 (the "**Debt Offering**"), subject to the terms and conditions of the Credit Agreement.

(f)     Simultaneously with the Initial Closing, options to purchase 6,620,000 Common Shares in the aggregate will be issued to the members of management of the Company listed on Schedule 1.1(f) (each a "**Management Option Recipient**") in the respective amounts listed on Schedule 1.1(f) under the Stock Plan (as defined below) (the "**Management Option Issuances**"), which option agreements will be in the form attached hereto as Exhibit P (the "**Management Option Agreements**").

1.2.     Closing; Delivery.

(a)     The initial purchase and sale of the Units and Lead Investor Warrants shall take place remotely via the exchange of documents and signatures on the date

4133768.14

**#13682.6**

hereof, or at such other place as the Company and the Investors mutually agree upon, orally or in writing (such closing of the purchases and sales being the "**Initial Closing**"). The term "**Closing**" shall apply to the Initial Closing and each Repurchase Closing (as defined below), if any.

(b)    At each Closing, the Company shall deliver to the relevant Investors a certificate representing the Shares being purchased by such Investor at such Closing against payment of the purchase price therefor by certified check payable to the Company or by wire transfer to a bank account designated by the Company.

### 1.3.    Sale of Additional Units.

(a)    Contemporaneously with its execution of this Agreement, the Company shall enter into an option agreement for the purchase by Lead Investor of additional Units (the "**Option Units**" with the Series A Preferred Shares included in the Option Units being the "**Option Shares**") in the form attached hereto as Exhibit B (the "**Option Agreement**"). The Option Agreement sets forth the terms and conditions for the purchase of the Option Units by Lead Investor.

(b)    After the Initial Closing, with the consent of Lead Investor and pursuant to Subsection 5.2, the Parent shall undertake to repurchase Parent Common Shares (as defined below) from existing holders of Parent Common Shares, or to assist Lead Investor or an Affiliate in soliciting from existing holders of Parent Common Shares offers to sell, pursuant to the Share Repurchase Program (as defined below). In the case of repurchases by Parent under the Share Repurchase Program, upon the satisfaction or Lead Investor's waiver of the conditions set forth in Subsection 4.4 with respect to a Repurchase Closing (as defined below), and simultaneously with the closing of the corresponding Parent Repurchase and Common Repurchase (each defined in Subsection 5.2), Lead Investor shall purchase from the Company, and the Company shall sell to Lead Investor at a price per Unit of US$1, that number of Units that is equal to the aggregate price paid (in US$) by the Company in the corresponding Common Repurchase plus any required withholding by the Company and any tax incurred by Parent in connection with the Common Repurchase (the "**Parent Redemption Price**") divided by US$1 (the consummation of any such purchase by Lead Investor being a "**Repurchase Closing**", the Units purchased in the Repurchase Closings being the "**Repurchase Units**", the Series A Preferred Shares included in the Repurchase Units being the "**Repurchase Shares**" and the aggregate consideration paid by Lead Investor in a Repurchase Closing being the "**Repurchase Consideration**"). Each Repurchase Closing shall be made pursuant to the terms of this Agreement and the proceeds therefrom shall be used solely to effect the corresponding redemption of Common Shares held by Parent, and the amounts distributed to Parent pursuant to such redemption shall be used solely to effect the corresponding Common Repurchase. In the case of share purchases by Lead Investor or an Affiliate under the Share Repurchase Program, the Company and Parent shall in good faith use commercially reasonable efforts to effect a direct or indirect exchange of such purchased Parent Common Shares for Units (such Units being included in the definition of Repurchase Units for purposes of this Agreement). Any such exchange shall be made pursuant to documentation reasonably satisfactory to Company, Parent, Lead Investor and any participating Affiliate.

3

#13682.7

1.4.    Use of Proceeds. Except as otherwise set forth in Subsection 1.3(b), in accordance with the directions of the Company's Board of Directors, as it shall be constituted in accordance with the Stockholders Agreement, the Company will use the proceeds from the sale of the Units to the Investors, and the borrowings under the Debt Offering, for the purposes set forth on Exhibit D, which shall include at the Initial Closing the repayment in full of all amounts borrowed and otherwise due under the Revere Note, the Sheriff Note and the Lender Note.

1.5.    Certain Defined Terms Used in this Agreement. The following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

(a)    "**Adverse Consequences**" means any and all liabilities, losses, damages, awards, royalties, deficiencies, penalties, fines, Taxes, demands, claims, costs and expenses (including reasonable fees and expenses of attorneys, accountants and other experts paid in connection with the investigation or defense of, and all amounts paid in settlement with respect to, any of the foregoing or any Proceeding relating to any of the foregoing); provided, however, that (i) the term Adverse Consequences shall not include any special, indirect, consequential, exemplary, or punitive damages, (ii) the term Adverse Consequences shall not include any damages associated with any lost profits, lost opportunities, or diminution in value, and (iii) for purposes of computing the amount of any Adverse Consequences incurred by an Indemnified Party there shall be deducted an amount equal to the amount of (A) any Tax benefit actually received or reasonably expected to be receivable by such Indemnified Party or any of its Affiliates in connection with such Adverse Consequences or any of the circumstances giving rise thereto, and (B) any insurance proceeds, indemnification payments, contribution payments or reimbursements actually received or receivable by the Indemnified Party or any of its affiliates in connection with such Adverse Consequences or any of the circumstances giving rise thereto.

(b)    "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, managing member, officer or director of such Person or any entity now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person.

(c)    "**Aggregate Purchase Price**" means an amount equal to the Purchase Price plus the aggregate Repurchase Consideration.

(d)    "**Aggregate Purchase Price Share**" means with respect to each Investor an amount equal to such Investor's Purchase Price Share plus amounts paid by such Investor as Repurchase Consideration.

(e)    "**Board**" or "**Board of Directors**" means the board of directors of the Company.

(f)    "**Code**" means the Internal Revenue Code of 1986, as amended.

(g)    "**Company Covered Person**" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1).

4

4133768.14

**#13682.8**

(h)     "**Company Indemnified Parties**" means the Company and Parent.

(i)     "**Company Intellectual Property**" means all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, mask works, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases as are used by the Company in the conduct of the Company's business as now conducted and as presently proposed to be conducted.

(j)     "**Consulting Agreement**" means that certain Consulting Agreement entered into as of even date herewith by and between the Company and R. L. Sheriff Custom Contracting, Inc.

(k)     "**Contract**" means any contract, commitment, agreement, instrument, obligation, undertaking or other legally binding arrangement or understanding, whether written or oral.

(l)     "**Fish Dish Director**" means Kenneth Lockhard.

(m)     "**Fish Dish Indemnified Parties**" means Fish Dish, each of its Affiliates (other than Parent, the Company and the Subsidiaries) and their respective equity holders, directors, managers, officers, employees, agents and representatives.

(n)     "**Fraud**" means intentional or willful misrepresentations of material facts which would constitute common law or statutory fraud under Delaware Law.

(o)     "**Fundamental Representations**" means, collectively, the representations and warranties contained in Subsections 2.1, 2.2, 2.4, 2.5, 2.11, 2.18(d), 2.19, 2.24, 2.28, 3.1, and 3.2.

(p)     "**Governmental Entity**" means any government or political subdivision or regulatory authority, whether federal, state, local, or foreign, and any agency, commission, bureau, department, authority, court, or other instrumentality of such government or political subdivision or regulatory authority.

(q)     "**Indemnification Agreements**" means an agreement between the Company and each of the directors serving on the Board of Directors pursuant to the Restated Certificate and the Stockholders Agreement including initially the Initial Closing Directors, dated as of the date of the Initial Closing, in the form of Exhibit E attached to this Agreement.

(r)     "**Indemnification Share**" means, for each Investor, an amount equal to the quotient (expressed as a percentage carried to four decimal points) of (i) such Investor's Purchase Price Share, divided by (ii) the Purchase Price.

(s)     "**Initial Closing Directors**" shall mean any Person who is a member of the Board of Directors as of the Initial Closing, including the Investor Directors.

4133768.14

(t)    **"Investor Directors"** means collectively the Lead Investor Directors and the Fish Dish Director.

(u)    **"Investor Indemnified Parties"** means the Lead Investor Indemnified Parties and Fish Dish Indemnified Parties.

(v)    **"IP Purchase"** means the purchase of certain intellectual property assets pursuant to that certain Intellectual Property Purchase Agreement (the **"IP Purchase Agreement"**), dated as of June 29, 2016, by and between VBF IP, Inc., R. L. Sheriff Custom Contracting, Inc., a Florida corporation , Richard L. Sheriff, Kathleen M. Sheriff, Opposing Flows Aquaculture, Inc., a Texas corporation, and VeroBlue Farms, Inc.

(w)    **"Key Persons"** means Leslie Wulf, Bruce Hall, Keith Driver, James Rea, John Rea, Mark Nelson and Jeffrey Nelson, as well as any employee or consultant who either alone or in concert with others develops, invents, programs or designs any Company Intellectual Property, which includes, but is not limited to, Richard Sheriff. **"Nelson Key Persons"** means Mark Nelson and Jeffrey Nelson.

(x)    **"Knowledge"** including the phrase **"to the Company's Knowledge"** shall mean the actual knowledge of the following persons: Leslie Wulf, Bruce Hall, Keith Driver, James Rea, John Rea, Mark Nelson and Jeffrey Nelson.

(y)    **"Lead Investor Directors"** means Björn Thelander and Jens Haarkötter.

(z)    **"Lead Investor Indemnified Parties"** means Lead Investor, each of its Affiliates (other than Parent, the Company and the Subsidiaries) and their respective equity holders, directors, managers, officers, employees, agents and representatives.

(aa)    **"Lender Note"** means that certain Secured Promissory Note issued by the Company to Amstar Group, LLC, a Colorado limited liability company, dated as of June 29, 2016;

(bb)    **"Lien"** means any mortgage, pledge, lien, encumbrance, charge, other security interest, claim, easement, or other restriction.

(cc)    **"Material Adverse Effect"** means any fact, event, circumstance, or change that has a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, or results of operations of the Company.

(dd)    **"Parent Articles of Amendment"** means the Director Amended Articles (as defined in the Parent Preferred Share Purchase Agreement).

(ee)    **"Parent Shareholders Agreement"** means the Shareholders Agreement among the Parent, Lead Investor and certain other shareholders of the Parent, dated as of the date hereof.

6

#13682.10

(ff)     "**Penalty Right**" means a right to receive up to one (1) Series A Preferred Share (subject to certain anti-dilution adjustments as set forth in the Penalty Rights Agreement) upon the satisfaction of certain conditions, subject to the terms of and as more particularly set forth in the Penalty Rights Agreement.

(gg)     "**Penalty Rights Agreement**" means the agreement among the Company and the Investors, dated as of the Initial Closing, in the form of <u>Exhibit F</u> attached to this Agreement.

(hh)     "**Penalty Share**" means each Series A Preferred Share (or fraction thereof) that the Company is required to issue to the Investors (or their permitted transferees) at any time pursuant to the Penalty Rights Agreement.

(ii)     "**Permitted Liens**" means (a) mechanics', warehousemens', materialmens', or similar Liens incurred in the ordinary course and not delinquent and that will be paid and discharged in the ordinary course; (b) Liens for Taxes not yet due and payable or for delinquent Taxes that the taxpayer is contesting in good faith through appropriate proceedings and for which reserves have been accrued on the Financial Statements to the extent required by IFRS applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Financial Statements for the most recent fiscal year end; (c) purchase money Liens and Liens created under capital lease arrangements; (d) Liens incurred in the ordinary course of business of the Company in connection with workers' compensation, unemployment insurance and other types of social security; (e) Liens in the nature of zoning restrictions, easements, rights or restrictions of record on the use of Real Property if the same do not materially detract from the value of the property encumbered thereby or materially impair the use of such property in the business of Parent, the Company or any of its Subsidiaries; (f) Liens on any leased property (including Leased Real Property) in favor of the landlord or lessors of such leased property lenders; (g) Liens created in connection with the Debt Offering; (h) Liens created by any of the Transaction Agreements; and (i) Liens listed on <u>Section 1.5(ii)</u> of the Disclosure Schedule.

(jj)     "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

(kk)     "**Registration Rights Agreement**" means the agreement among the Company and the Investors dated as of the date of the Initial Closing, in the form of <u>Exhibit G</u> attached to this Agreement.

(ll)     "**Restated Parent Articles**" means the Shareholder Amended Articles (as defined in the Parent Preferred Share Purchase Agreement).

(mm)  "**Revere Note**" means that certain Term Note, issued by the Company and Iowa's First, Inc. to Revere High Yield Fund, LP, for the original principal amount of $2,400,000.00 and dated as of September 30, 2015;

4133768.14

**#13682.11**

(nn)     "**Revere Loan Documents**" mean the Loan Documents, as defined in that certain Term Loan and Security Agreement, dated as of September 30, 2015, by and among Revere High Yield Fund, LP, the Company and Iowa's First, Inc.

(oo)     "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(pp)     "**Sheriff Loan Documents**" mean the Sheriff Note and that certain Security Agreement, dated as of June 29, 2016, by and among the Sheriff Parties and VBF IP, Inc.

(qq)     "**Sheriff Note**" means that certain Secured Promissory Note issued by VBF IP Inc. to the Sheriff Parties in the original principal amount of $2,550,000 and dated as of June 29, 2016.

(rr)     "**Sheriff Parties**" means R. L. Sheriff Custom Contracting, Inc., a Florida corporation, Richard L. Sheriff, and Kathleen M. Sheriff

(ss)     "**Stockholders Agreement**" means the Stockholders Agreement among the Company, the Investors and the other stockholders of the Company dated as of the date hereof.

(tt)     "**Subsidiaries**" means each direct and indirect subsidiary of the Company, which at the Initial Closing includes VBF IP Inc., a Texas corporation, VBF Operations Inc., a Texas corporation, Iowa's First Inc., an Iowa corporation, VBF Transport, Inc., a Delaware corporation, and VeroStream Seafood Marketing, Inc., a Texas corporation.

(uu)     "**Taxes**" means (a) all taxes, including any net income, gross income, corporation, gross receipts, transfer, franchise, license, withholding, social security, payroll, unemployment, severance, stamp, excise, occupation, property, sales, use, ad valorem, levies, assessments, customs duties, fees, or charges imposed by any Governmental Entity upon any Person, and any interest and penalties in respect of the foregoing; (b) any liability for the payment of any amount of the type described in the immediately preceding clause (a) as a result of being a member of a consolidated, affiliated, unitary or combined group with any other corporation or entity at any time on or prior to the Closing; and (c) any liability for the payment of any amount of the type described in the preceding clause (a) and (b) as a result of a contractual obligation to any other Person or as a result of transferor, successor or secondary liability.

(vv)     "**Transaction Agreements**" means this Agreement, the Registration Rights Agreement, the Stockholders Agreement, the Parent Preferred Share Purchase Agreement, the Parent Shareholders Agreement, the Voting Agreement, the Option Agreement, the Penalty Rights Agreement, the Employment Agreements, the Indemnification Agreements, the Consulting Agreement, the Lead Investor Warrants and the IP Purchase Agreement.

8

**#13682.12**

(ww) "**Updated Disclosure Schedule**" means an updated Disclosure Schedule dated as of the date of each subsequent Closing, which updated Disclosure Schedule shall be in conformity with the form of the Disclosure Schedule attached hereto.

(xx) "**Voting Agreement**" means the agreement among the Company, Lead Investor and the participants in the 2016 Stock Option Plan of the Company, dated as of the date of the Initial Closing, in the form of <u>Exhibit H</u> attached to this Agreement.

2. <u>Representations and Warranties of the Company and Parent</u>. The Company and Parent hereby represent and warrant, jointly and severally, to the Investors, as of the Initial Closing and each subsequent Closing, that, except as set forth on (i) with respect to the Initial Closing, the Disclosure Schedule attached as <u>Exhibit I</u> to this Agreement (the "**Disclosure Schedule**"), and (ii) with respect to any subsequent Closing, the applicable Updated Disclosure Schedule, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Initial Closing and each subsequent Closing, except as otherwise indicated. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections and subsections contained in this <u>Section 2</u>.

For purposes of these representations and warranties (other than those in Subsections <u>2.1</u>, <u>2.2</u>, <u>2.3</u>, <u>2.4</u>, <u>2.5</u>, and <u>2.6</u>), the term the "Company" shall include the Subsidiaries, unless otherwise noted herein.

2.1. <u>Organization, Good Standing, Corporate Power and Qualification of the Company and Parent</u>.

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted. Each of the Subsidiaries are corporations duly organized, validly existing and in good standing under the laws of the state of their organization, and have all requisite corporate power and authority to carry on their businesses as presently conducted and as proposed to be conducted. The Company and each Subsidiary are duly qualified to transact business and are in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

(b) The Parent is a corporation duly organized, validly existing and in good standing under the laws of the province of Ontario, Canada, and has all requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted.

2.2. <u>Capitalization.</u>

(a) The authorized capital of the Company consists, immediately prior to the Initial Closing, of:

(i) 175,000,000 shares of common stock, par value $0.01 per share (the "**Common Shares**"), 33,914,814 shares of which are issued and outstanding immediately prior to the Initial Closing and all of which are held by Parent. All of the

4133768.14

**#13682.13**

outstanding Common Shares have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable U.S. federal and state securities laws.

(ii)     150,000,000 shares of preferred stock, par value $0.01 per share (the "**Preferred Shares**"), of which 150,000,000 shares have been designated Series A Preferred Shares, none of which are issued and outstanding immediately prior to the Initial Closing. There are no other Preferred Shares or shares of any other series of Preferred Shares issued and outstanding immediately prior to the Initial Closing. The rights, privileges and preferences of the Preferred Shares are as stated in the Restated Certificate, as amended by the Certificate of Designation, and as provided by the Nevada Private Corporations Chapter of the Nevada Revised Statute.

(b)     The authorized capital of the Parent consists, immediately prior to the Initial Closing, of:

(i)     Unlimited common shares (the "**Parent Common Shares**"), 33,914,813 shares of which are issued and outstanding immediately prior to the Initial Closing. All of the outstanding Common Shares have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable U.S. and Canadian federal, state and provincial securities laws;

(ii)     An unlimited number of preferred shares ("**Parent Preferred Shares**"), issuable in series, of which no series other than the Series A preferred share (the "**Parent Series A Preferred Share**") has been authorized; and

(iii)     One (1) Series A preferred share, which immediately prior to the Initial Closing had not been issued and was not outstanding and which shall be issued and outstanding to the Lead Investor simultaneously with the Initial Closing pursuant to the Parent Preferred Share Purchase Agreement. The rights, privileges and preferences of the Parent Series A Preferred Share are as stated in the Restated Parent Articles, as amended by the Parent Articles of Amendment, and as provided by the Canada Business Corporations Act.

(c)     The Company has reserved 8,000,000 Common Shares for issuance to officers, directors, employees and consultants of the Company pursuant to its 2016 Stock Option Plan, duly adopted by the Board of Directors and approved by the Company stockholders (the "**Stock Plan**"). Of such reserved Common Shares, none have been issued, no options to purchase Common Shares under the Stock Plan have been issued, other than those that shall be granted to the Management Option Recipients pursuant to the Stock Plan as set forth on Schedule 1.1(f), and 1,380,000 Common Shares remain available for issuance to officers, directors, employees and consultants pursuant to the Stock Plan after giving effect to the reservation of Common Shares for issuance under the Management Option Issuances. The Company has furnished to each Investor complete and accurate copies of the Stock Plan and forms of agreements used thereunder.

(d)     Subsection 2.2(d) of the Disclosure Schedule sets forth the anticipated capitalization of the Company immediately following the Initial Closing and the Note

10

**#13682.14**

Conversions and Payoffs, including the number of shares of stock of the following and the holders and beneficial holders thereof: (i) issued and outstanding Common Shares, including, with respect to restricted Common Shares, vesting schedule and repurchase price; (ii) granted stock options, including vesting schedule and exercise price; (iii) Common Shares reserved for future award grants under the Stock Plan; (iv) each series of Preferred Shares; and (v) warrants or stock purchase rights, if any. Except for (A) the conversion privileges of the Series A Preferred Shares, (B) the rights to receive Series A Preferred Shares pursuant to the Penalty Rights issued to Investors under this Agreement, (C) the Lead Investor Warrants, (D) the Option Agreement, (E) the obligation of Lead Investor to purchase additional Units pursuant to Subsection 1.3, (F) the preemptive rights of the holders of Series A Preferred Shares pursuant to the Restated Certificate, (G) as provided in Section 3 of the Stockholders Agreement and (H) as required of Lead Investor pursuant to the Share Repurchase Program, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any Common Shares, Preferred Shares (including Series A Preferred Shares) or securities convertible into or exchangeable for Common Shares or Preferred Shares (including Series A Preferred Shares).

(e)     Subsection 2.2(e) of the Disclosure Schedule sets forth the anticipated capitalization of the Parent immediately following the Initial Closing, including the number of shares of the following and the holders and beneficial holders thereof: (i) issued and outstanding Parent Common Shares, including, with respect to restricted Parent Common Shares, vesting schedule and repurchase price; (ii) granted stock options, including vesting schedule and exercise price; (iii) each series of Parent Preferred Shares; and (iv) warrants or stock purchase rights, if any. Except for (A) the conversion privileges of the Promissory Notes, all of which will be exercised or waived in the Note Conversions and Payoffs and (B) as provided in Section 3 of the Parent Shareholders Agreement, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Parent any Parent Common Shares, Parent Preferred Shares (including the Parent Series A Preferred Share) or securities convertible into or exchangeable for Parent Common Shares or Parent Preferred Shares (including The Parent Series A Preferred Share).

(f)     409A. The Company believes that any "nonqualified deferred compensation plan" (as such term is defined under Section 409A(d)(1) of the Code and the guidance thereunder) under which the Company makes, is obligated to make or promises to make, payments (each, a "**409A Plan**") complies in all material respects, in both form and operation, with the requirements of Section 409A of the Code and the guidance thereunder. To the Knowledge of the Company, no payment to be made under any 409A Plan is, or will be, subject to the penalties of Section 409A(a)(1) of the Code.

(g)     The Company has obtained valid waivers of any rights by other parties to purchase any of the Shares covered by this Agreement, the Penalty Rights Agreement, the Lead Investor Warrants and the Option Agreement.

2.3.    Subsidiaries. Subsection 2.3 of the Disclosure Schedule sets forth all of the direct and indirect Subsidiaries of the Company and their capitalization, which consist solely

4133768.14

**#13682.15**

of the Subsidiaries. Other than as set forth on <u>Subsection 2.3</u> of the Disclosure Schedule, the Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. The Company is not a participant in any joint venture, partnership or similar arrangement.

2.4.    <u>Authorization</u>. All corporate action required to be taken by the Company's Board of Directors and stockholders and the Parent's Board of Directors and shareholders in order to authorize each of the Company and the Parent to enter into the Transaction Agreements to which they are a party, to adopt the Restated Certificate and the Certificate of Designation, in the case of the Company, and the Restated Parent Articles and the Parent Articles of Amendment, in the case of the Parent, to issue the Units and Lead Investor Warrants at the Initial Closing, , enter into the Debt Offering, issue the Option Units, issue the Repurchase Units and issue the Penalty Shares, has been taken. All action on the part of the officers of the Company necessary for the execution and delivery of the Transaction Agreements, the performance of all obligations of the Company under the Transaction Agreements to be performed as of the Initial Closing, and the issuance and delivery of the Shares in accordance with this Agreement has been taken. The Transaction Agreements constitute valid and legally binding obligations of the Company and Parent, enforceable against the Company and Parent in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (iii) to the extent the indemnification provisions contained in the Indemnification Agreements may be limited by applicable U.S. federal or state laws.

2.5.    <u>Valid Issuance of Shares</u>.

(a)    The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement and the Transaction Agreements, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable U.S. federal and state securities laws, liens or encumbrances created by or imposed by the Investors and the Stockholders Agreement. Assuming the accuracy of the representations of the Investors in <u>Section 3</u> of this Agreement and subject to the filings described in <u>Subsection 2.6</u> below, the Shares will be issued in compliance with all applicable federal and state securities laws. The Common Shares issuable upon conversion of the Shares have been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Certificate as amended by the Certificate of Designation, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable federal and state securities laws and liens or encumbrances created by or imposed by the Investors. The Option Shares, Penalty Shares, Warrant Shares and Repurchase Shares have been duly reserved for issuance, and upon issuance in accordance with the terms of this Agreement ,the Option Agreement, the Lead Investor Warrants or the Penalty Rights Agreement, as applicable, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable federal and state securities laws and liens or encumbrances created by or imposed by the Investors.

12

Based in part upon the representations of the Investors in <u>Section 3</u> of this Agreement, and subject to <u>Subsection 2.5(b)</u> below, the Common Shares issuable upon conversion of the Shares, the Repurchase Shares issuable in accordance with the terms of this Agreement, the Option Shares issuable in accordance with the terms of the Option Agreement, the Warrant Shares issuable in accordance with the terms of the Lead Investor Warrants and the Penalty Shares issuable in accordance with the terms of the Penalty Rights Agreement will be issued in compliance with all applicable federal and state securities laws.

(b)    No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "**Disqualification Event**") is applicable to the Company or, to the Company's Knowledge, any Company Covered Person, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3), is applicable.

2.6.    <u>Governmental Consents and Filings</u>. Assuming the accuracy of the representations made by the Investors in <u>Section 3</u> of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state, provincial or local governmental authority is required on the part of the Company or Parent in connection with the consummation of the transactions contemplated by this Agreement, except for (i) the filing of the Restated Certificate and the Certificate of Designation, which will have been filed as of the Initial Closing, (ii) the filing of the Restated Parent Articles and the Parent Articles of Amendment, which will have been filed as of the Initial Closing, and (iii) filings pursuant to the Securities Act (Ontario) or the Securities Act, and other applicable U.S. and Canadian federal, state provincial or territorial securities laws, which have been made or will be made in a timely manner.

2.7.    <u>Litigation</u>. There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation (together with any Enforcement Action, a "**Proceeding**") pending or to the Company's Knowledge, currently threatened (i) against the Company or Parent or any officer, director or Key Person of the Company or Parent arising out of or related to their employment, consulting or board relationship with the Company or Parent; (ii) that questions the validity of the Transaction Agreements or the right of the Company or Parent to enter into them, or to consummate the transactions contemplated by the Transaction Agreements; or (iii) otherwise against the Company or Parent. Neither the Company or Parent nor, to the Company's Knowledge, any of their officers, directors or Key Persons are a party or are named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or Key Persons, such as would affect the Company or Parent). There is no Proceeding by the Company or Parent pending or which the Company or Parent intends to initiate. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company or Parent) involving the prior employment of any of the Company's or Parent's employees, their services provided in connection with the Company's business, as consultants or otherwise, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers or counterparties to consulting or contractor arrangements.

2.8.    <u>Intellectual Property</u>. The Company and its Subsidiaries own or possess sufficient legal rights to all Company Intellectual Property without, to the Company's

4133768.14

**#13682.17**

Knowledge, any conflict with, or infringement of, the rights of others. To the Company's Knowledge, no product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any intellectual property rights of any other party. Other than with respect to commercially available software products under standard end-user object code license agreements, there are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Company Intellectual Property, nor, is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other Person. The Company has not received any written communications alleging that the Company has violated, or by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets, mask works or other proprietary rights or processes of any other Person. The Company has obtained and possesses valid licenses to use all of the software programs present on the computers and other software-enabled electronic devices that it owns or leases or that it has otherwise provided to its employees for their use in connection with the Company's business. To the Company's Knowledge, it will not be necessary to use any inventions of any of its employees or consultants (or Persons it currently intends to hire) made prior to their employment or engagement by the Company. To the Company's Knowledge, each employee and consultant has assigned to the Company all intellectual property rights he or she owns that are related to the Company's business as now conducted and as presently proposed to be conducted. Subsection 2.8 of the Disclosure Schedule lists all registered Company Intellectual Property. Neither the Company nor any of its suppliers have embedded any open source, copyleft or community source code in any of its products, including the various components and systems comprising the opposing flows tank technology (including control and monitoring systems) (the "**OFT Technology**"), generally available or in development nor is any such code present in any of the property purchased in the IP Purchase, including but not limited to any libraries or code licensed under any General Public License, Lesser General Public License or similar license arrangement. For purposes of this Subsection 2.8, the Company shall be deemed to have knowledge of a patent right if the Company has actual knowledge of the patent right or would be found to be on notice of such patent right as determined by reference to United States patent laws.

     2.9.   <u>Compliance with Other Instruments</u>. Except as set forth on <u>Subsection 2.9</u> of the Disclosure Schedule, neither the Company nor Parent is in violation or default (i) of any provisions of its Restated Certificate in the case of the Company, the Restated Parent Articles as amended by the Parent Articles of Amendment in the case of Parent, or their respective Bylaws, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, or (iv) under any Contract to which it is a party or by which it is bound, or (v) of any provision of federal, provincial or state statute, rule or regulation applicable to the Company or Parent. The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, order, writ, decree, or Contract; or an event which results in the creation of any Lien other than a Permitted Lien upon any assets of the Company or Parent or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company, Parent or any Subsidiary.

14

#13682.18

2.10.   Agreements; Actions.

(a)   Except for the Transaction Agreements or as set forth on Subsection 2.10(a) of the Disclosure Schedule, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company or Parent is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company or Parent in excess of $100,000, (ii) the license of any patent, copyright, trademark, trade secret or other proprietary right to or from the Company or Parent (excluding licenses from third parties to the Company or Parent of so-called "off-the-shelf" and "shrink wrap" software, software embedded in equipment, software as a service, web, and mobile applications in each case licensed to the Company in the ordinary course of business and easily obtainable without expense by the Company of $15,000 or more per license), (iii) the grant of rights to manufacture, produce, assemble, license, market, or sell its products or the OFT Technology to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products or the OFT Technology, or (iv) indemnification by the Company or Parent with respect to infringements of proprietary rights. The Company has all necessary rights under all agreements, instruments and contracts used in the operation of the business of the Company for the conduct of the business as currently conducted or proposed to be conducted.

(b)   Except as set forth on Subsection 2.10(b) of the Disclosure Schedule, neither the Company nor the Parent has (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $100,000, (iii) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business. For the purposes of (a) and (b) of this Subsection 2.10, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsection.

(c)   Neither the Company nor Parent is a guarantor or indemnitor of any indebtedness of any other Person.

2.11.   Certain Transactions.

(a)   Other than (i) standard employee benefits generally made available to all employees, (ii) the Management Services Agreements with Affiliates of the Key Persons, all of which, other than those with the Nelsons Key Persons, will be terminated, superseded and replaced by the Employment Agreements (or in the case of Richard Sheriff, the Consulting Agreement) entered into by the Key Persons other than the Nelson Key Persons at the Initial Closing, and (iii) the Sheriff Loan Documents, which will be satisfied and terminated at the Initial Closing, there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Persons, or any Affiliate thereof.

4133768.14

#13682.19

(b)     Except as specifically set forth on <u>Subsection 2.11(b)</u> of the Disclosure Schedule, neither the Company nor the Parent is indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than for customary employee benefits made generally available to all employees. None of the Company's or Parent's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company. <u>Subsection 2.11(b)</u> of the Disclosure Schedule sets forth all amounts owed by Parent and the Company under the MSAs.

2.12.   <u>Rights of Registration and Voting Rights</u>. Except as provided in the Registration Rights Agreement, neither the Company nor Parent is under any obligation to register under the Securities Act or its foreign equivalents any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities. To the Company's Knowledge, except as contemplated in the Stockholders Agreement and the Voting Agreement, no stockholder of the Company has entered into any agreements with respect to the voting of shares of capital stock of the Company. Except as contemplated in the Parent Stockholder Agreement, no shareholder of the Parent has entered into any agreements with respect to the voting of capital shares of the Parent.

2.13.   <u>Assets</u>. Except as set forth on <u>Subsection 2.13</u> of the Disclosure Schedule, the Company and its Subsidiaries own good and marketable title to, or a valid right to use, all of the tangible and intangible assets and property excluding Owned Real Property (as defined below) used or held in connection with their businesses, free and clear of any and all Liens other than Permitted Liens. The Parent owns no tangible or intangible assets or property other than Common Shares of the Company, which it holds free and clear of any and all Liens other than Permitted Liens.

2.14.   <u>Owned Real Property</u>. <u>Subsection 2.14</u> of the Disclosure Schedule sets forth a complete list, including an address and description, of all real property owned in fee by the Company or any Subsidiary ("**Owned Real Property**"). With respect to Owned Real Property: (i) the Company or a Subsidiary has good and marketable indefeasible fee simple title, free and clear of all Liens except Permitted Liens; (ii) neither the Company nor any Subsidiary has leased, licensed or otherwise granted to any Person the right to use or occupy the Owned Real Property or any portion thereof; and (iii) there are no outstanding options, rights of first offer or rights of first refusal to purchase the Owned Real Property or any portion thereof or interest therein. The Company or Subsidiary owning each Owned Real Property has all necessary permits, licenses and approvals for the use and occupancy of such Owned Real Property and for the conduct of its business at such location.

2.15.   <u>Leased Real Property</u>. <u>Subsection 2.15</u> of the Disclosure Schedule sets forth a complete list, including an address of each leasehold or subleasehold estate or other right to use or occupy any interest in real property held by the Company or a Subsidiary ("**Leased Real Property**" and, together with Owned Real Property, "**Real Property**"). With respect to each Leased Real Property, (i) the Company's or Subsidiary's possession and quiet enjoyment under the applicable Real Property Lease has not been disturbed and (ii) neither Company nor any Subsidiary has subleased, licensed or otherwise granted any Person the right to use or occupy any Leased Real Property or any portion thereof. The Company or Subsidiary leasing

16

#13682.20

each Leased Real Property has all necessary permits, licenses and approvals for the use and occupancy of such Leased Real Property and for the conduct of its business at such location.

     2.16.  <u>Financial Statements</u>. Parent has delivered to each of the Investors its unaudited financial statements for the fiscal year ended December 31, 2015 and its unaudited financial statements (including balance sheet, income statement and statement of cash flows) for the three-month period ended March 31, 2016 (the "**Interim Financial Statements**" and collectively, the "**Financial Statements**"). The Financial Statements have been prepared in accordance with the international financial reporting standards ("**IFRS**") applied on a consistent basis throughout the periods indicated subject, in the case of the Interim Financial Statements, to absence of notes required by IFRS and to normal year-end adjustments. The Financial Statements fairly present in all material respects the financial condition and operating results of Parent, the Company and its Subsidiaries on a consolidated basis as of the dates, and for the periods, indicated therein, subject in the case of the Interim Financial Statements to normal year-end adjustments. Except as set forth in the Financial Statements, Parent and the Company have no material liabilities or obligations, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to March 31, 2016; (ii) obligations under contracts and commitments incurred in the ordinary course of business; and (iii) liabilities and obligations of a type or nature not required under IFRS to be reflected in the Financial Statements, which, in all such cases, individually and in the aggregate would not have a Material Adverse Effect. The Company maintains and will continue to maintain a standard system of accounting established and administered in accordance with IFRS.

