**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| VEROBLUE FARMS USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:19-cv-00764-L |
| v. | ) | |
| | ) | |
| LESLIE A. WULF, BRUCE A. HALL, | ) | |
| JAMES REA, JOHN E. REA, | ) | |
| KEITH DRIVER, CANACCORD | ) | |
| GENUITY LLC, CHRISTINE GAGNE, | ) | |
| and SEAN MANIACI, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff, VeroBlue Farms USA, Inc. ("VBF"), through its undersigned counsel, complains of Defendants, Leslie A. Wulf ("Wulf"), Bruce A. Hall ("Hall"), James Rea ("James Rea"), John E. ("Ted") Rea, ("Ted Rea"), Keith Driver ("Driver") (Wulf, Hall, James Rea, Ted Rea, and Driver are collectively referred to as the "Founders"), Canaccord Genuity LLC ("Canaccord"), Christine Gagne ("Gagne"), and Sean Maniaci ("Maniaci") (together Canaccord, Gagne, and Maniaci are collectively referred to as the "Conspiring Defendants"), and alleges as follows:

## I. INTRODUCTION

1.     The Founders founded VBF, a sustainable fish farm business, in 2014.  The Founders did not invest any of their own money into VBF but by early 2018, the Founders had taken millions of dollars from VBF.  By early 2018, the last of the Founders were terminated by VBF and had misappropriated or otherwise squandered over $90,000,000 in debt and equity that others invested in VBF.  VBF filed for bankruptcy in 2018.

2.     The Founders' misconduct includes misappropriations and misuse of VBF's assets and continuous and knowing misrepresentations of VBF's operations, technology, and finances.

This caused VBF, at the Founders' direction, to sink tens of millions of dollars into what the Founders knew to be a losing proposition, to the benefit of the Founders and to the detriment of VBF.

3.      Those who raise and squander $90,000,000 in a mere three years cannot do so without a great deal of misconduct.  Overall, (1) the Founders drained VBF of assets and looted the company, (2) the Founders withdrew significant funds while VBF was in financial trouble, (3) the Founders, Gagne, and Maniaci received money and other assets that belonged to VBF for no reasonably equivalent value, (4) the Founders ultimately rendered VBF virtually incapable of operation, and (5) the Founders took improper salaries and other benefits from VBF's assets.  VBF acted as alleged herein through the control of the Founders.  The Conspiring Defendants aided the Founders in committing their misconduct, or otherwise committed misconduct.  VBF seeks compensatory damages in the amount of at least $90,000,000, plus punitive damages and other relief.

## II. <u>PARTIES</u>

4.      VBF is a Nevada corporation with its principal place of business in Webster City, Iowa.  VBF is a citizen of Nevada and Iowa.

5.      All Founders are Canadian citizens, except for Hall.

6.      Driver is a Canadian citizen and resides in Calgary, Alberta, Canada. Driver served as an officer (performing the function of Chief Operating Officer for most, if not all of his tenure, whether or not he held that official title) and employee (and/or contractor) of VBF from October 1, 2014 through on or about January 13, 2017, when VBF terminated his employment and officer status. Driver continued to serve VBF as an independent contractor through December 2017. During his tenure at VBF, Driver purported to serve as VBF's chief in-house aquaculture expert,

and therefore the Founders' fraud regarding VBF's technical performance bears heavily on Driver, in addition to the other Founders.

7.      James Rea, a Canadian citizen, has permanent resident alien status in the United States and is domiciled in Texas.  James Rea served as a director, officer and employee (and/or consultant) of VBF October 1, 2014 through on or about January 8, 2018 when VBF terminated his employment (and/or contractor), director, and officer status.

8.      Ted Rea, a Canadian citizen, has permanent resident alien status in the United States and is domiciled in Texas.  Ted Rea served as a director, officer and employee (and/or consultant) of VBF from October 1, 2014 through on or about October 27, 2017 when VBF terminated his employment (and/or contractor), director, and officer status.

9.      Hall, is a United States citizen and is domiciled in Texas. Hall served as a director, officer (Chief Financial Officer during much, if not all, of his tenure at VBF) and employee (and/or consultant) of VBF from October 1, 2014 through on or about October 27, 2017 when VBF terminated his employment (and/or contractor), director, and officer status.

10.     Wulf, a Canadian citizen, has permanent resident alien status in the United States and is domiciled in Texas.  Wulf served as a director, officer (Chief Executive Officer during much, if not all, of his tenure at VBF) and employee (and/or contractor) of VBF from October 1, 2014 through on or about November 6, 2017, when VBF terminated his employment (and/or consultant), director, and officer status.

11.     Canaccord is a Delaware limited liability company. The Founders retained Canaccord, an investment banking firm, to raise funds for VeroBlue Farms, Inc. ("VBF Canada"), not a party to this lawsuit.  After diligent investigation of publically available information, none of Canaccord's members are citizens of the same state as VBF (Iowa or Nevada).  Canaccord has

Canadian roots as a firm and has offices in Canada, Europe, the Middle East, the Far East, and Australia.  Its only United States offices are in cities not located in Nevada or Iowa.  VBF has no information that any Canaccord member is an Iowa or Nevada citizen after investigating the same. Alternatively, VBF requests limited discovery as to that issue.

12.     Gagne is a Canadian citizen whose present whereabouts are unknown to VBF after reasonable investigation. VBF believes that until recently Gagne lived with her husband in West Virginia.  Gagne's husband, however, informed VBF that Gagne no longer lives with him and that he does not know if or when she will return. After diligent investigation of publically available information, VBF has been unable to locate a more recent address for Gagne.  Gagne is Wulf's daughter who VBF paid during Wulf's tenure for alleged services performed. VBF knew Gagne to be a Canadian citizen during events alleged herein, and has not confirmed any facts that she has gained her citizenship.

13.     Maniaci is a lawyer, and at all relevant times, has been a partner specializing in corporate and securities laws at Cassels Brock & Blackwell LLP ("CBB"), a Canadian law firm with three offices, all in Canada.  Maniaci is a citizen of Canada. He works in the Toronto office, various communications he sent regarding VBF were sent with his Toronto, Canada signature block, he received his undergraduate degree in Canada; he received his master's in business administration in Canada, he received his equivalent to a law degree in Canada, and he received an advanced law degree in Canada.

### III.  JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 (a)(1) and (2). Gagne, Maniaci, and all the Founders except Hall are citizens of a foreign state and are not domiciled in the same states as VBF; Hall and, based upon diligent investigation, Canaccord are not citizens of the same states as VBF; and the amount in controversy exceeds

$75,000, exclusive of costs and interest. Alternatively, this Court has supplemental jurisdiction over Gagne, Canaccord, and Maniaci pursuant to 28 U.S.C. § 1367.

15.     The Court also has subject matter jurisdiction over all Defendants pursuant to 28 U.S.C. § 1331 as VBF brought claims against all Defendants pursuant to the United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 28 U.S.C. § 1961.

16.     Venue in this District is proper because the United States District Court for the Northern District of Iowa, on March 27, 2019, transferred this case to this Court. (*VeroBlue Farms USA, Inc. v. Wulf, et al.,* Case No. 18-CV-3047, Iowa Dkt. 50, the "Transfer Order").

17.     This Court has personal jurisdiction over Defendants pursuant to § 17.042(2) of the Texas Civil Practice and Remedies Code, as the Defendants committed torts in part in Texas and further, Founders James Rea, Ted Rea, Hall and Wulf are domiciled in Texas.

## IV.   VBF'S BEGINNINGS AND VBF'S DISCOVERY OF ITS CLAIMS

18.     The Nelson family of Webster City, Iowa, led by cousins Mark and Jeff Nelson (collectively, the "Nelsons"), started their aquaculture business in Blairsburg, Iowa in 2012, which was known as "Iowa's First."  Effective December 31, 2014, the Nelsons sold their business to VBF (incorporated by the Founders on September 5, 2014) through a transaction through which the Nelsons and their wives retired $1,200,000 in debt and received stock in VBF.  VBF thereafter operated a sustainable fish farm ("Farm") business (in the "aquaculture" industry) in Webster City, Iowa.

19.     The Founders controlled VBF from its incorporation until the Founders' departure from VBF by exerting control over VBF's operations and data regarding VBF's actual financial and operational performance, including in their continuing capacity as VBF officers.

20.     After terminating the Founders, VBF conducted an investigation through which VBF, by March 2018, started to discover the misappropriations and other misconduct alleged

herein.  VBF did not know, nor could it have known, of the Founders' misconduct until that time, especially since the Founders fraudulently concealed their misconduct from VBF, as further alleged herein.

21.     VBF discovered at least fourteen schemes consummated by the Founders to accomplish their misappropriations over a period of approximately three years.  The Founders accomplished these schemes without the approval of disinterested VBF directors with knowledge and notice of such schemes.

22.     Further, after VBF commenced this action on July 31, 2018, VBF, through continuing investigation and discovery, discovered more facts upon which this Second Amended Complaint is based. Prior to this investigation and lawsuit discovery, VBF did not know, nor could it have known, of all of these facts, and how they fit into the Founders' various schemes and other misconduct, especially since the Founders and the other Defendants fraudulently concealed their misconduct from independent directors of VBF, as further alleged herein.

23.     It was not until after VBF terminated all of the Founders that the Founders' grip over VBF, including its data, lessened and VBF was able to investigate the Founders' misconduct with less obstruction by the Founders.  This permitted VBF to start to learn the depth of the Founders' misconduct, which VBF is still investigating.  VBF could not have been aware of any of the transactions involving payments made to the Founders or fraudulent nature of those transactions until after it terminated the Founders.

24.     Thus, the discovery rule, fraudulent concealment, and equitable tolling principles apply to any applicable limitations period. *See, e.g.*, *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998) (where the discovery rule shifts the date of the "legal injury" from the time the wrongful action occurred to the time when "[plaintiffs] knew or, exercising reasonable

diligence, should have known of the facts giving rise to a cause of action"); *State v. Allan Const. Co.*, 851 F.2d 1526, 1528, 1534 (5th Cir. 1988) (holding that acts taken to conceal wrongful conduct and denial of wrongdoing may support the application of fraudulent concealment and reversing the trial court's grant of summary judgment on limitations grounds); *Remmes v. Int'l Flavors & Fragrances, Inc.*, 453 F. Supp. 2d 1058, 1067 (N.D. Iowa 2006) ("Under the common law discovery rule, an action does not accrue until the plaintiff knows or in the exercise of reasonable care should have known both the fact of the injury and its cause"); *Rieff v. Evans*, 630 N.W.2d 278, 290 (Iowa 2001), as amended on denial of reh'g (July 3, 2001) (holding that fraudulent concealment can toll the applicable statute of limitations and that, in the case of a fiduciary, plaintiff need not plead affirmative concealment and "mere silence may be enough to equal fraudulent concealment.")[1]

## V.  THE FOUNDERS' MISAPPROPRIATIONS

25.     The first category of the Founders' misconduct is their misappropriation of VBF's cash and other assets. The Founders never invested any of their own money in VBF.  Instead, they conspired and worked together to drain VBF of approximately $5,000,000 to $10,000,000 in cash and other assets over their three-year reign to directly benefit themselves to the detriment of VBF. This amount is subject to VBF's continuing investigation.

### A.     BAJJER Stock Scheme

26.     BAJJER LLC ("BAJJER") is owned and controlled by some or all of the Founders or their affiliates, including but not limited to, BHDH Family, LP (Hall), Law Holdings, LLC (Wulf), and J2 Family, LP (Ted Rea).  On September 18, 2014, the Founders directed VBF to transfer 1,250,000 shares of VBF Canada (VBF Canada initially owned the shares of VBF) to

---

[1] Alternatively, VBF cites Iowa law regarding the discovery rule as Iowa substantive law applies to this case.

BAJJER, for a grand total of $1.25. A true and correct copy of documentation regarding this transaction is attached and incorporated herein as **Exhibit 1**.

27. Such stock was sold to others around that same time for $0.90 per share, meaning that the Founders received for free what the Founders valued to others at the time as at least $1,125,000 worth of stock. Unfortunately, due to the Founders' misconduct, stock in VBF and its affiliates is without value.

**B.      American Growth Funding Loan Scheme**

28. BAJJER II, LLC ("BAJJER II") is also owned and controlled by some or all of the Founders or their affiliates (and third parties), including but not limited to, BHDH Family, LP and J2 Family LP. American Growth Funding, LLC ("AGF") loaned $78,000 to BAJJER II, which grew to $101,000, with interest, and which AGF wrote off as bad debt on or before December 31, 2016. AGF is a factoring/finance company, and its affiliates have been sued for fraud by the United States Securities and Exchange Commission, in the United States District Court for the Southern District of New York, as summarized in this press release: https://www.sec.gov/news/pressrelease/2016-21.html. Either BAJJER or BAJJER II initially owned AGF.

29. AGF loaned BAJJER another $200,000, which BAJJER transferred to VBF.

30. On July 8, 2016, the Founders directed VBF to pay AGF $375,000, even though VBF never had a direct borrowing relationship with AGF. Upon information and belief, this $375,000 amount encompasses not only the $200,000 referenced in paragraph 29 above, but also the $101,000 amount referenced in paragraph 28 above.

31. Therefore, the Founders utilized VBF funds to repay an alleged debt to AGF representing funds that did not benefit VBF, but instead that benefitted the Founders personally.

**C.**     **Wulf Lake House Scheme**

32.     Wulf owns, or owned at relevant times, a vacation home on a lake in Texas ("Wulf Lake House").  A fire destroyed the Wulf Lake House in early 2015.

33.     Wulf rebuilt the Wulf Lake House from in or around May 2015 through in or around July 2017.

34.     VBF employee Tracy Arbanas ("Arbanas") oversaw the reconstruction of the Wulf Lake House, and VBF paid her to do so at an annual cost to VBF of approximately $97,500, which represented Arbanas' compensation and benefits.  James Rea authorized Arbanas' work as it related to the Wulf Lake House.  Further, VBF funded housing for Arbanas close to the Lake House, and refreshments for the construction crew on this project.  All told, VBF incurred approximately $107,490.51 for compensation and benefits to Arbanas.  These funds did not benefit VBF, but instead, benefited Wulf.

**D.**     **Sedun Stock Scheme**

35.     Gregg Sedun ("Sedun"), upon information and belief, has had social and/or business relationships with the Founders outside of VBF, and preexisting VBF's incorporation.

36.     On December 11, 2015, Sedun loaned $200,000 to VBF, and Sedun loaned another $50,000 to VBF through an entity owned and controlled by Sedun, Alcaron Capital Corp. ("Alcaron") on June 23, 2016.

37.     On July 12, 2016, VBF paid Alcaron $326,056, representing about $76,000 in interest on $250,000 in loans made only months before the repayment.  That same day, July 12, 2016, Wulf authorized VBF to issue 1,500,000 shares of VBF to Alcaron, purportedly for Sedun's procurement of other investment in VBF, with Alcaron paying nothing for this stock (again, the stock was valued at $0.90/share at the time, rendering this allotment of stock to be worth about $1,350,000 at the time.)  Two days later, on July 14, 2016, Sedun loaned Wulf $225,000 for the

Wulf Lake House and Wulf promoted Sedun to be a VBF director.  Therefore, Wulf utilized VBF funds to benefit himself personally, rather than VBF.

**E.**     **Compensation Scheme**

38.     The five Founders set their own compensation from VBF at $400,000 annually for each Founder besides Driver, who made $325,000 annually, for a total for all five of the Founders of $1,925,000 per year.  For the sake of reference, one person replaced all of the Founders as VBF's President, and VBF has paid him $250,000 per year.  Therefore, the Founders were overpaying themselves at least, and approximately, $1,675,000 per year, even if they had been properly performing their duties, which they were not.

39.     Additionally, at the Founders' direction, without valid reason, and without full disclosure of material facts to disinterested directors such as those facts alleged herein, VBF paid the five Founders twice their monthly compensation in July 2016.

40.     At the time of this compensation, the disinterested VBF directors did not know of the Founders' fraud and other misconduct, and otherwise did not possess sufficient knowledge of the Founders' misconduct to knowingly approve of this excessive compensation.  The Founders not only affirmatively led such directors to believe that their compensation was justified based on VBF's actual performance, which the Founders consistently misrepresented as succeeding when it was actually failing, as the Founders knew, but also concealed material facts from those directors. In other words, the Founders misled disinterested directors into believing that the Founders' services to VBF were worth $1,925,000 in annual compensation and other benefits.

41.     This is all the more troubling because though the Founders were taking millions of dollars in "compensation" from VBF, they had not invested any of their own money in VBF, were misappropriating and misusing other funds of VBF, were purposefully mismanaging VBF to

benefit themselves and their other companies, and were committing and hiding their fraudulent acts from the independent directors and shareholders.

**F.      Gagne Scheme**

42.      Gagne is Wulf's daughter. Gagne is a Canadian citizen who did not have any legal immigration status to work in the United States during the relevant time period.  VBF, at Wulf's direction, purportedly employed Gagne or contracted with her for alleged services. Gagne would often drive from Canada allegedly to work at VBF in Webster City, Iowa.

43.      VBF, at Wulf's direction, paid Gagne not under her real name, but under the name "Ronnie O'Brien" to conceal VBF's payments to her.

44.      Gagne abruptly left VBF in November 2017, when VBF terminated Wulf's employment and other statuses with VBF.  At that time, Gagne said the following words to those present at VBF's Webster City, Iowa facility at the time, in recognition of the misconduct represented by her relationship with VBF as fostered by some or all the Founders: "None of you have ever seen me and you do not know who I am."

45.      At a minimum, VBF incurred approximately $52,264.28 for compensation and benefits to Gagne, which benefited Gagne and Wulf and was to the detriment of VBF.  Further, this and other schemes demonstrate the general manner with which the Founders played "fast and loose" with applicable laws and regulations to the detriment of VBF and for their own benefit.

**G.      OFA Scheme**

46.      The Founders incorporated Opposing Flows Aquaculture, Inc. ("OFA") on July 31, 2014 in anticipation of VBF's operations.  VBF grows its fish in tanks that are housed at the Farm ("Tanks").

47.      The Founders formed OFA to buy Tanks from a third-party, and then to resell Tanks to VBF at a profit to OFA and the Founders ("OFA Scheme").

48.     Of course, it was more beneficial to VBF not to pay OFA a profit as an unnecessary "middleman."  Instead, VBF could buy directly from the third party without paying any amount to OFA, which VBF ultimately has done now that it is no longer under the control of the Founders. VBF has yet to discover that OFA engaged in any transactions.  Through its count for an equitable accounting, however, VBF seeks a full accounting of OFA from the Founders.

## H.     Misappropriations of VBF Canada Stock

49.     The Founders did not invest their own money into VBF or VBF Canada.

50.     Yet, the Founders caused VBF Canada to issue VBF Canada stock to entities that the Founders owned.  Specifically, the Founders caused VBF Canada to issue to (a) Seven Hours Holding Company, Inc., Driver's company, 2,500,000 common shares in VBF Canada at $0.000001 a share; (b) BHDH Family, LP, Hall's company, 3,600,000 common shares in VBF Canada at $0.000001 a share; (c) J2 Family, L.P., Ted Rea's company, 3,300,000 common shares in VBF Canada at $0.000001 a share; LAW Holdings LLC, Wulf's company, 3,600,000 common shares in VBF Canada at $0.000001 a share; and (d) RGI Dragon, LLC, James Rea's company, 3,600,000 common shares in VBF Canada at $0.000001 a share.

51.     At the time of the transfer, the Founders were valuing the shares in VBF Canada at approximately $0.90 a share and requiring others to pay that price for VBF Canada shares.  Issuing such shares benefited the Founders to the detriment of VBF.

