**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **VEROBLUE FARMS USA, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 3:19-cv-00764-L** |
| **LESLIE A. WULF, BRUCE A. HALL,** | § | |
| **JAMES REA, JOHN E. REA, and KEITH** | § | |
| **DRIVER** | § | |
| | § | |
| **Defendant.** | § | |

---

**INDEX TO APPENDIX TO DEFENDANT KEITH DRIVER'S BRIEF IN SUPPORT OF
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

---

Exhibit A:     Amended Complaint ................................................................. APP0003

Exhibit B:     Declaration of Defendant Keith Driver in Support of 12(b)(6)
               Motion to Dismiss.................................................................. APP0031

Exhibit C:     Employment Agreement ........................................................ APP0033

Exhibit D:     Business Relationship Restructuring Agreement  ................................ APP0049

Exhibit E:     Second Amended Complaint  ............................................................. APP0066

---

Respectfully submitted,


By:___*/s/ Stacie M . Codr*_____
          Stacie M. Codr
          scodr@finleylaw.com
          **Finley Law Firm, P.C.**
          699 Walnut Street, Suite 1700
          Des Moines, IA  50309
          Telephone: (515) 288-0145


          R. Heath Cheek
          State Bar No. 24053141
          hcheek@bellnunnally.com
          Katie R. Beaird
          Texas Bar No. 24092099
          kbeaird@bellnunnally.com
          *Pro Hac Vice Pending*
          **Bell Nunnally & Martin LLP**
          2323 Ross Avenue, Suite 1900
          Dallas, TX 75201
          Telephone:  (214) 740-1400
          Telecopy:  (214) 740-1499

**ATTORNEYS FOR DEFENDANT**
**KEITH DRIVER**


## CERTIFICATE OF SERVICE

       The undersigned hereby certifies that a true and correct copy of the above and foregoing was served upon counsel of records for all parties via ECF Service.

    **DATED** this 29th day of October, 2019.


          */s/ Heath Cheek*_____
          R. Heath Cheek


10700.1 / 4778472_1.docx

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| VEROBLUE FARMS USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. Case 3:18-cv-03047-CJW |
| v. | ) | |
| | ) | |
| LESLIE A. WULF, BRUCE A. HALL, | ) | |
| JAMES REA, JOHN E. REA, | ) | |
| and KEITH DRIVER, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff, VeroBlue Farms USA, Inc. ("VBF"), through its undersigned counsel, complain of Defendants, Leslie A. Wulf ("Wulf"), Bruce A. Hall ("Hall"), James Rea ("James Rea"), John E. ("Ted") Rea ("Ted Rea"), and Keith Driver ("Driver") (collectively,  "Defendants"), as follows:

### Introduction

Defendants controlled VBF for almost three years from 2014 through 2017. VBF recently discovered that Defendants, while serving as VBF officers and/or directors, misappropriated millions of dollars from VBF and otherwise wasted VBF assets.  This suit seeks recovery of damages due VBF and other relief.

### Parties and Jurisdiction

1.      VBF is a Nevada corporation with its principal place of business in Webster City, Iowa.

2.      All Defendants are Canadian citizens, except for Hall.

3.      Driver, upon information and belief, resides in Calgary, Alberta, Canada. Driver served as an officer and employee (and/or contractor) of VBF from October 1, 2014 through on or about January 13, 2017, when VBF terminated his employment and officer status.

4.      James Rea, upon information and belief, has permanent resident alien status in the United States.  James Rea served as a director, officer and employee (and/or consultant) of VBF October 1, 2014 through on or about January 8, 2018 when VBF terminated his employment (and/or contractor), director, and officer status.

5.      Ted Rea, upon information and belief, has permanent resident alien status in the United States.  Ted Rea served as a director, officer and employee (and/or consultant) of VBF from October 1, 2014 through on or about October 27, 2017 when VBF terminated his employment (and/or contractor), director, and officer status.

6.      Hall, upon information and belief, is a U.S. citizen and a citizen of Texas.  Hall served as a director, officer and employee (and/or consultant) of VBF from October 1, 2014 through on or about October 27, 2017 when VBF terminated his employment (and/or contractor), director, and officer status.

7.      Wulf, upon information and belief, has permanent resident alien status in the United States.  Wulf served as a director, officer and employee (and/or contractor) of VBF from October 1, 2014 through on or about November 6, 2017, when VBF terminated his employment (and/or consultant), director, and officer status.

8.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(3) as all Defendants except Hall are citizens of a foreign state, Hall is not a citizen of the same state as VBF, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

9.     Venue in this District is proper because the transactions and associated misconduct at issue in this case occurred in whole or in part in Hamilton County, in the Northern District of Iowa.

10.     This Court has personal jurisdiction over Defendants pursuant to Iowa Code § 617.3 as the Defendants committed torts in part in Iowa, and against an Iowa resident, VBF.

**Defendants' Misappropriations Of VBF Cash And Other Assets**

11.     VBF was incorporated on September 5, 2014, and operates a sustainable fish farm ("Farm") business in Webster City, Iowa.  Its website can be found at http://verobluefarms.com/.

12.     Defendants, shortly thereafter, came into control of VBF, starting October 1, 2014.

13.     VBF conducted an investigation through which VBF, by March 2018, discovered the misappropriations and other misconduct alleged herein.  VBF did not know, nor could it have known, of Defendants' misconduct until that time, especially since Defendants fraudulently concealed their misconduct from VBF, as further alleged herein.

14.     VBF has discovered at least ten schemes consummated by the Defendants to accomplish this misconduct over a time period of approximately three years.  Defendants accomplished these schemes without the approval of disinterested VBF directors with knowledge and notice of such schemes.

**BAJJER Stock Scheme**

15.     BAJJER LLC ("BAJJER") is owned and controlled by some or all Defendants or their affiliates.  On September 18, 2014, Defendants directed VBF to transfer 1,250,000 shares of VBF's Canadian affiliate to BAJJER, for a grand total of $1.25.  A true and correct copy of documentation regarding this transaction is attached hereto and incorporated herein as Exhibit A.

3

APP0005

16.     Such stock was sold to others around that same time for $0.90 per share, meaning that Defendants received at least $1,125,000 worth of stock for free.  Unfortunately, due to Defendants' misconduct, stock in VBF and its affiliates has since lost significant value.

**American Growth Funding Loan Scheme**

17.     BAJJER II, LCC ("BAJJER II") is also owned and controlled by some or all Defendants or their affiliates (and third parties). American Growth Funding, LLC ("AGF") loaned $78,000 to BAJJER II, which grew to $101,000, with interest, and which AGF wrote off as bad debt on or before December 31, 2016.  AGF is a factoring/finance company, and its affiliates have been sued for fraud by the United States Securities and Exchange Commission, in the United States District Court for the Southern District of New York, as summarized in this press release: https://www.sec.gov/news/pressrelease/2016-21.html.

18.     AGF loaned BAJJER another $200,000, which BAJJER transferred to VBF.

19.     On July 8, 2016, the Defendants directed VBF to pay AGF $375,000, even though VBF never had a direct borrowing relationship with AGF.  Upon information and belief, this $375,000 amount encompasses not only the $200,000 referenced in paragraph 18 above, but also the $101,000 amount referenced in paragraph 17 above.

20.     Therefore, Defendants utilized VBF funds to repay an alleged debt to AGF representing funds that did not benefit VBF, but instead that benefitted Defendants personally.

**Wulf Lake House Scheme**

21.     Wulf owns, or owned at relevant times, a vacation home on a lake in Texas ("Wulf Lake House").  The Wulf Lake House was destroyed by a fire in early 2015.

22.     Wulf rebuilt the Wulf Lake House from in or around May 2015 through in or around July 2017.

4

APP0006

23.     VBF employee Tracy Arbanas ("Arbanas") oversaw the reconstruction of the Wulf Lake House, and VBF paid her to do so at an annual cost to VBF of approximately $97,500, which represented Arbanas' compensation and benefits.  Further, VBF funded housing for Arbanas close to the lake house, and refreshments for the construction crew on this project.  All told, VBF incurred approximately $107,490.51 for compensation and benefits to Arbanas.

**Sedun Stock Scheme**

24.     Gregg Sedun ("Sedun"), upon information and belief, has had social and/or business relationships with the Defendants outside of VBF, and preexisting VBF's incorporation.

25.     On December 11, 2015, Sedun loaned $200,000 to VBF, and Sedun loaned another $50,000 to VBF through an entity owned and controlled by Sedun, Alcaron Capital Corp. ("Alcaron") on June 23, 2016.

26.     On July 12, 2016, VBF paid Alcaron $326,056, representing about $76,000 in interest on $250,000 in loans made only months before the repayment.  That same day, July 12, 2016, Wulf authorized VBF to issue 1,500,000 shares of VBF to Alcaron, purportedly for Sedun's procurement of other investment in VBF, with Alcaron paying nothing for this stock (again, the stock was valued at $0.90/share at the time, rendering this allotment of stock to be worth about $1,350,000 at the time.)  Two days later, on July 14, 2016, Sedun loaned Wulf $225,000 for the Wulf Lake House and Wulf promoted Sedun to be a VBF director.

**Compensation Scheme**

27.     The five Defendants set their own compensation from VBF at $400,000 annually for each Defendant besides Driver, who made $325,000 annually, for a total for all five Defendants of $1,925,000 per year.  For the sake of reference, there is now one person that has replaced

5

Defendants as VBF's President, and VBF pays him $250,000 per year.   Therefore, Defendants were overpaying themselves at least, and approximately, $1,675,000 per year.

28.     Additionally, at Defendants' direction, and for no good reason, VBF paid the five Defendants twice their monthly compensation in July 2016.

**Christine Gagne Scheme**

29.     Christine Gagne ("Gagne") is Wulf's daughter. Gagne is a Canadian citizen without any legal immigration status to work in the United States.  VBF, at Wulf's direction, purportedly employed Gagne or contracted with her for alleged services. Gagne would often drive from Canada allegedly to work at VBF in Webster City, Iowa.

30.     VBF, at Wulf's direction, paid Gagne not under her real name, but under the name "Ronnie O'Brien" to conceal VBF's payments to her.

31.     Gagne abruptly left VBF in November 2017, when VBF terminated Wulf's employment and other statuses with VBF.  At that time, Gagne said the following words to those present at VBF's Webster City, Iowa facility at the time, in recognition of the misconduct represented by her relationship with VBF as fostered by some or all Defendants: "None of you have ever seen me and you do not know who I am."

32.     VBF incurred approximately $52,264.28 for compensation and benefits to Gagne. Further, this and other schemes demonstrate the general manner with which the Defendants played "fast and loose" with applicable laws and regulations.

**Tractor-Trailer Scheme**

33.     VBF has sold live fish to its customers at all relevant times, from its Webster City, Iowa facility.  Per industry standard, it is the customer's obligation to arrange for the pick-up and

6

APP0008

transport of the live fish from the facility, not VBF's.  Therefore, VBF generally does not need any tractor-trailers.

34.     Regardless, in or around July and August 2016, some or all Defendants orchestrated VBF's purchase of six (6) tractor-trailers at a total cost to VBF of approximately $375,237.77. These tractor-trailers sat dormant at VBF's Webster City, Iowa facilities.  Ultimately, after Defendants were terminated by VBF, VBF sold one tractor-trailer.  VBF is attempting to use two of the tractor-trailers, and the other three have sat dormant at VBF's facilities, despite VBF's attempts to sell them.

35.     At a minimum, this large purchase with VBF funds demonstrates the general recklessness with which Defendants handled VBF's money.

**OFA Scheme**

36.     Defendants incorporated Opposing Flows Aquaculture, Inc. ("OFA") on July 31, 2014 in anticipation of VBF's operations.  VBF grows its fish in tanks that are housed at the Farm ("Tanks").

37.     The Defendants formed OFA to buy Tanks from a third-party, and then to resell Tanks to VBF at a profit to OFA and the Defendants ("OFA Scheme").

38.     Of course, it was more beneficial to VBF not to pay OFA a profit as an unnecessary "middleman."  Instead, VBF could buy directly from the third party without paying any amount to OFA, which VBF ultimately has done.  Upon information and belief, VBF did not engage in any transactions with OFA, but, through its count for an equitable accounting, VBF seeks a full accounting of OFA from Defendants.

7

APP0009

**Other Misappropriations Of VBF Funds For Personal Use**

39.     Defendants engaged in a variety of other schemes through which they orchestrated

VBF's expenditure of its funds or other assets for Defendants' personal benefit, not VBF's,

including, but not limited to, the following:

    a.     travel and other expenses relating to a July 2014 trip by some or
           all Defendants to Denver, Colorado in relation to a non-VBF business
           known as ChipMeds, Inc.;

    b.     Wulf's personal cell phone bills well beyond a reasonable
           amount, or even the amount expensed by the other Defendants;

    c.     James Rea's personal living expenses in Ames, Iowa,
           about forty miles from Webster City, Iowa in or around
           August 2017;

    d.     exorbitant travel expenses for the Defendants to travel to
           or from Canada or Texas to Webster City, Iowa;

    e.     the unnecessary leasing of twenty-two company vehicles,
           including Ford Explorers for Defendants' personal use;

    f.     payment of personal travel expenses for Defendants and some or all of
           Defendants' friends and family, including trips to Australia and
           Norway;

    g.     directing VBF's controller to perform accounting services
           for the Defendants' non-VBF business ventures while on
           VBF company time and while he was being paid by VBF;

    h.     $310,000 for the purchase of a house in Webster City,
           Iowa, when the house was worth $240,000, if not less, and
           the home was not necessary for legitimate business reasons
           given Defendants' maintenance of their residence in Texas
           or Canada.  Indeed, VBF, through Hall and possibly other
           Defendants, purchased this home on August 9, 2016 for
           $310,000 and VBF sold this home on May 25, 2018 for
           $232,000. True and correct copies of the relevant closing
           statements are attached as Exhibit B; and,

    i.     other improper expenditures of VBF funds for some or all
           of Defendants' personal expenses.

**Other Mismanagement Of VBF**

40.     Defendants' misappropriations of VBF funds and assets are alleged above.

41.     Further, Defendants violated their fiduciary duty of due care by mismanaging VBF, including, but not limited to, overbuilding its facilities, presenting highly flawed and intentionally manipulated business plans, mismanaging technology, mismanaging capital expenditures (CapEx), mismanaging other financial and operational issues, purchasing unnecessary real and personal property, overpaying for real and personal property, and otherwise, in a period of three years, squandering what had been an investment of approximately $100,000,000 in debt and equity in VBF.  Just one example is VBF's purchase, at the direction of some or all Defendants, of a building and underlying property unnecessary to VBF's business and located in Webster City for $400,000 on July 28, 2016, which VBF sold for $135,000 on April 13, 2018.  True and correct copies of the relevant closing statements are attached as Exhibit C.

42.     Consequently, due to Defendants' mismanagement and waste of corporate assets, above and beyond their misappropriations alleged above, the value of VBF has plummeted from about $0.90 per share to a dramatically lower value.

## COUNT I-BREACH OF FIDUCIARY DUTY-ALL DEFENDANTS

43.     VBF adopts and reincorporates paragraphs 1 through 42.

44.     Defendants owed fiduciary duties to VBF from in or around October 1, 2014, when they came to control VBF, through and including January 2018, when the last of the Defendants was terminated as an employee, contractor, officer, and/or director of VBF.

45.     Defendants' fiduciary duties to VBF included, but were not limited to, those of obedience, loyalty, honesty, good faith, and due care.

9

APP0011

46.     Defendants breached their fiduciary duties to VBF in one ore more of the following ways:

        a.        by misappropriating VBF funds for Defendants' personal benefit;

        b.        by misappropriating other VBF assets for Defendants' personal benefit;

        c.        by self-dealing and by concealing their self-dealing from VBF;

        d.        by mismanagement and other waste of corporate assets that led to a dramatic devaluation of VBF to be determined at trial; and

        e.        by otherwise breaching their fiduciary duties to VBF, including but not limited through misconduct that led to a devaluation of VBF.

47.     VBF suffered injuries as a direct and proximate result of Defendants' breaches of fiduciary duty, and Defendants gained a personal benefit from such breaches. VBF's compensatory damages are millions of dollars for Defendants' misappropriations, and are an additional millions of dollars for Defendants' mismanagement and other waste of VBF corporate assets, thereby devaluing VBF.

48.     Further, Defendants' breaches of fiduciary duty were willful and egregious, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial. Additionally, Defendants' self-dealing transactions with VBF are presumed invalid, and the burden of proof lays with Defendants to prove the fairness of such transactions by clear and convincing evidence. Also, Defendants Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

WHEREFORE, Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

<u>**COUNT II-FRAUDULENT CONCEALMENT-ALL DEFENDANTS**</u>

49.     VBF adopts and reincorporates paragraphs 1 through 48.

50.     Defendants concealed material facts from VBF, including, but not limited to, the following, as alleged *supra*:

   a.     the BAJJER stock scheme;

   b.     the American Growth Funding Loan scheme;

   c.     the Wulf Lake House scheme;

   d.     the Sedun stock scheme;

   e.     the compensation scheme;

   f.     the Gagne scheme;

   g.     the tractor-trailer scheme;

   h.     the OFA Scheme;

   i.     Defendants' other misappropriations of VBF funds or other assets for personal use;

   j.     Defendants' devaluation of VBF's stock through their misconduct and other breaches of their duties of due care; and,

   k.     other material facts that would have revealed the existence of Defendants' misconduct.

APP0013

51.     Defendants, as fiduciaries to VBF, owed VBF a duty to disclose these material facts to VBF.

52.     Defendants knew that VBF lacked knowledge of these concealed material facts until after Defendants were ousted from their positions at VBF by January 2018.  Alternatively, Defendants intended to induce VBF and its shareholders to refrain from attempting to halt Defendants' misconduct, mismanagement, and corporate waste by concealing these material facts from VBF.

53.     Defendants knowingly failed to disclose these material facts to VBF, also knowing full well that VBF would not approve of Defendants' blatant misconduct.

54.     VBF justifiably relied on Defendants' failure to disclose these material facts given Defendants' status as fiduciaries to VBF and its shareholders.  Further, VBF did not have opportunities equal to Defendants to discover Defendants' misconduct until after Defendants were ousted from their positions at VBF.

55.     VBF suffered injuries as a direct and proximate result of Defendants' fraudulent concealment.  VBF's compensatory damages are millions of dollars for Defendants' misappropriations, in addition to millions of dollars representing the devaluation of VBF caused by Defendants' mismanagement and other corporate waste.

56.     Further, Defendants' fraudulent concealment was willful and egregious, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial.  Also, Defendants Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

APP0014

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

## COUNT III-FRAUDULENT MISREPRESENTATION-ALL DEFENDANTS

57.     VBF adopts and reincorporates paragraphs 1 through 56.

58.     Pleading in the alternative, Defendants' silence in the face of their duties to disclose their misconduct alleged herein to VBF and its shareholders, constitutes fraudulent misrepresentation of the material facts alleged in Count II.

59.     Defendants knew that their failures to disclose these material facts, and therefore what are deemed to be misrepresentations in light of Defendants' duties of disclosure to VBF and its shareholders, were false or alternatively in reckless disregard of the truth.

60.     Defendants intended to deceive VBF and its shareholders and to induce them to refrain from attempting to halt Defendants' misconduct by misrepresenting material facts to VBF.

61.     VBF and its shareholders justifiably and detrimentally relied on Defendants' misrepresentations given Defendants' status as fiduciaries to VBF and its shareholders.

62.     VBF suffered injuries as a direct and proximate result of Defendants' fraudulent misrepresentation.  VBF's compensatory damages are millions of dollars for Defendants'

APP0015

misappropriations, in addition to millions of dollars representing the devaluation of VBF caused by Defendants' mismanagement and other corporate waste.

63.     Further, Defendants' fraudulent misrepresentation was willful and egregious, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial.

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial,  as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

## COUNT IV-CONSTRUCTIVE FRAUD-ALL DEFENDANTS

64.     VBF adopts and reincorporates paragraphs 1 through 63.

65.     Defendants' misconduct, committed while they were fiduciaries to VBF, constitutes constructive fraud regardless of Defendants' intent.

66.     VBF suffered injuries as a direct and proximate result of Defendants' constructive fraud.  VBF's compensatory damages are millions of dollars for Defendants' misappropriations, in addition to millions of dollars representing the devaluation of VBF caused by Defendants' mismanagement and other corporate waste.

67.     Further, Defendants' fraudulent concealment was willful and egregious, or at least wanton, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial.

14

APP0016

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

### COUNT V-CIVIL CONSPIRACY-ALL DEFENDANTS

68.     VBF adopts and reincorporates paragraphs 1 through 67.

69.     From the outset of their misconduct alleged herein, Defendants had a meeting of the minds and agreed to engage in the breaches of fiduciary duties and fraud alleged herein, for their personal benefit, to cause harm to VBF, while concealing the same from VBF and its shareholders (the "Conspiracy").

70.     Defendants' aim, through the Conspiracy, was to accomplish the unlawful objective of personally benefiting Defendants at the expense of VBF, while concealing the same from VBF, and/or making fraudulent misrepresentations to VBF and its shareholders in the face of Defendants' duties of disclosure.

71.     Through the Conspiracy, the Defendants facilitated and accomplished their breaches of fiduciary duty, fraudulent concealment, constructive fraud, and fraudulent misrepresentation.

72.     VBF suffered injuries as a direct and proximate result of Defendants' Conspiracy. VBF's compensatory damages are millions of dollars for Defendants' misappropriations, in

APP0017

addition to millions of dollars representing the devaluation of VBF caused by Defendants' mismanagement and other corporate waste.

73.     Further, Defendants' misconduct was willful and egregious, or at least wanton, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial.

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

## COUNT VI-AIDING AND ABETTING-ALL DEFENDANTS

74.     VBF adopts and reincorporates paragraphs 1 through 73.

75.     From the outset of their misconduct alleged herein, Defendants knowingly and substantially assisted each other in their breaches of fiduciary duties alleged herein, for their personal benefit, while concealing the same from VBF and its shareholders.

76.     VBF suffered injuries as a direct and proximate result of Defendants' aiding and abetting.  VBF's compensatory damages are millions of dollars for Defendants' misappropriations, in addition to millions of dollars representing the devaluation of VBF caused by Defendants' mismanagement and other corporate waste.

APP0018

77.     Further, Defendants' misconduct was willful and egregious, or at least wanton, and therefore punitive damages against Defendants and in favor of VBF are warranted, in an amount to be determined at trial.

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial,  as compensatory damages for misappropriations, plus compensatory damages representing the devaluation of Plaintiff due to Defendants' mismanagement and other waste of corporate assets, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

## COUNT VII-UNJUST ENRICHMENT-ALL DEFENDANTS

78.     Plaintiffs adopt and reincorporate paragraphs 1 through 77.

79.     VBF has conferred millions of dollars' worth of benefit upon Defendants for which Defendants have not compensated VBF.  It would be unjust and contrary to principles of equity and good conscience to allow Defendants to retain this benefit conferred upon them by VBF without just consideration as Defendants have been unjustly enriched at VBF's expense.

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, plus costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just.

## COUNT VIII-EQUITABLE ACCOUNTING-ALL DEFENDANTS

80.     Plaintiffs adopt and reincorporate paragraphs 1 through 79.

APP0019

81.     As a result of Defendants' fiduciary duties to account to VBF, breaches of fiduciary duties, fraud, and unjust enrichment, as well as the existence of complex mutual accounts and the need for discovery, VBF is entitled to an order requiring Defendants to account for every dollar deposited, received, or otherwise transferred to or from VBF or any of its affiliates and Defendants from on or before October 1, 2014 through January 2018, and entering a judgment against Defendants as to any amounts for which Defendants cannot account, or which are shown by the accounting to have been misappropriated by Defendants.

82.     Pleading in the alternative, money damages are inadequate to VBF because VBF cannot fully learn the extent of Defendants' misconduct, of which Defendants' have superior knowledge, without an accounting.

WHEREFORE, the Plaintiff, VeroBlue Farms USA, Inc., respectfully requests that this Court enter judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, jointly and severally, requiring Defendants to produce an equitable accounting detailing every dollar deposited, received, or otherwise transferred to or from VBF or any of its affiliates and Defendants from on or before October 1, 2014 through January 31, 2018, and entering a judgment against Defendants as to any amounts for which Defendants cannot account, or which are shown by the accounting to have been misappropriated by Defendants, plus costs, allowable pre-judgment interest, and other relief deemed just.

## COUNT IX-DECLARATORY JUDGMENT-ALL DEFENDANTS

83.     Plaintiffs adopt and reincorporate paragraphs 1 through 82.

84.     VBF disputes the validity of any and all transactions wherein Defendants personally benefitted, or which were otherwise improper, including the funds and other assets

APP0020

that were misappropriated, and the stock that was transferred to Sedun and BAJJER for grossly inadequate consideration.

85.    Pursuant to 22 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and Defendants on the other hand, as to such transactions, wherein VBF asserts that all such transactions should be declared null and void *ab initio*, whereas Defendants presumably seek to uphold these transactions.

WHEREFORE, VeroBlue Farms USA, Inc., respectfully requests that this Court enter a declaratory judgment in its favor and against the Defendants, Leslie A. Wulf, Bruce A. Hall, James Rea, John E. ("Ted") Rea, and Keith Driver, plus costs, allowable pre-judgment interest, and other relief deemed just.

Dated: August 15, 2018

**JURY TRIAL DEMANDED**

/s/ Matthew E. Laughlin
Matthew E. Laughlin  AT0004515
Holly M. Logan  AT0004710
Katelynn T. McCollough  AT0013443
DAVIS, BROWN, KOEHN, SHORS
  & ROBERTS, P.C.
215 10th Street, Suite 1300
Des Moines, IA 50309
Telephone: 515-288-2500
Email:  MattLaughlin@davisbrownlaw.com
             HollyLogan@davisbrownlaw.com
             KatelynnMccollough@davisbrownlaw.com

ATTORNEYS FOR PLAINTIFF

19

APP0021

EXHIBIT

A

exhibitsticker.com

TO:        VEROBLUE FARMS INC.

           and to the directors thereof

The undersigned hereby subscribes for and agrees to take up 1,250,000 common shares in the capital of VeroBlue Farms Inc. and tenders herewith the sum of $1.25 in full payment of the subscription price for such shares.

The undersigned hereby requests that the said shares be allotted to the undersigned or to such persons as the undersigned may in writing direct, that such shares be issued as fully paid and non-assessable and that a certificate or certificates representing such shares be issued in the name of the undersigned or as the undersigned may, in writing, direct.

           DATED as of the 18th day of September, 2014.

                                 **BAJJER, LLC**

                          Per: _____

                                 Authorized Signing Officer

                          I have authority to bind the corporation

EXHIBIT

3

exhibitsticker.com

TO:       VEROBLUE FARMS INC.
            (the "**Corporation**")

            and to the directors thereof.

The undersigned, the Chief Executive Officer of the Corporation, hereby certifies that the Corporation has duly received from Bajjer, LLC (the "**Shareholder**") the sum of $1.25 pursuant to a subscription of shares dated as of the date hereof, which $1.25 is the consideration for the issuance by the Corporation of 1,250,000 common shares in the capital of the Corporation to the Shareholder as contemplated in a resolution passed by the board of directors of the Corporation today.

            DATED as of the 18th day of September, 2014.

                                          _Leslie Wulf_

                                       Leslie Wulf

EXHIBIT

B

exhibitsticker.com



711 Second St
Webster City, IA
50595
PH 515-832-3364
Fax 515-832-3374

## Buyers Closing Statement

706 1st Ave North
Fort Dodge, IA
50501
PH 515-576- 2012
Fax 515-576-1223

1507 Willson Ave Webster City

8/9/2016

| | | Credits | Debits (buyer owes) |
|---|---|---|---|
| Purchase Price | | $0.00 | $300,000.00 |
| Tax: | Annual Taxes $3604 Paid in full | | |
| Tax Prorate | July 1 2015 to August 9th 2016 Credit to buyer | $3,998.96 | $0.00 |
| Earnest Money | | $2,000.00 | |
| Revenue Stamps | Credit to Buyer | $479.20 | $0.00 |
| Recording Fee | Paid out of closing | $0.00 | $0.00 |
| Legal Fees | Paid out of closing | | |
| Interest Adjustment | | | |
| Moving Allowance | | $0.00 | $10,000.00 |
| Inspections | | | $0.00 |
| Appraisal Fee | | | |

Amount due from Buyer to be wired to Neighborhood Realty on behalf of the seller.......
**Buyer responsible for taxes due September 1 2016 and all subsequent taxes.**

| Total Debits: | $310,000.00 |
|---|---|
| Total Credits: | $6,478.16 |
| Due from Buyer: | $303,521.84 |

SELLERS

Scot and April Ely

BUYERS

Veroblue Farms USA inc.

See attached signature page

x _Bruce A. Hall, CFO_

APP0024

**Closing Statement Signature Page Addendum**
Scot and April Ely Sale to Iowa's First, Inc.
1507 Willson Avenue, Webster City, IA

**PURCHASER:**

IOWA'S FIRST, INC., an Iowa corporation

By: _____

Name: _BRUCE A. HALL, AS CFO_

Title: _CHIEF FINANCIAL OFFICER_

APP0025

# Closing Disclosure

## Closing Information

| | |
|---|---|
| Date Issued | |
| Closing Date | 5-25-18 |
| Disbursement Date | 5-25-18 |
| Settlement Agent | Ryan J. Mahoney |
| File # | 4112.000 |
| Property | 1507 Willson Ave. |
| | Webster City, IA 50595 |
| Sale Price | 232,000 |

## Transaction Information

| | |
|---|---|
| Borrower | Joella M. Grossoehme |
| | 10603 Hinterland Dr. |
| | Fishers, IN 46038 |
| Seller | Iowa's First, Inc. |
| | 401 Des Moines St. |
| | Webster City, IA 50595 |

## Summaries of Transactions

**SELLER'S TRANSACTION**

| | | | | | |
|---|---|---|---|---|---|
| **M. Due to Seller at Closing** | | | | | **$232,000.00** |
| 01 | Sale Price of Property | | | | $232,000.00 |
| 02 | Sale Price of Any Personal Property Included in Sale | | | | |
| 03 | | | | | |
| 04 | | | | | |
| 05 | | | | | |
| 06 | | | | | |
| 07 | | | | | |
| 08 | | | | | |
| **Adjustments for Items Paid by Seller in Advance** | | | | | |
| 09 | City/Town Taxes | | to | | $ 0.00 |
| 10 | County Taxes | | to | | $ 0.00 |
| 11 | Assessments | | to | | $ 0.00 |
| 12 | | | to | | $ 0.00 |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| **N. Due from Seller at Closing** | | | | | **$189,185.31** |
| 01 | Excess Deposit | | | | |
| 02 | Closing Costs Paid at Closing (J) | | | | $15,019.90 |
| 03 | Existing Loan(s) Assumed or Taken Subject to | | | | |
| 04 | Payoff of First Mortgage Loan to First State Bank | | | | 165,152.79 |
| 05 | Payoff of Second Mortgage Loan to Broadmoor Financial | | | | 4,757.19 |
| 06 | Mortgage Payoff fee to USPS | | | | 24.70 |
| 07 | Recording Fee for Release | | | | 10.00 |
| 08 | Seller Credit | | | | $ 0.00 |
| 09 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| **Adjustments for Items Unpaid by Seller** | | | | | |
| 14 | City/Town Taxes | | to | | $ 0.00 |
| 15 | County Taxes | 7-1-17 | to | 5-25-18 | 4220.73 |
| 16 | Assessments | | to | | $ 0.00 |
| 17 | | | to | | $ 0.00 |
| 18 | | | | | |
| 19 | | | | | |
| **CALCULATION** | | | | | |
| Total Due to Seller at Closing (M) | | | | | $232,000.00 |
| Total Due from Seller at Closing (N) | | | | | ($189,185.31) |
| Cash [ ] From [X] To Seller | | | | | **$42,814.69** |

## Contact Information

**REAL ESTATE BROKER (B)**

| | |
|---|---|
| Name | **Abens Realty** |
| Address | **1988 Superior St.** |
| | **Webster City, IA 50595** |
| __License ID | **F05703000** |
| Contact | **Tyler Abens** |
| Contact __License ID | **B43670000** |
| Email | |
| Phone | **515-297-0755** |

**REAL ESTATE BROKER (S)**

| | |
|---|---|
| Name | **Neighborhood Realty** |
| Address | **711 2nd St.** |
| | **Webster City, IA 50595** |
| __License ID | **T05081000** |
| Contact | **Stacy Wearda** |
| Contact __License ID | **B44605000** |
| Email | |
| Phone | |

**SETTLEMENT AGENT**

| | |
|---|---|
| Name | **Ryan J. Mahoney** |
| Address | **615 Story St.** |
| | **Boone, IA 50036** |
| __License ID | **ITG3731** |
| Contact | **Ryan J. Mahoney** |
| Contact __License ID | **AT4948** |
| Email | **ryan@jordanmahoney.com** |
| Phone | **515-432-4510** |



**Questions?** If you have questions about the loan terms or costs on this form, use the contact information below. To get more information or make a complaint, contact the Consumer Financial Protection Bureau at www.consumerfinance.gov/mortgage-closing

## Closing Cost Details

| Loan Costs | | Seller-Paid | |
|---|---|---|---|
| | | At Closing | Before Closing |
| **A.  Origination Charges** | | | |
| 01 | .147% of Loan Amount (Points) | | |
| 02 | Processing fee | | |
| 03 | | | |
| 04 | | | |
| 05 | | | |
| 06 | | | |
| 07 | | | |
| 08 | | | |
| **B.  Services Borrower Did Not Shop For** | | | |
| 01 | Appraisal Fee | | |
| 02 | Credit Report Fee | | |
| 03 | Flood Certification fee | | |
| 04 | UP front MIP | | |
| 05 | | | |
| 06 | | | |
| 07 | | | |
| 08 | | | |
| 09 | | | |
| 10 | | | |
| **C.  Services Borrower Did Shop For** | | | |
| 01 | Abstracting to Hamilton County Abstracting Services | 320.00 | |
| 02 | Courier Fees to USPS | | |
| 03 | Lender's insurance to Iowa Title Guaranty | | |
| 04 | Settlement fee to Jordan & Mahoney Law Firm, P.C. | | |
| 05 | Title Examination to Jordan & Mahoney Law Firm, P.C. | | |
| 06 | | | |
| 07 | | | |
| 08 | | | |

| Other Costs | | | |
|---|---|---|---|
| **E.  Taxes and Other Government Fees** | | | |
| 01 | Recording Fees     Deed:  17.00     Mortgage:  82.00 | | |
| 02 | Transfer Tax     to: Hamilton County Recorder | 370.40 | |
| **F.  Prepaids** | | | |
| 01 | Homeowner's Insurance Premium (  mo.) to: | | |
| 02 | Mortgage Insurance Premium (  mo.) to: | | |
| 03 | Prepaid Interest              per day from              to | | |
| 04 | Property Taxes (  mo.) to: | | |
| 05 | | | |
| **G.  Initial Escrow Payment at Closing** | | | |
| 01 | Homeowner's Insurance              per month for              mo. | | |
| 02 | Mortgage Insurance              per month for              mo. | | |
| 03 | Property Taxes              per month for              mo. | | |
| 04 | | per month for              mo. | | |
| 05 | | per month for              mo. | | |
| 06 | | per month for              mo. | | |
| 07 | | | |
| 08 | Aggregate Adjustment | | |
| **H.  Other** | | | |
| 01 | Real Estate Commission     6960.00  to:  Neighborhood Realty | $6,960.00 | |
| 02 | Real Estate Commission     6960.00  to:  Abens Realty | $6,960.00 | |
| 03 | | | |
| 04 | Deed Prep to Malloy Law Firm, LLP | 409.50 | |
| 05 | Attorney Fees for POA preparation | | |
| 06 | Recording Fees for Power of Attorney to Hamilton Co. Recorder | | |
| 07 | | | |
| 08 | | | |
| 09 | | | |
| 10 | | | |
| 11 | | | |

| J. TOTAL CLOSING CLOSTS | $15,019.90 | $  0.00 |
|---|---|---|

**CERTIFICATION**

I have carefully reviewed this Closing Disclosure and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the Closing Disclosure form.