     2.17.  <u>Changes</u>. Except as expressly contemplated in this Agreement and the other Transaction Agreements, since March 31, 2016 there has not been:

     (a)    any change in the assets, liabilities, financial condition or operating results of Parent or the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not caused, in the aggregate, a Material Adverse Effect;

     (b)    any damage, destruction or loss, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect;

     (c)    any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

     (d)    any satisfaction or discharge of any Lien or payment of any obligation by the Company, except in the ordinary course of business and the satisfaction or discharge of which would not reasonably be expected to have a Material Adverse Effect;

     (e)    any material change to a material Contract or agreement by which the Company or any of its assets is bound or subject;

     (f)    any material change in any compensation arrangement or agreement with any employee, officer, consultant, director or stockholder;

4133768.14

**#13682.21**

(g)     any resignation or termination of employment or consulting arrangement of any officer or Key Person of Parent or the Company;

(h)     any mortgage, pledge, transfer of a Lien in, or Lien, created by the Company, with respect to any of its material properties or assets, except for Permitted Liens;

(i)     any loans or guarantees made by Parent or the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(j)     any declaration, setting aside or payment or other distribution in respect of any of Parent's or the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by Parent or the Company;

(k)     any sale, assignment or transfer of any Company Intellectual Property;

(l)     receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company, or a loss of or material reduction in supply from any major supplier of the Company;

(m)     to the Company's Knowledge, any other event or condition of any character, other than events affecting the economy or the Company's industry generally, that would reasonably be expected to result in a Material Adverse Effect; or

(n)     any arrangement or commitment by Parent or the Company to do any of the things described in this Subsection 2.17.

2.18.   Employee Matters.

(a)     As of the date hereof, the Company employs twenty full-time employees and three part-time employees and engages three consultants or independent contractors. Subsection 2.18(a) of the Disclosure Schedule sets forth a description of all compensation, including salary, bonus, severance obligations and deferred compensation paid or payable for each officer, employee, consultant and independent contractor of the Company who received compensation in excess of $100,000 for the fiscal year ended December 31, 2015 or is anticipated to receive compensation in excess of $100,000 for the fiscal year ending December 31, 2016.

(b)     To the Company's Knowledge, none of its employees are obligated under any Contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's ability to promote the interest of the Company or that would conflict with the Company's business. Neither the execution or delivery of the Transaction Agreements, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, to the Company's Knowledge, conflict with or result in a breach

18

of the terms, conditions, or provisions of, or constitute a default under, any Contract, covenant or instrument under which any such employee is now obligated.

(c)     Except as set forth on <u>Subsection 2.18(c)</u> of the Disclosure Schedule, neither the Company nor Parent is delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, expense reimbursement or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants or independent contractors.

(d)     The Company has complied in all material respects with all applicable U.S. state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification and collective bargaining. The Company and Parent have withheld and paid to the appropriate Governmental Entity or is holding for payment not yet due to such Governmental Entity all amounts required to be withheld from employees or other service providers of the Company and Parent and are not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing. All Key Persons are legal residents of the United States or are foreign citizens with all necessary authorizations to remain in the United States as employees of the Company.

(e)     To the Company's Knowledge, no Key Person intends to terminate their employment or consulting arrangements with the Company or Parent or is otherwise likely to become unavailable to continue as a Key Person, nor does the Company or Parent have a present intention to terminate the employment or engagement of any of the foregoing. The employment of each employee, or engagement of each consultant, of the Company or Parent is terminable at the will of the Company or Parent, as applicable. Except as set forth in <u>Subsection 2.18(e)</u> of the Disclosure Schedule, in the Employment Agreements to be entered into at the Initial Closing, or as required by law, upon termination of the employment or engagement of any such employees or consultants, no severance or other payments will become due. Except as set forth in <u>Subsection 2.18(e)</u> of the Disclosure Schedule, neither the Company nor Parent have any policy, practice, plan or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

(f)     Neither the Company nor Parent has made any representations regarding equity incentives to any officer, employee, director or consultant.

(g)     <u>Subsection 2.18(g)</u> of the Disclosure Schedule sets forth each employee benefit plan maintained, established or sponsored by the Company or Parent, or which the Company or Parent participates in or contributes to, which is subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"). The Company and Parent have made all required contributions and has no liability to any such employee benefit plan, other than liability for health plan continuation coverage described in Part 6 of Title I(B) of ERISA, and has complied in all material respects with all applicable laws for any such employee benefit plan.

(h)     The Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the

#13682.23

knowledge of the Company, has sought to represent any of the employees, representatives or agents of the Company. There is no strike or other labor dispute involving the Company pending, or to the Company's Knowledge, threatened, nor is the Company aware of any labor organization activity involving its employees.

(i)     To the Company's Knowledge, none of the Key Persons or directors of the Company or Parent has been (a) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his business or property; (b) convicted in a criminal Proceeding or named as a subject of a pending criminal Proceeding (excluding traffic violations and other minor offenses); (c) subject to any order, judgment or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him from engaging, or otherwise imposing limits or conditions on his engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (d) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission or any Canadian securities authority to have violated any federal, provincial or state securities, commodities, or unfair trade practices law.

2.19.   Tax Matters. There are no federal, state, county, local or foreign Taxes due and payable by the Company or Parent which have not been timely paid. There are no accrued and unpaid federal, state, provincial, county, local or foreign Taxes of the Company or Parent which are due, whether or not assessed or disputed. There have been no examinations or audits of any tax returns or reports by any applicable federal, state, provincial, local or foreign governmental agency. The Company and Parent have duly and timely filed all federal, state, provincial, county, local and foreign tax returns required to have been filed by them and there are in effect no waivers of applicable statutes of limitations with respect to Taxes for any year.

2.20.   Insurance. To the Company's Knowledge, the Company has in full force and effect fire and casualty insurance policies with extended coverage, sufficient in amount (subject to reasonable deductions) to allow it to replace any of its properties that might be damaged or destroyed and that is commercially reasonable for the businesses in which the Company and its Subsidiaries engage.

2.21.   [Intentionally Omitted].

2.22.   Permits. The Company has all material franchises, permits, licenses and any similar authority necessary for the conduct of its business, including all federal, state and local permits and licenses necessary for (i) the import of Barramundi fish into the United States and Iowa, and (ii) for the sale and transport of fish where and in the manner the Company currently conducts business. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

2.23.   Corporate Documents. The Restated Certificate and Bylaws of the Company are in the form provided to the Investors. The Restated Parent Articles, as amended by the Parent Articles of Amendment, and Bylaws of Parent are in the form provided to the Investors. The copies of the minute books of the Company and Parent provided to the Investors

20

#13682.24

contains minutes of all meetings of directors and stockholders (or shareholders) and all actions by written consent without a meeting by the directors and stockholders (or shareholders) of each company since their respective dates of incorporation and accurately reflects in all material respects all actions by the directors (and any committee of directors) and stockholders (or shareholders) with respect to all transactions referred to in such minutes.

2.24.  <u>Real Property Holding Corporation</u>. Neither the Company nor any Subsidiary is now a "United States real property holding corporation" as defined in the Code and any applicable regulations promulgated thereunder. The Company has filed with the Internal Revenue Service all statements, if any, with its United States income tax returns which are required under such regulations.

2.25.  <u>Environmental and Safety Laws</u>. (a) The Company is and has been in compliance with all applicable Environmental Laws; (b) to the Company's Knowledge there are no, and have never been any, Hazardous Substances at property or facilities currently or formerly owned, leased or operated by the Company or other facts, circumstances or conditions reasonably expected to impose liability against the Company under any Environmental Law; (c) to the Company's Knowledge there have been no Hazardous Substances generated by the Company that have been disposed of or come to rest at any site that has been included in any published U.S. federal, state or local "superfund" site list or any other similar list of hazardous or toxic waste sites published by any governmental authority in the United States; and (d) to the Company's Knowledge there are no underground storage tanks located on, no polychlorinated biphenyls ("**PCBs**") or PCB-containing equipment used or stored on, and no hazardous waste as defined by the Resource Conservation and Recovery Act, as amended, stored on, any site owned or operated by the Company, except for the storage of hazardous waste in compliance with Environmental Laws. The Company has made available to the Investors a list of all material environmental records, reports, notifications, certificates of need, permits, pending permit applications, correspondence, engineering studies and environmental studies or assessments and copies of such reports where requested and where such disclosure will not violate any applicable law.

For purposes of this <u>Subsection 2.25</u>, "**Environmental Laws**" means any law, regulation, or other applicable requirement relating to (a) releases or threatened release of Hazardous Substance; (b) pollution or protection of employee health or safety, public health or the environment; (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances; or (d) the treatment and discharge of waste water. "**Hazardous Substances**" means all substances, materials, and wastes defined as a "hazardous substance" under the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. §300.5, or otherwise regulated by or subject to liability under any Environmental Law, including petroleum or any fraction, product or byproduct thereof.

2.26.  <u>Business Plan</u>. Reference is hereby made to that certain: (i) Executive Summary of the Company: and (ii) Equity Deck of the Company, dated December 21, 2015, copies of which are attached hereto as Exhibit R (collectively, the "**Business Plans**"). Subject to the qualifiers set forth in the Business Plans, the Business Plans do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which

21

**#13682.25**

they were made. The Business Plans were prepared in good faith; however, the Company does not warrant that it will achieve any results projected in the Business Plan, but the Company represents and warrants that it believes that the assumptions underlying such projections were and are reasonable.

2.27. <u>Disclosure</u>. No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Investors at the Closing contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

2.28. <u>Foreign Corrupt Practices Act</u>. Neither the Parent nor the Company nor any of the Company's or Parent's directors, officers, consultants, employees or agents have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**")), foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist the Parent, the Company or any of their Affiliates in obtaining or retaining business for or with, or directing business to, any Person. Neither the Parent nor the Company nor any of their respective directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any law, rule or regulation. The Company and Parent each further represent that they have maintained, and have caused each of their Subsidiaries and Affiliates to maintain, systems of internal controls (including, but not limited to, accounting systems, purchasing systems and billing systems) to ensure compliance with the FCPA or any other applicable anti-bribery or anti-corruption law. Neither the Company nor Parent, or, to the Company's Knowledge, any of their respective officers, directors or employees are the subject of any allegation, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA or any other anti-corruption law (collectively, "**Enforcement Action**").

3.    <u>Representations and Warranties of the Investors</u>. Each Investor severally, but not jointly, hereby represents and warrants to each of Company and Parent that as of the Initial Closing and, with respect to the Lead Investor, each subsequent Closing the following representations are true and complete as to such Investor as of the date of the Initial Closing and, with respect to the Lead Investor, each subsequent Closing, except as otherwise indicated.

3.1. <u>Organization, Good Standing, Corporate Power and Qualification of Investors</u>. Investor is an entity duly organized, validly existing and in good standing in the form and under the laws of the jurisdiction listed next to such Investor's name on <u>Schedule I</u> and has all requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted. Such Investor is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

22

#13682.26

3.2.   <u>Authorization</u>. All corporate, limited liability company, or partnership action required to be taken by Investor's governing persons and equity owners in order to authorize such Investor's entrance into the Transaction Agreements to which it is a party has been taken. Such Investor has full power and authority to enter into the Transaction Agreements to which it is a party. The Transaction Agreements to which such Investor is a party, when executed and delivered by such Investor, will constitute valid and legally binding obligations of such Investor, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, or (b) to the extent the indemnification provisions contained in the Registration Rights Agreement may be limited by applicable federal or state securities laws.

3.3.   <u>Purchase Entirely for Own Account</u>. This Agreement is made with Investor in reliance upon such Investor's representation to the Company, which by such Investor's execution of this Agreement, such Investor hereby confirms, that the Shares (and any Common Shares underlying such Shares) to be acquired by such Investor will be acquired for investment for such Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, such Investor further represents that the such Investor does not presently have any Contract with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares and any Common Shares underlying such Shares.

3.4.   <u>Disclosure of Information</u>. Investor has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Units with the Company's management and has had an opportunity to review the Company's facilities. The foregoing, however, does not limit or modify the representations and warranties of the Company in <u>Section 2</u> of this Agreement or the right of such Investor to rely thereon.

3.5.   <u>Restricted Securities</u>. Investor understands that the Shares, and the Common Shares underlying such Shares, have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Investor's representations as expressed herein. Such Investor understands that the Shares, and the Common Shares underlying such Shares, are "restricted securities" under the Securities Act and applicable state securities laws and that, pursuant to these laws, such Investor must hold the Shares, and the Common Shares underlying such Shares, indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Such Investor acknowledges that the Company has no obligation to register or qualify the Shares, or the Common Shares into which they may be converted, for resale except as set forth in the Registration Rights Agreement. Such Investor further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and the Common Shares underlying such Shares, and on

23

#13682.27

requirements relating to the Company which are outside of such Investor's control, and which the Company is under no obligation and may not be able to satisfy.

3.6.   No Public Market. Investor understands that no public market now exists for the Shares, or the Common Shares underlying such Shares, and that the Company has made no assurances that a public market will ever exist for the Shares or the Common Shares underlying such Shares.

3.7.   Legends. Investor understands that the Shares, the Common Shares underlying such Shares, and any securities issued in respect of or exchange for the Penalty Rights, may be notated with one or all of the following legends:

"THE SHARES OF STOCK REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(a)   Any legend set forth in, or required by, the other Transaction Agreements.

(b)   Any legend required by securities laws to the extent such laws are applicable to the Shares represented by the certificate, instrument, or book entry so legended.

3.8.   Accredited Investor. Investor is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.9.   Foreign Investor. Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Units or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Units, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Units. Such Investor's subscription and payment for and continued beneficial ownership of the Units will not violate any applicable securities or other laws of such Investor's jurisdiction.

3.10.   No General Solicitation. Neither Investor, nor any of its officers, directors, employees, agents, stockholders, members, partners or other equityholders has either directly or indirectly, including, through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Units.

3.11.   Residence. Investor's principal place of business is listed next to its name on Schedule I.

4133768.14

**#13682.28**

3.12.   <u>Governmental Consents and Filings</u>. Assuming the accuracy of the representations made by the Company in <u>Section 2</u> of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state, provincial or local governmental authority is required on the part of Investor in connection with the consummation of the transactions contemplated by this Agreement.

4.   <u>Closing Deliveries</u>.

4.1.   <u>Deliveries of the Company at the Initial Closing</u>. At the Initial Closing, the Company shall deliver to each Investor (unless otherwise specified below) the following:

(a)   share certificates representing the Series A Preferred Shares purchased by such Investor hereunder at the Initial Closing;

(b)   in the case of the Lead Investor, the Option Agreement, duly executed by the Company;

(c)   the Penalty Rights Agreement, duly executed by the Company;

(d)   in the case of the Lead Investor, the Lead Investor Warrants, duly executed by the Company;

(e)   the Stockholders Agreement, duly executed by each of Parent, Company, and each participant in the Stock Plan as of the Initial Closing;

(f)   the Registration Rights Agreement, duly executed by the Company;

(g)   in the case of the Lead Investor, the Voting Agreement, duly executed by the Company and each participant in the Stock Plan as of the Initial Closing;

(h)   a copy of the Stock Plan and the adopting resolution of the Board;

(i)   an Employment Agreement, substantially in the form attached hereto as <u>Exhibit J</u>, duly executed by the Company, and each of Leslie Wulf, Bruce Hall, Keith Driver, James Rea, John Rea, Mark Nelson and Jeffrey Nelson (each, an "**Employment Agreement**", and collectively, the "**Employment Agreements**");

(j)   a Consulting Agreement, substantially in the form attached hereto as <u>Exhibit K</u>, duly executed by the Company and Richard Sheriff;

(k)   Management Option Agreements with each Management Option Recipient, duly executed by the Company and each Management Option Recipient;

(l)   an Indemnification Agreement with each Initial Closing Director duly executed by the Company and with respect to the Initial Closing Directors other than the Investor Directors, duly executed by such other Initial Closing Directors;

4133768.14

**#13682.29**

(m)     a certificate duly executed by the Secretary of the Company certifying (i) the Bylaws of the Company, (ii) the Articles of Incorporation of the Company (in the form of the Restated Certificate as amended by the Certificate of Designation) certified by the Secretary of State of Nevada, (iii) resolutions of the Board of Directors of the Company approving the Transaction Agreements and the transactions contemplated under the Transaction Agreements, and (iv) resolutions of the Board and stockholders of the Company approving the Certificate of Designation and appointing the Investor Directors to the Board;

(n)     a certificate of good standing for Parent, the Company and each Subsidiary issued not more than ten (10) days prior to the Initial Closing by the Secretary of State or comparable governmental authority of its jurisdiction of organization and each other jurisdiction in which any of them are qualified to do business;

(o)     termination and release agreements effecting the termination of any agreement for consulting or management services with any Key Person other than the Nelson Key Persons (the "MSAs"), including in the case of termination of the MSAs, terms indicating that upon payment of the outstanding amounts set forth on Subsection 2.11(b) of the Disclosure Schedule, the obligations of the Company and Parent under such agreements shall be satisfied in full and forever discharged;

(p)     a payoff letter from Revere High Yield Fund, L.P. indicating that upon payment of a specified amount, the Revere Note shall be paid in full and such holder shall automatically release its security interests under the Revere Loan Documents and authorize Company to file Uniform Commercial Code termination statements, or such other documents or endorsements necessary to release of record the security interests of such holder;

(q)     a payoff letter from the Sheriff Parties indicating that upon payment of a specified amount, the Sheriff Note shall be paid in full and such holders shall automatically release their security interests under the Sheriff Loan Documents and authorize Company to file Uniform Commercial Code termination statements, or such other documents or endorsements necessary to release of record the security interests of such holder;

(r)     executed irrevocable Letters of Transmittal with each holder of a Promissory Note reflecting the Note Conversions and Payoffs as described on Schedule 1.1(c), each of which shall be irrevocable and effective as of the Initial Closing;

(s)     the Contract, duly executed by Mississippi Prison Industries Corporation and VBF Operations, Inc., substantially in the form attached hereto as Exhibit Q (the "**Tank Manufacturing Agreement**");

(t)     an amendment to the Supply Agreement, dated June 6, 2015, by and between the Company and Mainstream Aquaculture Pty Ltd. ("**Mainstream**") in the form attached hereto as Exhibit M, duly executed by the Company and Mainstream; and

(u)     resolutions duly adopted by the stockholders, members, partners, or other equity owners of the Company and of each Subsidiary appointing the Investor Directors to the Board of Directors of the Company and of each Subsidiary and the adoption of bylaws,

4133768.14

**#13682.30**

and in the case of Subsidiaries, amended and restated articles of incorporation (or their equivalent) in a form reasonably satisfactory to Lead Investor.

4.2. <u>Deliveries of Parent at the Initial Closing.</u> At the Initial Closing, Parent shall deliver to Lead Investor the following:

(a)  the Parent Preferred Share Purchase Agreement, duly executed by Parent, together with such other documents, agreements, and certificates required to be delivered to Lead Investor thereunder;

(b)  a certificate duly executed by the Secretary of Parent certifying that Parent has performed and complied with all covenants, agreements, obligations and conditions contained in the Parent Preferred Share Purchase Agreement that are required to be performed or complied with by it on or before the Closing (as defined in such agreement);

(c)  share certificates representing the Parent Series A Preferred Share purchased by Lead Investor at the Initial Closing; and

(d)  the Parent Shareholders Agreement, duly executed by Parent.

4.3. <u>Deliveries of the Investors at Initial Closing.</u> At the Initial Closing, each Investor (unless otherwise specified below) shall deliver to the Company the following:

(a)  a wire transfer of immediately available funds in the amount of such Investor's Purchase Price Share wired to an account designated by the Company in writing to such Investor;

(b)  in the case of Lead Investor, the Option Agreement, duly executed by Lead Investor;

(c)  the Penalty Rights Agreement, duly executed by such Investor;

(d)  in the case of Lead Investor, the Lead Investor Warrants, duly executed by Lead Investor;

(e)  the Stockholders Agreement, duly executed by such Investor;

(f)  the Registration Rights Agreement, duly executed by such Investor;

(g)  in the case of Lead Investor, the Voting Agreement, duly executed by Lead Investor;

(h)  the Indemnification Agreements, (i) in the case of Fish Dish duly executed by the Fish Dish Director, and (ii) in the case of Lead Investor, duly executed by each of the Lead Investor Directors; and

27

#13682.31

(i)     in the case of Lead Investor, the Parent Shareholders Agreement, duly executed by Lead Investor.

4.4.    <u>Conditions to Lead Investor's Obligations at each Repurchase Closing</u>. The obligation of Lead Investor to purchase Units at any Repurchase Closing is subject to the fulfillment, on or before such Closing, of each of the following conditions by the Company and Parent, unless otherwise waived:

(a)     Parent shall have entered into definitive documentation to effect the corresponding Parent Repurchase with each selling shareholder, in a form reasonably acceptable to Lead Investor, under which Parent has an irrevocable right to purchase the Parent Common Shares being repurchased thereunder contingent only upon payment by Parent of the repurchase consideration to be derived from Lead Investor's purchase of Units at the Repurchase Closing and the simultaneous repurchase by the Company of Common Shares held by Parent at the Company Repurchase.

(b)     The representations and warranties of the Company made in <u>Section 2</u>, shall be true and correct in all material respects as of such Closing with the same effect as though made at and as of such date except: (i) those representations and warranties that address matters only as of a specified date shall be true and correct in all respects as of that specified date, (ii) those representations and warranties which are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects, and (iii) all representations and warranties will be qualified by the relevant Updated Disclosure Schedule (with the exceptions contained therein deemed to be part of the representations and warranties made hereunder) rather than the Disclosure Schedule attached hereto.

(c)     The Company and Parent shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such Closing.

(d)     All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the U.S., or of any state that are required in connection with the lawful issuance and sale of the Units pursuant to this Agreement shall be obtained and effective as of such Closing.

(e)     The Secretary of the Company shall have delivered to Lead Investor at the Closing a certificate certifying (i) the Bylaws of the Company, (ii) the Articles of Incorporation of the Company, and (iii) resolutions of the Board of Directors of the Company approving the Common Repurchase, the issuance of the applicable Units to Lead Investor and associated agreements.

(f)     All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to Lead Investor, and Lead Investor (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested, which shall include certificates of good standing of the Company and each Subsidiary.

28

#13682.32

(g)     The Company shall have fully satisfied (including with respect to rights of timely notification) or obtained enforceable waivers in respect of any preemptive or similar rights directly or indirectly affecting any of its securities.

(h)     The Chief Executive Officer of the Company shall deliver to Lead Investor at such Closing a certificate certifying that the conditions specified in <u>Subsection 4.4</u> have been fulfilled.

4.5.   <u>Conditions of the Company's Obligations at each Repurchase Closing</u>. The obligations of the Company to sell Units to Lead Investor at any Repurchase Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived:

(a)     The representations and warranties of Lead Investor contained in <u>Section 3</u> shall be true and correct in all material respects as of such Closing with the same effect as though made at and as of such date except: (i) those representations and warranties that address matters only as of a specified date shall be true and correct in all respects as of that specified date, and (ii) those representations and warranties which are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects.

(b)     Lead Investor shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before such Closing.

(c)     All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the U.S., Canada or of any state or province that are required in connection with the lawful issuance and sale of the Units pursuant to this Agreement, the repurchase of Common Shares at the Common Repurchase and the repurchase of Parent Common Shares at the Parent Repurchase shall be obtained and effective as of the Closing.

5.     <u>Certain Covenants of the Company</u>. Following the Initial Closing:

5.1.   <u>Restructuring; Redomestication</u>. The Company and Parent shall cooperate with Lead Investor in examining potential restructuring of Parent, the Company, its Subsidiaries and its ownership, as well as their respective domicile, in order to achieve certain tax and other efficiencies desirable to Lead Investor. The Company and Parent shall use their commercially reasonable efforts to undertake any such restructurings and/or redomestications that are approved by Lead Investor, Parent (which approval by Parent shall require the approval by a majority of the non-Lead Investor designated directors of Parent) and the Company, prior to December 31, 2016.

5.2.   <u>Share Repurchase Program</u>. For a period of ninety (90) days following the Initial Closing, Parent shall approach existing shareholders of Parent with the express prior written consent of Lead Investor and use its commercially reasonable efforts to, after consultation with Lead Investor, either:

4133768.14

**#13682.33**

(a)      repurchase Parent Common Shares from such shareholders on terms that are reasonably acceptable to Parent; provided, however, that unless otherwise consented to by Lead Investor (a) no such repurchase shall be made for a price per share greater than US$1 and (b) each such repurchase shall be consummated within ninety (90) days following the Initial Closing (each such repurchase being a "**Parent Repurchase**"). Simultaneously with each Parent Repurchase, the Company shall repurchase that number of Common Shares (which may include fractional shares) held by Parent (each a "**Common Repurchase**") equal to the number of Units purchased by Lead Investor in the associated Repurchase Closing.; or

(b)      assist Lead Investor or an Affiliate in soliciting for sale to Lead Investor or an Affiliate Parent Common Shares from such holders on terms satisfactory to Lead Investor in its sole discretion (each a "**Direct Purchase**").

In no event shall the aggregate Direct Purchases and purchases of Units through Repurchase Closings exceed US$7,061,925. The processes set forth in the preceding subsections (a) and (b) are referred to herein collectively as the (the "**Share Repurchase Program**"). Lead Investor may in its sole discretion continue the Share Repurchase Program at any point and for any period of time following the initial 90 day period.

5.3.    <u>USRPHC Reporting</u>. For so long as Lead Investor holds any equity interest in the Company or any Subsidiary, Company shall provide Lead Investor with monthly testing reports setting forth the Company's determination of its status as a United States real property holding corporation ("**USRPHC**") as defined in the Code (each a "**USRPHC Report**"), with such determination based on the Code and other applicable law. Each such USRPHC Report shall include reasonable detail such that Lead Investor shall be able to reasonably verify the determinations made by the Company, and the Company shall make its employees and advisors available to Lead Investor and its advisors during normal business hours for the purpose of verifying the information and calculations included in a USRPHC Report. The Company shall prepare and provide to Lead Investor a USRPHC Report prior to any acquisition by it or a Subsidiary of any real property, the making of any material improvement to any piece of real property, the sale or other disposition of any material asset of the Company or a Subsidiary other than in the ordinary course of business, or the write-down or write-off of any asset that is a non-real property asset for the purposes of determining the Company's status as a USRPHC. The Company and its Subsidiaries shall at no time take any action that would cause the Company to be a USRPHC and shall use their respective best efforts to ensure that that the Company at no time becomes a USRPHC.

5.4.    <u>Execution of Stockholders Agreement</u>. As soon as practicable following the Closing, the Company shall use all commercially reasonable efforts to obtain the signatures of each Converting Noteholder acquiring Common Stock to execute the signature page to the Stockholders Agreement and become a party thereto.

5.5.    <u>Confidential Information Agreements</u>. The Company shall use commercially reasonable efforts to cause each current employee, consultant and officer of the Company to promptly execute an agreement with the Company regarding confidentiality, proprietary information and assignment of inventions in a form reasonably acceptable to Lead Investor.

4133768.14

**#13682.34**

5.6.   Other Post-Initial Closing Covenants. In the event that either or both of the Investors waive any of the conditions to the Initial Closing contained in Section 4.1 or 4.2 (each a "**Closing Condition**"), the Company or Parent, as applicable, shall use its commercially reasonable efforts to satisfy such Closing Conditions unless and until fully and finally waived in writing by the Investors.

6.   Indemnification

6.1.   Survival. The representations, warranties, covenants and agreements contained herein shall survive each of the Closings for the periods set forth below. No action for breach of any representation or warranty given at a Closing shall be brought more than 18 months after such Closing, except for any claim for breach of any Fundamental Representations, which shall be brought within seven (7) years after the Closing (giving effect to any waiver, mitigation or extension thereof) applicable to the subject matter of such representations and warranties bars all claims with respect to such subject matter  (each period, as applicable, the "**Applicable Claims Period**"). The agreements and covenants set forth in this Agreement shall survive indefinitely, unless specifically stated otherwise. Notwithstanding anything to the contrary, the Company and each Investor will be obligated to provide the indemnification contemplated under Subsections 6.2, and 6.3, respectively, only if the party entitled to receive indemnification under any such section validly delivers a written notice of such Claim (as defined below) in accordance with Subsection 6.4 to the party required to provide such indemnification on or prior to the conclusion of the Applicable Claims Period; provided, however, that if a Claim is validly delivered prior to the expiration of the Applicable Claims Period, then the rights of the party entitled to receive indemnification for the applicable representation or warranty will survive until such matter is resolved.

6.2.   Indemnification by Parent and Company. Company and Parent jointly and severally agree to indemnify and hold harmless the Investor Indemnified Parties from and against, and pay or reimburse the Investor Indemnified Parties for, any and all Adverse Consequences which any Investor Indemnified Party may suffer, sustain or incur directly or indirectly arising out of, relating to or otherwise by virtue of: (i) any inaccuracy in or breach of any of the representations or warranties contained in Section 2; (ii) any Proceeding that is or should be disclosed on Subsection 2.7; (iii) any inaccuracy in or breach of any of the representations or warranties contained in Subsection 2.24; (iv) any inaccuracy in or breach of any of the representations or warranties contained in Subsection 7.6; (v) a breach by Parent or Company of any of its covenants or agreements contained in this Agreement; and (vi) any Fraud.

6.3.   Indemnification by the Investors. Each Investor agrees severally, and not jointly, to indemnify and hold harmless the Company Indemnified Parties from and against, and pay or reimburse the Company Indemnified Parties for, any and all Adverse Consequences which any Company Indemnified Party may suffer, sustain or incur directly or indirectly arising out of, relating to or otherwise by virtue of: (i) any inaccuracy in or breach of any of the representations and warranties of such Investor contained in Section 3; (ii) a breach by such Investor of any of its covenants or agreements contained in this Agreement, or (iii) Fraud committed by such Investor.

6.4.   Indemnification Procedure.

31

#13682.35

(a)      In the event that any Person entitled to indemnification under this Agreement (an "**Indemnified Party**") receives notice of the assertion of any claim (a "**Claims**") whether such Claim is brought by any Person who is not a Party or an Affiliate of a Party (a "**Third Party Claim**"), or of the commencement of any Proceeding by the same against such Indemnified Party, or a Direct Claim (as defined below) by a Company Indemnified Party against an Investor or an Investor Indemnified Party against the Company, with respect to which a Party is or may be required to provide indemnification under this Agreement (an "**Indemnifying Party**"), the Indemnified Party shall give written notice regarding such Claim describing the claim, the amount thereof (if known and quantifiable) and a reasonable description of the basis thereof (such notice, a "**Claim Notice**") to the Indemnifying Party within thirty (30) days after learning of such Claim; provided, however, that the failure to so notify an Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent (and only to the extent) that the Indemnifying Party forfeits rights or defenses by reason of such failure. The Indemnifying Party shall be entitled to participate in the defense of such Third Party Claim at such Indemnifying Party's expense, and at its option shall be entitled to assume the defense thereof (subject to the limitations set forth below) by appointing counsel reasonably acceptable to the Indemnified Party to be the lead counsel in connection with such defense.

(b)      If the Indemnifying Party has assumed the defense of a Third Party Claim in accordance with the terms hereof, the Indemnified Party shall be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose, and the fees and expenses of such separate counsel shall be borne by the Indemnified Party other than (i) any fees and expenses of such separate counsel that are reasonably incurred prior to the date the Indemnifying Party assumes control of such defense and (ii) any fees and expenses of such separate counsel if the Indemnified Party reasonably shall have concluded (upon advice of its counsel) that there may be one or more legal defenses available to such Indemnified Party that are not available to the Indemnifying Party or that the Indemnified Party and the Indemnifying Party may have materially different, conflicting, or adverse legal positions or interests with respect to such Third Party Claim.

(c)      Notwithstanding anything to the contrary contained herein, the Indemnifying Party shall not be entitled to control the defense of a Third Party Claim (and the Indemnified Party shall be entitled to maintain or assume control of the defense of such Third Party Claim) if (i) the Third Party Claim relates to or involves any criminal or quasi criminal Proceeding; (ii) the Indemnified Party reasonably believes an adverse determination with respect to the Third Party Claim would be detrimental to or injure the Indemnified Party's reputation or future business prospects; (iii) the Third Party Claim seeks an injunction or other equitable relief against the Indemnified Party; or (iv) the Indemnified Party reasonably believes that the Adverse Consequences relating to the claim could exceed the maximum amount that such Indemnified Party would then be entitled to recover under this Section 6.

(d)      If the Indemnifying Party shall control the defense of any Third Party Claim, the Indemnifying Party shall obtain the prior written consent of the Indemnified Party before entering into any settlement of, consenting to the entry of any judgment with respect to or ceasing to defend such Third Party Claim if (i) pursuant to or as a result of such settlement, consent or cessation, injunctive or other equitable relief will be imposed against the Indemnified

4133768.14

**#13682.36**

Party, or a finding or admission of any violation of law would be made by any Indemnified Party, or such settlement, consent or cessation could otherwise reasonably be expected to interfere with or adversely affect the business, operations or assets of the Indemnified Party; or (ii) such settlement or judgment does not expressly and unconditionally release the Indemnified Party from all liabilities and obligations with respect to such Third Party Claim.

(e)    Any claim by an Indemnified Party for indemnification not involving a Third Party Claim (a "**Direct Claim**") may be asserted by sending the Indemnifying Party a Claim Notice in accordance with Subsection 6.4(a). The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. If the Indemnifying Party does not so respond within such thirty (30) day period, the Indemnifying Party shall be deemed to have rejected such Claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

6.5.    Certain Limitations.

(a)    Threshold on Adverse Consequences of Investor Indemnified Parties. Parent and the Company shall not be liable under Subsection 6.2(i) unless the aggregate Adverse Consequences incurred by the Investor Indemnified Parties with respect to all matters for which indemnification is to be provided under Subsection 6.2(i) exceed:

(i)    with respect to the Lead Investor Indemnified Parties, 1% of the Aggregate Purchase Price Share of the Lead Investor (the "**Lead Investor Threshold**"), in which event Parent and Company shall be jointly and severally liable under Subsection 6.2(i) for all Adverse Consequences in excess of 0.5% of the Aggregate Purchase Price Share of the Lead Investor (the "**Lead Investor Deductible**"); and

(ii)    with respect to the Fish Dish Indemnified Parties, 1% of the Aggregate Purchase Price Share of the Fish Dish Indemnified Parties (the "**Fish Dish Threshold**"), in which event Parent and Company shall be jointly and severally liable under Subsection 6.2(i) for all Adverse Consequences in excess of 0.5% of the Aggregate Purchase Price Share of Fish Dish (the "**Fish Dish Deductible**").

(b)    Threshold on Adverse Consequences of Company Indemnified Parties. Each Investor shall not be liable under Subsection 6.3(i) unless the aggregate Adverse Consequences incurred by the Company Indemnified Parties with respect to all matters for which indemnification is to be provided under Subsection 6.3(i) exceed the Lead Investor Threshold, with respect to the Lead Investor, or the Fish Dish Threshold, with respect to Fish Dish, in which event the applicable Investor shall be liable under Subsection 6.3(i) for all Adverse Consequences in excess of the Lead Investor Deductible or the Fish Dish Deductible, as applicable.

(c)    Cap on Adverse Consequences of Investor Indemnified Parties. The aggregate amount required to be paid by Parent and the Company to each Investor Indemnified Party under Subsection 6.2(i) shall not exceed the product of (i) such Investor's Indemnification Share, *multiplied by* (ii) $17,500,000 (the "**Cap**").