## I.     Other Misappropriations of VBF Funds For Personal Use

52.     The Founders engaged in a variety of other schemes through which they orchestrated VBF's expenditure of its funds or other assets for the Founders' personal benefit, not VBF's, and to VBF's detriment, including, but not limited to, the following:

    a.     travel and other expenses relating to a July 2014 trip by some or all of the Founders to Denver, Colorado in relation to a non-VBF business known as ChipMeds, Inc., and possibly other expenses relating to this entity;

b.      Wulf's personal cell phone bills well beyond a reasonable amount, or even the amount expensed to VBF by the other Founders;

c.      James Rea's personal living expenses in Ames, Iowa, about forty miles from Webster City, Iowa in or around August 2017;

d.      exorbitant travel expenses for the Founders to travel to or from Canada or Texas to Webster City, Iowa;

e.      the unnecessary leasing of twenty-two company vehicles, including Ford Explorers for the Founders' personal use;

f.      payment of personal travel expenses for the Founders and some or all of Founders' friends and family, including trips to Australia and Norway;

g.      directing VBF's controller to perform accounting services for the Founders' non-VBF business ventures while on VBF company time and while he was being paid by VBF;

h.      $310,000 for the purchase of a house in Webster City, Iowa, when the house was worth $240,000, if not less, and the home was not necessary for legitimate business reasons given the Founders' maintenance of their residence in Texas or Canada.  Indeed, VBF, through Hall and possibly other Founders, purchased this home on August 9, 2016 for $310,000 and VBF sold this home on May 25, 2018 for $232,000. True and correct copies of the relevant closing statements are attached as **Exhibit 2**; and,

i.      other improper expenditures of VBF funds for some or all of the Founders' personal expenses.

53.     Overall, perhaps one non-Founder VBF director said it best at a December 6, 2017 VBF board meeting when the Founders' misconduct was just starting to come to light: the Founders spent VBF's money "like drunken sailors."  Those same minutes reflect VBF's discovery that just three of the Founders, Wulf, Hall, and James Rea, had run up $496,000 in improper expenses reimbursed by VBF over a mere fifteen-month period.  The Founders took so much money out of VBF that VBF requires a full equitable accounting from the Founders to learn the true depth of the Founders' misappropriation and squandering of VBF's funds.

### VI.  **The Founders' Intentional Misrepresentations of VBF's Technology and Finances**

54.     In Section V, VBF alleges the Founders' misappropriation of approximately $5,000,000 to $10,000,000.  However, as alleged, VBF lost a total of $90,000,000 under the Founders' reign and due to their misconduct.

55.     VBF was never profitable under the Founders' three-year reign.  The Founders, like many swindlers, procured funds through fraud and other misconduct and then wasted tens of millions of dollars by investing in and operating VBF, including to benefit themselves, despite knowing VBF to be a fatally-flawed venture.  The Founders did so, in part, by knowingly misrepresenting VBF's performance and operational metrics, finances, and the amount of technical experience behind VBF, while concealing material and contrary information from disinterested VBF directors.  The Founders worked in concert to accomplish the fraud and bad acts, backing each Founder's misrepresentations and misconduct, which further explains how the Founders squandered $90,000,000 in about three years.

56.     Overall, the Founders violated their fiduciary duty of due care by blatantly and intentionally mismanaging  and misusing VBF funds and assets without regard to VBF's best interests or actual performance, including, but not limited to, overbuilding VBF's facilities, presenting highly flawed and intentionally manipulated business plans based on false representations of actual performance, misrepresenting technology, misrepresenting and/or recklessly or intentionally mismanaging capital expenditures, misrepresenting and/or recklessly or intentionally mismanaging other financial and operational issues, purchasing unnecessary real and personal property, overpaying for real and personal property, and otherwise, in a period of three years, squandering for their own benefit and to the detriment of VBF what had been an investment of approximately $90,000,000 in debt and equity by others (non-Founders) in VBF.

A.      **Key Performance and Financial Metrics**

57.     VBF was an indoor aquaculture business that relied on indoor Tanks to cultivate and grow its fish. There are several fundamental metrics ("<u>Metrics</u>") important to an aquaculture business like VBF. Information that is material to disinterested directors and officers in an aquaculture business includes data as to how the business is performing in these Metrics, and how this actual performance impacts planning, projections, and/or forecasts.  VBF, through its predecessor, Iowa's First, had been operating for approximately two to three years by the time the Founders started to solicit investments in VBF.

58.     In no particular order, the first Metric is the "Feed/Fish Conversion Ratio" ("<u>FCR</u>"). The FCR is stated in an equation as to the amount of fish feed (food) an aquaculture business utilizes to grow every pound of fish. For example, a 1:1 FCR means that the business utilizes one pound of fish feed for every pound of fish grown by the business. The FCR Metric heavily impacts an aquaculture business' profitability, or lack thereof, as spending too much money on feed increases costs.

59.     Second, there is density ("<u>Density</u>"), which is the amount of fish (measured in pounds) per tank that an aquaculture company can safely grow with reasonable mortality rates.

60.     Third, there are mortality rates ("<u>Mortality Rates</u>" or "<u>Mortality</u>") that are stated as a percentage of the amount of fish that die in the cultivation process.

61.     In addition to the Metrics, a paramount issue in the aquaculture business is the ability to supply and circulate clean water in the cultivation tanks ("<u>Water Quality</u>").  Fecal matter from the fish and other debris (such as uneaten feed) degrade water quality, and the ability of an aquaculture business to filter such toxic materials and to supply oxygen rich water limited in nitrates is critical to the success of the business.

62.     As far as financial performance, one measure represented by the Founders was "EBITDA per pound," that is the amount of Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA") per pound of fish.

63.     Also, aquaculture is a highly specialized industry, and therefore the technical experience and expertise behind such a business is crucial.

**B.     Overview of Canaccord's Participation in the Founders' Fraud And Breaches of Fiduciary Duty**

64.     In many respects, the Founders "reverse engineered" their plans: they knew what EBITDA, rates of return, or other financial metrics would be appealing to potentially interested third parties, shareholders and disinterested board members, and backfilled false data in order to achieve their lofty but unrealistic EBITDA or rates of return.   The bio-plans were even incompatible and inconsistent with VBF business plans, prepared by the Founders, as certain data included on bio-plans was represented differently on business plans. VBF will collectively refer to bio-plans and business plans as the "Reports."

65.     The Founders had the substantial assistance of Canaccord, the investment banker hired to help the Founders find debt and/or equity investments in VBF Canada.  Canaccord never performed any services directly for VBF, instead performing them for VBF Canada, but the representations that Canaccord concocted and publicized with the Founders were relayed to VBF, and continued by former Canaccord employees and/or the Founders until the last of the Founders left VBF in early 2018.

66.     Canaccord's work (the "Canaccord Project") began in or around January 2015 and allegedly continued into in or around July 2016.  Canaccord assigned a large team to the Canaccord Project, including, but not limited to, senior managing director (a prominent title at Canaccord) Steve Lobb ("Lobb"), corporate bond manager Mark Pibl ("Pibl"), senior investment banker

Jennifer Pardi ("Pardi"), Robert Goodman ("Goodman"), and sales person Clive Ginsberg ("Ginsberg").

67.     At some time in 2015, Lobb and Goodman left the employ of Canaccord to work for VBF, hired by the Founders.  This further established the linkage between Canaccord and the Founders, and Lobb and Goodman continued to be intimately involved in making misrepresentations about VBF, in collaboration with the Founders, as alleged herein as VBF employees or 1099 contractors.

68.     Canaccord was first attempting to raise debt for the Canaccord Project, but later solicited equity investors as well.

69.     Canaccord's process, upon information and belief, was generally in two parts. First, Canaccord investment bankers such as Lobb, Pardi, and others reviewed the underlying business and approved it for sale by Canaccord's sales team such as Ginsberg. Second, Ginsberg and other Canaccord sales people sought out to solicit debt and equity investors for the Canaccord Project.

70.     At the same time of the Canaccord Project, Canaccord was also trying to solicit investors for another purported business of the Founders, known as VeroLube. VeroLube was a business completely unrelated to VBF, and ultimately, upon information and belief, equally as unsuccessful as VBF.  Therefore, Canaccord's ties to the Founders ran deep.

71.     Ginsberg and others at Canaccord met with Founder Wulf three times in or around May and June 2015 to collaborate on the Canaccord Project.  There were also many email communications between these Canaccord representatives and the Founders, especially Wulf and Hall, on many occasions in the time period of in or around January 2015 to summer of 2016. Ginsberg also had fairly regular telephone calls with Wulf and perhaps other Founders, as well as

other Canaccord representatives, during in the May to July 2015 time frame.  VBF and Canaccord also had an electronic "data room" for the Canaccord Project, allowing for the further sharing of information.   Through these communications and information sharing, the Founders and Canaccord shared and revised data related to VBF's business and the Metrics, and in turn made representations regarding the same in Reports.

72.     Overall, Canaccord employees such as Lobb, Goodman, Ginsberg, and other Canaccord representatives contributed to Reports that resulted in the ultimate transmittal and continuation of false and misleading information as to VBF's operations and performance to disinterested VBF directors, and others.  The time period of the Canaccord Project, from in or around January 2015 to in or around summer 2016, was a critical period when the Founders and Canaccord solicited and obtained funding for VBF (and the Founders, Lobb, and/or Goodman continued to represent such data thereafter).

73.     Similarly, in a May 31, 2015 email from Wulf to Ginsberg and others at Canaccord, Wulf transmitted a valuation of VBF prepared by Hall that valued VBF at $32,500,000 at that time.  A true and correct copy of this email and valuation is attached as **Exhibit 3.**  This valuation was purportedly based in part on data of VBF's then-current operations and finances, and demonstrated that Canaccord was soliciting equity investment of $25,000,000 in VBF, in addition to an alleged debt commitment of $26,000,000.  This document also includes a $10,800,000 "promote fee" to the Founders for their alleged work done on VBF to date.  As is clear from Section V above, the Founders ultimately procured the approximate equivalent to this amount, if not more, through misappropriations from VBF.  This valuation was ultimately incorporated into Canaccord-Founder representations alleged herein.

74.     One example of Canaccord-Founder representations is the "Third June 2015 Written Representations," which are further alleged in other sections relating to specific Metrics below.   A true and correct copy of the Third June 2015 Written Representations is attached as **Exhibit 4.** The first page contains the notation, "CG-NYC," as in "Canaccord Genuity-New York City," to demonstrate Canaccord's input into this document, and dispersing of the information set forth therein to the marketplace.   The Third June 2015 Written Representations were the culmination of the collaboration between Canaccord and the Founders that began in or around January 2015 and which purported to be based on actual and then-current VBF data.   Canaccord directly revised representations contained in these written representations.   Further, the Third June 2015 Written Representations were represented to be based on actual data from the operations of VBF and its predecessor, Iowa's First, dating back to 2012.

75.     Ginsberg was introduced to a preeminent aquaculture expert Anthony Michaels, PhD ("Dr. Michaels") in or around early June 2015.   Dr. Michaels is an aquaculture consultant and investor who performed diligence on VBF in regards to a possible investment for his firm or other firms.   Ginsberg came to know that Dr. Michaels had extraordinary expertise in the indoor and outdoor aquaculture industry, and at the time there was a dearth of experts as to the indoor aquaculture industry.

76.     In a June 5, 2015 email, Ginsberg introduced Dr. Michaels and his expertise to Wulf because Dr. Michaels was an aquaculture expert.

77.     On June 7, 2015, Canaccord and the Founders finalized the Third June 2015 Written Representations.

78.     On June 12, 2015, Ginsberg, Wulf, and Dr. Michaels had a conference call to discuss VBF.  Ginsberg provided the Third June 2015 Written Representations to Dr. Michaels shortly before the call to prepare Dr. Michaels for the call.

79.     Dr. Michaels reviewed the Third June 2015 Written Representations.  Thereafter, by June 15, 2015, Dr. Michaels advised Ginsberg in an email, a true and correct copy of which is included in **Exhibit 5**, that:

> We find multiple significant errors in the numbers and weaknesses in the [Third June 2015 Written Representations] assumptions, all of which over-inflate the economics and understate the risks. As a result, we are not comfortable helping the company with its search for capital through any of (*sic*) of our existing relationships.

80.     Ginsberg described Dr. Michaels' findings as "very negative feedback."  Ginsberg, on behalf of Canaccord and the Founders, asked Dr. Michaels for more specificity, and Dr. Michaels obliged.

81.     As set forth in **Exhibit 5**, on June 15, 2015, Dr. Michaels provided more specifics such as:  (a)  that the Founders' reported data as to water flow, water oxygenation, and water cleanliness was "almost at the theoretical limits and it is almost impossible to be that close" (meaning that the Founders' representations as to these crucial metrics were fantasy); (b) that the Founders' other reported data as to those water issues "is 5 times better than the best that has ever been done commercially, but when compared to the water chemistry-it would kill the fish" (i.e. because there would be too many lethal elements in the water); and, (c) referring to the OFT, "[t]he technology is not as new as claimed and multiple companies have gone bankrupt on similar systems. The operators of these kind of systems have never met the claimed spec in commercial practice at scale over extended periods."

82.     Dr. Michaels' last statement turned out to be a prophecy for VBF, which filed for bankruptcy in 2018 based on the Founders' and Canaccord's fraudulent advancement of the OFT

"system" criticized in Dr. Michaels' findings.   The Founders and Canaccord concealed this prophecy of bankruptcy from potentially interested third parties, and ultimately from disinterested VBF directors.

83.     Indeed, with Dr. Michaels' permission, on June 16, 2015, Ginsberg forwarded the response to Wulf who immediately forwarded it to the other Founders, with the message:  "Les [Wulf], see below as discussed on the phone earlier."  **Exhibit 5.**  This indicates that Ginsberg and Wulf spoke on the phone about Dr. Michaels' negative findings on June 16, 2015.  Dr. Michaels authorized Ginsberg to share his thoughts with the Founders for altruistic reasons, *i.e.* partly so the Founders would not make such misrepresentations to others.

84.     Later that same day, June 16, 2015, Wulf forwarded Ginsberg's email and Dr. Michaels' report to the other four Founders with the message: "See below from the expert . . . Clive [Ginsberg] thinks he is jealous because he spent 7 years and did nothing in industry." **Exhibit 5.**  Therefore, the Founders blatantly disregarded Dr. Michaels' specific and pointed criticism of the Founders' misrepresentations because the truth spoken by Dr. Michaels would have prevented any reasonable investor or lender from providing funds to VBF.  Further, this truth, if known by disinterested VBF directors, would have caused such directors to seek to cease VBF's business and pursue the Founders, not release them.

85.     At his May 2019 deposition, Ginsberg testified that he never told Wulf that Dr. Michaels was "jealous" of the Founders or VBF.  Additionally, Ginsberg never told Wulf that Dr. Michaels never did anything in the industry, which would have been an outright lie.  Indeed, Dr. Michaels is an aquaculture expert with decades of experience, who has a PhD in an aquaculture discipline, taught aquaculture-related classes at the University of Southern California for about twelve years, was an investor in aquaculture businesses for years, and was referred to by Wulf

himself as an aquaculture "expert." Ginsberg confirmed that Dr. Michaels, to his knowledge, had more indoor aquaculture expertise than anyone who had reviewed VBF.

86.     Dr. Michaels also relayed other extremely negative information about VBF to Ginsberg through June 15, 2015 emails. Ginsberg admitted at his May 2019 deposition that "100 percent" (certainly) VBF potentially interested third parties, which would include those who became disinterested board members, should have been advised of Dr. Michaels' findings by the Founders and Canaccord. Ginsberg further testified at that deposition that "I would have definitely passed this [Dr. Michaels' findings] onto any of my investor base had they shown any inkling of interest I would have certainly passed it on, yes."

87.     However, such disclosure never occurred, including to VBF disinterested directors or other independent parties to VBF's knowledge, including, but not limited to, in the many written representations by the Founders and Canaccord as alleged herein. Thus, the Founders and Canaccord ignored Dr. Michaels' warnings, as they previously did with Dr. Kevin Fitzsimmons' September 2014 warnings about fatal flaws and false data in VBF's representations (as alleged below). This firmly demonstrates that Canaccord and the Founders were in harmony as to their wilful ignorance of multiple warnings from industry experts that VBF would fail (and even that it would go "bankrupt," as VBF did in 2018).

88.     Another example of Canaccord's and the Founder's joint manipulation and misrepresentation of VBF data can be seen in a July 7 to July 10, 2015 email chain amongst Wulf, Ginsberg, Lobb, Pibl, and another Canaccord representative, a true and correct copy of which is attached as **Exhibit 6**. By this point in time Canaccord and the Founders were disappointed with the reception in the marketplace received by VBF, and had Dr. Michaels' and Dr. Fitzsimmons' stark and negative findings in hand. To artificially drum up interest in VBF, Wulf advised

Ginsberg to advise potentially interested parties of "the story we have over 50% book full," meaning that Wulf advised Ginsberg to represent to others that VBF had commitments to 50% of its targeted equity investment, then $25,000,000 (or $12,500,000 in represented commitments). This was false as VBF had no such commitments at that time.

89.     The collaboration between Canaccord and the Founders is further alleged below in the context of representations made as to specific Metrics or other specific sub-issues.

## C.     Founders' and Canaccord's Misrepresentations of The Metrics

90.     As to technology, the Founders promoted the "Opposing Flows Technology" ("OFT"), which allegedly was VBF's proprietary technology, its "secret sauce," through which the currents in its Tanks would supposedly perform better than VBF's competition in supplying clean and oxygenated water to fish growing in VBF's Tanks.

91.     In reality, as later learned by VBF, the Founders consistently lied about, and over-exaggerated a number of important technical and performance data, including, the OFT and the Metrics.

92.     In a typical aquaculture business, the Metrics are the building blocks of the "bio-plans." A bio-plan is an aquaculture business' way of organizing its business around the Metrics, based on actual data. A bio-plan that incorporates actual and traditional financial metrics, such as revenue, costs, and EBITDA, can be characterized as a "business plan."

93.     However, the Founders did not materially base their "bio-plans" on actual, proven, performance data, but rather, on the Founders' invented data that many times was misrepresented as data reflecting VBF's actual operations.

## D.     The Founders' Misrepresentations of FCR

94.     The Founders consistently represented a FCR of approximately 1:1 to VBF and third parties, including disinterested VBF directors. After terminating the Founders, disinterested

VBF directors and officers learned that VBF's FCR was never even close to 1:1 (and certainly not on the consistent or material basis represented by the Founders). And, after terminating the Founders and after consulting with aquaculture experts, VBF learned that an FCR of 1:1 on large scale would be very hard, if not impossible, to achieve in an indoor or "closed" aquaculture system in the United States given its stricter environmental laws as compared to other countries where aquaculture competitors exist, such as China and Vietnam. Below are some, but not all of the Founders' various FCR misrepresentations.

95.      In an excel file that Hall created on June 25, 2014 (the "June 2014 Written Representations") and amended for the last time on May 31, 2016, Hall lists VBF's FCR as 1:1. A true and correct copy of the excel file is attached as **Exhibit 7**. The June 2014 Written Representations were provided to potential and actual investors, including but not limited to, Alder Aqua, Ltd. ("Alder"), which ultimately appointed directors to VBF. Additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees.

96.      Attached as **Exhibit 8** is a true and correct copy of a September 2014 PowerPoint, prepared and reviewed by the Founders ("September 2014 Written Representations"), which contains information that was ultimately circulated to disinterested VBF directors and potential and actual VBF lenders and investors. In the September 2014 Written Representations, the Founders represented that VBF would achieve a "1:1" FCR (at p. 20).