_____ Seller
Iowa's First, Inc.

To the best of my knowledge the Closing Disclosure which I have prepared is true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____ Settlement Agent   _____ Date
Ryan J. Mahoney

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

APP 0028

EXHIBIT

C

exhibitsticker.com



711 Second St
Webster City, IA
50595
PH 515-832-3364
Fax 515-832-3374

## Buyers Closing Statement

706 1st Ave North
Fort Dodge, IA
50501
PH 515-576- 2012
Fax 515-576-1223

207 Commerce Drive Webster City

7/28/2016

| | | Credits | Debits (buyer owes) |
|---|---|---|---|
| **Purchase Price** | Land $120,000. Improvements $209,800. Goodwill $70,200. | $0.00 | $400,000.00 |
| **Tax:** | Annual Taxes $9752 Paid in full | | |
| **Tax Prorate** | July 1 2015 to July 28th 2016 Credit to buyer | $10,500.09 | $0.00 |
| **Earnest Money** | | $0.00 | |
| **Revenue Stamps** | Credit to buyer | $639.20 | $0.00 |
| **Recording Fee** | Paid out of closing | | $0.00 |
| **Real Estate Taxes - Special** | | | |
| **Interest Adjustment** | | | |
| **Rebate to Buyers** | | $0.00 | $0.00 |
| **Inspections** | | | $0.00 |
| **Appraisal Fee** | | | |

| | |
|---|---|
| Total Debits: | $400,000.00 |
| Total Credits: | $11,139.29 |
| Due from Buyer: | $388,860.71 |

**Amount due from Buyer to be wired to Neighborhood Realty on behalf of the seller.......**
**Buyer responsible for taxes due September 1 2016 and all subsequent taxes.**

SELLERS

Larry Hinderks Estate

BUYERS

Iowa's First Inc

See attached signature page

_Bru Hall_

BRUCE A HALL, AS CFO

APP0029

## CLOSING STATEMENT

| | |
|---|---|
| **SELLER:** | **Iowa's First, Inc.** |
| **BUYER:** | **John A. Ruppel** |
| **LEGAL DESCRIPTION:** | **Auditor's Parcel Letter "A of Lot 1", Southeast Development Park #4 in Webster City, Iowa, per Survey Cabinet Slide 118A, page 10 filed on September 9, 2009.** |
| **CLOSING DATE:** | **April 13, 2018** |

---

| | | |
|---|---|---|
| Purchase Price | $ | 135,000.00 |
| Less earnest money (held in Davis Brown Law Firm Trust Account) | - | 10,000.00 |
| Less prorated real estate taxes covering period 07/01/17 through 04/12/18 ($8,550 [full year] x 286 days ÷ 365 days) | - | 6,699.45 |
| Plus deed recording | + | 15.00 |
| Balance due at closing (payable to and held in Johnson Law Firm Trust Account) | $ | 118,315.55 |

| | | |
|---|---|---|
| ***Total amount held in Johnson Law Firm Trust Account*** | **$** | **118,315.55** |

<u>Less expenses:</u>

| | | |
|---|---|---|
| • Johnson Law Firm (e-record) – revenue stamps | - | 215.20 |
| • Johnson Law Firm (e-record) – deed recording fee | - | 15.00 |
| • Johnson Law Firm (e-record) – partial mortgage release recording fee | - | 15.00 |
| • Hamilton County Abstracting Services, Inc. – abstracting | - | P.O.C. |
| • Davis Brown Law Firm – Seller's legal fees | - | P.O.C. |
| Net proceeds to Davis Brown Law Firm Trust Account | $ | 118,070.35 |

Note:  Johnson Law Firm to prepare 1099.

**Agreed to:**

| **"SELLER"** | **"BUYER"** |
|---|---|

**Iowa's First, Inc.**

**By**_____

_____
**John A. Ruppel**

APP0030

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| VEROBLUE FARMS USA, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 18-CV-3047 |
| LESLIE A. WULF, BRUCE A. HALL, | § | |
| JAMES REA, JOHN E. REA, and KEITH | § | |
| DRIVER | § | |
| | § | |
| Defendants. | | |

## DECLARATION OF DEFENDANT KEITH DRIVER IN SUPPORT OF 12(b)(6) MOTION TO DISMISS AND MOTION TO TRANSFER VENUE

Pursuant to 28 U.S.C. § 1746, I, Keith Driver, hereby state and declare as follows:

1.      "My name is Keith Driver.  I am over eighteen (18) years of age and have never been convicted of a felony.  I have personal knowledge of the facts set forth herein, and am otherwise competent to testify to the facts stated in this Declaration.  I have personal knowledge of the facts set forth below and could and would testify competently to them if called upon to do so.

2.      I performed services for VeroBlue Farms USA, Inc. ("VeroBlue") as a designated representative of Seven Hours Holding Company, Inc., an independent contractor of VeroBlue's. On July 1, 2016, VeroBlue and I entered into an Employment Agreement, which terminated my role as an independent contractor and put me into the position of Chief Operating Officer of VeroBlue. A true and correct copy of the Employment Agreement is attached hereto as **Exhibit 1**. The primary focus of this position was the day-to-day operations of the production facilities for the company.

APP0031

3.      On January 13, 2017, VeroBlue and Driver entered into a Business Relationship
Restructuring Agreement (the "Release Agreement"), which terminated Driver's Employment
Agreement with Plaintiff and re-established his consulting relationship with the company. A true
and correct copy of the Release Agreement is attached hereto as **Exhibit 2**. My sole duties during
this period were to answer any questions relating to events during my period as an employee. I
was only an employee of VeroBlue for six months.

4.      After January 13, 2017, I had no involvement with the management decisions of
VeroBlue.

5.      As of January 13, 2017 and for years prior to that, VeroBlue's principal place of
business was in Plano, Texas.

6.       Leslie Wulf, Bruce Hall, James Rea, and John Rea all reside in the Northern
District of Texas.

7.      I declare under penalty of perjury under the laws of the United States of America
and the State of Texas that the foregoing is true and correct."

EXECUTED on October___13th___, 2018, by

_____
**KEITH DRIVER**

# EMPLOYMENT AGREEMENT

This Employment Agreement (this "***Agreement***"), dated as of July 1, 2016 (the "***Effective Date***"), is by and between Keith Driver (the "***Employee***"), and VeroBlue Farms USA, Inc., a Nevada corporation (the "***Company***"). Employee and the Company are sometimes each referred to herein as a "***Party***" and collectively, as the "***Parties***".

## RECITALS

**WHEREAS**, Employee performed services for the Company as a designated representative of Seven Hours Holding Company, Inc., an independent contractor ("***Consultant***") under that certain Management Services Agreement (the "***MSA***") among the Company, Consultant and the Company's parent, VeroBlue Farms Inc., a corporation incorporated under the laws of the Province of Ontario, Canada ("***Parent Corporation***");

**WHEREAS**, the Parties desire to terminate the MSA pursuant to that certain Termination and Payoff Agreement of even date herewith and replace it with this Agreement whereby the Company desires to employ Employee on the terms and conditions set forth herein, and Employee desires to accept such employment terms;

**NOW, THEREFORE**, in consideration of the mutual covenants, promises and obligations set forth herein, the Parties agree as follows:

1.      <u>Employment</u>.

(a)      <u>Title and Duties</u>.   The Company hereby employs Employee, and Employee hereby accepts such employment, to serve as Chief Operating Officer of the Company.  Subject to the provisions of this Agreement, the Company and Employee agree that Employee's employment constitutes "at-will" employment. Employee's duties, responsibilities and authority shall be consistent with Employee's position and title at the Company and shall include such other duties, responsibilities and authority as may be assigned to Employee by the Board of Directors of the Company (the "***Board***").  Employee shall report to the Chief Executive Officer of the Company.

(b)      <u>Services and Exclusivity of Services</u>.  Employee shall devote Employee's full business time and shall use Employee's best efforts, energy and ability exclusively toward advancing the business, affairs and interests of the Company, and matters related thereto. Employee will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Board. Except as prohibited by <u>Section 4</u>, nothing in this Agreement shall preclude Employee from serving or participating on a board of or in trade organizations, charitable, community, school or religious activities or participating in other business endeavors, so long as such activities do not interfere with his duties and responsibilities hereunder or conflict with the interests of the Company.

(c)      <u>Location of Office</u>.  The Company shall make available to Employee an office and support services in Dallas, Texas, or at another location pursuant to the

recommendation of the Chief Executive Officer and the Board. Employee's main office shall be at such location; provided, however, that Employee will travel from time to time as business needs arise.

     2.    <u>Term</u>. The term of this Agreement shall commence on the Effective Date and shall continue indefinitely until terminated pursuant to <u>Section 5</u> below (the "***Term***").

     3.    <u>Compensation</u>.

     (a)    <u>Base Salary</u>. During the Term, the Company will pay to Employee a base salary at the rate of $325,000 per year, payable in accordance with the Company's practices in effect from time to time ("***Base Salary***"). Amounts payable shall be reduced by standard withholdings and other authorized deductions. Such Base Salary shall be reviewed during the Term for adjustment in the sole discretion of the Board, or such individual, group or committee that the Board may select as its delegate, not less frequently than annually during the Term; provided that no decrease may be made to Base Salary unless a corresponding percentage decrease in base salary is being made to all similarly situated employees of the Company. In conducting any such review, the Board or such delegate shall consider and take into account, among other things, any change in Employee's responsibilities, performance of Employee, the compensation of other similarly situated employees of comparable companies and other pertinent factors.

     (b)    <u>Car Allowance</u>. Employer will pay Employee a car allowance of $1,500 per calendar month, payable on the first day of each month.

     (c)    <u>Bonuses, Savings and Retirement Plans; Benefit Plans</u>. Employee shall be entitled to participate in all annual and long-term bonuses, savings and retirement plans generally available to other similarly situated employees of the Company. The decision to provide any bonus and the amount and terms of any bonus shall be in the sole and absolute discretion of the Board. Employee, and Employee's family as the case may be, and to the extent Employee and such family member are eligible, may participate in and receive all benefits under health benefit plans, practices, programs and policies provided to employees of the Company. The Company reserves the right to modify, suspend or discontinue any and all of its benefits referred to in this <u>Section 3(b)</u> at any time in its sole discretion without recourse by Employee so long as such action is taken generally with respect to other employees and does not single out Employee.

     (d)    <u>Reimbursement of Expenses</u>. The Company shall promptly reimburse Employee for any reasonable and necessary out-of-pocket expenses incurred by him in connection with the performance of Employee's duties hereunder, provided that Employee furnishes to the Company in a timely manner appropriate documentation in accordance with the Company's expense reimbursement policies and procedures and such other reasonable documentation and accounting as the Company, from time to time, may reasonably request.

     (e)    <u>Vacation</u>. Employee shall provide services for 48 out of every 52 week period during the Term (e.g., the equivalent of four (4) weeks of paid vacation).

4.    Representations; Confidential Information; Non-Competition; Non-Solicitation.

(a)    Representations.  In order to induce the Company to enter into this Agreement, Employee represents and warrants to the Company that neither the execution nor the performance of this Agreement by Employee will violate or conflict in any way with any other agreement by which Employee may be bound, or with any other duties imposed upon Employee by corporate or other statutory or common law.

(b)    Confidentiality.  Employee acknowledges that during his employment and as a result of his past, present and future relationship with the Company, Employee has obtained and will obtain knowledge of, and has been given and will be given access to, information concerning the Company and Parent Corporation and their respective affiliates, including, but not limited to, information regarding the business, operations, services, proposed services, business processes, business and marketing strategies, advertising, marketing and promotional plans and materials, pricing strategies and policies, financial information, stockholders and other trade secrets, confidential information and proprietary material of the Company, including information and material originated, discovered or developed in whole or in part by Employee (collectively referred to herein as "*Confidential Information*").  The term "*Confidential Information*" does not include any information which (i) at the time of disclosure is generally available to the public (other than as a result of a disclosure by Employee in breach of this Agreement), or (ii) was available to Employee on a non-confidential basis from a source (other than the Company or its representatives) that is not and was not prohibited from disclosing such information to Employee by a contractual, legal or fiduciary obligation.  Employee agrees that during the Term and, to the fullest extent permitted by law, thereafter, Employee will, in a fiduciary capacity for the benefit of the Company, hold all Confidential Information strictly in confidence and will not directly or indirectly reveal, report, disclose, publish or transfer any of such Confidential Information to any person or entity, or utilize any of the Confidential Information for any purpose, except in furtherance of Employee's employment under this Agreement and except to the extent that Employee may be required by law to disclose any Confidential Information.  Employee acknowledges that the Company is providing Employee additional Confidential Information that Employee was not given prior to execution of this Agreement, as further consideration to Employee for executing this Agreement, including the promises and covenants made by Employee in this Section 4.

(c)    Non-Competition and Non-Solicitation.  In further consideration of the compensation to be paid to Employee hereunder, Employee acknowledges that during the course of his employment and prior service with the Company, he has, and will, become familiar with the trade secrets of the Company and with other Confidential Information concerning the Company and that his services have been and shall continue to be of special, unique and extraordinary value to the Company.  Therefore, Employee agrees that, during Employee's employment hereunder and for one year after the date of termination of employment (the "*Restricted Period*"), he shall not directly or indirectly: (i) own any interest in, manage, control, participate in, consult with, render services for, be employed in an executive, managerial or administrative capacity by, or in any manner engage in, any Competing Business (as defined below); (ii) solicit, request or induce any employee, consultant or agent of the Company or Parent Corporation or any of their respective affiliates to terminate his or her employment or relationship with such company, nor hire any employee, or consultant of the Company or Parent

3

APP0035

the Company, or any of its customers or suppliers; (ii) a breach of this Agreement by Employee and/or Employee's gross neglect of Employee's duties hereunder which is not cured to the Board's reasonable satisfaction within fifteen (15) days after notice thereof is given to Employee by the Board; and (iii) damage to or misappropriation or conversion of any funds or assets of the Company.

       (iii)    "***Non-Egregious Cause***" shall mean (i) engaging in conduct bringing the Company into public disgrace or disrepute or causing economic harm; (ii) material or repeated failure to perform Employee's duties as directed by the Board following notice of such breach and failure to cure such breach within fifteen (15) days of such notice; and (iii) Employee's failure to follow the Company's policies or applicable law in connection with the performance of Employee's duties, and such failure is not cured by Employee within fifteen (15) days following Employee's receipt of written notice from the Company specifying such failure.

       (iv)    "***Cause***" shall mean either Egregious Cause or Non-Egregious Cause.

       (v)    "***Voluntary Termination***" shall mean a termination of employment by Employee on Employee's own initiative other than (i) a termination due to death or Disability or (ii) a termination for Good Reason (as defined below).

    (d)    <u>Termination by the Company without Cause or by Employee for Good Reason</u>. The Company may terminate Employee's employment hereunder without Cause and Employee shall be permitted to terminate Employee's employment hereunder for Good Reason (as hereinafter defined) prior to the end of the Term.  If the Company terminates Employee's employment hereunder without Cause, other than due to death or Disability, or if Employee effects a termination for Good Reason, Employee shall be entitled to receive the payments and benefits set forth in this <u>Section 5(d)</u>.

       (i)    So long as Employee has not breached any of the terms contained in <u>Section 4</u>, Employee shall be entitled to each of the following:

           (A)    Employee's Accrued Employment Entitlements;

           (B)    Except as otherwise modified pursuant to <u>Section 4(c)</u>, Employee's annual Base Salary in effect as of the date of such termination, payable in accordance with the Company's normal payroll practices for a period of one (1) year ("***Severance Term***") following such termination; and

           (C)    the actual bonus, if any, he would have received in respect of the fiscal year in which his termination occurs, prorated by a fraction, the numerator of which is the number of days in such fiscal year prior to the date of Employee's termination and the denominator of which is 365, payable at the same time as any such bonus payments are made to

7

APP0036

Corporation or any of their respective affiliates, or (iii) solicit, request, or induce or attempt to solicit, request, or induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or Parent Corporation or any of their respective affiliates to cease doing business with, or modify its business relationship with the Company or Parent Corporation or any of their respective affiliates, or in any way interfere with or hinder the relationship between any such customer, supplier, licensee or business relation and the Company or Parent Corporation or any of their respective affiliates, as applicable; provided that with respect to this Section 4(c), the Company shall have the option, but not the obligation, in its sole discretion, to extend the Restricted Period from a period of one (1) year to a period of two (2) years from the date of Employee's termination by agreeing in writing within one (1) month of such termination to extend the Severance Term provided in Section 5(d)(i)(B) from (1) year to two (2) years from the date following termination. For purposes hereof, "**_Competing Business_**" means a business that competes with the Company or Parent Corporation, or any of their respective affiliates in any geographic territory in which the Company, Parent Corporation, or any such affiliate conducts, sells or markets its business or plans to conduct, sell or market its business. Nothing herein shall prohibit Employee from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of a corporation that is publicly traded, so long as Employee has no active participation in the business of such corporation.

(d)    Proprietary Interest.   All correspondence, communications (electronic or otherwise), data, reports, software, systems, databases, methodology, processes, programs, templates, procedures, know-how, inventions, discoveries, creations, designs, improvements, patents, copyrights, discoveries or ideas which Employee conceives, develops, or produces (whether before the Effective Date during his past services, as part of his employment obligations and/or duties, solely or jointly with others, or otherwise), which relate to the business of the Company (collectively, the "**_Work Product_**"), including trade secrets, data, methodology, processes, programs, templates, and information concerning proprietary technology developed for the business, or for any interests of the Company, shall belong solely and exclusively to the Company, together with any intellectual property rights associated with such Work Product (the "**_IP Rights_**"). Employee acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) during his prior services or within the scope of his employment with the Company and which are protectable by copyright laws are "works made for hire," pursuant to the United States Copyright Act (17 U.S.C., Section 101), and that such works made for hire shall constitute part of the IP Rights. Employee shall assist the Company or its designees to obtain, and from time to time enforce, United States and foreign IP Rights in any and all countries. To that end, Employee shall execute, verify, and deliver such documents and perform such other acts (including appearing as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such IP Rights and the assignment thereof. In addition, Employee will execute, verify, and deliver assignments of such IP Rights to the Company or its designee. Employee's obligation to assist the Company with respect to IP Rights shall continue beyond Employee's employment with the Company. Employee hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which Employee now or may hereafter have for infringement of any IP Rights assigned hereunder to the Company.

(e)    Return of Materials.   Employee expressly acknowledges that all physical property, data, books, records and other Confidential Information of the Company obtained in

4

connection with the Company's business is the exclusive property of the Company and that upon the termination of Employee's employment by the Company, Employee will immediately surrender and return to the Company all such items and all other property belonging to the Company then in the possession of Employee, and Employee shall not make or retain any copies thereof.

(f)     Property of the Company.  Employee acknowledges that from time to time in the course of providing past services and future services pursuant to this Agreement, Employee shall have had and will have the opportunity to inspect and use certain property, both tangible and intangible, of the Company and Employee hereby agrees that such property shall remain the exclusive property of the Company.  Employee shall have no right or proprietary interest in such property, whether tangible or intangible.

(g)     Reasonable in Scope and Duration; Consideration.  Employee agrees and acknowledges that the restrictions contained in this Section 4 are reasonable in scope and duration and are necessary to protect the business interests and Confidential Information of the Company after the Effective Date, and Employee further agrees and acknowledges that he has reviewed the provisions of this Agreement with his legal counsel.  Employee acknowledges and agrees that Employee will receive substantial, valuable consideration from the Company for the covenants contained in this Section 4, including without limitation, compensation and other benefits.

(h)     Non-Disparagement.  Following separation of employment:

(i)     Employee agrees not to make to any person, including but not limited to customers of the Company, any statement that disparages the Company, Parent Corporation and its stockholders, or the Company's affiliates, or which reflects negatively upon the Company, Parent Corporation and its stockholders or the Company's affiliates, including but not limited to statements regarding the Company's or Parent Corporation's financial condition, its officers, managers, stockholders, employees and affiliates; and

(ii)     The Company agrees not to make to any person any statement that disparages Employee, or which reflects negatively upon Employee.

(i)     Enforcement.  If, at the time of enforcement of Section 4 of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the Parties hereto agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law.

(j)     Extension of Restricted Periods.  In addition to the remedies the Company may seek and obtain pursuant to this Agreement, the applicable restricted periods set forth herein shall be extended by any and all periods during which Employee shall be found by a court of competent jurisdiction to have been in violation of the covenants contained herein.

5

APP0038

5.     Termination.

(a)     Termination Prior to Expiration of Term. Notwithstanding anything to the contrary contained in Section 2, Employee's employment may be terminated prior to the expiration of the Term only as provided in this Section 5. Employee's employment with the Company shall cease effective on such termination date, and except as provided in this Section 5, the Company shall have no further obligations to Employee.

(b)     Death or Disability.

(i)     The Company may terminate Employee's employment hereunder due to death or Disability (as defined below). If Employee's employment hereunder is terminated as a result of death or Disability, Employee (or Employee's estate or personal representative in the event of death) shall be entitled to receive: (i) all Base Salary due to Employee through the date of termination; (ii) any previously vested benefits, such as retirement benefits and vacation pay, in accordance with the terms of the plan or agreement pursuant to which such benefits were granted to Employee; (items (i) and (ii) above collectively referred to as "*Accrued Employment Entitlements*"); and (iii) any benefits payable to Employee or Employee's beneficiaries, as applicable, in accordance with the terms of the applicable benefit plan.

(ii)     As used herein, "*Disability*" shall mean a determination by the Company, in its reasonable discretion, that the Employee is unable to engage in the customary duties and responsibilities of his position by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of at least six (6) months. Employee's Disability shall be determined by the Company, in good faith, based upon information supplied by Employee and/or a physician mutually agreed upon by the Company and Employee. Employee agrees to submit to physical exams and diagnostic tests reasonably recommended by such physician.

(c)     Termination by the Company for Cause or by Employee because of a Voluntary Termination.

(i)     Employee's employment hereunder may be terminated by the Company for Cause (as hereinafter defined) or, subject to Section 5(d) hereof, by Employee under a Voluntary Termination (as hereinafter defined). If Employee's employment hereunder is terminated under this Section 5(c), Employee shall be entitled to receive Employee's Accrued Employment Entitlements. Except as specifically set forth in this Section 5(c), the Company shall have no further obligations to Employee following a termination for Cause, or a Voluntary Termination.

(ii)     "*Egregious Cause*" shall mean (i) commission by Employee of a felony or crime involving moral turpitude, or the commission by Employee of any other willful act or willful omission involving dishonesty or fraud with respect to

6

APP0039

other similarly situated active employees pursuant to the terms of the bonus plan and subject to satisfaction of the performance targets for such fiscal year; provided that, any such bonus payment shall be paid to Employee in the fiscal year following the fiscal year in which the termination of employment occurred;

(ii)    "***Good Reason***" means and shall be deemed to exist if, without the prior written consent of Employee, (i) Employee suffers a reduction in Base Salary of greater than ten percent (10%) or a material reduction in duties, responsibilities or effective authority associated with Employee's title and position as set forth and described in this Agreement or is otherwise assigned any duties or responsibilities inconsistent in any material respect therewith (other than to the extent any such reduction in Base Salary is commensurate with a reduction of the salaries of other senior management of the Company); provided that, the foregoing shall not apply to any material reduction in duties following notice being provided of a termination for Cause, Disability or under a Voluntary Termination; (ii) the Company fails to pay Employee any amounts required to be paid or provided under this Agreement or is otherwise in material breach of this Agreement; or (iii) the office where Employee is required to report for work is moved more than fifty (50) miles from its current location. No termination by Employee shall be for "Good Reason" unless written notice of such termination setting forth in particular the event(s) constituting Good Reason is delivered to the Company within thirty (30) days following the date on which the event constituting Good Reason occurs and the Company fails to cure or remedy the event(s) identified in the notice within thirty (30) days after receipt of such notice, and Employee actually terminates employment within thirty (30) days following the end of the Company's cure period.

(e)    <u>Rights and Conditions Regarding Termination.</u>

(i)    Any payments made to Employee pursuant to this <u>Section 5</u> shall be in lieu of any rights under any severance plan or policy being utilized for or provided to the Company's other officers and employees, if applicable. Reporting of and withholding on any payment under this subsection for tax purposes shall be at the discretion of the Company in conformance with applicable tax laws. If a claim is made against the Company for any additional tax or withholding in connection with or arising out of any payment pursuant to this subsection, Employee shall pay any such claim within thirty (30) days of being notified by the Company and agrees to indemnify the Company and hold it harmless against such claims, including, but not limited to, any taxes, attorneys' fees, penalties, and/or interest, which are or become due from the Company.

(ii)    Employee's receipt of any pay under this <u>Section 5</u> shall be subject to the execution by Employee of, and terms of, a general release of claims, substantially in a form to be provided by the Company to Employee within ten (10) days following such termination, and the non-revocation of such release by

APP0040

Employee pursuant to any revocation rights afforded by applicable law. The general release must be executed and become irrevocable no later than sixty (60) days following the date of such termination, otherwise Employee shall forfeit any and all rights to such pay.

(iii)     If the sixty (60)-day period described in Section 5(e)(ii) begins in one calendar year and ends in a second calendar year (a "**Crossover 60-Day Period**") and if there are any payments under this Section 5 due Employee that are: (i) conditioned on Employee signing and not revoking a release of claims and (ii) otherwise due to be paid during the portion of the Crossover 60-Day Period that falls within the first year, then such payments will be delayed and paid in a lump sum during the portion of the Crossover 60-Day Period that falls within the second year.

(f)     <u>Transfers of Equity Prior to and Following Termination of Employment</u>. During the term of Employee's employment hereunder, neither Employee nor any of his affiliates shall be entitled to assign, sell, pledge, mortgage, hypothecate, encumber, dispose of or otherwise transfer ("**Transfer**") any shares of common stock or other equity of the Company or Parent Corporation owned by Employee or such affiliate (excluding any common stock or other equity that Employee or such affiliate receives pursuant to the 2016 Stock Option Plan of the Company) (collectively, the "**Employee Equity**") except by operation of law upon Employee's or such affiliate's death. Following the termination of Employee's employment hereunder for any reason, neither Employee nor any of his affiliates shall be entitled to Transfer any Employee Equity except by operation of law upon Employee's or such affiliate's death or in accordance with this Section 5(f):

(i)     At any time when the Majority Series A Holder (as defined in the Articles of Incorporation of the Company, as amended, including by the Certificate of Voting Powers, Designations, Preferences, Limitations, Restrictions, Relative Rights and Distinguishing Designation of Series A Preferred Stock of the Company) (the "**Majority Series A Holder**") owns less than fifty-one percent (51%) of the aggregate common stock and preferred stock (on an as-converted basis) of the Company then outstanding, neither Employee nor any of his affiliates may Transfer any Employee Equity without (A) first providing the Majority Series A Holder the right of first refusal to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms reasonably acceptable to the Majority Series A Holder, which right of first refusal shall be exercisable for a period of at least fifteen (15) business days after the Majority Series A Holder receives written notice of the desired transfer and the purchase price determined in accordance with Section 5(f)(iii); (B) if the Majority Series A Holder does not exercise such right of first refusal, then providing each other holder of shares of Series A preferred stock of the Company a secondary refusal right to purchase (on a pro rata basis in accordance with their respective ownership of Series A preferred stock of the Company or in such other proportions agreed to by such stockholders) all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such

9

APP0041

holders of Series A preferred stock than those offered to the Majority Series A Holder, which secondary refusal right shall be exercisable for a period of at least fifteen (15) business days; and (C) if the Majority Series A Holder and the other holders of Series A preferred stock of the Company do not exercise their rights pursuant to the preceding clauses (A) and (B), then providing the Company a tertiary refusal right to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to the Company than those offered to the Majority Series A Holder, which tertiary refusal right shall be exercisable for a period of at least fifteen (15) business days.  If none of the foregoing persons exercises its refusal right in connection with such proposed Transfer, then for a period of ninety (90) days after the end of the Company's fifteen (15)-day exercise period, Employee or such affiliate shall be entitled to Transfer all, but not less than all, of such Employee Equity that was offered to the foregoing persons to any third-party purchaser, for a purchase price equal to or greater than the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such third-party purchaser than those offered to the Majority Series A Holder (or at any lesser purchase price or on more favorable terms, provided that such purchase price and more favorable terms are first offered to the Majority Series A Holder and, if applicable, the other holders of Series A preferred stock of the Company and, if applicable, the Company, in accordance with this Section 5(f)(i)), subject to compliance with applicable law and subject to such third-party purchaser's execution of a joinder agreement to each stockholders agreement (or the equivalent) of the Company or Parent Corporation by which Employee or such transferring affiliate is bound with respect to the transferred Employee Equity; provided that if such Transfer is not consummated within such ninety (90)-day period, such Transfer shall again become subject to the refusal rights set forth in this Section 5(f).