33

#13682.37

(d) <u>Cap on Adverse Consequences of Company Indemnified Parties</u>. The aggregate amount required to be paid by each Investor under <u>Subsection 6.3(i)</u> shall not exceed the product of (i) such Investor's Indemnification Share, *multiplied by*, (ii) the Cap.

(e) <u>Exceptions to Threshold, Deductible and Cap</u>. Notwithstanding anything to the contrary contained herein, (i) the limitations set forth in <u>Subsections 0</u> through <u>(c)</u> shall not apply to Adverse Consequences arising out of, relating to or otherwise by virtue of, directly or indirectly, any breach of the representations and warranties contained in <u>Subsections 2.1</u>, <u>2.2</u>, <u>2.4</u>, <u>2.5</u>, <u>2.19</u>, <u>2.24</u>, <u>2.28</u>, <u>3.1</u>, and <u>3.2</u>, and (ii) no indemnification payment made by any Indemnifying Party arising out of, relating to or otherwise by virtue of, directly or indirectly, any breach of the representations and warranties contained in <u>Subsections 2.1</u>, <u>2.2</u>, <u>2.4</u>, <u>2.5</u>, <u>2.19</u>, <u>2.24</u>, <u>2.28</u>, <u>3.1</u>, and <u>3.2</u> shall be considered in determining whether the Lead Investor Threshold, the Fish Dish Threshold, the Lead Investor Deductible, the Fish Dish Deductible or the Caps have been exceeded; provided, however, in no event will the Company or Parent be responsible for Adverse Consequences to any Investor in excess of such Investor's Purchase Price Share.

6.6. <u>Materiality Qualifications</u>. Notwithstanding anything to the contrary contained herein, for purposes of determining (a) the amount of Adverse Consequences arising from such a breach for which the Investor Indemnified Parties or the Company Indemnified Parties are entitled to indemnification under this Agreement and (b) whether the Lead Investor Threshold or the Fish Dish Threshold, as applicable, has been exceeded, each representation and warranty contained in this Agreement shall be read without giving effect to any qualification that is based on materiality, including the words "material", "material adverse effect", "in any material respect" and other uses of the word "material" or words of similar meaning (and shall be treated as if such words were deleted from such representation or warranty).

6.7. <u>Indemnification as Sole Remedy</u>. The indemnification provided for in this <u>Section 6</u> shall be the sole and exclusive remedy and recourse for any breach of this Agreement. Notwithstanding anything in this Agreement to the contrary, (a) in the case of Fraud, the Investor Indemnified Parties or the Company Indemnified Parties, as applicable, shall have all remedies available under this Agreement or otherwise without giving effect to any of the limitations contained herein, and (b) nothing herein shall limit any party's right to seek and obtain equitable remedies with respect to any covenant or agreement contained in this Agreement.

6.8. <u>Investigation</u>. Notwithstanding anything to the contrary contained in this Agreement, the representations, warranties, covenants and agreements contained herein, and any Person's right to indemnification or other remedies with respect thereto, shall not be affected or deemed waived by reason of (a) any investigation made by or on behalf of such Person or any of its Affiliates or the directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person or any of its Affiliates or the fact that such Person or any of its Affiliates or the directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person or any of its Affiliates knew or should have known at any time that any such representation or warranty is, was or might be inaccurate, or that any such covenant or agreement was, or may have been breached, in each case, at any time, whether before or after the execution and delivery of this Agreement or the Closing, or (b) such Person's waiver of any condition to the Closing or participation in the Closing.

4133768.14

#13682.38

6.9.    Purchase Price Adjustment. Any indemnification received under this Section 6 shall be treated by Investors, Parent and the Company and their respective Affiliates, to the extent permitted by law, as an adjustment to the Purchase Price.

7.    Miscellaneous.

7.1.    Successors and Assigns; Assignment. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Each Investor may assign its rights, interests or obligations under in this Agreement to any Affiliate, and Lead Investor may assign to any Person, but this Agreement may not be assigned by any Investor to a non-Affiliate or a direct industry competitor without the prior written consent of the Company and Parent. This Agreement may not be assigned by the Company or Parent without the prior written consent of each Investor with any assignment not so consented to by the Investors being null and void *ab initio*.

7.2.    Governing Law. This Agreement shall be governed by the internal laws of the State of Delaware without regard to the conflict of laws or rules of such state.

7.3.    Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including .pdf) or other equivalent transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

7.4.    Titles and Subtitles; Currency. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. Unless otherwise noted herein, all references to $ or dollars are to United States Dollars.

7.5.    Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth below, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this Subsection 7.5.

If to the Company or Parent:

35

4133768.14

**#13682.39**

VeroBlue Farms USA, Inc.
1507 Capital Avenue, Suite 101
Plano, Texas 75074
Attn: Chief Executive Officer
Facsimile:
E-mail: les.wulf@verobluefarms.com

With a copy to (which shall not constitute notice):

Jackson Walker LLP
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Attn: Richard Dahlson
Facsimile: (214) 953-5896
Email: rdahlson@jw.com

If to Lead Investor:

Alder Capital International Ltd.
131 Front Street
Hamilton HM 12, Bermuda
Attn: Director

With a copy to (which shall not constitute notice):

Davis Graham & Stubbs LLP
1550 Seventeenth Street, Suite 500
Denver, Colorado 80202
Attn: Ron Levine
Facsimile: (303) 893-1379
Email: ron.levine@dgslaw.com

If to Fish Dish:

FishDish, LLC
4501 Prairie Parkway
Cedar Falls, Iowa 50613
Attn: Kenneth A. Lockhard
Facsimile: (319) 277-8080
E-mail: ken@lockardonline.com

4133768.14

**#13682.40**

With a copy to (which shall not constitute notice):

> Christopher J. Rausch, Esq.
> Senior Vice President & General Counsel
> Lockard Development, Inc.
> Lockard Construction, Inc.
> 4501 Prairie Parkway
> Cedar Falls, Iowa 50613
> Facsimile: (319) 277-8080
> Email: CRausch@lockardonline.com

7.6.    Finder's Fees. The purchase of Units in the Initial Closing are subject to finder's fees to be paid to certain third parties by the Company or Parent out of the proceeds of the Initial Closing, in an amount or amounts that have been disclosed to the Investors (collectively, the "**Finders Fees**"). The Company and Parent represent that other than the Finders Fees, they both neither are nor will be obligated for any other finder's fee or commission in connection with the transactions contemplated by this Agreement, including the purchase of the Repurchase Units, the Option Units, the Lead Investor Warrants or purchase of Shares thereunder, the conversion of any Shares, the issuance of any Shares pursuant to a Penalty Right, or any purchases made by Lead Investor in the Share Repurchase Program. Further, the Company represents and warrants that the Finders Fees will be paid only in accordance with all applicable law.

7.7.    Fees and Expenses. At the Initial Closing, the Company shall pay the reasonable fees and expenses of Lead Investor, including, without limitation Davis Graham & Stubbs LLP, counsel for Lead Investor, PricewaterhouseCoopers, and other advisers up to an aggregate of US$300,000. At each subsequent Closing, the Company shall pay any additional reasonable fees and expenses of Lead Investor, in an amount not to exceed, in the aggregate for each Repurchase Closing, US$50,000.

7.8.    Attorneys' Fees. If any action at law or in equity (including, arbitration) is necessary to enforce or interpret the terms of any of the Transaction Agreements, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

7.9.    Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company, Parent, and each Investor; provided, however, that (i) Subsections 1.1(d), 1.3, 4.4, 4.5, 5.1, 5.2, 7.7, and 7.14 may be amended or waived by the written consent of Company, Parent, and Lead Investor, and (ii) any Subsection may be waived individually by the written consent of all parties to whom such condition or provision applies to be charged with such waiver.

7.10.    Severability. If any provision in or obligation under this Agreement or any other document related to this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. If a court of competent jurisdiction should determine that a provision hereof

4133768.14

**#13682.41**

would be valid or enforceable if a period of time were extended or shortened or a particular percentage were increased or decreased, then such court may make such change as shall be necessary to render the provision in question effective and valid under applicable law.

7.11.   Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies under this Agreement shall be cumulative and not alternative.

7.12.   Entire Agreement. This Agreement (including the Exhibits hereto), the Restated Certificate, the Certificate of Designation, the Restated Parent Articles, the Parent Articles of Amendment and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and supersede all prior and contemporaneous written or oral agreements, negotiations, correspondence, undertakings and communications of the parties relating to the subject matter hereof.

7.13.   Dispute Resolution. THE PARTIES AGREE THAT ANY ACTION BROUGHT BY EITHER PARTY UNDER OR IN RELATION TO THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ALL DISPUTES ARISING OUT OF OR RELATING TO THIS AGREEMENT, WILL BE BROUGHT IN THE FEDERAL COURTS OR THE COURT OF CHANCERY SITTING IN WILMINGTON, DELAWARE. EACH PARTY IRREVOCABLY AGREES TO AND SUBMITS TO THE JURISDICTION AND VENUE OF ANY SUCH COURT AND WAIVE ANY OBJECTION TO VENUE LAID THEREIN, INCLUDING ANY OBJECTION BASED ON AN ASSERTION OF INCONVENIENCE OF SUCH FORUM OR FORUM NON CONVENIENS.

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND

4133768.14

**#13682.42**

VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL

7.14.   No Commitment for Additional Financing. The Company and Parent acknowledge and agree that Lead Investor has made no representation, undertaking, commitment or agreement to provide or assist the Company or Parent or any Subsidiary in obtaining any financing, investment or other assistance, other than the purchase of the Shares as set forth herein and subject to the conditions set forth herein. In addition, the Company and Parent acknowledge and agree that (i) no statements, whether written or oral, made by Lead Investor or its representatives on or before the date of this Agreement shall create an obligation, commitment or agreement to provide or assist the Company, Parent or any Subsidiary in obtaining any financing or investment, (ii) the Company and Parent shall not rely on any such statement by Lead Investor or its representatives, and (iii) an obligation, commitment or agreement to provide or assist the Company, Parent or any Subsidiary in obtaining any financing or investment may only be created by a written agreement, signed by Lead Investor and the Company, Parent or Subsidiary setting forth the terms and conditions of such financing or investment and stating that the parties intend for such writing to be a binding obligation or agreement. The Lead Investor shall have the right, in its sole and absolute discretion, to refuse or decline to participate in any other financing of or investment in the Company, Parent or Subsidiary, including declining to exercise any right to purchase Shares or Units under any other Transaction Agreement, and shall have no obligation to assist or cooperate with the Company, Parent or Subsidiary in obtaining any financing, investment or other assistance.

7.15.   Non-Reliance. The Investors acknowledge and agree (i) that they have not relied upon the accuracy or completeness of any express or implied representation, warranty, statement, or information of any nature made or provided by or on behalf of the Company or the Parent, except for the representations and warranties of the Company expressly set forth in this Agreement or any other Transaction Agreement to which the Company or Parent is a party, and (ii) that the Company and the Parent will have no liability to any Investor with respect to any representation, warranty, statement, or information of any nature made or provided by or on behalf of the Company or Parent that is not set forth in this Agreement or any other Transaction Agreement; provided, however, that this Section 7.15 shall in no event be construed to bar any claim brought by an Investor or Investors for a breach of the representations and warranties of Section 2.26 or 2.27.

7.16.   Representation. It is acknowledged by each of the parties hereto that the Company and Parent have retained Jackson Walker LLP (the "**Legal Counsel**") to act as their counsel in connection with the transactions contemplated hereby and that the Legal Counsel has not acted as counsel for any other Person in connection with the transactions contemplated hereby and that no other party to this Agreement or Person has the status of a client of any of the Legal Counsel for conflict of interest or any other purposes as a result thereof. Each Investor hereby agrees that, in the event that a dispute arises between any Investor or any of its Affiliates (including after the Company in the event the Company becomes an Affiliate of any Investor) and, Parent or any of its Affiliates, the Legal Counsel may represent Parent, the Company, any of their Affiliates, and any members of management of any of the foregoing (the "**Management Persons**") in such dispute even though the interests of such Person may be directly adverse to Investors or any of its Affiliates (including the Company if it becomes an Affiliate of any

4133768.14

**#13682.43**

Investor), and even though the Legal Counsel may have represented the Company in a matter substantially related to such dispute or may be handling ongoing matters for the Company. Each Investor, Parent, the Company, hereby waive, on behalf of themselves and each of their Affiliates, (a) any claim they have or may have that any of the Legal Counsel has a conflict of interest in connection with or is otherwise prohibited from engaging in such representation, (b) agree that, in the event that a dispute arises after the Closing between any Investor or any of their Affiliates (including the Company in the event it becomes an Affiliate of any Investor) on the one hand, and Parent, its Affiliates, or any Management Persons, on the other hand, the Legal Counsel may represent the Parent, its Affiliates, or such Management Persons, in such dispute even though the interest of any such party may be directly adverse to (i) such Investors or any of their Affiliates (including the Company if relevant), or (ii) Parent, the Company, its Affiliates, or any Management Persons and even though the Legal Counsel may have represented Parent, its Affiliates, or any Management Persons in a matter substantially related to such dispute or may be handling ongoing matters for any of Parent, its Affiliates, or any Management Persons. Each Investor further agrees that, (i) as to all communications between the Legal Counsel and Parent, the Company, its Affiliates, and any Management Persons that relate in any way to the transactions contemplated by this Agreement and the other Transaction Agreement, the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege belong to either to the given Parent, the Company, Affiliate or Management Person, as applicable, and may be controlled by such Parent, Affiliate or Management Person, as applicable, and shall not pass to or be claimed by any Investor, the Company or any Subsidiary, and (ii) in the event that the Company becomes an Affiliate of any Investor or multiple Investors, as to all communications between the Legal Counsel and the Company, or among the Legal Counsel, the Company, the Parent, their Affiliates and/or the Management Persons prior to the Closing that relate in any way to the transactions contemplated by this Agreement and the other Transaction Agreements, the attorney-client privilege, the expectation of client confidence and all other rights to evidentiary privilege belongs to Parent or any specific Affiliate or Management Person who receives a communication, as applicable, and may be controlled by such Person, as applicable, and shall not pass to or be claimed by the Company or any Subsidiary. The parties hereto further agree that the Legal Counsel and their respective partners and employees are third party beneficiaries of this Section 7.16. It is acknowledged by each of the parties hereto that Lead Investor has retained Davis Graham & Stubbs LLP (the "**Lead Investor Legal Counsel**") to act as its counsel in connection with the transactions contemplated hereby and under the Transaction Agreements and that the Lead Investor Legal Counsel has not acted as counsel for any other Person, including but not limited to Fish Dish, in connection with the transactions contemplated hereby and that no other party to this Agreement or other Person has the status of a client of any of the Lead Investor Legal Counsel for conflict of interest or any other purposes as a result thereof. The parties hereto further agree that the Lead Investor Legal Counsel and their respective partners and employees are third party beneficiaries of this Section 7.16.

[Signature Page Follows]

40

**#13682.44**

IN WITNESS WHEREOF, the parties have executed this Series A Preferred Share Purchase Agreement as of the date first written above.

PARENT:

VEROBLUE FARMS INC., a Canadian corporation

By: _____

Name: _____Leslie Wulf_____

Title: _____CEO_____

COMPANY:

VEROBLUE FARMS USA, INC., a Nevada corporation

By: _____

Name: _____Leslie Wulf_____

Title: _____CEO_____

LEAD INVESTOR:

ALDER CAPITAL INTERNATIONAL LTD.

By: _____

Name: Claude F. Lang

Title: Director

SIGNATURE PAGE TO VBF USA SHARE PURCHASE AGREEMENT

#13682.45

IN WITNESS WHEREOF, the parties have executed this Series A Preferred Share Purchase Agreement as of the date first written above.

PARENT:

VEROBLUE FARMS INC., a Canadian
corporation

By: _____

Name:_____

Title:_____


COMPANY:

VEROBLUE FARMS USA, INC., a Nevada
corporation

By: _____

Name:_____

Title:_____


LEAD INVESTOR:

ALDER CAPITAL INTERNATIONAL LTD.

By:_____

Name: Claude F. Lang

Title: Director


SIGNATURE PAGE TO VBF USA SHARE PURCHASE AGREEMENT

#13682.46

FISH DISH:

FISHDISH, LLC, an Iowa limited liability
company

By: _____

Name: _Kenneth A. Lockard_

Title: _Manager_

SIGNATURE PAGE TO VBF USA SHARE PURCHASE AGREEMENT

#13682.47

# EXHIBITS

Exhibit A -    FORM OF CERTIFICATE OF DESIGNATION

Exhibit B -    FORM OF OPTION AGREEMENT

Exhibit C -    [RESERVED]

Exhibit D -    USE OF PROCEEDS

Exhibit E -    FORM OF INDEMNIFICATION AGREEMENT

Exhibit F -    FORM OF PENALTY RIGHTS AGREEMENT

Exhibit G -    FORM OF REGISTRATION RIGHTS AGREEMENT

Exhibit H -    FORM OF VOTING AGREEMENT

Exhibit I -    DISCLOSURE SCHEDULES

Exhibit J -    FORM OF EMPLOYMENT AGREEMENT

Exhibit K -    FORM OF CONSULTING AGREEMENT

Exhibit L -    [RESERVED]

Exhibit M -    FORM OF MAINSTREAM AMENDMENT

Exhibit N -    FORM OF STOCKHOLDERS AGREEMENT

Exhibit O -    FORM OF LEAD INVESTOR WARRANT

Exhibit P -    FORM OF MANAGEMENT OPTION AGREEMENT

Exhibit Q -    FORM OF TANK MANUFACTURING AGREEMENT

Exhibit R -    BUSINESS PLANS

Schedule I -    INVESTOR DETAILS

**#13682.48**

**Exhibit "A-2"**

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "***Agreement***"), dated as of July 1, 2016 (the "***Effective Date***"), is by and between James Rea (the "***Employee***"), and VeroBlue Farms USA, Inc., a Nevada corporation (the "***Company***"). Employee and the Company are sometimes each referred to herein as a "***Party***" and collectively, as the "***Parties***".

### RECITALS

**WHEREAS**, Employee performed services for the Company as a designated representative of RGI Dragon, LLC, an independent contractor ("***Consultant***") under that certain Management Services Agreement (the "***MSA***") among the Company, Consultant and the Company's parent, VeroBlue Farms Inc., a corporation incorporated under the laws of the Province of Ontario, Canada ("***Parent Corporation***");

**WHEREAS**, the Parties desire to terminate the MSA pursuant to that certain Termination and Payoff Agreement of even date herewith and replace it with this Agreement whereby the Company desires to employ Employee on the terms and conditions set forth herein, and Employee desires to accept such employment terms;

**NOW, THEREFORE**, in consideration of the mutual covenants, promises and obligations set forth herein, the Parties agree as follows:

1.   <u>Employment</u>.

(a)   <u>Title and Duties</u>.   The Company hereby employs Employee, and Employee hereby accepts such employment, to serve as Director of Construction, Design and Tank Production of the Company.  Subject to the provisions of this Agreement, the Company and Employee agree that Employee's employment constitutes "at-will" employment. Employee's duties, responsibilities and authority shall be consistent with Employee's position and title at the Company and shall include such other duties, responsibilities and authority as may be assigned to Employee by the Board of Directors of the Company (the "***Board***").  Employee shall report to the Chief Executive Officer of the Company.

(b)   <u>Services and Exclusivity of Services</u>.  Employee shall devote Employee's full business time and shall use Employee's best efforts, energy and ability exclusively toward advancing the business, affairs and interests of the Company, and matters related thereto. Employee will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Board. Except as prohibited by <u>Section 4</u>, nothing in this Agreement shall preclude Employee from serving or participating on a board of or in trade organizations, charitable, community, school or religious activities or participating in other business endeavors, so long as such activities do not interfere with his duties and responsibilities hereunder or conflict with the interests of the Company.

(c)   <u>Location of Office</u>. The Company shall make available to Employee an office and support services in Dallas, Texas, or at another location pursuant to the

1



recommendation of the Chief Executive Officer and the Board. Employee's main office shall be at such location; provided, however, that Employee will travel from time to time as business needs arise.

2.    Term. The term of this Agreement shall commence on the Effective Date and shall continue indefinitely until terminated pursuant to Section 5 below (the "*Term*").

3.    Compensation.

(a)    Base Salary. During the Term, the Company will pay to Employee a base salary at the rate of $400,000 per year, payable in accordance with the Company's practices in effect from time to time ("*Base Salary*"). Amounts payable shall be reduced by standard withholdings and other authorized deductions. Such Base Salary shall be reviewed during the Term for adjustment in the sole discretion of the Board, or such individual, group or committee that the Board may select as its delegate, not less frequently than annually during the Term; provided that no decrease may be made to Base Salary unless a corresponding percentage decrease in base salary is being made to all similarly situated employees of the Company. In conducting any such review, the Board or such delegate shall consider and take into account, among other things, any change in Employee's responsibilities, performance of Employee, the compensation of other similarly situated employees of comparable companies and other pertinent factors.

(b)    Car Allowance. Employer will pay Employee a car allowance of $1,500 per calendar month, payable on the first day of each month.

(c)    Bonuses, Savings and Retirement Plans; Benefit Plans. Employee shall be entitled to participate in all annual and long-term bonuses, savings and retirement plans generally available to other similarly situated employees of the Company. The decision to provide any bonus and the amount and terms of any bonus shall be in the sole and absolute discretion of the Board. Employee, and Employee's family as the case may be, and to the extent Employee and such family member are eligible, may participate in and receive all benefits under health benefit plans, practices, programs and policies provided to employees of the Company. The Company reserves the right to modify, suspend or discontinue any and all of its benefits referred to in this Section 3(b) at any time in its sole discretion without recourse by Employee so long as such action is taken generally with respect to other employees and does not single out Employee.

(d)    Reimbursement of Expenses. The Company shall promptly reimburse Employee for any reasonable and necessary out-of-pocket expenses incurred by him in connection with the performance of Employee's duties hereunder, provided that Employee furnishes to the Company in a timely manner appropriate documentation in accordance with the Company's expense reimbursement policies and procedures and such other reasonable documentation and accounting as the Company, from time to time, may reasonably request.

(e)    Vacation. Employee shall provide services for 48 out of every 52 week period during the Term (e.g., the equivalent of four (4) weeks of paid vacation).

2



4.   Representations; Confidential Information; Non-Competition; Non-Solicitation.

(a)   Representations. In order to induce the Company to enter into this Agreement, Employee represents and warrants to the Company that neither the execution nor the performance of this Agreement by Employee will violate or conflict in any way with any other agreement by which Employee may be bound, or with any other duties imposed upon Employee by corporate or other statutory or common law.

(b)   Confidentiality. Employee acknowledges that during his employment and as a result of his past, present and future relationship with the Company, Employee has obtained and will obtain knowledge of, and has been given and will be given access to, information concerning the Company and Parent Corporation and their respective affiliates, including, but not limited to, information regarding the business, operations, services, proposed services, business processes, business and marketing strategies, advertising, marketing and promotional plans and materials, pricing strategies and policies, financial information, stockholders and other trade secrets, confidential information and proprietary material of the Company, including information and material originated, discovered or developed in whole or in part by Employee (collectively referred to herein as "*Confidential Information*"). The term "*Confidential Information*" does not include any information which (i) at the time of disclosure is generally available to the public (other than as a result of a disclosure by Employee in breach of this Agreement), or (ii) was available to Employee on a non-confidential basis from a source (other than the Company or its representatives) that is not and was not prohibited from disclosing such information to Employee by a contractual, legal or fiduciary obligation. Employee agrees that during the Term and, to the fullest extent permitted by law, thereafter, Employee will, in a fiduciary capacity for the benefit of the Company, hold all Confidential Information strictly in confidence and will not directly or indirectly reveal, report, disclose, publish or transfer any of such Confidential Information to any person or entity, or utilize any of the Confidential Information for any purpose, except in furtherance of Employee's employment under this Agreement and except to the extent that Employee may be required by law to disclose any Confidential Information. Employee acknowledges that the Company is providing Employee additional Confidential Information that Employee was not given prior to execution of this Agreement, as further consideration to Employee for executing this Agreement, including the promises and covenants made by Employee in this Section 4.

(c)   Non-Competition and Non-Solicitation. In further consideration of the compensation to be paid to Employee hereunder, Employee acknowledges that during the course of his employment and prior service with the Company, he has, and will, become familiar with the trade secrets of the Company and with other Confidential Information concerning the Company and that his services have been and shall continue to be of special, unique and extraordinary value to the Company. Therefore, Employee agrees that, during Employee's employment hereunder and for one year after the date of termination of employment (the "*Restricted Period*"), he shall not directly or indirectly: (i) own any interest in, manage, control, participate in, consult with, render services for, be employed in an executive, managerial or administrative capacity by, or in any manner engage in, any Competing Business (as defined below); (ii) solicit, request or induce any employee, consultant or agent of the Company or Parent Corporation or any of their respective affiliates to terminate his or her employment or relationship with such company, nor hire any employee, or consultant of the Company or Parent

3



Corporation or any of their respective affiliates, or (iii) solicit, request, or induce or attempt to solicit, request, or induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or Parent Corporation or any of their respective affiliates to cease doing business with, or modify its business relationship with the Company or Parent Corporation or any of their respective affiliates, or in any way interfere with or hinder the relationship between any such customer, supplier, licensee or business relation and the Company or Parent Corporation or any of their respective affiliates, as applicable; provided that with respect to this Section 4(c), the Company shall have the option, but not the obligation, in its sole discretion, to extend the Restricted Period from a period of one (1) year to a period of two (2) years from the date of Employee's termination by agreeing in writing within one (1) month of such termination to extend the Severance Term provided in Section 5(d)(i)(B) from (1) year to two (2) years from the date following termination. For purposes hereof, "*Competing Business*" means a business that competes with the Company or Parent Corporation, or any of their respective affiliates in any geographic territory in which the Company, Parent Corporation, or any such affiliate conducts, sells or markets its business or plans to conduct, sell or market its business. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of a corporation that is publicly traded, so long as Employee has no active participation in the business of such corporation.

(d)     Proprietary Interest.  All correspondence, communications (electronic or otherwise), data, reports, software, systems, databases, methodology, processes, programs, templates, procedures, know-how, inventions, discoveries, creations, designs, improvements, patents, copyrights, discoveries or ideas which Employee conceives, develops, or produces (whether before the Effective Date during his past services, as part of his employment obligations and/or duties, solely or jointly with others, or otherwise), which relate to the business of the Company (collectively, the "*Work Product*"), including trade secrets, data, methodology, processes, programs, templates, and information concerning proprietary technology developed for the business, or for any interests of the Company, shall belong solely and exclusively to the Company, together with any intellectual property rights associated with such Work Product (the "*IP Rights*"). Employee acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) during his prior services or within the scope of his employment with the Company and which are protectable by copyright laws are "works made for hire," pursuant to the United States Copyright Act (17 U.S.C., Section 101), and that such works made for hire shall constitute part of the IP Rights. Employee shall assist the Company or its designees to obtain, and from time to time enforce, United States and foreign IP Rights in any and all countries. To that end, Employee shall execute, verify, and deliver such documents and perform such other acts (including appearing as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such IP Rights and the assignment thereof. In addition, Employee will execute, verify, and deliver assignments of such IP Rights to the Company or its designee. Employee's obligation to assist the Company with respect to IP Rights shall continue beyond Employee's employment with the Company. Employee hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which Employee now or may hereafter have for infringement of any IP Rights assigned hereunder to the Company.

(e)     Return of Materials.  Employee expressly acknowledges that all physical property, data, books, records and other Confidential Information of the Company obtained in

4



connection with the Company's business is the exclusive property of the Company and that upon the termination of Employee's employment by the Company, Employee will immediately surrender and return to the Company all such items and all other property belonging to the Company then in the possession of Employee, and Employee shall not make or retain any copies thereof.

(f)     Property of the Company.  Employee acknowledges that from time to time in the course of providing past services and future services pursuant to this Agreement, Employee shall have had and will have the opportunity to inspect and use certain property, both tangible and intangible, of the Company and Employee hereby agrees that such property shall remain the exclusive property of the Company.  Employee shall have no right or proprietary interest in such property, whether tangible or intangible.

(g)     Reasonable in Scope and Duration; Consideration.  Employee agrees and acknowledges that the restrictions contained in this Section 4 are reasonable in scope and duration and are necessary to protect the business interests and Confidential Information of the Company after the Effective Date, and Employee further agrees and acknowledges that he has reviewed the provisions of this Agreement with his legal counsel.  Employee acknowledges and agrees that Employee will receive substantial, valuable consideration from the Company for the covenants contained in this Section 4, including without limitation, compensation and other benefits.

(h)     Non-Disparagement.  Following separation of employment:

(i)     Employee agrees not to make to any person, including but not limited to customers of the Company, any statement that disparages the Company, Parent Corporation and its stockholders, or the Company's affiliates, or which reflects negatively upon the Company, Parent Corporation and its stockholders or the Company's affiliates, including but not limited to statements regarding the Company's or Parent Corporation's financial condition, its officers, managers, stockholders, employees and affiliates; and

(ii)     The Company agrees not to make to any person any statement that disparages Employee, or which reflects negatively upon Employee.

(i)     Enforcement.   If, at the time of enforcement of Section 4 of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the Parties hereto agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law.

(j)     Extension of Restricted Periods.  In addition to the remedies the Company may seek and obtain pursuant to this Agreement, the applicable restricted periods set forth herein shall be extended by any and all periods during which Employee shall be found by a court of competent jurisdiction to have been in violation of the covenants contained herein.

5



5.    Termination.

(a)    Termination Prior to Expiration of Term. Notwithstanding anything to the contrary contained in Section 2, Employee's employment may be terminated prior to the expiration of the Term only as provided in this Section 5. Employee's employment with the Company shall cease effective on such termination date, and except as provided in this Section 5, the Company shall have no further obligations to Employee.

(b)    Death or Disability.

(i)    The Company may terminate Employee's employment hereunder due to death or Disability (as defined below).  If Employee's employment hereunder is terminated as a result of death or Disability, Employee (or Employee's estate or personal representative in the event of death) shall be entitled to receive: (i) all Base Salary due to Employee through the date of termination; (ii) any previously vested benefits, such as retirement benefits and vacation pay, in accordance with the terms of the plan or agreement pursuant to which such benefits were granted to Employee; (items (i) and (ii) above collectively referred to as *"Accrued Employment Entitlements"*); and (iii) any benefits payable to Employee or Employee's beneficiaries, as applicable, in accordance with the terms of the applicable benefit plan.

(ii)    As used herein, *"Disability"* shall mean a determination by the Company, in its reasonable discretion, that the Employee is unable to engage in the customary duties and responsibilities of his position by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of at least six (6) months.  Employee's Disability shall be determined by the Company, in good faith, based upon information supplied by Employee and/or a physician mutually agreed upon by the Company and Employee.  Employee agrees to submit to physical exams and diagnostic tests reasonably recommended by such physician.

(c)    Termination by the Company for Cause or by Employee because of a Voluntary Termination.

(i)    Employee's employment hereunder may be terminated by the Company for Cause (as hereinafter defined) or, subject to Section 5(d) hereof, by Employee under a Voluntary Termination (as hereinafter defined).  If Employee's employment hereunder is terminated under this Section 5(c), Employee shall be entitled to receive Employee's Accrued Employment Entitlements.  Except as specifically set forth in this Section 5(c), the Company shall have no further obligations to Employee following a termination for Cause, or a Voluntary Termination.

(ii)    *"Egregious Cause"* shall mean (i) commission by Employee of a felony or crime involving moral turpitude, or the commission by Employee of any other willful act or willful omission involving dishonesty or fraud with respect to

6



the Company, or any of its customers or suppliers; (ii) a breach of this Agreement by Employee and/or Employee's gross neglect of Employee's duties hereunder which is not cured to the Board's reasonable satisfaction within fifteen (15) days after notice thereof is given to Employee by the Board; and (iii) damage to or misappropriation or conversion of any funds or assets of the Company.

     (iii)    *"Non-Egregious Cause"* shall mean (i) engaging in conduct bringing the Company into public disgrace or disrepute or causing economic harm; (ii) material or repeated failure to perform Employee's duties as directed by the Board following notice of such breach and failure to cure such breach within fifteen (15) days of such notice; and (iii) Employee's failure to follow the Company's policies or applicable law in connection with the performance of Employee's duties, and such failure is not cured by Employee within fifteen (15) days following Employee's receipt of written notice from the Company specifying such failure.

     (iv)    *"Cause"* shall mean either Egregious Cause or Non-Egregious Cause.

     (v)    *"Voluntary Termination"* shall mean a termination of employment by Employee on Employee's own initiative other than (i) a termination due to death or Disability or (ii) a termination for Good Reason (as defined below).

     (d)    <u>Termination by the Company without Cause or by Employee for Good Reason</u>. The Company may terminate Employee's employment hereunder without Cause and Employee shall be permitted to terminate Employee's employment hereunder for Good Reason (as hereinafter defined) prior to the end of the Term.  If the Company terminates Employee's employment hereunder without Cause, other than due to death or Disability, or if Employee effects a termination for Good Reason, Employee shall be entitled to receive the payments and benefits set forth in this <u>Section 5(d)</u>.

     (i)    So long as Employee has not breached any of the terms contained in <u>Section 4</u>, Employee shall be entitled to each of the following:

     (A)    Employee's Accrued Employment Entitlements;

     (B)    Except as otherwise modified pursuant to <u>Section 4(c)</u>, Employee's annual Base Salary in effect as of the date of such termination, payable in accordance with the Company's normal payroll practices for a period of one (1) year (*"Severance Term"*) following such termination; and

     (C)    the actual bonus, if any, he would have received in respect of the fiscal year in which his termination occurs, prorated by a fraction, the numerator of which is the number of days in such fiscal year prior to the date of Employee's termination and the denominator of which is 365, payable at the same time as any such bonus payments are made to

7



other similarly situated active employees pursuant to the terms of the bonus plan and subject to satisfaction of the performance targets for such fiscal year; provided that, any such bonus payment shall be paid to Employee in the fiscal year following the fiscal year in which the termination of employment occurred;

(ii)     "*Good Reason*" means and shall be deemed to exist if, without the prior written consent of Employee, (i) Employee suffers a reduction in Base Salary of greater than ten percent (10%) or a material reduction in duties, responsibilities or effective authority associated with Employee's title and position as set forth and described in this Agreement or is otherwise assigned any duties or responsibilities inconsistent in any material respect therewith (other than to the extent any such reduction in Base Salary is commensurate with a reduction of the salaries of other senior management of the Company); provided that, the foregoing shall not apply to any material reduction in duties following notice being provided of a termination for Cause, Disability or under a Voluntary Termination; (ii) the Company fails to pay Employee any amounts required to be paid or provided under this Agreement or is otherwise in material breach of this Agreement; or (iii) the office where Employee is required to report for work is moved more than fifty (50) miles from its current location.  No termination by Employee shall be for "Good Reason" unless written notice of such termination setting forth in particular the event(s) constituting Good Reason is delivered to the Company within thirty (30) days following the date on which the event constituting Good Reason occurs and the Company fails to cure or remedy the event(s) identified in the notice within thirty (30) days after receipt of such notice, and Employee actually terminates employment within thirty (30) days following the end of the Company's cure period.

(e)     Rights and Conditions Regarding Termination.