97.      On September 17, 2014, Kevin Fitzsimmons PhD, an aquaculture expert and an alleged member of VBF's "advisory board" (as further addressed below), reviewed the September 2014 Written Representations and advised Driver of serious flaws therein. A true and correct copy of Dr. Fitzsimmons' email to Driver ("September 2014 Fitzsimmons Email") is attached as **Exhibit 9**. As it relates to FCR, Dr. Fitzsimmons warned Driver that "[a]n FCR of 1 to 1 is also

rare. Most farms are much closer to 2 to 1 when they start and edge down to 1 to 1.5 on typical operations." Driver in turn forwarded the September 2014 Fitzsimmons email to Wulf, James Rea, and Ted Rea, as set forth in **Exhibit 9**.  In that forwarding email, Driver noted Dr. Fitzsimmons' negative comments about VBF's data, including FCR and EBITDA, to the other Founders.

98.    As they later did with Dr. Michaels, the Founders, however, ignored Dr. Fitzsimmons' input since the truth was an impediment to their ability to raise funds.  Instead, the Founders continued to represent that VBF was achieving a 1:1 FCR when VBF was in fact not doing so.  For example, in a November 2014 PowerPoint also prepared and reviewed by the Founders ("November 2014 Written Representations"), the Founders again represented an FCR of 1:1 or less.  The information contained in the November 2014 Written Representations was, on information and belief, shared in some form ultimately with disinterested VBF directors and/or potentially interested third parties.  A true and correct copy of November 2014 Written Representations is attached as **Exhibit 10** (at p. 13, 18).

99.    Similarly, in a PowerPoint entitled "Opposing Flows Aquaculture Tank System Performance Data-Barramundi at Blairsburg, Iowa Facility November 2014 to April 2015," also prepared and reviewed by the Founders ("April 2015 Written Representations"), the Founders again represented an FCR of 1:1 or less, claiming (at the last page) that the "AVERAGE FCR ACROSS FULL LIFECYCLE IS 1.038:1," based on "operation data and taking into account conservatism through calculations."  A true and correct copy of the April 2015 Written Representations is attached as **Exhibit 11**.  The April 2015 Written Representations were based on alleged data from the Nelsons.  The information contained in the April 2015 Written Representations was, on information and belief,ultimately shared with disinterested VBF directors and/or potentially interested third parties.

100.    The Founders also provided the April 2015 Written Representations to Fisheries

Technology Associates, Inc. ("Fisheries"), a consultant doing diligence on VBF for a potential

lender and/or shareholder in June 2015.  Fisheries prepared a "Due Diligence Report" based on

same ("July 2015 Fisheries Report").  A true and correct copy of the July 2015 Fisheries Report is

attached as **Exhibit 12.**

101.    Specifically, based on data that the Founders (and especially Driver), upon

information and belief, provided Fisheries, Fisheries concluded that VBF's performance data

"appears to confirm feed conversion ratio (at or near 1.0 pounds of feed per pound of fish) and

growth rates (reaching 2.2 pounds in 6 months)."  The July 2015 Fisheries Report was provided to

potential and actual investors, including but not limited to, Alder, which ultimately appointed

directors to VBF.  Additionally this information was, on information and belief, passed onto other

disinterested VBF directors and employees.

102.    Likewise, in a February 16, 2015 writing prepared by Driver, Driver represented

that VBF's FCR was 1.03:1 ("February 2015 Written Representations").  The February 2015

Written Representations were also provided to Fisheries sometime in June 2015.  A true and correct

copy of the February 2015 Written Representations is attached as **Exhibit 13.**

103.    Similarly, in a March 25, 2015 spreadsheet prepared by Goodman (of Canaccord

and later VBF) and modified by Hall ("March 2015 Written Representations"), a 1:1 actual FCR

was again represented.  A true and correct copy of the March 2015 Written Representations is

attached as **Exhibit 14**.

104.    In June 2015, at least one of the Founders made a written representation that the

average feed conversation ratio was "1:1 pound of feed per pound of weight gain" ("First June

2015 Written Representations").  A true and correct copy of the First June 2015 Written

Representations is attached as **Exhibit 15** (at p. 4).  The First June 2015 Written Representations were made to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF. Additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees.

105.    Also in a June 2015 email, Hall made written representations that excluded fish feed in the calculations of FCR.  Hall first sent his email to Driver, Wulf, Ted Rea, and James Rea for their approval and then, presumably after they approved, he sent the e-mail to a potential lender ("Second June 2015 Written Representations").  A true and correct copy of the Second June 2015 Written Representations and the draft of same to the Founders is attached as **Exhibit 16-1 and Exhibit 16-2.**  In the Second June 2015 Written Representations, Hall admitted that VBF does not always track FCR as it "as it takes a considerable amount of staff time during a period of relative 'steady-state' operation."   This disclosure, however, was not made by the Founders in other representations alleged herein and demonstrates the reckless way in which the Founders represented important Metrics to potentially interested third parties and disinterested directors.

106.    Similarly, in June 2015, the Founders provided data to Canaccord for materials intended for potential lenders and/or shareholders, including that VBF then enjoyed an "industry-leading [FCR] of 1:1" ("Third June 2015 Written Representations").  A true and correct copy of the Third June 2015 Written Representations is attached as **Exhibit 4.**

107.    In late January and early February 2015, the Founders and Canaccord prepared a written representation ("January/February 2015 Written Representations") colloquially called a "teaser," which was modified by Canaccord and approved by VBF counsel Jackson Walker LLP ("Jackson Walker").  This document made various misrepresentations of VBF's technology and market, including a representation that "Barramundi feed conversion in an OFT tank can reach

1:1." A true and correct copy of the January/February 2015 Written Representations is attached as **Exhibit 17.** This document contains information that was, on information and belief, shared with VBF disinterested directors and potentially interested third parties. A similar document was also circulated to individuals at National Bank of Canada, which worked with Canaccord and the Founders to disperse VBF information to the marketplace, and Sean Maniaci, a purported VBF shareholder and counsel (as discussed more in-depth below). A true and correct copy of said email is attached as **Exhibit 18**.

108.    In an August 24, 2015 email from Wulf to Canaccord and National Bank of Canada ("August 2015 Written Representations"), Wulf  notes that they have modified the teaser and marketing deck to "reflect the De-Risked nature and advanced nature of the present operations," and that Canaccord and National Bank of Canada should use "this copy on the big equity push." A true and correct copy of the August 2015 Written Representations and the attachments thereto are attached as **Exhibit 19**. Wulf asserts that "[w]ith strong fish growth performance and industry low food conversion ratio of 1:1 in the OFA tank system, the impact of increases in fish meal cost effect of feed costs are for every $100 per metric ton increase impacts the price of feed to VBF by only $.015 per pound."

109.    Then, on October 22, 2015, Wulf sent Canaccord VBF's sales metrics and gross profits and again noted the 1:1 FCR ("October 2015 Written Representations"). A true and correct copy of the October 2015 Written Representations is attached as **Exhibit 20**. This email also represents unrealistic growth rates and utility costs. Finally, Wulf represents that there is no "scale up risk going from our present operations to 240 tanks in the Urban Farms expansion."

110.    In a November 5, 2015 presentation ("November 2015 Written Representations") the Founders represented that data from their internal software system supported an FCR of "1.03:1

or lower." A true and correct copy of the November 2015 Written Representations is attached hereto as **Exhibit 21**. The November 2015 Written Representations were made to potential and actual investors, and such data was included in representations ultimately made to Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees.

111.    Starting in August 2016 and continuing most months until November 2017, the Founders made written representations to disinterested VBF directors regarding the FCR. The Founders reported an FCR of 1.01 for the periods of July 2016 through February 2017 (**Exhibit 22-1 through 22-7** at p. 2). In February 2017, the Founders reported that VBF's FCR was 1.03 for March 2017, and continued to represent an FCR of 1.03 through May 2017 and again in August 2017 (**Exhibit 22-8 through 22-10 & 22-13** at p. 2). In June and July of 2017, the Founders reported an FCR of 1.02 (**Exhibit 22-11 through 22-12** at p. 2). Then, in September 2017, the FCR spiked to 1.483 (**Exhibit 22-14** at p. 2). In November 2017, it was 1.42 (**Exhibit 22-15** at p.2). (collectively, "2016 and 2017 Written Representations to the Board"). A true and correct copy of the 2016 and 2017 Written Representations to the Board is attached as **Exhibit 22**.

112.    In July 2017 VBF hired McCowan, who, later in 2017, came to suspect that VBF's real FCR was not 1:1. McCowan thereafter performed FCR testing and otherwise investigated VBF's FCR. After VBF terminated the Founders, McCowan discovered that VBF's real FCR at relevant times was 1.4:1, if not higher, not the 1:1 ratio consistently represented by the Founders and Canaccord. Thus, the Founders, at various and numerous times, falsely represented VBF's FCR to disinterested VBF directors and others. This was despite warnings from Drs. Fitzsimmons and Dr. Michaels, and actual VBF operational results, showing that VBF was not achieving a 1:1

FCR.  The Founders also based VBF's financial modeling, provided to disinterested VBF directors and potentially interested third parties, on false data.

113.    The FCR misrepresentation is material because an increase in FCR attributes to a 40% increase in VBF's number one expense: fish feed.  Thus, any increase in FCR has a tremendously negative impact on VBF's return on investment or the decision of disinterested directors to continue VBF's operations.

114.    Ultimately, the actual FCR was far less efficient than what the Founders represented and the impact of this misrepresentation is that VBF was actually spending many times more to feed fish than the Founders and Canaccord represented, which affected reports of VBF's operations and financial situation and projections.

### E.    The Founders' Misrepresentations of Density

115.    The development stages of commercially grown fish can be summarized as: eggs to hatchling (larvae) to spawn to fry (when the fish is out of its egg and can feed on its own) to fingerling.  A fingerling has been described as the last phase of the juvenile stage of fish, before it becomes an adult.  Commercial growers of fish start with fingerlings, and therefore must either grow fingerlings or purchase them from another source.  Upon information and belief, VBF bought fingerlings from a third party ("Mainstream") but this is subject to VBF's accounting count.

116.    When VBF was starting its operations in early 2015, the Founders knew that 10,000 to 12,000 fingerlings per tank was optimal, *i.e.* after an aquaculture business was up and running for years under experienced operators, operating efficiently, and operating profitably.  Their knowledge is reflected in representations that the Founders made (shown below), though, in reality, VBF never achieved the Density in the way that the Founders represented to others.

117.     In the February 2015 Written Representations prepared by Driver, and provided by Canaccord to others in June 2015, Driver represented that VBF's Density is "reaching 10,000 lbs per tank." *See* **Exhibit 13**.

118.     In in the First June 2015 Written Representations, Driver and/or other Defendants represented that VBF Tanks were stocking "16,000 fingerlings (40-60 gram) per pod every two months" with a "1:1 pound of fish per gallon of water" Density.  *See* **Exhibit 15** (at p. 4).  The First June 2015 Written Representations were made to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees. This was a false representation as VBF was not achieving such Density on a consistent basis, and never a profitable basis.

119.     In a June 20, 2015 e-mail, Wulf made a written representation to Goodman (of Canaccord) that VBF's base model used a Density of 10,000 fish per tank but "today we are stocking at 16,000 a 6,000 difference …in pounds produced out of each tank" (the "June 20, 2015 Representations"). A true and correct copy of this email is attached hereto as **Exhibit 23**.

120.     In response to the June 20, 2015 Written Representations, Goodman further explained that stocking at 16,000 results in an increase of the average harvest per tank of approximately 58% greater than the model which assumed 10,000 stocking per tank.  *Id.*

121.     Earlier that day, Goodman, in an email to Lobb (then working for VBF), Wulf, and Hall stated "I think if we list the assumptions that are conservative and show the impact of each on performance we can address this. For instance, change the assumed stocking density of 5,000 to 8,000 per tank would improve EBITDA by certain multiples."  A true and correct copy of this email is attached as **Exhibit 24**.  This further demonstrates the "reverse engineering" fraudulent

technique engaged in by Canaccord and VBF; that is to start with the numbers that these Defendants wanted to represent to the marketplace and others without regard to actual and contrary VBF data and reality, which was negative. Ginsberg described Goodman's manipulation of Density set forth above as a way to "juice up the numbers" at his May 2019 deposition. The Founders continued in this *modus operandi*, misrepresenting actual VBF data and "juicing up the numbers," to disinterested VBF directors throughout the Founders' tenure at VBF.

122. In a June 22, 2015 email chain amongst Wulf, Lobb, Goodman, Ginsberg, and Pibl, Wulf expressed disappointment that a recent "equity roadshow" that Canaccord and Wulf led in New York in order to find an equity investor for VBF, yielded little interest in VBF. A true and correct copy of this email chain is attached as **Exhibit 25.** Rather than taking the right approach by acknowledging VBF's shortcomings and ceasing efforts to market VBF, the Founders and Canaccord then stepped up their manipulate and misrepresent data to increase interest in VBF. For example, in this email chain, Wulf suggested further misrepresentations of actual and then-current VBF operational and financial data, including Density, to entice others into VBF.

123. Further, the July 2015 Fisheries Report cautioned that the VBF-provided stocking density data of one lb/g "is admirable, but should be approached with caution and care, and only after many months of company experience and management by experienced operators." **Exhibit 12** (at p. 5). This report also comments that densities of "0.2-0.7 pounds per gallon are more typical at other facilities with a similar production configuration*." Id*. Upon information and belief, the July 2015 Fisheries Report relied on data provided by the Founders, including false data relating to the Density of the VBF Tanks, which was shared with potential and actual investors, including, in some form or another, investors who actually became or appointed disinterested VBF directors.

124.    Despite these cautionary words, in an August 23, 2015 presentation, which is part of the August 2015 Written Representations and the October 1, 2015 marketing presentations, the Founders represented that VBF "has successfully been stocking a six tank pod with 16,000 fish or a 60% increase, representing $11M in additional EBITDA" ("October 2015 Written Marketing Presentation Representations").   The information was, on information and belief, shared with disinterested VBF directors and/or potentially interested third parties and is misleading because a "pod" is made up of six tanks.   The Founders were intentionally deceptive in describing the Density in a "six tank pod," to give the illusion that VBF had achieved a Density of 16,000 fish per Tank. A true and correct copy of the October 2015 Written Marketing Presentation Representations is attached as **Exhibit 26** (at p. 11).   *See* also **Exhibit 19** (Marketing Presentation at p. 11).

125.    The October 2015 Written Representations also notes a Density of 10,000 fish per 6 tank configuration, but that VBF is stocking 16,000 fish per six pack of Tanks. *See* **Exhibit 20**.

126.    In the November 2015 Written Representations the Founders represented that data from their internal software system supported a Density "originally with 10,000 fish per tank but VBF has validated stocking up to 16,000 fish per tank, a 60% increase. *See* **Exhibit 21**.   The November 2015 Written Representations were made to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief, likely shared with disinterested VBF directors and employees.

127.    Likewise, as reported by a member of the Nelson family who also worked for VBF, as of the fall of 2015, the Founders were promoting Reports calling for 15,000 fish per Tank, when this family member's data showed that VBF could only safely introduce 5,000 to 6,000 fish per Tank.   This individual reported his concerns to Driver and Ted Rea. However, the Reports

continued to use the artificially inflated numbers. And, as reported by this individual, Wulf would often push VBF's Density representations to 15,000 to 20,000 fish per tank.

128.    The Founders continued to misrepresent the actual Density of the Tanks in a January 2016 "Executive Summary" and Marketing Deck ("January 2016 Written Representations"), which stated that VBF was "currently stocking 16,000 fish per tank."  The January 2016 Written Representations were made to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees. A true and correct copy of the January 2016 Written Representations is attached as **Group Exhibit 27** (Executive Summary at p. 2).

129.    The January 2016 Written Representations also represented both that "VBF has successfully been stocking a six tank pod with 16,000 fish or a 34% increase over the model stocking." **Exhibit 27** (PowerPoint at p. 15).

130.    Similarly, in January or February of 2016, Driver, while walking a group of potential investors through VBF's facilities, misrepresented to those investors that VBF could stock 16,000 fish per tank ("January 2016 Oral Representations").  One of Driver's own subordinates advised him in or around that time that VBF was not meeting these Density representations and that it would be impossible for VBF to viably do so.

131.    Then, in April 2016, the Founders, particularly Wulf and Hall, created or contributed to an Excel file which represents that Density would increase from 12,000 to 16,000 fish per Tank ("April 2016 Written Representations").  The April 2016 Written Representations were made to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief,

34

passed onto other disinterested VBF directors and employees. In May, Wulf also sent the April 2016 Written Representations to non-Founder director Bjorn Thelander ("Thelander"), who was appointed by Alder. A true and correct copy of the April 2016 Written Representations is attached as **Group Exhibit 28**.

132. In the Founders' August 2016 board report, the Founders represented that one of VBF's facilities was stocking "16,000 *fish per tank*." *See* **Exhibit 22-1** (p. 2) (emphasis added). In the September and October 2016 board reports, the Founders misrepresented or were intentionally deceptive regarding the Density, stating: "16,000 fish *per six pack tank configuration*." **Exhibits 22-2 & 22-3** (p. 2) (emphasis added). In the May 2017 board report, the Founders represented that VBF was "back to 12,000 first stocking and 14,000 forward stocking." **Exhibit 22-10** (p. 2)

133. Thus, the Founders consistently and falsely claimed that VBF was achieving a Density of 16,000. In reality, the actual Density was either far less or, even if 16,000 fish were stocked at any given time, there was a significant impact of that Density on fish health (increasing mortality) and the water quality, which the Founders also concealed. In other words, while it is of course possible to stock 16,000 fish in a Tank no matter how poor the aquaculture business is operationally, more will die in the hands of such a business.

134. The impact of the 16,000 Density representation from a financial perspective is significant, including but not limited to, its correlation with annual production (i.e., a larger represented Density would support a larger represented pounds per production).

135. At various times, the Founders failed to include Density numbers in their Reports that they shared with third parties or the Founders changed the pounds of production without any corresponding change in Density.

136.    For example, in the June 20, 2015 Written Representations, Wulf represented to Canaccord that VBF's production per Tank increased from 20,000 pounds to 31,500 pounds because of a change in Density from 10,000 to 16,000 fish per Tank. Because of the increased pounds per tank, Wulf represented that EBITDA would increase from $17 million to $40 million in the second year of production.  **Exhibit 23.**  A Canaccord consultant and later a VBF employee, Goodman, restated Wulf's representations to explain that VBF was currently stocking 16,000 fish per tank.

137.    Upon information and belief, Wulf and other Founders (and Canaccord representatives) created the June 20, 2015 Written Representations because these Defendants knew that VBF's business model did not include sufficient working capital to take on millions of dollars in debt.

138.    Wulf shared the June 20, 2015 Written Representations with Canaccord, among others, stating that VBF is "stocking at 16,000 fish in the first tank, for an average harvest per tank of approximately 58% greater than assumed in the model."  A true and correct copy of this document is attached as **Exhibit 29**.

139.    The Founders' deliberate misrepresentations relating to VBF's pounds of production is perhaps best evidenced by two drastically different models both dated June 30, 2015, which were both represented to be based on actual data.  In one model, the Founders represented that VBF produced 20,000 pounds of fish per year per Tank.  In the other model, the Founders deliberately changed VBF's pounds of production per year to 34,650 per Tank (together, the "June 30, 2015 Models"). True and correct copies of the June 30, 2015 Models are attached as **Group Exhibit 30**. This information was, on information and belief, sent to disinterested VBF directors and employees.