(ii)     At any time when the Majority Series A Holder owns at least fifty-one percent (51%) of the aggregate common stock and preferred stock (on an as-converted basis) of the Company then outstanding, neither Employee nor any of his affiliates may Transfer any Employee Equity without (A) first providing the Company the right of first refusal to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms reasonably acceptable to the Company, which right of first refusal shall be exercisable for a period of at least fifteen (15) business days after the Company receives written notice of the desired transfer and the purchase price determined in accordance with Section 5(f)(iii); (B) if the Company does not exercise such right of first refusal, then providing the Majority Series A Holder the secondary refusal right to purchase all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms reasonably acceptable to the Majority Series A Holder, which secondary refusal right shall be exercisable for a period of at least fifteen (15) business days; (C) if the Company and the Majority Series A Holder do not exercise their rights pursuant to the preceding clauses (A) and (B), then providing each other holder of shares of Series A preferred stock of the Company a tertiary refusal right to purchase (on a

10

APP0042

pro rata basis in accordance with their respective ownership of Series A preferred stock of the Company or in such other proportions agreed to by such stockholders) all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such holders of Series A preferred stock than those offered to the Majority Series A Holder, which tertiary refusal right shall be exercisable for a period of at least fifteen (15) business days; and (D) if the Company, the Majority Series A Holder and the other holders of Series A preferred stock of the Company do not exercise their rights pursuant to the preceding clauses (A), (B) and (C), then providing the other stockholders of the Company a quaternary refusal right to purchase (on a pro rata basis in accordance with their respective ownership of common stock of the Company or in such other proportions agreed to by such stockholders) all of such Employee Equity for the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to the other stockholders than those offered to the Majority Series A Holder, which quaternary refusal right shall be exercisable for a period of at least fifteen (15) business days.  If none of the foregoing persons exercises its refusal right in connection with such proposed Transfer, then for a period of ninety (90) days after the end of the fifteen (15)-day exercise period provided for in the preceding clause (D), Employee or such affiliate shall be entitled to Transfer all, but not less than all, of such Employee Equity that was offered to the foregoing persons to any third-party purchaser, for a purchase price equal to or greater than the purchase price determined in accordance with Section 5(f)(iii) and on other terms no more favorable to such third-party purchaser than those offered to the Majority Series A Holder (or at any lesser purchase price or on more favorable terms, provided that such purchase price and more favorable terms are first offered to the Company and, if applicable, the Majority Series A Holder and, if applicable, the other holders of Series A preferred stock of the Company and, if applicable, the other stockholders of the Company, in accordance with this Section 5(f)(ii)), subject to compliance with applicable law and subject to such third-party purchaser's executing a joinder agreement to each stockholders agreement (or the equivalent) of the Company or Parent Corporation by which Employee or such transferring affiliate is bound with respect to the transferred Employee Equity; provided that if such Transfer is not consummated within such ninety (90)-day period, such Transfer shall again become subject to the refusal rights set forth in this Section 5(f).

(iii)     The purchase price at which Employee or his affiliate shall first offer to sell any Employee Equity to the Majority Series A Holder, other stockholders of the Company or the Company, as applicable, pursuant to this Section 5(f) shall be determined as follows: (A) if Employee's employment hereunder was terminated for Egregious Cause, such purchase price shall be an amount determined by the Board, which shall be no less than the cost-basis for such Employee Equity and no more than the Fair Market Value (as defined below) of such Employee Equity, less in either case all applicable withholding taxes; and (B) if Employee's employment hereunder was terminated for any reason other than for Egregious Cause, such purchase price shall be an amount equal to the Fair Market Value of such Employee Equity, less all applicable

11

APP0043

withholding taxes.  "*Fair Market Value*" means as of any date, the value of the Employee Equity determined as follows: (x) If the Employee Equity is listed on any established stock exchange, the Fair Market Value of a share of common stock shall be the closing sales price for such stock as quoted on such exchange (or the exchange with the greatest volume of trading in the common stock) on the last market trading day prior to the day of determination, as reported in *The Wall Street Journal* or such other source as the Board deems reliable, or (y) in the absence of such markets for the Employee Equity, the Fair Market Value shall be determined in good faith by the Board in accordance with Section 409A and the regulations and other guidance promulgated thereunder.

(iv)     Employee acknowledges and agrees that any purchaser of Employee Equity pursuant to this Section 5(f) shall be entitled to pay and/or withhold from the applicable purchase price therefor, any amount with respect to taxes that such purchaser (in its sole discretion) determines is required to be paid or withheld or advisable to pay or withhold under applicable law, and any amount so paid or withheld shall be treated for purposes of this Section 5(f) as an amount paid to Employee or its affiliate, as applicable, with respect to the purchased Employee Equity purchased.  **EMPLOYEE FURTHER ACKNOWLEDGES AND AGREES THAT HE SHALL BE SOLELY RESPONSIBLE AND LIABLE FOR ANY TAXES AND TAX CONSEQUENCES WITH RESPECT TO THE OWNERSHIP OR DISPOSITION BY EMPLOYEE OF ANY EMPLOYEE EQUITY AND WITH RESPECT TO THE PROVISIONS OF THIS SECTION 5(F) AND THE TRANSACTIONS CONTEMPLATED HEREBY.   NEITHER THE COMPANY NOR PARENT CORPORATION NOR ANY OF THEIR RESPECTIVE STOCKHOLDERS MAKES ANY REPRESENTATIONS, WARRANTIES OR COVENANTS REGARDING SUCH TAXES OR TAX CONSEQUENCES OF EMPLOYEE, AND THE COMPANY, PARENT CORPORATION AND THEIR RESPECTIVE STOCKHOLDERS SHALL HAVE NO LIABILITY THEREFOR.  EMPLOYEE ACKNOWLEDGES THAT HE IS AWARE THAT THE TAX CONSEQUENCES ARISING FROM THE OWNERSHIP AND DISPOSITION BY EMPLOYEE OF ANY EMPLOYEE EQUITY AND THE TAX CONSEQUENCES ARISING IN CONNECTION WITH THE PROVISIONS OF THIS SECTION 5(F) AND THE TRANSACTIONS CONTEMPLATED HEREBY ARE COMPLEX AND THAT EMPLOYEE HAS BEEN ENCOURAGED TO SEEK INDEPENDENT PROFESSIONAL GUIDANCE OR COUNSEL WITH RESPECT TO SUCH TAX CONSEQUENCES.   EMPLOYEE ACKNOWLEDGES THAT HE HAS EITHER SOUGHT SUCH GUIDANCE OR COUNSEL OR DETERMINED AFTER REVIEWING THIS AGREEMENT CAREFULLY THAT HE WILL WAIVE SUCH RIGHT.**

(v)     Notwithstanding anything to the contrary herein, (A) the Majority Series A Holder may assign any or all of its rights under this Section 5(f) at any time to any Person and (B) the Company may assign any or all of its rights under

this Section 5(f) with respect to any proposed Transfer of common stock or other equity of Parent Corporation to Parent Corporation, in either case with written notice to Employee of any such assignment.

(vi)     The Majority Series A Holder and the other stockholders of the Company are express third-party beneficiaries of this Section 5(f), and this Section 5(f) may not be amended without the written consent of the Majority Series A Holder.

6.     Notices.  Any notice or other communications relating to this Agreement shall be in writing and delivered personally or mailed by certified mail, return receipt requested, or sent by overnight courier, to the Party concerned at the address set forth below:

If to Company:           VeroBlue Farms USA, Inc.
                         1507 Capital Avenue, Suite 101
                         Plano, TX  75074


If to Employee:          Keith Driver
                         1507 Capital Avenue, Suite 101
                         Plano, TX  75074

Either Party may change the address for the giving of notices at any time by written notice given to the other Party under the provisions of this Section 6. If notice is given by personal delivery or overnight courier, said notice shall be conclusively deemed given at the time of such delivery or upon receipt of such couriered notice.  If notice is given by mail, such notice shall be conclusively deemed given upon deposit thereof in the United States mail.

7.     Assignment.   Except as otherwise provided in Section 5(f)(v), neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party hereto without the prior written consent of the other Party hereto.  In the event of the assignment of this Agreement pursuant to the provisions of this Section 7, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors and permitted assigns.

8.     Remedies.  Employee acknowledges that the services Employee is to render under this Agreement are of a unique and special nature, and because Employee has access to Confidential Information, the loss of which cannot reasonably or adequately be compensated for in monetary damages, and that irreparable injury and damage will result to the Company in the event of any default or breach of this Agreement by Employee.   The Parties agree and acknowledge that the breach by Employee of any of the terms of this Agreement will cause irreparable damage to the Company, and upon any such breach, the Company shall be entitled to injunctive relief, specific performance, or other equitable relief (without posting a bond or other security); provided, however, that this shall in no way limit any other remedies which the Company may have (including, without limitations, the right to seek monetary damages).

9.     Entire Agreement.  This Agreement constitutes the entire agreement between the Parties and supersedes all prior written and oral and all contemporaneous oral agreements, understandings and negotiations with respect to the subject matter hereof.  Without limiting the

13

APP0045

generality of the foregoing sentence, this Agreement supersedes any prior employment agreement, oral or written which shall terminate and be cancelled as of the Effective Date, except for any breaches thereof by Employee prior to the Effective Date which shall survive such termination. This Agreement may not be changed orally, but only by an agreement in writing signed by both Parties.

10.    Governing Law; Construction.    This Agreement shall be governed under and construed in accordance with the laws of the State of Texas, without regard to the principles of conflicts of laws.    The paragraph headings and captions contained herein are for reference purposes and convenience only and shall not in any way affect the meaning or interpretation of this Agreement.    It is intended by the Parties that this Agreement be interpreted in accordance with its fair and simple meaning, not for or against either Party, and neither Party shall be deemed to be the drafter of this Agreement.

11.    Severability.    The Parties agree that if any provision of this Agreement as applied to any Party or to any circumstance is adjudged by a court or arbitrator to be invalid or unenforceable, the same will in no way affect any other circumstance or the validity or enforceability of this Agreement.    Without limiting the generality of the foregoing, in particular, if any provision in Section 4, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the Parties agree that the court or arbitrator making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases, and in its reduced form, such provision shall then be enforceable and shall be enforced. In addition, in the event of a breach or violation by Employee of Section 4, the Restricted Period shall be automatically extended respectively by the amount of time between the initial occurrence of the breach or violation and when such breach or violation has been duly cured.

12.    Counterparts/Electronic Signatures.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.    For purposes of this Agreement, use of a facsimile, e-mail or other electronic medium shall have the same force and effect as an original signature.

13.    Dollars.    Unless otherwise provided in this Agreement, all dollar amounts referenced in this Agreement are United States dollars.

14.    Withholding.    The Company shall be entitled to withhold from any payments or benefits made or provided under this Agreement all applicable federal, state, city or other applicable taxes.

15.    Survival.    Sections 4, 5(e), 6, 7, 8, 9, 10, 11, 12, 13, 14 and this Section 15 shall survive the termination of this Agreement and shall continue in full force and effect according to their terms.

16.    Section 409A.

(a)    This Agreement is intended to comply with or be exempt from Section 409A of the Internal Revenue Code of 1986, as amended ("*Section 409A*") and shall be construed accordingly. It is the intention of the Parties that payments or benefits payable under

14



APP0046

this Agreement not be subject to the additional tax or interest imposed pursuant to Section 409A. To the extent such potential payments or benefits are or could become subject to Section 409A, the Parties shall cooperate to amend this Agreement with the goal of giving Employee the economic benefits described herein in a manner that does not result in such tax or interest being imposed. However, in no event shall the Company be liable to Employee for any taxes, interest, or penalties due as a result of the application of Section 409A to any payments or benefits provided hereunder.

(b)      Each payment provided for in this Agreement shall, to the extent permissible under Section 409A, be deemed a separate payment for purposes of Section 409A, and any payment to be made in installments shall be treated as a series of separate payments.

(c)      Payments or benefits pursuant to this Agreement shall be treated as exempt from Section 409A to the maximum extent possible under Treasury Regulation Section 1.409A-1(b)(9)(v), and/or under any other exemption that may be applicable, and this Agreement shall be construed accordingly.  For purposes of Section 5, phrases such as "termination of employment" shall refer to Employee's "separation from service," as defined for purposes of Section 409A.

(d)      All taxable expenses or other reimbursements or in-kind benefits under this Agreement shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by Employee.  Any such taxable reimbursement or any taxable in-kind benefits provided in one calendar year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year.

(e)      Employee shall have no right to designate the date of any payment hereunder.

15

APP0047

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the day and year first above written.

**COMPANY:**

VEROBLUE FARMS USA, INC.

By: _____
        Leslie Wulf, Chief Executive Officer

**EMPLOYEE:**

_____
Keith Driver

*Signature Page to Employment Agreement*

## BUSINESS RELATIONSHIP RESTRUCTURING AGREEMENT

This Business Relationship Restructuring Agreement (this "**Agreement**") is made and entered into as of January 13, 2017 (the "**Effective Date**"), by and among VeroBlue Farms Inc., a Canadian corporation ("**VBF Canada**"), VeroBlue Farms USA, Inc., a Nevada corporation ("**VBF USA**"), Keith Driver, a resident of Calgary, Canada ("**Driver**"), and Seven Hours Holding Company, Inc., a Canadian corporation, which is one hundred percent (100%) owned by Driver ("**Driver Co.**"). VBF Canada, VBF USA, Driver and Driver Co. are sometimes each referred to herein as a "**Party**" and collectively, as the "**Parties**".

## W I T N E S E T H :

**WHEREAS**, Driver and VBF USA are parties to that certain Employment Agreement, dated as of July 1, 2016 (the "**Employment Agreement**"); and

**WHEREAS**, Driver Co. owns 2,500,000 common shares of VBF Canada (the "**VBF Canada Shares**"); and

**WHEREAS**, on November 16, 2016, Driver delivered to VBF USA a letter providing notice that VBF USA was in breach of the Agreement and such breach constituted "Good Reason" under the Employment Agreement allowing Driver to terminate the Employment Agreement if such breach was not cured within thirty (30) days after such notice (the "**Good Reason Claims**"); and

**WHEREAS**, VBF USA denies that Driver has "Good Reason" to terminate the Employment Agreement, and VBF USA has claims against Driver that he has breached the Employment Agreement because, among other things, Driver has failed to maintain his main office in Dallas, Texas, and Driver has engaged in other business interests and engagements outside of VBF USA (the "**Egregious Cause Claims**"); and

**WHEREAS** without admitting any liability on the part of any Party, and in order to resolve their claims against each other, the Parties desire to restructure their business relationship to the extent provided herein;

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.      <u>Termination of Employment Agreement, Stock Option Agreement and Stock Option Grant</u>. Effective as of the Effective Date: (i) the Employment Agreement is hereby terminated and of no further force or effect; (ii) that certain Stock Option Agreement, dated as of July 14, 2016, by and between VBF USA and Driver (the "**Stock Option Agreement**") is hereby terminated and of no further force or effect; and (iii) that certain Stock Option Grant Notice, dated as of July 14, 2016, by and between VBF USA and Driver (the "**Stock Option Grant Notice**") is hereby terminated and of no further force or effect; it being agreed and understood that all obligations of the Driver and VBF USA under the Employment Agreement (payment or otherwise), the Stock Option Agreement and the Stock Option Grant Notice are terminated in their entirety.

APP0049

2.   <u>Execution and Delivery of Consulting Agreement</u>. Simultaneously with the execution and delivery of this Agreement by the Parties, Driver and VBF USA shall execute and deliver a Consulting Agreement, a copy of which is attached hereto as <u>Exhibit A</u> (the "**Consulting Agreement**").

3.   <u>Cancellation of VBF Canada Shares</u>. Effective as of the Effective Date, the VBF Canada Shares shall be deemed to be cancelled, and Driver hereby grants to Leslie Wulf a power-of-attorney, which is coupled with an interest, to execute and deliver any and all documentation required by TSX Trust, VBF Canada's transfer agent, to cancel the VBF Canada Shares.

4.   <u>Confidentiality; Agreement Not-To Compete</u>.

(a)   Driver acknowledges that during his employment and as a result of his past, relationship with VBF USA, Driver has obtained, and has been given access to, information concerning VBF USA and Parent Corporation and their respective affiliates, including, but not limited to, information regarding the business, operations, services, proposed services, business processes, business and marketing strategies, advertising, marketing and promotional plans and materials, pricing strategies and policies, financial information, stockholders and other trade secrets, confidential information and proprietary material of VBF USA, including information and material originated, discovered or developed in whole or in part by Driver (collectively referred to herein as "**Confidential Information**"). The term "**Confidential Information**" does not include any information which (i) at the time of disclosure is generally available to the public (other than as a result of a disclosure by Driver in breach of the Employment Agreement), or (ii) was available to Driver on a non-confidential basis from a source (other than VBF USA or its representatives) that is not and was not prohibited from disclosing such information to Driver by a contractual, legal or fiduciary obligation. Driver agrees that, to the fullest extent permitted by law, Driver will, in a fiduciary capacity for the benefit of VBF USA, hold all Confidential Information strictly in confidence and will not directly or indirectly reveal, report, disclose, publish or transfer any of such Confidential Information to any person or entity, or utilize any of the Confidential Information for any purpose, except in furtherance of Driver's duties under the Consulting Agreement and except to the extent that Driver may be required by law to disclose any Confidential Information.

(b)   For a period of five (5) years after the Effective Date (the "**Restricted Period**"), he shall not directly or indirectly: (i) own any interest in, manage, control, participate in, consult with, render services for, be employed in an executive, managerial or administrative capacity by, or in any manner engage in, any Competing Business (as defined below); (ii) solicit, request or induce any adviser, consultant or agent of the VBF USA or any of its affiliates to terminate his or her employment or relationship with such company, nor hire any adviser, or consultant of VBF USA or any of its affiliates, or (iii) solicit, request, or induce or attempt to solicit, request, or induce or attempt to induce any customer, supplier, licensee or other business relation of VBF USA or any of its affiliates to cease doing business with, or modify its business relationship with VBF USA or any of its affiliates, or in any way interfere with or hinder the relationship between any such customer, supplier, licensee or business relation and VBF USA or and of its affiliates, as applicable. For purposes hereof, "**Competing Business**" means a business that, directly or indirectly, cultures and/or hatches finfish or shrimp; excluding however, a business that cultures and/or hatches shrimp located in Alberta, Canada or British Colombia, Canada solely for sales and resales to persons and entities in Alberta, Canada and British Colombia, Canada. Nothing herein shall prohibit Driver from being a

APP0050

passive owner of not more than five percent (5%) of the outstanding stock of any class of a corporation that is publicly traded, so long as Driver has no active participation in the business of such corporation. In addition, during the Restricted Period, prior to accepting any position, or becoming involved, any person or entity that is potentially a Competing Business, Driver agrees to inform such person or entity, as the case may be, of the provisions of this Agreement, and specifically the provisions of this Section 4.

(c)     Driver agrees and acknowledges that the restrictions contained in this Section 4 are reasonable in scope and duration and are necessary to protect the business interests and confidential information of VBF USA, and Driver further agrees and acknowledges that he has reviewed the provisions of this Agreement with his legal counsel.

(d)     If any provision in this Section 4, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the Parties agree that the court or arbitrator making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases, and in its reduced form, such provision shall then be enforceable and shall be enforced. In addition, in the event of a breach or violation by Driver of Section 4, the Restricted Period shall be automatically extended respectively by the amount of time between the initial occurrence of the breach or violation and when such breach or violation has been duly cured.

5.     Releases.

(a)     As a material inducement to VBF USA and VBF Canada to enter into this Agreement, and except for the covenants and agreements of VBF USA and VBF Canada provided for in this Agreement, Driver and Driver Co., on their own behalf and on behalf of their respective equityholders, directors, managers, officers, affiliates, heirs, dependents, successors and assigns, or any of them (collectively, the "**Driver Releasers**") hereby irrevocably and unconditionally release, acquit and forever discharge VBF USA and VBF Canada and each of their respective successors, assigns, agents, members, managers, officers, employees, representatives, subsidiaries and affiliates and all persons acting by, through, under or in concert with any of them (collectively, the "**VBF Releasees**"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown ("**Driver Claim**" or "**Driver Claims**") which the Driver Releasers now have, own, hold, or which the Driver Releasers at any time heretofore had, owned or held against each of the VBF Releasees including, but not limited to: (i) all Driver Claims under the Age Discrimination in Employment Act of 1967, as amended; (ii) all Driver Claims under Title VII of the Civil Rights Act of 1964, as amended; (iii) all Driver Claims under the Employee Retirement Income Security Act of 1974, as amended; (iv) all Driver Claims arising under the Americans With Disabilities Act of 1990, as amended; (v) all Driver Claims arising under the Family and Medical Leave Act of 1993, as amended; (vi) all Driver Claims related to Driver's employment or engagement with the VBF Releasees; (vii) all Driver Claims of unlawful discrimination based on age, sex, race, religion, national origin, handicap, disability, equal pay, sexual orientation or otherwise; (viii) all Driver Claims of wrongful discharge, breach of an implied or express employment contract, negligent or intentional infliction of emotional distress, libel, defamation, breach of privacy, fraud, breach of any implied covenant of good faith and fair dealing and any other

APP0051

federal, state, or local common law or statutory claims, whether in tort or in contract; (xi) all Driver Claims related to unpaid wages, salary, deferred compensation, overtime compensation, bonuses, severance pay, vacation pay or other compensation or benefits arising out of Driver's employment or engagement with any VBF Releasee; (x) all Driver Claims arising under any federal, state or local regulation, law, code or statute; (xi) all Driver Claims of discrimination arising under any state or local law or ordinance; (xii) all Driver Claims that the Driver Releasers have pertaining to the purchase, holding and cancellation of the VBF Canada Shares; (xiii) the Good Reason Claims; and (xiv) all Driver Claims relating to any agreement, arrangement or understanding that the Driver Releasers have, or may have, with any VBF Releasee (but specifically excluding this Agreement) for anything occurring prior to the Effective Date. The Driver Releasers represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Driver Claim or any portion thereof or interest therein.

(b)     As a material inducement to Driver and Driver Co. to enter into this Agreement, and except for the covenants and agreements of Driver and Driver Co. provided for in this Agreement, VBF USA and VBF Canada, on their own behalf and on behalf of the other VBF Releasees, hereby irrevocably and unconditionally release, acquit and forever discharge the Driver Releasers from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (the "**VBF Releasee Claims**") which the VBF Releasees now have, own, hold, or to which the VBF Releasees at any time heretofore had, owned or held against each of the Driver Releasers, including, without limitation, the Egregious Cause Claims. The VBF Releasees represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any VBF Releasee Claim or any portion thereof or interest therein.

(c)     Driver, on his own behalf and on behalf of the other Driver Releasers, agrees not to make any disparaging or negative statements, written or verbal, regarding any of the VBF USA Releasees at any time in the future, whether such statement is true or false, except as required by law or in defense of any legal action brought by any VBF USA Releasee against any Driver Releaser in violation of this Agreement. VBF USA, on its own behalf and on behalf of the other VBF USA Releasees, agrees not to make any disparaging or negative statements, written or verbal, regarding any of the Driver Releasers at any time in the future, whether such statement be true or false, except as required by law or in defense of any legal action brought by any Driver Releaser against any VBF USA Releasee in violation of this Agreement.

6.     Settlement Consideration.

(a)     In consideration of the matters described in Sections 1-5 above, VBF USA agrees to make the following payments to Driver:

(i)     a payment of $550,000 on the Effective Date ($500,000 of which is for the cancellation of the VBF Canada Shares as described in Section 3 above, and the remaining $50,000 of which is for severance pay);

APP0052

       (ii)    a payment of $100,000 on the first anniversary of the Effective Date, which amount shall be allocated to the non-compete provisions of Section 4(b) above;

       (iii)    a payment of $100,000 on the second anniversary of the Effective Date, which amount shall be allocated to the non-compete provisions of Section 4(b) above;

       (iv)    a payment of $100,000 on the third anniversary of the Effective Date, which amount shall be allocated to the non-compete provisions of Section 4(b) above;

       (v)    a payment of $100,000 on the fourth anniversary of the Effective Date, which amount shall be allocated to the non-compete provisions of Section 4(b) above; and

       (vi)    a payment of $100,000 on the fifth anniversary of the Effective Date, which amount shall be allocated to the non-compete provisions of Section 4(b) above.

Notwithstanding anything in this Agreement to the contrary, in the event that Driver breaches any of the provisions of Section 4, than any and all payments to be made in subitems (b) – (d) above that have not been made shall be deemed to be cancelled in their entirety, in addition to any and all rights and remedies that VBF USA may have under law or in equity; it being agreed and understood that the cancellation of any such payments shall not preclude VBF USA from pursuing a claim against Driver for any such breach.

       (b)    For all amounts that are owed to Consultant by the Company as of the Effective Date, (including, without limitation, unpaid salary, PTO and expenses), on the Effective Date, the Company will pay Consultant $7,001.05.

       7.    <u>Representations and Warranties</u>. Each Party hereby represents and warrants to each other Party that the following representations and warranties are true and correct as of the date hereof: (a) such Party is fully competent to execute, deliver and perform this Agreement; (ii) this Agreement has been duly executed and delivered by such Party and constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally or the availability of equitable remedies; and (iii) neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby or thereby will: (1) conflict with, or result in a violation or breach of the terms, conditions or provisions of, or constitute a default under any agreement, indenture or other instrument under which such Party is bound or subject; or (2) violate or conflict with any judgment, decree, order, statute, rule or regulation of any court or any public, governmental or regulatory agency or body having jurisdiction over such Party.

       8.    <u>Miscellaneous</u>.

APP0053

(a)    Any notice or communication hereunder must be in writing and given by depositing the same in the United States or Canadian mail, addressed to the Party to be notified, postage prepaid and registered or certified with return receipt requested, or by delivering the same in person. Such notice shall be deemed received on the date on which it is hand-delivered, or delivered by Federal Express or on the third business day following the date on which it is so mailed. For purposes of notice, the addresses of the Parties shall be as follows:

|  |  |
|---|---|
| If to VBF Canada or VBF USA: | c/o VeroBlue Farms USA, Inc. |
|  | 3369 Premier Drive, Suite 300 |
|  | Plano, Texas  75023 |
|  | Attn:  Chief Executive Officer |
|  |  |
| If to Driver or Driver Co.: | c/o Keith Driver |
|  | 5858 Dalcastle Drive NW |
|  | Calgary, Alberta, Canada  T3A-1Z3 |

Any Party may change its address for notice by written notice given to the other party in accordance with this Section.

(b)    This Agreement (including the Consulting Agreement) contains the entire agreement among the Parties relating to the subject matter hereof and supersedes any prior agreement, arrangement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

(c)    All dollar amounts used herein are United States dollars, and all amounts payable hereunder shall be paid in United States dollars.

(d)    VBF USA shall be entitled to withhold from any payments or benefits made or provided under this Agreement all applicable federal, state, city or other applicable taxes.

(e)    No alterations, amendments, waiver, or any other change in any term or provision of this Agreement shall be valid or binding on any Party unless the same shall have been agreed to in writing by all of the Parties. No waiver or default of any term of this Agreement shall be deemed a waiver of any subsequent breach or default of the same or similar nature. This Agreement may not be changed except by written agreement signed by all Parties.

(f)    Each Party acknowledges that a refusal by such Party to perform any covenant or agreement contained in this Agreement may cause irreparable harm to one or more of the other Parties, for which there may be no adequate remedy at law and for which the ascertainment of damages would be difficult. Therefore, the Parties agree that in any such case, the other Party or Parties shall be entitled, in addition to, and without having to prove the inadequacy of, other remedies at law, to specific performance of this Agreement, as well as injunctive relief (without being required to post bond or other security).

(g)    In the event it becomes necessary to bring suit to enforce any provision of this Agreement, the prevailing Party shall be entitled to recover, in addition to any other award, reasonable legal costs, including court costs and attorney's fees, from the non-prevailing Party or Parties.

APP0054

(h)     If any provision of this Agreement is held to be unenforceable or invalid, the remaining provisions of this Agreement will remain in effect.

(i)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, regardless of the laws that might otherwise govern under applicable principles of conflicts of law thereof. Each Party irrevocably submits to the exclusive jurisdiction of the Federal District Court for the Northern District of Texas (the "**District Court**") for the purposes of any suit, action or other proceeding arising out of this Agreement. Each Party agrees to commence any action, suit or proceeding relating to this Agreement in the District Court. Each Party further agrees that service of any process, summons, notice or document by registered mail to such Party's respective address set forth in Section 8(a) above shall be effective service of process. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the District Court, and hereby further irrevocably and unconditionally waives and shall not assert by way of motion, defense, or otherwise, in any such Proceeding, any claim that it is not subject personally to the jurisdiction of the District Court, that its property is exempt or immune from attachment or execution, that such proceeding is brought in an inconvenient forum, that the venue of the proceeding is improper, or that the Agreement may not be enforced in or by the District Court.

(j)     The paragraph headings and captions contained herein are for reference purposes and convenience only and shall not in any way affect the meaning or interpretation of this Agreement. It is intended by the Parties that this Agreement be interpreted in accordance with its fair and simple meaning, not for or against any Party, and no Party shall be deemed to be the drafter of this Agreement.

(k)     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail or other electronic medium shall have the same force and effect as an original signature.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

VEROBLUE FARMS, INC.

By: _____
Leslie Wulf,
Chief Executive Officer


VEROBLUE FARMS USA, INC.

By: _____
Leslie Wulf,
Chief Executive Officer

APP0055

_____
Keith Driver

SEVEN HOURS HOLDING COMPANY,
INC.

By: _____
Keith Driver, President

8

APP0056

# EXHIBIT A

## Form of Consulting Agreement

[See attached document]

APP0057

## CONSULTING AGREEMENT

This Consulting Agreement (this "**Agreement**"), dated as of January 13, 2017 (the "**Effective Date**") is by and between VeroBlue Farms USA, Inc., a Nevada corporation (the "**Company**"), and Keith Driver, a resident of Calgary, Alberta ("**Consultant**"). The Company and Consultant are sometimes each referred to herein as a "**Party**" and collectively, as the "**Parties**."

**WHEREAS,** the Company desires to engage Consultant as an independent contractor to perform certain services for the Company, and Consultant desires to be retained by the Company to perform such services;

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the Parties hereby agree as follows:

1.  <u>Services</u>.  The Company hereby retains Consultant to serve as an independent contractor to the Company to consult and provide the Company and its subsidiaries with advice and assistance in the following areas: water treatment, permitting, technical services and general research and development (the "**Services**"). Consultants shall only be required to spend sixty (60) hours per month in providing the Services to the Company; it being agreed and understood that Consultant shall be required to receive pre-approval from an executive officer of the Company to provide the Services in any month over the sixty (60) hour requirement, and if such approval is received, Consultant will be compensated by the Company at the rate of $150/hour.

2.  <u>Compensation</u>.  As compensation for performing the Services, the Company shall pay Consultant the following compensation:

    (a)     A fee of $100,000 per annum, payable in installments of $8,333.33 per month, in arrears, on the first day of each calendar month; and

    (b)     During the term of this Agreement, the Company shall reimburse Consultant for all reasonable and necessary out-of-pocket travel and other expenses incurred by Consultant in rendering Services hereunder, on a monthly basis upon submission of a detailed monthly statement and reasonable documentation; it being agreed and understood that all expenses over $1,000 must be approved in advance by the Company.

The compensation set forth above will be the sole compensation payable to Consultant for performing the Services under the Agreement, and no additional compensation or fee will be payable by the Company to Consultant by reason of any benefit gained by the Company directly or indirectly through Consultant performing the Services, nor shall the Company be liable in any way for any additional compensation or fee for Consultant's performing the Services, unless the Company shall have expressly agreed thereto in writing.

17520018v.4

APP0058

3.    Status as Independent Contractor.

(a)    The Parties acknowledge and covenant that (i) Consultant will act exclusively as an independent contractor, and not as an employee, of the Company in performing the Services, and (ii) the Parties do not intend, and will not hold out that there exists, any joint venture, undertaking for a profit or other form of business venture or any employment relationship between the Parties other than that of an independent contractor relationship. Consultant is not entitled to the benefits provided by the Company to its employees, including but not limited to Workmen's Compensation Insurance, unemployment insurance, and health and welfare benefits.

(b)    In performing the Services, Consultant is obligated to provide quality service within industry standards. The manner and means of conducting the work are under Consultant's exclusive control. Consultant is solely responsible for his own conduct during the performance of this Agreement.

4.    Confidential Information; Intellectual Property.

(a)    Consultant, while engaged by the Company hereunder or at any time thereafter, will not, without the express written consent of the Company, directly or indirectly communicate or divulge, or use for the benefit of Consultant, or of any other person, firm or association, any of the Company's trade secrets, proprietary data or other confidential information, which trade secrets and confidential information were communicated to or otherwise learned or acquired by Consultant in the course of Consultant's engagement with the Company and that is not otherwise generally known within the Company's industry, except that Consultants may disclose such matters to the extent that disclosure is required pursuant to any deposition, interrogatory, request for documents, subpoena, civil investigative demand, or similar process. Consultant agrees not to any such trade secrets or confidential information in any way or in any capacity other than as an independent contractor of the Company and to further the Company's interests.