(i)     Any payments made to Employee pursuant to this Section 5 shall be in lieu of any rights under any severance plan or policy being utilized for or provided to the Company's other officers and employees, if applicable. Reporting of and withholding on any payment under this subsection for tax purposes shall be at the discretion of the Company in conformance with applicable tax laws.  If a claim is made against the Company for any additional tax or withholding in connection with or arising out of any payment pursuant to this subsection, Employee shall pay any such claim within thirty (30) days of being notified by the Company and agrees to indemnify the Company and hold it harmless against such claims, including, but not limited to, any taxes, attorneys' fees, penalties, and/or interest, which are or become due from the Company.

(ii)     Employee's receipt of any pay under this Section 5 shall be subject to the execution by Employee of, and terms of, a general release of claims, substantially in a form to be provided by the Company to Employee within ten (10) days following such termination, and the non-revocation of such release by

8



Employee pursuant to any revocation rights afforded by applicable law. The general release must be executed and become irrevocable no later than sixty (60) days following the date of such termination, otherwise Employee shall forfeit any and all rights to such pay.

(iii)     If the sixty (60)-day period described in <u>Section 5(e)(ii)</u> begins in one calendar year and ends in a second calendar year (a "***Crossover 60-Day Period***") and if there are any payments under this <u>Section 5</u> due Employee that are: (i) conditioned on Employee signing and not revoking a release of claims and (ii) otherwise due to be paid during the portion of the Crossover 60-Day Period that falls within the first year, then such payments will be delayed and paid in a lump sum during the portion of the Crossover 60-Day Period that falls within the second year.

(f)     <u>Transfers of Equity Prior to and Following Termination of Employment</u>. During the term of Employee's employment hereunder, neither Employee nor any of his affiliates shall be entitled to assign, sell, pledge, mortgage, hypothecate, encumber, dispose of or otherwise transfer ("***Transfer***") any shares of common stock or other equity of the Company or Parent Corporation owned by Employee or such affiliate (excluding any common stock or other equity that Employee or such affiliate receives pursuant to the 2016 Stock Option Plan of the Company) (collectively, the "***Employee Equity***") except by operation of law upon Employee's or such affiliate's death. Following the termination of Employee's employment hereunder for any reason, neither Employee nor any of his affiliates shall be entitled to Transfer any Employee Equity except by operation of law upon Employee's or such affiliate's death or in accordance with this <u>Section 5(f)</u>:

(i)     At any time when the Majority Series A Holder (as defined in the Articles of Incorporation of the Company, as amended, including by the Certificate of Voting Powers, Designations, Preferences, Limitations, Restrictions, Relative Rights and Distinguishing Designation of Series A Preferred Stock of the Company) (the "***Majority Series A Holder***") owns less than fifty-one percent (51%) of the aggregate common stock and preferred stock (on an as-converted basis) of the Company then outstanding, neither Employee nor any of his affiliates may Transfer any Employee Equity without (A) first providing the Majority Series A Holder the right of first refusal to purchase all of such Employee Equity for the purchase price determined in accordance with <u>Section 5(f)(iii)</u> and on other terms reasonably acceptable to the Majority Series A Holder, which right of first refusal shall be exercisable for a period of at least fifteen (15) business days after the Majority Series A Holder receives written notice of the desired transfer and the purchase price determined in accordance with <u>Section 5(f)(iii)</u>; (B) if the Majority Series A Holder does not exercise such right of first refusal, then providing each other holder of shares of Series A preferred stock of the Company a secondary refusal right to purchase (on a pro rata basis in accordance with their respective ownership of Series A preferred stock of the Company or in such other proportions agreed to by such stockholders) all of such Employee Equity for the purchase price determined in accordance with <u>Section 5(f)(iii)</u> and on other terms no more favorable to such

9



holders of Series A preferred stock than those offered to the Majority Series A Holder, which secondary refusal right shall be exercisable for a period of at least fifteen (15) business days; and (C) if the Majority Series A Holder and the other holders of Series A preferred stock of the Company do not exercise their rights pursuant to the preceding clauses (A) and (B), then providing the Company a tertiary refusal right to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to the Company than those offered to the Majority Series A Holder, which tertiary refusal right shall be exercisable for a period of at least fifteen (15) business days. If none of the foregoing persons exercises its refusal right in connection with such proposed Transfer, then for a period of ninety (90) days after the end of the Company's fifteen (15)-day exercise period, Employee or such affiliate shall be entitled to Transfer all, but not less than all, of such Employee Equity that was offered to the foregoing persons to any third-party purchaser, for a purchase price equal to or greater than the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such third-party purchaser than those offered to the Majority Series A Holder (or at any lesser purchase price or on more favorable terms, provided that such purchase price and more favorable terms are first offered to the Majority Series A Holder and, if applicable, the other holders of Series A preferred stock of the Company and, if applicable, the Company, in accordance with this Section 5(f)(i)), subject to compliance with applicable law and subject to such third-party purchaser's execution of a joinder agreement to each stockholders agreement (or the equivalent) of the Company or Parent Corporation by which Employee or such transferring affiliate is bound with respect to the transferred Employee Equity; provided that if such Transfer is not consummated within such ninety (90)-day period, such Transfer shall again become subject to the refusal rights set forth in this Section 5(f).

(ii)     At any time when the Majority Series A Holder owns at least fifty-one percent (51%) of the aggregate common stock and preferred stock (on an as-converted basis) of the Company then outstanding, neither Employee nor any of his affiliates may Transfer any Employee Equity without (A) first providing the Company the right of first refusal to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms reasonably acceptable to the Company, which right of first refusal shall be exercisable for a period of at least fifteen (15) business days after the Company receives written notice of the desired transfer and the purchase price determined in accordance with Section 5(f)(iii); (B) if the Company does not exercise such right of first refusal, then providing the Majority Series A Holder the secondary refusal right to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms reasonably acceptable to the Majority Series A Holder, which secondary refusal right shall be exercisable for a period of at least fifteen (15) business days; (C) if the Company and the Majority Series A Holder do not exercise their rights pursuant to the preceding clauses (A) and (B), then providing each other holder of shares of Series A preferred stock of the Company a tertiary refusal right to purchase (on a

10

pro rata basis in accordance with their respective ownership of Series A preferred stock of the Company or in such other proportions agreed to by such stockholders) all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such holders of Series A preferred stock than those offered to the Majority Series A Holder, which tertiary refusal right shall be exercisable for a period of at least fifteen (15) business days; and (D) if the Company, the Majority Series A Holder and the other holders of Series A preferred stock of the Company do not exercise their rights pursuant to the preceding clauses (A), (B) and (C), then providing the other stockholders of the Company a quaternary refusal right to purchase (on a pro rata basis in accordance with their respective ownership of common stock of the Company or in such other proportions agreed to by such stockholders) all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to the other stockholders than those offered to the Majority Series A Holder, which quaternary refusal right shall be exercisable for a period of at least fifteen (15) business days. If none of the foregoing persons exercises its refusal right in connection with such proposed Transfer, then for a period of ninety (90) days after the end of the fifteen (15)-day exercise period provided for in the preceding clause (D), Employee or such affiliate shall be entitled to Transfer all, but not less than all, of such Employee Equity that was offered to the foregoing persons to any third-party purchaser, for a purchase price equal to or greater than the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such third-party purchaser than those offered to the Majority Series A Holder (or at any lesser purchase price or on more favorable terms, provided that such purchase price and more favorable terms are first offered to the Company and, if applicable, the Majority Series A Holder and, if applicable, the other holders of Series A preferred stock of the Company and, if applicable, the other stockholders of the Company, in accordance with this Section 5(f)(ii)), subject to compliance with applicable law and subject to such third-party purchaser's executing a joinder agreement to each stockholders agreement (or the equivalent) of the Company or Parent Corporation by which Employee or such transferring affiliate is bound with respect to the transferred Employee Equity; provided that if such Transfer is not consummated within such ninety (90)-day period, such Transfer shall again become subject to the refusal rights set forth in this Section 5(f).

(iii)     The purchase price at which Employee or his affiliate shall first offer to sell any Employee Equity to the Majority Series A Holder, other stockholders of the Company or the Company, as applicable, pursuant to this Section 5(f) shall be determined as follows: (A) if Employee's employment hereunder was terminated for Egregious Cause, such purchase price shall be an amount determined by the Board, which shall be no less than the cost-basis for such Employee Equity and no more than the Fair Market Value (as defined below) of such Employee Equity, less in either case all applicable withholding taxes; and (B) if Employee's employment hereunder was terminated for any reason other than for Egregious Cause, such purchase price shall be an amount equal to the Fair Market Value of such Employee Equity, less all applicable

11

withholding taxes. "*Fair Market Value*" means as of any date, the value of the Employee Equity determined as follows: (x) If the Employee Equity is listed on any established stock exchange, the Fair Market Value of a share of common stock shall be the closing sales price for such stock as quoted on such exchange (or the exchange with the greatest volume of trading in the common stock) on the last market trading day prior to the day of determination, as reported in *The Wall Street Journal* or such other source as the Board deems reliable, or (y) in the absence of such markets for the Employee Equity, the Fair Market Value shall be determined in good faith by the Board in accordance with Section 409A and the regulations and other guidance promulgated thereunder.

(iv)   Employee acknowledges and agrees that any purchaser of Employee Equity pursuant to this Section 5(f) shall be entitled to pay and/or withhold from the applicable purchase price therefor, any amount with respect to taxes that such purchaser (in its sole discretion) determines is required to be paid or withheld or advisable to pay or withhold under applicable law, and any amount so paid or withheld shall be treated for purposes of this Section 5(f) as an amount paid to Employee or its affiliate, as applicable, with respect to the purchased Employee Equity purchased. **EMPLOYEE FURTHER ACKNOWLEDGES AND AGREES THAT HE SHALL BE SOLELY RESPONSIBLE AND LIABLE FOR ANY TAXES AND TAX CONSEQUENCES WITH RESPECT TO THE OWNERSHIP OR DISPOSITION BY EMPLOYEE OF ANY EMPLOYEE EQUITY AND WITH RESPECT TO THE PROVISIONS OF THIS SECTION 5(F) AND THE TRANSACTIONS CONTEMPLATED HEREBY. NEITHER THE COMPANY NOR PARENT CORPORATION NOR ANY OF THEIR RESPECTIVE STOCKHOLDERS MAKES ANY REPRESENTATIONS, WARRANTIES OR COVENANTS REGARDING SUCH TAXES OR TAX CONSEQUENCES OF EMPLOYEE, AND THE COMPANY, PARENT CORPORATION AND THEIR RESPECTIVE STOCKHOLDERS SHALL HAVE NO LIABILITY THEREFOR. EMPLOYEE ACKNOWLEDGES THAT HE IS AWARE THAT THE TAX CONSEQUENCES ARISING FROM THE OWNERSHIP AND DISPOSITION BY EMPLOYEE OF ANY EMPLOYEE EQUITY AND THE TAX CONSEQUENCES ARISING IN CONNECTION WITH THE PROVISIONS OF THIS SECTION 5(F) AND THE TRANSACTIONS CONTEMPLATED HEREBY ARE COMPLEX AND THAT EMPLOYEE HAS BEEN ENCOURAGED TO SEEK INDEPENDENT PROFESSIONAL GUIDANCE OR COUNSEL WITH RESPECT TO SUCH TAX CONSEQUENCES. EMPLOYEE ACKNOWLEDGES THAT HE HAS EITHER SOUGHT SUCH GUIDANCE OR COUNSEL OR DETERMINED AFTER REVIEWING THIS AGREEMENT CAREFULLY THAT HE WILL WAIVE SUCH RIGHT.**

(v)   Notwithstanding anything to the contrary herein, (A) the Majority Series A Holder may assign any or all of its rights under this Section 5(f) at any time to any Person and (B) the Company may assign any or all of its rights under

12



this Section 5(f) with respect to any proposed Transfer of common stock or other equity of Parent Corporation to Parent Corporation, in either case with written notice to Employee of any such assignment.

(vi)    The Majority Series A Holder and the other stockholders of the Company are express third-party beneficiaries of this Section 5(f), and this Section 5(f) may not be amended without the written consent of the Majority Series A Holder.

6.    Notices.  Any notice or other communications relating to this Agreement shall be in writing and delivered personally or mailed by certified mail, return receipt requested, or sent by overnight courier, to the Party concerned at the address set forth below:

| | |
|---|---|
| If to Company: | VeroBlue Farms USA, Inc.<br>1507 Capital Avenue, Suite 101<br>Plano, TX  75074 |
| If to Employee: | James Rea<br>1507 Capital Avenue, Suite 101<br>Plano, TX  75074 |

Either Party may change the address for the giving of notices at any time by written notice given to the other Party under the provisions of this Section 6. If notice is given by personal delivery or overnight courier, said notice shall be conclusively deemed given at the time of such delivery or upon receipt of such couriered notice.  If notice is given by mail, such notice shall be conclusively deemed given upon deposit thereof in the United States mail.

7.    Assignment.  Except as otherwise provided in Section 5(f)(v), neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party hereto without the prior written consent of the other Party hereto.  In the event of the assignment of this Agreement pursuant to the provisions of this Section 7, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors and permitted assigns.

8.    Remedies.  Employee acknowledges that the services Employee is to render under this Agreement are of a unique and special nature, and because Employee has access to Confidential Information, the loss of which cannot reasonably or adequately be compensated for in monetary damages, and that irreparable injury and damage will result to the Company in the event of any default or breach of this Agreement by Employee.   The Parties agree and acknowledge that the breach by Employee of any of the terms of this Agreement will cause irreparable damage to the Company, and upon any such breach, the Company shall be entitled to injunctive relief, specific performance, or other equitable relief (without posting a bond or other security); provided, however, that this shall in no way limit any other remedies which the Company may have (including, without limitations, the right to seek monetary damages).

9.    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties and supersedes all prior written and oral and all contemporaneous oral agreements, understandings and negotiations with respect to the subject matter hereof.  Without limiting the

13



generality of the foregoing sentence, this Agreement supersedes any prior employment agreement, oral or written which shall terminate and be cancelled as of the Effective Date, except for any breaches thereof by Employee prior to the Effective Date which shall survive such termination.  This Agreement may not be changed orally, but only by an agreement in writing signed by both Parties.

10.     Governing Law; Construction.  This Agreement shall be governed under and construed in accordance with the laws of the State of Texas, without regard to the principles of conflicts of laws.  The paragraph headings and captions contained herein are for reference purposes and convenience only and shall not in any way affect the meaning or interpretation of this Agreement.  It is intended by the Parties that this Agreement be interpreted in accordance with its fair and simple meaning, not for or against either Party, and neither Party shall be deemed to be the drafter of this Agreement.

11.     Severability.  The Parties agree that if any provision of this Agreement as applied to any Party or to any circumstance is adjudged by a court or arbitrator to be invalid or unenforceable, the same will in no way affect any other circumstance or the validity or enforceability of this Agreement.  Without limiting the generality of the foregoing, in particular, if any provision in Section 4, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the Parties agree that the court or arbitrator making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases, and in its reduced form, such provision shall then be enforceable and shall be enforced. In addition, in the event of a breach or violation by Employee of Section 4, the Restricted Period shall be automatically extended respectively by the amount of time between the initial occurrence of the breach or violation and when such breach or violation has been duly cured.

12.     Counterparts/Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  For purposes of this Agreement, use of a facsimile, e-mail or other electronic medium shall have the same force and effect as an original signature.

13.     Dollars.  Unless otherwise provided in this Agreement, all dollar amounts referenced in this Agreement are United States dollars.

14.     Withholding.  The Company shall be entitled to withhold from any payments or benefits made or provided under this Agreement all applicable federal, state, city or other applicable taxes.

15.     Survival. Sections 4, 5(e), 6, 7, 8, 9, 10, 11, 12, 13, 14 and this Section 15 shall survive the termination of this Agreement and shall continue in full force and effect according to their terms.

16.     Section 409A.

        (a)     This Agreement is intended to comply with or be exempt from Section 409A of the Internal Revenue Code of 1986, as amended ("*Section 409A*") and shall be construed accordingly. It is the intention of the Parties that payments or benefits payable under

14



this Agreement not be subject to the additional tax or interest imposed pursuant to Section 409A. To the extent such potential payments or benefits are or could become subject to Section 409A, the Parties shall cooperate to amend this Agreement with the goal of giving Employee the economic benefits described herein in a manner that does not result in such tax or interest being imposed. However, in no event shall the Company be liable to Employee for any taxes, interest, or penalties due as a result of the application of Section 409A to any payments or benefits provided hereunder.

(b)     Each payment provided for in this Agreement shall, to the extent permissible under Section 409A, be deemed a separate payment for purposes of Section 409A, and any payment to be made in installments shall be treated as a series of separate payments.

(c)     Payments or benefits pursuant to this Agreement shall be treated as exempt from Section 409A to the maximum extent possible under Treasury Regulation Section 1.409A-1(b)(9)(v), and/or under any other exemption that may be applicable, and this Agreement shall be construed accordingly. For purposes of Section 5, phrases such as "termination of employment" shall refer to Employee's "separation from service," as defined for purposes of Section 409A.

(d)     All taxable expenses or other reimbursements or in-kind benefits under this Agreement shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by Employee. Any such taxable reimbursement or any taxable in-kind benefits provided in one calendar year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year.

(e)     Employee shall have no right to designate the date of any payment hereunder.

15



**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the day and year first above written.

COMPANY:

VEROBLUE FARMS USA, INC.

By: _____

Leslie Wulf, Chief Executive Officer

EMPLOYEE:

_____

James Rea

*Signature Page to Employment Agreement*

**Exhibit "A-3"**

EXECUTION VERSION 12/1/2017

## SEPARATION AGREEMENT

This Separation Agreement (this "**Agreement**") is made and entered into as of December 1, 2017 (the "**Effective Date**"), by and between VeroBlue Farms USA, Inc., a Nevada corporation (the "**Company**"), and Leslie A. Wulf ("**Wulf**"). The Company and Wulf are sometimes each referred to herein as a "**Party**" and collectively, as the "**Parties**".

### W I T N E S E T H :

**WHEREAS**, Wulf and the Company are parties to that certain Employment Agreement, dated as of July 1, 2016 (the "**Employment Agreement**"); and

**WHEREAS**, pursuant to a Stock Option Agreement, executed by Wulf and the Company on July 8, 2016 (the "**Stock Option Agreement**") and Stock Option Grant Notice, executed by Wulf and the Company on July 8, 2016 the "**Stock Option Grant Notice**"), the Company granted to Wulf a non-statutory stock option to purchase 1,000,000 shares of the common stock, par value $0.01 per share, of the Company (the "**Common Stock**"), at a purchase price of $1.00 per share, under the Company's 2016 Stock Option Plan (the "**Stock Option Grant**");

**WHEREAS**, Wulf, through LAW Holdings LLC, an entity indirectly controlled by Wulf, owns 3,600,000 common shares (the "**Wulf Shares**") of VeroBlue Farms, Inc. a corporation incorporated under the laws of the Province of Ontario, Canada ("**VBF Canada**"); and

**WHEREAS**, the Company terminated Wulf as Chief Executive Officer and as an employee of the Company and its Subsidiaries without cause, effective as of November 6, 2017 (the "**Termination Date**"); and

**WHEREAS**, pursuant to Section 5(e)(ii) the Employment Agreement, Wulf's receipt of any payments under Section 5 of the Employment Agreement is subject to his execution and non-revocation of a general release of claims within sixty (60) days following his termination of employment in a form provided by the Company, with the Company having provided this Agreement to Wulf as such general release of claims.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.    Termination of Employment and Employment Agreement.

(a)    Effective immediately after the Effective Date, Wulf has made a written offer to the Company under Section 5(f)(ii) of the Employment Agreement to purchase the Wulf Shares at a purchase price of $0.50 per share (the "**Wulf Share Offer**"). The Parties agree that with respect to the Wulf Share Offer, Section 5(f)(ii) of the Employment Agreement is hereby amended to remove subsection (D) thereof solely for the Wulf Share Offer, such that the other stockholders of the Company (other than the holders of Series A preferred stock of the Company) will not be offered the Wulf Shares under the Wulf Share Offer pursuant to such subsection (D); it being agreed and understood that if the Wulf Shares are not sold by

Wulf pursuant to the Wulf Share Offer in accordance with the terms and conditions of Section 5(f)(ii) of the Employment Agreement (as such terms and provisions have been amended as provided above), then for any subsequent sale or transfer of the Wulf Shares, Wulf must again follow the terms and provisions of Section 5(f)(ii) of the Employment Agreement. Wulf covenants and agrees to comply with the terms of this Section 1(a) and Section 5(f) of the Employment Agreement.

(b)     Effective as of the Termination Date the Company removed Wulf as Chief Executive Officer of the Company and its subsidiaries and terminated his employment. Effective as of the Effective Date, the Employment Agreement is terminated (including, specifically, Section 15 thereof) and is of no further force or effect, excluding Sections 5(f), and 6-14 (the "**Surviving Sections**"), which Surviving Sections shall remain in full force and effect.

(c)     Wulf resigns effective as of the Termination Date from any and all positions as an officer or director of VBF Canada, the Company, VeroBlue Canada Finco ULC ("**VBF Finco**"), VBF Operations Inc., a Texas corporation, VBF Transport, Inc., a Delaware corporation, Iowa's First, Inc., an Iowa corporation, Verostream Seafood Marketing, Inc., a Texas corporation, VBF IP Inc., a Texas corporation, VBF Construction Assets Inc., an Iowa corporation, and VBF Construction Services Inc., an Iowa corporation.

(d)     Contemporaneously herewith, Wulf shall execute in blank and deliver to the Company the documents set forth on Exhibit B attached hereto, pursuant to which Wulf will among other actions transfer the one (1) common shares Wulf owns in VBF Finco as provided in such documents.

2.     Termination of Stock Option Agreement and Stock Option Grant. Effective as of the Termination Date, the Stock Option Agreement, Stock Option Grant Notice and Stock Option Grant are terminated in their entirety and of no further force or effect; it being agreed and understood that no shares of Common Stock have been, or will be, issued under the Stock Option Agreement, Stock Option Grant Notice or Stock Option Grant.

3.     Confidential Information; Non-Competition; Non-Solicitation.

(a)     Confidentiality. Wulf acknowledges that during his employment with the Company, Wulf obtained knowledge of, and has been given access to, information concerning the Company and VBF Canada and their respective affiliates, including, but not limited to, information regarding the business, operations, services, proposed services, business processes, business and marketing strategies, advertising, marketing and promotional plans and materials, pricing strategies and policies, financial information, stockholders and other trade secrets, confidential information and proprietary material of the Company and VBF Canada and their respective affiliates, including information and material originated, discovered or developed in whole or in part by Wulf (collectively referred to herein as "**Confidential Information**"). The term "**Confidential Information**" does not include any information which (i) at the time of disclosure is generally available to the public (other than as a result of a disclosure by Wulf in breach of this Agreement or any other agreement by which Wulf is or was prohibited from disclosing Confidential Information), or

(ii) was available to Wulf on a non-confidential basis from a source (other than the Company or its affiliates or their representatives) that is not and was not prohibited from disclosing such information to Wulf by a contractual, legal or fiduciary obligation. Wulf agrees that Wulf will, in a fiduciary capacity for the benefit of the Company, hold all Confidential Information strictly in confidence and will not directly or indirectly reveal, report, disclose, publish or transfer any of such Confidential Information to any person or entity or utilize any of the Confidential Information for any purpose, including the terms of and existence of this Agreement, except to the extent that Wulf may be required by law to disclose any Confidential Information.

(b)   Limitations.  Wulf acknowledges that he understands the following: An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

(c)   Non-Competition and Non-Solicitation.  In further consideration of the compensation to be paid to Wulf hereunder, Wulf acknowledges that during the course of his employment and prior service with the Company, he has become familiar with the trade secrets of the Company and its affiliates and with other Confidential Information concerning the Company and its affiliates and that his services have been and shall continue to be of special, unique and extraordinary value to the Company. Therefore, Wulf agrees that, for a period of one (1) year following the Termination Date (the "**Restricted Period**"), he shall not directly or indirectly: (i) own any interest in, manage, control, participate in, consult with, render services for, be employed in an executive, managerial or administrative capacity by, or in any manner engage in, any Competing Business (as defined below); (ii) solicit, request or induce any employee, consultant or agent of the Company or VBF Canada or any of their respective affiliates to terminate his or her employment or relationship with such company, nor hire any employee of the Company or VBF Canada or any of their respective affiliates, or (iii) solicit, request, or induce or attempt to solicit, request, or induce or attempt to induce any customer, supplier, licensee or other business relation of the Company, VBF Canada, or any of their respective affiliates in the Restricted Territory (defined below) to cease doing business with, or modify its business relationship with the Company or VBF Canada or any of their respective affiliates, or in any way interfere with or hinder the relationship between any such customer, supplier, licensee or business relation and the Company or VBF Canada or any of their respective affiliates, as applicable. For purposes hereof, "**Competing Business**" means an aquaculture business that competes with the Company or VBF Canada, or any of their respective affiliates in any geographic territory in which the Company, VBF Canada, or any such affiliate conducts, sells or markets its business or plans to conduct, sell or market its business (it being agreed and understood that

the Company is currently conducting, or plans to conduct, business in the United States, Canada and Australia) (the "**Restricted Territory**"). Nothing herein shall prohibit Wulf from being a passive owner of not more than five percent (5.0%) of the outstanding stock of any class of a corporation that is publicly traded, so long as Wulf has no active participation in the business of such corporation.

(d)     Proprietary Interest. All correspondence, communications (electronic or otherwise), data, reports, software, systems, databases, methodology, processes, programs, templates, procedures, know-how, inventions, discoveries, creations, designs, improvements, patents, copyrights, discoveries or ideas which Wulf conceived, developed, or produced prior to the date hereof as an employee or officer of, or consultant to, the Company, VBF Canada or their affiliates which relate to the business of the Company (collectively, the "**Work Product**"), including trade secrets, data, methodology, processes, programs, templates, and information concerning proprietary technology developed for the business, or for any interests of the Company, shall belong solely and exclusively to the Company, together with any intellectual property rights associated with such Work Product (the "**IP Rights**"). Wulf acknowledges that all original works of authorship which were made by Wulf (solely or jointly with others) during his prior services or within the scope of his employment with the Company and which are protectable by copyright laws are "works made for hire," pursuant to the United States Copyright Act (17 U.S.C., Section 101), and that such works made for hire shall constitute part of the IP Rights. Wulf shall assist the Company or its designees to obtain, and from time to time enforce, United States and foreign IP Rights in any and all countries. To that end, Wulf shall execute, verify, and deliver such documents and perform such other acts (including appearing as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such IP Rights and the assignment thereof. In addition, Wulf will execute, verify, and deliver assignments of such IP Rights to the Company or its designee. Wulf hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which Wulf now or may hereafter have for infringement of any IP Rights assigned hereunder to the Company.

(e)     Return of Materials. Wulf expressly acknowledges that all physical property, data, books, records and other Work Product and Confidential Information of the Company and its affiliates obtained in connection with the Company's and its affiliates' business is the exclusive property of the Company. Wulf warrants and represents that prior to executing this Agreement, Wulf has surrendered and returned to the Company all such Work Product and Confidential Information and all other items and property belonging to the Company then in the possession of Wulf, and Wulf shall not make or retain any copies of extracts thereof. Wulf agrees that, to the extent that Wulf possesses any files, data, or information relating in any way to the Company, VBF Canada, any of their affiliates, or their business on any personal computer or other device or account, Wulf will first return to the Company and then delete those files, data, or information, including, without limitation, all Confidential Information, and will retain no copies in any form. Wulf's full compliance with the obligations set forth in this Section 3(e) is a condition precedent to the Company's obligations set forth in Section 5 hereof, and Wulf must submit a signed declaration and certification in the form attached to this Agreement as Exhibit A to demonstrate the satisfaction of such condition precedent.

(f)  Property of the Company.  Wulf acknowledges that from time to time in the course of providing past services to the Company and its affiliates, Wulf has had the opportunity to inspect and use certain property, both tangible and intangible, of the Company and Wulf hereby agrees that such property shall remain the exclusive property of the Company and its affiliates.  Wulf shall have no right or proprietary interest in such property, whether tangible or intangible.

(g)  Reasonable in Scope and Duration; Consideration.  Wulf agrees and acknowledges that the restrictions contained in this Section 1 are reasonable in scope and duration and are necessary to protect the business interests and Confidential Information of the Company and its affiliates from and after the Effective Date, and Wulf further agrees and acknowledges that he has reviewed the provisions of this Agreement with his legal counsel. Wulf acknowledges and agrees that Wulf will receive substantial valuable consideration from the Company for the covenants contained in this Section 3, including without limitation, compensation and other benefits as set forth in Section 5 below.

(h)  Enforcement.  If, at the time of enforcement of Section 3 of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the Parties hereto agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law.

(i)  Extension of Restricted Periods.  In addition to the remedies the Company may seek and obtain pursuant to this Agreement, the applicable restricted periods set forth herein shall be extended by any and all periods during which Wulf shall be found by a court of competent jurisdiction to have been in violation of the covenants contained herein.

(j)  Cooperation.  Wulf agrees to cooperate with and assist the Company or VBF Canada with any investigation, lawsuit, arbitration, or other proceeding to which the Company or VBF Canada is subjected.  Wulf agrees to be available for preparation for, and attendance of, hearings, proceedings or trial, including pretrial discovery and trial preparation.

4.  Releases and Non-Disparagement.

(a)  Except for the covenants and agreements of the Company provided for in this Agreement, Wulf, on his own behalf and on behalf of his, affiliates, heirs, dependents, successors and assigns, or any of them (collectively, the "Wulf Releasers") hereby irrevocably and unconditionally release, acquit and forever discharge the Company and VBF Canada and each of their respective successors, assigns, agents, equity holders, members of the boards of directors, officers, employees, representatives, subsidiaries, affiliates and related parties and all persons acting by, through, under or in concert with any of them (collectively, the "Company Releasees"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown

(each, a "**Wulf Claim**", and collectively, the "**Wulf Claims**") which the Wulf Releasers now have, own, hold, or which the Wulf Releasers at any time heretofore had, owned or held against each of the Company Releasees including, but not limited to: (i) all Wulf Claims under the Age Discrimination in Employment Act of 1967, as amended; (ii) all Wulf Claims under Title VII of the Civil Rights Act of 1964, as amended; (iii) all Wulf Claims under the Employee Retirement Income Security Act of 1974, as amended; (iv) all Wulf Claims arising under the Americans With Disabilities Act of 1990, as amended; (v) all Wulf Claims arising under the Family and Medical Leave Act of 1993, as amended; (vi) all Wulf Claims related to Wulf's employment or engagement with the Company Releasees; (vii) all Wulf Claims of unlawful discrimination based on age, sex, race, religion, national origin, handicap, disability, equal pay, sexual orientation or otherwise; (viii) all Wulf Claims of wrongful discharge, breach of an implied or express employment contract, negligent or intentional infliction of emotional distress, libel, defamation, breach of privacy, fraud, breach of any implied covenant of good faith and fair dealing and any other federal, state, or local common law or statutory claims, whether in tort or in contract; (xi) all Wulf Claims related to unpaid wages, salary, deferred compensation, overtime compensation, bonuses, severance pay, vacation pay or other compensation or benefits arising out of Wulf's employment or engagement with any Company Releasee; (x) all Wulf Claims arising under any federal, state or local regulation, law, code or statute; (xi) all Wulf Claims of discrimination arising under any state or local law or ordinance; (xii) the failure of this Agreement, or of any other employment, severance, profit sharing, bonus, equity incentive or other compensatory plan to which Wulf and the Company are or were parties, to comply with, or to be operated in compliance with, Internal Revenue Code Section 409A, or any similar provision of state or local income tax law; and (xiii) all Wulf Claims relating to any agreement, arrangement or understanding that the Wulf Releasers have, or may have, with any Company Releasee (but specifically excluding this Agreement and the Surviving Sections) for anything occurring prior to the Effective Date. The Wulf Releasers represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Wulf Claim or any portion thereof or interest therein. Notwithstanding anything in this section 4(a), the Parties agree that this Section 4(a) does not apply to Wulf with respect to his ownership of the Wulf Shares and his rights as a shareholder of VBF Canada.

(b)     Wulf, on his own behalf and on behalf of the other Wulf Releasers, agrees not to make any disparaging or negative statements, written or verbal, regarding any of the Company Releasees at any time in the future, whether such statement is true or false, except (i) as required by law; (ii) in defense of any legal action brought by any Company Releasee against any Wulf Releaser in violation of this Agreement; or (iii) as is necessary to correct any statement made by any Company Releasee that Wulf believes, in good faith, is false, mischaracterizing, or is a self-serving representation of facts and circumstances concerning Wulf. The Company, on its own behalf and on behalf of the other Company Releasees, agrees not to make any disparaging or negative statements, written or verbal, regarding any Wulf Releaser at any time in the future, whether such statement is true or false, except (i) as required by law, (ii) in defense of any legal action brought by any Wulf Releaser against any Company Releasee in violation of this Agreement, (iii) in pursuit of any legal action brought by any Company Releasee not otherwise prohibited by this Agreement, or (iv) discussion of facts and circumstances in the ordinary course of business of the Company, including but not limited to discussion of past performance or actions of Wulf, the Company and its

subsidiaries with directors, employees, consultants, agents, customers, suppliers, and representatives of the Company and any other Company Releasee.

5.    Settlement Consideration.

(a)    In consideration of the covenants, agreements and other matters described in Sections 1-4 above and in full satisfaction of the Company's obligations under Section 5(d)(i)(B) of the Employment Agreement, and subject to the terms of this Agreement, including Sections 3(e) and 7(c), the Company agrees to pay to Wulf an aggregate amount equal to $400,000 as follows: (i) an amount equal to $100,000, representing 3 months of Wulf's Base Salary (as defined in the Employment Agreement), on the Effective Date, and (ii) the remainder shall be payable in equal installments, in accordance with the Company's normal payroll practices over the 9 months period beginning on the first regular payroll date of the Company following January 1, 2018.

(b)    Subject to the terms of this Agreement, including Sections 3(e) and 7(c), in the event Wulf timely and properly elects continuation coverage under the Company's health and welfare plans under COBRA, Company shall pay in full all COBRA premiums for the lesser of (i) 12 months, or (ii) the duration of such COBRA coverage. COBRA premiums shall be paid by the Company directly to the relevant insurer on the first day of each month; provided, that premiums due for any month prior to the date on which Wulf timely makes a COBRA election shall be paid within five (5) business days of the date of such election.

(c)    For all amounts that are owed to Wulf by the Company as of the Termination Date, (including, without limitation, unpaid salary, PTO and reimbursable expenses), the Company will pay Wulf $25,000 for accrued PTO on the Effective Date. For the avoidance of doubt, the foregoing payments are in satisfaction of and not in addition to the Accrued Employment Entitlements (as defined in the Employment Agreement) provided for in Section 5 of the Employment Agreement.

(d)    All payments under this Section 5 will be made by wire transfer of immediately available funds to the following account:

> Bank: Wells Fargo
> Bank Address and Telephone : 212 Coit Road Plano Texas 75075
> Account Name: Leslie Wulf
> Account # ███████
> Wire Routing #: ███████
> SWIFT# ███████

(e)    The Company will report and withhold payment under this Section 5 for tax purposes as required under applicable tax laws. If a claim is made against the Company for any additional tax or withholding in connection with or arising out of any payment pursuant to this Section 5, Wulf shall pay any such claim within thirty (30) days of being notified by the Company and agrees to indemnify the Company and hold it harmless against such

claims, including, but not limited to, any taxes, attorneys' fees, penalties, and/or interest, which are or become due from the Company.