140.     The financial impact of the changes in the pounds of production per Tank per year was a 115% in the return on investment in year 2 of VBF's production and a 255% return on investment in year 3 of VBF's production.  **Group Exhibit 30.**

## F.     The Founders' Misrepresentations of Mortality Rates

141.     The Mortality Rate Metric is closely aligned with the Density Metric and other Metrics.  For example, if an aquaculture business is stocking too many fish per tank, many fish die.  In that circumstance, the Density number may look positive, but the Mortality Rate, if accurately represented, will be commensurately negative.  The Founders often concealed or skewed the inter-relationship amongst the various Metrics to give the false appearance of efficiency and profitability, sometimes telling half-truths and other times outright falsities.

142.     VBF's former operations manager, a member of the Nelson family, advised that when individuals, including potentially interested parties, toured VBF's facilities from the summer of 2015 through the summer of 2016, they would view written, recorded data on individual Tanks regarding Density and Mortality data for that particular Tank.  Wulf initially asked this operations manager and others to alter the Mortality Rates depicted on this documentation to make them lower than they actually were to falsely represent Mortality.  When some of Wulf's subordinates refused, the Founders instead directed VBF employees to remove this documentation from the Tanks.

143.     During that same period, Driver advised VBF fish technicians and other personnel to "be vague" when speaking to others about Mortality Rates and other actual VBF performance Metrics.  Later, the Founders limited VBF employees' contact with potentially interested third parties to the Founders and one other person, to avoid VBF employees revealing the truth.

144.     This operations manager also has reviewed data provided by the Founders, including Driver, which represented, in writing, Mortality Rates "lower than [the operations

manager] has ever seen in our system" according to the operations manager.  This was an untrue statement.

145.    In the April 2016 Written Representations where Wulf provided data to potential and actual investors and disinterested VBF directors including Thelander, Alder, and others, VBF's Mortality Rate was represented as 3%.  This Mortality Rate was deceptively low because it reported the loss of fish per month rather than the cumulative loss of fish over several months. **Exhibit 28.**

146.    In their 2016 and 2017 Written Representations to the Board, the Founders reported "average death loss bio mass" for the prior month between 4% and 10.28% (in August 2016, 4%; in September 2016, 7.48%; in October 2016, 8.44%; in December 2016, 5.2%; in January 2017, 2.78%; in February 2017, 2.54%; in March 2017, 3.55%; in June 2017, 10.28%; and in August 2017 between 2.108% and 3.565%).  **Exhibit 22** (p. 2).  In reality, the Mortality Rates were much higher, as alleged below.

147.    In spring 2017, the aforementioned VBF operations manager met with Ted Rea to discuss the manager's concerns about VBF's Mortality Rates at one of its facilities, which "were through the roof."

148.    In the summer of 2017, there were one or more significant "fish loss [death] events" at VBF, especially at the St. Louis facility (collectively, "Fish Loss Events").  The Founders covered up the cause, extent, and frequency of these Fish Loss Events to disinterested VBF directors.  For example, in response to a board member's direct question in September 2017, Ted Rea misrepresented that Fish Loss Events had been solved.   In fact, the fish mortality problem was not solved and persisted at the time Ted Rea made this misrepresentation.

149.    After the Founders were terminated, and through its own internal investigation, VBF learned the actual Mortality Rates were as follows: in 2015 only four of 17 batches were 16,000 or more fish and the Mortality Rate on the four batches was 19.25%; in 2016, only 8 of 21 batches were 16,000 or more fish and the average Mortality Rate was 38.03% for the 8 batches; in 2017, the standing bio-mass was 164,675 pounds and the average Mortality was 17.2%.  These numbers are contrary the grossly more optimistic data reported in the 2016 and 2017 Written Representations to the Board.

150.    Overall, VBF's preliminary investigation shows that in 2015 up through July 2016, VBF lost approximately 36% of its fish to Mortality in all Tanks.

**G.    The Founders' Misrepresentations of Water Quality**

151.    The Founders also represented in the September 2014 Written Representations (**Exhibit 8**, p. 28) that VBF's Tanks, thanks to VBF's OFT, which supposedly innovated how to regulate currents in the cultivation Tanks, "have a continual flow of clean purified water, eliminating any algae, harmful bacteria, ammonia and nitrates."  The Founders further represented therein that VBF's technology left "very little food or fish waste in the water, which gives the fish a higher fillet yield and a cleaner taste as compared to fish grown in the wild."

152.    In response, Dr. Fitzsimmons warned in the September 2014 Fitzsimmons Email that "OFT has not developed a good 'scientific' record of removing nitrates, harmful bacteria or off flavors.  At this point, we are having to accept the claims of the developer and a few farmers. It may be true, but I am not aware of any technical, peer reviewed science to support the claims." **Exhibit 9.**

153.    Similarly, in the <u>Third June Representations</u> that the Founders provided to Canaccord and that Canaccord shared with Dr. Michaels and likely others, the Founders represented that VBF's technology would require very little energy – only 1.3 KW or $0.11 per

pound of production – to recirculate the water, add oxygen back in the water, and clean up the fish waste.  The Founders stated that there was "no need or expense to 'create' oxygen' and infuse into the water" with forced air technology. **Exhibit 4** (p. 25)**.**  In reality, under the Founders' control, VBF's tanks experienced a build-up of ammonia – which is fatal to fish – because the technology was unable to recirculate sufficient oxygenated water.  A true and correct copy of the email chain including Dr. Michaels' response to the Third June 2015 Representations is attached as **Exhibit 5**.

154.    Again, in the October 2015 Written Marketing Representations the Founders continued to represent that the fish raised in VBF's Tanks had a "continual flow of clean, purified water, eliminating any algae, harmful bacteria, ammonia, and nitrates."  This information was, on information and belief, presented to disinterested directors and potentially interested third parties. **Exhibit 26** (p. 31).

## H.    The Founders' Misrepresentations of EBITDA and Other Financial Metrics

155.    Much of the fraud outlined above is also encapsulated in financial information represented by the Founders to disinterested VBF directors, lenders, potential and actual investors, and others.  Time after time, the Founders ignored expert advice and warnings about the Founders' dispersing of false data.

156.    For example, the Founders represented in the September 2014 Written Representations that VBF, or its predecessor Iowa's First, was achieving a profit of about 46.59%. **Exhibit** 8 (p. 32—dividing the operating costs by revenue).  In response, Dr. Fitzsimmons warned in the September 2014 Fitzsimmons Email that "[s]orry, but I do not buy the EBITDA figure. Never heard of any fish crop with that kind of return…." **Exhibit 9**.  The Founders only somewhat adjusted the EBITDA figures in future representations, but such representations were still not grounded in reality.

157.    The Founders not only misrepresented financial data regarding VBF's actual performance to such potential and actual investors, lenders, and disinterested directors; they also continued to generate forecasts and projections based on financial assumptions contrary to VBF's actual results and that were wildly unrealistic.  They nonetheless continued to knowingly make such misrepresentations to disinterested VBF directors, potentially interested third parties, and others.

158.    In the October 2015 Written Marketing Presentation Representations (**Exhibit 26**) the Founders misrepresented that: (a)  VBF was operating with 45% gross margins (p. 5); (b) that VBF would achieve $1.59 EBITDA/pound and 20,000 pounds per tank/year for $7.632 million in EBITDA if VBF had 240 tanks, which it did (p. 13); and (c) that VBF has lowered its operating costs in part by using blowers and not pumps (p. 30).  This presentation not only misrepresented actual VBF financial data, but included forecasts based on this flawed data.  Further, in the October 2015 Written Marketing Presentation Representations, the Founders represented that "two world renown [sic] debt funds" had validated "all of the present operating metrics for full scale commercialization."  This gave potentially interested third parties and lenders the false appearance of third party validation of VBF.

159.    In the January 2016 Written Representations, the Founders represented to potentially interested third parties and disinterested VBF directors that VBF would achieve an estimated rate of return of 36% and 72% for investors by the end of year 2 and year 3, respectively. **Exhibit 27** (p. 1).  The Founders also forecasted for VBF "EBITDA growing to $18 million in year 2 and $37 million in year 3."   Obviously, VBF never even came close to these numbers, and the Founders knew that VBF could not achieve these numbers at the time the Founders made these representations.

160.     In a January 15, 2017 email ("January 2017 Written Representations") the Founders represented to disinterested VBF directors the following forecast for that same year, 2017:

- 2017 Revenue: $15,141,620
- 2017 Cost of Sales: $5,912,373
- 2017 Total Expenses: $15,142,812
- 2017 Net Income (Loss): $2,989, 287
- 2017 EBITDA: $4,449,599

- 2018 Revenue: $56,869,366
- 2018 Cost of Sales: $19,235,719
- 2018 Total Expenses: $27,164,337
- 2018 Net Income (Loss): $30, 881,962
- 2018 EBITDA: $32,675,553

A true and correct copy of the January 2017 Written Representations is attached as **Exhibit 31**. These representations were based on false data and the Founders knew that these numbers could not be achieved when they represented them.   Indeed, VBF never came anywhere close to achieving these numbers, despite the fact that the Founders made the above forecasts in the very year that encompassed the first year of the forecasts.

161.     From 2015 through dates in 2017, a VBF employee warned the Founders that VBF's actual results were not properly considered and represented in projections or forecasts that the Founders provided to disinterested VBF directors, lenders, potentially interested third parties, and others.

162.     Similarly, one disinterested VBF director advised that a fundamental assumption of financial data provided by the Founders was that VBF's technology was effective and could support a profitable business, when the truth is that VBF's technology was fatally flawed as set forth above. The Founders, despite knowing that its OFT technology was fatally flawed, continued to solicit potentially interested third parties and lenders for VBF, and continued to make representations to other disinterested VBF directors, that falsely assumed and portrayed VBF's

technology to be effective and profitable. These dynamics manifested themselves in the financial information misrepresented by the Founders to disinterested VBF directors.

**I.**     **The Founders' Misrepresentations of Theirs and VBF's Technical Abilities**

163.     The Founders generally misrepresented their ability to operate a sustainable fish farm business.   They also intentionally and/or with gross recklessness misused VBF funds in furtherance of what the Founders knew to be a dead-end business early on in their reign over VBF, as evidenced by the fact that the Founders never invested their own money in VBF.

164.     In the November 2014 Written Representations (**Exhibit 10**), prepared by the Founders, the Founders represented as follows:

- "Proven onshore, indoor fish farming platform" (p. 5).  There was nothing proven about VBF or its predecessor. VBF never made any profit.  It was a losing proposition from the start, and the Founders knew it would be so, which is likely why they did not invest any of their own money in VBF.

-  "Operations management teamed with aquaculture industry experts" (p. 5). In reality, the Founders had little to no relevant aquaculture experience, and they shunned advice from experts when such advice was provided to the Founders. Similarly, the Founders represented in investor and lender solicitations circulated in 2015 and 2016 that they had an aquaculture-experienced "advisory board" behind VBF (p. 5). In fact, this advisory board appears to have had little to no involvement in VBF, and what little input was provided by the board was ignored by the Founders (as exemplified by the Founders' ignorance of Dr. Fitzsimmons' warnings).

- "low cost of operations, industry-leading food conversion and superior fish growth rates" (p. 5).  This was false.

-  "barramundi . . . commands a premium" (p. 6). This was false, as barramundi is commoditized like many other types of fish, and barramundi never had the market demand represented by the Founders and falsely assumed in their forecasts provided to disinterested VBF directors and others.

- "Capacity to produce in excess of 4.3 million pounds [of fish] per year" (p. 6). This was false, as VBF's actual production was about 73,000 for 2015, about 223,000 pounds in 2016, and about 1,100,000 pounds in 2017.  Later, the Founders upped the ante on this misrepresentation and represented from 6.7 million to 7.2 million pounds per year.  The Founders knew that VBF was not achieving such amounts

when they made these representations, and also knew that VBF could never realistically achieve such numbers.

- "The landed cost of Barramundi fry in Iowa is US$0.28 per Fry" (p. 19). This was false, as the actual cost of fry (when a fish is out of its egg and able to feed itself) was about $0.40 per fry.

- "each [VBF] tank can produce 20,000 lbs of fish per year" (p. 23). This was false, as the actually capacity was significantly less.

165.    In the April 2015 Written Representations (**Exhibit 11**), the Founders represented as follows as to the actual performance of VBF's tanks:

- That the "Average FCR across full lifecycle is 1.04:1."  This was false.

- A zero percent mortality rate is represented.  This was false.

- The daily feeds listed in many of the stages of fish growth is false, failing to represent that as fish grow, they need more food.

166.    In a May 12, 2015 Marketing Plan ("May 2015 Written Representations"), the Founders made the following misrepresentations:

- VBF has "[d]eep financial and management resources (they can fund and lead)" (p. 4).

- VBF has "[p]roprietary technology which delivers cost and product benefits to land based fish" (p. 4).

- VBF has an "[e]xperienced sales group with strong industry connections" (p. 4). This is false as VBF never had such a sales team during the Founders' reign over VBF.

A true and correct copy of this the May 2015 Written Misrepresentations is attached as **Exhibit 32**.

167.    The Founders provided the May 2015 Written Representations to potentially interested third parties, including, but not limited to, Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief,  passed onto other disinterested VBF directors and employees.   They also provided the May 2015 Written Representations to Fisheries to prepare the July 2015 Fisheries Report.

168.    The Marketing Presentation that the Founders provided to Canaccord in the Third June 2015 Written Representations (**Exhibit 4**), and then later to Dr. Michaels and, upon information and belief, others, contained the following misrepresentations:

- "Barramundi. . . has a demonstrated demand profile in North America" (p. 4).

- "Deployment of exclusive technology allowing VBF to have the lowest cost of operations, industry-leading food conversion of 1:1, superior fish growth rates of market ready fish in 6 months, and strong economics" (p. 4).

- "VBF has the lowest feed conversion ratios, water consumption and operating costs" (p. 4).

- VBF has the "exclusive global rights to an industry-changing and patented fish culturing tank system," the OFA (p. 4).

169.    The October 2015 Written Marketing Representations (**Exhibit 26**), prepared by the Founders and, upon information and belief, with input from Canaccord, contained the following misrepresentations:

- "There is a 500M pound white fish shortage in North America" (p. 4).  This was false.

- That VBF had achieved "superior fish growth rates of market ready fish in 6 months" (p. 4).  This was false, and VBF never did so at any measurable or sustainable level.

- "In protein production VBF has the lowest . . . operating costs" (p. 4).

- VBF had "proven and seasoned management team" (p. 5).

- "840,000 pounds of production and a 57% increase" (p. 6). In reality, production as of October 1, 2015 was 183,000 pounds.

- "Market risks have been mitigated. VBF has identified definite market demand for the first 15M pounds of Barramundi" (p. 6). Indeed, the largest barramundi seller as far as VBF knows sells only 6,000 pounds per week.

- Represents a joint venture with MainStream that never happened (p. 6).

- "expansion of Iowa's First proven platform to 240 tanks and 4.8M pounds of fish" (p. 8). VBF never produced 4.8 million pounds of fish and has never had the technology to do so.

- That VBF then had "fully vertically integrated operations," which never occurred (p. 8).

- That "VBF has successfully obtained approximately $5.4M in new equity" (p. 8). This is false as VBF did not procure any new investors of that magnitude at that time, instead taking on debt in the form of bridge loans.

- "Debt commitment of $26M" from Generation Investment Management and M&G Investments (p. 8). This is false as there were no firm and unqualified commitments from these parties, to VBF's knowledge.

- "in a six tank modular pod, VBF has modeled stocking with 10,000 fish. However, VBF has successfully been stocking a six tank pod with 16,000 fish" (p. 11).

- "planned JV hatchery with mainstream reducing our input costs of Fry to $0.10 each" (p. 11). This joint venture never occurred.

- "Tank sales – none modeled and sales outside network worldwide could represent $3M annually in additional EBITDA" (p. 11). This is false as tank sales never occurred.

- On page 27 there is a representation of a Water Recirculating System chart, which never was achieved, as demonstrated by VBF's water cleanliness issues.

- "the operation has been successfully producing fish for three (3) years and has validated all the operating parameters and performance data for VBF commercialization of the operation" (p. 28).

170.    The January 2016 Written Representations (**Group Exhibit 27**) contain the following misrepresentations:

- Investment is to fund expansion of Urban Farm, which has been "successfully growing Barramundi…since 2012" (Executive Summary p. 1).

- "VBF Insiders have invested $8 million in new capital into the Company in over last year" (Executive Summary p. 1).

- "VBF secured a debt commitment for $26 million from (1) Generation…and (2) M & G Investments (owned by Prudential). Generation/M&G "agreed to provide lead equity order of $5 million" (Executive Summary p. 1).

- "VBF has an established client base of current customers and robust demand (annualized expected product of approximate 3 million pounds at the end of the first year vs. over 500 million pounds of high quality fish consumed per year in US)" (Executive Summary p. 1).

**J.**     <u>Other Waste of VBF Assets By The Founders</u>

171.     Another example of the Founders' blatant disregard of their fiduciary duties when it came to handling VBF's money, at the direction of some or all of the Founders, was causing VBF to purchase a building and underlying property unnecessary to VBF's business and located in Webster City for $400,000 on July 28, 2016, which VBF sold for $135,000 on April 13, 2018. True and correct copies of the relevant closing statements are attached as **Exhibit 33**.

172.     Further, the Founders purchased a waste water treatment plant with over $2 million of VBF's money that did not comply with VBF's waste water disposal obligations to Webster City, Iowa.

173.     As further evidence of their deliberate waste of VBF money, Ted Rea and James Rea spent VBF's money on furniture from Schooner Realty, which was owned by Ted and James Rea's parents, which they then paid their parents to transport to the Webster City home. True and correct copies of the relevant expense reports are attached hereto as **Exhibit 34**. After paying their parents to transport furniture from Texas to Iowa, the Founders also used VBF funds to make repairs to the trailer that their parents used.

174.     In or around July and August 2016, some or all of the Founders orchestrated VBF's purchase of six (6) tractor-trailers at a total cost to VBF of approximately $375,237.77. But, VBF sold live fish to its customers at all relevant times, from its Webster City, Iowa facility. VBF did not need to deliver fish to its customers as it was the customer's obligation to arrange for the pick-up and transport of the live fish from the facility. Therefore, VBF generally does not need any tractor-trailers. These tractor-trailers sat dormant at VBF's Webster City, Iowa facilities. Ultimately, after VBF terminated the Founders, VBF was eventually able to sell the tractor-trailers.

175.     The Founders also purchased 22 vehicles for purported "Company use" which cost VBF in excess of $11,000 per month when those vehicles were not necessary for VBF's operations.

### VII.  THE FOUNDERS' MISCONDUCT CONTINUES INTO THE YEAR 2019

**A.    The Founders Surreptitiously Meddle in VBF's Bankruptcy Proceedings in an Attempt To Subterfuge This Lawsuit**

176.    As alleged, on September 21, 2018, VBF and affiliated entities ("Bankruptcy Debtors") filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court for the Northern District of Iowa, *In re: VeroBlue Farms USA, Inc., et al.,* Case No. 18-01297 ("Bankruptcy Proceedings").

177.    Shortly thereafter, the Founders, aided and abetted by Maniaci, sought to surreptitiously interfere in the Bankruptcy Proceedings.  The Founders sought a dismissal of this case, against them, through the Bankruptcy Proceedings, for zero consideration to VBF.  This demonstrates the desperate means the Founders will undertake to obfuscate their misconduct, seeking the dismissal of a claim for approximately $81,000,000 in compensatory damages, for nothing. They did so in a number of ways.