(b)    Consultant recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that Consultant owes the Company and such third parties, during the term of Consultant's engagement hereunder and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or company (except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party) or to use it for the benefit of anyone other than for the Company or such third party (consistent with the Company's agreement with such third party) without the prior consent of an authorized representative of the Company.

(c)    To the extent that, during the term of this Agreement, Consultant jointly or solely conceives, develops or reduces to practice any new inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable or registerable under copyright or similar laws or other intellectual property

2

APP0059

(collectively, "**Intellectual Property**"), then all rights, titles and interests in, to any under such Intellectual Property shall be deemed to be exclusively owned by the Company. The Company shall exclusively own all U.S. and international rights, title and interest in and to the Intellectual Property, including, but no limited to all graphical, textual and other contents, and all copyrights and any other intellectual property rights therein (e.g., patent and trademark rights). Consultant hereby assigns to the Company all rights, title and interest in and to the Intellectual Property, and Consultant agrees to promptly execute and deliver, and to cause its employees and/or contractors to promptly execute and deliver, any and all documentation or instruments that the Company reasonably believes is necessary to transfer all rights, titles and interests in and to such Intellectual Property to the Company. The Company and its successors and assigns shall have the right to obtain and hold in its own name all copyright or trademark registrations and other evidence of rights that may be available for the deliverables and any portion(s) thereof. Consultant agrees that the Intellectual Property shall be considered a "work made for hire" as that term is defined under the copyright laws of the United States and other countries.

(d)     Notwithstanding anything herein to the contrary, the Parties understand and agree that the provisions of Section 4(c) shall not apply to the shrimp culturing system which have been developed by Consultant, Sheriff and/or their affiliates independently of the provision of Services hereunder.

5.     Indemnification.   The Company agrees to indemnify and hold harmless Consultant from and against any and all losses, claims, damages, liabilities and expenses, and all actions, inquiries, proceedings and investigations in respect thereof, to which Consultant may become subject arising in any manner out of or in connection with Consultant's engagement under this Agreement; provided, however, that the Company shall not be responsible to indemnify Consultant under this Section 5 to the extent that such loss, claim, damage, liability or expense has been finally judicially determined to have resulted primarily and directly from actions taken or omitted to be taken by Consultant due to his gross negligence or willful misconduct.   To the extent that any prior indemnification payment the Company made to Consultant is determined to have been improper by reason of Consultant's gross negligence or willful misconduct, Consultant will promptly pay the Company such amount.

6.     Term of Agreement; Termination.

(a)     This Agreement shall commence as of the Effective Date and shall continue until terminated by either Party upon written notice to the other Party, which written notice may not be given by the Company before December 28, 2017.

(b)     Notwithstanding anything herein to the contrary, the provisions of Section 4 and 5 above, this subsection (b) and Section 7 below, shall survive the termination of the Term and this Agreement.

7.     Miscellaneous Provisions.

(a)     The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

17520018v.4

3

(b)    This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.  The Parties agree that the exclusive jurisdiction of any case or controversy arising under or out of this Agreement shall be in the state of federal courts located in Dallas, Texas, and each of the Parties hereby consents to the jurisdiction of such courts.

(c)    The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

(d)    This Agreement may not be modified, amended, altered or supplemented except upon the execution and delivery of a written agreement executed by both of the Parties.

(e)    This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof.

(f)    All dollar amount used herein are United States dollars.

(g)    All notices provided under this Agreement by any Party to any other Party shall be in writing, and shall be delivered in person or sent by an internationally recognized overnight express courier service, by first class certified or registered mail (return receipt requested), or by email or facsimile transmission (confirmed by mailing a copy thereof to the recipient in accordance with this Section 7(g)) to such Party's address, email address or facsimile number set out below.  Any such notice shall be effective (i) immediately (if delivered in person or sent by confirmed email or facsimile), (ii) on the third business day after delivery to an internationally recognized overnight express courier service or (iii) five days after mailing (if sent by mail), and in proving same it shall be sufficient to show that the envelope containing the same was delivered to the courier or postal service and duly addressed, or that receipt of a facsimile was confirmed by the recipient as provided above.  The addresses and facsimile numbers of the Parties for purposes of this Agreement are:

If the notice is to the Company:

VeroBlue Farms USA, Inc.
3369 Premier Drive, Suite 300
Plano, Texas  75023
Attn:  Leslie Wulf, Chief Executive Officer
Email:  les.wulf@verobluefarms.com

APP0061

If the notice is to the Consultant:

Keith Driver
5858 DalCastle Drive NW
Calgary, Alberta, Canada  T3A-1Z3
Email: _KDRIVER@DRIVERPROJECTS.COM_

(h)   This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

**EXECUTED** as of the Effective Date.

VEROBLUE FARMS USA, INC.

By: _____

Leslie Wulf,
Chief Executive Officer

_____
Keith Driver

17520018v.4

APP0062

## RESOLUTION

On motion duly made and seconded, it is unanimously resolved THAT the:

President is hereby authorized and empowered on behalf of the Company to accept and convey, assign, transfer or otherwise dispose of all or any shares, stocks, bonds, debentures, or debenture stock and other securities of every description now or hereafter registered in the name of the Company or held or owned by the Company and to make, sign and execute on behalf of the Company all and any instruments of acceptance, assignment and transfer and documents whenever necessary or proper to effectuate the same with full power to appoint in their place and stead an attorney or attorneys with full power of substitution therein, and that any and all instruments of acceptance, assignment and transfer and other documents in connection therewith and heretofore signed and executed on behalf of the Company in accordance with the authority set out above are hereby ratified and confirmed.

## CERTIFICATE

I hereby certify that the foregoing is a true and correct copy of a Resolution duly passed at a meeting of the Directors of Seven Hours Holding Company Inc. regularly held on the 12ʳ day of _January_, 2017 and that the said Resolution is now in full force and effect. I further certify that the following is a list of all Directors, officers and employees of the Company authorized by this Resolution to do any act or thing with a true specimen of their signatures. I further certify that the following persons still hold their respective offices at the present time.

WITNESS my hand and seal of the Company this 12ʳ day of _January_, 20 17.

PER: _____
     (Secretary)

Keith Driver    President    _____
                            (Please Sign)

## DIRECTION TO CANCEL

**TO:**   **TMX Trust Company ("TMX Trust")**
**Toronto, Ontario**

**RE:**   **DIRECTION TO CANCEL**

You are authorized and directed, as transfer agent and registrar of VeroBlue Farms Inc. to cancel from the securityholder register share certificate the following certificate and reduce the share capital of VeroBlue Farms Inc. accordingly.

| Certificate Number | Total Number of Shares | Registration (exactly as it appears on certificate) |
|---|---|---|
| 9 | 2,500,000 | Seven Hours Holding Company Inc. 634 WENTWORTH PL SW CALGARY AB T3H 4N8 |

I certify that the return to treasury of these securities is not in violation of any applicable laws or regulations, including applicable securities laws and regulations, and exchange regulations.

VeroBlue Farms Inc. agrees to indemnify and hold harmless TMX Trust, its successors and assigns, and each of their respective directors, officers, employees and agents (the "Indemnified Parties") against any demands, claims, assessments, proceedings, suits, actions, costs, judgments, penalties, interest, liabilities, losses, damages, expenses and disbursements (including legal fees and disbursements on a substantial indemnity or solicitor and client basis) that the Indemnified Parties, or any of them , in consequence of, arising from or in any way relating to acting on this direction.

*[Signature page follows]*

Dated as of the _____ day of January, 2017.

**VEROBLUE FARMS INC.**

Per: _____

    Leslie Wulf
    Chief Executive Officer

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| VEROBLUE FARMS USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:19-cv-00764-L |
| v. | ) | |
| | ) | |
| LESLIE A. WULF, BRUCE A. HALL, | ) | |
| JAMES REA, JOHN E. REA, | ) | |
| KEITH DRIVER, CANACCORD | ) | |
| GENUITY LLC, CHRISTINE GAGNE, | ) | |
| and SEAN MANIACI, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

Plaintiff, VeroBlue Farms USA, Inc. ("VBF"), through its undersigned counsel, complains

of Defendants, Leslie A. Wulf ("Wulf"), Bruce A. Hall ("Hall"), James Rea ("James Rea"), John E.

("Ted") Rea, ("Ted Rea"), Keith Driver ("Driver") (Wulf, Hall, James Rea, Ted Rea, and Driver

are collectively referred to as the "Founders"), Canaccord Genuity LLC ("Canaccord"), Christine

Gagne  ("Gagne"), and Sean Maniaci ("Maniaci") (together Canaccord, Gagne, and Maniaci are

collectively referred to as the "Conspiring Defendants"), and alleges as follows:

## I. INTRODUCTION

1.     The Founders founded VBF, a sustainable fish farm business, in 2014.  The

Founders did not invest any of their own money into VBF but by early 2018, the Founders had

taken millions of dollars from VBF.  By early 2018, the last of the Founders were terminated by

VBF and had misappropriated or otherwise squandered over $90,000,000 in debt and equity that

others invested in VBF.  VBF filed for bankruptcy in 2018.

2.     The Founders' misconduct includes misappropriations and misuse of VBF's assets

and continuous and knowing misrepresentations of VBF's operations, technology, and finances.

This caused VBF, at the Founders' direction, to sink tens of millions of dollars into what the Founders knew to be a losing proposition, to the benefit of the Founders and to the detriment of VBF.

3.     Those who raise and squander $90,000,000 in a mere three years cannot do so without a great deal of misconduct.  Overall, (1) the Founders drained VBF of assets and looted the company, (2) the Founders withdrew significant funds while VBF was in financial trouble, (3) the Founders, Gagne, and Maniaci received money and other assets that belonged to VBF for no reasonably equivalent value, (4) the Founders ultimately rendered VBF virtually incapable of operation, and (5) the Founders took improper salaries and other benefits from VBF's assets.  VBF acted as alleged herein through the control of the Founders.  The Conspiring Defendants aided the Founders in committing their misconduct, or otherwise committed misconduct.  VBF seeks compensatory damages in the amount of at least $90,000,000, plus punitive damages and other relief.

## II. <u>PARTIES</u>

4.     VBF is a Nevada corporation with its principal place of business in Webster City, Iowa.  VBF is a citizen of Nevada and Iowa.

5.     All Founders are Canadian citizens, except for Hall.

6.     Driver is a Canadian citizen and resides in Calgary, Alberta, Canada. Driver served as an officer (performing the function of Chief Operating Officer for most, if not all of his tenure, whether or not he held that official title) and employee (and/or contractor) of VBF from October 1, 2014 through on or about January 13, 2017, when VBF terminated his employment and officer status. Driver continued to serve VBF as an independent contractor through December 2017. During his tenure at VBF, Driver purported to serve as VBF's chief in-house aquaculture expert,

2

and therefore the Founders' fraud regarding VBF's technical performance bears heavily on Driver, in addition to the other Founders.

7.      James Rea, a Canadian citizen, has permanent resident alien status in the United States and is domiciled in Texas.  James Rea served as a director, officer and employee (and/or consultant) of VBF October 1, 2014 through on or about January 8, 2018 when VBF terminated his employment (and/or contractor), director, and officer status.

8.      Ted Rea, a Canadian citizen, has permanent resident alien status in the United States and is domiciled in Texas.  Ted Rea served as a director, officer and employee (and/or consultant) of VBF from October 1, 2014 through on or about October 27, 2017 when VBF terminated his employment (and/or contractor), director, and officer status.

9.      Hall, is a United States citizen and is domiciled in Texas. Hall served as a director, officer (Chief Financial Officer during much, if not all, of his tenure at VBF) and employee (and/or consultant) of VBF from October 1, 2014 through on or about October 27, 2017 when VBF terminated his employment (and/or contractor), director, and officer status.

10.     Wulf, a Canadian citizen, has permanent resident alien status in the United States and is domiciled in Texas.  Wulf served as a director, officer (Chief Executive Officer during much, if not all, of his tenure at VBF) and employee (and/or contractor) of VBF from October 1, 2014 through on or about November 6, 2017, when VBF terminated his employment (and/or consultant), director, and officer status.

11.     Canaccord is a Delaware limited liability company.  The Founders retained Canaccord, an investment banking firm, to raise funds for VeroBlue Farms, Inc. ("VBF Canada"), not a party to this lawsuit.  After diligent investigation of publically available information, none of Canaccord's members are citizens of the same state as VBF (Iowa or Nevada).  Canaccord has

3

Canadian roots as a firm and has offices in Canada, Europe, the Middle East, the Far East, and Australia.  Its only United States offices are in cities not located in Nevada or Iowa.  VBF has no information that any Canaccord member is an Iowa or Nevada citizen after investigating the same. Alternatively, VBF requests limited discovery as to that issue.

12.     Gagne is a Canadian citizen whose present whereabouts are unknown to VBF after reasonable investigation. VBF believes that until recently Gagne lived with her husband in West Virginia.  Gagne's husband, however, informed VBF that Gagne no longer lives with him and that he does not know if or when she will return. After diligent investigation of publically available information, VBF has been unable to locate a more recent address for Gagne.  Gagne is Wulf's daughter who VBF paid during Wulf's tenure for alleged services performed. VBF knew Gagne to be a Canadian citizen during events alleged herein, and has not confirmed any facts that she has gained her citizenship.

13.     Maniaci is a lawyer, and at all relevant times, has been a partner specializing in corporate and securities laws at Cassels Brock & Blackwell LLP ("CBB"), a Canadian law firm with three offices, all in Canada.  Maniaci is a citizen of Canada. He works in the Toronto office, various communications he sent regarding VBF were sent with his Toronto, Canada signature block, he received his undergraduate degree in Canada; he received his master's in business administration in Canada, he received his equivalent to a law degree in Canada, and he received an advanced law degree in Canada.

### III.  JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 (a)(1) and (2). Gagne, Maniaci, and all the Founders except Hall are citizens of a foreign state and are not domiciled in the same states as VBF; Hall and, based upon diligent investigation, Canaccord are not citizens of the same states as VBF; and the amount in controversy exceeds

4

$75,000, exclusive of costs and interest. Alternatively, this Court has supplemental jurisdiction over Gagne, Canaccord, and Maniaci pursuant to 28 U.S.C. § 1367.

15.     The Court also has subject matter jurisdiction over all Defendants pursuant to 28 U.S.C. § 1331 as VBF brought claims against all Defendants pursuant to the United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 28 U.S.C. § 1961.

16.     Venue in this District is proper because the United States District Court for the Northern District of Iowa, on March 27, 2019, transferred this case to this Court. (*VeroBlue Farms USA, Inc. v. Wulf, et al.,* Case No. 18-CV-3047, Iowa Dkt. 50, the "Transfer Order").

17.     This Court has personal jurisdiction over Defendants pursuant to § 17.042(2) of the Texas Civil Practice and Remedies Code, as the Defendants committed torts in part in Texas and further, Founders James Rea, Ted Rea, Hall and Wulf are domiciled in Texas.

**IV.     VBF'S BEGINNINGS AND VBF'S DISCOVERY OF ITS CLAIMS**

18.     The Nelson family of Webster City, Iowa, led by cousins Mark and Jeff Nelson (collectively, the "Nelsons"), started their aquaculture business in Blairsburg, Iowa in 2012, which was known as "Iowa's First."  Effective December 31, 2014, the Nelsons sold their business to VBF (incorporated by the Founders on September 5, 2014) through a transaction through which the Nelsons and their wives retired $1,200,000 in debt and received stock in VBF.  VBF thereafter operated a sustainable fish farm ("Farm") business (in the "aquaculture" industry) in Webster City, Iowa.

19.     The Founders controlled VBF from its incorporation until the Founders' departure from VBF by exerting control over VBF's operations and data regarding VBF's actual financial and operational performance, including in their continuing capacity as VBF officers.

20.     After terminating the Founders, VBF conducted an investigation through which VBF, by March 2018, started to discover the misappropriations and other misconduct alleged

5

herein. VBF did not know, nor could it have known, of the Founders' misconduct until that time, especially since the Founders fraudulently concealed their misconduct from VBF, as further alleged herein.

21.     VBF discovered at least fourteen schemes consummated by the Founders to accomplish their misappropriations over a period of approximately three years. The Founders accomplished these schemes without the approval of disinterested VBF directors with knowledge and notice of such schemes.

22.     Further, after VBF commenced this action on July 31, 2018, VBF, through continuing investigation and discovery, discovered more facts upon which this Second Amended Complaint is based. Prior to this investigation and lawsuit discovery, VBF did not know, nor could it have known, of all of these facts, and how they fit into the Founders' various schemes and other misconduct, especially since the Founders and the other Defendants fraudulently concealed their misconduct from independent directors of VBF, as further alleged herein.

23.     It was not until after VBF terminated all of the Founders that the Founders' grip over VBF, including its data, lessened and VBF was able to investigate the Founders' misconduct with less obstruction by the Founders. This permitted VBF to start to learn the depth of the Founders' misconduct, which VBF is still investigating. VBF could not have been aware of any of the transactions involving payments made to the Founders or fraudulent nature of those transactions until after it terminated the Founders.

24.     Thus, the discovery rule, fraudulent concealment, and equitable tolling principles apply to any applicable limitations period. *See, e.g.*, *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998) (where the discovery rule shifts the date of the "legal injury" from the time the wrongful action occurred to the time when "[plaintiffs] knew or, exercising reasonable

APP0071

diligence, should have known of the facts giving rise to a cause of action"); *State v. Allan Const. Co.*, 851 F.2d 1526, 1528, 1534 (5th Cir. 1988) (holding that acts taken to conceal wrongful conduct and denial of wrongdoing may support the application of fraudulent concealment and reversing the trial court's grant of summary judgment on limitations grounds); *Remmes v. Int'l Flavors & Fragrances, Inc.*, 453 F. Supp. 2d 1058, 1067 (N.D. Iowa 2006) ("Under the common law discovery rule, an action does not accrue until the plaintiff knows or in the exercise of reasonable care should have known both the fact of the injury and its cause"); *Rieff v. Evans*, 630 N.W.2d 278, 290 (Iowa 2001), as amended on denial of reh'g (July 3, 2001) (holding that fraudulent concealment can toll the applicable statute of limitations and that, in the case of a fiduciary, plaintiff need not plead affirmative concealment and "mere silence may be enough to equal fraudulent concealment.")[1]

## V. THE FOUNDERS' MISAPPROPRIATIONS

25.     The first category of the Founders' misconduct is their misappropriation of VBF's cash and other assets. The Founders never invested any of their own money in VBF.  Instead, they conspired and worked together to drain VBF of approximately $5,000,000 to $10,000,000 in cash and other assets over their three-year reign to directly benefit themselves to the detriment of VBF. This amount is subject to VBF's continuing investigation.

### A.     BAJJER Stock Scheme

26.     BAJJER LLC ("BAJJER") is owned and controlled by some or all of the Founders or their affiliates, including but not limited to, BHDH Family, LP (Hall), Law Holdings, LLC (Wulf), and J2 Family, LP (Ted Rea).  On September 18, 2014, the Founders directed VBF to transfer 1,250,000 shares of VBF Canada (VBF Canada initially owned the shares of VBF) to

---

[1] Alternatively, VBF cites Iowa law regarding the discovery rule as Iowa substantive law applies to this case.

APP0072

BAJJER, for a grand total of $1.25. A true and correct copy of documentation regarding this transaction is attached and incorporated herein as **Exhibit 1**.

27. Such stock was sold to others around that same time for $0.90 per share, meaning that the Founders received for free what the Founders valued to others at the time as at least $1,125,000 worth of stock. Unfortunately, due to the Founders' misconduct, stock in VBF and its affiliates is without value.

**B.      American Growth Funding Loan Scheme**

28. BAJJER II, LLC ("BAJJER II") is also owned and controlled by some or all of the Founders or their affiliates (and third parties), including but not limited to, BHDH Family, LP and J2 Family LP. American Growth Funding, LLC ("AGF") loaned $78,000 to BAJJER II, which grew to $101,000, with interest, and which AGF wrote off as bad debt on or before December 31, 2016. AGF is a factoring/finance company, and its affiliates have been sued for fraud by the United States Securities and Exchange Commission, in the United States District Court for the Southern      District      of      New      York,      as      summarized      in      this      press      release: https://www.sec.gov/news/pressrelease/2016-21.html. Either BAJJER or BAJJER II initially owned AGF.

29. AGF loaned BAJJER another $200,000, which BAJJER transferred to VBF.

30. On July 8, 2016, the Founders directed VBF to pay AGF $375,000, even though VBF never had a direct borrowing relationship with AGF. Upon information and belief, this $375,000 amount encompasses not only the $200,000 referenced in paragraph 29 above, but also the $101,000 amount referenced in paragraph 28 above.

31. Therefore, the Founders utilized VBF funds to repay an alleged debt to AGF representing funds that did not benefit VBF, but instead that benefitted the Founders personally.

APP0073

C.    **Wulf Lake House Scheme**

32.    Wulf owns, or owned at relevant times, a vacation home on a lake in Texas ("Wulf Lake House").  A fire destroyed the Wulf Lake House in early 2015.

33.    Wulf rebuilt the Wulf Lake House from in or around May 2015 through in or around July 2017.

34.    VBF employee Tracy Arbanas ("Arbanas") oversaw the reconstruction of the Wulf Lake House, and VBF paid her to do so at an annual cost to VBF of approximately $97,500, which represented Arbanas' compensation and benefits.  James Rea authorized Arbanas' work as it related to the Wulf Lake House.  Further, VBF funded housing for Arbanas close to the Lake House, and refreshments for the construction crew on this project.  All told, VBF incurred approximately $107,490.51 for compensation and benefits to Arbanas.  These funds did not benefit VBF, but instead, benefited Wulf.

D.    **Sedun Stock Scheme**

35.    Gregg Sedun ("Sedun"), upon information and belief, has had social and/or business relationships with the Founders outside of VBF, and preexisting VBF's incorporation.

36.    On December 11, 2015, Sedun loaned $200,000 to VBF, and Sedun loaned another $50,000 to VBF through an entity owned and controlled by Sedun, Alcaron Capital Corp. ("Alcaron") on June 23, 2016.

37.    On July 12, 2016, VBF paid Alcaron $326,056, representing about $76,000 in interest on $250,000 in loans made only months before the repayment.  That same day, July 12, 2016, Wulf authorized VBF to issue 1,500,000 shares of VBF to Alcaron, purportedly for Sedun's procurement of other investment in VBF, with Alcaron paying nothing for this stock (again, the stock was valued at $0.90/share at the time, rendering this allotment of stock to be worth about $1,350,000 at the time.)  Two days later, on July 14, 2016, Sedun loaned Wulf $225,000 for the

9

Wulf Lake House and Wulf promoted Sedun to be a VBF director.  Therefore, Wulf utilized VBF funds to benefit himself personally, rather than VBF.

**E.**      **Compensation Scheme**

38.      The five Founders set their own compensation from VBF at $400,000 annually for each Founder besides Driver, who made $325,000 annually, for a total for all five of the Founders of $1,925,000 per year.  For the sake of reference, one person replaced all of the Founders as VBF's President, and VBF has paid him $250,000 per year.  Therefore, the Founders were overpaying themselves at least, and approximately, $1,675,000 per year, even if they had been properly performing their duties, which they were not.

39.      Additionally, at the Founders' direction, without valid reason, and without full disclosure of material facts to disinterested directors such as those facts alleged herein, VBF paid the five Founders twice their monthly compensation in July 2016.

40.      At the time of this compensation, the disinterested VBF directors did not know of the Founders' fraud and other misconduct, and otherwise did not possess sufficient knowledge of the Founders' misconduct to knowingly approve of this excessive compensation.  The Founders not only affirmatively led such directors to believe that their compensation was justified based on VBF's actual performance, which the Founders consistently misrepresented as succeeding when it was actually failing, as the Founders knew, but also concealed material facts from those directors. In other words, the Founders misled disinterested directors into believing that the Founders' services to VBF were worth $1,925,000 in annual compensation and other benefits.

41.      This is all the more troubling because though the Founders were taking millions of dollars in "compensation" from VBF, they had not invested any of their own money in VBF, were misappropriating and misusing other funds of VBF, were purposefully mismanaging VBF to

10

APP0075

benefit themselves and their other companies, and were committing and hiding their fraudulent acts from the independent directors and shareholders.

## F.   <u>Gagne Scheme</u>

42.    Gagne is Wulf's daughter. Gagne is a Canadian citizen who did not have any legal immigration status to work in the United States during the relevant time period.  VBF, at Wulf's direction, purportedly employed Gagne or contracted with her for alleged services. Gagne would often drive from Canada allegedly to work at VBF in Webster City, Iowa.

43.    VBF, at Wulf's direction, paid Gagne not under her real name, but under the name "Ronnie O'Brien" to conceal VBF's payments to her.

44.    Gagne abruptly left VBF in November 2017, when VBF terminated Wulf's employment and other statuses with VBF.  At that time, Gagne said the following words to those present at VBF's Webster City, Iowa facility at the time, in recognition of the misconduct represented by her relationship with VBF as fostered by some or all the Founders: "None of you have ever seen me and you do not know who I am."

45.    At a minimum, VBF incurred approximately $52,264.28 for compensation and benefits to Gagne, which benefited Gagne and Wulf and was to the detriment of VBF.  Further, this and other schemes demonstrate the general manner with which the Founders played "fast and loose" with applicable laws and regulations to the detriment of VBF and for their own benefit.

## G.   <u>OFA Scheme</u>

46.    The Founders incorporated Opposing Flows Aquaculture, Inc. ("OFA") on July 31, 2014 in anticipation of VBF's operations.  VBF grows its fish in tanks that are housed at the Farm ("Tanks").

47.    The Founders formed OFA to buy Tanks from a third-party, and then to resell Tanks to VBF at a profit to OFA and the Founders ("OFA Scheme").

APP0076

48.     Of course, it was more beneficial to VBF not to pay OFA a profit as an unnecessary "middleman."  Instead, VBF could buy directly from the third party without paying any amount to OFA, which VBF ultimately has done now that it is no longer under the control of the Founders.  VBF has yet to discover that OFA engaged in any transactions.  Through its count for an equitable accounting, however, VBF seeks a full accounting of OFA from the Founders.

**H.     Misappropriations of VBF Canada Stock**

49.     The Founders did not invest their own money into VBF or VBF Canada.

50.     Yet, the Founders caused VBF Canada to issue VBF Canada stock to entities that the Founders owned.  Specifically, the Founders caused VBF Canada to issue to (a) Seven Hours Holding Company, Inc., Driver's company, 2,500,000 common shares in VBF Canada at $0.000001 a share; (b) BHDH Family, LP, Hall's company, 3,600,000 common shares in VBF Canada at $0.000001 a share; (c) J2 Family, L.P., Ted Rea's company, 3,300,000 common shares in VBF Canada at $0.000001 a share; LAW Holdings LLC, Wulf's company, 3,600,000 common shares in VBF Canada at $0.000001 a share; and (d) RGI Dragon, LLC, James Rea's company, 3,600,000 common shares in VBF Canada at $0.000001 a share.

51.     At the time of the transfer, the Founders were valuing the shares in VBF Canada at approximately $0.90 a share and requiring others to pay that price for VBF Canada shares.  Issuing such shares benefited the Founders to the detriment of VBF.

**I.     Other Misappropriations of VBF Funds For Personal Use**

52.     The Founders engaged in a variety of other schemes through which they orchestrated VBF's expenditure of its funds or other assets for the Founders' personal benefit, not VBF's, and to VBF's detriment, including, but not limited to, the following:

     a.    travel and other expenses relating to a July 2014 trip by some or all of the Founders to Denver, Colorado in relation to a non-VBF business known as ChipMeds, Inc., and possibly other expenses relating to this entity;

12

b.      Wulf's personal cell phone bills well beyond a reasonable amount, or even the amount expensed to VBF by the other Founders;

c.      James Rea's personal living expenses in Ames, Iowa, about forty miles from Webster City, Iowa in or around August 2017;

d.      exorbitant travel expenses for the Founders to travel to or from Canada or Texas to Webster City, Iowa;

e.      the unnecessary leasing of twenty-two company vehicles, including Ford Explorers for the Founders' personal use;

f.      payment of personal travel expenses for the Founders and some or all of Founders' friends and family, including trips to Australia and Norway;

g.      directing VBF's controller to perform accounting services for the Founders' non-VBF business ventures while on VBF company time and while he was being paid by VBF;

h.      $310,000 for the purchase of a house in Webster City, Iowa, when the house was worth $240,000, if not less, and the home was not necessary for legitimate business reasons given the Founders' maintenance of their residence in Texas or Canada.  Indeed, VBF, through Hall and possibly other Founders, purchased this home on August 9, 2016 for $310,000 and VBF sold this home on May 25, 2018 for $232,000. True and correct copies of the relevant closing statements are attached as **Exhibit 2**; and,

i.      other improper expenditures of VBF funds for some or all of the Founders' personal expenses.

53.     Overall, perhaps one non-Founder VBF director said it best at a December 6, 2017 VBF board meeting when the Founders' misconduct was just starting to come to light: the Founders spent VBF's money "like drunken sailors."  Those same minutes reflect VBF's discovery that just three of the Founders, Wulf, Hall, and James Rea, had run up $496,000 in improper expenses reimbursed by VBF over a mere fifteen-month period.  The Founders took so much money out of VBF that VBF requires a full equitable accounting from the Founders to learn the true depth of the Founders' misappropriation and squandering of VBF's funds.

13

## VI. **The Founders' Intentional Misrepresentations of VBF's Technology and Finances**

54.     In Section V, VBF alleges the Founders' misappropriation of approximately $5,000,000 to $10,000,000.  However, as alleged, VBF lost a total of $90,000,000 under the Founders' reign and due to their misconduct.

55.     VBF was never profitable under the Founders' three-year reign.  The Founders, like many swindlers, procured funds through fraud and other misconduct and then wasted tens of millions of dollars by investing in and operating VBF, including to benefit themselves, despite knowing VBF to be a fatally-flawed venture.  The Founders did so, in part, by knowingly misrepresenting VBF's performance and operational metrics, finances, and the amount of technical experience behind VBF, while concealing material and contrary information from disinterested VBF directors.  The Founders worked in concert to accomplish the fraud and bad acts, backing each Founder's misrepresentations and misconduct, which further explains how the Founders squandered $90,000,000 in about three years.

56.     Overall, the Founders violated their fiduciary duty of due care by blatantly and intentionally mismanaging  and misusing VBF funds and assets without regard to VBF's best interests or actual performance, including, but not limited to, overbuilding VBF's facilities, presenting highly flawed and intentionally manipulated business plans based on false representations of actual performance, misrepresenting technology, misrepresenting and/or recklessly or intentionally mismanaging capital expenditures, misrepresenting and/or recklessly or intentionally mismanaging other financial and operational issues, purchasing unnecessary real and personal property, overpaying for real and personal property, and otherwise, in a period of three years, squandering for their own benefit and to the detriment of VBF what had been an investment of approximately $90,000,000 in debt and equity by others (non-Founders) in VBF.

14

A.     **Key Performance and Financial Metrics**

57.     VBF was an indoor aquaculture business that relied on indoor Tanks to cultivate and grow its fish. There are several fundamental metrics ("Metrics") important to an aquaculture business like VBF. Information that is material to disinterested directors and officers in an aquaculture business includes data as to how the business is performing in these Metrics, and how this actual performance impacts planning, projections, and/or forecasts.  VBF, through its predecessor, Iowa's First, had been operating for approximately two to three years by the time the Founders started to solicit investments in VBF.

58.     In no particular order, the first Metric is the "Feed/Fish Conversion Ratio" ("FCR"). The FCR is stated in an equation as to the amount of fish feed (food) an aquaculture business utilizes to grow every pound of fish. For example, a 1:1 FCR means that the business utilizes one pound of fish feed for every pound of fish grown by the business. The FCR Metric heavily impacts an aquaculture business' profitability, or lack thereof, as spending too much money on feed increases costs.

59.     Second, there is density ("Density"), which is the amount of fish (measured in pounds) per tank that an aquaculture company can safely grow with reasonable mortality rates.

60.     Third, there are mortality rates ("Mortality Rates" or "Mortality") that are stated as a percentage of the amount of fish that die in the cultivation process.

61.     In addition to the Metrics, a paramount issue in the aquaculture business is the ability to supply and circulate clean water in the cultivation tanks ("Water Quality").  Fecal matter from the fish and other debris (such as uneaten feed) degrade water quality, and the ability of an aquaculture business to filter such toxic materials and to supply oxygen rich water limited in nitrates is critical to the success of the business.

15

62.     As far as financial performance, one measure represented by the Founders was "EBITDA per pound," that is the amount of Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA") per pound of fish.

63.     Also, aquaculture is a highly specialized industry, and therefore the technical experience and expertise behind such a business is crucial.