6.     Representations and Warranties.

       (a)     Each Party hereby represents and warrants to each other Party that the following representations and warranties are true and correct as of the Effective Date as follows: (a) such Party is fully competent to execute, deliver and perform this Agreement; (ii) this Agreement has been duly executed and delivered by such Party and constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally or the availability of equitable remedies; and (iii) neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby or thereby will: (1) conflict with, or result in a violation or breach of the terms, conditions or provisions of, or constitute a default under any agreement, indenture or other instrument under which such Party is bound or subject; or (2) violate or conflict with any judgment, decree, order, statute, rule or regulation of any court or any public, governmental or regulatory agency or body having jurisdiction over such Party.

       (b)     In addition, Wulf warrants and represents as follows:

              (i)     he voluntarily executes this Agreement (1) after having been advised to consult with legal counsel and (2) after having had opportunity to consult with legal counsel:

              (ii)     he understands that: (1) nothing contained in this Agreement limits Wulf's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission ("**Government Agencies**"); and (2) this Agreement does not limit Wulf's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company. Notwithstanding the foregoing, Wulf waives any right to any monetary recovery or other relief should any party, including, without limitation, any federal, state or local governmental entity or administrative agency, pursue any claims on Wulf's behalf arising out of, relating to, or in any way connected with the Released Claims, provided, however, this Agreement does not limit Wulf's right to receive a reward for information provided to any Government Agencies;

              (iii)     he has the right to consider the terms of this Agreement for at least twenty-one (21) days; and in the event that he executes this Agreement in less time, it is with the full understanding that he had the full twenty-one (21) days if he so desired and that he was not pressured by the Company or any of its representatives or agents to take less time to consider the Agreement; it being agreed and understood

that, in such event, Wulf expressly intends such execution to be a waiver of any right Wulf had to review the Agreement for a full twenty-one (21) days;

(iv)    he has not violated any obligations contained in Section 4 of the Employment Agreement;

(v)    he has not engaged in any acts or omissions amounting to "Cause" (as defined in the Employment Agreement and for purposes hereof without regard for any right to cure) for the Company to terminate his employment pursuant to the Employment Agreement;

(vi)    that (1) as set forth in Section 5(e)(ii) of the Employment Agreement, he is not otherwise entitled to the amounts set forth in Sections 5(a) above without his execution and non-revocation of this Agreement, and (2) those amounts are good and sufficient consideration for this Agreement; and

(vii)    he admits, acknowledges, and agrees that, except for the payments promised in this Agreement, Wulf has been fully and finally paid or provided all wages, compensation, vacation, bonuses, stock, stock options, or other benefits from the Company which are or could be due to Wulf under the terms of Wulf's employment with the Company, or otherwise; and

(viii)    he has not initiated and has no knowledge of the existence of any lawsuit, charge, or proceeding against the Company or any of its officers, directors, board members, committee members, employees, equity holders, lenders, successors, affiliates, or agents arising out of or otherwise connected with any of the matters herein released. In the event that any such lawsuit, charge, or proceeding has been filed by Wulf, Wulf immediately will take all actions necessary to withdraw or terminate that lawsuit, charge, or proceeding, unless the requirement for such withdrawal or termination is prohibited by applicable law.

7.    Miscellaneous.

(a)    Any notice or communication hereunder must be in writing and given by depositing the same in the United States mail, addressed to the Party to be notified, postage prepaid and registered or certified with return receipt requested, or by delivering the same in person. Such notice shall be deemed received on the date on which it is hand-delivered, or delivered by Federal Express or on the third business day following the date on which it is so mailed. For purposes of notice, the addresses of the Parties shall be as follows:

If to the Company:          VeroBlue Farms USA, Inc.
                            3369 Premier Drive, Suite 300
                            Plano, Texas 75023
                            Attn: Chief Executive Officer

If to Wulf:                 Leslie A. Wulf
                            144 Ocean Drive

EXECUTION VERSION 12/1/2017

Gun Barrel City Texas 75156

Any Party may change its address for notice by written notice given to the other party in accordance with this Section.

(b)      This Agreement is intended to comply with Section 409A of the Code and Treasury Regulations promulgated thereunder ("**Section 409A**") and shall be construed accordingly.  It is the intention of the Parties that payments or benefits payable under this Agreement not be subject to the additional tax or interest imposed pursuant to Section 409A.  To the extent such potential payments or benefits are or could become subject to Section 409A, the Parties shall cooperate to amend this Agreement with the goal of giving Wulf the economic benefits described herein in a manner that does not result in such tax or interest being imposed.  Wulf shall, at the request of the Company, take any reasonable action (or refrain from taking any action), required to comply with any correction procedure promulgated pursuant to Section 409A.  Each payment to be made under this Agreement shall be a separate payment, and a separately identifiable and determinable payment, to the fullest extent permitted under Section 409A.

(c)      Notwithstanding any provision to the contrary herein, in addition to other remedies described in this Agreement, in the event of a breach of the representations or warranties set forth in Section (6)(b)(iv), Section 6(b)(v), and/or any of Wulf's obligations or agreements set forth in Section 3, whether past, present or future, then any remaining payment obligations of the Company pursuant to Section 5(a) and Section 5(b) shall immediately terminate and Wulf shall repay the amounts paid by the Company pursuant to Section 5(a) and Section 5(b) of this Agreement within ten (10) business days after the Company's notification of the breach and demand for payment.

(d)      This Agreement contains the entire agreement among the Parties relating to the subject matter hereof and, except as provided herein, supersedes any prior agreement, arrangement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

(e)      The Company shall be entitled to withhold from any payments or benefits made or provided under this Agreement all applicable federal, state, city or other applicable taxes if so required by law.

(f)      No alterations, amendments, waiver, or any other change in any term or provision of this Agreement shall be valid or binding on any Party unless the same shall have been agreed to in writing by all of the Parties.  No waiver of default of any term of this Agreement shall be deemed a waiver of any subsequent breach or default of the same or similar nature.  This Agreement may not be changed except by written agreement signed by all Parties.

(g)      Each Party acknowledges that a refusal by such Party to perform any covenant or agreement contained in this Agreement may cause irreparable harm to one or more of the other Parties, for which there may be no adequate remedy at law and for which the ascertainment of damages would be difficult.  Therefore, the Parties agree that in any

such case, the other Party or Parties shall be entitled, in addition to, and without having to prove the inadequacy of, other remedies at law, to specific performance of this Agreement, as well as injunctive relief (without being required to post bond or other security).

(h)     The Company may assign its rights under this Agreement.  No other assignment is permitted except by mutual written agreement of the Parties.

(i)     In the event it becomes necessary to bring suit to enforce any provision of this Agreement, the prevailing Party shall be entitled to recover, in addition to any other award, reasonable legal costs, including court costs and attorney's fees, from the non-prevailing Party or Parties.

(j)     EACH OF THE PARTIES VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

(k)     If any provision of this Agreement is held to be unenforceable or invalid, the remaining provisions of this Agreement will remain in effect.

(l)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, regardless of the laws that might otherwise govern under applicable principles of conflicts of law thereof.  Each Party irrevocably submits to the exclusive jurisdiction of the Federal District Court for the Northern District of Texas (the "**District Court**") for the purposes of any suit, action or other proceeding arising out of this Agreement.  Each Party agrees to commence any action, suit or proceeding relating to this Agreement in the District Court.  Each Party further agrees that service of any process, summons, notice or document by registered mail to such Party's respective address set forth in Section 7(a) above shall be effective service of process.  Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the District Court, and hereby further irrevocably and unconditionally waives and shall not assert by way of motion, defense, or otherwise, in any such Proceeding, any claim that it is not subject personally to the jurisdiction of the District Court, that its property is exempt or immune from attachment or execution, that such proceeding is brought in an inconvenient forum, that the venue of the proceeding is improper, or that the Agreement may not be enforced in or by the District Court.

(m)     The paragraph headings and captions contained herein are for reference purposes and convenience only and shall not in any way affect the meaning or interpretation of this Agreement.  It is intended by the Parties that this Agreement be interpreted in accordance with its fair and simple meaning, not for or against any Party, and no Party shall be deemed to be the drafter of this Agreement.

(n)     Wulf has been informed and understands that (i) notwithstanding anything in this Agreement to the contrary, to the extent that this Agreement waives or releases any claims Wulf might have under the Age Discrimination in Employment Act, Wulf may rescind Wulf's waiver and release within seven (7) calendar days of Wulf's execution of this

EXECUTION VERSION 12/1/2017

Agreement; and (ii) any such rescission must be in writing, hand delivered to Norman McCowan at the address for the Company set forth below in Section 7, and emailed to Norman McCowan at norman.mccowan@vero blue farms.com, both within the seven-day period. The Parties agree that, notwithstanding anything in this Agreement to the contrary, in the event that Wulf makes any such rescission, (A) Wulf shall repay to the Company by wire transfer of immediately available funds, within one (1) day of any such rescission, all amounts paid to him pursuant to Sections 5(a) and 5(b), (B) in accordance with Section 5(e)(ii) of the Employment Agreement, Wulf's right to any amounts pursuant to Section 5(d) of the Employment Agreement shall terminate and be of no further force or effect, and (C) this Agreement shall be deemed to be terminated and of no force or effect except for the terms of this Section 7(n).

(o) This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail or other electronic medium shall have the same force and effect as an original signature.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the dates set forth below.

VEROBLUE FARMS USA, INC.

By: _____
Norman McCowan,
President

Date: _____


_____
Leslie A. Wulf

Date:   12-1-2017

EXECUTION VERSION 12/1/2017

### Exhibit A to Separation Agreement

Sworn Declaration and Certification

I, Leslie Wulf, under penalty of perjury, hereby swear, declare, and certify as follows:

1.   My employment with VeroBlue Farms USA, Inc. (the "Company") has ended.

2.   In accordance with the Separation Agreement I signed on December 1 , 2017 (the "Termination Agreement"):

   a.   I have surrendered and returned to the Company all Work Product and Confidential Information (as those terms are defined in the Termination Agreement) and all other items and property belonging to the Company that were at any time in my possession, and I have not made or retained any copies or extracts thereof.

   b.   I have first returned to the Company and then destroyed any files, data, or information relating in any way to the Company, VBF Canada (as defined in the Termination Agreement), any of their affiliates, or their business, that exist or have existed on or in any personal computer or other device or account.  I have not retained copies of any such files, data, or information in any form.

3.   I understand that any failure to act in accordance with this Sworn Declaration and Certification and the Termination Agreement may result in non-payment of amounts otherwise due to me under the Termination Agreement, as well as a lawsuit against me seeking damages for breach of such agreement.

Executed on the  1st  day of December, 2017

Leslie Wulf

**Exhibit "A-4"**

# BUSINESS RELATIONSHIP TERMINATION AGREEMENT

This Business Relationship Termination Agreement (this **"Agreement"**) is made and entered into as of October 27, 2017 (the **"Effective Date"**), by and between VeroBlue Farms USA, Inc., a Nevada corporation (the **"Company"**), and Bruce Hall (**"Hall"**). The Company and Hall are sometimes each referred to herein as a **"Party"** and collectively, as the **"Parties"**.

## W I T N E S E T H :

**WHEREAS**, Hall and the Company are parties to that certain Employment Agreement, dated as of July 1, 2016 (the **"Employment Agreement"**); and

**WHEREAS**, pursuant to a Stock Option Agreement, executed by Hall and the Company on July 8, 2016 (the **"Stock Option Agreement"**) and Stock Option Grant Notice, executed by Hall and the Company on July 8, 2016 the **"Stock Option Grant Notice"**), the Company granted to Hall a non-statutory stock option to purchase 1,000,000 shares of the common stock, par value $0.01 per share, of the Company (the **"Common Stock"**), at a purchase price of $1.00 per share, under the Company's 2016 Stock Option Plan (the **"Stock Option Grant"**); and

**WHEREAS**, Hall, through BHDH Family, LP (the **"Hall Entity"**), an entity indirectly controlled by Hall, owns 3,600,000 common shares (the **"Hall Shares"**) of VeroBlue Farms Inc., a corporation incorporated under the laws of the Province of Ontario, (**"VBF Canada"**); and

**WHEREAS** the Parties desire to terminate their business relationship and to resolve any claims they may have against each other;

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.  Termination of Employment and Employment Agreement.

    (a)  Effective as of the Effective Date: (i) Hall's employment and positions as Chief Financial Officer and as an employee of the Company are hereby terminated; and (ii) the Employment Agreement is hereby terminated (including, specifically, Section 15 thereof) and of no further force or effect, excluding Sections 5(f)(ii)-(vi), and 6-14 (the **"Surviving Sections"**), which Surviving Sections shall remain in full force and effect. In addition, effective immediately after the Effective Date, the Hall Entity has made a written offer to the Company under Section 5(f)(ii) of the Employment Agreement to purchase the Hall Shares at a purchase price of $1.00 per share (the **"Hall Share Offer"**). The Parties agree that with respect to the Hall Share Offer, Section 5(f)(ii) of the Employment Agreement is hereby amended to: (i) remove subsection (D) thereof solely for the Hall Share Offer, such that the other stockholders of the Company (other than the holders of Series A preferred stock of the Company) will not be offered the Hall Shares under the Hall Share Offer pursuant to such subsection (D); it being agreed and understood that if the Hall Shares are not sold by the Hall Entity pursuant to the Hall Share Offer in accordance with the terms and conditions of Section 5(f)(ii) of the Employment Agreement (as such terms and provisions have been

amended as provided above), then for any subsequent sale or transfer of the Hall Shares, the Hall Entity must again follow the terms and provisions of Section 5(f)(ii) of the Employment Agreement; and (ii) provide that any offer of Employee Equity under Section 5(f)(ii) of the Employment Agreement, the parties under subsections (A) – (D) thereof and any third-party purchasers offered Employee Equity thereafter under Section 5.2(f) of the Employment Agreement, can purchase all or less than all of such offered Employee Equity (instead of only all of such offered Employee Equity as currently written in the Employment Agreement). Hall covenants and agrees to cause the Hall Entity to comply with the terms of this Section 1(a) and Section 5(f) of the Employment Agreement.

(b)     Hall hereby resigns from any and all positions as an officer or director of VBF Canada, the Company, VBF Operations Inc., a Texas corporation, VBF Transport, Inc., a Delaware corporation, Iowa's First, Inc., an Iowa corporation, Verostream Seafood Marketing, Inc., a Texas corporation, VBF IP Inc., a Texas corporation, VBF Construction Assets Inc., an Iowa corporation, and VBF Construction Services Inc., an Iowa corporation.

2.     Termination of Stock Option Agreement and Stock Option Grant. Effective as of the Effective Date, the Stock Option Agreement, Stock Option Grant Notice and Stock Option Grant are hereby terminated in their entirety and of no further force or effect; it being agreed and understood that no shares of Common Stock have been, or will be, issued under the Stock Option Agreement, Stock Option Grant Notice or Stock Option Grant.

3.     Confidential Information; Non-Competition; Non-Solicitation.

(a)     Confidentiality. Hall acknowledges that during his employment with the Company, Hall has obtained knowledge of, and has been given and will be given access to, information concerning the Company and VBF Canada and their respective affiliates, including, but not limited to, information regarding the business, operations, services, proposed services, business processes, business and marketing strategies, advertising, marketing and promotional plans and materials, pricing strategies and policies, financial information, stockholders and other trade secrets, confidential information and proprietary material of the Company, including information and material originated, discovered or developed in whole or in part by Hall (collectively referred to herein as "**Confidential Information**"). The term "**Confidential Information**" does not include any information which (i) at the time of disclosure is generally available to the public (other than as a result of a disclosure by Hall in breach of this Agreement or any other agreement by which Hall is or was prohibited from disclosing Confidential Information), or (ii) was available to Hall on a non-confidential basis from a source (other than the Company or its affiliates or their representatives) that is not and was not prohibited from disclosing such information to Hall by a contractual, legal or fiduciary obligation. Hall agrees that Hall will, in a fiduciary capacity for the benefit of the Company, hold all Confidential Information strictly in confidence and will not directly or indirectly reveal, report, disclose, publish or transfer any of such Confidential Information to any person or entity or utilize any of the Confidential Information for any purpose, except to the extent that Hall may be required by law to disclose any Confidential Information.

19226033

(b)      Hall acknowledges that he understands the following: An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law.  An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

(c)      <u>Non-Competition and Non-Solicitation</u>.  In further consideration of the compensation to be paid to Hall hereunder, Hall acknowledges that during the course of his employment and prior service with the Company, he has become familiar with the trade secrets of the Company and with other Confidential Information concerning the Company and that his services have been and shall continue to be of special, unique and extraordinary value to the Company.  Therefore, Hall agrees that, for a period of one (1) year following the Effective Date (the "**Restricted Period**"), he shall not directly or indirectly: (i) own any interest in, manage, control, participate in, consult with, render services for, be employed in an executive, managerial or administrative capacity by, or in any manner engage in, any Competing Business (as defined below); (ii) solicit, request or induce any employee, consultant or agent of the Company or VBF Canada or any of their respective affiliates to terminate his or her employment or relationship with such company, nor hire any employee of the Company or VBF Canada or any of their respective affiliates, or (iii) solicit, request, or induce or attempt to solicit, request, or induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or VBF Canada or any of their respective affiliates to cease doing business with, or modify its business relationship with the Company or VBF Canada or any of their respective affiliates, or in any way interfere with or hinder the relationship between any such customer, supplier, licensee or business relation and the Company or VBF Canada or any of their respective affiliates, as applicable.  For purposes hereof, "**Competing Business**" means an aquaculture business that competes with the Company or VBF Canada, or any of their respective affiliates in any geographic territory in which the Company, VBF Canada, or any such affiliate conducts, sells or markets its business or plans to conduct, sell or market its business (it being agreed and understood that the Company is currently conducting, or plans to conduct, business in the United States, Canada and Australia).  Nothing herein shall prohibit Hall from being a passive owner of not more than five percent (5.0%) of the outstanding stock of any class of a corporation that is publicly traded, so long as Hall has no active participation in the business of such corporation.

(d)      <u>Proprietary Interest</u>.  All correspondence, communications (electronic or otherwise), data, reports, software, systems, databases, methodology, processes, programs, templates, procedures, know-how, inventions, discoveries, creations, designs, improvements, patents, copyrights, discoveries or ideas which Hall conceived, developed, or produced prior to the date hereof as an employee or officer of, or consultant to, the Company, VBF Canada

or their affiliates which relate to the business of the Company (collectively, the "**Work Product**"), including trade secrets, data, methodology, processes, programs, templates, and information concerning proprietary technology developed for the business, or for any interests of the Company, shall belong solely and exclusively to the Company, together with any intellectual property rights associated with such Work Product (the "**IP Rights**"). Hall acknowledges that all original works of authorship which were made by Hall (solely or jointly with others) during his prior services or within the scope of his employment with the Company and which are protectable by copyright laws are "works made for hire," pursuant to the United States Copyright Act (17 U.S.C., Section 101), and that such works made for hire shall constitute part of the IP Rights. Hall shall assist the Company or its designees to obtain, and from time to time enforce, United States and foreign IP Rights in any and all countries. To that end, Hall shall execute, verify, and deliver such documents and perform such other acts (including appearing as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such IP Rights and the assignment thereof. In addition, Hall will execute, verify, and deliver assignments of such IP Rights to the Company or its designee. Hall hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which Hall now or may hereafter have for infringement of any IP Rights assigned hereunder to the Company.

(e)     Return of Materials. Hall expressly acknowledges that all physical property, data, books, records and other Work Product and Confidential Information of the Company and its affiliates obtained in connection with the Company's and its affiliates' business is the exclusive property of the Company. Hall warrants and represents that prior to executing this Agreement, Hall has surrendered and returned to the Company all such Work Product and Confidential Information and all other items and property belonging to the Company then in the possession of Hall, and Hall shall not make or retain any copies of extracts thereof. Hall agrees that, to the extent that Hall possesses any files, data, or information relating in any way to the Company, VBF Canada, any of their affiliates, or their business on any personal computer or other device or account, Hall will first return to the Company and then delete those files, data, or information (and will retain no copies in any form).

(f)     Property of the Company. Hall acknowledges that from time to time in the course of providing past services to the Company and its affiliates, Hall has had the opportunity to inspect and use certain property, both tangible and intangible, of the Company and Hall hereby agrees that such property shall remain the exclusive property of the Company and its affiliates. Hall shall have no right or proprietary interest in such property, whether tangible or intangible.

(g)     Reasonable in Scope and Duration; Consideration. Hall agrees and acknowledges that the restrictions contained in this Section 3 are reasonable in scope and duration and are necessary to protect the business interests and Confidential Information of the Company and its affiliates from and after the Effective Date, and Hall further agrees and acknowledges that he has reviewed the provisions of this Agreement with his legal counsel. Hall acknowledges and agrees that Hall will receive substantial valuable consideration from the Company for the covenants contained in this Section 3, including without limitation, compensation and other benefits as set forth in Section 5 below.

(h)     Enforcement. If, at the time of enforcement of Section 3 of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the Parties hereto agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law.

(i)     Extension of Restricted Periods. In addition to the remedies the Company may seek and obtain pursuant to this Agreement, the applicable restricted periods set forth herein shall be extended by any and all periods during which Hall shall be found by a court of competent jurisdiction to have been in violation of the covenants contained herein.

4.     Releases.

(a)     Except for the covenants and agreements of the Company provided for in this Agreement, Hall, on his own behalf and on behalf of his, affiliates, heirs, dependents, successors and assigns, or any of them (collectively, the "**Hall Releasers**") hereby irrevocably and unconditionally release, acquit and forever discharge the Company and VBF Canada and each of their respective successors, assigns, agents, equity holders, members of the boards of directors, officers, employees, representatives, subsidiaries and affiliates and all persons acting by, through, under or in concert with any of them (collectively, the "**Company Releasees**"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (each, a "**Hall Claim**", and collectively, the "**Hall Claims**") which the Hall Releasers now have, own, hold, or which the Hall Releasers at any time heretofore had, owned or held against each of the Company Releasees including, but not limited to: (i) all Hall Claims under the Age Discrimination in Employment Act of 1967, as amended; (ii) all Hall Claims under Title VII of the Civil Rights Act of 1964, as amended; (iii) all Hall Claims under the Employee Retirement Income Security Act of 1974, as amended; (iv) all Hall Claims arising under the Americans With Disabilities Act of 1990, as amended; (v) all Hall Claims arising under the Family and Medical Leave Act of 1993, as amended; (vi) all Hall Claims related to Hall's employment or engagement with the Company Releasees; (vii) all Hall Claims of unlawful discrimination based on age, sex, race, religion, national origin, handicap, disability, equal pay, sexual orientation or otherwise; (viii) all Hall Claims of wrongful discharge, breach of an implied or express employment contract, negligent or intentional infliction of emotional distress, libel, defamation, breach of privacy, fraud, breach of any implied covenant of good faith and fair dealing and any other federal, state, or local common law or statutory claims, whether in tort or in contract; (xi) all Hall Claims related to unpaid wages, salary, deferred compensation, overtime compensation, bonuses, severance pay, vacation pay or other compensation or benefits arising out of Hall's employment or engagement with any Company Releasee; (x) all Hall Claims arising under any federal, state or local regulation, law, code or statute; (xi) all Hall Claims of discrimination arising under any state or local law or ordinance; (xii); and (xiii) all Hall Claims relating to any agreement, arrangement or understanding that the Hall Releasers have, or may have, with any Company Releasee (but specifically excluding this Agreement and the Surviving Sections) for anything occurring

prior to the Effective Date. The Hall Releasers represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Hall Claim or any portion thereof or interest therein. Notwithstanding anything in this section 4(a), the Parties agree that this Section 4(a) does not apply to the Hall Entity with respect to its ownership of the Hall Shares and its rights as a shareholder of VBF Canada.

(b)     Except for the covenants and agreements of Hall provided for in this Agreement, the Company, on its own behalf and on behalf of the other Company Releasees, hereby irrevocably and unconditionally release, acquit and forever discharge the Hall Releasers from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (the "**Company Releasee Claims**") which the Company Releasees now have, own, hold, or to which the Company Releasees at any time heretofore had, owned or held against each of the Hall Releasers. The Company Releasees represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Company Releasee Claim or any portion thereof or interest therein.

(c)     Hall, on his own behalf and on behalf of the other Hall Releasers, agrees not to make any disparaging or negative statements, written or verbal, regarding any of the Company Releasees at any time in the future, whether such statement is true or false, except as required by law or in defense of any legal action brought by any Company Releasee against any Hall Releaser in violation of this Agreement. The Company, on its own behalf and on behalf of the other Company Releasees, agrees not to make any disparaging or negative statements, written or verbal, regarding any of the Hall Releasers at any time in the future, whether such statement be true or false, except as required by law or in defense of any legal action brought by any Hall Releaser against any Company Releasee in violation of this Agreement.

5.     Settlement Consideration.

(a)     In consideration of the covenants, agreements and other matters described in Sections 1-4 above, and in full satisfaction of the Company's obligations under Section 5(d) of the Employment Agreement, the Company agrees to make a payment of Hall of $400,000 on or prior to November 6, 2017.

(b)     For all amounts that are owed to Hall by the Company as of the Effective Date, (including, without limitation, unpaid salary, PTO and reimbursable expenses), on or prior to November 6, 2017, the Company will pay Hall $49,115.38 (consisting of $25,000 of PTO and $24,115.38 of unpaid salary for the last pay period which would have been paid on November 3, 2017). For the avoidance of doubt, the foregoing payments are in satisfaction of and not in addition to the Accrued Employment Entitlements (as defined in the Employment Agreement) provided for in Section 5 of the Employment Agreement.

(c)     All payments under this Section 5 will be made by wire transfer of immediately available funds to the following account:

| | |
|---|---|
| Bank: | Bank of America, N.A. |
| Bank Address and Telephone : | 780 S. MacArthur Blvd. Coppell, TX 75019 972-304-2140 |
| Account Name: | Bruce A. Hall POD Darienne K. Hall |
| Account #: |  |
| Wire Routing #: | |

(d)     The Company will report and withhold payment under this Section 5 for tax purposes as required under applicable tax laws.  If a claim is made against the Company for any additional tax or withholding in connection with or arising out of any payment pursuant to this Section 5, Hall shall pay any such claim within thirty (30) days of being notified by the Company and agrees to indemnify the Company and hold it harmless against such claims, including, but not limited to, any taxes, attorneys' fees, penalties, and/or interest, which are or become due from the Company.

6.     Representations and Warranties.

(a)     Each Party hereby represents and warrants to each other Party that the following representations and warranties are true and correct as of the Effective Date as follows: (a) such Party is fully competent to execute, deliver and perform this Agreement; (ii) this Agreement has been duly executed and delivered by such Party and constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally or the availability of equitable remedies; and (iii) neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby or thereby will: (1) conflict with, or result in a violation or breach of the terms, conditions or provisions of, or constitute a default under any agreement, indenture or other instrument under which such Party is bound or subject; or (2) violate or conflict with any judgment, decree, order, statute, rule or regulation of any court or any public, governmental or regulatory agency or body having jurisdiction over such Party.

(b)     In addition, Hall warrants and represents as follows:

(i)     he voluntarily executes this Agreement (1) after having been advised to consult with legal counsel and (2) after having had opportunity to consult with legal counsel;

(ii)     he understands that: (1) nothing contained in this Agreement limits Hall's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission (**"Government Agencies"**); and (2) this Agreement does not limit Hall's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company.  Notwithstanding the foregoing,

19226033

Hall waives any right to any monetary recovery or other relief should any party, including, without limitation, any federal, state or local governmental entity or administrative agency, pursue any claims on Hall's behalf arising out of, relating to, or in any way connected with the Released Claims, provided, however, this Agreement does not limit Hall's right to receive a reward for information provided to any Government Agencies;

(iii)    he has the right to consider the terms of this Agreement for at least twenty-one (21) days; and in the event that he executes this Agreement in less time, it is with the full understanding that he had the full twenty-one (21) days if he so desired and that he was not pressured by the Company or any of its representatives or agents to take less time to consider the Agreement; it being agreed and understood that, in such event, Hall expressly intends such execution to be a waiver of any right Hall had to review the Agreement for a full twenty-one (21) days;

(iv)    he has not violated any obligations contained in Section 4 of the Employment Agreement;

(v)    he has not engaged in any acts or omissions amounting to "Egregious Cause" (as defined in the Employment Agreement) for the Company to terminate his employment pursuant to the Employment Agreement;

(vi)    that (1) as set forth in Section 5(e)(ii) of the Employment Agreement, he is not otherwise entitled to the amounts set forth in Sections 5(a) above without his execution and non-revocation of this Agreement, and (2) those amounts are good and sufficient consideration for this Agreement; and

(vii)    he admits, acknowledges, and agrees that, except for the payments promised in this Agreement, Hall has been fully and finally paid or provided all wages, compensation, vacation, bonuses, stock, stock options, or other benefits from the Company which are or could be due to Hall under the terms of Hall's employment with the Company, or otherwise.

7.    Miscellaneous.

(a)    Any notice or communication hereunder must be in writing and given by depositing the same in the United States mail, addressed to the Party to be notified, postage prepaid and registered or certified with return receipt requested, or by delivering the same in person. Such notice shall be deemed received on the date on which it is hand-delivered, or delivered by Federal Express or on the third business day following the date on which it is so mailed. For purposes of notice, the addresses of the Parties shall be as follows:

If to the Company:          VeroBlue Farms USA, Inc.
                            3369 Premier Drive, Suite 300
                            Plano, Texas 75023
                            Attn: Chief Executive Officer

19226033v

If to Hall:       Bruce Hall
           836 Blue Jay Lane
           Coppell, Texas  75019

Any Party may change its address for notice by written notice given to the other party in accordance with this Section.

(b)   This Agreement is intended to comply with Section 409A of the Code and Treasury Regulations promulgated thereunder ("**Section 409A**") and shall be construed accordingly. It is the intention of the Parties that payments or benefits payable under this Agreement not be subject to the additional tax or interest imposed pursuant to Section 409A. To the extent such potential payments or benefits are or could become subject to Section 409A, the Parties shall cooperate to amend this Agreement with the goal of giving Hall the economic benefits described herein in a manner that does not result in such tax or interest being imposed. Hall shall, at the request of the Company, take any reasonable action (or refrain from taking any action), required to comply with any correction procedure promulgated pursuant to Section 409A. Each payment to be made under this Agreement shall be a separate payment, and a separately identifiable and determinable payment, to the fullest extent permitted under Section 409A.

(c)   Notwithstanding Section 4(b) or any other provision to the contrary herein, in addition to other remedies described in this Agreement, in the event a court of competent jurisdiction renders a final, non-appealable verdict that Hall breached any of the warranties set forth in Sections (6)(b)(iv) and/or 6(b)(v) above (the "**Breach Verdict**"), then Hall shall repay the amounts set forth in Section 5(a) of this Agreement within ten (10) business days after the Company's notification of the Breach Verdict.

(d)   This Agreement contains the entire agreement among the Parties relating to the subject matter hereof and, except as provided herein, supersedes any prior agreement, arrangement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

(e)   The Company shall be entitled to withhold from any payments or benefits made or provided under this Agreement all applicable federal, state, city or other applicable taxes if so required by law.

(f)   No alterations, amendments, waiver, or any other change in any term or provision of this Agreement shall be valid or binding on any Party unless the same shall have been agreed to in writing by all of the Parties. No waiver or default of any term of this Agreement shall be deemed a waiver of any subsequent breach or default of the same or similar nature. This Agreement may not be changed except by written agreement signed by all Parties.

(g)   Each Party acknowledges that a refusal by such Party to perform any covenant or agreement contained in this Agreement may cause irreparable harm to one or more of the other Parties, for which there may be no adequate remedy at law and for which the ascertainment of damages would be difficult. Therefore, the Parties agree that in any such case, the other Party or Parties shall be entitled, in addition to, and without having to prove the inadequacy of, other

19226033

remedies at law, to specific performance of this Agreement, as well as injunctive relief (without being required to post bond or other security).

(h)     The Company may assign its rights under this Agreement.   No other assignment is permitted except by mutual written agreement of the Parties.

(i)     In the event it becomes necessary to bring suit to enforce any provision of this Agreement, the prevailing Party shall be entitled to recover, in addition to any other award, reasonable legal costs, including court costs and attorney's fees, from the non-prevailing Party or Parties.

(j)     EACH OF THE PARTIES VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

(k)     If any provision of this Agreement is held to be unenforceable or invalid, the remaining provisions of this Agreement will remain in effect.

(l)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, regardless of the laws that might otherwise govern under applicable principles of conflicts of law thereof. Each Party irrevocably submits to the exclusive jurisdiction of the Federal District Court for the Northern District of Texas (the **"District Court"**) for the purposes of any suit, action or other proceeding arising out of this Agreement. Each Party agrees to commence any action, suit or proceeding relating to this Agreement in the District Court. Each Party further agrees that service of any process, summons, notice or document by registered mail to such Party's respective address set forth in Section 7(a) above shall be effective service of process. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the District Court, and hereby further irrevocably and unconditionally waives and shall not assert by way of motion, defense, or otherwise, in any such Proceeding, any claim that it is not subject personally to the jurisdiction of the District Court, that its property is exempt or immune from attachment or execution, that such proceeding is brought in an inconvenient forum, that the venue of the proceeding is improper, or that the Agreement may not be enforced in or by the District Court.

(m)     The paragraph headings and captions contained herein are for reference purposes and convenience only and shall not in any way affect the meaning or interpretation of this Agreement.   It is intended by the Parties that this Agreement be interpreted in accordance with its fair and simple meaning, not for or against any Party, and no Party shall be deemed to be the drafter of this Agreement.

(n)     Hall has been informed and understands that (i) notwithstanding anything in this Agreement to the contrary, to the extent that this Agreement waives or releases any claims Hall might have under the Age Discrimination in Employment Act, Hall may rescind Hall's waiver and release within seven (7) calendar days of Hall's execution of this Agreement; and (ii) any such rescission must be in writing and e-mailed and hand delivered to Les Wulf at the address for the Company set forth below in Section 7, within the seven-day period.   The Parties agree that,

notwithstanding anything in this Agreement to the contrary, in the event that Hall makes any such rescission, this Agreement shall be deemed to be terminated and of no force or effect

(o)     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.   For purposes of this Agreement, use of a facsimile, e-mail or other electronic medium shall have the same force and effect as an original signature.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the dates set forth below.

VEROBLUE FARMS USA, INC.

By: _____

     Leslie Wulf,
     Chief Executive Officer
Date: _____10-27-2017_____


_____
Bruce Hall
Date: October 27, 2017

**Exhibit "A-5"**

## BUSINESS RELATIONSHIP TERMINATION AGREEMENT

This Business Relationship Termination Agreement (this "**Agreement**") is made and entered into as of October 27, 2017 (the "**Effective Date**"), by and between VeroBlue Farms USA, Inc., a Nevada corporation (the "**Company**"), and John E. (Ted) Rea ("**Rea**"). The Company and Rea are sometimes each referred to herein as a "**Party**" and collectively, as the "**Parties**".