178.    The first way was through the unsecured creditors committee ("Creditors Committee").  On December 18, 2018, counsel for the Creditors Committee submitted a "Notice of Challenge" to VBF and the other Bankruptcy Debtors in the Bankruptcy Proceedings ("Challenge Notice").  Through the Challenge Notice, the Creditors Committee purported to challenge certain bankruptcy actions and sought a dismissal of this lawsuit, for zero consideration to VBF, based on a series of allegations, many of them false. Two days later, the Challenge Notice was also adopted by the "Ad Hoc Committee of Equityholders" ("AHC"), which was a non-sanctioned group of shareholders mostly concocted by the Founders.

179.    The Challenge Notice has since been withdrawn by the Creditors Committee, who never acted on it, and for good reason.  VBF confirmed that the Challenge Notice was prepared

based on falsities and half-truths that the Founders provided to Creditors Committee counsel about this case.

180.     Indeed, it seemed strange to VBF that the Creditors Committee and AHC would seek the dismissal of this case in its Challenge Notice with no recovery to VBF.  Thus, on January 9, 2019, VBF counsel met with Creditors Committee counsel to discuss the Challenge Notice, at which time counsel acknowledged that the Founders were the impetus of the Challenge Notice and that the Founders were the source of background information for that document.

181.     In addition to trying to improperly seek dismissal of this lawsuit, the Challenge Notice shamefully repeated the Founders' false accusations of sexual harassment against a representative of Alder.  This is one of the Founders' repeated tactics, where they have attempted to deflect attention from their misconduct, but such claims have been debunked, including by the Nelson's, through their March 2018 letter, a true and correct copy of which is attached as **Exhibit 35** (which refers to the Founders as "the Dallas Group").  The Founders, other than Driver, have tried to use those false accusations in these proceedings as well.

182.     In another attempt, the Founders retained the Chicago law firm of Horwood Marcus & Berk Chartered ("HMB") to represent them in the Bankruptcy Proceedings.  In a bankruptcy filing, HMB represented that "HMB has previously provided limited services to Ted Rea, James Rea, Bruce Hall, and Leslie Wulf (the "Founding Shareholders") for several weeks in conjunction with these Chapter 11 proceedings…."  The Founders have also at times represented to courts that the Founders are members of the AHC, which attempted to meddle in the Bankruptcy Proceedings even when the Creditors Committee refused to do so, based on the same meritless claims that were ultimately rejected by the Creditors Committee, as set forth above.  The Founders or HMB,

however, have also denied that the Founders were ever members of the AHC in other representations to the bankruptcy court and this Court.

183.    For example, in the Founders' February 24, 2019 Motion to Quash in this case, (Iowa Dkt. 37-1 at 10), the Founders represented as follows:

> HMB was Defendants' [Founders'] individual counsel in the Bankruptcy Case from November 8 through December 18, 2018 . . . since December 18, 2018, Defendants have been members of the Equityholders' Committee [AHC] that HMB and the Beecher Firm now represent, therefore, all [of the Founders' or their counsel's] communications related to the Equityholders' Committee's investigation of VBF and its challenges to VBF's reorganization plan are also privileged.

184.    The Founders made other representations in that Motion, to the Iowa Court (and now this Court), that they "are members of the Equityholders' Committee (AHC)" (*Id*. at 11); that "HMB was Defendants' individual counsel and now represents Defendants as members of the Equityholders' Committee in the Bankruptcy Case" (*Id.* at 9); and that "HMB [is] Counsel to the Ad Hoc Committee of Equityholders, including Defendants" (*Id* at 4). Thus, the Founders flatly admitted that they were part of the AHC, led by the Founders' own counsel, HMB.  The AHC, therefore, was nothing more than the Founders' vehicle to attempt to secretly manipulate the Bankruptcy Proceedings to their benefit.  Again, this demonstrates the Founders' surreptitious meddling in the Bankruptcy Proceedings to gain a dismissal of this case.

185.    In a February 27, 2019 filing submitted in the Bankruptcy Proceedings, however, an HMB attorney verified under oath as follows:  "None of the Founding Shareholders [the Founders] are members of the Equity Committee …."  Bankruptcy Proceedings, Dkt. 42-1 at p. 151, ¶ 5, verified statement of Aaron L. Hammer, specifically stated under penalties of perjury; *See also Id.* at p. 150, ¶ 1, which certifies under oath that "Exhibit A" thereto lists all AHC members, and Exhibit A thereto, at pp. 154-158, does not list the Founders as AHC members.

186.     Later, in a March 18, 2019 filing in this case, the Founders contradicted their previous representations to the Iowa Court (and now this Court) that they were AHC members: "Defendants are not currently represented by HMB as counsel to the Equityholders' Committee in VBF's Bankruptcy Case. Defendants are not and have not been members of the Equityholders' Committee." Iowa Dkt. 46 at 2.

187.     Thus, the Founders and their counsel have made contradictory representations to this Court and the bankruptcy court, and the latter court has taken notice of these contradictory representations.  Ultimately, on March 22, 2019, the bankruptcy court barred the AHC from acting in the Bankruptcy Proceedings after VBF and its co-Bankruptcy Debtors raised these and other issues with the court.  Bankruptcy Proceedings, Dkt.  398.

188.     The Founders' misuse of the AHC to obfuscate their misconduct did not stop there, as they also incorporated VBF's counsel, Maniaci, in such misconduct, to act against the interests of VBF, his own client, as explained in the next section.

**B.**     **Maniaci Aids and Abets The Founders in Their 2019 Misconduct**

**1.**     **Maniaci As Founders' Counsel Separate From VBF**

189.     Four of the five Founders have Canadian roots and, as VBF is recently learning, have had a longstanding relationship with Maniaci and CBB, a Canadian firm, outside of VBF's business.  VBF recently discovered emails to that effect in 2019. One of these endeavors was Maniaci's representation of the ChipMeds, Inc. entity alleged above.  Maniaci has continued to further the Founders' interests to VBF's detriment, even in to the year 2019.  Maniaci has worn many conflicting hats in relation to VBF, including as Founders' counsel, VBF's counsel, and fierce advocate against VBF.

### 2.      Maniaci As VBF's Counsel

Maniaci was CBB's "relationship partner" for VBF, overseeing CBB's legal representation of VBF. Maniaci is currently identified by CBB as a partner in its securities law group, purporting to specialize in industries such as aquaculture. Maniaci and CBB represented VBF, VBF Canada, and possibly other VBF-related entities on a large variety of matters from 2014 through November 2017, including general corporate, securities issues, issues relating to the OFT, import/export work, corporate structuring, and other issues.    Thus, Maniaci's representation of VBF was not casual or isolated. Rather, Maniaci represented VBF on many aspects of its operations (such as preparation of written representations).   Neither VBF nor Maniaci (or CBB) have entered into any disengagement of representation agreement or notification.

### 3.      Maniaci as A Preferred Shareholder of VBF Canada

190.    Maniaci, along with his brother Anthony and the Founders, appears to be one of the first shareholders of VBF or VBF Canada (and a preferred shareholder at that). The Maniaci's received their stock either at a 50% discount from what other shareholders were paying at the time, or, like the Founders, basically for free.

191.    For example, Maniaci's entity, Sailstreet Capital Inc., received 750,000 shares in VBF Canada for a grand total of $0.075 (seventy-five cents) for all 750,000 shares in May 2014. Maniaci, through Sailstreet, paid $0.000001 per share of stock at a time when others were paying about 900,000 times that amount, or $0.90 per share.

### 4.      Maniaci as An Advocate Against His Client, VBF

192.    Maniaci manipulated his conflicted position as both shareholder of VBF, and VBF's counsel, to attempt to blatantly harm VBF and interfere with VBF's Bankruptcy Proceedings, and to aid and abet the Founders' in their surreptitious meddling in the Bankruptcy Proceedings.  On January 9, 2019, Maniaci wrote a letter ("January 9 Maniaci Letter") on behalf

of the AHC to his "Fellow VBF Shareholder[s]" in regards to VBF's Bankruptcy Proceedings, ostensibly to garner opposition to the Bankruptcy Debtors' Plan.   A true and correct copy of this document is attached as **Exhibit 36**.  The letter, upon information and belief, was sent to most or all VBF shareholders, is striking by what it misrepresents, and what it conceals on behalf of the Founders.

193.    Maniaci starts the letter with the statement that "I write to you as a minority shareholder of VeroBlue Farms," not specifying in which entity he is a shareholder, how he acquired his stock, or how much he paid for his stock (nothing for most of it, through Sailstreet).

194.    Further, although the letter is written on CBB letterhead by CBB partner Maniaci, perhaps to give the letter an air of respectability as written from a law firm, Maniaci nowhere discloses in his letter that CBB or he served as counsel to VBF on an extensive array of matters from inception of the VBF's business for years thereafter. In fact, Maniaci does not specify that he is a lawyer.  As to that point, in a March 20, 2019 letter CBB admitted: "We do acknowledge that such letter was written without the authorization of management of this firm, and, therefore, Mr. Maniaci's letter written in his personal capacity should not have been put on to our firm's letterhead."

195.    Maniaci also conceals from the recipients of his letter that CBB and he have represented the Founders on matters unrelated to VBF, and apparently have a close relationship to the Founders.

196.    Also in the January 9, 2019 Maniaci Letter, Maniaci improperly solicits clients for counsel to the AHC, admitting that he is essentially trying to "crowdfund litigation" against VBF through his letter. Obviously, Maniaci was working in concert with the Founders and AHC counsel.

197.    Maniaci also misleadingly represents in his letter that the Creditors' Committee determined that this lawsuit is "retaliatory and without merit," without noting that counsel for the Creditors' Committee acknowledged that the Founders were the source of his conclusion and that he performed no independent investigation.  This, combined with Maniaci's obvious lobbying against his clients' (VBF's) Plan of Reorganization ("Plan"), blatantly demonstrates Maniaci's intent to undermine VBF's interests.

198.    Further, Maniaci and CBB failed and refused to turn over client files to VBF, withholding their own clients' property presumably because Maniaci is concerned that those documents contain information damaging to CBB, Maniaci, the Founders, and possibly other Defendants.  The Bankruptcy Debtors brought an adversary complaint against CBB for turnover of these files and other data in the Bankruptcy Proceeding.

199.    On April 22, 2019, the bankruptcy court approved the Bankruptcy Debtors' Plan, through which plan sponsor, Alder, acquired the Bankruptcy Debtors' assets.  The Founders objected to the Plan.  This is after the bankruptcy court rebuked the AHC tactic perpetrated by the Founders, barring the AHC from participation in the Bankruptcy Proceedings.

## VIII.  THE FOUNDERS' MISUSE OF OTHER CORPORATE COUNSEL

200.    Through Jackson Walker, the Founders orchestrated the drafting of improper purported release provisions to which Founders Ted Rea, Hall and Driver claim a benefit, and also have concealed material information from VBF based on an improper privilege claim through which the Founders prevented VBF from receiving VBF's own client files from Jackson Walker. Jackson Walker often worked with Maniaci and CBB on VBF issues.

201.    Upon information and belief, the Founders retained Jackson Walker (and its partner Rick Dahlson) to represent VBF and had a preexisting relationship with the firm, and the Founders have continued their relationship with Jackson Walker outside of the firm's representation of VBF.

In a January 31, 2019 email, in response to an inquiry from VBF, Jackson Walker disclosed as follows: "Mr. Dahlson has had contact with Les Wulf, but only regarding subjects other than VeroBlue." A true and correct copy of this document is attached as **Exhibit 37**.

202.   On October 24, 2018, McCowan, as VBF's President, requested that Jackson Walker turn over all of VBF's client files to VBF. A true and correct copy of this request is attached as **Exhibit 38**.

203.   In response, Jackson Walker stated that before producing certain documents it first needed to consult with the Founders, though the Founders have long since left the employ of VBF, based on some privilege the Founders could claim as to VBF files. *See* **Exhibit 38**. This marks the first time that VBF disinterested directors or officers learned that Jackson Walker had loyalties, and divided ones at that, to both the Founders and VBF. Jackson Walker thereafter began producing documents but did not complete production of the documents it was willing to produce until February 8, 2019. A true and correct copy of this document is attached as **Exhibit 39**. Disinterested VBF directors were unaware of the nature and extent of Jackson Walker's attorney-client and other relationships with the Founders at the time that Jackson Walker prepared the Founders' Termination Agreements, which the Founders now claim to benefit them to the detriment of VBF.

204.   As part of its production, Jackson Walker produced invoices showing the firm's representation of VBF on a variety of issues, as VBF's outside general counsel, from on or about September 8, 2014 through on or about January 10, 2018 (and VBF submit that Jackson Walker remains their counsel, as there has been no definitive termination of representation to VBF's knowledge). These dates coincide with Founders' reign over VBF. All told, VBF paid Jackson Walker about $1,483,287.87 for its representation of VBF.

205.     On February 8, 2019, after much delay, Jackson Walker produced additional documents, but withheld from VBF about 800 documents from the firm's files for its representation of VBF.  VBF strenuously objected to its own counsel's withholding of files from the firm's own clients, VBF.  VBF also had to insist on Jackson Walker providing a privilege log that it obviously had readily available (given the short time that elapsed between VBF's demand for a log, late in the day on Friday, February 8, 2019, and the date that Jackson Walker produced the log, Monday, February 11, 2019).

206.     The Jackson Walker "privilege log" reveals the following about the documents that Jackson Walker withheld from its own clients: (a) the documents are dated March 20, 2015 through July 6, 2016, well within the September 2014 through January 2018 time frame that Jackson Walker represented VBF (and Jackson Walker has never, to VBF's knowledge, withdrawn from its representation of VBF); (b) the documents were all sent, received, or generated by Jackson Walker in its representation of VBF (as they were logged in response to VBF's request for their files); and (c) there are 784 documents logged, many of which attach yet more documents;" and (d) some of the documents are communications, drafts, or other documents relating to the very employment agreements that the Founders have put at issue as to various aspects of this case.  A true and correct copy of this document is attached as **Exhibit 40**.

207.     Jackson Walker's basis for withholding documents from its own clients based on the attorney-client privilege is further based on a spurious analogy to a July 2016 transaction wherein an entity purchased a large amount of VBF stock, becoming one of many VBF shareholders.  Jackson Walker artificially likened this situation to a corporate merger, citing a Delaware case on merger, as the basis for the privilege.  There was no merger here, and the overwhelming implication is that Jackson Walker is withholding almost 800 documents from its

own clients because those clients are now suing the Founders for fraud and other misconduct through which the Founders misappropriated or otherwise squandered close to $90,000,000 during Founders' four year reign over VBF (which coincided almost exactly with Jackson Walker's representation of VBF). This presents an appearance that Jackson Walker is hiding something.

208.    VBF filed an adversary complaint against Jackson Walker in the Bankruptcy Proceeding seeking turnover of its client files.  Regardless, upon information and belief, Jackson Walker is shielding information from its own client, VBF, that is damaging to the Founders, demonstrating the Founders' misuse of Jackson Walker under the guise of the firm being VBF's "corporate counsel," when it appears that the firm has at least sometimes been more concerned about representing the Founders' interests.

209.    Jackson Walker's actions are particularly concerning as it relates to this case because Ted Rea, Hall, and Driver claim that they were released under certain agreements that they also claim Jackson Walker drafted on behalf of VBF, as alleged in the next section.  It appears that these agreements were prepared by conflicted counsel with divided loyalties.

## IX.  THE FOUNDERS' FRAUD BEGINS TO UNRAVEL

210.    Starting in late 2017, disinterested VBF directors started to become concerned about the Founders' abilities to lead and execute the business.

### A.    Termination of Hall and Ted Rea

211.    By late 2017, with VBF's mounting losses, the disinterested VBF directors recommended that Hall and Ted Rea be fired.  On or about October 27, 2017, Hall executed a "Termination Agreement," which included, among other things, a purported release of some of VBF's claims against Hall.  Wulf, one of Hall's co-conspirators, purportedly executed Hall's Termination Agreement on behalf of VBF ("Hall's Termination Agreement").

212.    On the same day, Ted Rea executed a "Termination Agreement," which included, among other things, a purported release of some of VBF's claims against Ted Rea. Wulf purportedly executed Ted Rea's Termination Agreement ("Ted Rea's Termination Agreement") on behalf of VBF.

213.    Jackson Walker, now believed to be the Founders' longstanding counsel, drafted and reviewed these agreements purportedly as VBF's counsel.  True and correct copies of these agreements are attached as **Group Exhibit 41.** VBF knew of no separate counsel representing Ted Rea as to Ted Rea's Termination Agreement or Hall as to Hall's Termination Agreement. Therefore, it appears that Jackson Walker essentially represented, or had existing professional relationships with, both parties to Ted Rea's Termination Agreement, VBF and Ted Rea, and both parties to Hall's Termination Agreement, VBF and Hall.

214.    The purported release in Hall's Termination Agreement and Ted Rea's Termination Agreement provides:

> Except for the covenants and agreements of [Hall/Ted Rea] provided for in this Agreement, the Company, on its own behalf and on behalf of the other Company Releasees, hereby irrevocably and unconditionally release, acquit and forever discharge the [Hall/Ted Rea] Releasers from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (the "Company Releasee Claims") which the Company Releasees now have, own, hold, or to which the Company Releasees at any time heretofore had, owned or held against each of the [Hall Releasers/Ted Rea Releasers]. The Company Releasees represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Company Releasee Claim or any portion thereof or interest therein.

215.    The Termination Agreements also included severance payments to both Hall and Ted Rea in the amount of $400,000 each.

216.    At the time that the Termination Agreements for Hall and Ted Rea were executed, VBF had not yet discovered the fraudulent acts committed by the Founders because the Founders had actively and fraudulently concealed their conduct.

**B.**    **Termination of Keith Driver**

217.    Driver worked along with the other Founders from the inception of VBF. Between approximately July 1, 2016 and January 13, 2017, Driver was the Chief Operating Officer of VBF.

218.    On January 13, 2017, Driver executed a Business Relationship Restructuring Agreement and Consulting Agreement ("Driver's Termination Agreement") that changed Driver's role to an independent contractor.  Wulf purportedly executed Driver's Termination Agreement on behalf of VBF.[2] A true and correct copy of this document is attached as **Exhibit 42**.

219.    Jackson Walker drafted and reviewed this agreement purportedly as VBF's counsel. VBF knows of no counsel retained by Driver separately from Jackson Walker, who, as VBF has recently learned, has a longstanding (and continuing) relationship with the Founders. Therefore, it appears that Jackson Walker essentially represented both parties to Driver's Termination Agreement, VBF and Driver. And Wulf, one of Driver's co-conspirators, executed this agreement for VBF.

220.    VBF terminated Driver's independent contractor relationship on or about December 28, 2017.

221.    Driver's Termination Agreement provided for six installments payments totalling $550,000 and one payment of $500,000 for the cancellation of certain shares in VBF's affiliate.

222.    Driver's Termination Agreement also contained a purported release provision as follows:

---

[2] VBF fired Defendants Wulf, and James Rea later in 2017 and into early 2018, providing no releases, after the hiring of McCowan.

(b)     As a material inducement to Driver and Driver Co. to enter into this Agreement, and except for the covenants and agreements of Driver and Driver Co. provided for in this Agreement, VBF USA and VBF Canada, on their own behalf and on behalf of the other VBF Releasees, hereby irrevocably ad unconditionally release, acquit, and forever discharge the Driver Releasers from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (the "**VBF Releasee Claims**") which the VBF Releasees now have, own, hold, or to which the VBF Releasees at any time heretofore had, owned or held against each of the Driver Releasers, including, without limitation, the Egregious Cause Claims.  The VBF Releasees represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any VBF Releasee Claim or any portion thereof or interest therein.