**B.    Overview of Canaccord's Participation in the Founders' Fraud And Breaches of Fiduciary Duty**

64.     In many respects, the Founders "reverse engineered" their plans: they knew what EBITDA, rates of return, or other financial metrics would be appealing to potentially interested third parties, shareholders and disinterested board members, and backfilled false data in order to achieve their lofty but unrealistic EBITDA or rates of return.   The bio-plans were even incompatible and inconsistent with VBF business plans, prepared by the Founders, as certain data included on bio-plans was represented differently on business plans. VBF will collectively refer to bio-plans and business plans as the "Reports."

65.     The Founders had the substantial assistance of Canaccord, the investment banker hired to help the Founders find debt and/or equity investments in VBF Canada.  Canaccord never performed any services directly for VBF, instead performing them for VBF Canada, but the representations that Canaccord concocted and publicized with the Founders were relayed to VBF, and continued by former Canaccord employees and/or the Founders until the last of the Founders left VBF in early 2018.

66.     Canaccord's work (the "Canaccord Project") began in or around January 2015 and allegedly continued into in or around July 2016.  Canaccord assigned a large team to the Canaccord Project, including, but not limited to, senior managing director (a prominent title at Canaccord) Steve Lobb ("Lobb"), corporate bond manager Mark Pibl ("Pibl"), senior investment banker

16

Jennifer Pardi ("Pardi"), Robert Goodman ("Goodman"), and sales person Clive Ginsberg ("Ginsberg").

67.     At some time in 2015, Lobb and Goodman left the employ of Canaccord to work for VBF, hired by the Founders.  This further established the linkage between Canaccord and the Founders, and Lobb and Goodman continued to be intimately involved in making misrepresentations about VBF, in collaboration with the Founders, as alleged herein as VBF employees or 1099 contractors.

68.     Canaccord was first attempting to raise debt for the Canaccord Project, but later solicited equity investors as well.

69.     Canaccord's process, upon information and belief, was generally in two parts. First, Canaccord investment bankers such as Lobb, Pardi, and others reviewed the underlying business and approved it for sale by Canaccord's sales team such as Ginsberg. Second, Ginsberg and other Canaccord sales people sought out to solicit debt and equity investors for the Canaccord Project.

70.     At the same time of the Canaccord Project, Canaccord was also trying to solicit investors for another purported business of the Founders, known as VeroLube. VeroLube was a business completely unrelated to VBF, and ultimately, upon information and belief, equally as unsuccessful as VBF.  Therefore, Canaccord's ties to the Founders ran deep.

71.     Ginsberg and others at Canaccord met with Founder Wulf three times in or around May and June 2015 to collaborate on the Canaccord Project.  There were also many email communications between these Canaccord representatives and the Founders, especially Wulf and Hall, on many occasions in the time period of in or around January 2015 to summer of 2016. Ginsberg also had fairly regular telephone calls with Wulf and perhaps other Founders, as well as

APP0082

other Canaccord representatives, during in the May to July 2015 time frame.  VBF and Canaccord also had an electronic "data room" for the Canaccord Project, allowing for the further sharing of information.   Through these communications and information sharing, the Founders and Canaccord shared and revised data related to VBF's business and the Metrics, and in turn made representations regarding the same in Reports.

72.    Overall, Canaccord employees such as Lobb, Goodman, Ginsberg, and other Canaccord representatives contributed to Reports that resulted in the ultimate transmittal and continuation of false and misleading information as to VBF's operations and performance to disinterested VBF directors, and others.  The time period of the Canaccord Project, from in or around January 2015 to in or around summer 2016, was a critical period when the Founders and Canaccord solicited and obtained funding for VBF (and the Founders, Lobb, and/or Goodman continued to represent such data thereafter).

73.    Similarly, in a May 31, 2015 email from Wulf to Ginsberg and others at Canaccord, Wulf transmitted a valuation of VBF prepared by Hall that valued VBF at $32,500,000 at that time.  A true and correct copy of this email and valuation is attached as **Exhibit 3.**  This valuation was purportedly based in part on data of VBF's then-current operations and finances, and demonstrated that Canaccord was soliciting equity investment of $25,000,000 in VBF, in addition to an alleged debt commitment of $26,000,000.  This document also includes a $10,800,000 "promote fee" to the Founders for their alleged work done on VBF to date.  As is clear from Section V above, the Founders ultimately procured the approximate equivalent to this amount, if not more, through misappropriations from VBF.  This valuation was ultimately incorporated into Canaccord-Founder representations alleged herein.

APP0083

74.     One example of Canaccord-Founder representations is the "Third June 2015 Written Representations," which are further alleged in other sections relating to specific Metrics below.  A true and correct copy of the Third June 2015 Written Representations is attached as **Exhibit 4.** The first page contains the notation, "CG-NYC," as in "Canaccord Genuity-New York City," to demonstrate Canaccord's input into this document, and dispersing of the information set forth therein to the marketplace.   The Third June 2015 Written Representations were the culmination of the collaboration between Canaccord and the Founders that began in or around January 2015 and which purported to be based on actual and then-current VBF data.  Canaccord directly revised representations contained in these written representations.  Further, the Third June 2015 Written Representations were represented to be based on actual data from the operations of VBF and its predecessor, Iowa's First, dating back to 2012.

75.     Ginsberg was introduced to a preeminent aquaculture expert Anthony Michaels, PhD ("Dr. Michaels") in or around early June 2015.  Dr. Michaels is an aquaculture consultant and investor who performed diligence on VBF in regards to a possible investment for his firm or other firms.  Ginsberg came to know that Dr. Michaels had extraordinary expertise in the indoor and outdoor aquaculture industry, and at the time there was a dearth of experts as to the indoor aquaculture industry.

76.     In a June 5, 2015 email, Ginsberg introduced Dr. Michaels and his expertise to Wulf because Dr. Michaels was an aquaculture expert.

77.     On June 7, 2015, Canaccord and the Founders finalized the Third June 2015 Written Representations.

APP0084

78.     On June 12, 2015, Ginsberg, Wulf, and Dr. Michaels had a conference call to discuss VBF.  Ginsberg provided the Third June 2015 Written Representations to Dr. Michaels shortly before the call to prepare Dr. Michaels for the call.

79.     Dr. Michaels reviewed the Third June 2015 Written Representations.  Thereafter, by June 15, 2015, Dr. Michaels advised Ginsberg in an email, a true and correct copy of which is included in **Exhibit 5**, that:

> We find multiple significant errors in the numbers and weaknesses in the [Third June 2015 Written Representations] assumptions, all of which over-inflate the economics and understate the risks. As a result, we are not comfortable helping the company with its search for capital through any of (*sic*) of our existing relationships.

80.     Ginsberg described Dr. Michaels' findings as "very negative feedback."  Ginsberg, on behalf of Canaccord and the Founders, asked Dr. Michaels for more specificity, and Dr. Michaels obliged.

81.     As set forth in **Exhibit 5**, on June 15, 2015, Dr. Michaels provided more specifics such as:  (a)  that the Founders' reported data as to water flow, water oxygenation, and water cleanliness was "almost at the theoretical limits and it is almost impossible to be that close" (meaning that the Founders' representations as to these crucial metrics were fantasy); (b) that the Founders' other reported data as to those water issues "is 5 times better than the best that has ever been done commercially, but when compared to the water chemistry-it would kill the fish" (i.e. because there would be too many lethal elements in the water); and, (c) referring to the OFT, "[t]he technology is not as new as claimed and multiple companies have gone bankrupt on similar systems. The operators of these kind of systems have never met the claimed spec in commercial practice at scale over extended periods."

82.     Dr. Michaels' last statement turned out to be a prophecy for VBF, which filed for bankruptcy in 2018 based on the Founders' and Canaccord's fraudulent advancement of the OFT

APP0085

"system" criticized in Dr. Michaels' findings. The Founders and Canaccord concealed this prophecy of bankruptcy from potentially interested third parties, and ultimately from disinterested VBF directors.

83. Indeed, with Dr. Michaels' permission, on June 16, 2015, Ginsberg forwarded the response to Wulf who immediately forwarded it to the other Founders, with the message: "Les [Wulf], see below as discussed on the phone earlier." **Exhibit 5.** This indicates that Ginsberg and Wulf spoke on the phone about Dr. Michaels' negative findings on June 16, 2015. Dr. Michaels authorized Ginsberg to share his thoughts with the Founders for altruistic reasons, *i.e.* partly so the Founders would not make such misrepresentations to others.

84. Later that same day, June 16, 2015, Wulf forwarded Ginsberg's email and Dr. Michaels' report to the other four Founders with the message: "See below from the expert . . . Clive [Ginsberg] thinks he is jealous because he spent 7 years and did nothing in industry." **Exhibit 5.** Therefore, the Founders blatantly disregarded Dr. Michaels' specific and pointed criticism of the Founders' misrepresentations because the truth spoken by Dr. Michaels would have prevented any reasonable investor or lender from providing funds to VBF. Further, this truth, if known by disinterested VBF directors, would have caused such directors to seek to cease VBF's business and pursue the Founders, not release them.

85. At his May 2019 deposition, Ginsberg testified that he never told Wulf that Dr. Michaels was "jealous" of the Founders or VBF. Additionally, Ginsberg never told Wulf that Dr. Michaels never did anything in the industry, which would have been an outright lie. Indeed, Dr. Michaels is an aquaculture expert with decades of experience, who has a PhD in an aquaculture discipline, taught aquaculture-related classes at the University of Southern California for about twelve years, was an investor in aquaculture businesses for years, and was referred to by Wulf

21

himself as an aquaculture "expert."   Ginsberg confirmed that Dr. Michaels, to his knowledge, had more indoor aquaculture expertise than anyone who had reviewed VBF.

86.    Dr. Michaels also relayed other extremely negative information about VBF to Ginsberg through June 15, 2015 emails.  Ginsberg admitted at his May 2019 deposition that "100 percent" (certainly) VBF potentially interested third parties, which would include those who became disinterested board members, should have been advised of Dr. Michaels' findings by the Founders and Canaccord.  Ginsberg further testified at that deposition that "I would have definitely passed this [Dr. Michaels' findings] onto any of my investor base had they shown any inkling of interest I would have certainly passed it on, yes."

87.    However, such disclosure never occurred, including to VBF disinterested directors or other independent parties to VBF's knowledge, including, but not limited to, in the many written representations by the Founders and Canaccord as alleged herein.   Thus, the Founders and Canaccord ignored Dr. Michaels' warnings, as they previously did with Dr. Kevin Fitzsimmons' September 2014 warnings about fatal flaws and false data in VBF's representations (as alleged below).  This firmly demonstrates that Canaccord and the Founders were in harmony as to their wilful ignorance of multiple warnings from industry experts that VBF would fail (and even that it would go "bankrupt," as VBF did in 2018).

88.    Another example of Canaccord's and the Founder's joint manipulation and misrepresentation of VBF data can be seen in a July 7 to July 10, 2015 email chain amongst Wulf, Ginsberg, Lobb, Pibl, and another Canaccord representative, a true and correct copy of which is attached as **Exhibit 6**.  By this point in time Canaccord and the Founders were disappointed with the reception in the marketplace received by VBF, and had Dr. Michaels' and Dr. Fitzsimmons' stark and negative findings in hand.   To artificially drum up interest in VBF, Wulf advised

APP0087

Ginsberg to advise potentially interested parties of "the story we have over 50% book full," meaning that Wulf advised Ginsberg to represent to others that VBF had commitments to 50% of its targeted equity investment, then $25,000,000 (or $12,500,000 in represented commitments). This was false as VBF had no such commitments at that time.

89.     The collaboration between Canaccord and the Founders is further alleged below in the context of representations made as to specific Metrics or other specific sub-issues.

### C.     Founders' and Canaccord's Misrepresentations of The Metrics

90.     As to technology, the Founders promoted the "Opposing Flows Technology" ("OFT"), which allegedly was VBF's proprietary technology, its "secret sauce," through which the currents in its Tanks would supposedly perform better than VBF's competition in supplying clean and oxygenated water to fish growing in VBF's Tanks.

91.     In reality, as later learned by VBF, the Founders consistently lied about, and over-exaggerated a number of important technical and performance data, including, the OFT and the Metrics.

92.     In a typical aquaculture business, the Metrics are the building blocks of the "bio-plans." A bio-plan is an aquaculture business' way of organizing its business around the Metrics, based on actual data. A bio-plan that incorporates actual and traditional financial metrics, such as revenue, costs, and EBITDA, can be characterized as a "business plan."

93.     However, the Founders did not materially base their "bio-plans" on actual, proven, performance data, but rather, on the Founders' invented data that many times was misrepresented as data reflecting VBF's actual operations.

### D.     The Founders' Misrepresentations of FCR

94.     The Founders consistently represented a FCR of approximately 1:1 to VBF and third parties, including disinterested VBF directors. After terminating the Founders, disinterested

APP0088

VBF directors and officers learned that VBF's FCR was never even close to 1:1 (and certainly not on the consistent or material basis represented by the Founders). And, after terminating the Founders and after consulting with aquaculture experts, VBF learned that an FCR of 1:1 on large scale would be very hard, if not impossible, to achieve in an indoor or "closed" aquaculture system in the United States given its stricter environmental laws as compared to other countries where aquaculture competitors exist, such as China and Vietnam. Below are some, but not all of the Founders' various FCR misrepresentations.

95.     In an excel file that Hall created on June 25, 2014 (the "June 2014 Written Representations") and amended for the last time on May 31, 2016, Hall lists VBF's FCR as 1:1. A true and correct copy of the excel file is attached as **Exhibit 7**. The June 2014 Written Representations were provided to potential and actual investors, including but not limited to, Alder Aqua, Ltd. ("Alder"), which ultimately appointed directors to VBF. Additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees.

96.     Attached as **Exhibit 8** is a true and correct copy of a September 2014 PowerPoint, prepared and reviewed by the Founders ("September 2014 Written Representations"), which contains information that was ultimately circulated to disinterested VBF directors and potential and actual VBF lenders and investors. In the September 2014 Written Representations, the Founders represented that VBF would achieve a "1:1" FCR (at p. 20).

97.     On September 17, 2014, Kevin Fitzsimmons PhD, an aquaculture expert and an alleged member of VBF's "advisory board" (as further addressed below), reviewed the September 2014 Written Representations and advised Driver of serious flaws therein. A true and correct copy of Dr. Fitzsimmons' email to Driver ("September 2014 Fitzsimmons Email") is attached as **Exhibit 9**. As it relates to FCR, Dr. Fitzsimmons warned Driver that "[a]n FCR of 1 to 1 is also

APP0089

rare. Most farms are much closer to 2 to 1 when they start and edge down to 1 to 1.5 on typical operations." Driver in turn forwarded the September 2014 Fitzsimmons email to Wulf, James Rea, and Ted Rea, as set forth in **Exhibit 9**. In that forwarding email, Driver noted Dr. Fitzsimmons' negative comments about VBF's data, including FCR and EBITDA, to the other Founders.

98.     As they later did with Dr. Michaels, the Founders, however, ignored Dr. Fitzsimmons' input since the truth was an impediment to their ability to raise funds. Instead, the Founders continued to represent that VBF was achieving a 1:1 FCR when VBF was in fact not doing so. For example, in a November 2014 PowerPoint also prepared and reviewed by the Founders ("November 2014 Written Representations"), the Founders again represented an FCR of 1:1 or less. The information contained in the November 2014 Written Representations was, on information and belief, shared in some form ultimately with disinterested VBF directors and/or potentially interested third parties. A true and correct copy of November 2014 Written Representations is attached as **Exhibit 10** (at p. 13, 18).

99.     Similarly, in a PowerPoint entitled "Opposing Flows Aquaculture Tank System Performance Data-Barramundi at Blairsburg, Iowa Facility November 2014 to April 2015," also prepared and reviewed by the Founders ("April 2015 Written Representations"), the Founders again represented an FCR of 1:1 or less, claiming (at the last page) that the "AVERAGE FCR ACROSS FULL LIFECYCLE IS 1.038:1," based on "operation data and taking into account conservatism through calculations." A true and correct copy of the April 2015 Written Representations is attached as **Exhibit 11**. The April 2015 Written Representations were based on alleged data from the Nelsons. The information contained in the April 2015 Written Representations was, on information and belief,ultimately shared with disinterested VBF directors and/or potentially interested third parties.

APP0090

100.    The Founders also provided the April 2015 Written Representations to Fisheries Technology Associates, Inc. ("Fisheries"), a consultant doing diligence on VBF for a potential lender and/or shareholder in June 2015.  Fisheries prepared a "Due Diligence Report" based on same ("July 2015 Fisheries Report").  A true and correct copy of the July 2015 Fisheries Report is attached as **Exhibit 12.**

101.    Specifically, based on data that the Founders (and especially Driver), upon information and belief, provided Fisheries, Fisheries concluded that VBF's performance data "appears to confirm feed conversion ratio (at or near 1.0 pounds of feed per pound of fish) and growth rates (reaching 2.2 pounds in 6 months)."  The July 2015 Fisheries Report was provided to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF.  Additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees.

102.    Likewise, in a February 16, 2015 writing prepared by Driver, Driver represented that VBF's FCR was 1.03:1 ("February 2015 Written Representations").  The February 2015 Written Representations were also provided to Fisheries sometime in June 2015.  A true and correct copy of the February 2015 Written Representations is attached as **Exhibit 13.**

103.    Similarly, in a March 25, 2015 spreadsheet prepared by Goodman (of Canaccord and later VBF) and modified by Hall ("March 2015 Written Representations"), a 1:1 actual FCR was again represented.  A true and correct copy of the March 2015 Written Representations is attached as **Exhibit 14**.

104.    In June 2015, at least one of the Founders made a written representation that the average feed conversation ratio was "1:1 pound of feed per pound of weight gain" ("First June 2015 Written Representations").  A true and correct copy of the First June 2015 Written

26

Representations is attached as **Exhibit 15** (at p. 4).  The First June 2015 Written Representations were made to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF. Additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees.

105.    Also in a June 2015 email, Hall made written representations that excluded fish feed in the calculations of FCR.  Hall first sent his email to Driver, Wulf, Ted Rea, and James Rea for their approval and then, presumably after they approved, he sent the e-mail to a potential lender ("Second June 2015 Written Representations").  A true and correct copy of the Second June 2015 Written Representations and the draft of same to the Founders is attached as **Exhibit 16-1 and Exhibit 16-2.**  In the Second June 2015 Written Representations, Hall admitted that VBF does not always track FCR as it "as it takes a considerable amount of staff time during a period of relative 'steady-state' operation."   This disclosure, however, was not made by the Founders in other representations alleged herein and demonstrates the reckless way in which the Founders represented important Metrics to potentially interested third parties and disinterested directors.

106.    Similarly, in June 2015, the Founders provided data to Canaccord for materials intended for potential lenders and/or shareholders, including that VBF then enjoyed an "industry-leading [FCR] of 1:1" ("Third June 2015 Written Representations").  A true and correct copy of the Third June 2015 Written Representations is attached as **Exhibit 4.**

107.    In late January and early February 2015, the Founders and Canaccord prepared a written representation ("January/February 2015 Written Representations") colloquially called a "teaser," which was modified by Canaccord and approved by VBF counsel Jackson Walker LLP ("Jackson Walker").  This document made various misrepresentations of VBF's technology and market, including a representation that "Barramundi feed conversion in an OFT tank can reach

APP0092

1:1." A true and correct copy of the January/February 2015 Written Representations is attached as **Exhibit 17.** This document contains information that was, on information and belief, shared with VBF disinterested directors and potentially interested third parties.  A similar document was also circulated to individuals at National Bank of Canada, which worked with Canaccord and the Founders to disperse VBF information to the marketplace, and Sean Maniaci, a purported VBF shareholder and counsel (as discussed more in-depth below).  A true and correct copy of said email is attached as **Exhibit 18**.

108.     In an August 24, 2015 email from Wulf to Canaccord and National Bank of Canada ("August 2015 Written Representations"), Wulf  notes that they have modified the teaser and marketing deck to "reflect the De-Risked nature and advanced nature of the present operations," and that Canaccord and National Bank of Canada should use "this copy on the big equity push." A true and correct copy of the August 2015 Written Representations and the attachments thereto are attached as **Exhibit 19**. Wulf asserts that "[w]ith strong fish growth performance and industry low food conversion ratio of 1:1 in the OFA tank system, the impact of increases in fish meal cost effect of feed costs are for every $100 per metric ton increase impacts the price of feed to VBF by only $.015 per pound."

109.     Then, on October 22, 2015, Wulf sent Canaccord VBF's sales metrics and gross profits and again noted the 1:1 FCR ("October 2015 Written Representations"). A true and correct copy of the October 2015 Written Representations is attached as **Exhibit 20**.  This email also represents unrealistic growth rates and utility costs.  Finally, Wulf represents that there is no "scale up risk going from our present operations to 240 tanks in the Urban Farms expansion."

110.     In a November 5, 2015 presentation ("November 2015 Written Representations") the Founders represented that data from their internal software system supported an FCR of "1.03:1

APP0093

or lower."  A true and correct copy of the November 2015 Written Representations is attached

hereto as **Exhibit 21**.  The November 2015 Written Representations were made to potential and

actual investors, and such data was included in representations ultimately made to Alder, which

ultimately appointed directors to VBF, and additionally this information was, on information and

belief, passed onto other disinterested VBF directors and employees.

111.    Starting in August 2016 and continuing most months until November 2017, the

Founders made written representations to disinterested VBF directors regarding the FCR. The

Founders reported an FCR of 1.01 for the periods of July 2016 through February 2017 (**Exhibit**

**22-1 through 22-7** at p. 2).  In February 2017, the Founders reported that VBF's FCR was 1.03

for March 2017, and continued to represent an FCR of 1.03 through May 2017 and again in August

2017 (**Exhibit 22-8 through 22-10 & 22-13** at p. 2). In June and July of 2017, the Founders

reported an FCR of 1.02 (**Exhibit 22-11 through 22-12** at p. 2). Then, in September 2017, the

FCR spiked to 1.483 (**Exhibit 22-14** at p. 2).  In November 2017, it was 1.42 (**Exhibit 22-15** at

p.2).  (collectively, "2016 and 2017 Written Representations to the Board"). A true and correct

copy of the 2016 and 2017 Written Representations to the Board is attached as **Exhibit 22**.

112.    In July 2017 VBF hired McCowan, who, later in 2017, came to suspect that VBF's

real FCR was not 1:1. McCowan thereafter performed FCR testing and otherwise investigated

VBF's FCR.  After VBF terminated the Founders, McCowan discovered that VBF's real FCR at

relevant times was 1.4:1, if not higher, not the 1:1 ratio consistently represented by the Founders

and Canaccord.  Thus, the Founders, at various and numerous times, falsely represented VBF's

FCR to disinterested VBF directors and others. This was despite warnings from Drs. Fitzsimmons

and Dr. Michaels, and actual VBF operational results, showing that VBF was not achieving a 1:1

APP0094

FCR. The Founders also based VBF's financial modeling, provided to disinterested VBF directors and potentially interested third parties, on false data.

113.    The FCR misrepresentation is material because an increase in FCR attributes to a 40% increase in VBF's number one expense: fish feed.  Thus, any increase in FCR has a tremendously negative impact on VBF's return on investment or the decision of disinterested directors to continue VBF's operations.

114.    Ultimately, the actual FCR was far less efficient than what the Founders represented and the impact of this misrepresentation is that VBF was actually spending many times more to feed fish than the Founders and Canaccord represented, which affected reports of VBF's operations and financial situation and projections.

### E.    The Founders' Misrepresentations of Density

115.    The development stages of commercially grown fish can be summarized as: eggs to hatchling (larvae) to spawn to fry (when the fish is out of its egg and can feed on its own) to fingerling.  A fingerling has been described as the last phase of the juvenile stage of fish, before it becomes an adult.  Commercial growers of fish start with fingerlings, and therefore must either grow fingerlings or purchase them from another source.  Upon information and belief, VBF bought fingerlings from a third party ("Mainstream") but this is subject to VBF's accounting count.

116.    When VBF was starting its operations in early 2015, the Founders knew that 10,000 to 12,000 fingerlings per tank was optimal, *i.e.* after an aquaculture business was up and running for years under experienced operators, operating efficiently, and operating profitably.  Their knowledge is reflected in representations that the Founders made (shown below), though, in reality, VBF never achieved the Density in the way that the Founders represented to others.

30

117.    In the February 2015 Written Representations prepared by Driver, and provided by Canaccord to others in June 2015, Driver represented that VBF's Density is "reaching 10,000 lbs per tank." *See* **Exhibit 13**.

118.    In in the First June 2015 Written Representations, Driver and/or other Defendants represented that VBF Tanks were stocking "16,000 fingerlings (40-60 gram) per pod every two months" with a "1:1 pound of fish per gallon of water" Density. *See* **Exhibit 15** (at p. 4).  The First June 2015 Written Representations were made to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees. This was a false representation as VBF was not achieving such Density on a consistent basis, and never a profitable basis.

119.    In a June 20, 2015 e-mail, Wulf made a written representation to Goodman (of Canaccord) that VBF's base model used a Density of 10,000 fish per tank but "today we are stocking at 16,000 a 6,000 difference …in pounds produced out of each tank" (the "June 20, 2015 Representations"). A true and correct copy of this email is attached hereto as **Exhibit 23**.

120.    In response to the June 20, 2015 Written Representations, Goodman further explained that stocking at 16,000 results in an increase of the average harvest per tank of approximately 58% greater than the model which assumed 10,000 stocking per tank. *Id.*

121.    Earlier that day, Goodman, in an email to Lobb (then working for VBF), Wulf, and Hall stated "I think if we list the assumptions that are conservative and show the impact of each on performance we can address this. For instance, change the assumed stocking density of 5,000 to 8,000 per tank would improve EBITDA by certain multiples."  A true and correct copy of this email is attached as **Exhibit 24**.  This further demonstrates the "reverse engineering" fraudulent

APP0096

technique engaged in by Canaccord and VBF; that is to start with the numbers that these Defendants wanted to represent to the marketplace and others without regard to actual and contrary VBF data and reality, which was negative.   Ginsberg described Goodman's manipulation of Density set forth above as a way to "juice up the numbers" at his May 2019 deposition.   The Founders continued in this *modus operandi*, misrepresenting actual VBF data and "juicing up the numbers," to disinterested VBF directors throughout the Founders' tenure at VBF.

122.    In a June 22, 2015 email chain amongst Wulf, Lobb, Goodman, Ginsberg, and Pibl, Wulf expressed disappointment that a recent "equity roadshow" that Canaccord and Wulf led in New York in order to find an equity investor for VBF, yielded little interest in VBF.   A true and correct copy of this email chain is attached as **Exhibit 25.**   Rather than taking the right approach by acknowledging VBF's shortcomings and ceasing efforts to market VBF, the Founders and Canaccord then stepped up their manipulate and misrepresent data to increase interest in VBF. For example, in this email chain, Wulf suggested further misrepresentations of actual and then-current VBF operational and financial data, including Density, to entice others into VBF.

123.    Further, the July 2015 Fisheries Report cautioned that the VBF-provided stocking density data of one lb/g "is admirable, but should be approached with caution and care, and only after many months of company experience and management by experienced operators." **Exhibit 12** (at p. 5). This report also comments that densities of "0.2-0.7 pounds per gallon are more typical at other facilities with a similar production configuration*." Id*. Upon information and belief, the July 2015 Fisheries Report relied on data provided by the Founders, including false data relating to the Density of the VBF Tanks, which was shared with potential and actual investors, including, in some form or another, investors who actually became or appointed disinterested VBF directors.

32

124.     Despite these cautionary words, in an August 23, 2015 presentation, which is part of the August 2015 Written Representations and the October 1, 2015 marketing presentations, the Founders represented that VBF "has successfully been stocking a six tank pod with 16,000 fish or a 60% increase, representing $11M in additional EBITDA" ("October 2015 Written Marketing Presentation Representations").   The information was, on information and belief, shared with disinterested VBF directors and/or potentially interested third parties and is misleading because a "pod" is made up of six tanks.   The Founders were intentionally deceptive in describing the Density in a "six tank pod," to give the illusion that VBF had achieved a Density of 16,000 fish per Tank. A true and correct copy of the October 2015 Written Marketing Presentation Representations is attached as **Exhibit 26** (at p. 11).   *See also* **Exhibit 19** (Marketing Presentation at p. 11).

125.     The October 2015 Written Representations also notes a Density of 10,000 fish per 6 tank configuration, but that VBF is stocking 16,000 fish per six pack of Tanks. *See* **Exhibit 20**.

126.     In the November 2015 Written Representations the Founders represented that data from their internal software system supported a Density "originally with 10,000 fish per tank but VBF has validated stocking up to 16,000 fish per tank, a 60% increase. *See* **Exhibit 21**.   The November 2015 Written Representations were made to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief, likely shared with disinterested VBF directors and employees.

127.     Likewise, as reported by a member of the Nelson family who also worked for VBF, as of the fall of 2015, the Founders were promoting Reports calling for 15,000 fish per Tank, when this family member's data showed that VBF could only safely introduce 5,000 to 6,000 fish per Tank.   This individual reported his concerns to Driver and Ted Rea. However, the Reports

APP0098

continued to use the artificially inflated numbers. And, as reported by this individual, Wulf would often push VBF's Density representations to 15,000 to 20,000 fish per tank.

128.    The Founders continued to misrepresent the actual Density of the Tanks in a January 2016 "Executive Summary" and Marketing Deck ("January 2016 Written Representations"), which stated that VBF was "currently stocking 16,000 fish per tank."   The January 2016 Written Representations were made to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees. A true and correct copy of the January 2016 Written Representations is attached as **Group Exhibit 27** (Executive Summary at p. 2).

129.    The January 2016 Written Representations also represented both that "VBF has successfully been stocking a six tank pod with 16,000 fish or a 34% increase over the model stocking." **Exhibit 27** (PowerPoint at p. 15).

130.    Similarly, in January or February of 2016, Driver, while walking a group of potential investors through VBF's facilities, misrepresented to those investors that VBF could stock 16,000 fish per tank ("January 2016 Oral Representations").   One of Driver's own subordinates advised him in or around that time that VBF was not meeting these Density representations and that it would be impossible for VBF to viably do so.

131.    Then, in April 2016, the Founders, particularly Wulf and Hall, created or contributed to an Excel file which represents that Density would increase from 12,000 to 16,000 fish per Tank ("April 2016 Written Representations").   The April 2016 Written Representations were made to potential and actual investors, including but not limited to, Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief,

34

passed onto other disinterested VBF directors and employees.  In May, Wulf also sent the April 2016 Written Representations to non-Founder director Bjorn Thelander ("Thelander"), who was appointed by Alder.  A true and correct copy of the April 2016 Written Representations is attached as **Group Exhibit 28**.

132.    In the Founders' August 2016 board report, the Founders represented that one of VBF's facilities was stocking "16,000 *fish per tank*."  *See* **Exhibit 22-1** (p. 2) (emphasis added). In the September and October 2016 board reports, the Founders misrepresented or were intentionally deceptive regarding the Density, stating: "16,000 fish *per six pack tank configuration*." **Exhibits 22-2 & 22-3** (p. 2) (emphasis added). In the May 2017 board report, the Founders represented that VBF was "back to 12,000 first stocking and 14,000 forward stocking." **Exhibit 22-10** (p. 2)

133.    Thus, the Founders consistently and falsely claimed that VBF was achieving a Density of 16,000.  In reality, the actual Density was either far less or, even if 16,000 fish were stocked at any given time, there was a significant impact of that Density on fish health (increasing mortality) and the water quality, which the Founders also concealed.  In other words, while it is of course possible to stock 16,000 fish in a Tank no matter how poor the aquaculture business is operationally, more will die in the hands of such a business.

134.    The impact of the 16,000 Density representation from a financial perspective is significant, including but not limited to, its correlation with annual production (i.e., a larger represented Density would support a larger represented pounds per production).

135.    At various times, the Founders failed to include Density numbers in their Reports that they shared with third parties or the Founders changed the pounds of production without any corresponding change in Density.

35

136.    For example, in the June 20, 2015 Written Representations, Wulf represented to Canaccord that VBF's production per Tank increased from 20,000 pounds to 31,500 pounds because of a change in Density from 10,000 to 16,000 fish per Tank. Because of the increased pounds per tank, Wulf represented that EBITDA would increase from $17 million to $40 million in the second year of production.  **Exhibit 23.**  A Canaccord consultant and later a VBF employee, Goodman, restated Wulf's representations to explain that VBF was currently stocking 16,000 fish per tank.

137.    Upon information and belief, Wulf and other Founders (and Canaccord representatives) created the June 20, 2015 Written Representations because these Defendants knew that VBF's business model did not include sufficient working capital to take on millions of dollars in debt.

138.    Wulf shared the June 20, 2015 Written Representations with Canaccord, among others, stating that VBF is "stocking at 16,000 fish in the first tank, for an average harvest per tank of approximately 58% greater than assumed in the model."  A true and correct copy of this document is attached as **Exhibit 29**.