## W̲I̲T̲N̲E̲S̲E̲T̲H̲ :

**WHEREAS**, Rea and the Company are parties to that certain Employment Agreement, dated as of July 1, 2016 (the "**Employment Agreement**"); and

**WHEREAS**, pursuant to a Stock Option Agreement, executed by Rea and the Company on July 8, 2016 (the "**Stock Option Agreement**") and Stock Option Grant Notice, executed by Rea and the Company on July 8, 2016 the "**Stock Option Grant Notice**"), the Company granted to Rea a non-statutory stock option to purchase 1,000,000 shares of the common stock, par value $0.01 per share, of the Company (the "**Common Stock**"), at a purchase price of $1.00 per share, under the Company's 2016 Stock Option Plan (the "**Stock Option Grant**"); and

**WHEREAS**, Rea, through J2 Family, L.P. (the "**Rea Entity**"), an entity indirectly controlled by Rea, owns 3,300,000 common shares (the "**Rea Shares**") of VeroBlue Farms Inc., a corporation incorporated under the laws of the Province of Ontario, ("**VBF Canada**"); and

**WHEREAS** the Parties desire to terminate their business relationship and to resolve any claims they may have against each other;

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.     <u>Termination of Employment and Employment Agreement.</u>

(a)     Effective as of the Effective Date: (i) Rea's employment and positions as Chief Operating Officer and as an employee of the Company are hereby terminated; and (ii) the Employment Agreement is hereby terminated (including, specifically, Section 15 thereof) and of no further force or effect, excluding Sections 5(f)(ii)-(vi), and 6-14 (the "**Surviving Sections**"), which Surviving Sections shall remain in full force and effect. In addition, effective immediately after the Effective Date, the Rea Entity has made a written offer to the Company under Section 5(f)(ii) of the Employment Agreement to purchase the Rea Shares at a purchase price of USD $1.00 per share (the "**Rea Share Offer**"). The Parties agree that with respect to the Rea Share Offer, Section 5(f)(ii) of the Employment Agreement is hereby amended to: (i) remove subsection (D) thereof solely for the Rea Share Offer, such that the other stockholders of the Company (other than the holders of Series A preferred stock of the Company) will not be offered the Rea Shares under the Rea Share Offer pursuant to such subsection (D); it being agreed and understood that if the Rea Shares are not sold by the Rea Entity pursuant to the Rea Share Offer in accordance with the terms and conditions of Section 5(f)(ii) of the Employment Agreement (as such terms and provisions have been

amended as provided above), then for any subsequent sale or transfer of the Rea Shares, the Rea Entity must again follow the terms and provisions of Section 5(f)(ii) of the Employment Agreement; and (ii) provide that any offer of Employee Equity under Section 5(f)(ii) of the Employment Agreement, the parties under subsections (A) – (D) thereof and any third-party purchasers offered Employee Equity thereafter under Section 5.2(f) of the Employment Agreement, can purchase all or less than all of such offered Employee Equity (instead of only all of such offered Employee Equity as currently written in the Employment Agreement). Rea covenants and agrees to cause the Rea Entity to comply with the terms of this Section 1(a) and Section 5(f) of the Employment Agreement.

(b)     Rea hereby resigns from any and all positions as an officer or director of VBF Canada, the Company, VBF Operations Inc., a Texas corporation, VBF Transport, Inc., a Delaware corporation, Iowa's First, Inc., an Iowa corporation, Verostream Seafood Marketing, Inc., a Texas corporation, VBF IP Inc., a Texas corporation, VBF Construction Assets Inc., an Iowa corporation, and VBF Construction Services Inc., an Iowa corporation.

2.      Termination of Stock Option Agreement and Stock Option Grant. Effective as of the Effective Date, the Stock Option Agreement, Stock Option Grant Notice and Stock Option Grant are hereby terminated in their entirety and of no further force or effect; it being agreed and understood that no shares of Common Stock have been, or will be, issued under the Stock Option Agreement, Stock Option Grant Notice or Stock Option Grant.

3.      Confidential Information; Non-Competition; Non-Solicitation.

(a)     Confidentiality. Rea acknowledges that during his employment with the Company, Rea has obtained knowledge of, and has been given and will be given access to, information concerning the Company and VBF Canada and their respective affiliates, including, but not limited to, information regarding the business, operations, services, proposed services, business processes, business and marketing strategies, advertising, marketing and promotional plans and materials, pricing strategies and policies, financial information, stockholders and other trade secrets, confidential information and proprietary material of the Company, including information and material originated, discovered or developed in whole or in part by Rea (collectively referred to herein as "**Confidential Information**"). The term "**Confidential Information**" does not include any information which (i) at the time of disclosure is generally available to the public (other than as a result of a disclosure by Rea in breach of this Agreement or any other agreement by which Rea is or was prohibited from disclosing Confidential Information), or (ii) was available to Rea on a non-confidential basis from a source (other than the Company or its affiliates or their representatives) that is not and was not prohibited from disclosing such information to Rea by a contractual, legal or fiduciary obligation. Rea agrees that Rea will, in a fiduciary capacity for the benefit of the Company, hold all Confidential Information strictly in confidence and will not directly or indirectly reveal, report, disclose, publish or transfer any of such Confidential Information to any person or entity or utilize any of the Confidential Information for any purpose, except to the extent that Rea may be required by law to disclose any Confidential Information.

(b)      Rea acknowledges that he understands the following: An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law.  An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

(c)      Non-Competition and Non-Solicitation.  In further consideration of the compensation to be paid to Rea hereunder, Rea acknowledges that during the course of his employment and prior service with the Company, he has become familiar with the trade secrets of the Company and with other Confidential Information concerning the Company and that his services have been and shall continue to be of special, unique and extraordinary value to the Company. Therefore, Rea agrees that, for a period of one (1) year following the Effective Date (the "**Restricted Period**"), he shall not directly or indirectly: (i) own any interest in, manage, control, participate in, consult with, render services for, be employed in an executive, managerial or administrative capacity by, or in any manner engage in, any Competing Business (as defined below); (ii) solicit, request or induce any employee, consultant or agent of the Company or VBF Canada or any of their respective affiliates to terminate his or her employment or relationship with such company, nor hire any employee of the Company or VBF Canada or any of their respective affiliates, or (iii) solicit, request, or induce or attempt to solicit, request, or induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or VBF Canada or any of their respective affiliates to cease doing business with, or modify its business relationship with the Company or VBF Canada or any of their respective affiliates, or in any way interfere with or hinder the relationship between any such customer, supplier, licensee or business relation and the Company or VBF Canada or any of their respective affiliates, as applicable.  For purposes hereof, "**Competing Business**" means an aquaculture business that competes with the Company or VBF Canada, or any of their respective affiliates in any geographic territory in which the Company, VBF Canada, or any such affiliate conducts, sells or markets its business or plans to conduct, sell or market its business (it being agreed and understood that the Company is currently conducting, or plans to conduct, business in the United States, Canada and Australia). Nothing herein shall prohibit Rea from being a passive owner of not more than five percent (5.0%) of the outstanding stock of any class of a corporation that is publicly traded, so long as Rea has no active participation in the business of such corporation.

(d)      Proprietary Interest.  All correspondence, communications (electronic or otherwise), data, reports, software, systems, databases, methodology, processes, programs, templates, procedures, know-how, inventions, discoveries, creations, designs, improvements, patents, copyrights, discoveries or ideas which Rea conceived, developed, or produced prior to the date hereof as an employee or officer of, or consultant to, the Company, VBF Canada

or their affiliates which relate to the business of the Company (collectively, the "**Work Product**"), including trade secrets, data, methodology, processes, programs, templates, and information concerning proprietary technology developed for the business, or for any interests of the Company, shall belong solely and exclusively to the Company, together with any intellectual property rights associated with such Work Product (the "**IP Rights**"). Rea acknowledges that all original works of authorship which were made by Rea (solely or jointly with others) during his prior services or within the scope of his employment with the Company and which are protectable by copyright laws are "works made for hire," pursuant to the United States Copyright Act (17 U.S.C., Section 101), and that such works made for hire shall constitute part of the IP Rights. Rea shall assist the Company or its designees to obtain, and from time to time enforce, United States and foreign IP Rights in any and all countries. To that end, Rea shall execute, verify, and deliver such documents and perform such other acts (including appearing as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such IP Rights and the assignment thereof. In addition, Rea will execute, verify, and deliver assignments of such IP Rights to the Company or its designee. Rea hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which Rea now or may hereafter have for infringement of any IP Rights assigned hereunder to the Company.

(e) <u>Return of Materials</u>. Rea expressly acknowledges that all physical property, data, books, records and other Work Product and Confidential Information of the Company and its affiliates obtained in connection with the Company's and its affiliates' business is the exclusive property of the Company. Rea warrants and represents that prior to executing this Agreement, Rea has surrendered and returned to the Company all such Work Product and Confidential Information and all other items and property belonging to the Company then in the possession of Rea, and Rea shall not make or retain any copies of extracts thereof. Rea agrees that, to the extent that Rea possesses any files, data, or information relating in any way to the Company, VBF Canada, any of their affiliates, or their business on any personal computer or other device or account, Rea will first return to the Company and then delete those files, data, or information (and will retain no copies in any form).

(f) <u>Property of the Company</u>. Rea acknowledges that from time to time in the course of providing past services to the Company and its affiliates, Rea has had the opportunity to inspect and use certain property, both tangible and intangible, of the Company and Rea hereby agrees that such property shall remain the exclusive property of the Company and its affiliates. Rea shall have no right or proprietary interest in such property, whether tangible or intangible.

(g) <u>Reasonable in Scope and Duration; Consideration</u>. Rea agrees and acknowledges that the restrictions contained in this Section 3 are reasonable in scope and duration and are necessary to protect the business interests and Confidential Information of the Company and its affiliates from and after the Effective Date, and Rea further agrees and acknowledges that he has reviewed the provisions of this Agreement with his legal counsel. Rea acknowledges and agrees that Rea will receive substantial valuable consideration from the Company for the covenants contained in this Section 3, including without limitation, compensation and other benefits as set forth in Section 5 below.

(h)     Enforcement. If, at the time of enforcement of Section 3 of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the Parties hereto agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law.

(i)     Extension of Restricted Periods. In addition to the remedies the Company may seek and obtain pursuant to this Agreement, the applicable restricted periods set forth herein shall be extended by any and all periods during which Rea shall be found by a court of competent jurisdiction to have been in violation of the covenants contained herein.

4.     Releases.

(a)     Except for the covenants and agreements of the Company provided for in this Agreement, Rea, on his own behalf and on behalf of his, affiliates, heirs, dependents, successors and assigns, or any of them (collectively, the "**Rea Releasers**") hereby irrevocably and unconditionally release, acquit and forever discharge the Company and VBF Canada and each of their respective successors, assigns, agents, equity holders, members of the boards of directors, officers, employees, representatives, subsidiaries and affiliates and all persons acting by, through, under or in concert with any of them (collectively, the "**Company Releasees**"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (each, a "**Rea Claim**", and collectively, the "**Rea Claims**") which the Rea Releasers now have, own, hold, or which the Rea Releasers at any time heretofore had, owned or held against each of the Company Releasees including, but not limited to: (i) all Rea Claims under the Age Discrimination in Employment Act of 1967, as amended; (ii) all Rea Claims under Title VII of the Civil Rights Act of 1964, as amended; (iii) all Rea Claims under the Employee Retirement Income Security Act of 1974, as amended; (iv) all Rea Claims arising under the Americans With Disabilities Act of 1990, as amended; (v) all Rea Claims arising under the Family and Medical Leave Act of 1993, as amended; (vi) all Rea Claims related to Rea's employment or engagement with the Company Releasees; (vii) all Rea Claims of unlawful discrimination based on age, sex, race, religion, national origin, handicap, disability, equal pay, sexual orientation or otherwise; (viii) all Rea Claims of wrongful discharge, breach of an implied or express employment contract, negligent or intentional infliction of emotional distress, libel, defamation, breach of privacy, fraud, breach of any implied covenant of good faith and fair dealing and any other federal, state, or local common law or statutory claims, whether in tort or in contract; (xi) all Rea Claims related to unpaid wages, salary, deferred compensation, overtime compensation, bonuses, severance pay, vacation pay or other compensation or benefits arising out of Rea's employment or engagement with any Company Releasee; (x) all Rea Claims arising under any federal, state or local regulation, law, code or statute; (xi) all Rea Claims of discrimination arising under any state or local law or ordinance; (xii); and (xiii) all Rea Claims relating to any agreement, arrangement or understanding that the Rea Releasers have, or may have, with any Company Releasee (but specifically excluding this Agreement and the Surviving Sections) for anything occurring

prior to the Effective Date.  The Rea Releasers represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Rea Claim or any portion thereof or interest therein.  Notwithstanding anything in this section 4(a), the Parties agree that this Section 4(a) does not apply to the Rea Entity with respect to its ownership of the Rea Shares and its rights as a shareholder of VBF Canada.

(b)  Except for the covenants and agreements of Rea provided for in this Agreement, the Company, on its own behalf and on behalf of the other Company Releasees, hereby irrevocably and unconditionally release, acquit and forever discharge the Rea Releasers from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (the "**Company Releasee Claims**") which the Company Releasees now have, own, hold, or to which the Company Releasees at any time heretofore had, owned or held against each of the Rea Releasers.  The Company Releasees represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Company Releasee Claim or any portion thereof or interest therein.

(c)  Rea, on his own behalf and on behalf of the other Rea Releasers, agrees not to make any disparaging or negative statements, written or verbal, regarding any of the Company Releasees at any time in the future, whether such statement is true or false, except as required by law or in defense of any legal action brought by any Company Releasee against any Rea Releaser in violation of this Agreement. The Company, on its own behalf and on behalf of the other Company Releasees, agrees not to make any disparaging or negative statements, written or verbal, regarding any of the Rea Releasers at any time in the future, whether such statement be true or false, except as required by law or in defense of any legal action brought by any Rea Releaser against any Company Releasee in violation of this Agreement.

5.  <u>Settlement Consideration.</u>

(a)  In consideration of the covenants, agreements and other matters described in Sections 1-4 above, and in full satisfaction of the Company's obligations under Section 5(d) of the Employment Agreement, the Company agrees to make a payment of Rea of $400,000 on or prior to November 6, 2017.

(b)  For all amounts that are owed to Rea by the Company as of the Effective Date, (including, without limitation, unpaid salary, PTO and reimbursable expenses), on or prior to November 6, 2017, the Company will pay Rea $49,115.38 (consisting of $25,000 of PTO and $24,115.38 of unpaid salary for the last pay period which would have been paid on November 3, 2017). For the avoidance of doubt, the foregoing payments are in satisfaction of and not in addition to the Accrued Employment Entitlements (as defined in the Employment Agreement) provided for in Section 5 of the Employment Agreement.

(c)  All payments under this Section 5 will be made by wire transfer of immediately available funds to the following account:

| | |
|---|---|
| Bank: | Comerica Bank |
| Bank Address: | 3310 Premier Drive<br>Plano, TX 75023 |
| Account Name: | John Rea & Jodie Bruner |
| Account #: |  |
| Wire Routing #: | |

(d)      The Company will report and withhold payment under this Section 5 for tax purposes as required under applicable tax laws.  If a claim is made against the Company for any additional tax or withholding in connection with or arising out of any payment pursuant to this Section 5, Rea shall pay any such claim within thirty (30) days of being notified by the Company and agrees to indemnify the Company and hold it harmless against such claims, including, but not limited to, any taxes, attorneys' fees, penalties, and/or interest, which are or become due from the Company.

6.      Representations and Warranties.

(a)      Each Party hereby represents and warrants to each other Party that the following representations and warranties are true and correct as of the Effective Date as follows: (a) such Party is fully competent to execute, deliver and perform this Agreement; (ii) this Agreement has been duly executed and delivered by such Party and constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally or the availability of equitable remedies; and (iii) neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby or thereby will: (1) conflict with, or result in a violation or breach of the terms, conditions or provisions of, or constitute a default under any agreement, indenture or other instrument under which such Party is bound or subject; or (2) violate or conflict with any judgment, decree, order, statute, rule or regulation of any court or any public, governmental or regulatory agency or body having jurisdiction over such Party.

(b)      In addition, Rea warrants and represents as follows:

(i)      he voluntarily executes this Agreement (1) after having been advised to consult with legal counsel and (2) after having had opportunity to consult with legal counsel;

(ii)      he understands that: (1) nothing contained in this Agreement limits Rea's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission ("**Government Agencies**"); and (2) this Agreement does not limit Rea's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company.  Notwithstanding the foregoing, Rea waives any right to any monetary recovery or other relief should any party,

including, without limitation, any federal, state or local governmental entity or administrative agency, pursue any claims on Rea's behalf arising out of, relating to, or in any way connected with the Released Claims, provided, however, this Agreement does not limit Rea's right to receive a reward for information provided to any Government Agencies;

(iii)    he has the right to consider the terms of this Agreement for at least twenty-one (21) days; and in the event that he executes this Agreement in less time, it is with the full understanding that he had the full twenty-one (21) days if he so desired and that he was not pressured by the Company or any of its representatives or agents to take less time to consider the Agreement; it being agreed and understood that, in such event, Rea expressly intends such execution to be a waiver of any right Rea had to review the Agreement for a full twenty-one (21) days;

(iv)    he has not violated any obligations contained in Section 4 of the Employment Agreement;

(v)    he has not engaged in any acts or omissions amounting to "Egregious Cause" (as defined in the Employment Agreement) for the Company to terminate his employment pursuant to the Employment Agreement;

(vi)    that (1) as set forth in Section 5(e)(ii) of the Employment Agreement, he is not otherwise entitled to the amounts set forth in Sections 5(a) above without his execution and non-revocation of this Agreement, and (2) those amounts are good and sufficient consideration for this Agreement; and

(vii)    he admits, acknowledges, and agrees that, except for the payments promised in this Agreement, Rea has been fully and finally paid or provided all wages, compensation, vacation, bonuses, stock, stock options, or other benefits from the Company which are or could be due to Rea under the terms of Rea's employment with the Company, or otherwise.

7.    Miscellaneous.

(a)    Any notice or communication hereunder must be in writing and given by depositing the same in the United States mail, addressed to the Party to be notified, postage prepaid and registered or certified with return receipt requested, or by delivering the same in person. Such notice shall be deemed received on the date on which it is hand-delivered, or delivered by Federal Express or on the third business day following the date on which it is so mailed. For purposes of notice, the addresses of the Parties shall be as follows:

If to the Company:          VeroBlue Farms USA, Inc.
                            3369 Premier Drive, Suite 300
                            Plano, Texas  75023
                            Attn:  Chief Executive Officer

If to Rea:                              John E. (Ted) Rea
                                        3900 Jefferson Circle
                                        Plano, Texas  75023

Any Party may change its address for notice by written notice given to the other party in accordance with this Section.

(b)      This Agreement is intended to comply with Section 409A of the Code and Treasury Regulations promulgated thereunder ("**Section 409A**") and shall be construed accordingly. It is the intention of the Parties that payments or benefits payable under this Agreement not be subject to the additional tax or interest imposed pursuant to Section 409A. To the extent such potential payments or benefits are or could become subject to Section 409A, the Parties shall cooperate to amend this Agreement with the goal of giving Rea the economic benefits described herein in a manner that does not result in such tax or interest being imposed. Rea shall, at the request of the Company, take any reasonable action (or refrain from taking any action), required to comply with any correction procedure promulgated pursuant to Section 409A. Each payment to be made under this Agreement shall be a separate payment, and a separately identifiable and determinable payment, to the fullest extent permitted under Section 409A.

(c)      Notwithstanding Section 4(b) or any other provision to the contrary herein, in addition to other remedies described in this Agreement, in the event a court of competent jurisdiction renders a final, non-appealable verdict that Rea breached any of the warranties set forth in Sections (6)(b)(iv) and/or 6(b)(v) above (the "**Breach Verdict**"), then Rea shall repay the amounts set forth in Section 5(a) of this Agreement within ten (10) business days after the Company's notification of the Breach Verdict.

(d)      This Agreement contains the entire agreement among the Parties relating to the subject matter hereof and, except as provided herein, supersedes any prior agreement, arrangement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

(e)      The Company shall be entitled to withhold from any payments or benefits made or provided under this Agreement all applicable federal, state, city or other applicable taxes if so required by law.

(f)      No alterations, amendments, waiver, or any other change in any term or provision of this Agreement shall be valid or binding on any Party unless the same shall have been agreed to in writing by all of the Parties. No waiver or default of any term of this Agreement shall be deemed a waiver of any subsequent breach or default of the same or similar nature. This Agreement may not be changed except by written agreement signed by all Parties.

(g)      Each Party acknowledges that a refusal by such Party to perform any covenant or agreement contained in this Agreement may cause irreparable harm to one or more of the other Parties, for which there may be no adequate remedy at law and for which the ascertainment of damages would be difficult. Therefore, the Parties agree that in any such case, the other Party or Parties shall be entitled, in addition to, and without having to prove the inadequacy of, other

remedies at law, to specific performance of this Agreement, as well as injunctive relief (without being required to post bond or other security).

(h)     The Company may assign its rights under this Agreement.  No other assignment is permitted except by mutual written agreement of the Parties.

(i)     In the event it becomes necessary to bring suit to enforce any provision of this Agreement, the prevailing Party shall be entitled to recover, in addition to any other award, reasonable legal costs, including court costs and attorney's fees, from the non-prevailing Party or Parties.

(j)     EACH OF THE PARTIES VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN.

(k)     If any provision of this Agreement is held to be unenforceable or invalid, the remaining provisions of this Agreement will remain in effect.

(l)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, regardless of the laws that might otherwise govern under applicable principles of conflicts of law thereof.  Each Party irrevocably submits to the exclusive jurisdiction of the Federal District Court for the Northern District of Texas (the "**District Court**") for the purposes of any suit, action or other proceeding arising out of this Agreement.  Each Party agrees to commence any action, suit or proceeding relating to this Agreement in the District Court. Each Party further agrees that service of any process, summons, notice or document by registered mail to such Party's respective address set forth in Section 7(a) above shall be effective service of process.  Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the District Court, and hereby further irrevocably and unconditionally waives and shall not assert by way of motion, defense, or otherwise, in any such Proceeding, any claim that it is not subject personally to the jurisdiction of the District Court, that its property is exempt or immune from attachment or execution, that such proceeding is brought in an inconvenient forum, that the venue of the proceeding is improper, or that the Agreement may not be enforced in or by the District Court.

(m)     The paragraph headings and captions contained herein are for reference purposes and convenience only and shall not in any way affect the meaning or interpretation of this Agreement.  It is intended by the Parties that this Agreement be interpreted in accordance with its fair and simple meaning, not for or against any Party, and no Party shall be deemed to be the drafter of this Agreement.

(n)     Rea has been informed and understands that (i) notwithstanding anything in this Agreement to the contrary, to the extent that this Agreement waives or releases any claims Rea might have under the Age Discrimination in Employment Act, Rea may rescind Rea's waiver and release within seven (7) calendar days of Rea's execution of this Agreement; and (ii) any such rescission must be in writing and e-mailed and hand delivered to Les Wulf at the address for the Company set forth below in Section 7, within the seven-day period.  The Parties agree that,

notwithstanding anything in this Agreement to the contrary, in the event that Rea makes any such rescission, this Agreement shall be deemed to be terminated and of no force or effect

(o)     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  For purposes of this Agreement, use of a facsimile, e-mail or other electronic medium shall have the same force and effect as an original signature.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the dates set forth below.

VEROBLUE FARMS USA, INC.

By: _____

    Leslie Wulf,
    **Chief Executive Officer**
Date: _____10-27-2017_____


_____
    Joh  E. (Ted) Rea
Date: _____October 27, 2017_____

19281541

**Exhibit "A-6"**

Please find attached my comments to the external communication – what do you think?

From: Eva Ebstein
Sent: Montag, 6. November 2017 23:50
To: 'Bjorn Thelander'; Anders Wester
Subject: RE: Draft announcement

Anders, Bjorn,

Please find attached some proposals for change from my end, as well: We need a list of the most important counterparties that our external communique is going to be sent to, according to OH, it should be no more than the most crucial 20-30 business relationships. Norman also needs to create an "away" message for Les' Email and forward things. I will get in touch with him about that.

Norman has informed me that, today, Eric lied to him and Brian on the phone that he had taken away the keys, computers etc. from Ted and Bruce when they departed last week. At the very same time of this phone call, today, Ted was at the office, just fishing out is keys etc.
I agreed with him that Eric will have to face consequences but asked Norman not to kick him out on the spot. Tomorrow is another day. I have generally instructed Norman not to start hiring and firing right away but to actually come with a plan that he proposes to the board and gets ratified.

==Depending on how bad things got with Eric and the willing collusion with the political agendas of the big four, I personally could see good reason to get Eric out, as soon as tomorrow. What do you think?==
==I have also asked Norman to get advice from Rick as to the legal position of the company with respect to the requirements of severance payments. So far, anyone terminated by Les received a lovely golden parachute of other people's money. We need to try and avoid this, if legally permissible.==

I have talked to my father and he recommended that Anders be working on the Coral Coast DD (financial, legal, and coordinating the genetic DD with Christine) while he is in Switzerland, so this gets moved forwards. The DD expense sheet looked quite over the top and there should be an attempt to lower these costs.

Anders should also help Dallas on the Finance side of things, as they lack guidance and Norman admitted he needs some help here, he is not strong with finance. Anders, could you continue to go through the most urgent payments and inspect every bill that needs to be settled. OH would like to address everything that is urgent, but still not start going over-board with too generous funding. We need to form an opinion on where the business is headed and keep control over spending. Tidying up the company expense side with all the credit card abuse may also be a good starting signal.

==I like the proposal of "executive director", as this will allow for direct engagement with the business and has, in fact, been suggested by Terry wrt.== The CEO position. As long as it doesn't imply a work-place in the US. I would still recommend that the search for the interim CFO continues (as guided and informed by Anders) and ==none of us has an official work title (otherwise we get into the work visa issues).==

Anders, will you be able to give guidance to the Finance guys, during this week while you are in CH? It will be very helpful when Anders returns to Dallas during the coming week. Thereafter, my father suggested that Anders ideally should fly to Australia for kicking off the DD on Coral Coast. Would this work for you, Anders? I am aware this is a lot of travel. Please let me know.

==Bjorn and I should go as planned to Webster / Dallas.== I propose to be in Webster next Monday / Tue and in Dallas on Wednesday, returning thereafter to CH. Bjorn could be in Webster during this time (3 days,

**Exhibit "A-7"**

# UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS AND THE SOLE SHAREHOLDER
## OF VBF IP INC.

### Adopted on July 6, 2016

The undersigned, being all of the members of the Board of Directors (the "Board") and the sole shareholder (the "Shareholder") of VBF IP Inc., a Texas corporation (the "Company"), hereby consent to the following actions and adopt the following resolutions by written consent without a meeting:

## Amended and Restated Certificate of Formation

WHEREAS, the Board and Shareholder have determined it is in the best interests of the Company to approve the adoption of the Company's Amended and Restated Certificate of Formation in substantially the form presented to the Board and Shareholder (the "Amended and Restated Certificate").

NOW, THEREFORE, BE IT RESOLVED, that the Amended and Restated Certificate are hereby approved and adopted in all respects, and that the same promptly be filed with the Secretary of State of the State of Texas; and

FURTHER RESOLVED, that the Officers (as defined below) be, and each of them hereby is, authorized, empowered, and directed, for and on behalf of the Company, to take any and all action to negotiate for and enter into agreements and amendments to agreements, to perform all such acts, to execute, file, deliver or record in the name and on behalf of the Company, all such certificates, instruments, agreements, or other documents, and to make all such payments as they, in their judgment, or in the judgment of any one or more of them, may deem necessary, advisable, or appropriate in order to carry out the purpose and intent of, or consummate the transactions contemplated by, the foregoing resolutions and any of the transactions contemplated therein or thereby, the authorization therefor to be conclusively evidenced by the taking of such action or the execution and delivery of such certificates, instruments, agreements, or documents; and

FURTHER RESOLVED, that any and all actions taken, done, or performed in connection with the authority granted by the foregoing resolutions, as well as any and all lawful actions, of any nature whatsoever, heretofore taken by the directors, officers, agents, attorneys, or other representatives of the Company incidental to, contemplated by, arising out of or in connection with, or otherwise relating to, in any manner whatsoever, the subject of the foregoing resolutions, are hereby approved, ratified, and confirmed in all respects as the act and deed of the Company.

## Amended and Restated Bylaws

WHEREAS, the Board believes it is in the best interest of the Company to amend and restate the bylaws of the Company pursuant to the Amended and Restated Bylaws of the Company, in the form attached hereto as Exhibit A (the "Amended and Restated Bylaws").

16563973v.2

NOW, THEREFORE, BE IT RESOLVED, that the Amended and Restated Bylaws are hereby approved and adopted in all respects as the Bylaws of the Company.

**Voting Agreement and Appointment of Investor Directors**

WHEREAS, VeroBlue Farms USA, Inc., the sole shareholder of the Company ("VBF USA") has agreed to sell and issue Series A Preferred Stock of VBF USA ("Preferred Shares", with such purchase and sale being the "Investment") to Alder Capital International Ltd. ("Lead Investor") and certain other investors pursuant to that certain Series A Preferred Stock Purchase Agreement between VBF USA, Lead Investor, and the other Investors which are parties thereto (the "Purchase Agreement");

WHEREAS, concurrently with the execution of the Purchase Agreement, the Board and Shareholder have determined that it is in the best interests of the Company to approve the adoption of that certain Voting Agreement between the Company, VBF USA, certain affiliates of VBF USA, and the Lead Investor, in substantially the form presented to the Board and Shareholder (the "Voting Agreement"); and

WHEREAS, pursuant to the terms of the Voting Agreement, the Shareholder agrees to vote, or cause to be voted, all shares of Common Stock of the Company held by the Shareholder to ensure that the Investor Directors (as defined in the Voting Agreement) are elected to the Board, subject to the terms and conditions of the Purchase Agreement and the Voting Agreement.

NOW, THEREFORE, BE IT RESOLVED, that the Voting Agreement is hereby approved and adopted in all respects; and

FURTHER RESOLVED, that, effective immediately following the closing of the Investment, and subject to the terms of the Purchase Agreement and the Voting Agreement, the Shareholder hereby appoints the following individuals to serve as Investor Directors on the Board of the Company, until their successors have been duly appointed and qualified or until their earlier resignation or removal:

Jens Haarkötter
Björn Thelander

**Loan Transaction**

WHEREAS, it has been proposed that it is appropriate and in the best interests of the Company to enter into and consummate the transactions contemplated by (i) a Loan Agreement by and among VBF Operations Inc. and certain of its affiliates as borrowers (collectively, the "Borrowers"), the Company and other credit parties party thereto, Amstar Group, LLC (the "Agent"), and the other Lenders from time to time a party thereto (the "Lenders" and each individually a "Lender") (the "Credit Agreement") pursuant to which the Lenders shall agree, among other things, upon the terms and conditions stated therein, to make a loan of up to $29,000,000 to the Borrowers and (ii) a Security Agreement by and among the Borrowers, the Company and certain of the Borrowers' other affiliates as guarantors (the "Guarantors") and the

VBF 00024202

Agent (the "Security Agreement") pursuant to which the Borrowers and Guarantors will grant liens on substantially all of their assets; and

WHEREAS, the Board has reviewed the most recent drafts of the Credit Agreement, the Security Agreement, and each other Loan Document (as defined in the Credit Agreement);

NOW, THEREFORE, BE IT RESOLVED, that the execution, delivery and performance of the Credit Agreement, Security Agreement and the other Loan Documents by the Company in substantially the form of the drafts so reviewed be, and the same hereby is, approved and adopted in all respects, with such changes and modifications to the terms and provisions thereof as any Officer (as defined below) executing the same, in his or her respective sole discretion, shall approve or deem necessary or appropriate, the execution and delivery thereof by any such Officer to be conclusive evidence of the necessity and appropriateness thereof;

FURTHER RESOLVED, that any officer of the Company (each an "Officer"), each acting individually, be, and hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to negotiate, execute, deliver and perform the Credit Agreement, Security Agreement, the other Loan Documents, and all credit agreements, security agreements, promissory notes, instruments, leasehold mortgages, mortgages, fee letters, indemnity agreements, contract assignments, pledge agreements, guarantees, intellectual property security agreements, landlord waivers, deposit account control agreements and other documents (collectively, the "Credit Documents") that are necessary, appropriate or advisable to effect the transactions contemplated by the Credit Agreement, the Security Agreement, the other Loan Documents or these resolutions or are required to be delivered or filed in connection therewith, on the terms and conditions that any Officer may approve in his or her sole discretion, and to do or cause to be done any and all further acts and things as such Officer may deem necessary, advisable or appropriate in connection with the negotiation, execution and delivery of the Credit Documents or in order to consummate fully all of the transactions contemplated by the Credit Documents or these resolutions, the execution or delivery thereof by any such Officer to be conclusive evidence of the necessity and appropriateness and approval thereof by such Officer;

FURTHER RESOLVED, that the Company be, and hereby is, authorized from time to time to (i) grant liens on, security interests in, and mortgages on all assets and property of the Company as may be provided for in or contemplated by the Credit Documents, including, without limitation, all real property, equipment, investment property, inventory, accounts, chattel paper and general intangibles, in each case whether now owned or existing or hereafter acquired or arising and (ii) cause the Company to authorize the filing by or on behalf of the Lenders from time to time of Uniform Commercial Code financing statements, and any amendments thereto or continuations thereof, in any such case as such Officer may deem necessary, advisable or appropriate, each in such form and substance as may be approved by any Officer, in each case such approval to be conclusively evidenced by the authorization, execution and/or delivery thereof for and on behalf of the Company by such Officer;

FURTHER RESOLVED, that each Officer, acting individually, is authorized in the name of and on behalf of the Company to pay any fees, including closing fees, amendment fees, facility fees, recording and filings fees and expenses incurred in connection with the negotiation, execution, delivery and enforcement of the Credit Documents (and any amendments thereto);

316563973v.2

FURTHER RESOLVED, that each Officer, acting individually, is hereby authorized, on behalf of and in the name of the Company now and from time to time hereafter, as such person in his or her sole discretion deems necessary or proper, to amend, modify, alter, extend, renew or otherwise change any of the provisions, terms, conditions, covenants, guaranties or representations contained in the Credit Documents in accordance with the terms of the Credit Documents;

FURTHER RESOLVED, that each Officer, acting individually, is hereby authorized and directed to take any and all such actions and to execute and deliver any and all agreements, amendments, supplements, certificates, reports, applications, notices, letters or other documents or instruments as such Officer shall deem necessary or advisable in furtherance of or to carry out the intent and effectuate the purposes of any of the foregoing resolutions; the fact that any Officer has taken any such action or executed or delivered any such document or instrument being conclusive evidence of the approval and authorization thereof by the Board;

FURTHER RESOLVED, that each Officer, acting individually, is hereby authorized, empowered and directed in the name and on behalf of the Company, to take all such actions that such Officer deems necessary or appropriate to comply with the applicable laws of any jurisdiction and with any consent, notice, approval or other authorization or requirement of any foreign or domestic court, governmental, regulatory or administrative agency or instrumentality;

FURTHER RESOLVED, that the authority hereby conferred is in addition to that conferred by any other resolution heretofore or hereafter delivered by the Company to the Agent and shall continue in full force and effect until the Agent shall have received notice in writing, certified by the Secretary of the Company, of the revocation hereof by a resolution duly adopted by the Board, and any such revocation shall be effective only as to credit which is extended or committed by the Lenders, or actions which are taken by the Company pursuant to the resolutions contained herein, subsequent to the Agent's receipt of such notice; and

FURTHER RESOLVED, that all actions previously taken by any Officer, director or agent of the Company, relating to the foregoing resolutions are hereby adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Company.