See **Exhibit 42, ¶4(b)** (collectively the purported release and severance provisions in Hall's Termination Agreement, Ted Rea's Termination Agreement, and Driver's Termination Agreement are hereinafter referred to as the "Release and Severance Provisions").

223.    In Driver's Termination Agreement, Driver also agreed to a confidentiality provision prohibiting him from disclosing confidential information "in a fiduciary capacity for the benefit of" VBF except in furtherance of Driver's duties under the Consulting Agreement or required by law to so disclose.  See **Exhibit 42, ¶4(a).**

224.    At the time that Driver's Termination Agreement was executed, VBF had not yet discovered the fraudulent acts committed by the Founders because the Founders had actively and fraudulently concealed their conduct.

**C.     Termination of Wulf**

225.    On December 1, 2017, VBF terminated Wulf pursuant to a separation agreement ("Wulf Separation Agreement").  At this time, the Defendants' bad acts were just beginning to come to light, though, as VBF has come to learn, it had only scratched the surface of the Defendants' misconduct and had yet to learn the vast majority of the Defendants' misconduct as depicted herein or most specifics relating to same.  See **Exhibit 43.**  Jackson Walker also drafted the Wulf Separation Agreement, and VBF knows of no other counsel separately representing Wulf.

Therefore, the same conflict problems attendant to the other termination agreements were present as to the Wulf Separation Agreement.

226.    The Wulf Separation Agreement contemplates that Wulf would be paid a settlement totaling $400,000 and that VBF would continue to pay COBRA premiums for the lesser of either 12 months or the duration of such COBRA coverage.

**D.    Termination of James Rea**

227.    On or about July 1, 2016, VBF and James Rea entered into an Employment Agreement ("Employment Agreement") which provided that James Rea could be terminated "by the Company for Cause."  A true and correct copy of this document is attached as **Exhibit 44**.  If he was so terminated, James Rea was not entitled to receive certain benefits including "accrued employment entitlements" which included (1) James Rea's base salary through the date of termination and (2) any previously vested benefits, such as retirement benefits and vacation pay. Jackson Walker drafted and reviewed this agreement purportedly as VBF's counsel.

228.    At various times between July 1, 2016 and January 8, 2018, James Rea committed various acts constituting "Egregious Cause" as defined in the Employment Agreement including (1)  the commission of a crime of moral turpitude, or the commission of any other willful act or willful omission involving dishonesty or fraud with respect to VBF; (2) breaches of the Employment Agreement and/or gross neglect of James Rea's duties and (3) damage to or misappropriation or conversion of any funds or assets of the Company.

229.    By January 8, 2018, VBF was aware that James Rea charged personal expenditures to VBF's business account, and it terminated his employment for Egregious Cause.  Because of his termination for Egregious Cause, VBF did not owe James Rea accrued employment entitlements.  Further, VBF did not enter into a termination agreement with James Rea, as it did with other Founders, due to the Founders' misconduct that was coming to light at this point.

## X.  CLAIMS

### COUNT I – BREACH OF FIDUCIARY DUTY – ALL FOUNDERS

230.    VBF adopts and reincorporates paragraphs 1 through 229.

231.    The Founders owed fiduciary duties to VBF from in or around October 1, 2014, when they came to control VBF and served as officers and directors, through and including January 2018, when the last of the Founders was terminated as an employee, contractor, officer, and/or director of VBF.

232.    The Founders' fiduciary duties to VBF included, but were not limited to, those of obedience, loyalty, honesty, good faith, and due care.

233.    The Founders breached their fiduciary duties of loyalty, good faith, candor, to restrain from self-dealing, integrity, fair and honest dealing, full disclosure, and others, to VBF in one or more of the following ways:

  a.  by misappropriating VBF funds for the Founders' personal benefit;

  b.  by misappropriating other VBF assets for the Founders' personal benefit;

  c.  by self-dealing and by concealing their self-dealing from VBF;

  d.  by grossly reckless and/or intentional misuse and waste of corporate assets that led to a dramatic devaluation of VBF to be determined at trial;

  e.  by continuously and systematically misrepresenting the Metrics, VBF's financial situation, VBF's valuation, and VBF's technology to disinterested VBF directors and other VBF personnel;

  f.  by misusing VBF's corporate counsel, Jackson Walker and CBB's Sean Maniaci, to promote the Founders' selfish interests, including, but not limited to, the obfuscation of the Founders' misconduct; and

  g.  by otherwise breaching their fiduciary duties to VBF, including but not limited through misconduct that led to the demise of VBF.

234.    VBF suffered injuries as a direct and proximate result of the Founders' breaches of fiduciary duty, and the Founders gained a personal benefit from such breaches.   VBF's compensatory damages are in excess of $90,000,000.

235.    Further, the Founders' breaches of fiduciary duty have been willful and egregious, and the Founders' misconduct continues into the year 2019.  Therefore, punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial. Additionally, the Founders' self-dealing transactions with VBF are presumed invalid, and the burden of proof lays with the Founders to prove the fairness of such transactions by clear and convincing evidence.  Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

## COUNT II – FRAUDULENT CONCEALMENT – ALL FOUNDERS

236.    VBF adopts and reincorporates paragraphs 1 through 229.

237.    The Founders concealed from or failed to disclose to VBF material facts including, but not limited to, the following, as alleged *supra*:

      a.      the BAJJER stock scheme;

      b.      the American Growth Funding Loan scheme;

      c.      the Wulf Lake House scheme;

      d.      the Sedun stock scheme;

      e.      the compensation scheme;

      f.      the Gagne scheme;

      g.      the tractor-trailer scheme;

      h.      the OFA Scheme;

      i.      the Founders' misappropriations of VBF Canada's stock;

  j.  The Founders' other misappropriations of VBF funds or other assets for personal use;

  k.  The Founders' devaluation of VBF's stock through their misconduct and other breaches of their duties of due care; and,

  l.  The Founders' misrepresentations of:

    i.  FCR,

    ii.  Density,

    iii.  Mortality Rates,

    iv.  Water Quality,

    v.  EBITDA, VBF's valuation, and other Financial Metrics,

    vi.  Theirs and VBF's Technical Abilities, and

    vii.  VBF's Technology;

  m.  misusing VBF's corporate counsel, Jackson Walker and CBB's Maniaci, to promote the Founders' selfish interests, including, but not limited to, the obfuscation of the Founders' misconduct; and,

  n.  other material facts that would have revealed the existence of the Founders' misconduct.

238.  The Founders, as fiduciaries to VBF, owed VBF a duty to disclose these material facts to VBF.  Further, the Founders created false impressions through partial disclosures and voluntarily disclosed some related information, also leading to a duty to disclose the whole truth of these material facts to VBF.

239.  The Founders knew that VBF lacked knowledge of these concealed material facts until after VBF terminated the Founders by January 2018.  The Founders intended to induce VBF to refrain from attempting to halt the Founders' misconduct, mismanagement, and corporate waste by concealing these material facts from VBF.

240.     The Founders were deliberately silent when they had a duty to speak. The Founders knowingly failed to disclose these material facts to VBF knowing full well that VBF would not approve of the Founders' blatant misconduct.

241.     VBF justifiably relied on the Founders' failure to disclose these material facts given the Founders' status as fiduciaries to VBF.  Further, VBF did not have opportunities equal to the Founders to discover the Founders' misconduct until after the Founders were ousted from their positions at VBF.

242.     VBF suffered injuries as a direct and proximate result of the Founders' fraudulent concealment.  VBF's compensatory damages are in excess of $90,000,000.

243.     Further, the Founders' fraudulent concealment has been willful and egregious, and the Founders' misconduct continues into the year 2019.  Therefore, punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial.  Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

## COUNT III – FRAUDULENT MISREPRESENTATION – ALL FOUNDERS

244.     VBF adopts and reincorporates paragraphs 1 through 229.

245.     Pleading in the alternative, the Founders' silence in the face of their duties to disclose their misconduct alleged herein to VBF, constitutes fraudulent misrepresentation of the material facts alleged in Count II.

246.     The Founders knew that their failures to disclose these material facts, and therefore what are deemed to be misrepresentations in light of the Founders' duties of disclosure to VBF, were false or alternatively in reckless disregard of the truth.

247.     The Founders intended to deceive VBF and to induce them to refrain from attempting to halt the Founders' misconduct by misrepresenting material facts to VBF.

248.    VBF justifiably and detrimentally relied on the Founders' misrepresentations given the Founders' status as fiduciaries to VBF.

249.    VBF suffered injuries as a direct and proximate result of the Founders' fraudulent misrepresentation.  VBF's compensatory damages are in excess of $90,000,000.

250.    Further, the Founders' fraud has been willful and egregious, and the Founders' misconduct continues into the year 2019.  Therefore, punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial.  Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

### COUNT IV – CONSTRUCTIVE FRAUD – ALL FOUNDERS

251.    VBF adopts and reincorporates paragraphs 1 through 229.

252.    The Founders' misconduct, committed while they were fiduciaries to VBF, constitutes constructive fraud regardless of the Founders' intent.

253.    VBF suffered injuries as a direct and proximate result of the Founders' constructive fraud.  VBF's compensatory damages are in excess of $90,000,000.

254.    Further, the Founders' fraudulent concealment was willful and egregious, or at least wanton, and therefore punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial. Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

### COUNT V – UNIFORM VOIDABLE TRANSFERS ACT
### (IOWA CODE §684.4(1)(a)) – ALL FOUNDERS

255.    VBF adopts and incorporates paragraphs 1 through 229.

256.     VBF seeks to void transfers made to the Founders, including transfers from 2014 to 2018 related to:

    a.     the BAJJER stock scheme;

    b.     the American Growth Funding Loan scheme;

    c.     the Wulf Lake House scheme;

    d.     the Sedun stock scheme;

    e.     the compensation scheme;

    f.     the Gagne scheme;

    g.     the tractor-trailer scheme;

    h.     the OFA Scheme;

    i.     the Founders' misappropriations of VBF Canada shares; and

    j.     Other misappropriations of VBF funds or other assets for the Founders' personal use.

257.     VBF made or authorized transfers of assets and stock (as described above) totaling (and based on information available today, VBF's investigation is ongoing):

    a.     at least $4,562,498 to Wulf;

    b.     at least $4,747,333 to Hall;

    c.     at least $4,365,000 to James Rea;

    d.     at least $4,487,410 to Ted Rea; and

    e.     at least $3,389,501 to Driver.

258.     The transfers were made with the actual intent to hinder, delay, or defraud VBF, demonstrated by, among other things, that:

    a.     The transfers consisted of misappropriations of VBF funds and other assets for the Founders' personal benefit;

    b.      The Founders misrepresented facts related to the FCR, Density, Mortality Rates, Water Quality, valuation, EBITDA and other Financial Metrics, and theirs and VBF's Technical Abilities to mislead VBF and its creditors;

    c.      The Founders concealed facts that would have alerted VBF and its creditors of the misappropriation and that the alleged profits from the business were derived from the misrepresented facts;

    d.      The Founders' transfers were to themselves and other insiders;

    e.      The transfers occurred after VBF was insolvent;

    f.      A number of the transfers occurred both before and after substantial debts were incurred;

    g.      The consideration received by VBF for the transfers to the Founders was not reasonably equivalent in value to the amount of monies transferred to the Founders; and

    h.      The Founders, not the debtor, have retained possession or control of the property transferred after the transfer.

259.    As alleged above, VBF made or authorized transfers totaling between $5 million to $20 million in assets and/or stock to the Founders during the period from 2014 to 2018.

260.    VBF's claims arose before or shortly after the transfers were made and VBF brought this claim within one year after the transfers could reasonably have been discovered.

261.    Moreover, VBF was insolvent or became insolvent shortly after the transfers to the Founders were made.  Specifically, due to the fraudulent scheme and misrepresented facts related to the VBF business described above, VBF was insolvent from the beginning of that scheme and the commencement of the misrepresentations.  The Founders generated significant investments and other funds through the misstated business metrics, which funds were diverted to the Founders.

262.    Therefore, VBF has the right to avoid the transfers to the Founders under Section 684.4(1)(a) of the Iowa Code.  VBF should recover all assets wrongfully transferred to the Founders from 2014 to 2018.

## COUNT VI – UNIFORM VOIDABLE TRANSFERS ACT
### (IOWA CODE §684.4(1)(b)) – ALL FOUNDERS

263.     VBF adopts and reincorporates paragraphs 1 through 229.

264.     Pleading in the alternative to Count V, VBF made or authorized transfers of assets and stock (as described above) totaling (and based on information available today, VBF's investigation is ongoing):

     a.   at least $4,562,498 to Wulf;

     b.   at least $4,747,333 to Hall;

     c.   at least $4,365,000 to James Rea;

     d.   at least $4,487,410 to Ted Rea; and

     e.   at least $3,389,501 to Driver.

265.     Transfers from 2014 to 2018 to the Founders were fraudulent as to VBF.

266.     VBF did not receive a reasonably equivalent value in exchange for the transfers to the Founders and VBF seeks to void them under Section 684.4(1)(b) of Iowa law.

267.     Further, because the Founders' services to VBF, in whatever form, were premised on maintenance and perpetuation of a fraudulent scheme, they did not contribute any value in exchange for the monies received.

268.     At the time of the transfers, VBF was engaged in or were about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to its business.

269.     Moreover, VBF was insolvent or became insolvent shortly after the transfers to the Founders were made.  Specifically, due to the fraudulent scheme and misrepresented facts related to the VBF business described above, VBF was insolvent from the beginning of that scheme and

the commencement of the misrepresentations. The Founders generated significant investments and other funds through the misstated business metrics, which funds were diverted to the Founders.

270.     Therefore, VBF should recover amounts paid to the Founders described herein from 2014 to 2018.

## COUNT VII – ACTUAL FRAUDULENT TRANSFER (TEXAS LAW) – ALL FOUNDERS (TEX. BUS. & COMM. CODE § 24.005(a)(1))

271.     VBF adopts and reincorporates paragraphs 1 through 229.

272.     Pleading in the alternative to Counts V and VI[3], VBF seeks to avoid transfers made to the Founders, including transfers from 2014 to 2018 related to:

a.      the BAJJER stock scheme;

b.      the American Growth Funding Loan scheme;

c.      the Wulf Lake House scheme;

d.      the Sedun stock scheme;

e.      the compensation scheme;

f.      the Gagne scheme;

g.      the tractor-trailer scheme;

h.      the OFA Scheme;

i.      the Founders' misappropriations of VBF Canada shares; and

j.      Other misappropriations of VBF funds or other assets for the Founders' personal use.

273.     VBF made or authorized transfers of assets and stock (as described above) totaling (and based on information available today, VBF's investigation is ongoing):

a.      at least $4,562,498 to Wulf;

---

[3] VBF alleges statutory fraud claims under Texas law in the event that this Court rules that Texas law applies, which it should not.  VBF affirmatively states that this case is covered by Iowa law.

b.      at least $4,747,333 to Hall;

c.      at least $4,365,000 to James Rea;

d.      at least $4,487,410 to Ted Rea; and

e.      at least $3,389,501 to Driver.

274.    The transfers were made with the actual intent to hinder, delay, or defraud VBF, demonstrated by, among other things, that:

a.      The transfers consisted of misappropriation of VBF funds and other assets for the Founders' personal benefit;

b.      The Founders misrepresented facts related to the FCR, Density, Mortality Rates, Water Quality, valuation, EBITDA and other Financial Metrics, and theirs and VBF's Technical Abilities to mislead VBF and its creditors;

c.      The Founders concealed facts that would have alerted VBF and its creditors of the misappropriation and that the alleged profits from the business were derived from the misrepresented facts;

d.      The Founders were insiders;

e.      The transfers occurred after VBF was insolvent;

f.      A number of the transfers occurred both before and after substantial debts were incurred; and

g.      The consideration received by VBF for the transfers to the Founders was not reasonably equivalent in value.

275.    As alleged above, VBF made or authorized transfers totaling between $5 million to $20 million in assets and/or stock to the Founders during the period from 2014 to 2018.

276.    VBF's claims arose before or within a reasonable time after the transfers to the Founders.

277.    Moreover, VBF was insolvent or became insolvent shortly after the transfers to the Founders were made.  Specifically, due to the fraudulent scheme and misrepresented facts related to the VBF business described above, VBF was insolvent from the beginning of that scheme and

the commencement of the misrepresentations.  The Founders generated significant investments and other funds through the misstated business metrics, which funds were diverted to the Founders.

278.     Further, VBF did not receive consideration that was reasonably equivalent to the amount of monies transferred to the Founders.

279.     Therefore, VBF has the right to avoid the transfers to the Founders under Section 24.005(a)(1) of the Texas Business and Commerce Code.  VBF should recover all assets wrongfully transferred to the Founders from 2014 to 2018.

## COUNT VIII – CONSTRUCTIVE FRAUDULENT TRANSFER (TEXAS LAW) – ALL FOUNDERS (TEX. BUS. & COMM. CODE § 24.005(a)(2))

280.     VBF adopts and reincorporates paragraphs 1 through 229.

281.     Pleading in the alternative to Counts VI and VII[4], VBF made or authorized transfers of assets and stock (as described above) totaling (and based on information available today, VBF's investigation is ongoing):

> a.     at least $4,562,498 to Wulf;
>
> b.     at least $4,747,333 to Hall;
>
> c.     at least $4,365,000 to James Rea;
>
> d.     at least $4,487,410 to Ted Rea; and
>
> e.     at least $3,389,501 to Driver.

282.     Transfers from 2014 to 2018 to the Founders were fraudulent as to VBF.

283.     VBF did not receive reasonably equivalent value in exchange for these transfers, and VBF avoids them under Texas state fraudulent transfer law.  Tex. Bus. & Comm. Code § 24.005(a)(2).

---

[4] VBF alleges statutory fraud claims under Texas law in the event that this Court rules that Texas law applies, which it should not.  VBF affirmatively states that this case is covered by Iowa law.

284.     Further, because the Founders' services to the company, in whatever form, were premised on maintenance and perpetuation of a fraudulent scheme, they did not contribute any value in exchange for the monies received.

285.     At the time of the transfers, VBF was engaged or was about to engage in transactions for which its remaining assets were unreasonably small in relation to its business.

286.     At the time of the transfers, VBF intended to incur or believed that it would incur, debts beyond its ability to pay as they became due.

287.     Moreover, VBF was insolvent or became insolvent shortly after the transfers to the Founders were made.  Specifically, due to the fraudulent scheme and misrepresented facts related to the VBF business described above, VBF was insolvent from the beginning of that scheme and the commencement of the misrepresentations.  The Founders generated significant investments and other funds through the misstated business metrics, which funds were diverted to the Founders.

288.     Therefore, VBF should recover amounts paid to the Founders described herein from 2014 to 2018.

## COUNT IX – CIVIL CONSPIRACY – ALL FOUNDERS

289.     VBF adopts and reincorporates paragraphs 1 through 229.

290.     From the outset of their misconduct alleged herein, each of the Founders had a meeting of the minds with each of the other Founders and agreed to engage in the breaches of fiduciary duties and fraud alleged herein, for their personal benefit, to cause harm to VBF, while concealing the same from VBF (the "Conspiracy").

291.     The Founders' aim, through the Conspiracy, was to accomplish the unlawful objective of personally benefiting the Founders at the expense of VBF, while concealing the same from VBF, and/or making fraudulent misrepresentations to VBF, its disinterested directors, and

fraudulent non-disclosures or concealments from VBF in the face of the Founders' duties of disclosure.