139.    The Founders' deliberate misrepresentations relating to VBF's pounds of production is perhaps best evidenced by two drastically different models both dated June 30, 2015, which were both represented to be based on actual data.  In one model, the Founders represented that VBF produced 20,000 pounds of fish per year per Tank.  In the other model, the Founders deliberately changed VBF's pounds of production per year to 34,650 per Tank (together, the "June 30, 2015 Models"). True and correct copies of the June 30, 2015 Models are attached as **Group Exhibit 30**. This information was, on information and belief, sent to disinterested VBF directors and employees.

36

APP0101

140.    The financial impact of the changes in the pounds of production per Tank per year was a 115% in the return on investment in year 2 of VBF's production and a 255% return on investment in year 3 of VBF's production. **Group Exhibit 30.**

**F.    The Founders' Misrepresentations of Mortality Rates**

141.    The Mortality Rate Metric is closely aligned with the Density Metric and other Metrics.  For example, if an aquaculture business is stocking too many fish per tank, many fish die.  In that circumstance, the Density number may look positive, but the Mortality Rate, if accurately represented, will be commensurately negative.  The Founders often concealed or skewed the inter-relationship amongst the various Metrics to give the false appearance of efficiency and profitability, sometimes telling half-truths and other times outright falsities.

142.    VBF's former operations manager, a member of the Nelson family, advised that when individuals, including potentially interested parties, toured VBF's facilities from the summer of 2015 through the summer of 2016, they would view written, recorded data on individual Tanks regarding Density and Mortality data for that particular Tank.  Wulf initially asked this operations manager and others to alter the Mortality Rates depicted on this documentation to make them lower than they actually were to falsely represent Mortality.  When some of Wulf's subordinates refused, the Founders instead directed VBF employees to remove this documentation from the Tanks.

143.    During that same period, Driver advised VBF fish technicians and other personnel to "be vague" when speaking to others about Mortality Rates and other actual VBF performance Metrics.  Later, the Founders limited VBF employees' contact with potentially interested third parties to the Founders and one other person, to avoid VBF employees revealing the truth.

144.    This operations manager also has reviewed data provided by the Founders, including Driver, which represented, in writing, Mortality Rates "lower than [the operations

APP0102

manager] has ever seen in our system" according to the operations manager.  This was an untrue statement.

145.     In the April 2016 Written Representations where Wulf provided data to potential and actual investors and disinterested VBF directors including Thelander, Alder, and others, VBF's Mortality Rate was represented as 3%.  This Mortality Rate was deceptively low because it reported the loss of fish per month rather than the cumulative loss of fish over several months. **Exhibit 28.**

146.     In their 2016 and 2017 Written Representations to the Board, the Founders reported "average death loss bio mass" for the prior month between 4% and 10.28% (in August 2016, 4%; in September 2016, 7.48%; in October 2016, 8.44%; in December 2016, 5.2%; in January 2017, 2.78%; in February 2017, 2.54%; in March 2017, 3.55%; in June 2017, 10.28%; and in August 2017 between 2.108% and 3.565%).  **Exhibit 22** (p. 2).  In reality, the Mortality Rates were much higher, as alleged below.

147.     In spring 2017, the aforementioned VBF operations manager met with Ted Rea to discuss the manager's concerns about VBF's Mortality Rates at one of its facilities, which "were through the roof."

148.     In the summer of 2017, there were one or more significant "fish loss [death] events" at VBF, especially at the St. Louis facility (collectively, "Fish Loss Events").  The Founders covered up the cause, extent, and frequency of these Fish Loss Events to disinterested VBF directors.  For example, in response to a board member's direct question in September 2017, Ted Rea misrepresented that Fish Loss Events had been solved.   In fact, the fish mortality problem was not solved and persisted at the time Ted Rea made this misrepresentation.

APP0103

149.     After the Founders were terminated, and through its own internal investigation, VBF learned the actual Mortality Rates were as follows: in 2015 only four of 17 batches were 16,000 or more fish and the Mortality Rate on the four batches was 19.25%; in 2016, only 8 of 21 batches were 16,000 or more fish and the average Mortality Rate was 38.03% for the 8 batches; in 2017, the standing bio-mass was 164,675 pounds and the average Mortality was 17.2%.  These numbers are contrary the grossly more optimistic data reported in the 2016 and 2017 Written Representations to the Board.

150.     Overall, VBF's preliminary investigation shows that in 2015 up through July 2016, VBF lost approximately 36% of its fish to Mortality in all Tanks.

**G.     The Founders' Misrepresentations of Water Quality**

151.     The Founders also represented in the September 2014 Written Representations (**Exhibit 8**, p. 28) that VBF's Tanks, thanks to VBF's OFT, which supposedly innovated how to regulate currents in the cultivation Tanks, "have a continual flow of clean purified water, eliminating any algae, harmful bacteria, ammonia and nitrates."  The Founders further represented therein that VBF's technology left "very little food or fish waste in the water, which gives the fish a higher fillet yield and a cleaner taste as compared to fish grown in the wild."

152.     In response, Dr. Fitzsimmons warned in the September 2014 Fitzsimmons Email that "OFT has not developed a good 'scientific' record of removing nitrates, harmful bacteria or off flavors.  At this point, we are having to accept the claims of the developer and a few farmers.  It may be true, but I am not aware of any technical, peer reviewed science to support the claims." **Exhibit 9.**

153.     Similarly, in the Third June Representations that the Founders provided to Canaccord and that Canaccord shared with Dr. Michaels and likely others, the Founders represented that VBF's technology would require very little energy – only 1.3 KW or $0.11 per

39

pound of production – to recirculate the water, add oxygen back in the water, and clean up the fish waste. The Founders stated that there was "no need or expense to 'create' oxygen' and infuse into the water" with forced air technology. **Exhibit 4** (p. 25). In reality, under the Founders' control, VBF's tanks experienced a build-up of ammonia – which is fatal to fish – because the technology was unable to recirculate sufficient oxygenated water. A true and correct copy of the email chain including Dr. Michaels' response to the Third June 2015 Representations is attached as **Exhibit 5**.

154.    Again, in the October 2015 Written Marketing Representations the Founders continued to represent that the fish raised in VBF's Tanks had a "continual flow of clean, purified water, eliminating any algae, harmful bacteria, ammonia, and nitrates." This information was, on information and belief, presented to disinterested directors and potentially interested third parties. **Exhibit 26** (p. 31).

## H.    The Founders' Misrepresentations of EBITDA and Other Financial Metrics

155.    Much of the fraud outlined above is also encapsulated in financial information represented by the Founders to disinterested VBF directors, lenders, potential and actual investors, and others. Time after time, the Founders ignored expert advice and warnings about the Founders' dispersing of false data.

156.    For example, the Founders represented in the September 2014 Written Representations that VBF, or its predecessor Iowa's First, was achieving a profit of about 46.59%. **Exhibit** 8 (p. 32—dividing the operating costs by revenue). In response, Dr. Fitzsimmons warned in the September 2014 Fitzsimmons Email that "[s]orry, but I do not buy the EBITDA figure. Never heard of any fish crop with that kind of return…." **Exhibit 9**. The Founders only somewhat adjusted the EBITDA figures in future representations, but such representations were still not grounded in reality.

40

157.    The Founders not only misrepresented financial data regarding VBF's actual performance to such potential and actual investors, lenders, and disinterested directors; they also continued to generate forecasts and projections based on financial assumptions contrary to VBF's actual results and that were wildly unrealistic.   They nonetheless continued to knowingly make such misrepresentations to disinterested VBF directors, potentially interested third parties, and others.

158.    In the October 2015 Written Marketing Presentation Representations (**Exhibit 26**) the Founders misrepresented that: (a)  VBF was operating with 45% gross margins (p. 5); (b) that VBF would achieve $1.59 EBITDA/pound and 20,000 pounds per tank/year for $7.632 million in EBITDA if VBF had 240 tanks, which it did (p. 13); and (c) that VBF has lowered its operating costs in part by using blowers and not pumps (p. 30).   This presentation not only misrepresented actual VBF financial data, but included forecasts based on this flawed data.   Further, in the October 2015 Written Marketing Presentation Representations, the Founders represented that "two world renown [sic] debt funds" had validated "all of the present operating metrics for full scale commercialization."  This gave potentially interested third parties and lenders the false appearance of third party validation of VBF.

159.    In the January 2016 Written Representations, the Founders represented to potentially interested third parties and disinterested VBF directors that VBF would achieve an estimated rate of return of 36% and 72% for investors by the end of year 2 and year 3, respectively. **Exhibit 27** (p. 1).  The Founders also forecasted for VBF "EBITDA growing to $18 million in year 2 and $37 million in year 3."   Obviously, VBF never even came close to these numbers, and the Founders knew that VBF could not achieve these numbers at the time the Founders made these representations.

APP0106

160.    In a January 15, 2017 email ("January 2017 Written Representations") the Founders represented to disinterested VBF directors the following forecast for that same year, 2017:

- 2017 Revenue: $15,141,620
- 2017 Cost of Sales: $5,912,373
- 2017 Total Expenses: $15,142,812
- 2017 Net Income (Loss): $2,989, 287
- 2017 EBITDA: $4,449,599

- 2018 Revenue: $56,869,366
- 2018 Cost of Sales: $19,235,719
- 2018 Total Expenses: $27,164,337
- 2018 Net Income (Loss): $30, 881,962
- 2018 EBITDA: $32,675,553

A true and correct copy of the January 2017 Written Representations is attached as **Exhibit 31**. These representations were based on false data and the Founders knew that these numbers could not be achieved when they represented them.   Indeed, VBF never came anywhere close to achieving these numbers, despite the fact that the Founders made the above forecasts in the very year that encompassed the first year of the forecasts.

161.    From 2015 through dates in 2017, a VBF employee warned the Founders that VBF's actual results were not properly considered and represented in projections or forecasts that the Founders provided to disinterested VBF directors, lenders, potentially interested third parties, and others.

162.    Similarly, one disinterested VBF director advised that a fundamental assumption of financial data provided by the Founders was that VBF's technology was effective and could support a profitable business, when the truth is that VBF's technology was fatally flawed as set forth above. The Founders, despite knowing that its OFT technology was fatally flawed, continued to solicit potentially interested third parties and lenders for VBF, and continued to make representations to other disinterested VBF directors, that falsely assumed and portrayed VBF's

42

technology to be effective and profitable. These dynamics manifested themselves in the financial information misrepresented by the Founders to disinterested VBF directors.

## I.    The Founders' Misrepresentations of Theirs and VBF's Technical Abilities

163.   The Founders generally misrepresented their ability to operate a sustainable fish farm business.  They also intentionally and/or with gross recklessness misused VBF funds in furtherance of what the Founders knew to be a dead-end business early on in their reign over VBF, as evidenced by the fact that the Founders never invested their own money in VBF.

164.   In the November 2014 Written Representations (**Exhibit 10**), prepared by the Founders, the Founders represented as follows:

- "Proven onshore, indoor fish farming platform" (p. 5).  There was nothing proven about VBF or its predecessor. VBF never made any profit.  It was a losing proposition from the start, and the Founders knew it would be so, which is likely why they did not invest any of their own money in VBF.

- "Operations management teamed with aquaculture industry experts" (p. 5). In reality, the Founders had little to no relevant aquaculture experience, and they shunned advice from experts when such advice was provided to the Founders. Similarly, the Founders represented in investor and lender solicitations circulated in 2015 and 2016 that they had an aquaculture-experienced "advisory board" behind VBF (p. 5). In fact, this advisory board appears to have had little to no involvement in VBF, and what little input was provided by the board was ignored by the Founders (as exemplified by the Founders' ignorance of Dr. Fitzsimmons' warnings).

- "low cost of operations, industry-leading food conversion and superior fish growth rates" (p. 5).  This was false.

- "barramundi . . . commands a premium" (p. 6). This was false, as barramundi is commoditized like many other types of fish, and barramundi never had the market demand represented by the Founders and falsely assumed in their forecasts provided to disinterested VBF directors and others.

- "Capacity to produce in excess of 4.3 million pounds [of fish] per year" (p. 6). This was false, as VBF's actual production was about 73,000 for 2015, and about 223,000 pounds in 2016, and about 1,100,000 pounds in 2017.  Later, the Founders upped the ante on this misrepresentation and represented from 6.7 million to 7.2 million pounds per year.  The Founders knew that VBF was not achieving such amounts

43

when they made these representations, and also knew that VBF could never realistically achieve such numbers.

- "The landed cost of Barramundi fry in Iowa is US$0.28 per Fry" (p. 19). This was false, as the actual cost of fry (when a fish is out of its egg and able to feed itself) was about $0.40 per fry.

- "each [VBF] tank can produce 20,000 lbs of fish per year" (p. 23). This was false, as the actually capacity was significantly less.

165.    In the April 2015 Written Representations (**Exhibit 11**), the Founders represented as follows as to the actual performance of VBF's tanks:

- That the "Average FCR across full lifecycle is 1.04:1." This was false.

- A zero percent mortality rate is represented. This was false.

- The daily feeds listed in many of the stages of fish growth is false, failing to represent that as fish grow, they need more food.

166.    In a May 12, 2015 Marketing Plan ("May 2015 Written Representations"), the Founders made the following misrepresentations:

- VBF has "[d]eep financial and management resources (they can fund and lead)" (p. 4).

- VBF has "[p]roprietary technology which delivers cost and product benefits to land based fish" (p. 4).

- VBF has an "[e]xperienced sales group with strong industry connections" (p. 4). This is false as VBF never had such a sales team during the Founders' reign over VBF.

A true and correct copy of this the May 2015 Written Misrepresentations is attached as **Exhibit 32**.

167.    The Founders provided the May 2015 Written Representations to potentially interested third parties, including, but not limited to, Alder, which ultimately appointed directors to VBF, and additionally this information was, on information and belief, passed onto other disinterested VBF directors and employees. They also provided the May 2015 Written Representations to Fisheries to prepare the July 2015 Fisheries Report.

44

168.     The Marketing Presentation that the Founders provided to Canaccord in the Third
June 2015 Written Representations (**Exhibit 4**), and then later to Dr. Michaels and, upon
information and belief, others, contained the following misrepresentations:

- "Barramundi. . . has a demonstrated demand profile in North America" (p. 4).

- "Deployment of exclusive technology allowing VBF to have the lowest cost of operations, industry-leading food conversion of 1:1, superior fish growth rates of market ready fish in 6 months, and strong economics" (p. 4).

- "VBF has the lowest feed conversion ratios, water consumption and operating costs" (p. 4).

- VBF has the "exclusive global rights to an industry-changing and patented fish culturing tank system," the OFA (p. 4).

169.     The October 2015 Written Marketing Representations (**Exhibit 26**), prepared by
the Founders and, upon information and belief, with input from Canaccord, contained the
following misrepresentations:

- "There is a 500M pound white fish shortage in North America" (p. 4).  This was false.

- That VBF had achieved "superior fish growth rates of market ready fish in 6 months" (p. 4).  This was false, and VBF never did so at any measurable or sustainable level.

- "In protein production VBF has the lowest . . . operating costs" (p. 4).

- VBF had "proven and seasoned management team" (p. 5).

- "840,000 pounds of production and a 57% increase" (p. 6). In reality, production as of October 1, 2015 was 183,000 pounds.

- "Market risks have been mitigated. VBF has identified definite market demand for the first 15M pounds of Barramundi" (p. 6). Indeed, the largest barramundi seller as far as VBF knows sells only 6,000 pounds per week.

- Represents a joint venture with MainStream that never happened (p. 6).

- "expansion of Iowa's First proven platform to 240 tanks and 4.8M pounds of fish" (p. 8). VBF never produced 4.8 million pounds of fish and has never had the technology to do so.

45

- That VBF then had "fully vertically integrated operations," which never occurred (p. 8).

- That "VBF has successfully obtained approximately $5.4M in new equity" (p. 8). This is false as VBF did not procure any new investors of that magnitude at that time, instead taking on debt in the form of bridge loans.

- "Debt commitment of $26M" from Generation Investment Management and M&G Investments (p. 8). This is false as there were no firm and unqualified commitments from these parties, to VBF's knowledge.

- "in a six tank modular pod, VBF has modeled stocking with 10,000 fish. However, VBF has successfully been stocking a six tank pod with 16,000 fish" (p. 11).

- "planned JV hatchery with mainstream reducing our input costs of Fry to $0.10 each" (p. 11). This joint venture never occurred.

- "Tank sales – none modeled and sales outside network worldwide could represent $3M annually in additional EBITDA" (p. 11). This is false as tank sales never occurred.

- On page 27 there is a representation of a Water Recirculating System chart, which never was achieved, as demonstrated by VBF's water cleanliness issues.

- "the operation has been successfully producing fish for three (3) years and has validated all the operating parameters and performance data for VBF commercialization of the operation" (p. 28).

170. The January 2016 Written Representations (**Group Exhibit 27**) contain the following misrepresentations:

- Investment is to fund expansion of Urban Farm, which has been "successfully growing Barramundi…since 2012" (Executive Summary p. 1).

- "VBF Insiders have invested $8 million in new capital into the Company in over last year" (Executive Summary p. 1).

- "VBF secured a debt commitment for $26 million from (1) Generation…and (2) M & G Investments (owned by Prudential). Generation/M&G "agreed to provide lead equity order of $5 million" (Executive Summary p. 1).

- "VBF has an established client base of current customers and robust demand (annualized expected product of approximate 3 million pounds at the end of the first year vs. over 500 million pounds of high quality fish consumed per year in US)" (Executive Summary p. 1).

46

**J.    Other Waste of VBF Assets By The Founders**

171.    Another example of the Founders' blatant disregard of their fiduciary duties when it came to handling VBF's money, at the direction of some or all of the Founders, was causing VBF to purchase a building and underlying property unnecessary to VBF's business and located in Webster City for $400,000 on July 28, 2016, which VBF sold for $135,000 on April 13, 2018. True and correct copies of the relevant closing statements are attached as **Exhibit 33**.

172.    Further, the Founders purchased a waste water treatment plant with over $2 million of VBF's money that did not comply with VBF's waste water disposal obligations to Webster City, Iowa.

173.    As further evidence of their deliberate waste of VBF money, Ted Rea and James Rea spent VBF's money on furniture from Schooner Realty, which was owned by Ted and James Rea's parents, which they then paid their parents to transport to the Webster City home.  True and correct copies of the relevant expense reports are attached hereto as **Exhibit 34**. After paying their parents to transport furniture from Texas to Iowa, the Founders also used VBF funds to make repairs to the trailer that their parents used.

174.    In or around July and August 2016, some or all of the Founders orchestrated VBF's purchase of six (6) tractor-trailers at a total cost to VBF of approximately $375,237.77. But, VBF sold live fish to its customers at all relevant times, from its Webster City, Iowa facility.  VBF did not need to deliver fish to its customers as it was the customer's obligation to arrange for the pick-up and transport of the live fish from the facility.  Therefore, VBF generally does not need any tractor-trailers. These tractor-trailers sat dormant at VBF's Webster City, Iowa facilities. Ultimately, after VBF terminated the Founders, VBF was eventually able to sell the tractor-trailers.

175.    The Founders also purchased 22 vehicles for purported "Company use" which cost VBF in excess of $11,000 per month when those vehicles were not necessary for VBF's operations.

47

## VII.  THE FOUNDERS' MISCONDUCT CONTINUES INTO THE YEAR 2019

**A.**  **The Founders Surreptitiously Meddle in VBF's Bankruptcy Proceedings in an Attempt To Subterfuge This Lawsuit**

176.    As alleged, on September 21, 2018, VBF and affiliated entities ("Bankruptcy Debtors") filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court for the Northern District of Iowa, *In re: VeroBlue Farms USA, Inc., et al.,* Case No. 18-01297 ("Bankruptcy Proceedings").

177.    Shortly thereafter, the Founders, aided and abetted by Maniaci, sought to surreptitiously interfere in the Bankruptcy Proceedings.  The Founders sought a dismissal of this case, against them, through the Bankruptcy Proceedings, for zero consideration to VBF.  This demonstrates the desperate means the Founders will undertake to obfuscate their misconduct, seeking the dismissal of a claim for approximately $81,000,000 in compensatory damages, for nothing. They did so in a number of ways.

178.    The first way was through the unsecured creditors committee ("Creditors Committee").  On December 18, 2018, counsel for the Creditors Committee submitted a "Notice of Challenge" to VBF and the other Bankruptcy Debtors in the Bankruptcy Proceedings ("Challenge Notice").  Through the Challenge Notice, the Creditors Committee purported to challenge certain bankruptcy actions and sought a dismissal of this lawsuit, for zero consideration to VBF, based on a series of allegations, many of them false. Two days later, the Challenge Notice was also adopted by the "Ad Hoc Committee of Equityholders" ("AHC"), which was a non-sanctioned group of shareholders mostly concocted by the Founders.

179.    The Challenge Notice has since been withdrawn by the Creditors Committee, who never acted on it, and for good reason.  VBF confirmed that the Challenge Notice was prepared

48

based on falsities and half-truths that the Founders provided to Creditors Committee counsel about this case.

180.    Indeed, it seemed strange to VBF that the Creditors Committee and AHC would seek the dismissal of this case in its Challenge Notice with no recovery to VBF.  Thus, on January 9, 2019, VBF counsel met with Creditors Committee counsel to discuss the Challenge Notice, at which time counsel acknowledged that the Founders were the impetus of the Challenge Notice and that the Founders were the source of background information for that document.

181.    In addition to trying to improperly seek dismissal of this lawsuit, the Challenge Notice shamefully repeated the Founders' false accusations of sexual harassment against a representative of Alder.  This is one of the Founders' repeated tactics, where they have attempted to deflect attention from their misconduct, but such claims have been debunked, including by the Nelson's, through their March 2018 letter, a true and correct copy of which is attached as **Exhibit 35** (which refers to the Founders as "the Dallas Group").  The Founders, other than Driver, have tried to use those false accusations in these proceedings as well.

182.    In another attempt, the Founders retained the Chicago law firm of Horwood Marcus & Berk Chartered ("HMB") to represent them in the Bankruptcy Proceedings.  In a bankruptcy filing, HMB represented that "HMB has previously provided limited services to Ted Rea, James Rea, Bruce Hall, and Leslie Wulf (the "Founding Shareholders") for several weeks in conjunction with these Chapter 11 proceedings…."  The Founders have also at times represented to courts that the Founders are members of the AHC, which attempted to meddle in the Bankruptcy Proceedings even when the Creditors Committee refused to do so, based on the same meritless claims that were ultimately rejected by the Creditors Committee, as set forth above.  The Founders or HMB,

49

however, have also denied that the Founders were ever members of the AHC in other representations to the bankruptcy court and this Court.

183.    For example, in the Founders' February 24, 2019 Motion to Quash in this case, (Iowa Dkt. 37-1 at 10), the Founders represented as follows:

> HMB was Defendants' [Founders'] individual counsel in the Bankruptcy Case from November 8 through December 18, 2018 . . . since December 18, 2018, Defendants have been members of the Equityholders' Committee [AHC] that HMB and the Beecher Firm now represent, therefore, all [of the Founders' or their counsel's] communications related to the Equityholders' Committee's investigation of VBF and its challenges to VBF's reorganization plan are also privileged.

184.    The Founders made other representations in that Motion, to the Iowa Court (and now this Court), that they "are members of the Equityholders' Committee (AHC)" (*Id*. at 11); that "HMB was Defendants' individual counsel and now represents Defendants as members of the Equityholders' Committee in the Bankruptcy Case" (*Id.* at 9); and that "HMB [is] Counsel to the Ad Hoc Committee of Equityholders, including Defendants" (*Id* at 4). Thus, the Founders flatly admitted that they were part of the AHC, led by the Founders' own counsel, HMB. The AHC, therefore, was nothing more than the Founders' vehicle to attempt to secretly manipulate the Bankruptcy Proceedings to their benefit. Again, this demonstrates the Founders' surreptitious meddling in the Bankruptcy Proceedings to gain a dismissal of this case.

185.    In a February 27, 2019 filing submitted in the Bankruptcy Proceedings, however, an HMB attorney verified under oath as follows:  "None of the Founding Shareholders [the Founders] are members of the Equity Committee …."  Bankruptcy Proceedings, Dkt. 42-1 at p. 151, ¶ 5, verified statement of Aaron L. Hammer, specifically stated under penalties of perjury; *See also Id.* at p. 150, ¶ 1, which certifies under oath that "Exhibit A" thereto lists all AHC members, and Exhibit A thereto, at pp. 154-158, does not list the Founders as AHC members.

50

186.     Later, in a March 18, 2019 filing in this case, the Founders contradicted their previous representations to the Iowa Court (and now this Court) that they were AHC members: "Defendants are not currently represented by HMB as counsel to the Equityholders' Committee in VBF's Bankruptcy Case. Defendants are not and have not been members of the Equityholders' Committee." Iowa Dkt. 46 at 2.

187.     Thus, the Founders and their counsel have made contradictory representations to this Court and the bankruptcy court, and the latter court has taken notice of these contradictory representations.  Ultimately, on March 22, 2019, the bankruptcy court barred the AHC from acting in the Bankruptcy Proceedings after VBF and its co-Bankruptcy Debtors raised these and other issues with the court.  Bankruptcy Proceedings, Dkt.  398.

188.     The Founders' misuse of the AHC to obfuscate their misconduct did not stop there, as they also incorporated VBF's counsel, Maniaci, in such misconduct, to act against the interests of VBF, his own client, as explained in the next section.

**B.     Maniaci Aids and Abets The Founders in Their 2019 Misconduct**

**1.     Maniaci As Founders' Counsel Separate From VBF**

189.     Four of the five Founders have Canadian roots and, as VBF is recently learning, have had a longstanding relationship with Maniaci and CBB, a Canadian firm, outside of VBF's business.  VBF recently discovered emails to that effect in 2019. One of these endeavors was Maniaci's representation of the ChipMeds, Inc. entity alleged above.  Maniaci has continued to further the Founders' interests to VBF's detriment, even in to the year 2019.  Maniaci has worn many conflicting hats in relation to VBF, including as Founders' counsel, VBF's counsel, and fierce advocate against VBF.

51

### 2.     Maniaci As VBF's Counsel

Maniaci was CBB's "relationship partner" for VBF, overseeing CBB's legal representation of VBF. Maniaci is currently identified by CBB as a partner in its securities law group, purporting to specialize in industries such as aquaculture. Maniaci and CBB represented VBF, VBF Canada, and possibly other VBF-related entities on a large variety of matters from 2014 through November 2017, including general corporate, securities issues, issues relating to the OFT, import/export work, corporate structuring, and other issues.   Thus, Maniaci's representation of VBF was not casual or isolated. Rather, Maniaci represented VBF on many aspects of its operations (such as preparation of written representations).   Neither VBF nor Maniaci (or CBB) have entered into any disengagement of representation agreement or notification.

### 3.     Maniaci as A Preferred Shareholder of VBF Canada

190.     Maniaci, along with his brother Anthony and the Founders, appears to be one of the first shareholders of VBF or VBF Canada (and a preferred shareholder at that). The Maniaci's received their stock either at a 50% discount from what other shareholders were paying at the time, or, like the Founders, basically for free.

191.     For example, Maniaci's entity, Sailstreet Capital Inc., received 750,000 shares in VBF Canada for a grand total of $0.075 (seventy-five cents) for all 750,000 shares in May 2014. Maniaci, through Sailstreet, paid $0.000001 per share of stock at a time when others were paying about 900,000 times that amount, or $0.90 per share.

### 4.     Maniaci as An Advocate Against His Client, VBF

192.     Maniaci manipulated his conflicted position as both shareholder of VBF, and VBF's counsel, to attempt to blatantly harm VBF and interfere with VBF's Bankruptcy Proceedings, and to aid and abet the Founders' in their surreptitious meddling in the Bankruptcy Proceedings.  On January 9, 2019, Maniaci wrote a letter ("January 9 Maniaci Letter") on behalf

52

of the AHC to his "Fellow VBF Shareholder[s]" in regards to VBF's Bankruptcy Proceedings, ostensibly to garner opposition to the Bankruptcy Debtors' Plan.   A true and correct copy of this document is attached as **Exhibit 36**.   The letter, upon information and belief, was sent to most or all VBF shareholders, is striking by what it misrepresents, and what it conceals on behalf of the Founders.

193.    Maniaci starts the letter with the statement that "I write to you as a minority shareholder of VeroBlue Farms," not specifying in which entity he is a shareholder, how he acquired his stock, or how much he paid for his stock (nothing for most of it, through Sailstreet).

194.    Further, although the letter is written on CBB letterhead by CBB partner Maniaci, perhaps to give the letter an air of respectability as written from a law firm, Maniaci nowhere discloses in his letter that CBB or he served as counsel to VBF on an extensive array of matters from inception of the VBF's business for years thereafter. In fact, Maniaci does not specify that he is a lawyer.   As to that point, in a March 20, 2019 letter CBB admitted: "We do acknowledge that such letter was written without the authorization of management of this firm, and, therefore, Mr. Maniaci's letter written in his personal capacity should not have been put on to our firm's letterhead."

195.    Maniaci also conceals from the recipients of his letter that CBB and he have represented the Founders on matters unrelated to VBF, and apparently have a close relationship to the Founders.

196.    Also in the January 9, 2019 Maniaci Letter, Maniaci improperly solicits clients for counsel to the AHC, admitting that he is essentially trying to "crowdfund litigation" against VBF through his letter. Obviously, Maniaci was working in concert with the Founders and AHC counsel.

APP0118

197.     Maniaci also misleadingly represents in his letter that the Creditors' Committee determined that this lawsuit is "retaliatory and without merit," without noting that counsel for the Creditors' Committee acknowledged that the Founders were the source of his conclusion and that he performed no independent investigation.  This, combined with Maniaci's obvious lobbying against his clients' (VBF's) Plan of Reorganization ("Plan"), blatantly demonstrates Maniaci's intent to undermine VBF's interests.

198.     Further, Maniaci and CBB failed and refused to turn over client files to VBF, withholding their own clients' property presumably because Maniaci is concerned that those documents contain information damaging to CBB, Maniaci, the Founders, and possibly other Defendants.  The Bankruptcy Debtors brought an adversary complaint against CBB for turnover of these files and other data in the Bankruptcy Proceeding.

199.     On April 22, 2019, the bankruptcy court approved the Bankruptcy Debtors' Plan, through which plan sponsor, Alder, acquired the Bankruptcy Debtors' assets.  The Founders objected to the Plan.  This is after the bankruptcy court rebuked the AHC tactic perpetrated by the Founders, barring the AHC from participation in the Bankruptcy Proceedings.

### VIII.  THE FOUNDERS' MISUSE OF OTHER CORPORATE COUNSEL

200.     Through Jackson Walker, the Founders orchestrated the drafting of improper purported release provisions to which Founders Ted Rea, Hall and Driver claim a benefit, and also have concealed material information from VBF based on an improper privilege claim through which the Founders prevented VBF from receiving VBF's own client files from Jackson Walker. Jackson Walker often worked with Maniaci and CBB on VBF issues.

201.     Upon information and belief, the Founders retained Jackson Walker (and its partner Rick Dahlson) to represent VBF and had a preexisting relationship with the firm, and the Founders have continued their relationship with Jackson Walker outside of the firm's representation of VBF.

54

In a January 31, 2019 email, in response to an inquiry from VBF, Jackson Walker disclosed as follows: "Mr. Dahlson has had contact with Les Wulf, but only regarding subjects other than VeroBlue." A true and correct copy of this document is attached as **Exhibit 37**.

202.    On October 24, 2018, McCowan, as VBF's President, requested that Jackson Walker turn over all of VBF's client files to VBF. A true and correct copy of this request is attached as **Exhibit 38**.

203.    In response, Jackson Walker stated that before producing certain documents it first needed to consult with the Founders, though the Founders have long since left the employ of VBF, based on some privilege the Founders could claim as to VBF files. *See* **Exhibit 38**. This marks the first time that VBF disinterested directors or officers learned that Jackson Walker had loyalties, and divided ones at that, to both the Founders and VBF. Jackson Walker thereafter began producing documents but did not complete production of the documents it was willing to produce until February 8, 2019. A true and correct copy of this document is attached as **Exhibit 39**. Disinterested VBF directors were unaware of the nature and extent of Jackson Walker's attorney-client and other relationships with the Founders at the time that Jackson Walker prepared the Founders' Termination Agreements, which the Founders now claim to benefit them to the detriment of VBF.

204.    As part of its production, Jackson Walker produced invoices showing the firm's representation of VBF on a variety of issues, as VBF's outside general counsel, from on or about September 8, 2014 through on or about January 10, 2018 (and VBF submit that Jackson Walker remains their counsel, as there has been no definitive termination of representation to VBF's knowledge). These dates coincide with Founders' reign over VBF. All told, VBF paid Jackson Walker about $1,483,287.87 for its representation of VBF.