[signature page follows]

416563973v.2

**IN WITNESS WHEREOF**, the undersigned constituting all of the members of the Board and the Shareholder of the Company have executed this Written Consent as of the date first written above.

DIRECTORS:

_____
Leslie A. Wulf

_____
Bruce A. Hall

SHAREHOLDER:

VEROBLUE FARMS USA, INC.

_____
By:
Its:

Written Consent of VBF IP Inc.

EXHIBIT A

Amended and Restated Bylaws

See attached.

16563973v.2

VBF 00024206

# AMENDED AND RESTATED BYLAWS

## OF

## VBF IP INC.

**July 6, 2016**

16606599v.1

VBF 00024207

## TABLE OF CONTENTS

**Page**

### ARTICLE I
### OFFICES

Section 1.1   Registered Office ................................................................1
Section 1.2   Other Offices.....................................................................1

### ARTICLE II
### SHAREHOLDERS

Section 2.1   Place of Meetings.............................................................1
Section 2.2   Annual Meeting ...............................................................1
Section 2.3   List of Shareholders........................................................1
Section 2.4   Special Meetings.............................................................2
Section 2.5   Notice..............................................................................2
Section 2.6   Quorum...........................................................................2
Section 2.7   Voting.............................................................................2
Section 2.8   Method of Voting............................................................2
Section 2.9   Record Date.....................................................................3
Section 2.10  Action by Consent ..........................................................3

### ARTICLE III
### BOARD OF DIRECTORS

Section 3.1   Management.....................................................................3
Section 3.2   Qualification; Election; Term .........................................3
Section 3.3   Number ...........................................................................3
Section 3.4   Removal ..........................................................................3
Section 3.5   Vacancies........................................................................4
Section 3.6   Place of Meetings...........................................................4
Section 3.7   Annual Meeting ..............................................................4
Section 3.8   Regular Meetings............................................................4
Section 3.9   Special Meetings.............................................................4
Section 3.10  Quorum...........................................................................4
Section 3.11  Interested Directors.........................................................5
Section 3.12  Committees......................................................................5
Section 3.13  Action by Consent ..........................................................5
Section 3.14  Compensation of Directors .............................................5

### ARTICLE IV
### NOTICE

Section 4.1   Form of Notice................................................................5

VBF 00024208

Section 4.2      Waiver ................................................................................................6

ARTICLE V
OFFICERS AND AGENTS

Section 5.1      In General .........................................................................................6
Section 5.2      Election ............................................................................................6
Section 5.3      Other Officers and Agents ...............................................................6
Section 5.4      Compensation ...................................................................................6
Section 5.5      Term of Office and Removal ............................................................6
Section 5.6      Employment and Other Contracts ...................................................6
Section 5.7      Chairman of the Board of Directors ................................................6
Section 5.8      Chief Executive Officer ...................................................................7
Section 5.9      President ...........................................................................................7
Section 5.10     Vice Presidents ................................................................................7
Section 5.11     Secretary ..........................................................................................7
Section 5.12     Assistant Secretaries ........................................................................7
Section 5.13     Chief Financial Officer and Treasurer ...........................................8
Section 5.14     Assistant Treasurers .........................................................................8
Section 5.15     Bonding ............................................................................................8

ARTICLE VI
CERTIFICATES REPRESENTING SHARES

Section 6.1      Form of Certificates .........................................................................8
Section 6.2      Lost Certificates ...............................................................................8
Section 6.3      Transfer of Shares ............................................................................9
Section 6.4      Registered Shareholders ...................................................................9

ARTICLE VII
GENERAL PROVISIONS

Section 7.1      Dividends .........................................................................................9
Section 7.2      Reserves ...........................................................................................9
Section 7.3      Telephone and Similar Meetings ...................................................10
Section 7.4      Books and Records ........................................................................10
Section 7.5      Fiscal Year .....................................................................................10
Section 7.6      Seal ................................................................................................ 10
Section 7.7      Advances of Expenses ...................................................................10
Section 7.8      Indemnification ..............................................................................11
Section 7.9      Insurance ........................................................................................11
Section 7.10     Resignation ....................................................................................11
Section 7.11     Amendment of Bylaws ...................................................................12
Section 7.12     Invalid Provisions ..........................................................................12
Section 7.13     Relation to the Certificate of Formation .......................................12

(ii)

VBF 00024209

**AMENDED AND RESTATED BYLAWS**

**OF**

**VBF IP INC.**

## ARTICLE I
## OFFICES

Section 1.1     Registered Office. The registered office and registered agent of VBF IP Inc. (the "**Corporation**") will be as from time to time set forth in the Corporation's Certificate of Formation, as may be amended from time to time (as amended, the "**Certificate of Formation**"), or in any certificate filed with the Secretary of State of the State of Texas, and the appropriate county Recorder or Recorders, as the case may be, to amend such information.

Section 1.2     Principal Office. The principal office of the Corporation shall be in the City of Plano, Collin County, Texas or such other place within or outside the State of Texas as the Board may from time to time determine.

Section 1.3     Other Offices. The Corporation may also have offices at such other places both within and without the State of Texas as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II
## SHAREHOLDERS

Section 2.1     Place of Meetings. All meetings of the shareholders for the election of Directors will be held at such place, within or without the State of Texas, as may be fixed from time to time by the Board of Directors. Meetings of shareholders for any other purpose may be held at such time and place, within or without the State of Texas, as may be stated in the notice of the meeting or in a duly executed waiver of notice thereof.

Section 2.2     Annual Meeting. An annual meeting of the shareholders will be held at such time as may be determined by the Board of Directors, at which meeting the shareholders will elect a Board of Directors, and transact such other business as may properly be brought before the meeting.

Section 2.3     List of Shareholders. At least ten days before each meeting of shareholders, a complete list of the shareholders entitled to vote at said meeting, arranged in alphabetical order, with the address of and the number of voting shares registered in the name of each, will be prepared by the officer or agent having charge of the stock transfer books. Such list will be open to the examination of any shareholder, as provided by the Texas Business Organizations Code ("**TBOC**"). Such list will be produced and kept open at the time and place of the meeting during the whole time thereof, and will be subject to the inspection of any shareholder who may be present.

1

Section 2.4    Special Meetings. Special meetings of the shareholders, for any purpose or purposes, unless otherwise prescribed by law, the Certificate of Formation or these Bylaws, may be called by the Chairman of the Board, the Chief Executive Officer or the Board of Directors. Business transacted at all special meetings will be confined to the purposes stated in the notice of the meeting unless all shareholders entitled to vote are present and consent.

Section 2.5    Notice. Written or printed notice stating the place, day and hour of any meeting of the shareholders and, in case of a special meeting, the purpose or purposes for which the meeting is called, will be delivered not less than ten nor more than sixty days before the date of the meeting, either personally or by mail, by or at the direction of the Chairman of the Board, the Chief Executive Officer, the President, the Secretary, or the officer or person calling the meeting, to each shareholder of record entitled to vote at the meeting. If mailed, such notice will be deemed to be delivered when deposited in with a nationally recognized overnight courier, addressed to the shareholder at his, her or its address as it appears on the stock transfer books of the Corporation, with postage thereon prepaid.

Section 2.6    Quorum. At all meetings of shareholders, a quorum will be present if the holders of a majority of the shares of capital stock entitled to vote at the meeting are represented at the meeting in person or by proxy will be necessary and sufficient to constitute a quorum for the transaction of business except as otherwise provided by the Certificate of Formation, these Bylaws, or non-waivable provisions of the TBOC. If, however, such quorum is not present or represented at any meeting of the shareholders, the shareholders entitled to vote thereat, present in person or represented by proxy, will have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting will be given to each shareholder of record entitled to vote at the meeting. At such adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally notified.

Section 2.7    Voting. When a quorum is present at any meeting of the Corporation's shareholders, the vote of the holders of a majority of the shares entitled to vote on, and voted for or against, any matter that are present or represented by proxy at such meeting will decide any questions brought before such meeting, unless the question is one upon which, by express provision of law, the Certificate of Formation, these Bylaws, or non-waivable provisions of the TBOC a different vote is required, in which case such express provision will govern and control the decision of such question. The shareholders present in person or by proxy at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.

Section 2.8    Method of Voting. Each outstanding share of the Corporation's capital stock, regardless of class, will be entitled to one vote on each matter submitted to a vote at a meeting of shareholders, except to the extent that the voting rights of the shares of any class or classes are limited or denied by the Certificate of Formation, as amended from time to time. At any meeting of the shareholders, every shareholder having the right to vote will be entitled to vote in person, or by proxy appointed by an instrument in writing subscribed by such shareholder and bearing a date not more than three years prior to such meeting, unless such instrument

2

provides for a longer period. Each proxy will be revocable unless expressly provided therein to be irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally. Such proxy will be filed with the Secretary of the Corporation prior to or at the time of the meeting. Voting on any question or in any election may be by voice vote or show of hands unless the presiding officer orders, or any shareholder demands, that voting be by written ballot.

Section 2.9   <u>Record Date</u>. The Board of Directors may fix in advance a record date for the purpose of determining shareholders entitled to notice of or to vote at a meeting of shareholders, which record date will not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date will not be less than ten nor more than sixty days prior to such meeting. In the absence of any action by the Board of Directors, the close of business on the date next preceding the day on which the notice is given will be the record date, or, if notice is waived, the close of business on the day next preceding the day on which the meeting is held will be the record date.

Section 2.10   <u>Action by Consent</u>. Any action required or permitted by law, the Certificate of Formation or these Bylaws to be taken at a meeting of the shareholders of the Corporation may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, is signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and will be delivered to the Corporation by delivery to its registered office in Texas, its principal place of business or an officer or agent of the Corporation having custody of the minute book.

## ARTICLE III
## BOARD OF DIRECTORS

Section 3.1   <u>Management</u>. The business and affairs of the Corporation will be managed by or under the direction of its Board of Directors who may exercise all such powers of the Corporation and do all such lawful acts and things as are not by the TBOC, by the Certificate of Formation or by these Bylaws directed or required to be exercised or done by the shareholders.

Section 3.2   <u>Qualification; Election; Term</u>. None of the Directors need be a shareholder of the Corporation or a resident of the State of Texas. The Directors will be elected by plurality vote at the annual meeting of the shareholders, except as hereinafter provided or provided in the Certificate of Formation, and each Director elected will hold office for one year terms or until the earlier of his successor being elected and qualified, his resignation, his removal from office by the shareholders or his death.

Section 3.3   <u>Number</u>. The number of Directors shall be seven (7).

Section 3.4   <u>Removal</u>. Except as otherwise provided in the Certificate of Formation, any Director may be removed either for or without cause, at any special meeting of shareholders by the affirmative vote of a majority in number of shares of the shareholders present in person or represented by proxy at such meeting and entitled to vote for the election of such Director;

3

VBF 00024212

provided that notice of the intention to act upon such matter has been given in the notice calling such meeting.

Section 3.5    Vacancies. Newly created directorships resulting from any vacancies occurring in the Board of Directors caused by death, resignation, retirement, disqualification or removal from office of any Directors or otherwise, may be chosen in accordance with the terms of the Certificate of Formation at a special meeting of the shareholders called for that purpose, and each successor Director so chosen will hold office until the next election of the class for which such Director has been chosen or until whichever of the following occurs first: his successor is elected and qualified, his resignation, his removal from office by the shareholders or his death.

Section 3.6    Place of Meetings. Meetings of the Board of Directors, regular or special, may be held at such place within or without the State of Texas as may be fixed from time to time by the Board of Directors. At each meeting of the Board of Directors, each Director shall be afforded the opportunity to participate via telephonic or other electronic means by which all participants are able to hear and speak to each other participant at all times during such meeting.

Section 3.7    Annual Meeting. The first meeting of each newly elected Board of Directors will be held without further notice immediately following the annual meeting of shareholders and at the same place, unless by unanimous consent, the Directors then elected and serving change such time or place.

Section 3.8    Regular Meetings. Regular meetings of the Board of Directors may be held following at least five (5) business days prior oral or written notice, at such time and place as is from time to time determined by resolution of the Board of Directors.

Section 3.9    Special Meetings. Special meetings of the Board of Directors may be called by the Chairman of the Board, the Chief Executive Officer or the President on not less than two (2) days prior oral or written notice to each Director, given either personally, by telephone, by e-mail with delivery confirmed by telephone, by telegram or by mail; special meetings will be called by the Chairman of the Board, Chief Executive Officer, President or Secretary in like manner or on like notice on the written request of at least two Directors. The purpose or purposes of any special meeting will be specified in the notice relating thereto.

Section 3.10    Quorum. At all meetings of the Board of Directors the presence of a majority of the number of Directors in accordance with these Bylaws will be necessary and sufficient to constitute a quorum for the transaction of business, and the affirmative vote of at least a majority of the Directors present at any meeting at which there is a quorum will be the act of the Board of Directors, except as may be otherwise specifically provided by law, the Certificate of Formation or these Bylaws. At any time that a vacancy exists on the Board of Directors, and where the vote attributable to such vacancy has been assigned pursuant to the Certificate of Formation to an appointed director such that such appointed director has been afforded the additional vote of such vacancy, for the term of such of such vacancy, such vacancy shall be counted for purposes of quorum. If a quorum is not present at any meeting of the Board of Directors, the Directors present thereat may adjourn the meeting from time to time without notice other than announcement at the meeting, until a quorum is present.

4

Section 3.11   <u>Interested Directors</u>. No contract or transaction between the Corporation and one or more of its Directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of the Corporation's Directors or officers are directors or officers or have a financial interest, will be void or voidable solely for this reason, solely because the Director or officer is present at or participates in the meeting of the Board of Directors or committee thereof that authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if: (i) the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board of Directors or committee in good faith authorizes the contract or transaction by the affirmative vote of a majority of the disinterested Directors, even though the disinterested Directors be less than a quorum, (ii) the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board of Directors, a committee thereof or the shareholders. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee that authorizes the contract or transaction.

Section 3.12   <u>Committees</u>. The Board of Directors may, by resolution passed unanimously by the Board, designate committees, each committee to consist of two or more Directors of the Corporation, which committees will have such power and authority and will perform such functions as may be provided in such resolution. Such committee or committees will have such name or names as may be designated by the Board and will keep regular minutes of their proceedings and report the same to the Board of Directors when required.

Section 3.13   <u>Action by Consent</u>. Any action required or permitted to be taken at any meeting of the Board of Directors or any committee of the Board of Directors may be taken without such a meeting if a consent or consents in writing, setting forth the action so taken, is signed by all the members of the Board of Directors or such committee, as the case may be.

Section 3.14   <u>Compensation of Directors</u>. Directors will receive such compensation for their services and reimbursement for their expenses as the Board of Directors, by resolution, may establish; provided that nothing herein contained will be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

**ARTICLE IV**
**NOTICE**

Section 4.1   <u>Form of Notice</u>. Whenever by law, the Certificate of Formation or of these Bylaws, notice is to be given to any Director or shareholder, and no provision is made as to how such notice will be given, such notice may be given in writing, by mail, postage prepaid, addressed to such Director or shareholder at such address as appears on the books of the Corporation. Any notice required or permitted to be given by mail will be deemed to be given at the time the same is deposited with a nationally recognized overnight courier.

5

VBF 00024214

Section 4.2   <u>Waiver</u>. Whenever any notice is required to be given to any shareholder or Director of the Corporation as required by law, the Certificate of Formation or these Bylaws, a written waiver thereof, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, will be equivalent to the giving of such notice. Attendance of a shareholder or Director at a meeting will constitute a waiver of notice of such meeting, except where such shareholder or Director attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened.

**ARTICLE V**
**OFFICERS AND AGENTS**

Section 5.1   <u>In General</u>. The officers of the Corporation will be elected by the Board of Directors and will be a Chief Executive Officer, a President, a Secretary and a Chief Financial Officer and Treasurer. The Board of Directors may also elect a Chairman of the Board, Vice Presidents, Assistant Vice Presidents and one or more Assistant Secretaries and Assistant Treasurers. Any two or more offices may be held by the same person.

Section 5.2   <u>Election</u>. The Board of Directors, at its first meeting after each annual meeting of shareholders, will elect the officers, none of whom need be a member of the Board of Directors.

Section 5.3   <u>Other Officers and Agents</u>. The Board of Directors may also elect and appoint such other officers and agents as it deems necessary, who will be elected and appointed for such terms and will exercise such powers and perform such duties as may be determined from time to time by the Board.

Section 5.4   <u>Compensation</u>. The compensation of all officers and agents of the Corporation will be fixed by the Board of Directors or any committee of the Board, if so authorized by the Board.

Section 5.5   <u>Term of Office and Removal</u>. Each officer of the Corporation will hold office until his death, his resignation or removal from office, or the election and qualification of his successor, whichever occurs first. Any officer or agent elected or appointed by the Board of Directors may be removed at any time, for or without cause, by the affirmative vote of a majority of the entire Board of Directors, but such removal will not prejudice the contract rights, if any, of the person so removed. If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Directors.

Section 5.6   <u>Employment and Other Contracts</u>. The Board of Directors may authorize any officer or officers or agent or agents to enter into any contract or execute and deliver any instrument in the name or on behalf of the Corporation, and such authority may be general or confined to specific instances. The Board of Directors may, when it believes the interest of the Corporation will best be served thereby, authorize executive employment contracts that will have terms and conditions as the Board of Directors deems appropriate.

Section 5.7   <u>Chairman of the Board of Directors</u>. If the Board of Directors has elected a Chairman of the Board, he will preside at all meetings of the shareholders and the Board of

6

VBF 00024215

Directors. Except where by law the signature of the President or Chief Executive Officer is required, the Chairman will have the same power as the President or Chief Executive Officer to sign all certificates, contracts and other instruments of the Corporation. During the absence or disability of the Chief Executive Officer, the Chairman will exercise the powers and perform the duties of the Chief Executive Officer.

Section 5.8    Chief Executive Officer. If the Board of Directors has elected a Chief Executive Officer, he will be the chief executive officer of the Corporation and, subject to the control of the Board of Directors, will supervise and control all of the business and affairs of the Corporation. He will, in the absence of the Chairman of the Board, preside at all meetings of the shareholders and the Board of Directors. The Chief Executive Officer will have all powers and perform all duties incident to the office of Chief Executive Officer and will have such other powers and perform such other duties as the Board of Directors may from time to time prescribe.

Section 5.9    President. The President, subject to the control of the Board of Directors and Chief Executive Officer, will have such duties as may be assigned to him from time to time by the Chief Executive Officer or the Board of Directors. The President will have all powers and perform all duties incident to the office of President and will have such other powers and perform such other duties as the Board of Directors and Chief Executive Officer may from time to time prescribe. In the absence or disability of the Chief Executive Officer and the Chairman of the Board, the President will exercise the powers and perform the duties of the Chief Executive Officer.

Section 5.10   Vice Presidents. Each Vice President will have the usual and customary powers and perform the usual and customary duties incident to the office of Vice President, and will have such other powers and perform such other duties as the Board of Directors or any committee thereof may from time to time prescribe or as the Chief Executive Officer or President may from time to time delegate to him. In the absence or disability of the President and the Chairman of the Board, a Vice President designated by the Board of Directors, or in the absence of such designation the Vice Presidents in the order of their seniority in office, will exercise the powers and perform the duties of the President.

Section 5.11   Secretary. The Secretary will attend all meetings of the shareholders and record all votes and the minutes of all proceedings in a book to be kept for that purpose. The Secretary will perform like duties for the Board of Directors and committees thereof when required. The Secretary will give, or cause to be given, notice of all meetings of the shareholders and special meetings of the Board of Directors. The Secretary will be under the supervision of the Chief Executive Officer. The Secretary will have such other powers and perform such other duties as the Board of Directors may from time to time prescribe or as the Chief Executive Officer or President may from time to time delegate to him.

Section 5.12   Assistant Secretaries. The Assistant Secretaries in the order of their seniority in office, unless otherwise determined by the Board of Directors, will, in the absence or disability of the Secretary, exercise the powers and perform the duties of the Secretary. They will have such other powers and perform such other duties as the Board of Directors may from time to time prescribe or as the Chief Executive Officer or President may from time to time delegate to them.

VBF 00024216

Section 5.13   Chief Financial Officer and Treasurer. The Chief Financial Officer and Treasurer will have responsibility for the receipt and disbursement of all corporate funds and securities, will keep full and accurate accounts of such receipts and disbursements, and will deposit or cause to be deposited all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Chief Financial Officer and Treasurer will render to the Directors whenever they may require it an account of the operating results and financial condition of the Corporation, and will have such other powers and perform such other duties as the Board of Directors may from time to time prescribe or as the Chief Executive Officer or President may from time to time delegate to him.

Section 5.14   Assistant Treasurers. The Assistant Treasurers in the order of their seniority in office, unless otherwise determined by the Board of Directors, will, in the absence or disability of the Chief Financial Officer and Treasurer, exercise the powers and perform the duties of the Chief Financial Officer and Treasurer. They will have such other powers and perform such other duties as the Board of Directors may from time to time prescribe or as the Chief Executive Officer or President may from time to time delegate to them.

Section 5.15   Bonding. The Corporation may secure a bond to protect the Corporation from loss in the event of embezzlement by any of the officers, which bond may be in such form and amount and with such surety as the Board of Directors may deem appropriate.

# ARTICLE VI
# CERTIFICATES REPRESENTING SHARES

Section 6.1   Form of Certificates. Certificates, in such form as may be determined by the Board of Directors, representing shares to which shareholders are entitled will be delivered to each shareholder. Such certificates will be consecutively numbered and will be entered in the stock book of the Corporation as they are issued. Each certificate will state on the face thereof the holder's name, the number, class of shares, and the par value of such shares or a statement that such shares are without par value. They will be signed by (i) the Chairman of the Board, the President or a Vice President and (ii) the Secretary, an Assistant Secretary, the Chief Financial Officer and Treasurer, or an Assistant Treasurer and may be sealed with the seal of the Corporation or a facsimile thereof. If any certificate is countersigned by a transfer agent, or an assistant transfer agent or registered by a registrar, either of which is other than the Corporation or an employee of the Corporation, the signatures of the Corporation's officers may be facsimiles. In case any officer or officers who have signed, or whose facsimile signature or signatures have been used on such certificate or certificates, ceases to be such officer or officers of the Corporation, whether because of death, resignation or otherwise, before such certificate or certificates have been delivered by the Corporation or its agents, such certificate or certificates may nevertheless be adopted by the Corporation and be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures have been used thereon had not ceased to be such officer or officers of the Corporation.

Section 6.2   Lost Certificates. The Board of Directors may direct that a new certificate be issued in place of any certificate theretofore issued by the Corporation alleged to have been

8

lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate to be lost or destroyed. When authorizing such issue of a new certificate, the Board of Directors, in its discretion and as a condition precedent to the issuance thereof, may require the owner of such lost or destroyed certificate, or his legal representative, to advertise the same in such manner as it may require and/or to give the Corporation a bond, in such form, in such sum, and with such surety or sureties as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost or destroyed. When a certificate has been lost, apparently destroyed or wrongfully taken, and the holder of record fails to notify the Corporation within a reasonable time after such holder has notice of it, and the Corporation registers a transfer of the shares represented by the certificate before receiving such notification, the holder of record is precluded from making any claim against the Corporation for the transfer of a new certificate.

Section 6.3    <u>Transfer of Shares</u>. Shares of stock will be transferable only on the books of the Corporation by the holder thereof in person or by such holder's duly authorized attorney. Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate representing shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it will be the duty of the Corporation or the transfer agent of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

Section 6.4    <u>Registered Shareholders</u>. The Corporation will be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and, accordingly, will not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it has express or other notice thereof, except as otherwise provided by law.

**ARTICLE VII**
**GENERAL PROVISIONS**

Section 7.1    <u>Dividends</u>. Dividends upon the outstanding shares of the Corporation, subject to the provisions of the Certificate of Formation, if any, may be declared by the Board of Directors at any regular or special meeting. Dividends may be declared and paid in cash, in property, or in shares of the Corporation, subject to the provisions of the TBOC and the Certificate of Formation. The Board of Directors may fix in advance a record date for the purpose of determining shareholders entitled to receive payment of any dividend, such record date will not precede the date upon which the resolution fixing the record date is adopted, and such record date will not be more than sixty days prior to the payment date of such dividend. In the absence of any action by the Board of Directors, the close of business on the date upon which the Board of Directors adopts the resolution declaring such dividend will be the record date.

Section 7.2    <u>Reserves</u>. There may be created by resolution of the Board of Directors out of the surplus of the Corporation such reserve or reserves as the Directors from time to time, in their discretion, deem proper to provide for contingencies, or to equalize dividends, or to repair or maintain any property of the Corporation, or for such other purpose as the Directors may deem beneficial to the Corporation, and the Directors may modify or abolish any such reserve in the manner in which it was created. Surplus of the Corporation to the extent so

9

reserved will not be available for the payment of dividends or other distributions by the Corporation.

Section 7.3    Telephone and Similar Meetings. Shareholders, directors and committee members may participate in and hold meetings by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Participation in such a meeting will constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened.

Section 7.4    Books and Records. The Corporation will keep correct and complete books and records of account and minutes of the proceedings of its shareholders and Board of Directors, and will keep at its registered office or principal place of business, or at the office of its transfer agent or registrar, a record of its shareholders, giving the names and addresses of all shareholders and the number and class of the shares held by each.

Section 7.5    Fiscal Year. The fiscal year of the Corporation will be fixed by resolution of the Board of Directors.

Section 7.6    Seal. The Corporation may have a seal, in such form as determined by the Board of Directors, and the seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise. Any officer of the Corporation will have authority to affix the seal to any document requiring it.

Section 7.7    Advances of Expenses. The Corporation will advance to its directors and officers expenses incurred by them in connection with any "**Proceeding**," which term includes any threatened, pending or completed action, suit or proceeding, whether brought by or in the right of the Corporation or otherwise and whether of a civil, criminal, administrative or investigative nature (including all appeals therefrom) other than a proceeding brought by an officer or director against the Corporation, in which a director or officer may be or may have been involved as a party or otherwise, by reason of the fact that he is or was a director or officer of the Corporation, by reason of any action taken by him or of any inaction on his part while acting as such, or by reason of the fact that he is or was serving at the request of the Corporation as a director, officer, trustee, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise ("**Official**," which term also includes directors and officers of the Corporation in their capacities as directors and officers of the Corporation), whether or not he is serving in such capacity at the time any liability or expense is incurred; provided that the Official undertakes to repay all amounts advanced unless:

(a)    in the case of all Proceedings other than a Proceeding by or in the right of the Corporation, the Official establishes to the satisfaction of the disinterested members of the Board of Directors that he acted in good faith or in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal proceeding, that he did not have reasonable cause to believe his conduct was unlawful; provided that the termination of any such Proceeding by judgment, order of court, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not by itself create a presumption as to

VBF 00024219

whether the Official acted in good faith or in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation or, with respect to any criminal proceeding, as to whether he had reasonable cause to believe his conduct was unlawful; or

(b) in the case of a Proceeding by or in the right of the Corporation, the Official establishes to the satisfaction of the disinterested members of the Board of Directors that he acted in good faith or in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation; provided that if in such a Proceeding the Official is adjudged to be liable to the Corporation, all amounts advanced to the Official for expenses must be repaid except to the extent that the court in which such adjudication was made shall determine upon application that despite such adjudication, in view of all the circumstances, the Official is fairly and reasonably entitled to indemnity for such expenses as the court may deem proper.

Section 7.8    Indemnification. Except to the extent restricted by applicable law, the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed Proceeding (other than an action by or in the right of the Corporation) by reason of the fact that he is or was a director or officer of the Corporation, or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, association, or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit, or proceeding, if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.  The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, that he had reasonable cause to believe that his conduct was unlawful. The indemnification and advancement of expenses provided by, or granted pursuant to, the these Bylaws shall not be deemed exclusive of any other rights to which any person seeking indemnification or advancement of expenses may be entitled, under the Certificate of Formation or under any other bylaw, agreement, insurance policy, vote of stockholders or disinterested directors, statute, or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office. Any indemnification under this Section 7.8 (unless ordered by a court) shall be made (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a quorum of such directors designated by majority vote of such directors, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders.

Section 7.9    Insurance. The Corporation may at the discretion of the Board of Directors purchase and maintain insurance on behalf of the Corporation and any person whom it has the power to indemnify pursuant to law, the Certificate of Formation, these Bylaws or otherwise.

Section 7.10    Resignation. Any director, officer or agent may resign by giving written notice to the Chief Executive Officer or the Secretary. Such resignation will take effect at the

11

VBF 00024220

time specified therein or immediately if no time is specified therein. Unless otherwise specified therein, the acceptance of such resignation will not be necessary to make it effective.

Section 7.11   <u>Amendment of Bylaws</u>. These Bylaws may be altered, amended, or repealed at any meeting of the Board of Directors at which a quorum is present, by the affirmative vote of a majority of the Directors present at such meeting, subject to any restrictions set forth in the Certificate of Formation.

Section 7.12   <u>Invalid Provisions</u>. If any part of these Bylaws is held invalid or inoperative for any reason, the remaining parts, so far as possible and reasonable, will be valid and operative.

Section 7.13   <u>Relation to the Certificate of Formation</u>. These Bylaws are subject to, and governed by, the Certificate of Formation of the Corporation. In the event of a conflict between these Bylaws and the Certificate of Formation of the Corporation, the Certificate of Formation shall control.

VBF 00024221

**Exhibit "A-8"**

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Gregory L. Gonzales
Secretary of State

# Office of the Secretary of State

August 03, 2016

Capitol Services Inc
P O Box 1831
Austin, TX 78767 USA

----

RE: VBF IP Inc.
File Number: 802489091

It has been our pleasure to file the Restated Certificate of Formation for the referenced entity.  Enclosed is
the certificate evidencing filing.  Payment of the filing fee is acknowledged by this letter.

If we may be of further service at any time, please let us know.

Sincerely,

Corporations Section
Business & Public Filings Division
(512) 463-5555

Enclosure

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555                    Fax: (512) 463-5709                    Dial: 7-1-1 for Relay Services
Prepared by: William Johnson            TID: 10323                              Document: 683041780002

VBF 00024222

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Gabrielle K. Gedney
Secretary of State

# Office of the Secretary of State

## CERTIFICATE OF FILING
## OF

### VBF IP Inc.
802489091

The undersigned, as Secretary of State of Texas, hereby certifies that a Restated Certificate of Formation for the above named domestic for-profit corporation has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing filing effective on the date shown below.

Dated: 08/02/2016

Effective: 08/02/2016



Carlos H. Cascos
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

| | | |
|---|---|---|
| Phone: (512) 463-5555 | Fax: (512) 463-5709 | Dial: 7-1-1 for Relay Services |
| Prepared by: William Johnson | TID: 10313 | Document: 683041780002 |

VBF 00024223

FILED
in the Office of the
Secretary of State of Texas

AUG 0 2 2016

Corporations Section

## AMENDED AND RESTATED CERTIFICATE OF FORMATION

### OF

### VBF IP INC.

Pursuant to Section 3.059 of the Texas Business Organizations Code (the "**TBOC**"), VBF IP Inc., a corporation organized and existing under and by virtue of the laws of the State of Texas, does hereby certify:

1. The name of the entity is VBF IP Inc., and it is a for-profit corporation.

2. The filing number issued to the entity by the Secretary of State of the State of Texas is 802489091, and its original date of formation is June 27, 2016.

3. The Amended and Restated Certificate of Formation attached hereto as <u>Exhibit A</u> makes new amendments to the original Certificate of Formation of VBF IP Inc.  Provided below is an identification by reference or description of each added, altered or deleted provision thereof.

    a. Article TWELFTH of the Certificate of Formation is amended in its entirety and restated as provided in Article TWELFTH of the Amended and Restated Certificate of Formation.

4. Each new amendment has been made in accordance with the provisions of the TBOC. The amendments to the Certificate of Formation have been approved in the manner required by the TBOC and by the governing documents of VBF IP Inc.

5. The Amended and Restated Certificate of Formation, attached hereto as <u>Exhibit A</u>, accurately states the text of the Certificate of Formation being restated and each amendment to the Certificate of Formation being restated that is in effect, as further amended by the Amended and Restated Certificate of Formation.  It does not contain any other change in the Certificate of Formation being restated except for the information permitted to be omitted by the provisions of the TBOC applicable to the entity.

6. The amendments shall be effective upon filing this Amended and Restated Certificate of Formation with the Secretary of State of the State of Texas.

*[Remainder of page left blank.]*

VBF 00024224

The undersigned affirms that the person designated as registered agent in the Amended and Restated Certificate of Formation has consented to the appointment.  The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the Corporation to execute this Amended and Restated Certificate of Formation.

EXECUTED on  August 2 , 2016.

_____
Leslie A. Wulf, President

VBF 00024225

**EXHIBIT A**
**See attached.**

VBF 00024226

## AMENDED AND RESTATED CERTIFICATE OF FORMATION
## OF
## VBF IP INC.

**FIRST:** The entity being formed is a for-profit business corporation. The name of the corporation is VBF IP Inc. (the "*Corporation*").

**SECOND:** The Corporation will have perpetual existence.

**THIRD:** The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the TBOC.

**FOURTH:** The aggregate number of shares of capital stock that the Corporation will have authority to issue is one thousand (1,000), all of which will be shares of Common Stock, having a par value of $0.001 per share.

**FIFTH:** No shareholder of the Corporation will, solely by reason of holding shares of any class of capital stock, have any preemptive or preferential right to purchase or subscribe for any shares of capital stock of the Corporation, now or hereafter to be authorized, or any notes, debentures, bonds or other securities convertible into or carrying warrants, rights or options to purchase shares of any class of capital stock, now or hereafter to be authorized, whether or not the issuance of any such shares or such notes, debentures, bonds or other securities would adversely affect the dividend, voting or any other rights of such shareholder. The Board of Directors may authorize the issuance of, and the Corporation may issue, shares of any class of capital stock of the Corporation, or any notes, debentures, bonds or other securities convertible into or carrying warrants, rights or options to purchase any such shares, without offering any shares of any class of capital stock to the existing holders of any class of stock of the Corporation.

**SIXTH:** At all meetings of shareholders, a quorum will be present if the holders of a majority of the shares of capital stock entitled to vote at the meeting are represented at the meeting in person or by proxy. Meetings of shareholders may be held within or without the State of Texas, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Texas at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**SEVENTH:** Shareholders of the Corporation will not have the right of cumulative voting for the election of directors or for any other purpose.

**EIGHTH:** The Board of Directors is expressly authorized to alter, amend or repeal the Bylaws of the Corporation or to adopt new Bylaws.

**NINTH:** The Corporation shall, to the fullest extent permitted by the TBOC, as the same exists or may hereafter be amended, indemnify the directors and officers from and against any and all of the expenses, liabilities or other matters referred to in or covered by such law. Such indemnification may be provided pursuant to any Bylaw, agreement, vote of shareholders or disinterested directors, or otherwise, both as to action in his director or officer capacity and as to action in another capacity while holding such office; will continue as to a person who has ceased

VBF 00024227

to be a director or officer; and will inure to the benefit of the heirs, executors and administrators of such a person.