292.    Through the Conspiracy and the overt, unlawful actions alleged herein, the Founders facilitated and accomplished their breaches of fiduciary duty, fraudulent concealment, constructive fraud, fraudulent misrepresentation and fraudulent transfers.

293.    VBF suffered injuries as a direct and proximate result of the Founders' Conspiracy. VBF's compensatory damages are in excess of $90,000,000.

294.    Further, the Founders' misconduct was willful and egregious, or at least wanton, and has continued into the year 2019.  Therefore punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial. Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

## COUNT X – AIDING AND ABETTING – ALL FOUNDERS

295.    VBF adopts and reincorporates paragraphs 1 through 229.

296.    From the outset of their misconduct alleged herein, the Founders knowingly and substantially assisted each other in their breaches of fiduciary duties alleged herein, for their personal benefit, while concealing the same from VBF and its disinterested director.

297.    VBF suffered injuries as a direct and proximate result of the Founders' aiding and abetting.  VBF's compensatory damages are in excess of $90,000,000.

298.    Further, the Founders' misconduct was willful and egregious, or at least wanton, and has continued into the year 2019.  Therefore punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial. Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

## COUNT XI – UNJUST ENRICHMENT – ALL FOUNDERS

299.     VBF adopts and reincorporates paragraphs 1 through 229.

300.     VBF has conferred millions of dollars' worth of benefit upon the Founders due to the Founders' fraud or taking undue advantage, for which the Founders have not compensated VBF.  It would be unjust and contrary to principles of equity and good conscience to allow the Founders to retain this benefit conferred upon them by VBF without just consideration as the Founders have been unjustly enriched at VBF's expense.

## COUNT XII – EQUITABLE ACCOUNTING – ALL FOUNDERS

301.     VBF adopts and reincorporates paragraphs 1 through 229.

302.     VBF cannot attain pertinent information to fully account for the tens of millions of dollars misappropriated and squandered by the Founders through ordinary discovery procedures such as those permitted by Federal Rules of Civil Procedure 26, 33, 34, 36, and 45.  The Founders' concealment was integral to their misconduct, and therefore they cannot possibly be trusted to provide full and complete information through traditional discovery methods.  Additionally, upon information and belief, the Founders and those friendly to them have spoliated data, or otherwise cannot be trusted in discovery.  Indeed, currently pending are the Founders' and the Nelsons' Motions to Quash basic discovery to critical witnesses.  Also, VBF's own counsel, Jackson Walker, is withholding VBF's own client files from VBF based on an alleged Founders' privilege.  Further, VBF's other counsel, CBB and Maniaci, have continued to act contrary to VBF's interests, and to promote the Founders' schemes, while refusing to turnover VBF client files to VBF.  Simply put, the Founders should be required to "show us the money" through an equitable accounting since only the Founders truly know the extent of their massive and complex fraud.  The complexity of the fraud is further alleged in VBF's RICO count.

303.     Discovery to date has also revealed accounts utilized by the Founders so complex that adequate relief cannot be obtained at law.   VBF has to date been able to receive partial compliance on a subpoena to Wells Fargo Bank, which held VBF accounts during the Founders' reign and the personal accounts of Wulf.   The information produced by Wells Fargo to date reveals numerous wire transfers to and from unknown accounts, and other transactions that appear suspicious.   It will virtually impossible for VBF to painstakingly piece together the various documentation from the Founders and numerous third parties to fully document the "money in" and "money out" of VBF during the Founders' tenure at VBF.

304.     Therefore, as a result of the Founders' fiduciary duties to account to VBF, breaches of fiduciary duties, fraud, and unjust enrichment, as well as the existence of complex mutual accounts and the need for discovery, VBF is entitled to an order requiring the Founders to account for every dollar deposited, received, or otherwise transferred to or from VBF or any of its affiliates and the Founders (or others on behalf of the Founders) from on or before October 1, 2014 through January 31, 2018, and entering a judgment against the Founders as to any amounts for which the Founders cannot account, or which are shown by the accounting to have been misappropriated by the Founders.

305.     Pleading in the alternative, money damages are inadequate to VBF because VBF cannot fully learn the extent of the Founders' misconduct, of which the Founders' have superior knowledge, without an accounting.

## COUNT XIII – DECLARATORY JUDGMENT-
## ALL TRANSACTIONS VOID – ALL FOUNDERS

306.     VBF adopts and reincorporates paragraphs 1 through 229.

307.    VBF disputes the validity of any and all transactions wherein the Defendants personally benefitted, or which were otherwise improper, including the funds and other assets that were misappropriated, for grossly inadequate consideration.

308.    Pursuant to 22 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and the Founders on the other hand, as to such transactions, wherein VBF asserts that all such transactions should be declared null and void ab initio, whereas the Founders presumably seek to uphold these transactions.

## COUNT XIV – RESCISSION–TERMINATION AGREEMENTS, SELECTIVE PROVISIONS AND DECLARATORY JUDGMENT – HALL, DRIVER, TED REA

309.    VBF adopts and reincorporates paragraphs 1 through 229.

310.    When Hall, Ted Rea and Driver's Termination Agreements (collectively, the "Termination Agreements") were entered into, neither VBF nor its disinterested board members knew or could have known of those Defendants' breaches of fiduciary duty or fraud and, in fact, believed to be true all the material misrepresentations that Hall, Ted Rea, and Driver relayed to cover up their breaches of fiduciary duty and fraud.

311.    Both VBF and the disinterested board members relied on what they only later realized were material misrepresentations in executing the Termination Agreements.

312.    Indeed, Hall, Ted Rea, and Driver intended that VBF and its disinterested board members rely on their material misrepresentations and each defendant's failure to disclose the true facts of their fraud in order to secure the Termination Agreements.

313.    Had VBF and/or its disinterested board members known the true facts of Hall, Ted Rea, and Driver's breaches of fiduciary duty and fraud, the Termination Agreements would not have been entered into.

314. Because the true facts of Hall, Ted Rea, and Driver's breaches of fiduciary duty, fraud and material misrepresentations were concealed and never revealed to VBF or its disinterested board members, the Termination Agreements are voidable.

315. VBF has retained no benefits under the Termination Agreements. Only after signing the Termination Agreements did VBF begin to uncover the Founders' breaches of fiduciary duty, fraudulent concealment, fraudulent misrepresentation, constructive fraud, conspiracy, misappropriation and other waste of over $90,000,000 of VBF's corporate assets leading to its ultimate demise.

316. By March 2018, VBF discovered some of the misconduct alleged herein against Hall, Ted Rea, and Driver, and VBF initiated this action in July 2018. After VBF filed this lawsuit, it has continued to discover more facts of the Founders' misconduct and concealment of the same to VBF and disinterested VBF board members, and the investigation is ongoing.

317. VBF has no adequate remedy at law if the Termination Agreements are not rescinded because those agreements purport to release some of VBF's claims against Hall, Ted Rea, and Driver.

318. Rescission of the Termination Agreements is necessary to avoid Hall, Ted Rea's, and Driver's unjust enrichment as all three have benefited from their respective Termination Agreements, including the Release and Severance Provisions therein.

319. VBF would suffer substantial harm and injury if the Termination Agreements are not rescinded because, if deemed enforceable, the Termination Agreements and its provisions would purportedly preclude VBF from bringing at least some claims against Hall, Ted Rea, and Driver for VBF's damages.

320.    Based on the egregious conduct herein, damages, as well as rescission, are warranted to accomplish full justice in an amount to be proven at trial.

321.    Pleading in the alternative, to the extent the Court deems the Release and Severance Provisions of the Termination Agreements to be divisible, VBF seeks partial rescission of the Release and Severance Provisions only.

322.    Pleading in the alternative, to the extent the Court deems rescission of the Termination Agreements or its provisions inappropriate, and because there exists an actual controversy between VBF and the defendants named herein pursuant to 22 U.S.C. § 2201, VBF, which has a tangible legal benefit in bringing this action against the defendants named herein, seeks a declaration that the Termination Agreements and its Release and Severance Provisions are null and void *ab initio.*

## COUNT XV – DECLARATORY JUDGMENT
## JAMES REA

323.    VBF adopts and reincorporates paragraphs 1 through 229.

324.    On one or more occasions, James Rea misappropriated funds or assets of the Company, committed willful acts or omissions of dishonesty or fraud, and was in gross neglect of his duties to VBF between 2014 and January 2018 in breach of his Employment Agreement.

325.    As a result of James Rea's misconduct, VBF has been damaged in at least the amounts that James Rea misappropriated or converted to his own personal benefit, in addition to millions of dollars representing the devaluation of VBF caused by his mismanagement and other corporate waste.

326.    VBF has a tangible legal benefit in not being obligated to confer any benefit on James Rea under the Employment Agreement as it was procured by fraud, breaches of fiduciary duty, among other misconduct.

327.    Pursuant to 22 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and James Rea on the other hand, as to whether any benefits are owed by VBF to James Rea under the Employment Agreement, wherein VBF asserts that James Rea is not owed any benefits under the Employment Agreement, whereas James Rea presumably seeks to uphold the benefits under the Employment Agreement.

**COUNT XVI – RESCISSION –**
**EMPLOYMENT AGREEMENT – JAMES REA**

328.    VBF adopts and reincorporates paragraphs 1 through 229.

329.    When James Rea's Employment Agreement was entered into, neither VBF nor its disinterested board members knew or could have known of his breaches of fiduciary duty and, in fact, believed to be true all the representations that he relayed to cover up his breaches of fiduciary duty.

330.    At the time the Employment Agreement was entered into, neither VBF nor its disinterested board members were aware or could have been aware of the Founders' various schemes, the use of VBF funds for James Rea's own personal benefit, and the misrepresentations of the Metrics.

331.    Had VBF and/or its disinterested board members known the true facts, the Employment Agreement would not have been entered into.

332.    Because the true facts of James Rea's breaches of fiduciary duty, fraud, and material misrepresentations were concealed and never revealed to VBF or its disinterested board members, the Employment Agreement is voidable.

333.    VBF has retained no benefits under the Employment Agreement.  Less than two years after signing the Employment Agreement, VBF began to uncover the Founders' breaches of fiduciary duty, fraudulent concealment, fraudulent misrepresentation, constructive fraud,

conspiracy, misappropriation and other waste of over $90,000,000 of VBF's corporate assets leading to its ultimate demise.

334.    By January 2018, VBF discovered some of the misconduct alleged herein against James Rea, and VBF initiated this action in July 2018.   After VBF filed this lawsuit, it has continued to discover more facts of the Founders' misconduct, concealment of the same to VBF and disinterested VBF board members, and the investigation is ongoing.

335.    VBF has no adequate remedy at law if the Employment Agreement is not rescinded because that agreement purports to release some of VBF's claims against James Rea.

336.    Rescission and/or renunciation of the Employment Agreement is necessary to avoid James Rea's unjust enrichment as well as VBF's substantial harm and injury and to discharge any obligations in the future because, if the Employment Agreement is upheld, VBF may be required to pay James Rea's accrued employment benefits.

337.    Based on the egregious conduct herein, damages, as well as rescission, are warranted to accomplish full justice in an amount to be proven at trial.

### COUNT XVII – RESCISSION – SEPARATION AGREEMENT – WULF

338.    VBF adopts and reincorporates paragraphs 1 through 229.

339.    When the Wulf Separation Agreement was entered into, neither VBF nor its disinterested board members knew of his breaches of fiduciary duty and, in fact, believed to be true all the representations that Wulf relayed to cover up his breaches of fiduciary duty. Specifically, neither VBF nor its disinterested board members were aware of the misconduct alleged herein including Wulf's various schemes for his own personal benefit, which resulted in a colossal waste of corporate assets.

340.    Had VBF and/or its disinterested board members known the actual facts, the Wulf Separation Agreement would not have been entered into.

341.     Because the true facts of Wulf's breaches of fiduciary duty and other misconduct including their misrepresentations were concealed and never revealed to VBF or its disinterested board members, the Wulf Separation Agreement is voidable due to mistake and/or the Wulf's breaches of fiduciary duty and misconduct including fraud.

342.     VBF has retained no benefits under the agreement.   After signing the Wulf Separation Agreement VBF began to uncover the breaches of fiduciary duty, fraudulent concealment, fraudulent misrepresentation, constructive fraud, conspiracy, misappropriation and other waste of over $90,000,000 of VBF's corporate assets leading to its ultimate demise.

343.     By March 2018, VBF discovered some of the misconduct alleged herein against Wulf, and VBF initiated this action in July 2018.   After VBF filed this lawsuit, it has continued to discover more facts of Wulf's various schemes, other misconduct, and their fraudulent concealment of the same to VBF and disinterested VBF board members, and the investigation is ongoing.

344.     VBF has no adequate remedy at law if the Wulf Separation Agreement is not rescinded because that agreement purports to provide a severance payment to Wulf that was procured by fraud and other misconduct.

345.     As no adequate remedy at law exists, the Wulf Separation Agreement should be rescinded as a result of Wulf's breaches of fiduciary duty while in control of VBF.

346.     As no adequate remedy at law exists, the Wulf Separation Agreement was made by mistake as neither VBF nor disinterested VBF board member knew sufficient facts of Wulf's misconduct alleged herein and thus the Wulf Separation Agreement is voidable.

347.     Rescission of the Wulf Separation Agreement is necessary to avoid Wulf's unjust enrichment as he has benefited from it, including the severance payments therein.

348.    VBF would suffer substantial harm and injury if the Wulf Separation Agreement is not rescinded as VBF would be forced to pay Wulf's severance and other benefits under the Wulf Separation Agreement.

349.    As a result of Wulf's actions, VBF has been damaged in the amount of over $80 million.  Thus, damages, as well as rescission, are warranted to accomplish full justice in an amount to be proven at trial.

## COUNT XVIII – DECLARATORY JUDGMENT – SEPARATION AGREEMENT – WULF

350.    VBF adopts and reincorporates paragraphs 1 through 229.

351.    Pleading in the alternative, VBF has a tangible legal benefit in not being obligated in any way under the Wulf Separation Agreement as the benefits therein were procured by fraud, breaches of fiduciary duty, among other misconduct.

352.    Pursuant to 22 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and Wulf on the other hand, as to the benefits under the Wulf Separation Agreement, wherein VBF asserts that Wulf is not entitled to recover any benefits under the Wulf Separation Agreement, and Wulf presumably seeks to recover benefits under the Wulf Separation Agreement.

## COUNT XIX – RESTITUTION–HALL, TED REA, DRIVER AND WULF

353.    VBF adopts and reincorporates paragraphs 1 through 229.

354.    The Termination Agreements, the Wulf Separation Agreement, or the provisions therein are not valid as they were procured by fraud, breaches of fiduciary duty, and other misconduct.

355.    Defendants Hall, Ted Rea, Driver, and Wulf wrongfully received benefits, including money, pursuant to their Termination Agreements and the Wulf Separation Agreement.

356.     It would be unjust and contrary to principles of equity and good conscience to allow the defendants named herein to retain the benefits or the value thereof conferred upon them by VBF.

357.     The benefits received by the defendants named herein rightfully belong to VBF in equity and good conscience.

## COUNT XX – CONSPIRACY – CANACCORD

358.     VBF adopts and reincorporates paragraphs 1 through 229.

359.     The Founders and Canaccord had a meeting of the minds and agreed to engage in a conspiracy for their personal benefit, to cause harm to VBF by securing investments based on false data and/or misrepresentations while concealing the same from VBF, its disinterested board members, and potentially interested third parties ("Founders-Canaccord Conspiracy").

360.     The Founders and Canaccord's aim, through the Founders-Canaccord Conspiracy, was to accomplish the unlawful objective of benefiting the Founders and Canaccord at the expense of VBF, while concealing the same from VBF, and/or making fraudulent misrepresentations to VBF, and fraudulent non-disclosures or concealments from VBF, its disinterested directors, and potentially interested third parties in the face of the Founders' duties of disclosure.

361.     The overt, unlawful actions described herein furthered the Founders-Canaccord Conspiracy. Canaccord facilitated, encouraged, and assisted in accomplishing the Founders' breaches of fiduciary duty, fraudulent concealment, constructive fraud, and fraudulent misrepresentation.

362.     VBF suffered injuries as a direct and proximate result of the Conspiracy between the Founders and Canaccord. VBF's compensatory damages are in excess of $90,000,000.

363.     Further, Canaccord's misconduct was willful and egregious, or at least wanton, and warrants punitive damages in an amount to be determined at trial.

## COUNT XXI – AIDING AND ABETTING CONSPIRACY – CANACCORD

364.    VBF adopts and reincorporates paragraphs 1 through 229.

365.    While in control of VBF, the Founders engaged in a Conspiracy to accomplish the unlawful objective of personally benefiting at the expense of VBF. Canaccord had knowledge that the Founders were engaged in the Conspiracy.

366.    From the beginning of its engagement with VBF at all times thereafter until that engagement ended, Canaccord intended to assist the Founders in carrying out their Conspiracy and other misconduct described herein.

367.    Canaccord knowingly and substantially assisted the Founders in carrying out the Conspiracy alleged herein, while concealing the same from VBF, its disinterested board members, and potentially interested third parties.

368.    As a direct and proximate result of Canaccord's aiding and abetting of the Founders' Conspiracy, VBF suffered compensatory damages are in excess of $90,000,000.

369.    Canaccord's actions were willful and egregious, or at least wanton, and therefore punitive damages against Canaccord in an amount to be determined at trial are warranted.

## COUNT XXII – CONSPIRACY – CHRISTINE GAGNE

370.    VBF adopts and reincorporates paragraphs 1 through 229.

371.    The Founders' and Gagne had a meeting of the minds and agreed to engage in a conspiracy for their personal benefit and to cause harm to VBF by employing and/or compensating Gagne with VBF funds while she was not without any legal immigration status to work in the United States ("Founders-Gagne Conspiracy"), while concealing the same from VBF and its disinterested board members.

372.    The Founders and Gagne's aim, through the Founders-Gagne Conspiracy, was to accomplish the unlawful objective of personally benefiting the Founders and Gagne at the expense of VBF while concealing the same from VBF and its disinterested board members.

373.    The overt, unlawful actions described herein further the Founders-Gagne Conspiracy.  Gagne facilitated, encouraged and assisted in accomplishing the Founders' breaches of fiduciary duty, fraudulent concealment, constructive fraud, and fraudulent misrepresentation.

374.    VBF suffered injuries as a direct and proximate result of the Conspiracy between the Founders and Gagne.  In total, VBF's compensatory damages are in excess of $90,000,000.

375.    Further, Gagne's misconduct was willful and egregious as evidenced by, for example, her statements to VBF employees alleged herein, or at least wanton, and warrants punitive damages in an amount to be determined at trial.

## COUNT XXIII – AIDING AND ABETTING CONSPIRACY – CHRISTINE GAGNE

376.    VBF adopts and reincorporates paragraphs 1 through 229.

377.    The Founders owed fiduciary duties to VBF from in or around October 1, 2014, when they came to control VBF, through and including January 2018, when the last of the Founders was terminated as an employee, contractor, officer and/or director of VBF.

378.    Gagne knew of the Founders' fiduciary relationship to VBF.

379.    By receiving monies from VBF while she was without any legal immigration status to work in the United States and knowingly receiving those monies under another person's name, Gagne was aware that she was participating in the breach of the Founders' fiduciary duties to VBF.

380.    Gagne knowingly and substantially assisted the Founders in their breaches of fiduciary duties alleged herein while concealing the same from VBF and disinterested board members.