APP0120

205.    On February 8, 2019, after much delay, Jackson Walker produced additional documents, but withheld from VBF about 800 documents from the firm's files for its representation of VBF.  VBF strenuously objected to its own counsel's withholding of files from the firm's own clients, VBF.  VBF also had to insist on Jackson Walker providing a privilege log that it obviously had readily available (given the short time that elapsed between VBF's demand for a log, late in the day on Friday, February 8, 2019, and the date that Jackson Walker produced the log, Monday, February 11, 2019).

206.    The Jackson Walker "privilege log" reveals the following about the documents that Jackson Walker withheld from its own clients: (a) the documents are dated March 20, 2015 through July 6, 2016, well within the September 2014 through January 2018 time frame that Jackson Walker represented VBF (and Jackson Walker has never, to VBF's knowledge, withdrawn from its representation of VBF); (b) the documents were all sent, received, or generated by Jackson Walker in its representation of VBF (as they were logged in response to VBF's request for their files); and (c) there are 784 documents logged, many of which attach yet more documents;" and (d) some of the documents are communications, drafts, or other documents relating to the very employment agreements that the Founders have put at issue as to various aspects of this case.  A true and correct copy of this document is attached as **Exhibit 40**.

207.    Jackson Walker's basis for withholding documents from its own clients based on the attorney-client privilege is further based on a spurious analogy to a July 2016 transaction wherein an entity purchased a large amount of VBF stock, becoming one of many VBF shareholders.  Jackson Walker artificially likened this situation to a corporate merger, citing a Delaware case on merger, as the basis for the privilege.  There was no merger here, and the overwhelming implication is that Jackson Walker is withholding almost 800 documents from its

APP0121

own clients because those clients are now suing the Founders for fraud and other misconduct through which the Founders misappropriated or otherwise squandered close to $90,000,000 during Founders' four year reign over VBF (which coincided almost exactly with Jackson Walker's representation of VBF). This presents an appearance that Jackson Walker is hiding something.

208.    VBF filed an adversary complaint against Jackson Walker in the Bankruptcy Proceeding seeking turnover of its client files. Regardless, upon information and belief, Jackson Walker is shielding information from its own client, VBF, that is damaging to the Founders, demonstrating the Founders' misuse of Jackson Walker under the guise of the firm being VBF's "corporate counsel," when it appears that the firm has at least sometimes been more concerned about representing the Founders' interests.

209.    Jackson Walker's actions are particularly concerning as it relates to this case because Ted Rea, Hall, and Driver claim that they were released under certain agreements that they also claim Jackson Walker drafted on behalf of VBF, as alleged in the next section. It appears that these agreements were prepared by conflicted counsel with divided loyalties.

## IX.  **THE FOUNDERS' FRAUD BEGINS TO UNRAVEL**

210.    Starting in late 2017, disinterested VBF directors started to become concerned about the Founders' abilities to lead and execute the business.

### A.    **Termination of Hall and Ted Rea**

211.    By late 2017, with VBF's mounting losses, the disinterested VBF directors recommended that Hall and Ted Rea be fired. On or about October 27, 2017, Hall executed a "Termination Agreement," which included, among other things, a purported release of some of VBF's claims against Hall. Wulf, one of Hall's co-conspirators, purportedly executed Hall's Termination Agreement on behalf of VBF ("Hall's Termination Agreement").

APP0122

212.     On the same day, Ted Rea executed a "Termination Agreement," which included, among other things, a purported release of some of VBF's claims against Ted Rea. Wulf purportedly executed Ted Rea's Termination Agreement ("Ted Rea's Termination Agreement") on behalf of VBF.

213.     Jackson Walker, now believed to be the Founders' longstanding counsel, drafted and reviewed these agreements purportedly as VBF's counsel.  True and correct copies of these agreements are attached as **Group Exhibit 41.** VBF knew of no separate counsel representing Ted Rea as to Ted Rea's Termination Agreement or Hall as to Hall's Termination Agreement. Therefore, it appears that Jackson Walker essentially represented, or had existing professional relationships with, both parties to Ted Rea's Termination Agreement, VBF and Ted Rea, and both parties to Hall's Termination Agreement, VBF and Hall.

214.     The purported release in Hall's Termination Agreement and Ted Rea's Termination Agreement provides:

> Except for the covenants and agreements of [Hall/Ted Rea] provided for in this Agreement, the Company, on its own behalf and on behalf of the other Company Releasees, hereby irrevocably and unconditionally release, acquit and forever discharge the [Hall/Ted Rea] Releasers from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (the "Company Releasee Claims") which the Company Releasees now have, own, hold, or to which the Company Releasees at any time heretofore had, owned or held against each of the [Hall Releasers/Ted Rea Releasers]. The Company Releasees represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Company Releasee Claim or any portion thereof or interest therein.

215.     The Termination Agreements also included severance payments to both Hall and Ted Rea in the amount of $400,000 each.

58

216.    At the time that the Termination Agreements for Hall and Ted Rea were executed, VBF had not yet discovered the fraudulent acts committed by the Founders because the Founders had actively and fraudulently concealed their conduct.

**B.    Termination of Keith Driver**

217.    Driver worked along with the other Founders from the inception of VBF. Between approximately July 1, 2016 and January 13, 2017, Driver was the Chief Operating Officer of VBF.

218.    On January 13, 2017, Driver executed a Business Relationship Restructuring Agreement and Consulting Agreement ("Driver's Termination Agreement") that changed Driver's role to an independent contractor.  Wulf purportedly executed Driver's Termination Agreement on behalf of VBF.[2] A true and correct copy of this document is attached as **Exhibit 42**.

219.    Jackson Walker drafted and reviewed this agreement purportedly as VBF's counsel. VBF knows of no counsel retained by Driver separately from Jackson Walker, who, as VBF has recently learned, has a longstanding (and continuing) relationship with the Founders. Therefore, it appears that Jackson Walker essentially represented both parties to Driver's Termination Agreement, VBF and Driver. And Wulf, one of Driver's co-conspirators, executed this agreement for VBF.

220.    VBF terminated Driver's independent contractor relationship on or about December 28, 2017.

221.    Driver's Termination Agreement provided for six installments payments totalling $550,000 and one payment of $500,000 for the cancellation of certain shares in VBF's affiliate.

222.    Driver's Termination Agreement also contained a purported release provision as follows:

---

[2] VBF fired Defendants Wulf, and James Rea later in 2017 and into early 2018, providing no releases, after the hiring of McCowan.

APP0124

(b)     As a material inducement to Driver and Driver Co. to enter into this Agreement, and except for the covenants and agreements of Driver and Driver Co. provided for in this Agreement, VBF USA and VBF Canada, on their own behalf and on behalf of the other VBF Releasees, hereby irrevocably ad unconditionally release, acquit, and forever discharge the Driver Releasers from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (the "**VBF Releasee Claims**") which the VBF Releasees now have, own, hold, or to which the VBF Releasees at any time heretofore had, owned or held against each of the Driver Releasers, including, without limitation, the Egregious Cause Claims.  The VBF Releasees represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any VBF Releasee Claim or any portion thereof or interest therein.

See **Exhibit 42, ¶4(b)** (collectively the purported release and severance provisions in Hall's Termination Agreement, Ted Rea's Termination Agreement, and Driver's Termination Agreement are hereinafter referred to as the <u>"Release and Severance Provisions"</u>)**.**

223.     In Driver's Termination Agreement, Driver also agreed to a confidentiality provision prohibiting him from disclosing confidential information "in a fiduciary capacity for the benefit of" VBF except in furtherance of Driver's duties under the Consulting Agreement or required by law to so disclose.  See **Exhibit 42, ¶4(a).**

224.     At the time that Driver's Termination Agreement was executed, VBF had not yet discovered the fraudulent acts committed by the Founders because the Founders had actively and fraudulently concealed their conduct.

## C.     <u>Termination of Wulf</u>

225.     On December 1, 2017, VBF terminated Wulf pursuant to a separation agreement ("<u>Wulf Separation Agreement</u>").  At this time, the Defendants' bad acts were just beginning to come to light, though, as VBF has come to learn, it had only scratched the surface of the Defendants' misconduct and had yet to learn the vast majority of the Defendants' misconduct as depicted herein or most specifics relating to same.  See **Exhibit 43.**  Jackson Walker also drafted the Wulf Separation Agreement, and VBF knows of no other counsel separately representing Wulf.

APP0125

Therefore, the same conflict problems attendant to the other termination agreements were present as to the Wulf Separation Agreement.

226.    The Wulf Separation Agreement contemplates that Wulf would be paid a settlement totaling $400,000 and that VBF would continue to pay COBRA premiums for the lesser of either 12 months or the duration of such COBRA coverage.

**D.    Termination of James Rea**

227.    On or about July 1, 2016, VBF and James Rea entered into an Employment Agreement ("Employment Agreement") which provided that James Rea could be terminated "by the Company for Cause."  A true and correct copy of this document is attached as **Exhibit 44**.  If he was so terminated, James Rea was not entitled to receive certain benefits including "accrued employment entitlements" which included (1) James Rea's base salary through the date of termination and (2) any previously vested benefits, such as retirement benefits and vacation pay. Jackson Walker drafted and reviewed this agreement purportedly as VBF's counsel.

228.    At various times between July 1, 2016 and January 8, 2018, James Rea committed various acts constituting "Egregious Cause" as defined in the Employment Agreement including (1)  the commission of a crime of moral turpitude, or the commission of any other willful act or willful omission involving dishonesty or fraud with respect to VBF; (2) breaches of the Employment Agreement and/or gross neglect of James Rea's duties and (3) damage to or misappropriation or conversion of any funds or assets of the Company.

229.    By January 8, 2018, VBF was aware that James Rea charged personal expenditures to VBF's business account, and it terminated his employment for Egregious Cause.  Because of his termination for Egregious Cause, VBF did not owe James Rea accrued employment entitlements.  Further, VBF did not enter into a termination agreement with James Rea, as it did with other Founders, due to the Founders' misconduct that was coming to light at this point.

61

# X.  CLAIMS

## COUNT I – BREACH OF FIDUCIARY DUTY – ALL FOUNDERS

230.     VBF adopts and reincorporates paragraphs 1 through 229.

231.     The Founders owed fiduciary duties to VBF from in or around October 1, 2014, when they came to control VBF and served as officers and directors, through and including January 2018, when the last of the Founders was terminated as an employee, contractor, officer, and/or director of VBF.

232.     The Founders' fiduciary duties to VBF included, but were not limited to, those of obedience, loyalty, honesty, good faith, and due care.

233.     The Founders breached their fiduciary duties of loyalty, good faith, candor, to restrain from self-dealing, integrity, fair and honest dealing, full disclosure, and others, to VBF in one or more of the following ways:

   a.     by misappropriating VBF funds for the Founders' personal benefit;

   b.     by misappropriating other VBF assets for the Founders' personal benefit;

   c.     by self-dealing and by concealing their self-dealing from VBF;

   d.     by grossly reckless and/or intentional misuse and waste of corporate assets that led to a dramatic devaluation of VBF to be determined at trial;

   e.     by continuously and systematically misrepresenting the Metrics, VBF's financial situation, VBF's valuation, and VBF's technology to disinterested VBF directors and other VBF personnel;

   f.     by misusing VBF's corporate counsel, Jackson Walker and CBB's Sean Maniaci, to promote the Founders' selfish interests, including, but not limited to, the obfuscation of the Founders' misconduct; and

   g.     by otherwise breaching their fiduciary duties to VBF, including but not limited through misconduct that led to the demise of VBF.

62

234.     VBF suffered injuries as a direct and proximate result of the Founders' breaches of fiduciary duty, and the Founders gained a personal benefit from such breaches.  VBF's compensatory damages are in excess of $90,000,000.

235.     Further, the Founders' breaches of fiduciary duty have been willful and egregious, and the Founders' misconduct continues into the year 2019.  Therefore, punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial. Additionally, the Founders' self-dealing transactions with VBF are presumed invalid, and the burden of proof lays with the Founders to prove the fairness of such transactions by clear and convincing evidence.  Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

## COUNT II – FRAUDULENT CONCEALMENT – ALL FOUNDERS

236.     VBF adopts and reincorporates paragraphs 1 through 229.

237.     The Founders concealed from or failed to disclose to VBF material facts including, but not limited to, the following, as alleged *supra*:

    a.      the BAJJER stock scheme;

    b.      the American Growth Funding Loan scheme;

    c.      the Wulf Lake House scheme;

    d.      the Sedun stock scheme;

    e.      the compensation scheme;

    f.      the Gagne scheme;

    g.      the tractor-trailer scheme;

    h.      the OFA Scheme;

    i.      the Founders' misappropriations of VBF Canada's stock;

63

      j.     The Founders' other misappropriations of VBF funds or other assets for personal use;

      k.     The Founders' devaluation of VBF's stock through their misconduct and other breaches of their duties of due care; and,

      l.     The Founders' misrepresentations of:

         i.     FCR,

        ii.     Density,

      iii.     Mortality Rates,

      iv.     Water Quality,

       v.     EBITDA, VBF's valuation, and other Financial Metrics,

      vi.     Theirs and VBF's Technical Abilities, and

      vii.     VBF's Technology;

      m.     misusing VBF's corporate counsel, Jackson Walker and CBB's Maniaci, to promote the Founders' selfish interests, including, but not limited to, the obfuscation of the Founders' misconduct; and,

      n.     other material facts that would have revealed the existence of the Founders' misconduct.

238.    The Founders, as fiduciaries to VBF, owed VBF a duty to disclose these material facts to VBF. Further, the Founders created false impressions through partial disclosures and voluntarily disclosed some related information, also leading to a duty to disclose the whole truth of these material facts to VBF.

239.    The Founders knew that VBF lacked knowledge of these concealed material facts until after VBF terminated the Founders by January 2018. The Founders intended to induce VBF to refrain from attempting to halt the Founders' misconduct, mismanagement, and corporate waste by concealing these material facts from VBF.

APP0129

240.     The Founders were deliberately silent when they had a duty to speak. The Founders knowingly failed to disclose these material facts to VBF knowing full well that VBF would not approve of the Founders' blatant misconduct.

241.     VBF justifiably relied on the Founders' failure to disclose these material facts given the Founders' status as fiduciaries to VBF.  Further, VBF did not have opportunities equal to the Founders to discover the Founders' misconduct until after the Founders were ousted from their positions at VBF.

242.     VBF suffered injuries as a direct and proximate result of the Founders' fraudulent concealment.  VBF's compensatory damages are in excess of $90,000,000.

243.     Further, the Founders' fraudulent concealment has been willful and egregious, and the Founders' misconduct continues into the year 2019.  Therefore, punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial.  Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

## **COUNT III – FRAUDULENT MISREPRESENTATION – ALL FOUNDERS**

244.     VBF adopts and reincorporates paragraphs 1 through 229.

245.     Pleading in the alternative, the Founders' silence in the face of their duties to disclose their misconduct alleged herein to VBF, constitutes fraudulent misrepresentation of the material facts alleged in Count II.

246.     The Founders knew that their failures to disclose these material facts, and therefore what are deemed to be misrepresentations in light of the Founders' duties of disclosure to VBF, were false or alternatively in reckless disregard of the truth.

247.     The Founders intended to deceive VBF and to induce them to refrain from attempting to halt the Founders' misconduct by misrepresenting material facts to VBF.

65

248.    VBF justifiably and detrimentally relied on the Founders' misrepresentations given the Founders' status as fiduciaries to VBF.

249.    VBF suffered injuries as a direct and proximate result of the Founders' fraudulent misrepresentation.  VBF's compensatory damages are in excess of $90,000,000.

250.    Further, the Founders' fraud has been willful and egregious, and the Founders' misconduct continues into the year 2019.  Therefore, punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial.  Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

### COUNT IV – CONSTRUCTIVE FRAUD – ALL FOUNDERS

251.    VBF adopts and reincorporates paragraphs 1 through 229.

252.    The Founders' misconduct, committed while they were fiduciaries to VBF, constitutes constructive fraud regardless of the Founders' intent.

253.    VBF suffered injuries as a direct and proximate result of the Founders' constructive fraud.  VBF's compensatory damages are in excess of $90,000,000.

254.    Further, the Founders' fraudulent concealment was willful and egregious, or at least wanton, and therefore punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial. Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

### COUNT V – UNIFORM VOIDABLE TRANSFERS ACT
### (IOWA CODE §684.4(1)(a)) – ALL FOUNDERS

255.    VBF adopts and incorporates paragraphs 1 through 229.

APP0131

256.    VBF seeks to void transfers made to the Founders, including transfers from 2014 to 2018 related to:

      a.      the BAJJER stock scheme;

      b.      the American Growth Funding Loan scheme;

      c.      the Wulf Lake House scheme;

      d.      the Sedun stock scheme;

      e.      the compensation scheme;

      f.      the Gagne scheme;

      g.      the tractor-trailer scheme;

      h.      the OFA Scheme;

      i.      the Founders' misappropriations of VBF Canada shares; and

      j.      Other misappropriations of VBF funds or other assets for the Founders' personal use.

257.    VBF made or authorized transfers of assets and stock (as described above) totaling (and based on information available today, VBF's investigation is ongoing):

      a.      at least $4,562,498 to Wulf;

      b.      at least $4,747,333 to Hall;

      c.      at least $4,365,000 to James Rea;

      d.      at least $4,487,410 to Ted Rea; and

      e.      at least $3,389,501 to Driver.

258.    The transfers were made with the actual intent to hinder, delay, or defraud VBF, demonstrated by, among other things, that:

      a.      The transfers consisted of misappropriations of VBF funds and other assets for the Founders' personal benefit;

67

b. The Founders misrepresented facts related to the FCR, Density, Mortality Rates, Water Quality, valuation, EBITDA and other Financial Metrics, and theirs and VBF's Technical Abilities to mislead VBF and its creditors;

c. The Founders concealed facts that would have alerted VBF and its creditors of the misappropriation and that the alleged profits from the business were derived from the misrepresented facts;

d. The Founders' transfers were to themselves and other insiders;

e. The transfers occurred after VBF was insolvent;

f. A number of the transfers occurred both before and after substantial debts were incurred;

g. The consideration received by VBF for the transfers to the Founders was not reasonably equivalent in value to the amount of monies transferred to the Founders; and

h. The Founders, not the debtor, have retained possession or control of the property transferred after the transfer.

259. As alleged above, VBF made or authorized transfers totaling between $5 million to $20 million in assets and/or stock to the Founders during the period from 2014 to 2018.

260. VBF's claims arose before or shortly after the transfers were made and VBF brought this claim within one year after the transfers could reasonably have been discovered.

261. Moreover, VBF was insolvent or became insolvent shortly after the transfers to the Founders were made. Specifically, due to the fraudulent scheme and misrepresented facts related to the VBF business described above, VBF was insolvent from the beginning of that scheme and the commencement of the misrepresentations. The Founders generated significant investments and other funds through the misstated business metrics, which funds were diverted to the Founders.

262. Therefore, VBF has the right to avoid the transfers to the Founders under Section 684.4(1)(a) of the Iowa Code. VBF should recover all assets wrongfully transferred to the Founders from 2014 to 2018.

68

APP0133

## COUNT VI – UNIFORM VOIDABLE TRANSFERS ACT
## (IOWA CODE §684.4(1)(b)) – ALL FOUNDERS

263.    VBF adopts and reincorporates paragraphs 1 through 229.

264.    Pleading in the alternative to Count V, VBF made or authorized transfers of assets and stock (as described above) totaling (and based on information available today, VBF's investigation is ongoing):

      a.  at least $4,562,498 to Wulf;

      b.  at least $4,747,333 to Hall;

      c.  at least $4,365,000 to James Rea;

      d.  at least $4,487,410 to Ted Rea; and

      e.  at least $3,389,501 to Driver.

265.    Transfers from 2014 to 2018 to the Founders were fraudulent as to VBF.

266.    VBF did not receive a reasonably equivalent value in exchange for the transfers to the Founders and VBF seeks to void them under Section 684.4(1)(b) of Iowa law.

267.    Further, because the Founders' services to VBF, in whatever form, were premised on maintenance and perpetuation of a fraudulent scheme, they did not contribute any value in exchange for the monies received.

268.    At the time of the transfers, VBF was engaged in or were about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to its business.

269.    Moreover, VBF was insolvent or became insolvent shortly after the transfers to the Founders were made.  Specifically, due to the fraudulent scheme and misrepresented facts related to the VBF business described above, VBF was insolvent from the beginning of that scheme and

69

the commencement of the misrepresentations. The Founders generated significant investments and

other funds through the misstated business metrics, which funds were diverted to the Founders.

270.    Therefore, VBF should recover amounts paid to the Founders described herein from

2014 to 2018.

## COUNT VII – ACTUAL FRAUDULENT TRANSFER (TEXAS LAW) –
## ALL FOUNDERS (TEX. BUS. & COMM. CODE § 24.005(a)(1))

271.    VBF adopts and reincorporates paragraphs 1 through 229.

272.    Pleading in the alternative to Counts V and VI[3], VBF seeks to avoid transfers made

to the Founders, including transfers from 2014 to 2018 related to:

      a.      the BAJJER stock scheme;

      b.      the American Growth Funding Loan scheme;

      c.      the Wulf Lake House scheme;

      d.      the Sedun stock scheme;

      e.      the compensation scheme;

      f.      the Gagne scheme;

      g.      the tractor-trailer scheme;

      h.      the OFA Scheme;

      i.      the Founders' misappropriations of VBF Canada shares; and

      j.      Other misappropriations of VBF funds or other assets for the Founders' personal use.

273.    VBF made or authorized transfers of assets and stock (as described above) totaling

(and based on information available today, VBF's investigation is ongoing):

      a.      at least $4,562,498 to Wulf;

---

[3] VBF alleges statutory fraud claims under Texas law in the event that this Court rules that Texas law applies, which it should not.  VBF affirmatively states that this case is covered by Iowa law.

70

b.      at least $4,747,333 to Hall;

c.      at least $4,365,000 to James Rea;

d.      at least $4,487,410 to Ted Rea; and

e.      at least $3,389,501 to Driver.

274.     The transfers were made with the actual intent to hinder, delay, or defraud VBF, demonstrated by, among other things, that:

a.      The transfers consisted of misappropriation of VBF funds and other assets for the Founders' personal benefit;

b.      The Founders misrepresented facts related to the FCR, Density, Mortality Rates, Water Quality, valuation, EBITDA and other Financial Metrics, and theirs and VBF's Technical Abilities to mislead VBF and its creditors;

c.      The Founders concealed facts that would have alerted VBF and its creditors of the misappropriation and that the alleged profits from the business were derived from the misrepresented facts;

d.      The Founders were insiders;

e.      The transfers occurred after VBF was insolvent;

f.      A number of the transfers occurred both before and after substantial debts were incurred; and

g.      The consideration received by VBF for the transfers to the Founders was not reasonably equivalent in value.

275.     As alleged above, VBF made or authorized transfers totaling between $5 million to $20 million in assets and/or stock to the Founders during the period from 2014 to 2018.

276.     VBF's claims arose before or within a reasonable time after the transfers to the Founders.

277.     Moreover, VBF was insolvent or became insolvent shortly after the transfers to the Founders were made.  Specifically, due to the fraudulent scheme and misrepresented facts related to the VBF business described above, VBF was insolvent from the beginning of that scheme and

APP0136

the commencement of the misrepresentations. The Founders generated significant investments and other funds through the misstated business metrics, which funds were diverted to the Founders.

278. Further, VBF did not receive consideration that was reasonably equivalent to the amount of monies transferred to the Founders.

279. Therefore, VBF has the right to avoid the transfers to the Founders under Section 24.005(a)(1) of the Texas Business and Commerce Code. VBF should recover all assets wrongfully transferred to the Founders from 2014 to 2018.

### COUNT VIII – CONSTRUCTIVE FRAUDULENT TRANSFER (TEXAS LAW) – ALL FOUNDERS (TEX. BUS. & COMM. CODE § 24.005(a)(2))

280. VBF adopts and reincorporates paragraphs 1 through 229.

281. Pleading in the alternative to Counts VI and VII[4], VBF made or authorized transfers of assets and stock (as described above) totaling (and based on information available today, VBF's investigation is ongoing):

    a.    at least $4,562,498 to Wulf;

    b.    at least $4,747,333 to Hall;

    c.    at least $4,365,000 to James Rea;

    d.    at least $4,487,410 to Ted Rea; and

    e.    at least $3,389,501 to Driver.

282. Transfers from 2014 to 2018 to the Founders were fraudulent as to VBF.

283. VBF did not receive reasonably equivalent value in exchange for these transfers, and VBF avoids them under Texas state fraudulent transfer law. Tex. Bus. & Comm. Code § 24.005(a)(2).

---

[4] VBF alleges statutory fraud claims under Texas law in the event that this Court rules that Texas law applies, which it should not. VBF affirmatively states that this case is covered by Iowa law.

APP0137

284.     Further, because the Founders' services to the company, in whatever form, were premised on maintenance and perpetuation of a fraudulent scheme, they did not contribute any value in exchange for the monies received.

285.     At the time of the transfers, VBF was engaged or was about to engage in transactions for which its remaining assets were unreasonably small in relation to its business.

286.     At the time of the transfers, VBF intended to incur or believed that it would incur, debts beyond its ability to pay as they became due.

287.     Moreover, VBF was insolvent or became insolvent shortly after the transfers to the Founders were made.  Specifically, due to the fraudulent scheme and misrepresented facts related to the VBF business described above, VBF was insolvent from the beginning of that scheme and the commencement of the misrepresentations.  The Founders generated significant investments and other funds through the misstated business metrics, which funds were diverted to the Founders.

288.     Therefore, VBF should recover amounts paid to the Founders described herein from 2014 to 2018.

## COUNT IX – CIVIL CONSPIRACY – ALL FOUNDERS

289.     VBF adopts and reincorporates paragraphs 1 through 229.

290.     From the outset of their misconduct alleged herein, each of the Founders had a meeting of the minds with each of the other Founders and agreed to engage in the breaches of fiduciary duties and fraud alleged herein, for their personal benefit, to cause harm to VBF, while concealing the same from VBF (the "Conspiracy").

291.     The Founders' aim, through the Conspiracy, was to accomplish the unlawful objective of personally benefiting the Founders at the expense of VBF, while concealing the same from VBF, and/or making fraudulent misrepresentations to VBF, its disinterested directors, and

73

fraudulent non-disclosures or concealments from VBF in the face of the Founders' duties of disclosure.

292.    Through the Conspiracy and the overt, unlawful actions alleged herein, the Founders facilitated and accomplished their breaches of fiduciary duty, fraudulent concealment, constructive fraud, fraudulent misrepresentation and fraudulent transfers.

293.    VBF suffered injuries as a direct and proximate result of the Founders' Conspiracy. VBF's compensatory damages are in excess of $90,000,000.

294.    Further, the Founders' misconduct was willful and egregious, or at least wanton, and has continued into the year 2019.  Therefore punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial. Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

### COUNT X – AIDING AND ABETTING – ALL FOUNDERS

295.    VBF adopts and reincorporates paragraphs 1 through 229.

296.    From the outset of their misconduct alleged herein, the Founders knowingly and substantially assisted each other in their breaches of fiduciary duties alleged herein, for their personal benefit, while concealing the same from VBF and its disinterested director.

297.    VBF suffered injuries as a direct and proximate result of the Founders' aiding and abetting.  VBF's compensatory damages are in excess of $90,000,000.

298.    Further, the Founders' misconduct was willful and egregious, or at least wanton, and has continued into the year 2019.  Therefore punitive damages against the Founders and in favor of VBF are warranted, in an amount to be determined at trial. Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

74

## COUNT XI – UNJUST ENRICHMENT – ALL FOUNDERS

299.    VBF adopts and reincorporates paragraphs 1 through 229.

300.    VBF has conferred millions of dollars' worth of benefit upon the Founders due to the Founders' fraud or taking undue advantage, for which the Founders have not compensated VBF.  It would be unjust and contrary to principles of equity and good conscience to allow the Founders to retain this benefit conferred upon them by VBF without just consideration as the Founders have been unjustly enriched at VBF's expense.

## COUNT XII – EQUITABLE ACCOUNTING – ALL FOUNDERS

301.    VBF adopts and reincorporates paragraphs 1 through 229.

302.    VBF cannot attain pertinent information to fully account for the tens of millions of dollars misappropriated and squandered by the Founders through ordinary discovery procedures such as those permitted by Federal Rules of Civil Procedure 26, 33, 34, 36, and 45.  The Founders' concealment was integral to their misconduct, and therefore they cannot possibly be trusted to provide full and complete information through traditional discovery methods.  Additionally, upon information and belief, the Founders and those friendly to them have spoliated data, or otherwise cannot be trusted in discovery.  Indeed, currently pending are the Founders' and the Nelsons' Motions to Quash basic discovery to critical witnesses.  Also, VBF's own counsel, Jackson Walker, is withholding VBF's own client files from VBF based on an alleged Founders' privilege.  Further, VBF's other counsel, CBB and Maniaci, have continued to act contrary to VBF's interests, and to promote the Founders' schemes, while refusing to turnover VBF client files to VBF.  Simply put, the Founders should be required to "show us the money" through an equitable accounting since only the Founders truly know the extent of their massive and complex fraud.  The complexity of the fraud is further alleged in VBF's RICO count.

75

303.    Discovery to date has also revealed accounts utilized by the Founders so complex that adequate relief cannot be obtained at law.  VBF has to date been able to receive partial compliance on a subpoena to Wells Fargo Bank, which held VBF accounts during the Founders' reign and the personal accounts of Wulf.  The information produced by Wells Fargo to date reveals numerous wire transfers to and from unknown accounts, and other transactions that appear suspicious.  It will virtually impossible for VBF to painstakingly piece together the various documentation from the Founders and numerous third parties to fully document the "money in" and "money out" of VBF during the Founders' tenure at VBF.

304.    Therefore, as a result of the Founders' fiduciary duties to account to VBF, breaches of fiduciary duties, fraud, and unjust enrichment, as well as the existence of complex mutual accounts and the need for discovery, VBF is entitled to an order requiring the Founders to account for every dollar deposited, received, or otherwise transferred to or from VBF or any of its affiliates and the Founders (or others on behalf of the Founders) from on or before October 1, 2014 through January 31, 2018, and entering a judgment against the Founders as to any amounts for which the Founders cannot account, or which are shown by the accounting to have been misappropriated by the Founders.

305.    Pleading in the alternative, money damages are inadequate to VBF because VBF cannot fully learn the extent of the Founders' misconduct, of which the Founders' have superior knowledge, without an accounting.

## COUNT XIII – DECLARATORY JUDGMENT-
## ALL TRANSACTIONS VOID – ALL FOUNDERS

306.    VBF adopts and reincorporates paragraphs 1 through 229.

APP0141

307.     VBF disputes the validity of any and all transactions wherein the Defendants personally benefitted, or which were otherwise improper, including the funds and other assets that were misappropriated, for grossly inadequate consideration.

308.     Pursuant to 22 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and the Founders on the other hand, as to such transactions, wherein VBF asserts that all such transactions should be declared null and void ab initio, whereas the Founders presumably seek to uphold these transactions.

## COUNT XIV – RESCISSION–TERMINATION AGREEMENTS, SELECTIVE PROVISIONS AND DECLARATORY JUDGMENT – HALL, DRIVER, TED REA

309.     VBF adopts and reincorporates paragraphs 1 through 229.

310.     When Hall, Ted Rea and Driver's Termination Agreements (collectively, the "Termination Agreements") were entered into, neither VBF nor its disinterested board members knew or could have known of those Defendants' breaches of fiduciary duty or fraud and, in fact, believed to be true all the material misrepresentations that Hall, Ted Rea, and Driver relayed to cover up their breaches of fiduciary duty and fraud.

311.     Both VBF and the disinterested board members relied on what they only later realized were material misrepresentations in executing the Termination Agreements.

312.     Indeed, Hall, Ted Rea, and Driver intended that VBF and its disinterested board members rely on their material misrepresentations and each defendant's failure to disclose the true facts of their fraud in order to secure the Termination Agreements.

313.     Had VBF and/or its disinterested board members known the true facts of Hall, Ted Rea, and Driver's breaches of fiduciary duty and fraud, the Termination Agreements would not have been entered into.

77

314. Because the true facts of Hall, Ted Rea, and Driver's breaches of fiduciary duty, fraud and material misrepresentations were concealed and never revealed to VBF or its disinterested board members, the Termination Agreements are voidable.

315. VBF has retained no benefits under the Termination Agreements. Only after signing the Termination Agreements did VBF begin to uncover the Founders' breaches of fiduciary duty, fraudulent concealment, fraudulent misrepresentation, constructive fraud, conspiracy, misappropriation and other waste of over $90,000,000 of VBF's corporate assets leading to its ultimate demise.