**TENTH:** To the fullest extent permitted by the laws of the State of Texas as the same exist or may hereafter be amended, a director of the Corporation will not be liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty for an act or omission in the director's capacity as a director. Any repeal or modification of this Section will not increase the personal liability of any director of the Corporation for any act or occurrence taking place before such repeal or modification, or adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification. The provisions of this Section shall not be deemed to limit or preclude indemnification of a director by the Corporation for any liability of a director that has not been eliminated by the provisions of this Section.

**ELEVENTH:** The address of the Corporation's initial registered office is 206 E. 9th Street, Suite 1300, Austin, TX 78701 and the name of its initial registered agent at that address is Capitol Corporate Services, Inc.

**TWELFTH:** The number of directors constituting the Board of Directors of the Corporation is seven, and shall at no time be greater than seven, and the name and mailing address of such person, who is to serve as director until their successors are elected and qualified, is:

| Name | Address |
|---|---|
| Leslie A. Wulf | 1507 Capital Ave, Suite 101 Plano Texas 75074 |
| James Rea | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |
| Terry Lyons | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |
| Kenneth Lockard | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |
| Gregg Sedun | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |
| Jens Haarkötter | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |
| Björn Thelander | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |

Hereafter, the number of directors will be determined in accordance with the Bylaws of the Corporation. In the event of a vacancy on the Board of Directors of the Corporation that Alder Capital International Ltd., a company organized under the laws of the British Virgin Islands (together with its successors and/or assigns, the "***Investor***") is entitled to designate pursuant to that Voting Agreement, dated as of July 7, 2016, by and among the Corporation, Investor, VeroBlue Farms USA, Inc., Iowa's First, Inc., VBF Operations Inc., VBF Transport, Inc., and VeroStream Seafood Marketing, Inc. (the "***Voting Agreement***"), the director or directors serving

on the Board of Directors that were designated by the Investor pursuant to the Voting Agreement shall be entitled to vote with respect to such vacant seat.

**THIRTEENTH:** Any action required or permitted by law, this Certificate of Formation, or the Bylaws of the Corporation to be taken at a meeting of the shareholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall have been signed and dated by the holder or holders of shares having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all shares entitled to vote on the action were present and voted.

Prompt notice of the taking of any action by shareholders without a meeting by less than unanimous written consent shall be given to those shareholders who did not consent in writing to the action.

16709626v.2

**Exhibit "A-9"**



No: W01056678
Date: 08/03/2016

490 DP-289111
IOWA'S FIRST, INC.

## ACKNOWLEDGEMENT OF DOCUMENT FILED

The Secretary of State acknowledges receipt of the following document:

Restated Articles

The document was filed on Aug  3 2016  2:21PM, to be effective as of Aug  3 2016  2:21PM.

The amount of $50.00 was received in full payment of the filing fee.



PAUL D. PATE    SECRETARY OF STATE

*289111*

## RESTATED ARTICLES OF INCORPORATION

### OF

### IOWA'S FIRST, INC.

Pursuant to Section 490.1007 of the Iowa Business Corporation Act (the "*IBCA*"), Iowa's First, Inc., a corporation organized and existing under and by virtue of the laws of the State of Iowa (the "*Corporation*"), does hereby certify:

1. The name of the entity is Iowa's First, Inc., and it is a domestic for profit corporation.

2. The Restated Articles of Incorporation attached hereto as <u>Exhibit A</u> consolidate all amendments to the Articles of Incorporation of the Corporation into a single document.

3. Each new amendment has been duly adopted by the shareholders of the Corporation in the manner required by the IBCA and the Articles of Incorporation.

IN WITNESS WHEREOF, Iowa's First, Inc. has caused these Restated Articles of Incorporation to be signed by Leslie A. Wulf, a duly authorized officer of the Corporation, on August 3, 2016.

_____
Leslie A. Wulf, President



## RESTATED ARTICLES OF INCORPORATION
## OF
## IOWA'S FIRST, INC.

**FIRST:** The entity being formed is a for-profit business corporation. The name of the corporation is Iowa's First, Inc. (the "***Corporation***").

**SECOND:** The Corporation will have perpetual existence.

**THIRD:** The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the IBCA.

**FOURTH:** The aggregate number of shares of capital stock that the Corporation will have authority to issue is two thousand four hundred (2,400), all of which will be shares of Common Stock, having no par value.

**FIFTH:** No shareholder of the Corporation will, solely by reason of holding shares of any class of capital stock, have any preemptive or preferential right to purchase or subscribe for any shares of capital stock of the Corporation, now or hereafter to be authorized, or any notes, debentures, bonds or other securities convertible into or carrying warrants, rights or options to purchase shares of any class of capital stock, now or hereafter to be authorized, whether or not the issuance of any such shares or such notes, debentures, bonds or other securities would adversely affect the dividend, voting or any other rights of such shareholder. The Board of Directors may authorize the issuance of, and the Corporation may issue, shares of any class of capital stock of the Corporation, or any notes, debentures, bonds or other securities convertible into or carrying warrants, rights or options to purchase any such shares, without offering any shares of any class of capital stock to the existing holders of any class of stock of the Corporation.

**SIXTH:** At all meetings of shareholders, a quorum will be present if the holders of a majority of the shares of capital stock entitled to vote at the meeting are represented at the meeting in person or by proxy. Meetings of shareholders may be held within or without the State of Iowa, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Iowa at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**SEVENTH:** Shareholders of the Corporation will not have the right of cumulative voting for the election of directors or for any other purpose.

**EIGHTH:** The Board of Directors is expressly authorized to alter, amend or repeal the Bylaws of the Corporation or to adopt new Bylaws.

**NINTH:** The Corporation shall, to the fullest extent permitted by the IBCA, as the same exists or may hereafter be amended, indemnify the directors and officers from and against any and all of the expenses, liabilities or other matters referred to in or covered by such law. Such indemnification may be provided pursuant to any Bylaw, agreement, vote of shareholders or disinterested directors, or otherwise, both as to action in his director or officer capacity and as to action in another capacity while holding such office; will continue as to a person who has ceased

SNB 16777

to be a director or officer; and will inure to the benefit of the heirs, executors and administrators of such a person.

**TENTH:** To the fullest extent permitted by the laws of the State of Iowa as the same exist or may hereafter be amended, a director of the Corporation will not be liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty for an act or omission in the director's capacity as a director. Any repeal or modification of this Section will not increase the personal liability of any director of the Corporation for any act or occurrence taking place before such repeal or modification, or adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification. The provisions of this Section shall not be deemed to limit or preclude indemnification of a director by the Corporation for any liability of a director that has not been eliminated by the provisions of this Section.

**ELEVENTH:** The address of the Corporation's initial registered office is 503 N. Main, PO Box 128, Goldfield, Iowa 50542 and the name of its initial registered agent at that address is Robert Malloy.

**TWELFTH:** The number of directors constituting the Board of Directors of the Corporation is seven, and shall at no time be greater than seven, and the name and mailing address of such person, who is to serve as director until their successors are elected and qualified, is:

| **Name** | **Address** |
|---|---|
| Leslie A. Wulf | 1507 Capital Ave, Suite 101 Plano Texas 75074 |
| James Rea | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |
| Terry Lyons | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |
| Kenneth Lockard | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |
| Gregg Sedun | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |
| Jens Haarkötter | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |
| Björn Thelander | 1507 Capital Avenue, Suite 101 Plano, Texas 75074 |

Hereafter, the number of directors will be determined in accordance with the Bylaws of the Corporation. In the event of a vacancy on the Board of Directors of the Corporation that Alder Capital International Ltd., a company organized under the laws of the British Virgin Islands (together with its successors and/or assigns, the "***Investor***") is entitled to designate pursuant to that Voting Agreement, dated as of July 7, 2016, by and among the Corporation, Investor, VeroBlue Farms USA, Inc., VBF IP Inc., VBF Operations Inc., VBF Transport, Inc., and VeroStream Seafood Marketing, Inc. (the "***Voting Agreement***"), the director or directors serving

on the Board of Directors that were designated by the Investor pursuant to the Voting Agreement shall be entitled to vote with respect to such vacant seat.

**THIRTEENTH:** Any action required or permitted by law, these Articles of Incorporation, or the Bylaws of the Corporation to be taken at a meeting of the shareholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall have been signed and dated by the holder or holders of shares having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all shares entitled to vote on the action were present and voted.

Prompt notice of the taking of any action by shareholders without a meeting by less than unanimous written consent shall be given to those shareholders who did not consent in writing to the action.

16711514v.1

FILED
IOWA
SECRETARY OF STATE
8-3-16
2:21P
W01056678

**<u>Exhibit A-10"</u>**

<mark>**MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS**
**OF**
**VEROBLUE FARMS USA, INC.**</mark>

<mark>**Held On**
**September 20-21, 2016**</mark>

DIRECTORS PRESENT:     Jens Haarkotter, Ken Lockard, Terry Lyons, James Rea, Gregg Sedun, <mark>Bjorn Thelander</mark> and Les Wulf.

OTHERS PRESENT:        Rick Dahlson and various members of the management team.

PLACE:                 <mark>The Company's office in Plano, Texas.</mark>

    Mr. Lyons acted as Chairman of the meeting (the "**Meeting**") of the Board of Directors (the "**Board**") of VeroBlue Farms USA, Inc. (the "**Company**"). Mr. Dahlson acted as Secretary of the Meeting. Mr. Lyons stated that the first day of the Meeting would be management presentations, which are listed below, and that the formal Meeting would be tomorrow. Thereafter, Mr. Wulf introduced the various management team members who made presentations to the Board, during which time the Board and management had extensive interaction. The areas presented were as follows:

    1.    Team Development (Keith Driver).

    2.    Sales and Marketing (Jim Bruffy).

    3.    Operations (Jeanine Siemens). During this presentation, Ms. Siemens and Mr. Driver described operational processes and risks, with the Board requesting follow-up reports/information from management regarding the following:

        (a)    An internal audit on the Company's biosecurity program;

        (b)    An internal and external risk assessment and review of the Company's transportation plan;

        (c)    An internal and external coverage and content review of the Company's insurance policies; and

        (d)    A risk matrix (which should be provided to the Board on a quarterly basis).

    4.    Construction and Manufacturing (James Rea). Mr. Rea will provide the Board from time to time status/timeline updates on the various construction projects being undertaken by the Company.

    5.    Key Operations Initiatives (Keith Driver).

**#9068.1**

6.      Recommendation for Approval of, and Migration to, the Net Suite Business Management Software (Bruce Hall).

7.      Recommendation for Approval of, and Migration to, the aquaManager Data Management System (Katie Olson).

8.      Nanobubble Technology, Water Conditioning Technology, Waste Management Process and the St. Louis Facility Status (Ted Rea).

After the above presentations, the Meeting was adjourned for the day.

---

On September 21, 2016, the Board and management reconvened, and the following management presentations were given:

1.      Financial Matters (Bruce Hall).  During this discussion, Mr. Hall presented to the Board an analysis of the Company's cash position and stated that the Company was in compliance with all covenants of its senior lender.

2.      Company Update (Mr. Wulf).  During this presentation, the Board requested that the Company create and distribute to the Board from time-to-time maps and pictures depicting the Company's locations and facilities.  In addition, Mr. Wulf discussed with the Board the status of a possible new business arrangement with Mainstream Aquaculture PTY LTD ("**Mainstream**") and other opportunities.  Lastly, Mr. Wulf presented the status of the purchase of the Beam Building and an option to purchase an additional 36-acre parcel of land in the Webster City's industrial park, and assume a purchase option that the Webster City has for an additional 20-acre parcel of land adjacent to such 36-acre parcel.

---

After these presentations, the Meeting was called to order by Mr. Lyons, who acted as Chairman.  Ms. Dahlson acted as Secretary.  The Chairman stated that a quorum was present and that the Meeting was in all respects duly convened.  All members of the Board were in attendance as well as Mr. Hall and Mr. Dahlson.

**MAINSTREAM OPPORTUNITIES**

Mr. Wulf led the Board in a further discussion of the different alternatives to the Company's business relationship with Mainstream.  The Board also discussed potential business opportunities with Robarra.  Mr. Wulf requested thirty days to evaluate a potential business relationship with Robarra.

**BOARD COMMITTEES**

The Chairman stated that the next order of business was the consideration of the formation of Audit, Compensation and Corporate Governance Committees of the Board.  The Chairman indicated that his preference was to have two committees, Audit and a combined Governance and

**#9068.2**

Compensation Committee.  After discussion and upon a motion duly made and seconded, the Board unanimously approved the establishment of an Audit Committee and a Governance and Compensation Committee, and the election of the following directors as members of such committees:

<u>Audit Committee</u>
Jens Haarkotter
Ken Lockard
Terry Lyons

<u>Governance and Compensation Committee</u>
Gregg Sedun
Bjorn Thelander
Jens Haarkotter

The Board deferred approving the Committee Operating Guidelines and Charters for the Audit Committee and the Governance and Compensation Committee, drafts of which had previously been distributed to the Board, until such time as all comments to the drafts of these documents have been assimilated and processed.  Mr. Hall will collect comments on these documents from the members of the Board.

## VISION OF BOARD EVOLUTION

The Board then discussed the evolution of the Board over time.  All members of the Board agreed that as the Company progresses there will be a need to attract and retain Board members with industry expertise and connections.  The Chairman suggested that the Board undertake annual evaluations of the Board members, which proposal was agreed to by all members of the Board.

## IN-HOUSE COUNSEL

The Board then discussed the concept of hiring in-house counsel.  After discussion, the Board decided to defer such hire at this time, and asked management and Mr. Dahlson to prepare a scope of work and retainer proposal with Jackson Walker L.L.P.

## CANACCORD SETTLEMENT AGREEMENT AND MUTUAL RELEASE

The Chairman stated that the next order of business was the consideration for approval of a Settlement Agreement and Mutual Release with Canaccord Genuity Inc. (the "**Settlement Agreement**").  Messrs. Dahlson and Wulf explained the background of the claims and the settlement terms.  After discussion, and upon a motion duly made and seconded, the Board unanimously approved the Settlement Agreement, and authorized and directed the Company to execute and deliver the Settlement Agreement.

## MIGRATION OF CANADIAN SHAREHOLDERS TO UNITED STATES COMPANY

The next order of business was the consideration of the migration of the shareholders of VeroBlue Farms Inc. to a company in the United States.  Mr. Hall presented charts and analysis on possible alternatives, and recommended one alternative.  Messrs. Haarkotter and Thelander

**#9068.3**

requested that the Board defer consideration of this matter until they have reviewed this matter in depth.

## APPOINTMENT OF TRANSFER AGENT

Mr. Wulf then presented a proposal to the Board to retain Transfer Online as the transfer agent for the Company's common stock ("**Transfer Agent**").  Messrs. Hall and Wulf have worked with Transfer Agent in the past and for a minimal monthly fee Transfer Agent will handle all Company common stock transfer matters.  After discussion, and upon a motion duly made and seconded, the Board unanimously approved retaining Transfer Agent as the transfer agent of the Company's common stock, and authorized and empowered the officers of the Company, or any of them, to execute and deliver all documents, instruments and agreements reasonably necessary to retain Transfer Agent as the Company's transfer agent for its common stock.

## CONVERSION OF THE COMPANY TO A PARTNERSHIP FOR TAX PURPOSES

Mr. Hall explained to the Board that the majority preferred shareholder of the Company had previously requested that the Company consider converting from a company taxed as a corporation to a company taxed as a partnership, and Mr. Hall and tax counsel had undertaken a tax analysis of such a conversion.  After analysis, the estimated tax liability would be over $14,000,000.  Given that result, the Board determined not to pursue a conversion.

## PURCHASE OF BEAM BUILDING AND OPTION TO PURCHASE ADJACENT LAND

The next item for consideration on the Agenda was the purchase of the Beam Building in Webster City, Iowa and an option to purchase an additional 36-acre parcel of land in Webster City's industrial park, and assume a purchase option that Webster City has for an additional 20-acre parcel of land adjacent to such 36-acre parcel.  Mr. Wulf explained that a purchase offer has been submitted to the City Counsel of Webster City, and that a mandatory bid period was running. After the bid period expires, management will submit the purchase agreement for the Beam Building and the Option Agreement for the 36-acre parcel to the Board for approval.

## APPOINTMENT OF TAX AND AUDIT FIRM

The next order of business was the appointment of a tax and audit firm for the Company. Mr. Hall explained that he had considered and evaluated the retention by the Company of Deloitte, PricewaterhouseCoopers LLP ("**PWC**") and Montgomery Coscia Greilich LLP, and that his recommendation is that the Company retain PWC.  After discussion, and upon a motion duly made and seconded, the Board unanimously approved the retention of PWC as the Company's tax advisor and auditor; subject, however, to the Company receiving an acceptable fee arrangement with PWC; it being further agreed and understood that Mr. Hall will bring such fee arrangement to the Board for approval once it has been negotiated with PWC.

## ESTABLISHMENT OF FISH PARK I

Mr. Wulf then discussed the concept of raising outside capital to build Fish Park I, which would consist of a 96-tank salmon farm in Webster City, Iowa, on the land adjacent to the Urban Farm, and two live-haul barns, one on the east coast (Upstate NY), and one on the west coast

**#9068.4**

(Seattle-Tacoma).  After discussion, the Board asked Mr. Wulf to draft a proposal using input from Mr. Lockard and Mr. Dahlson.

## NET SUITE BUSINESS MANAGEMENT SOFTWARE

The next order of business was the consideration for approval of, and migration to, the Net Suite Business Management Software as discussed yesterday by Mr. Hall.  Mr. Hall stated that he was finalizing requirements and negotiating pricing and would request approval from the Board at a later date.

## AQUAMANAGER DATA MANAGEMENT SYSTEM

The next order of business was the consideration for approval of, and migration to, the aquaManager Data Management System as discussed yesterday by Ms. Olson.  Mr. Hall stated that he was finalizing requirements and negotiating pricing and would request approval from the Board at a later date.

## DISCUSSION OF MONTHLY BOARD REPORTING PACKAGE

The Board then discussed what information they would like from management on a monthly basis.  After discussion, the Board asked management provide the following information to the Board on a monthly basis, which information will be placed into the data room:

- Milestones and progress to the milestones
- Compliance with senior debt covenants
- Red-flag items (i.e., material issues and delays)
- Market intelligence and analysis

In addition, the Board agreed to provide further input to management on the monthly Board reporting package.

## BOARD MEETINGS

The Board discussed the number of regularly scheduled Board meetings they should have each year.  After discussion, and upon a motion duly made and seconded, the Board unanimously agreed to have four regular Board meetings each year, which Board meetings would be held on a quarterly basis.

In addition, the Board discussed having the next regularly scheduled Board meeting in October (telephonic), with an in-person Board meeting the week of January 23, 2017, with final dates to be determined in the future.

## BOARD MANUAL

The next order of business was the consideration of adoption of a Board Manual, a draft of which was previously distributed to the Board.  The Board discussed the concept of having a Board Manual, and a number of the members of the Board said that they had comments to the draft.  The

**#9068.5**

Board asked Mr. Hall to collect comments and work with Mr. Dahlson on circulating a revised Board Manual.

## CODE OF BUSINESS CONDUCT AND ETHICS

The next matter for consideration was the adoption of a Code of Business Conduct and Ethics, a draft of which was previously distributed to the Board.  The Chairman stated that this was an urgent item to get finalized and approved and that every employee, officer and director of the Company should be required to sign the Code of Business Conduct and Ethics.  The Board asked Mr. Hall to collect comments and work with Mr. Dahlson on circulating a revised draft of the Code of Business Conduct and Ethics.

## ANTI-BRIBERY AND CORRUPTION OF PUBLIC OFFICER POLICY

The next matter for consideration was the adoption of an Anti-Bribery and Corruption of Public Officer Policy, a draft of which was previously distributed to the Board.  After discussion, and upon a motion duly made and seconded, the Board unanimously approved the Anti-Bribery and Corruption of Public Officer Policy, and requested that the officers of the Company have each employee, officer and director of the Company execute a copy of the Anti-Bribery and Corruption of Public Officer Policy.

## BOARD COMPENSATION PLAN

The Chairman next outlined potential compensation for non-employee directors, which compensation plan would include cash compensation and stock options.  After discussion and upon a motion duly made and seconded, the Board unanimously approved the granting of options to purchase up to 200,000 shares of Common Stock of the Company, at an exercise price of $1.00 per share, to each of Jens Haarkotter, Bjorn Thelander and Ken Lockard, which options will be vested 100% at issuance, and will otherwise be in substantially the form of the Company's standard Nonqualified Stock Option Agreement.  The Board then provided comments to the outlined potential cash-compensation plan and asked for additional time to consider the cash-compensation plan.

## DISSEMINATION OF COMPANY INFORMATION

The Chairman than stated that all Company inquiries should be delivered to, and handled by, Mr. Wulf as the Company's Chief Executive Officer.  The Board unanimously approved this policy and asked management to make all employees and officers of the Company aware of this policy.

**#9068.6**

**<u>ADJOURNMENT</u>**

There being no further business to come before the Board, upon a motion duly made, seconded and unanimously passed, the meeting was adjourned.


 

 

_____
Richard F. Dahlson, Secretary of the Meeting


Approved:


_____
Terry Lyons, Chairman

**#9068.7**

**Exhibit "A-11"**

FORM **BCA 13.15** (rev. Dec. 2003)
**APPLICATION FOR AUTHORITY TO**
**TRANSACT BUSINESS IN ILLINOIS**
Business Corporation Act

Secretary of State
Department of Business Services
501 S. Second St., Rm. 350
Springfield, IL  62756
217-782-1832
www.cyberdriveillinois.com

Remit payment in the form of a cashier's
check, certified check, money order
or an Illinois attorney's or CPA's check
payable to the Secretary of State.
**SEE NOTE 1 CONCERNING PAYMENT!**      File #_____

Filing Fee: $_____ Franchise Tax: $_____ Penalty/Interest: $_____ Total: $_____ Approved: _____

— — — — —Submit in duplicate — — — —Type or Print clearly in black ink— — — —Do not write above this line— — — —

1.  (a)   CORPORATE NAME:   Iowa's First, Inc.
_____

(Complete Item 1 (b) only if the corporate name is not available in this state.)

(b)   ASSUMED CORPORATE NAME: _____
(By electing this assumed name, the corporation hereby agrees NOT to use its corporate name in the
transaction of business in Illinois. Form BCA 4.15 is attached.)

2.  State or Country          Date of                                    Period of
of Incorporation  Iowa          ;   Incorporation  01/13/2004          ;   Duration  Perpetual

3.  (a)   Address of the principal office, wherever located:      (b)   Address of principal office in Illinois:
                                                                        (if none, so state)

3369 Premier Drive, Suite 300                    None

Plano, TX 75023

4.  Name and address of the registered agent and registered office in Illinois.

Registered Agent:   Capitol Corporate Services, Inc.
                    First Name                    Middle Initial              Last Name

Registered Office:  1315  W Lawrence  Ave
                    Number              Street                    Suite #      (A P.O. Box alone
                                                                               is not acceptable.)
                    Springfield                  62704                   Sangamon
                    City                         ZIP Code                County

5.  States and countries in which it is admitted or qualified to transact business: (include state of incorporation)
Iowa

6.  Name and addresses of officers and directors: (If more than 3 directors and/or additional officers, attach list.)

| | Name | No. & Street | City | State | ZIP |
|---|---|---|---|---|---|
| President | Leslie A. Wulf | 3369 Premier Drive, Suite 300, Plano, TX 75023 | | | |
| Secretary | Bruce A. Hall | 3369 Premier Drive, Suite 300, Plano, TX 75023 | | | |
| Director | James Rea | 3369 Premier Drive, Suite 300, Plano, TX 75023 | | | |
| Director | Terry Lyons | 3369 Premier Drive, Suite 300, Plano, TX 75023 | | | |
| Director | Kenneth Lockard | 3369 Premier Drive, Suite 300, Plano, TX 75023 | | | |

Printed by authority of the State of Illinois. January 2015 - 1 - C 171.16

CONFIDENTIAL          SNB 16687

7. The purpose or purposes for which it was organized which it proposes to pursue in the transaction of business in this state: (If not sufficient space to cover this point, add one or more sheets of this size)

Aquaculture

8. Authorized and issued shares:

| Class | Series | Par Value | Number of Shares Authorized | Number of Shares Issued |
|-------|--------|-----------|----------------------------|------------------------|
| Common | N/A | 0.00 | 2400 | 2400 |
| | | | | |
| | | | | |
| | | | | |

(If more, attach list)

9. Paid-in Capital: $ 494,345

("Paid-in Capital" replaces the terms Stated Capital & Paid-in Surplus and is equal to the total of these accounts.)

10. (a) Give an estimate of the total value of all the property* of the corporation for the following year: $ 40,000,000

(b) Give an estimate of the total value of all the property* of the corporation for the following year that will be located in Illinois: $ 2,000,000

(c) State the estimated total business of the corporation to be transacted by it everywhere for the following year: $ 24,000,000

(d) State the estimated annual business of the corporation to be transacted by it at or from places of business in the State of Illinois: $ 2,880,000

11. Interrogatories: (Important - this section must be completed.)

(a) Is the corporation transacting business in this state at this time?  ☐ Yes  ☒ No

(b) If the answer to Item 11(a) is yes, state the exact date on which it commenced to transact business in Illinois: N/A

Month/Day/Year

12. This application is accompanied by a certified copy of the articles of incorporation, as amended, duly authenticated, within the last ninety (90) days, by the proper officer of the state or country wherein the corporation is incorporated.

13. The undersigned corporation has caused this application to be signed by a duly authorized officer, who affirms, under penalties of perjury, that the facts stated herein are true. (All signatures must be in BLACK INK.)

Dated _December 2_, _2016_

(Month  Day)        (Year)

_Bruce A. Hall / CFO, Secretary_

(Any Authorized Officer's Signature)

(Print Name and Title)

Iowa's First, Inc.

Exact Name of Corporation

* PROPERTY as used in this application shall apply to all property of the corporation, real, personal, tangible, intangible, or mixed without qualifications.

Note 1: Payment in connection with this application must be in the form of a certified check, cashier's check, Illinois attorney or CPA's check or money order made payable to the "Secretary of State". The minimum fee due upon qualification is $175. Any additional fees will be billed and must be paid before this application can be filed.

**Iowa's First, Inc.**
**Application for Certificate of Authority (cont)**

#6.

| | |
|---|---|
| Gregg Sedun | Director |
| Jens Haarkotter | Director |
| Bjorn Thelander | Director |

Address for all directors listed above is:

3369 Premier Drive
Suite 300
Plano, TX 75023

**Exhibit "A-12"**

**MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS**
**OF**
**VEROBLUE FARMS USA INC.**

**Held by teleconference on October 24, 2017**

Directors Present:  Ken Lockard, Terry Lyons, Gregg Sedun, Bjorn Thelander, Eva Ebstein and Les
Wulf

Others Present: None

Mr. Lyons, the Chairman of the Board (The "Chairman") of VeroBlue Farms USA Inc. (The "Company" or
"VBF") acted as Chairman of the meeting and also acted as recording Secretary of the meeting. The
Chairman called the meeting to order noting that all Directors except Jens Haarkotter were present by
telephone and a quorum had been constituted. Notice having been waived by the Directors the meeting
was in all respects duly called for the transaction of business.

REVIEW OF TERMINATION OF BRUCE HALL AND TED REA

Prior to this meeting Bruce Hall and Ted Rea were terminated by the CEO. The terms of their severance
was one year of salary each with a full release. This release was being circulated to Bjorn Thelander and
Les Wulf today for finalization. Terms such as no defamation, confidentiality and release of liability were
to be included however no consultancy agreement was being offered. Les Wulf explained the process
for offering stock for sale from terminated executives. There is a 90-day window to first offer shares to
Aqua Alder and then Fish Dish-to be reported on at future Board meetings.

Bjorn Thelander commented on the skills required for a CFO in a startup such as VBF including tight
expense controls, the ability to challenge assumptions and financial acumen-Bruce was lacking in these
skills. Ted had lost the confidence of the Board especially in working with advisors and in coming to grips
with the stocking plans-we need independent verification of these assumptions and mass balance
calculations.

OPERATIONAL CHANGES

Norman McCowan is in Charge of production and it was the consensus of the Board to have Norman
also assume the title of Chief Operating Officer. A discussion then ensued on operating problems. The
CEO commented that with the current analysis (not yet complete or tested) the current view is that the
production issues centred around air balancing not mass balancing-this has yet to be determined with
many Board members skeptical.

JENS HAARKOTTER DISCUSSION

The discussion then turned to the alleged improprieties of one of our Directors Jens Haarkotter who has
been accused of sexual harassment and bullying by certain female staff. The question was raised as to
why it took so long for these issues to get to the Board level. The CEO explained that he felt that the first

==step was to have HR do an internal investigation which took somewhat longer than expected. There was== ==unanimous support for commissioning an independent investigation and undertaking this with a== ==professional investigator the selection should be undertaken in the next 2 days.== A report of the findings/progress is to be given at the Board meeting of Dec. 6, 2017.

DIRECTOR REALIGNMENT

A further concern was raised is that while many requests have been made of management to acquire D&O insurance no insurance has been put in place as of this meeting date. This must be prioritized.

==Bjorn Thelander confirmed that with the recent exercise of warrants into VBF common shares, the== ==family office now has the right to appoint 4 directors of a seven-person Board. After extensive discussion== ==it was agreed that Jens Haarkotter step down as a Director, Anders Wester be appointed to replace him== ==and Bjorn Thelender be granted 2 votes until a suitable fourth director can be appointed representing== ==the Family Office. After further discussion it was agreed that in order to reduce the Board to seven votes== ==Les Wulf would tender his resignation from The Company's Board==

On Motion Duly made and seconded and unanimously approved it was agreed to take such actions and prepare such omnibus resolutions to implement this proposal

There being no further business on Motion duly made and seconded the meeting terminated

Terry Lyons
Chairman and Recording Secretary

**Exhibit "A-13"**

> From: Ted Rea <trea@j2capco.com>
> Sent: Tuesday, November 14, 2017 1:11 PM
> To: 'Bjorn Thelander' <Bjorn.Thelander@lufin.ch>

> Cc: 'Bruce Hall' <brucearthurhall@gmail.com>
> Subject: RE: VBF - Severance Demand Letters [IWOV-JWDOCS.FID2801357]
>
>
>
> Bjorn,
>
> We have forwarded this to our counsel for review and hope to hear back
> from her shortly.
>
>
>
> Thanks,
>
>
>
> Ted
>
>
>
> From: Bjorn Thelander [mailto:Bjorn.Thelander@lufin.ch]
> Sent: Tuesday, November 14, 2017 11:19 AM
> To: trea@j2capco.com <mailto:trea@j2capco.com>
> Subject: Fwd: VBF - Severance Demand Letters [IWOV-JWDOCS.FID2801357]
>
>
>
> Hi Ted (and Bruce),
>
> Good speaking with you just now. Please see the attached release
> letter. If you can sign and return this attachment electronically, we
> will process the payment immediately. Afterwards please send the
> original to Rick at Jackson Walker.
> Thanks and best of luck going forward,
>
> Brgds Bjorn
>
> Ps. My mobile number is +41 79 264 4744
>
> Begin forwarded message:
>
> From: "Taylor, Justin" <Justin.Taylor@dgslaw.com
> <mailto:Justin.Taylor@dgslaw.com> >
> Date: 13 November 2017 at 20:27:43 GMT-6
> To: "Eva Ebstein <ehe@dnw.ch <mailto:ehe@dnw.ch >" <ehe@dnw.ch
> <mailto:ehe@dnw.ch >, Bjorn Thelander <Bjorn.Thelander@lufin.ch
> <mailto:Bjorn.Thelander@lufin.ch> >, Anders Wester <aw@dnw.ch
> <mailto:aw@dnw.ch> >
> Cc: "Boonstra, Brian" <Brian.Boonstra@dgslaw.com
> <mailto:Brian.Boonstra@dgslaw.com> >, "Painter, Brett"
> <Brett.Painter@dgslaw.com <mailto:Brett.Painter@dgslaw.com> >, "Lynch,
> Jason" <Jason.Lynch@dgslaw.com <mailto:Jason.Lynch@dgslaw.com> >

> Subject: RE: VBF - Severance Demand Letters [IWOV-JWDOCS.FID2801357]
>
> Eva,
>
>
>
> The attached is what we would suggest to JW be sent to Bruce and Ted
> to resolve the remaining uncertainty. Please let us know your thoughts
> on this when you can, and we're happy to discuss at your convenience.
>
>
>
> Best regards,
>
> Justin
>
>
>
> Justin Taylor  ▪  Davis Graham & Stubbs LLP
>
> P: 303.892.7419 ▪  C: 312.772.2383 ▪
> <http://www.dgslaw.com/images/vCards/jtay.vcf> vcard
>
>
>
>
>
> <winmail.dat>

**Exhibit "A-14"**

**From:** Leslie Wulf
**Sent:** Wednesday, November 22, 2017 7:17 AM
**To:** 'Bjorn Thelander' <Bjorn.Thelander@lufin.ch>
**Cc:** Leslie Wulf <law@wulfs.com>
**Subject:** RE: Paperwork

Bjorn,

Morning It is almost a week from your last correspondence on my paperwork. If you can have DGS /JW send me the paperwork that we can get it completed and the 85k paid first of next week.

Thanks

Les

---

**From:** Bjorn Thelander [mailto:Bjorn.Thelander@lufin.ch]
**Sent:** Wednesday, November 15, 2017 8:55 AM
**To:** Leslie Wulf <law@wulfs.com>
**Subject:** Re: Paperwork

Hi Les,

I'm sincerely sorry for this. ==I have been pushing from my side to settle this as soon as possible, and have no desire to delay or draw anything out. I will again do my best to push the lawyers. The terms are agreed.==

Hope you're well and perhaps enjoying some free time.

Best regards, Bjorn

On 13 Nov 2017, at 05:00, Leslie Wulf <law@wulfs.com> wrote:

Bjorn,

It has been a week, did you hear from the lawyers on my paperwork? Seems strange as they had a template to already work from. If you can have them provide me with my severance paperwork with the terms that we have agreed upon.

Leslie Wulf

**#152.1**

**From:** Bjorn Thelander [mailto:Bjorn.Thelander@lufin.ch]
**Sent:** Thursday, November 9, 2017 5:35 AM
**To:** Leslie Wulf <law@wulfs.com>
**Subject:** Re: Paperwork

Hi Les,

This is my understanding as well. <mark>I promise to follow up with the lawyers today and see where we stand.</mark>

Brgds Bjorn


On 9 Nov 2017, at 10:49, Leslie Wulf <law@wulfs.com> wrote:

Bjorn,


Morning, can you give me a update on when the lawyers will be sending me my paperwork. With the changes we have agreed upon it should be easy changes for the lawyers.


1) Payment as per under my employment agreement one year severance under no cause.

2) One year health care coverage

3) Instead of one time full payment just leaving me on payroll to make it easier on cash draws for the company.

4) Advance myself $85K that will be taken off the back end of the one years severance.


Thanks


Leslie Wulf
C (214) 679 5263

Sent from mobile device
Please excuse typos and shortness of message

**#152.2**