381.    VBF suffered injuries as a direct and proximate result of Gagne's aiding and abetting of the Founders' breaches.

382.    Because of the Gagne's substantial assistance to the Founders, VBF's compensatory damages for Gagne's misconduct are, individually and/or in the aggregate with the other claims, more likely than not in excess of $75,000.

383.    Further, Gagne's knowing participation and substantial assistance to the Founders was willful and egregious, or at least wanton, therefore, punitive damages against Gagne and in favor of VBF are warranted, in an amount to be determined at trial.

## COUNT XXIV – UNJUST ENRICHMENT – CHRISTINE GAGNE

384.    VBF adopts and reincorporates paragraphs 1 through 229.

385.    VBF, at Wulf's direction and due to the Founders' fraud or taking undue advantage, conferred VBF funds for Gagne as compensation and benefits for alleged services Gagne provided to VBF.

386.    It would be unjust and contrary to principles of equity and good conscience to allow Gagne to retain the benefits conferred upon her by VBF, which she wrongfully secured, as she has been unjustly enriched at VBF's expense and to its detriment.

## COUNT XXV – CONSPIRACY – MANIACI

387.    VBF adopts and reincorporates paragraphs 1 through 229.

388.    The Founders and Maniaci had a meeting of the minds and agreed to engage in a conspiracy for their personal benefit so Maniaci could secure shares at discounted prices as described herein and to cause harm to VBF, while concealing the same from VBF, its disinterested board members ("Founders-Maniaci Conspiracy").

389.    The Founders and Maniaci's aim, through the Founders-Maniaci Conspiracy, was to accomplish the unlawful objective of personally benefiting the Founders and Maniaci at the

expense of VBF, while concealing the same from VBF, and/or making fraudulent misrepresentations to VBF and its disinterested board members in the face of the Founders' duties of disclosure.

390.    The overt, unlawful actions described herein furthered the conspiracy. Maniaci facilitated, encouraged, and assisted in accomplishing the Founders' breaches of fiduciary duty, fraudulent concealment, constructive fraud, and fraudulent misrepresentation.

391.    VBF suffered injuries as a direct and proximate result of the conspiracy between the Founders and Maniaci. In total, VBF's compensatory damages are in excess of $90,000,000.

392.    Further, Maniaci's misconduct was willful and egregious, or at least wanton, and warrants punitive damages in an amount to be determined at trial as it continues into 2019 through the Bankruptcy Proceedings.

## COUNT XXVI – AIDING AND ABETTING – MANIACI

393.    VBF adopts and reincorporates paragraphs 1 through 229.

394.    While in control of VBF, the Founders engaged in the Conspiracy to accomplish the unlawful objective of personally benefiting at the expense of VBF. Maniaci had knowledge that the Founders were engaged in this conspiracy.

395.    From the beginning of his role in overseeing the work of CBB lawyers for VBF, his own legal work for VBF, and his personal relationship with the Founders and at all times thereafter, Maniaci intended to assist the Founders in carrying out the Conspiracy and other misconduct described herein.

396.    Maniaci knowingly and substantially assisted the Founders in carrying out the Conspiracy alleged herein, while concealing the same from VBF and its disinterested board members.

397.    Maniaci's substantial assistance toward carrying out the Founders' Conspiracy is evidenced by, among other things, his acquisition of VBF stock for a steep discount or the acquisition of VBF stock for a steep discount by entities associated with Maniaci, as well as his legal work (through CBB) for entities other than VBF but paid for by VBF.

398.    VBF suffered and continues to suffer injuries as a direct and proximate result of Maniaci's aiding and abetting of the Founders' Conspiracy as Maniaci and the Founders concealed his personal relationship with the Founders and the discounts he received on VBF stock from VBF, its disinterested board members and throughout the Bankruptcy Proceedings.

399.    Maniaci's actions were and are willful and egregious, or at least wanton, in particular his continued withholding of VBF files that may contain further evidence of the Founders' conspiracy (or the other claims alleged herein against any Defendant) and Maniaci's role therein, as well as his recent efforts to solicit clients to join the Ad Hoc Committee of equity investors in VBF's Bankruptcy Proceedings. Therefore, punitive damages against Maniaci in an amount to be determined at trial are warranted.

## COUNT XXVII – VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) (18 U.S.C. § 1962(c)) – FOUNDERS

400.    VBF adopts and incorporates paragraphs 1 through 229.

### A.    The RICO "Person" and "Enterprise"

401.    Each of the Founders is a "person," as that term is defined in 18 U.S.C. § 1961(3).

402.    VBF is a Racketeer Influenced and Corrupt Organizations ("RICO") enterprise. Specifically, VBF was formed as a sustainable fish farm business but was instead controlled by the Founders as an abused corporate enterprise and ultimately a victim of the Founders' schemes. The Founders directed the affairs of VBF, the RICO enterprise, as part of their scheme to loot and defraud VBF.

403.    Collectively, the Founders form an "enterprise" or "enterprises" as defined by 18 U.S.C. § 1961(4) ("Enterprise").  The Founders have been associated in fact outside of VBF, and have functioned outside of VBF in an organized fashion, having a joint purpose of acting together for each other's benefit in VBF and other businesses, for the purposes of enriching themselves at the expense of VBF by engaging in the fraudulent scheme alleged above, and the Founders have therefore had business and, upon information and belief, personal relationships with each other outside of VBF over an extended period of time.  Each member conducted the affairs of the enterprises through a pattern of racketeering activity—namely, mail fraud and wire fraud, as described herein.

404.    Further, the Founders or the Founders through VBF acted as an enterprise as to VBF, orchestrating their joint misconduct over an approximate three year period.  Additionally, the Founders misused VBF itself as an instrumentality not to accomplish VBF's legitimate business, but instead to conduct the illegal acts set forth herein.

405.    Therefore, VBF was not a beneficiary of the Enterprise, but instead its victim, misused by the Founders as a passive instrumentality to accomplish their misconduct, as the Founders controlled VBF at relevant times.

406.    At all times material to the allegations stated herein, the Enterprise was engaged in, or had some effect upon, interstate commerce as VBF has done business in various states, including, but not limited to, Illinois, Iowa, Texas, New York, Florida, and Canada and VBF shareholders reside in multiple states.

407.    As alleged herein, the Enterprise's purpose was to serve as the vehicle through which the Founders implemented their continuous and ongoing scheme to injure VBF.  The intended purpose of the Founders' scheme was to misappropriate millions of dollars from VBF.

B.      **The Pattern of Racketeering Activity**

408.    The Founders directed the affairs of VBF and the association-in-fact enterprise as part of the scheme to defraud VBF.

409.    The Founders served as the executives of VBF and were the primary decision makers.  As alleged above, the Founders made all major decisions concerning the marketing, finances, and day-to-day operations of VBF.  The Founders were aware and had knowledge indicating that the facts related to the FCR, Density, Mortality Rates, Water Quality, EBITDA and other Financial Metrics, and theirs and VBF's Technical Abilities were being misrepresented to VBF, its disinterested directors, its shareholders, and potentially interested third parties. Nonetheless, the Founders devised and participated in a plan to use such business Metrics to generate unrealistic value to VBF.  Canaccord, including Lobb and Goodman who were, for a time, employed by Canaccord and after that time, consultants to VBF, participated in the Founders' plan to generate unrealistic value to VBF by contributing to and/or approving of the Founders' plan to use business Metrics to induce investments in VBF. Moreover, the Founders conspired and acted outside of their positions at VBF to accomplish the scheme that looted and injured VBF.

410.    The Founders, by and through the Enterprise, committed at least two related acts of racketeering activity which occurred within ten years of each other within the meaning of  18 § 1961(5), as alleged in more detail in this sub-section.

C.      **Predicate Acts**

411.    Between September 5, 2014 and the present, the Founders executed their unlawful racketeering activity targeted at VBF through the following mailings and interstate wires (*i.e.* electronic mail, facsimiles and telephone calls).  Each such communication is a discrete violation of 18 U.S.C. §§ 1341 (mail fraud) or 1343 (wire fraud) and a "predicate act" of racketeering activity pursuant to 18 U.S.C. § 1961(1) (the "Predicate Acts"):

a.      Compensation of Christine Gagne who was compensated with VBF funds under the name of "Ronnie O'Brien" while she did not have legal immigration status to work in the United States;

b.      June 2014 Written Representations

c.      May 2015 Written Representations;

d.      Various June 2015 Written Representations;

e.      July 2015 Fisheries Report

f.      November 2015 Written Representations;

g.      January 2016 Written Representations;

h.      April 2016 Written Representations; and

i.      The Founders' involvement in other businesses while at VBF

412.    The Founders distributed marketing materials, contracts, e-mail communications, and other documents containing material misrepresentations related to the business Metrics, technology, and finances of VBF that were transmitted by mail and wire in interstate commerce.

413.    In reality, the Founders misrepresented and concealed their misconduct through such communications.

414.    Each of the Predicate Acts includes statements that were knowingly false and/or made with reckless indifference as to their truth or falsity, and was made with intent to fraudulently induce VBF to refrain from attempting to halt the Founders' misconduct by concealing these material facts from VBF.

415.    These Predicate Acts consisted of communications and transmissions through the mail and across the interstate wires.  They were intended to, and did in fact, directly or indirectly affect the Enterprise, by allowing it to misappropriate VBF funds and other assets.

416.    The Founders' repeated violation of 18 U.S.C. §§ 1341 (mail fraud) or 1343 (wire fraud) occurred over a period of several years, commencing in 2014, and was continuous

throughout the relevant time period (i.e. on or before September 2014 through at least November 2017, if not later).

417.    The Predicate Acts were related and connected to the same unlawful scheme or artifice to fund VBF, loot VBF, and ultimately defraud VBF devised and executed by the Founders to continually conduct or participate in the conduct of the affairs of the Enterprise.

418.    Accordingly, the Founders' pattern of racketeering activity consisted of multiple Predicate Acts that victimized VBF. The Predicate Acts occurred and extended over a substantial period of time constituting a close-ended scheme.  Pleading in the alternative, the Predicate Acts constituted an open-ended scheme as they occurred over a substantial period of time and threaten continuing criminal conduct.

419.    The Founders' pattern of racketeering activity is further evidenced by the number of Predicate Acts and the variety of the Predicate Acts (consisting of, inter alia, projections, invoicing, emails, guaranties and other promises).

420.    VBF made or authorized transfers of assets and stock (as described above) totaling (and based on information available today, VBF's investigation is ongoing):

    a.    at least $4,562,498 to Wulf;

    b.    at least $4,747,333 to Hall;

    c.    at least $4,365,000 to James Rea;

    d.    at least $4,487,410 to Ted Rea; and

    e.    at least $3,389,501 to Driver.

421.    The Founders also directed all distributions made by VBF.  Instead of leaving sufficient funds in VBF to conduct day-to-day operations, the Founders looted the company through misappropriation of funds and self-dealing.  These funds were diverted from VBF to the Founders.  These distributions were effectuated through the United States mail and by wire in

interstate commerce, in furtherance of the fraudulent scheme alleged herein.  This conduct caused injury to VBF's business, as it resulted in, among other things, VBF owing millions of dollars without sufficient funds to account for such debt.

**D.     Defendants Conducted the Enterprise's Affairs Through a Pattern of Racketeering Activity**

422.    At all relevant times, the Founders were associated with the Enterprise as the parties in control of the Enterprise and VBF.  The Founders exercised continuous authority over the Enterprise on an ongoing basis, up through and including November 2017.

423.    The Founders conducted the affairs of VBF and the association-in-fact enterprise through a pattern of racketeering activity:  namely, mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343.

424.    The Founders furthered their scheme by transferring funds to themselves via wire on multiple occasions, paying themselves sums of money in compensation and bonuses. Additionally, the Founders authorized and requested payments related to the BAJER stock scheme, the American Growth Funding Loan scheme, the Wulf Lake House scheme, the Sedun stock scheme, the Gagne scheme, the tractor-trailer scheme, and the OFA Scheme to loot VBF and its resources, and payments made for these schemes were made by wire or mail.

425.    At all relevant times, the Founders' association with the Enterprise facilitated their commission of the Predicate Acts comprising a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).

426.    The Founders committed or caused to be committed the Predicate Acts, acts of mail or wire fraud, as the means by which he conducted, or participated in the conduct of the Enterprise's affairs for the intended purpose of misappropriating funds and other assets from VBF.

94

427.    The Founders used mail and wire over a continuous period of years, establishing a pattern of racketeering activity.

**E.    Injury To VBF**

428.    As a direct and proximate result of the Founders' racketeering activities, VBF suffered actual damages in the amount of at least $90,000,000.   VBF has been directly, purposefully, and foreseeably injured in its business and property by reason of the Founders' violation of 18 U.S.C. § 1962(c).   VBF is a "person" who has suffered a compensable injury as a result of the Founders' unlawful activity, as defined in 18 U.S.C. § 1964(c).

429.    Pursuant to 18 U.S.C. § 1964(c), VBF is entitled to recover three times the actual damages that it has sustained as a direct and proximate cause of the Enterprise's unlawful racketeering activity, amounting to at least $240,000,000, as well as VBF's reasonable attorney's fees and litigation expenses.

430.    The intended, direct and foreseeable consequence of the Founders' unlawful racketeering activity, as described above, was and is to injure VBF's business or property by, among other things, extracting millions of dollars of from VBF.

431.    As a result of the Founders' racketeering activity and scheme to defraud, VBF has suffered damages in excess of the minimum jurisdictional limit of this Court, for which it seeks recovery.  VBF has suffered injury to its business and property as a result of the Founders' conduct of VBF through a pattern of racketeering activity.

432.    The misappropriation of funds and self-dealing perpetrated by the Founders have depleted VBF of funds that could have been used to continue to operate its business and pay its creditors.   VBF was injured by the Founders' fraudulent and racketeering activity because it prevented the business from continuing to operate and maintain the core of its business.

433.    VBF is entitled to treble damages and attorneys' fees based upon the Founders'

violation of 18 U.S.C. § 1962(c).

434.    VBF did not discover its injuries resulting from the Founders' pattern of

racketeering activity until in or around March 2018.

## XI.  ATTORNEYS' FEES

435.    VBF is entitled to recover reasonable and necessary attorney's fees and costs for

the claim against Defendants.

436.    Specifically, under Iowa's fraudulent transfer law, the Court may award, any other

relief the circumstances may require (*see* Iowa Code § 684.7) and under Texas' fraudulent transfer

law, Plaintiff is entitled to attorneys' fees and costs for the claims against Defendants (*see* TEX.

BUS. & COMM. CODE § 24.013).

## XII.  PRAYER

WHEREFORE, VBF respectfully requests the following relief:

437.    That this Court enter judgment in its favor and against the Defendants, jointly and

severally, in an amount in excess of $75,000, but to be determined at trial, as actual and

consequential damages, including but not limited to compensatory damages representing the

devaluation of Plaintiff due to Defendants Leslie A. Wulf's, Bruce A. Hall's, James Rea's, John

E. Rea's, and Keith Driver's fraud, mismanagement, other waste of corporate assets, and other

misconduct described herein, plus exemplary damages due to Defendants' fraudulent and

malicious conduct, costs, allowable pre-judgment and post-judgment interest at the high rates

allowed by law; and disgorgement of compensation and any other amounts unjustly retained;

438.    That VBF be awarded treble damages and attorneys' fees based under the

Founders' violation of 18 U.S.C. §1962(c);

439.     That Defendants Leslie A. Wulf, Bruce A. Hall, James Rea, John E. Rea, and Keith Driver be ordered to return all funds received from VBF as a result of the conduct described herein, and that judgment be entered against them and in favor of VBF for the total amount transferred to them. In the case that the funds were spent to acquire any real or personal property, VBF requests that a constructive trust be imposed upon the property, and an order that such property must immediately be turned over to VBF;

440.     That Defendants Leslie A. Wulf, Bruce A. Hall, James Rea, John E. Rea, and Keith Driver be required to produce an equitable accounting detailing every dollar deposited, received, or otherwise transferred to or from VBF or any of its affiliates and Defendants from on or before October 1, 2014 through January 31, 2018, and entering a judgment against Defendants as to any amounts for which Defendants cannot account, or which are shown by the accounting to have been misappropriated by Defendants;

441.     That this Court rescind the Termination Agreements and Wulf Separation Agreement of Defendants Leslie A. Wulf, Bruce A. Hall, John E. Rea, and Keith Driver and return the parties to their *status quo ante* before those agreements were entered into;

442.     That this Court enter a judgment declaring that the Release and Severance Provisions in the Termination Agreements are null and void *ab initio*, and that Defendants Bruce A. Hall, John E. Rea, and Keith Driver are not entitled to rely on the Release and Severance Provisions to avoid the claims asserted against them by VBF and award other relief deemed just;

443.     That this Court enter a judgment declaring that the benefits under the Employment Agreement between VBF and Defendant James Rea are null and void *ab initio*, and that Defendant James Rea is not entitled to rely thereon, and awarding other relief just;

444.    That this Court enter a judgment declaring that the benefits under the Wulf Separation Agreement between VBF and Defendant Leslie A. Wulf are null and void *ab initio*, and that Defendant Wulf is not entitled to rely thereon, and awarding other relief deemed just;

445.    That this Court enter judgment in its favor and against Defendant Christine Gagne, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for the Founders-Gagne Conspiracy and aiding and abetting the Founders' Conspiracy, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just;

446.    That Defendant Christine Gagne be ordered to return all funds received from VBF as a result of the conduct described herein, and that judgment be entered against her and in favor of VBF for the total amount transferred to her;

447.    That this Court enter judgment in its favor and against the Defendant Canaccord, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for the Founders-Canaccord Conspiracy and aiding and abetting the Founders' Conspiracy, plus punitive damages in an amount to be determined at trial, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just;

448.    That this Court enter judgment in its favor and against the Defendant Maniaci, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for the Founders-Maniaci Conspiracy and aiding and abetting the Founders' Conspiracy plus punitive damages in an amount to be determined at trial, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just;

449.    That VBF be awarded attorneys' fees and costs; and

450.     That VBF be awarded any other relief, both special and general to which it may be justly entitled.

Dated: September 23, 2019

**JURY TRIAL DEMANDED**

/s/ *Nicole Williams*

ATTORNEYS FOR PLAINTIFF

Nicole Williams
Texas Bar No. 24041784
nicole.williams@tklaw.com
William L. Banowsky
Texas Bar No. 01697125
bill.banowsky@tklaw.com
Jasmine S. Wynton
Texas Bar No. 24090481
jasmine.wynton@tklaw.com

**THOMPSON & KNIGHT LLP**
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201
214-969-1149

/s/ *Robert H. Lang*
Robert H. Lang
(appearing *pro hac vice*)
rhlang@thompsoncoburn.com
Patrick Morales-Doyle
(appearing *pro hac vice*)
pmoralesdoyle@thompsoncoburn.com
Caroline Pritikin
(appearing *pro hac vice*)
cpritikin@thompsoncoburn.com
Eileen E. Boyle Perich
(appearing *pro hac vice*)
eboyleperich@thompsoncoburn.com

Adam C. Decker
(appearing *pro hac vice*)
adecker@thompsoncoburn.com

**THOMPSON COBURN LLP**
55 East Monroe, 37th Floor
Chicago, IL 60603
312-346-7500

***ATTORNEYS FOR PLAINTIFF***
***VEROBLUE FARMS USA, INC.***

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned, a non-attorney, hereby certifies under penalties as provided by law, that on Sepember 23, 2019, she caused a true and correct copy of the foregoing **Second Amended Complaint** to be served upon counsel of record via ECF system of Texas:

/s/       Arianna Thornton