316. By March 2018, VBF discovered some of the misconduct alleged herein against Hall, Ted Rea, and Driver, and VBF initiated this action in July 2018. After VBF filed this lawsuit, it has continued to discover more facts of the Founders' misconduct and concealment of the same to VBF and disinterested VBF board members, and the investigation is ongoing.

317. VBF has no adequate remedy at law if the Termination Agreements are not rescinded because those agreements purport to release some of VBF's claims against Hall, Ted Rea, and Driver.

318. Rescission of the Termination Agreements is necessary to avoid Hall, Ted Rea's, and Driver's unjust enrichment as all three have benefited from their respective Termination Agreements, including the Release and Severance Provisions therein.

319. VBF would suffer substantial harm and injury if the Termination Agreements are not rescinded because, if deemed enforceable, the Termination Agreements and its provisions would purportedly preclude VBF from bringing at least some claims against Hall, Ted Rea, and Driver for VBF's damages.

APP0143

320. Based on the egregious conduct herein, damages, as well as rescission, are warranted to accomplish full justice in an amount to be proven at trial.

321. Pleading in the alternative, to the extent the Court deems the Release and Severance Provisions of the Termination Agreements to be divisible, VBF seeks partial rescission of the Release and Severance Provisions only.

322. Pleading in the alternative, to the extent the Court deems rescission of the Termination Agreements or its provisions inappropriate, and because there exists an actual controversy between VBF and the defendants named herein pursuant to 22 U.S.C. § 2201, VBF, which has a tangible legal benefit in bringing this action against the defendants named herein, seeks a declaration that the Termination Agreements and its Release and Severance Provisions are null and void *ab initio.*

## COUNT XV – DECLARATORY JUDGMENT
## JAMES REA

323. VBF adopts and reincorporates paragraphs 1 through 229.

324. On one or more occasions, James Rea misappropriated funds or assets of the Company, committed willful acts or omissions of dishonesty or fraud, and was in gross neglect of his duties to VBF between 2014 and January 2018 in breach of his Employment Agreement.

325. As a result of James Rea's misconduct, VBF has been damaged in at least the amounts that James Rea misappropriated or converted to his own personal benefit, in addition to millions of dollars representing the devaluation of VBF caused by his mismanagement and other corporate waste.

326. VBF has a tangible legal benefit in not being obligated to confer any benefit on James Rea under the Employment Agreement as it was procured by fraud, breaches of fiduciary duty, among other misconduct.

APP0144

327.     Pursuant to 22 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and James Rea on the other hand, as to whether any benefits are owed by VBF to James Rea under the Employment Agreement, wherein VBF asserts that James Rea is not owed any benefits under the Employment Agreement, whereas James Rea presumably seeks to uphold the benefits under the Employment Agreement.

**COUNT XVI – RESCISSION –**
**EMPLOYMENT AGREEMENT – JAMES REA**

328.     VBF adopts and reincorporates paragraphs 1 through 229.

329.     When James Rea's Employment Agreement was entered into, neither VBF nor its disinterested board members knew or could have known of his breaches of fiduciary duty and, in fact, believed to be true all the representations that he relayed to cover up his breaches of fiduciary duty.

330.     At the time the Employment Agreement was entered into, neither VBF nor its disinterested board members were aware or could have been aware of the Founders' various schemes, the use of VBF funds for James Rea's own personal benefit, and the misrepresentations of the Metrics.

331.     Had VBF and/or its disinterested board members known the true facts, the Employment Agreement would not have been entered into.

332.     Because the true facts of James Rea's breaches of fiduciary duty, fraud, and material misrepresentations were concealed and never revealed to VBF or its disinterested board members, the Employment Agreement is voidable.

333.     VBF has retained no benefits under the Employment Agreement.  Less than two years after signing the Employment Agreement, VBF began to uncover the Founders' breaches of fiduciary duty, fraudulent concealment, fraudulent misrepresentation, constructive fraud,

APP0145

conspiracy, misappropriation and other waste of over $90,000,000 of VBF's corporate assets leading to its ultimate demise.

334.    By January 2018, VBF discovered some of the misconduct alleged herein against James Rea, and VBF initiated this action in July 2018.  After VBF filed this lawsuit, it has continued to discover more facts of the Founders' misconduct, concealment of the same to VBF and disinterested VBF board members, and the investigation is ongoing.

335.    VBF has no adequate remedy at law if the Employment Agreement is not rescinded because that agreement purports to release some of VBF's claims against James Rea.

336.    Rescission and/or renunciation of the Employment Agreement is necessary to avoid James Rea's unjust enrichment as well as VBF's substantial harm and injury and to discharge any obligations in the future because, if the Employment Agreement is upheld, VBF may be required to pay James Rea's accrued employment benefits.

337.    Based on the egregious conduct herein, damages, as well as rescission, are warranted to accomplish full justice in an amount to be proven at trial.

### COUNT XVII – RESCISSION – SEPARATION AGREEMENT – WULF

338.    VBF adopts and reincorporates paragraphs 1 through 229.

339.    When the Wulf Separation Agreement was entered into, neither VBF nor its disinterested board members knew of his breaches of fiduciary duty and, in fact, believed to be true all the representations that Wulf relayed to cover up his breaches of fiduciary duty. Specifically, neither VBF nor its disinterested board members were aware of the misconduct alleged herein including Wulf's various schemes for his own personal benefit, which resulted in a colossal waste of corporate assets.

340.    Had VBF and/or its disinterested board members known the actual facts, the Wulf Separation Agreement would not have been entered into.

81

341.    Because the true facts of Wulf's breaches of fiduciary duty and other misconduct including their misrepresentations were concealed and never revealed to VBF or its disinterested board members, the Wulf Separation Agreement is voidable due to mistake and/or the Wulf's breaches of fiduciary duty and misconduct including fraud.

342.    VBF has retained no benefits under the agreement.   After signing the Wulf Separation Agreement VBF began to uncover the breaches of fiduciary duty, fraudulent concealment, fraudulent misrepresentation, constructive fraud, conspiracy, misappropriation and other waste of over $90,000,000 of VBF's corporate assets leading to its ultimate demise.

343.    By March 2018, VBF discovered some of the misconduct alleged herein against Wulf, and VBF initiated this action in July 2018.  After VBF filed this lawsuit, it has continued to discover more facts of Wulf's various schemes, other misconduct, and their fraudulent concealment of the same to VBF and disinterested VBF board members, and the investigation is ongoing.

344.    VBF has no adequate remedy at law if the Wulf Separation Agreement is not rescinded because that agreement purports to provide a severance payment to Wulf that was procured by fraud and other misconduct.

345.    As no adequate remedy at law exists, the Wulf Separation Agreement should be rescinded as a result of Wulf's breaches of fiduciary duty while in control of VBF.

346.    As no adequate remedy at law exists, the Wulf Separation Agreement was made by mistake as neither VBF nor disinterested VBF board member knew sufficient facts of Wulf's misconduct alleged herein and thus the Wulf Separation Agreement is voidable.

347.    Rescission of the Wulf Separation Agreement is necessary to avoid Wulf's unjust enrichment as he has benefited from it, including the severance payments therein.

APP0147

348.     VBF would suffer substantial harm and injury if the Wulf Separation Agreement is not rescinded as VBF would be forced to pay Wulf's severance and other benefits under the Wulf Separation Agreement.

349.     As a result of Wulf's actions, VBF has been damaged in the amount of over $80 million.  Thus, damages, as well as rescission, are warranted to accomplish full justice in an amount to be proven at trial.

## COUNT XVIII – DECLARATORY JUDGMENT – SEPARATION AGREEMENT – WULF

350.     VBF adopts and reincorporates paragraphs 1 through 229.

351.     Pleading in the alternative, VBF has a tangible legal benefit in not being obligated in any way under the Wulf Separation Agreement as the benefits therein were procured by fraud, breaches of fiduciary duty, among other misconduct.

352.     Pursuant to 22 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and Wulf on the other hand, as to the benefits under the Wulf Separation Agreement, wherein VBF asserts that Wulf is not entitled to recover any benefits under the Wulf Separation Agreement, and Wulf presumably seeks to recover benefits under the Wulf Separation Agreement.

## COUNT XIX – RESTITUTION–HALL, TED REA, DRIVER AND WULF

353.     VBF adopts and reincorporates paragraphs 1 through 229.

354.     The Termination Agreements, the Wulf Separation Agreement, or the provisions therein are not valid as they were procured by fraud, breaches of fiduciary duty, and other misconduct.

355.     Defendants Hall, Ted Rea, Driver, and Wulf wrongfully received benefits, including money, pursuant to their Termination Agreements and the Wulf Separation Agreement.

APP0148

356.    It would be unjust and contrary to principles of equity and good conscience to allow the defendants named herein to retain the benefits or the value thereof conferred upon them by VBF.

357.    The benefits received by the defendants named herein rightfully belong to VBF in equity and good conscience.

## COUNT XX – CONSPIRACY – CANACCORD

358.    VBF adopts and reincorporates paragraphs 1 through 229.

359.    The Founders and Canaccord had a meeting of the minds and agreed to engage in a conspiracy for their personal benefit, to cause harm to VBF by securing investments based on false data and/or misrepresentations while concealing the same from VBF, its disinterested board members, and potentially interested third parties ("Founders-Canaccord Conspiracy").

360.    The Founders and Canaccord's aim, through the Founders-Canaccord Conspiracy, was to accomplish the unlawful objective of benefiting the Founders and Canaccord at the expense of VBF, while concealing the same from VBF, and/or making fraudulent misrepresentations to VBF, and fraudulent non-disclosures or concealments from VBF, its disinterested directors, and potentially interested third parties in the face of the Founders' duties of disclosure.

361.    The overt, unlawful actions described herein furthered the Founders-Canaccord Conspiracy. Canaccord facilitated, encouraged, and assisted in accomplishing the Founders' breaches of fiduciary duty, fraudulent concealment, constructive fraud, and fraudulent misrepresentation.

362.    VBF suffered injuries as a direct and proximate result of the Conspiracy between the Founders and Canaccord. VBF's compensatory damages are in excess of $90,000,000.

363.    Further, Canaccord's misconduct was willful and egregious, or at least wanton, and warrants punitive damages in an amount to be determined at trial.

84

## COUNT XXI – AIDING AND ABETTING CONSPIRACY – CANACCORD

364.    VBF adopts and reincorporates paragraphs 1 through 229.

365.    While in control of VBF, the Founders engaged in a Conspiracy to accomplish the unlawful objective of personally benefiting at the expense of VBF. Canaccord had knowledge that the Founders were engaged in the Conspiracy.

366.    From the beginning of its engagement with VBF at all times thereafter until that engagement ended, Canaccord intended to assist the Founders in carrying out their Conspiracy and other misconduct described herein.

367.    Canaccord knowingly and substantially assisted the Founders in carrying out the Conspiracy alleged herein, while concealing the same from VBF, its disinterested board members, and potentially interested third parties.

368.    As a direct and proximate result of Canaccord's aiding and abetting of the Founders' Conspiracy, VBF suffered compensatory damages are in excess of $90,000,000.

369.    Canaccord's actions were willful and egregious, or at least wanton, and therefore punitive damages against Canaccord in an amount to be determined at trial are warranted.

## COUNT XXII – CONSPIRACY – CHRISTINE GAGNE

370.    VBF adopts and reincorporates paragraphs 1 through 229.

371.    The Founders' and Gagne had a meeting of the minds and agreed to engage in a conspiracy for their personal benefit and to cause harm to VBF by employing and/or compensating Gagne with VBF funds while she was not without any legal immigration status to work in the United States ("Founders-Gagne Conspiracy"), while concealing the same from VBF and its disinterested board members.

85

372.     The Founders and Gagne's aim, through the Founders-Gagne Conspiracy, was to accomplish the unlawful objective of personally benefiting the Founders and Gagne at the expense of VBF while concealing the same from VBF and its disinterested board members.

373.     The overt, unlawful actions described herein further the Founders-Gagne Conspiracy.  Gagne facilitated, encouraged and assisted in accomplishing the Founders' breaches of fiduciary duty, fraudulent concealment, constructive fraud, and fraudulent misrepresentation.

374.     VBF suffered injuries as a direct and proximate result of the Conspiracy between the Founders and Gagne.  In total, VBF's compensatory damages are in excess of $90,000,000.

375.     Further, Gagne's misconduct was willful and egregious as evidenced by, for example, her statements to VBF employees alleged herein, or at least wanton, and warrants punitive damages in an amount to be determined at trial.

## COUNT XXIII – AIDING AND ABETTING CONSPIRACY – CHRISTINE GAGNE

376.     VBF adopts and reincorporates paragraphs 1 through 229.

377.     The Founders owed fiduciary duties to VBF from in or around October 1, 2014, when they came to control VBF, through and including January 2018, when the last of the Founders was terminated as an employee, contractor, officer and/or director of VBF.

378.     Gagne knew of the Founders' fiduciary relationship to VBF.

379.     By receiving monies from VBF while she was without any legal immigration status to work in the United States and knowingly receiving those monies under another person's name, Gagne was aware that she was participating in the breach of the Founders' fiduciary duties to VBF.

380.     Gagne knowingly and substantially assisted the Founders in their breaches of fiduciary duties alleged herein while concealing the same from VBF and disinterested board members.

86

APP0151

381.    VBF suffered injuries as a direct and proximate result of Gagne's aiding and abetting of the Founders' breaches.

382.    Because of the Gagne's substantial assistance to the Founders, VBF's compensatory damages for Gagne's misconduct are, individually and/or in the aggregate with the other claims, more likely than not in excess of $75,000.

383.    Further, Gagne's knowing participation and substantial assistance to the Founders was willful and egregious, or at least wanton, therefore, punitive damages against Gagne and in favor of VBF are warranted, in an amount to be determined at trial.

### COUNT XXIV – UNJUST ENRICHMENT – CHRISTINE GAGNE

384.    VBF adopts and reincorporates paragraphs 1 through 229.

385.    VBF, at Wulf's direction and due to the Founders' fraud or taking undue advantage, conferred VBF funds for Gagne as compensation and benefits for alleged services Gagne provided to VBF.

386.    It would be unjust and contrary to principles of equity and good conscience to allow Gagne to retain the benefits conferred upon her by VBF, which she wrongfully secured, as she has been unjustly enriched at VBF's expense and to its detriment.

### COUNT XXV – CONSPIRACY – MANIACI

387.    VBF adopts and reincorporates paragraphs 1 through 229.

388.    The Founders and Maniaci had a meeting of the minds and agreed to engage in a conspiracy for their personal benefit so Maniaci could secure shares at discounted prices as described herein and to cause harm to VBF, while concealing the same from VBF, its disinterested board members ("Founders-Maniaci Conspiracy").

389.    The Founders and Maniaci's aim, through the Founders-Maniaci Conspiracy, was to accomplish the unlawful objective of personally benefiting the Founders and Maniaci at the

APP0152

expense of VBF, while concealing the same from VBF, and/or making fraudulent misrepresentations to VBF and its disinterested board members in the face of the Founders' duties of disclosure.

390.    The overt, unlawful actions described herein furthered the conspiracy. Maniaci facilitated, encouraged, and assisted in accomplishing the Founders' breaches of fiduciary duty, fraudulent concealment, constructive fraud, and fraudulent misrepresentation.

391.    VBF suffered injuries as a direct and proximate result of the conspiracy between the Founders and Maniaci. In total, VBF's compensatory damages are in excess of $90,000,000.

392.    Further, Maniaci's misconduct was willful and egregious, or at least wanton, and warrants punitive damages in an amount to be determined at trial as it continues into 2019 through the Bankruptcy Proceedings.

## COUNT XXVI – AIDING AND ABETTING – MANIACI

393.    VBF adopts and reincorporates paragraphs 1 through 229.

394.    While in control of VBF, the Founders engaged in the Conspiracy to accomplish the unlawful objective of personally benefiting at the expense of VBF. Maniaci had knowledge that the Founders were engaged in this conspiracy.

395.    From the beginning of his role in overseeing the work of CBB lawyers for VBF, his own legal work for VBF, and his personal relationship with the Founders and at all times thereafter, Maniaci intended to assist the Founders in carrying out the Conspiracy and other misconduct described herein.

396.    Maniaci knowingly and substantially assisted the Founders in carrying out the Conspiracy alleged herein, while concealing the same from VBF and its disinterested board members.

APP0153

397.     Maniaci's substantial assistance toward carrying out the Founders' Conspiracy is evidenced by, among other things, his acquisition of VBF stock for a steep discount or the acquisition of VBF stock for a steep discount by entities associated with Maniaci, as well as his legal work (through CBB) for entities other than VBF but paid for by VBF.

398.     VBF suffered and continues to suffer injuries as a direct and proximate result of Maniaci's aiding and abetting of the Founders' Conspiracy as Maniaci and the Founders concealed his personal relationship with the Founders and the discounts he received on VBF stock from VBF, its disinterested board members and throughout the Bankruptcy Proceedings.

399.     Maniaci's actions were and are willful and egregious, or at least wanton, in particular his continued withholding of VBF files that may contain further evidence of the Founders' conspiracy (or the other claims alleged herein against any Defendant) and Maniaci's role therein, as well as his recent efforts to solicit clients to join the Ad Hoc Committee of equity investors in VBF's Bankruptcy Proceedings. Therefore, punitive damages against Maniaci in an amount to be determined at trial are warranted.

## COUNT XXVII – VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) (18 U.S.C. § 1962(c)) – FOUNDERS

400.     VBF adopts and incorporates paragraphs 1 through 229.

### A.     The RICO "Person" and "Enterprise"

401.     Each of the Founders is a "person," as that term is defined in 18 U.S.C. § 1961(3).

402.     VBF is a Racketeer Influenced and Corrupt Organizations ("RICO") enterprise. Specifically, VBF was formed as a sustainable fish farm business but was instead controlled by the Founders as an abused corporate enterprise and ultimately a victim of the Founders' schemes. The Founders directed the affairs of VBF, the RICO enterprise, as part of their scheme to loot and defraud VBF.

APP0154

403.    Collectively, the Founders form an "enterprise" or "enterprises" as defined by 18 U.S.C. § 1961(4) ("Enterprise").  The Founders have been associated in fact outside of VBF, and have functioned outside of VBF in an organized fashion, having a joint purpose of acting together for each other's benefit in VBF and other businesses, for the purposes of enriching themselves at the expense of VBF by engaging in the fraudulent scheme alleged above, and the Founders have therefore had business and, upon information and belief, personal relationships with each other outside of VBF over an extended period of time.  Each member conducted the affairs of the enterprises through a pattern of racketeering activity—namely, mail fraud and wire fraud, as described herein.

404.    Further, the Founders or the Founders through VBF acted as an enterprise as to VBF, orchestrating their joint misconduct over an approximate three year period.  Additionally, the Founders misused VBF itself as an instrumentality not to accomplish VBF's legitimate business, but instead to conduct the illegal acts set forth herein.

405.    Therefore, VBF was not a beneficiary of the Enterprise, but instead its victim, misused by the Founders as a passive instrumentality to accomplish their misconduct, as the Founders controlled VBF at relevant times.

406.    At all times material to the allegations stated herein, the Enterprise was engaged in, or had some effect upon, interstate commerce as VBF has done business in various states, including, but not limited to, Illinois, Iowa, Texas, New York, Florida, and Canada and VBF shareholders reside in multiple states.

407.    As alleged herein, the Enterprise's purpose was to serve as the vehicle through which the Founders implemented their continuous and ongoing scheme to injure VBF.  The intended purpose of the Founders' scheme was to misappropriate millions of dollars from VBF.

APP0155

## B.      The Pattern of Racketeering Activity

408.     The Founders directed the affairs of VBF and the association-in-fact enterprise as part of the scheme to defraud VBF.

409.     The Founders served as the executives of VBF and were the primary decision makers.  As alleged above, the Founders made all major decisions concerning the marketing, finances, and day-to-day operations of VBF.  The Founders were aware and had knowledge indicating that the facts related to the FCR, Density, Mortality Rates, Water Quality, EBITDA and other Financial Metrics, and theirs and VBF's Technical Abilities were being misrepresented to VBF, its disinterested directors, its shareholders, and potentially interested third parties. Nonetheless, the Founders devised and participated in a plan to use such business Metrics to generate unrealistic value to VBF.  Canaccord, including Lobb and Goodman who were, for a time, employed by Canaccord and after that time, consultants to VBF, participated in the Founders' plan to generate unrealistic value to VBF by contributing to and/or approving of the Founders' plan to use business Metrics to induce investments in VBF. Moreover, the Founders conspired and acted outside of their positions at VBF to accomplish the scheme that looted and injured VBF.

410.     The Founders, by and through the Enterprise, committed at least two related acts of racketeering activity which occurred within ten years of each other within the meaning of  18 § 1961(5), as alleged in more detail in this sub-section.

## C.      Predicate Acts

411.     Between September 5, 2014 and the present, the Founders executed their unlawful racketeering activity targeted at VBF through the following mailings and interstate wires (*i.e.* electronic mail, facsimiles and telephone calls).  Each such communication is a discrete violation of 18 U.S.C. §§ 1341 (mail fraud) or 1343 (wire fraud) and a "predicate act" of racketeering activity pursuant to 18 U.S.C. § 1961(1) (the "Predicate Acts"):

91

APP0156

     a.     Compensation of Christine Gagne who was compensated with VBF funds under the name of "Ronnie O'Brien" while she did not have legal immigration status to work in the United States;

     b.     June 2014 Written Representations

     c.     May 2015 Written Representations;

     d.     Various June 2015 Written Representations;

     e.     July 2015 Fisheries Report

     f.     November 2015 Written Representations;

     g.     January 2016 Written Representations;

     h.     April 2016 Written Representations; and

     i.     The Founders' involvement in other businesses while at VBF

412.    The Founders distributed marketing materials, contracts, e-mail communications, and other documents containing material misrepresentations related to the business Metrics, technology, and finances of VBF that were transmitted by mail and wire in interstate commerce.

413.    In reality, the Founders misrepresented and concealed their misconduct through such communications.

414.    Each of the Predicate Acts includes statements that were knowingly false and/or made with reckless indifference as to their truth or falsity, and was made with intent to fraudulently induce VBF to refrain from attempting to halt the Founders' misconduct by concealing these material facts from VBF.

415.    These Predicate Acts consisted of communications and transmissions through the mail and across the interstate wires. They were intended to, and did in fact, directly or indirectly affect the Enterprise, by allowing it to misappropriate VBF funds and other assets.

416.    The Founders' repeated violation of 18 U.S.C. §§ 1341 (mail fraud) or 1343 (wire fraud) occurred over a period of several years, commencing in 2014, and was continuous

92

throughout the relevant time period (i.e. on or before September 2014 through at least November 2017, if not later).

417.    The Predicate Acts were related and connected to the same unlawful scheme or artifice to fund VBF, loot VBF, and ultimately defraud VBF devised and executed by the Founders to continually conduct or participate in the conduct of the affairs of the Enterprise.

418.    Accordingly, the Founders' pattern of racketeering activity consisted of multiple Predicate Acts that victimized VBF. The Predicate Acts occurred and extended over a substantial period of time constituting a close-ended scheme.  Pleading in the alternative, the Predicate Acts constituted an open-ended scheme as they occurred over a substantial period of time and threaten continuing criminal conduct.

419.    The Founders' pattern of racketeering activity is further evidenced by the number of Predicate Acts and the variety of the Predicate Acts (consisting of, inter alia, projections, invoicing, emails, guaranties and other promises).

420.    VBF made or authorized transfers of assets and stock (as described above) totaling (and based on information available today, VBF's investigation is ongoing):

   a.    at least $4,562,498 to Wulf;

   b.    at least $4,747,333 to Hall;

   c.    at least $4,365,000 to James Rea;

   d.    at least $4,487,410 to Ted Rea; and

   e.    at least $3,389,501 to Driver.

421.    The Founders also directed all distributions made by VBF.  Instead of leaving sufficient funds in VBF to conduct day-to-day operations, the Founders looted the company through misappropriation of funds and self-dealing.  These funds were diverted from VBF to the Founders.  These distributions were effectuated through the United States mail and by wire in

APP0158

interstate commerce, in furtherance of the fraudulent scheme alleged herein.  This conduct caused injury to VBF's business, as it resulted in, among other things, VBF owing millions of dollars without sufficient funds to account for such debt.

**D.**   **Defendants Conducted the Enterprise's Affairs Through a Pattern of Racketeering Activity**

422.   At all relevant times, the Founders were associated with the Enterprise as the parties in control of the Enterprise and VBF.  The Founders exercised continuous authority over the Enterprise on an ongoing basis, up through and including November 2017.

423.   The Founders conducted the affairs of VBF and the association-in-fact enterprise through a pattern of racketeering activity:  namely, mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343.

424.   The Founders furthered their scheme by transferring funds to themselves via wire on multiple occasions, paying themselves sums of money in compensation and bonuses. Additionally, the Founders authorized and requested payments related to the BAJER stock scheme, the American Growth Funding Loan scheme, the Wulf Lake House scheme, the Sedun stock scheme, the Gagne scheme, the tractor-trailer scheme, and the OFA Scheme to loot VBF and its resources, and payments made for these schemes were made by wire or mail.

425.   At all relevant times, the Founders' association with the Enterprise facilitated their commission of the Predicate Acts comprising a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).

426.   The Founders committed or caused to be committed the Predicate Acts, acts of mail or wire fraud, as the means by which he conducted, or participated in the conduct of the Enterprise's affairs for the intended purpose of misappropriating funds and other assets from VBF.

94

APP0159

427. The Founders used mail and wire over a continuous period of years, establishing a pattern of racketeering activity.

**E.** **Injury To VBF**

428. As a direct and proximate result of the Founders' racketeering activities, VBF suffered actual damages in the amount of at least $90,000,000. VBF has been directly, purposefully, and foreseeably injured in its business and property by reason of the Founders' violation of 18 U.S.C. § 1962(c). VBF is a "person" who has suffered a compensable injury as a result of the Founders' unlawful activity, as defined in 18 U.S.C. § 1964(c).

429. Pursuant to 18 U.S.C. § 1964(c), VBF is entitled to recover three times the actual damages that it has sustained as a direct and proximate cause of the Enterprise's unlawful racketeering activity, amounting to at least $240,000,000, as well as VBF's reasonable attorney's fees and litigation expenses.

430. The intended, direct and foreseeable consequence of the Founders' unlawful racketeering activity, as described above, was and is to injure VBF's business or property by, among other things, extracting millions of dollars of from VBF.

431. As a result of the Founders' racketeering activity and scheme to defraud, VBF has suffered damages in excess of the minimum jurisdictional limit of this Court, for which it seeks recovery. VBF has suffered injury to its business and property as a result of the Founders' conduct of VBF through a pattern of racketeering activity.

432. The misappropriation of funds and self-dealing perpetrated by the Founders have depleted VBF of funds that could have been used to continue to operate its business and pay its creditors. VBF was injured by the Founders' fraudulent and racketeering activity because it prevented the business from continuing to operate and maintain the core of its business.

APP0160

433.    VBF is entitled to treble damages and attorneys' fees based upon the Founders' violation of 18 U.S.C. § 1962(c).

434.    VBF did not discover its injuries resulting from the Founders' pattern of racketeering activity until in or around March 2018.

## XI.  ATTORNEYS' FEES

435.    VBF is entitled to recover reasonable and necessary attorney's fees and costs for the claim against Defendants.

436.    Specifically, under Iowa's fraudulent transfer law, the Court may award, any other relief the circumstances may require (*see* Iowa Code § 684.7) and under Texas' fraudulent transfer law, Plaintiff is entitled to attorneys' fees and costs for the claims against Defendants (*see* TEX. BUS. & COMM. CODE § 24.013).

## XII.  PRAYER

WHEREFORE, VBF respectfully requests the following relief:

437.    That this Court enter judgment in its favor and against the Defendants, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, as actual and consequential damages, including but not limited to compensatory damages representing the devaluation of Plaintiff due to Defendants Leslie A. Wulf's, Bruce A. Hall's, James Rea's, John E. Rea's, and Keith Driver's fraud, mismanagement, other waste of corporate assets, and other misconduct described herein, plus exemplary damages due to Defendants' fraudulent and malicious conduct, costs, allowable pre-judgment and post-judgment interest at the high rates allowed by law; and disgorgement of compensation and any other amounts unjustly retained;

438.    That VBF be awarded treble damages and attorneys' fees based under the Founders' violation of 18 U.S.C. §1962(c);

96

APP0161

439.     That Defendants Leslie A. Wulf, Bruce A. Hall, James Rea, John E. Rea, and Keith Driver be ordered to return all funds received from VBF as a result of the conduct described herein, and that judgment be entered against them and in favor of VBF for the total amount transferred to them. In the case that the funds were spent to acquire any real or personal property, VBF requests that a constructive trust be imposed upon the property, and an order that such property must immediately be turned over to VBF;

440.     That Defendants Leslie A. Wulf, Bruce A. Hall, James Rea, John E. Rea, and Keith Driver be required to produce an equitable accounting detailing every dollar deposited, received, or otherwise transferred to or from VBF or any of its affiliates and Defendants from on or before October 1, 2014 through January 31, 2018, and entering a judgment against Defendants as to any amounts for which Defendants cannot account, or which are shown by the accounting to have been misappropriated by Defendants;

441.     That this Court rescind the Termination Agreements and Wulf Separation Agreement of Defendants Leslie A. Wulf, Bruce A. Hall, John E. Rea, and Keith Driver and return the parties to their *status quo ante* before those agreements were entered into;

442.     That this Court enter a judgment declaring that the Release and Severance Provisions in the Termination Agreements are null and void *ab initio*, and that Defendants Bruce A. Hall, John E. Rea, and Keith Driver are not entitled to rely on the Release and Severance Provisions to avoid the claims asserted against them by VBF and award other relief deemed just;

443.     That this Court enter a judgment declaring that the benefits under the Employment Agreement between VBF and Defendant James Rea are null and void *ab initio*, and that Defendant James Rea is not entitled to rely thereon, and awarding other relief just;

97

444.    That this Court enter a judgment declaring that the benefits under the Wulf Separation Agreement between VBF and Defendant Leslie A. Wulf are null and void *ab initio*, and that Defendant Wulf is not entitled to rely thereon, and awarding other relief deemed just;

445.    That this Court enter judgment in its favor and against Defendant Christine Gagne, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for the Founders-Gagne Conspiracy and aiding and abetting the Founders' Conspiracy, plus punitive damages, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just;

446.    That Defendant Christine Gagne be ordered to return all funds received from VBF as a result of the conduct described herein, and that judgment be entered against her and in favor of VBF for the total amount transferred to her;

447.    That this Court enter judgment in its favor and against the Defendant Canaccord, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for the Founders-Canaccord Conspiracy and aiding and abetting the Founders' Conspiracy, plus punitive damages in an amount to be determined at trial, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just;

448.    That this Court enter judgment in its favor and against the Defendant Maniaci, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for the Founders-Maniaci Conspiracy and aiding and abetting the Founders' Conspiracy plus punitive damages in an amount to be determined at trial, costs, allowable pre-judgment interest, the imposition of a constructive trust, and other relief deemed just;

449.    That VBF be awarded attorneys' fees and costs; and

450.    That VBF be awarded any other relief, both special and general to which it may be

justly entitled.

Dated: September 23, 2019

**JURY TRIAL DEMANDED**

/s/ *Nicole Williams*

ATTORNEYS FOR PLAINTIFF

Nicole Williams
Texas Bar No. 24041784
nicole.williams@tklaw.com
William L. Banowsky
Texas Bar No. 01697125
bill.banowsky@tklaw.com
Jasmine S. Wynton
Texas Bar No. 24090481
jasmine.wynton@tklaw.com

**THOMPSON & KNIGHT LLP**
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201
214-969-1149

/s/ *Robert H. Lang*
Robert H. Lang
(appearing *pro hac vice*)
rhlang@thompsoncoburn.com
Patrick Morales-Doyle
(appearing *pro hac vice*)
pmoralesdoyle@thompsoncoburn.com
Caroline Pritikin
(appearing *pro hac vice*)
cpritikin@thompsoncoburn.com
Eileen E. Boyle Perich
(appearing *pro hac vice*)
eboyleperich@thompsoncoburn.com

APP0164

Adam C. Decker
(appearing *pro hac vice*)
adecker@thompsoncoburn.com

**THOMPSON COBURN LLP**
55 East Monroe, 37th Floor
Chicago, IL 60603
312-346-7500

***ATTORNEYS FOR PLAINTIFF***
***VEROBLUE FARMS USA, INC.***

100

APP0165

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, a non-attorney, hereby certifies under penalties as provided by law, that on Sepember 23, 2019, she caused a true and correct copy of the foregoing **Second Amended Complaint** to be served upon counsel of record via ECF system of Texas:

/s/      Arianna Thornton