# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| VEROBLUE FARMS USA INC., | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| LESLIE A. WULF, BRUCE A. HALL, JAMES | § | |
| REA, JOHN REA, and KEITH DRIVER, | § | |
|     Defendants/Third Party Plaintiffs, | § | CIVIL ACTION NO. 3:19-CV-00764-L |
| | § | |
| v. | § | HON. BRANTLEY STARR |
| | § | |
| EVA EBSTEIN, JENS HAARKOETTER, BJORN | § | |
| THELANDER, ANDERS WESTER, NORMAN | § | |
| MCCOWAN, DR. OTTO HAPPEL and ALDER | § | |
| AQUA, LTD. | § | |
|     Third-Party Defendants | § | |

---

## DEFENDANTS/THIRD-PARTY PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION TO THIRD-PARTY DEFENDANT BJORN THELANDER'S MOTION TO DISMISS AMENDED THIRD PARTY COMPLAINT

---

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

FACTUAL BACKGROUND ............................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.   The Court Maintains Personal Jurisdiction over Thelander Based on Years of Activities Directed Toward VBF's Operations in Texas. (FRCP 12(b)(2)) ........................ 4

   A.   Thelander Purposefully Directed Activities at VBF's Offices, Personnel, and Operations in this District. ........................................................................................... 6

     1)   July 6, 2016 – Unanimous Written Consent of the Board of Directors and the Sole Shareholder of VBF IP, Inc. (Exhibit A-7, APP00114-135). ............................................ 6

     2)   July 7, 2016 – VeroBlue Farms, USA Inc. Series A Preferred Stock Purchase Agreement (Exhibit A-1, APP0009-56). .................................................................................. 7

     3)   August 3, 2016 – Amended and Restated Certificate of Formation of VBF IP, Inc. (Exhibit A-8, APP00136-144). ..................................................................................................... 7

     4)   August 3, 2016 – Restated Articles of Incorporation of Iowa's First, Inc. (Exhibit A-9, APP00145-150). .......................................................................................................... 8

     5)   September 20-21, 2016 – Minutes of the Meeting of the Board of Directors of VeroBlue Farms USA, Inc. (Exhibit A-10, APP00151-158). ............................................ 8

     6)   December 6, 2016 – Iowa's First Inc.'s Application for Authority to Transact Business in Illinois (Exhibit A-11, APP00159-162). ........................................................ 8

     7)   October 24, 2017 - Minutes of the Meeting of the Board of Directors of VeroBlue Farms USA, Inc. (Exhibit A-12, APP00163-165). .............................................. 9

     8)   October 27, 2017 – Hall and T. Rea Termination Agreements. .................................. 9

     9)   November 6, 2017 – E-mail Correspondence between Ebstein, Thelander, and Wester (TPC, Ex. E, APP00113). .......................................................................................... 10

     10)  November 9, 2017 – November 22, 2018 – E-mail Correspondence between Wulf and Thelander (Exhibit A-14, APP00171-72). .................................................................... 11

     11)  December 1, 2017 – Wulf Termination Agreement (Ex. A-3, APP00075-87). ........................ 11

   B.   Founders' Claims "Arise out of or Relate To" The Thelander's Activities Within the Northern District of Texas. .................................................................................... 12

   C.   The Northern District of Texas Exercising Jurisdiction Would Not be Unreasonable. ................................................................................................................ 13

II.   Founders Have Alleged Adequate Facts to State a Claim for Tortious Interference Against Thelander. (FRCP 12(b)(6)) ............................................................ 14

   A.   Thelander Was Acting for His Personal Self Interest, and not as Agent for VBF, in Encouraging VBF to Breach its Contracts with Founders. ............................................. 14

ii

**B.   Thelander Cannot Assert VBF's "Justification" in Breaching its Contacts with Founders as a Basis for Dismissal** ................................................................................... **16**

    *1.   The Releases in the Termination Agreements Act Bar VBF's Claims against T. Rea and Hall 17*

    *2.   Whether Egregious Cause Existed Under the Employment Agreement Justifying VBF's Termination of James Rea is A Question of Fact*......................................................................... *18*

**C.   VBF's Confirmation Plan Explicitly Carved Out Founders' Claims Against Thelander from Release and Discharge**.................................................................... **19**

**III.  Founders' Damages and Prayer for Attorneys' Fees are Well Plead.** ........................ **22**

**CONCLUSION** ..................................................................................................................... **25**

1523819v1 - V0265.00001 200109 Founder Response to Thelander Motion to Dismiss (Final)

## <u>TABLE OF AUTHORITIES</u>

Other Authorities

*AFTG–TG, LLC v. Nuvoton Tech. Corp.*,
    689 F.3d 1358 (Fed. Cir. 2012) ............................................................................... 3, 5
*Akro Corp. v. Luker*,
    45 F.3d 1541 (Fed. Cir. 1995) .................................................................................... 4
*Alma Group, LLC v. Palmer*,
    143 S.W. 3d 840 .......................................................................................................... 24
*Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*,
    566 F.3d 1012 (Fed. Cir. 2009) ............................................................................... 4, 5
*Bell Atlantic Corp v. Twombly*,
    550 U.S. 540 (2007) ...................................................................................................... 4
*Conley v. Gibson*,
    335 U.S. 41 (1957) ........................................................................................................ 4
*Cypress Engine Access., LLC v. HDMS Ltd. Co*,
    283 F. Supp. 3d 580 (S.D. Tex. 2017) ............................................................... 17, 18
*Daimler AG v. Bauman*,
    —U.S.——, 134 S. Ct. 746 (2014) ............................................................................ 5
*Ed Rachel Foundation v. D'Unger*,
    117 S.W. 3d 348 ........................................................................................................... 24
*Elecs. for Imaging*,
    340 F.3d. ............................................................................................................... 3, 4, 5
*Ganske v.  WRS Group, Inc.*,
    Cause No. 10-06-00050-CV, 2007 WL 1147357 (Tex. App. – Waco April 18, 2007, no pet.)
    .......................................................................................................... 17, 18, 20, 22
*Grober v. Mako Prods., Inc.*,
    686 F.3d 1335 (Fed. Cir. 2012) ............................................................................... 4, 5
*Grober*,
    686 F.3d. ......................................................................................................................... 5
*Hanson v. Denckla*,
    357 U.S. 235 (1958) ...................................................................................................... 4
*Holloway v. Skinner*,
    898 S.W.2d 793 (Tex. 1995) ................................................................................. 14, 15
*In re Chinese-Manufactured Drywall Products Liab. Litig.*,
    753 F.3d 521 (5th Cir. 2014) ................................................................................ 12, 13
*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) .................................................................................................. 4, 5
*ITL Int'l, Inc. v. Constenla, S.A.*,
    669 F.3d 493 (5th Cir. 2012) ................................................................... 6, 10, 11, 12
*J. McIntyre Mach., Ltd. v. Nicastro*,
    — U.S. —, 131 S. Ct. 2780 (2011) .......................................................................... 4
*Luv n' care, LTD. v. Insta-mix, Inc.*,
    438 F.3d 465 (5th Cir. 2006) ...................................................................................... 14

iv

*McFadin v. Gerber*,
  587 F.3d 753 (5th Cir. 2009) ........................................................................................ 6
*National Property Holdings, L.P. v.  Westergren*,
  453 S.W.3d 419 (Tex. 2015) ....................................................................................... 17
*Nuance Commc'ns, Inc. v. Abbyy Software House*,
  626 F.3d 1222 (Fed. Cir. 2010) .................................................................................... 5
*Religious Tech. Ctr. v. Liebreich*,
  339 F.3d 369 (5th Cir. 2003) ........................................................................................ 4
*Schlobohm v. Schapiro*,
  784 S.W.2d 355 (Tex. 1990) ......................................................................................... 4
*Silent Drive, Inc. v. Strong Indus., Inc.*,
  326 F.3d 1194 (Fed. Cir. 2003) .................................................................................... 6
*Sterner v. Marathon Oil Co.*,
  767 S.W.2d 686 (Tex. 1989) ....................................................................................... 16
*Stuart v. Spademan*,
  772 F.2d 1185 (5th Cir. 1985) ...................................................................................... 3
*Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*,
  563 F.3d 1285 (Fed. Cir. 2009) .................................................................................... 6
*Twombly*,
  550 U.S ............................................................................................................................ 4
*Wien Air Alaska, Inc. v. Brandt*,
  195 F.3d 208 (5th Cir. 1999) ...................................................................................... 14
*World–Wide Volkswagon Corp. v. Woodson*,
  444 U.S. 286 (1984) ....................................................................................................... 5

## Regulations

Bankruptcy Code §§ 524(e) and 1129 (a) .......................................................................... 19
Tex. Civ. Prac. & Rem. Code § 38.011 ............................................................................. 23
Texas Civ. Prac. & Rem. Code § 38.001 ...................................................................... 23, 24

## Rules

FRCP 12(b)(2); and (2) ................................................................................................... 3, 4
FRCP 12(b)(6) ......................................................................................................... 3, 4, 14
FRCP 8(c)(1) ................................................................................................................... 16

Defendants/Third Party Plaintiffs, Leslie A. Wulf ("**Wulf**"), Bruce A. Hall ("**Hall**"), John E. "Ted" Rea ("**T. Rea**"), and James Rea ("**J. Rea**") (collectively "**Founders**"), hereby respond to Third Party Defendant, Bjorn Thelander's ("**Thelander**") Motion to Dismiss Amended Third Party Complaint Pursuant to Rules 12(b)(2) & 12(b)(6) (the "**MTD**") [Dkt. No. 227]. Thelander, as a director of VBF and a representative of VBF's controlling shareholder, personally directed the termination of all of the Founders, negotiated the agreements governing their termination, and then immediately obliged VBF to breach the binding contracts it negotiated with the Founders. These actions, which (1) all took place against Texas residents, (2) from an office based in Plano, Texas, (3) involving agreements selecting Texas courts as the proper forum, subject Thelander to the jurisdiction of this Court. In further opposition to Thelander's Motion, Founders state:

## FACTUAL BACKGROUND

Founders were the founders, officers, and directors of VeroBlue Farms, USA, Inc. ("**VBF**"), and were among its original shareholders and officers: CEO (Wulf), CFO (Hall), COO (T. Rea) and Construction Director (J. Rea). (Amended Third-Party Complaint, Dkt. No. 186, ("**TPC**"), ¶ 13.)  At various times between 2014 and 2016, each of the Founders served as Directors on VBF's Board as well. (*Id.*) In July 2016, Alder Capital International Ltd., ("**Alder**" which later became Alder Aqua, Ltd.), and FishDish LLC, an Iowa investor group ("**FishDish**"), together invested $34,000,000 in VBF through a purchase of preferred stock.[1] (*Id.,* ¶ 14.) Third Party Defendant Thelander was one of two directors that Alder appointed as its representatives to VBF's Board in July 2016. (*Id.*) Thelander served as director of VBF until sometime in early 2018. (*Id.,* ¶ 15.) At the same time, it invested equity into VBF, Alder extended a line of credit to VBF,

---

[1] *See* July 9, 2016 VeroBlue Farms USA Inc. Series A Preferred Stock Purchase Agreement ("**Series A Ag.**"). attached as **Exhibit A-1** to Affidavit of Leslie Wulf, dated September 17, 2019, Exhibit A hereto ("**Wulf Aff.**").

1

through its affiliate, Amstar Funds ("**Amstar**"), and in exchange, VBF issued warrants to Alder that could be exercised to obtain additional shares, via a separate agreement. (*Id.*)

Within a year of Alder's investment, in July 2017, VBF had drawn down on the Amstar loan and Alder exercised certain warrant rights, which resulted in Alder owning a controlling interest (54%) in VBF. (TPC, Dkt. No. 186, ¶16.) Within weeks, Thelander, along with Alder representative and VBF board member, Jens Haarkoetter, and Alder principals, Otto Happel ("**Happel**") and his daughter Eva Ebstein ("**Ebstein**"), began serially terminating Founders from their positions with VBF. (*Id.*, ¶¶ 18, 35-40, 44-46, 49, 57-60.) Since then, Founders have discovered that Thelander and the other Third-Party Defendants participated in a scheme to oust Founders from management, falsely accuse them of a litany of misdeeds, and avoid, or otherwise breach VBF's contractual obligations to the Founders. (*Id.*, ¶ 18.) Specifically, Thelander and the other Third-Party Defendants negotiated termination agreements between three of the four Founders and VBF, and then directed VBF to fabricate reasons to avoid its obligations to Founders under such agreements.[2] (*Id.*, ¶ 19.) This was succinctly stated by Ebstein in an email to Thelander before terminating Mr. Wulf: "[A]nyone terminated by Les received a lovely golden parachute of other people's money. ***We need to try and avoid this, if legally permissibl**e." (*Id.*, ¶ 46, Ex. E.)

On July 31, 2018, VBF filed suit against Founders claiming they had misappropriated funds and committed other misdeeds while officers and directors of the company.[3] (TPC, Dkt. No. 186, ¶ 21.) On April 10, 2019, the Founders filed their Third-Party Complaint against Thelander and six other directors and investors in VBF. [Dkt. No. 66.] This was amended on November 8,

---

[2] Founders' respective agreements with VBF are defined as they are in the TPC. (*See* TPC, Exs. A-D.)
[3] Shortly thereafter, on September 21, 2018, VBF filed for Chapter 11 bankruptcy protection in the Northern District of Iowa (*In re: VeroBlue Farms USA, Inc.*, Case No. 18-01297 (Bankr. N.D. Iowa) ("*In re VBF*"). Alder, through Thelander, Harkoetter, Ebstein and the other Third-Party Defendants, controlled VBF's reorganization, first as the sole DIP lender and now, as the sole shareholder of the reorganized entity.

2019. [Dkt. No. 186.] In the TPC, each Founder asserts that Thelander and the other Third-Party Defendants used their leverage as Alder's representatives on VBF's Board to tortiously interfere with his respective agreement with VBF, which led to VBF breaching its obligations to the Founders under these contracts. (TPC, Counts I-IV.) Founders allege that each and every action taken by Thelander was directed against Founders in their positions as officers of VBF, whose principal office was located in Plano, Texas.  Thelander's actions were repeatedly made in or directed at people, entities, activities and contracts located in and governed by Texas law. This Court unquestionably has jurisdiction over Thelander in this matter, and Founders claims are adequately pled and should proceed.

## **ARGUMENT**

Thelander's Motion is brought under two separate grounds: (1) that this Court lacks personal jurisdiction over him under FRCP 12(b)(2); and (2) that the Third-Party Complaint fails to state a claim under FRCP 12(b)(6). To survive Thelander's jurisdictional claim under Rule 12(b)(2), in the absence of jurisdictional discovery or an evidentiary hearing, Founders need only make a *prima facie* showing of jurisdiction.[4]  In evaluating that showing, a court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."[5]  Uncontroverted allegations in the plaintiff's complaint must be accepted as true, and any factual conflicts in the parties' evidence must be resolved in the plaintiff's favor.[6]

Thelander's motion to dismiss under Rule 12(b)(6) should be granted *only* if it appears beyond a doubt that Founders can prove *no set of facts* in support of its claim which would entitle

---

[4] *AFTG–TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1360 (Fed. Cir. 2012) (citing *Elecs. for Imaging*, 340 F.3d at 1349)).
[5] *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).
[6] *AFTG–TG*, 689 F.3d at 1360.

them to relief.[7] Such a motion merely tests the legal sufficiency of a complaint, requiring a court to construe the complaint liberally, assume all facts as true, and draw all reasonable inferences in favor of the plaintiff.[8] A complaint should never be dismissed because the court is doubtful that the plaintiff will be able to prove all of the factual allegations contained therein. *Id.*

I.     **The Court Maintains Personal Jurisdiction over Thelander Based on Years of Activities Directed Toward VBF's Operations in Texas. (FRCP 12(b)(2))**

In the Federal Circuit, "[a] personal jurisdiction determination for an out-of-state defendant is a two-step inquiry: (1) whether a forum state's long-arm statute permits service of process and (2) whether assertion of personal jurisdiction violates due process."[9] The Texas long-arm statute, which governs here, is coextensive with the limits of federal due process.[10] For that reason, the personal jurisdiction analysis narrows to one inquiry: whether an exercise of personal jurisdiction comports with the Due Process Clause of the U.S. Constitution.[11]

To satisfy the Due Process Clause, a defendant must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[12] As a general matter, the sovereign's exercise of judicial power requires some act by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protections of its laws."[13] In that manner, due process principles "give a degree of predictability to the legal system that allows

---

[7] *Conley v. Gibson*, 335 U.S. 41, 48 (1957) (emphasis added); *see also* Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp v. Twombly*, 550 U.S. 540, 570 (2007).

[8] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).

[9] *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012) (quoting *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017 (Fed. Cir. 2009)) (internal quotation marks omitted).

[10] *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990); *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003).

[11] *See Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003).

[12] *Akro Corp. v. Luker*, 45 F.3d 1541, 1545 (Fed. Cir. 1995) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[13] *J. McIntyre Mach., Ltd. v. Nicastro*, — U.S. —, 131 S. Ct. 2780, 2787 (2011) (plurality opinion) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

4

potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."[14]

There are two types of minimum contacts: (1) those giving rise to "general" personal jurisdiction, and (2) those giving rise to "specific" personal jurisdiction.[15] General jurisdiction exists only if the defendant's "continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities."[16]  Specific jurisdiction, by contrast, is "based on activities that arise out of or relate to the cause of action, and can exist even if the defendant's contacts are not continuous or systematic."[17]

As described *infra,* Thelander has held himself out to multiple governmental authorities as being officed in or otherwise located in Plano, Texas. He certainly wanted those authorities to believe he was "essentially at home" in Texas, as required to establish general jurisdiction.[18]  But even without general jurisdiction, it is clear this Court can exercise specific jurisdiction over Thelander. The Federal Circuit applies a three-factor test to determine if specific personal jurisdiction exists: (1) whether the defendant "purposefully directs" his activities at residents of the forum state, (2) whether the claim "arises out of or relates to" the defendant's activities with the forum state, and (3) whether assertion of personal jurisdiction is "reasonable and fair."[19] "The plaintiff has the burden of proving parts one and two of the test, and then the burden shifts to the defendant to prove that personal jurisdiction is unreasonable."[20]  "Under this test, a court may

---

[14] *World–Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1984).
[15] *AFTG–TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1360 (Fed. Cir. 2012).
[16] *Daimler AG v. Bauman*, —U.S.——, 134 S. Ct. 746, 754 (2014) (quoting *Int'l Shoe Co.*, 326 U.S. 310, 316 (1945)).
[17] *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1346 (Fed. Cir. 2012) (quoting *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017 (Fed. Cir. 2009)).
[18] *Daimler* 134 S. Ct. at 754.
[19] *AFTG–TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1361 (Fed. Cir. 2012) (citing *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1231 (Fed. Cir. 2010)).
[20] *Grober*, 686 F.3d at 1356 (citing *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1350 (Fed. Cir. 2003)).

5

properly assert specific jurisdiction, even if the contacts are isolated and sporadic, so long as the cause of action arises out of or relates to those contacts."[21]

### A.      Thelander Purposefully Directed Activities at VBF's Offices, Personnel, and Operations in this District.

The "touchstone" of the minimum contacts test under the first prong "is whether the defendant's conduct shows that it 'reasonably anticipates being haled into court."[22] "This requirement can be satisfied by showing that the defendant purposefully directed [his] activities toward the forum state or purposely availed [himself] of the privileges of conducting activities there."[23] While specific jurisdiction is possible even if the defendant's forum contacts are only isolated or sporadic, the relevant contacts "must be more than random, fortuitous, or attenuated, or of the unilateral activity of another party or third person."[24] What follows is a nonexclusive, chronological account of Thelander's contacts with the State of Texas that unambiguously reveal Thelander is acutely aware he could be "haled into" this Court.

> #### 1)  July 6, 2016 – Unanimous Written Consent of the Board of Directors and the Sole Shareholder of VBF IP, Inc. (Exhibit A-7, APP00114-135).[25]

VBF IP, Inc. is a Texas corporation. VBF is the sole shareholder of VBF IP, Inc. The July 6, 2016 Unanimous Written Consent appointed Thelander to serve as an "Investor Director" on the Board of VBF IP, Inc. This Consent also specified that the principal office of VBF IP, Inc. would be in Plano, Collin County, Texas, and required VBF IP to maintain a list of shareholders in accordance with the Texas Business Organizations Code ("TBOC"). The TBOC is invoked an

---

[21] *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico*, 563 F.3d 1285, 1297 (Fed. Cir. 2009) (citing *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1200 (Fed. Cir. 2003)).
[22] *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009)
[23] *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 498 (5th Cir. 2012)
[24] *Id.* at 498-99.
[25] *See* Wulf Aff., APP0006, ¶ 18, for a description of all exhibits referenced herein.

6

additional four (4) times in the July 6, 2016 Unanimous Written Consent. By agreeing to serve as an Investment Director on the board of a Texas corporation, with a principal office in Plano, Texas, that was governed by the TBOC, Thelander unquestionably directed his activities towards the Northern District of Texas.

2) *July 7, 2016 – VeroBlue Farms, USA Inc. Series A Preferred Stock Purchase Agreement (Exhibit A-1, APP0009-56).*

Alder's equity investment into VBF is documented, in part, by the Series A Agreement. In that Agreement, Thelander is identified as one of two "Lead Investor Directors" of VBF. (Series A Ag., Ex. A-1, APP0018, § 1.5(y).)  This Agreement clearly identifies VBF's offices as 1507 Capital Avenue, Suite 101, Plano, Texas 75074, and requires notice to be provided to VBF's counsel, Jackson Walker, in Dallas. (*Id.*, APP0047, §7.5) Moreover, the Series A Agreement required Thelander to execute an Indemnification Agreement with VBF as part of the equity transaction. (*Id.*, APP0039, §4.3(h).) Accordingly, Thelander was specifically named as Alder's representative to a Board of a company (VBF) that had its named office located in Texas, and Thelander entered into an indemnification agreement with that same company for his acts as one of its directors. Thelander not only sits on the board of two companies with principal offices in Texas, but he has been indemnified by at least one of them for his acts as director.

3) *August 3, 2016 – Amended and Restated Certificate of Formation of VBF IP, Inc. (Exhibit A-8, APP00136-144).*

Shortly after Thelander's installation as director of VBF IP, that company submitted an Amended and Restated Certificate of Formation to the Texas Secretary of State.  In this Certificate, Thelander lists his address as 1507 Capital Avenue, Suite 101, Plano, Texas 75074. This was not merely a statement of where the company was located, but where he personally, as a director, was

7

located.  Thelander essentially reported to the Texas Secretary of State that he could be found in

Plano, Texas - a plainly purposeful and directed activity towards this forum.

4) *August 3, 2016 – Restated Articles of Incorporation of Iowa's First, Inc.*
   *(Exhibit A-9, APP00145-150).*

Iowa's First, Inc. is another entity owned by VBF.  Thelander also sits on its Board of

Directors. Although Iowa's First is an Iowa corporation, in its restated Articles of incorporation,

submitted to the Iowa Secretary of State, Thelander again lists his address as 1507 Capital Avenue,

Suite 101, Plano, Texas 75074. Even in other states, Thelander affirmatively holds himself out as

having a continuing presence in Plano, Texas.

5) *September 20-21, 2016 – Minutes of the Meeting of the Board of Directors of*
   *VeroBlue Farms USA, Inc. (Exhibit A-10, APP00151-158).*

Thelander participated in quarterly meetings of VBF's Board of Directors.  (Wulf Aff., Ex.

A, APP0004, ¶¶ 10-11.) Several of these meetings took place via telephone calls initiated by VBF's

executive personnel in Plano, Texas.  However, ***Thelander was also physically present at VBF's***

***offices in Plano, Texas*** for at least one Board of Directors meeting on September 20 – 21, 2016.

(*Id.*, ¶ 11, Ex. A-10, APP00151-58). Also, the minutes of this meeting name Thelander as a

member of VBF's Governance and Compensation Committee, which was directed from VBF's

corporate office in Plano, Texas.

6) *December 6, 2016 – Iowa's First Inc.'s Application for Authority to Transact*
   *Business in Illinois (Exhibit A-11, APP00159-162).*

On December 6, 2016, Iowa's First, filed an Application for Authority to Transact Business

in Illinois. On the last page of the Application, Thelander is listed, again, as a director of Iowa's

First. However, Thelander now lists his address as 3369 Premier Drive, Suite 300, Plano, Texas

8

75023. Via this filing, Thelander claimed two distinct addresses within the jurisdictional limits of the Northern District of Texas.

> 7)  *October 24, 2017 - Minutes of the Meeting of the Board of Directors of VeroBlue Farms USA, Inc. (Exhibit A-12, APP00163-165).*

On October 24, 2017, VBF's Board of Directors met by telephone to discuss two matters at the heart of Founders' TPC: 1) termination of Defendants' T. Rea and Hall; and 2) the harassment allegations against Alder Director Haarkoetter. The minutes of this meeting indicate that Thelander was present telephonically.  But more importantly, these minutes illustrate Thelander's detailed involvement in Founders' termination and negotiation of the very agreements that VBF later breached with them.  The minutes also disclose that the "terms of their [T. Rea and Hall] severance was one year of salary each with a full release. This release was being circulated to Bjorn Thelander and Les [Wulf] today for finalization." The minutes go on to provide that "Bjorn Thelander commented on the skills required for a CFO in a startup such as VBF including tight expense controls, the ability to challenge assumptions and financial acumen – Bruce was lacking in these skills." The notes from this meeting indicate that Thelander was not merely a board member of VBF, he was active, and the apparent leader of the efforts to terminate two executives who officed out of VBF's Plano, Texas office. Not only that, but Thelander was actively participating in the negotiation of the Termination Agreements for Hall and T. Rea. (Wulf Aff., Ex. A, APP0004-05, ¶¶ 11, 13-14.) Thelander availed himself to the jurisdiction of this Court far beyond the "more than random, fortuitous, or attenuated" standard applied by this Court.

> 8)  *October 27, 2017 – Hall and T. Rea Termination Agreements.*

Hall and T. Rea's Termination Agreements were executed on October 27, 2017. (TPC, Dkt. No. 186,  Exs., C, D, APP0096, 0101.) Thelander was actively involved in negotiating these

9

Termination Agreements and was undeniably aware of the contents of each. (Wulf Aff., APP004-005, ¶ 13). Included in Hall and T. Rea's Termination Agreements is a provision that they would be governed by and construed in accordance with the laws of the State of Texas. (*Id.*, ¶ 14). Additionally, the Termination Agreements contain the provision that "[e]ach Party irrevocably submits to the exclusive jurisdiction of the Federal District Court for the Northern District of Texas for the purpose of any suit, action, or other proceeding arising out of this Agreement." (*Id.,* Ex. A-4, APP0096, ¶ 7(l) and Ex. A-5, APP00110, ¶ 7(l)).  On November 14, 2017, in an effort to clarify certain provisions of the Termination Agreements, Thelander sent Hall and T. Rea an e-mail stating that it was "good speaking with you just now," and that "if you can sign and return this attachment electronically, we will process the payment immediately." (Wulf Aff., APP004-05, ¶ 13, Ex. A-13, APP00166-169). The "attachment" referenced is a release letter designed to clarify the Termination Agreements, and from the e-mail, it appears Thelander was withholding payments due under the Termination Agreement until Hall and Ted signed an additional release. (*Id.*) Thelander inserted himself in the negotiation and clarification of the Termination Agreements, and from his e-mail, had the power and authority to control payments due under the Termination Agreements. As such, Thelander was unquestionably aware that his conduct in interfering with the Termination Agreements would subject him to the jurisdiction of this Court.

9) *November 6, 2017 – E-mail Correspondence between Ebstein, Thelander, and Wester (TPC, Ex. E, APP00113).*

Within two weeks of terminating Hall and T. Rea, and on the very same day that Wulf was terminated as VBF's CEO, Ebstein was communicating with Thelander and other Third-party Defendants to cement their scheme to gin up allegations and pretenses under which VBF could avoid the very contractual obligations to Founders that Thelander was tasked with negotiating.  As quoted in the Third-Party Complaint, Ebstein conveyed to Thelander and others her dismay that

10

"anyone terminated by Les received a lovely golden parachute of other people's money." Ex. A-6, APP00113). She then suggested that she, Thelander and others: "need to try and avoid this, if legally permissible." (*Id.*) At this point in time, both Hall and T. Rea had been "terminated by Les [Wulf]" and Thelander had just been tasked, days before, with negotiating and executing their Termination Agreements. This e-mail provides direct evidence that Thelander was part of a scheme attempting to reach into the Northern District of Texas and breach legally binding contracts with the Founders. When Thelander agreed to participate in this scheme, and then actually carried it out, he forfeited any jurisdictional argument he potentially had.

> 10) *November 9, 2017 – November 22, 2018 – E-mail Correspondence between Wulf and Thelander (Exhibit A-14, APP00171-72).*

Just days after Wulf was terminated, Thelander emailed him to discuss the particulars of Wulf's Termination Agreement. (Wulf Aff., Ex. A, APP0004-06, ¶¶ 11-17.) In the emails, Thelander states (1) "I promise to follow up with the lawyers today and see where we stand" in regards to editing and finalizing Wulf's Termination Agreement; and (2) "I have been pushing from my side to settle this as soon as possible, and have no desire to delay or draw anything out. I will again do my best to push the lawyers. (*Id.*, Ex. A-14, APP00171-72.) These communications expose that Thelander was intimately and substantially involved in negotiating, finalizing, and executing Wulf's Termination Agreement. As previously discussed, Wulf was the CEO of VBF and officed exclusively out of VBF's Plano office. These communications between Thelander and Wulf therefore show Thelander actively participating in the termination of a senior level executive working in the Northern District of Texas. This action alone is sufficient to put Thelander on notice that he should "anticipate being haled into" this Court.

> 11) *December 1, 2017 – Wulf Termination Agreement (Ex. A-3, APP00075-87).*

11

In the same vein, Wulf's Termination Agreement included a provision that the Agreement would be governed by Texas law and a provision designating the Northern District of Texas as the exclusive jurisdiction for any disputes regarding that agreement.  Coupled with the prior correspondence, Wulf's Termination Agreement clearly illustrates that Thelander was well aware that any interference with that Agreement would be litigated in this Court. Founders have provided more than sufficient evidence that Thelander not only tortiously interfered with the Termination Agreements, but knew that this interference would be litigated in the Northern District of Texas.

Thelander served on the Board of Directors of a company whose principal office was located in Plano, Texas; he represented to three different state government bodies that he could be personally located at an address in Plano, Texas; he visited Texas for at least one Board meeting and participated in numerous others telephonically with the officers there; communicated weekly with VBF's CEO and employees about the company's operations, and he personally negotiated with the Founders over the very contracts that are now the subject of Founders' claims against him.  Through all these activities, Thelander "purposefully directed" his activities at residents of Texas, specifically the Northern District and is subject to this Court's jurisdiction.

**B.      Founders' Claims "Arise out of or Relate To" The Thelander's Activities Within the Northern District of Texas.**

The second factor in assessing specific jurisdiction is whether Founders' claims are based on "alleged injuries that arise out of or relate to those activities" on which the Thelander's minimum contacts are established.[26] In other words, there must be a sufficient "nexus between the defendants' contacts with [the forum state] and the plaintiffs' [underlying] claims."[27] The Fifth Circuit has suggested that this flexible standard aims to both ensure a "causal nexus between the

---

[26] *In re Chinese-Manufactured Drywall Products Liab. Litig.*, 753 F.3d 521, 540 (5th Cir. 2014)
[27] *ITL Int'l*, 669 F.3d at 500.

12

[alleged] conduct and the purposeful contact" and account for "the foreseeability and fundamental fairness principles forming the foundation upon which the specific jurisdiction doctrine rests."[28]

Thelander's directed contacts with the Northern District of Texas all relate to actions he took as a director of VBF and/or one of its subsidiaries.  His closest contacts: personal attendance at a VBF Board meeting, emails with Ebstein and Wulf about Founders' termination, and negotiation of the Founders' Termination Agreements, establish some of the very actions that Founders claim constitute interference in their contractual agreements.  Thelander was directly involved in negotiating agreements with the Founders that he later worked with Ebstein and the other Third Party Defendants to sabotage.[29] While Thelander may challenge the validity of Founders' claim for tortious interference, this Court's inquiry is simply "whether the plaintiff's cause of action arises out of or results from the defendant's forum related contacts, *whatever the claims ultimate merits*.[30]

Accordingly, Founders have shown that Thelander purposely availed himself of the privileges of conducting activities in the Northern District of Texas. He did so by claiming an address at two different locations in this district, attending company board meetings here, negotiating contracts and agreements in Texas, advising on VBF's hiring and firing decisions in this district (Wulf Aff. Ex. A, APP0004-06, ¶¶ 10-17), and scheming to breach those agreements here in Texas. Thelander's ability to tortiously interfere with Founders' Agreement arises out of and relates to his business dealings with the Founders in the Northern District of Texas.

### C.   The Northern District of Texas Exercising Jurisdiction Would Not be Unreasonable.

---

[28] *Chinese-Manufactured Drywall Products*, 753 F.3d at 543.
[29] In fact, it was these very agreements that Thelander negotiated, and the forum selection provisions they contained, that lead the Iowa District Court to transfer this case to the Northern District of Texas.
[30] *Id*. at 549.

Lastly, at step three of the jurisdictional analysis, "the burden of proof shifts to the defendant to show that the exercise of jurisdiction would be unreasonable."[31]  For a defendant to carry his burden at this step, he "must make a compelling case."[32] Thelander fails even to argue that the exercise of jurisdiction would be unreasonable and therefore cannot carry this burden.  Accordingly, this Court may lawfully assert personal jurisdiction over Founders' tortious interference claims asserted against Thelander.

## II.    Founders Have Alleged Adequate Facts to State a Claim for Tortious Interference Against Thelander. (FRCP 12(b)(6))

As a separate matter, Thelander argues that Founders' separate claims for tortious interference against him fail to allege sufficient facts. The elements for tortious interference with an existing contract under Texas law include: (1) an existing contract subject to interference and (2) a willful and intentional act of interference with the contract (3) that proximately caused the plaintiff's injury and (4) caused actual damages or loss.  Founders have alleged more than adequate facts to establish each of these elements and their claims should proceed accordingly.

### A.    Thelander Was Acting for His Personal Self Interest, and not as Agent for VBF, in Encouraging VBF to Breach its Contracts with Founders.

Thelander first suggests that element two was not met because, as a director of VBF, Thelander was an agent of VBF and not legally capable of tortious interference with VBF's contracts. (MTD, Dkt. No. 227 at 10-14.) To be legally capable of tortious interference, Thelander must be a "stranger to the contract" with which he allegedly interfered.[33] A corporation's agent is

---

[31] *Luv n' care, LTD. v. Insta-mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006)
[32] *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)
[33] *Holloway v. Skinner*, 898 S.W.2d 793, 795-95 (Tex. 1995) (emphasis added) (recognizing the fundamental principle that a party to a contract cannot tortiously interfere with its own contract.)

14

not a stranger to the contract and cannot tortiously interfere with the corporation's contract, ***unless the agent is acting in his or her own self-interest***.[34]

Founders have alleged that Thelander was acting to benefit himself and the other Alder Defendants, namely Alder, not VBF, in directing VBF to breach their respective termination and employment agreements.   One of the first acts that VBF director Ebstein asked Thelander to undertake was to consult with legal counsel to find a way to avoid the obligations to the Founders due to their "political agendas," notably, not due to their performance as officers. (TPC, Dkt. No. 186, ¶ 46, Ex. E.) Ebstein was not an officer of VBF when she sent this email, but purportedly an independent director (and the daughter of the largest shareholder). Thus, in following her direction, Thelander was acting in his own self-interest, and that of the majority shareholder, not of VBF.

Additionally, Thelander engaged *Alder's counsel*, Davis Graham & Stubbs ("DGS"), instead of VBF's corporate counsel, Jackson Walker, to negotiate and document Wulf's Separation Agreement, (TPC, Dkt. No. 186, ¶¶ 44,45). Refusing to utilize VBF's corporate counsel in negotiating the removal of a senior level executive is a curious decision. If Thelander was truly acting as an agent of VBF, as alleged in his Motion, it would follow that he would use VBF resources in exercising his duties to VBF. Thelander's decision to engage Alder's law firm to remove Wulf from his position as CEO certainly raises questions regarding who Thelander was representing in this transaction. It could have been Alder, the entity that appointed Thelander to the Board of Directors of VBF in the first place (*id.*, ¶ 24), it could have been Happel, principal of both Alder & VBF's primary lender, Amstar (*id.*, ¶ 8), it could have been to protect his fellow Alder board representative Haarkoetter, who Founders discovered and revealed had sexually

---

[34] *Id.* at 795-96 (holding that for an agent to be liable for tortious interference, the plaintiff had to show that the agent acted so contrary to the principal's best interests that his actions could only have been motivated by personal interests).

15

harassed multiple employees of VBF. (*Id.*, ¶¶ 14, 32-34). In short, Thelander was acting as an agent for, and in the interests of multiple parties, but he did not even attempt to distinguish among those interests.

When the Third-Party Complaint is construed liberally, when all facts therein are assumed true, and when all reasonable inferences are made in favor of Founders, the Complaint undeniably would tend to support Founders' claim for relief. Founders' allegations are sufficient to permit Founders to pursue a tortious interference claim against Thelander, even though he was a director of VBF, as Thelander's loyalties, at the very least, were conflicted.

### B.    Thelander Cannot Assert VBF's "Justification" in Breaching its Contacts with Founders as a Basis for Dismissal.

Next, Thelander argues that Founders did not allege sufficient facts to demonstrate that Thelander actively persuaded VBF to breach the Termination Agreements. (MTD, Dkt. No. 227 at 14-17.) Specifically, Thelander asserts that VBF had a contractual right to take the actions it did (invoking the justification defense). Legal justification is an affirmative defense, which requires the defendant to show that the interference: (1) was done in a bona fide exercise of the defendant's own rights, or (2) the defendant's interest in the contract's subject matter was equal or superior to the plaintiff's.[35]   Thelander appears to argue only the first type of justification: that VBF was within its rights to terminate J. Rea and to file suit against Hall and T. Rea, despite having previously released them. (MTD, p. 14-17.)[36]  Thelander then claims that VBF was "justified" in bringing suit, despite the broad releases in T. Rea's and Hall's Termination Agreements, because

---

[35] *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 691 (Tex. 1989).
[36] Part of this argument relies on VBF's claim that the Termination Agreements are not enforceable because they were fraudulently procured. (*Id.*) But invalidity of a contract is a separate defense from justification. FRCP 8(c)(1).

16

those contracts did not include a covenant not to sue. (MTD, p. 15.) Neither of these arguments are compelling.

      1.  *The Releases in the Termination Agreements Act Bar VBF's Claims against T. Rea and Hall.*

Thelander cites *National Property Holdings, L.P. v. Westergren,* 453 S.W.3d 419, 428-29 (Tex. 2015) for the proposition that a release is not a covenant not to sue. (MTD, p. 15.)  But whether a release or settlement agreement operates as a covenant not to sue depends on the particular language used.  In *Westergren*, the parties simply agreed to "release all liability" related to a lis pendens and related claims in a pending lawsuit, and the release specifically provided that it could be plead as an affirmative defense. *Id.* at 422. Similarly, in *Cypress Engine Access., LLC v. HDMS Ltd. Co*, 283 F. Supp. 3d 580 (S.D. Tex. 2017), also cited by Thelander, the parties could not even agree on what constituted their settlement agreement, disputing what portion of a series of emails and a one-page outline was the final agreement. *Id.* at 583.  That case also related to claims already pending in a lawsuit.  The releases granted by VBF to Hall and T. Rea each are much broader and clearly evidence the parties' intent not to sue each other in the future.  VBF not only agreed to "release, acquit and forever discharge" Hall and T. Rea from "claims" and "liabilities" but also from "***charges, complaints, actions, causes of action, suits***." (Exhibit A-4, APP0093-94, ¶ 4(a), Exhibit A-5, APP00105-06, ¶ 4(a)) (emphasis supplied).) This language clearly encompasses more than merely a release of potential liability or pending claims, but an agreement to discharge the right to bring a "charge," "complaint," (like the Second Amended Complaint), "cause of action" or "suit."

To that end, this case is more on point with *Ganske v. WRS Group, Inc.*, Cause No. 10-06-00050-CV, 2007 WL 1147357 (Tex. App. – Waco April 18, 2007, no pet.), where a company  was found liable for breach of the release in a settlement agreement with its former officer by bringing

17

suit (and the former officer was awarded attorneys' fees incurred in enforcing the release as compensatory damages). Although *Ganske* was decided before *Westergren*, the Texas Supreme Court did not overrule *Ganske* in its decision and as noted by the district court in *Cypress Engine*, the language in the *Ganske* release was more specific.[37] As the *Ganske* court found: "There could be no more foreseeable consequence of a breach of the settlement agreement that the cost of litigation than it was specifically designed to avoid."[38] Hall and T. Rea did not merely agree to a defense to any claim by VBF, but negotiated to avoid any "***charges, complaints, actions, causes of action, [and] suits***" from VBF. This language constitutes more than a release, but a complete discharge of any action against them. By bringing the Amended Complaint against Hall and T. Rea, VBF has breached that obligation and Thelander is liable for inducing VBF to do so.

2. *Whether Egregious Cause Existed Under the Employment Agreement Justifying VBF's Termination of James Rea is A Question of Fact.*

Also, Thelander claims VBF was justified in denying J. Rea amounts due to him under his Employment Agreement, because that contract permitted termination for Egregious Cause. (MTD, Dkt. No. 227 at 16.) J. Rea and the Founders have alleged how VBF's "Egregious Cause" was fabricated, after the fact, as part of Thelander's and the other Alder Defendants' plan to come up with any legal reason to avoid payments to J. Rea and the Founders under their respective contracts. (TPC, Dkt. No. 186, ¶¶ 57-61.) Regardless, this defense is fact-dependent, and cannot be ruled upon at the pleading stage. This defense requires an inquiry into VBF's ability to terminate the

---

[37] *Cypress Engine*, 283 F. Supp. 3d at 587. The language in the *Ganske* release included a statement that it was intended to "buy his peace and avoid costly and time costing [sic] litigation" by the company's former president. *Ganske*, 2007 WL 1147357 at *3. Here, T. Rea's and Hall's Termination Agreements expressly state that their purpose is to "***resolve any clams they [VBF and Hall or T. Rea] may have against each other.***" (TPC, Dkt. No. 186, Exs. C, D, APP0089, 00101, 4th "Whereas" clause.) Similar to the situation at bar, in *Ganske*, the company's majority shareholder chose to ignore the negotiated release with the former president and filed suit for various business torts. *Id.* at *1, *4.
[38] *Id.*, 2007 WL 1147357 at * 3.

18

relevant contracts, and VBF's impetus to terminate and/or breach the agreements.  The ultimate decision will reside with the jury and cannot be resolved via this motion.

### C.    VBF's Confirmation Plan Explicitly Carved Out Founders' Claims Against Thelander from Release and Discharge.

Thelander urges this Court to dismiss Founders claims against both himself and the other Third-Party Defendants because they were encompassed in the discharge in VBF's Reorganization Plan.  (MTD, Dkt. No. 227 at 17-18.)  This ignores several specific modifications that Founders negotiated with VBF's counsel in the bankruptcy proceeding (and with VBF's present litigation counsel, who was present at the bankruptcy confirmation hearing) that carved out Founders' claims from the discharge and releases in the Reorganization Plan.  The only appearance that Founders made in VBF's Chapter 11 proceeding was to object to the non-debtor releases in the Reorganization Plan to the extent they could apply to the affirmative defenses against VBF and claims against all Third-Party Defendants, including Thelander, plead here.[39]  Founders' original TPC was already pending against Thelander and the Alder Defendants when VBF's Reorganization Plan was set for confirmation.  To that end, Founders objected to VBF's plan, arguing that its releases of certain non-debtor third parties, including all of the Third-Party Defendants, violated Bankruptcy Code §§ 524(e) and 1129 (a), as well improperly deprived Founders of their right to assert claims against Third Party Defendants and seek set off and recoupment against VBF.  (Founders Plan Obj., Ex. B, APP00176-80, ¶¶ 3, 4, 11, 14, 15, 16.)

---

[39] *See* Objection of [Founder Defendants] to Amended Joint Chapter 11 Plan of Reorganization of VeroBlue Farms USA, Inc. and its Affiliated Debtors, filed April 12, 2019, in *In re VBF*, Dkt. No. 446 and Supplement to Objection of [Founder Defendants] Amended Joint Chapter 11 Plan of Reorganization of VeroBlue Farms USA, Inc. and its Affiliated Debtors, filed April 15, 2019 (*In re VBF*,  Dkt. No. 466). Together, the Bankruptcy Docket Items 446 and 466 filed by Founders are referred to as "**Founders' Plan Obj**. and are attached hereto as Exhibit B, APP00173-246.

19

Founders explicitly objected to the discharge in § 9.13 of the Plan, the very section that VBF relies upon, on these grounds. (Founders Plan Obj., Ex. B, APP00245, ¶ 2.)

During the confirmation hearing on VBF's Reorganization Plan, held before the Bankruptcy Court in the Northern District of Iowa on April 17-18, 2019, Founders raised these objections. The parties, including VBF and both sets of its counsel, and Alder, agreed to certain modifications to VBF's Reorganization Plan to address Founders' objections, and VBF submitted these to the Court as part of its final Reorganization Plan. (*In re VBF,* Bankr. Dkt. No. 511 (the "**Modification**"), attached as part of MTD, Dkt. No. 227, Ex. 2, pp.144-45.) The Modification was included in Exhibit 2 to Thelander's Motion to Dismiss, but is wholly ignored in his argument. As relevant to Thelander's claims, the VBF Reorganization Plan, as clarified by the agreed Modification, provides:

- As to Section 9.15 of the Plan, which released Thelander and the other Alder Defendants, the parties agreed: "For the avoidance of doubt, ***Section 9.15 does not apply to the claims of any party to the litigation pending as 19-cv-764 in the United Stated District Court for the Northern District of Texas***, provided that such party does not receive payment or distribution under the Plan. (Modification, MTD, Dkt. No. 22, Ex. 2, p. 144, ¶ 2 (emphasis supplied).)

- The parties agreed to add a statement: "***Notwithstanding any*** provision ***in the Plan,*** upon entry of the Confirmation Order, parties in the litigation pending as 19-cv-764, in the United States District Court for the Northern District of Texas, may to the full extent the Bankruptcy Code permits, plead any and all defenses for an amount up to but not exceeding any recovery that may be obtained by the Debtors, without prejudice to each parties' right to dispute such claims" (*Id.*, pp. 144-45, ¶ 4.)

The Confirmation Order signed by the Bankruptcy Court recites that Founders' Plan Objections were resolved via the Modification and that document was incorporated into the Confirmation Order. (MTD, Dkt. No. 227, Ex. 2, pp. 1, 8, ¶ L.) As Modification ¶ 2 provides, any release of Thelander or any of the other Third-Party Defendants provided in VBF's Reorganization Plan does not apply to Founders' claims in this litigation, as long as they do not receive distributions or

20

payments under the Plan.  Thelander did not inform the Court of this provision and did not argue that it did not apply because any Founder received distributions or payments under the Plan.[40]

But Thelander asks this Court to circumvent the Modification by arguing the discharge of VBF, provided in § 9.13 of the Plan, makes it impossible for Founders to allege breach against VBF and therefore, makes it impossible to allege tortious interference against Thelander. (MTD, Dkt. No. 227 at 16.)  This is precisely why Founders objected to VBF's discharge, to the extent it would affect their defenses to VBF's Complaint and the TPC and why they insisted on the additional language in Paragraphs 2 and 4 of the Modification.

These provisions apply ***notwithstanding any provision of the plan*** and allows Founders to assert defenses against VBF in this litigation. This provision was specifically included to address Founders' anticipated affirmative defenses against VBF and claims against third parties, which will allege breach of Founders' various agreements with VBF, and seek set off and/or recoupment against VBF for any such breach.  (*See* Ans., Dkt. No. 66, Third, Fourth, Sixth, Seventh Aff. Def.) Thus, VBF's Reorganization Plan, as clarified by the Modification***, specifically contemplated and permits Founders to allege that VBF breached its contracts with Founders***, and to seek setoff from VBF for any such breach.  It follows then, that any such breach by VBF, even if in the nature of setoff only, can then also serve as the basis for a finding that Thelander induced that breach through his tortious interference. The Modification was negotiated to address these very claims and the Plan does not discharge VBF's liability, or Thelander's liability to Founders for these same claims.

---

[40] In fact, Founders did not submit proofs of claim in VBF's Chapter 11 proceeding and will not receive any distributions under VBF's Reorganization Plan.

21

### III.   <u>Founders' Damages and Prayer for Attorneys' Fees are Well Plead.</u>

Thelander argues against three aspects of Founders' requested relief: 1) that Hall and T. Rea cannot seek attorneys' fees as damages, 2) that none of the Founders are entitled to attorneys' fees separately, and 3) there is no basis for exemplary damages. (MTD, Dkt. No. 227 at 19-22.)

Addressing these in turn, Thelander first asserts that Hall and T. Rea cannot recover attorneys' fees they incur in defending themselves from VBF's claims against them in the Amended Complaint because that is not a separate lawsuit with a third party. (MTD at 19.)   Hall and T. Rea negotiated full and complete releases from VBF in their Termination Agreements. Thelander, along with the other Third-Party Defendants, induced VBF to breach these contracts and sue Hall and T. Rea on a plethora of matters that are clearly encompassed by the releases. If not for Thelander's interference with Hall's and T. Rea's agreements with VBF and the releases contained therein, Hall and T. Rea would not have been pursued by VBF.  This is not an instance where Hall and Rea are trying to recover fees from Thelander *in a case brought by him against them*.  He is not a party to the Termination Agreements, and he has not brought claims against Hall or T. Rea.  This is not a cross claim against VBF for its breach of the agreements.  It is a third-party claim and involves Thelander's separate individual liability to Hall and T. Rea deriving from VBF's liability to them under the agreements. Thus, this is the precise type of exception in which attorneys' fees are recoverable as damages:  Thelander's tortious acts, which were outside of his position as a VBF director, lead Hall and T. Rea to be sued by VBF.  The fees Hall and T. Rea incur in defending against VBF's claims are therefore, damages resulting from Thelander's individual torts and recoverable as damages.[41]

---

[41] *Ganske*, 2007 WL 1147357 at * 3 ("There could be no more foreseeable consequence of a breach of the settlement agreement than the cost of litigation that it was specifically designed to avoid.").

Separately, Thelander claims that he cannot be liable for attorney's fees to Wulf or J. Rea under TEXAS CIV. PRAC. & REM. CODE § 38.001 resulting from his tortious interference with their respective Separation and Employment Agreements. Thelander argues Texas law does not have a statute providing for such recovery, and that there is no contract between Wulf and/or J. Rea, on the one hand, and Thelander, on the other, permitting the recovery of attorney's fees.  (MTD, Dkt. No. 227 at 20-21.)   It is important to note Founders' requests for attorneys' fees under their agreements and TEX. CPRC § 38.001 is different from those requested by Hall and T. Rea in Counts 1 and 2.  In their claims for tortious interference, Hall and T. Rea seek the attorneys' fees that they have incurred (and continued to incur) *in defending against VBF's claims* against them in the Amended Complaint.  Those attorneys' fees flow as consequential *damages* from; i) VBF's breach of its obligations under the release provisions of Hall's and T. Rea's Termination Agreements, and ii) Thelander's inducement of VBF's breach (his tortious interference).

All four Founders also seek recovery of the attorneys' fees they incur *in pursuing their third-party claims against Thelander and the other third-party defendants*, pursuant to the provisions of their respective agreements (Hall, T. Rea, Wulf) and under TEX. CIV. PRAC. & REM. CODE § 38.011 (J. Rea).  Again, to the extent Thelander induced VBF to breach those agreements, then the Founders are entitled to recover attorneys' fees for that breach.  VBF's agreements with Hall, T. Rea and Wulf all contain specific provisions awarding attorney's fees for a breach.  And § 38.001 allows for the recovery of attorneys' fees "if the claim is for … (8) an oral or written contract."  The statute does not specify that the contract breached must be one between the same parties to the litigation.  It follows then, that a party who tortiously interferes with another party's contract, and thereby causes that contract to be breached, should bear the full cost of inducing such

23

breach, including contractually provided attorneys' fees. Otherwise, the victim would be deprived of part of relief for which he contracted.

None of the cases Thelander cites address this particular issue. In both cases cited, the court found that a breach of the underlying contract had *not* been established and there was no separate basis for the recovery of attorneys' fees.  (MTD, Dkt. No. 227 at 20; *Alma Group, LLC v. Palmer*, 143 S.W. 3d 840, 845 (Tex. App. – Corpus Christi – Edinburg 2004) (defendant failed to prove breach of contract or tortious interference); *Ed Rachel Foundation v. D'Unger*, 117 S.W. 3d 348, (Tex. App. – Corpus Christi – Edinburg 2003) (defendant failed to recover damages on breach of contract claim).)  Here, if Founders were to prevail, they would have established a breach of multiple written contracts, and § 38.001 would apply to permit the recovery of their fees incurred pursuing that breach.

Finally, Thelander claims Founders have not adequately alleged fraud, malice, or gross negligence on his part to justify an award of punitive damages. (MTD, Dkt. No. 227 at 21-22.) Thelander points to Founders' allegations that his conduct, along with that of the other Defendants, was "intentional, malicious, and vindictive" and states that such a conclusion is insufficient. (*Id.*) But this ignores multiple other factual allegations in the TPC, including:

- The Alder Defendants (including Thelander) withheld funds from VBF's credit facility until the Founders were terminated (evidence of fraud) (TPC, ¶ 35);

- Thelander imposed additional conditions on Hall and T. Rea's severance payments after the fact (vindictiveness) (*Id.*, ¶ 41);

- Thelander planned to create ways to avoid payments due to Founders under their agreements (malice) (*Id.*, ¶ 46);

- Thelander, along with the other Alder Defendants, knew that Wulf's wife had multiple sclerosis and  agreed to a provision in Wulf's Separation Agreement to pay his health insurance for 12 months, but then failed to make these payments,

24

resulting in Wulf and his wife being denied medical coverage (fraud and malice) (*Id.*, ¶¶ 50, 55);

- Thelander along with the Alder Defendants engaged an outside firm to investigate Haarkoetter's behavior and later, James Rea's expenditures, but then refused to share the results of these reports with anyone but themselves, (fraud and malice) (*Id.*, ¶¶ 53, 61); and

- Thelander and the Alder Defendants considered Founders to have a "political agenda" with regard to Haarkoetter and wanted to terminate anyone who "willing[ly] collude[d]" with them in that agenda (malice) (*Id.*, ¶ 47).

The campaign Founders allege in the TPC is not merely a soured business relationship or sharp-elbowed economic competition. This was a premeditated, intentional, vindictive plan to punish Founders for trying to protect their employees from a harassing and bullying director and owner, and to enable the Alder Defendants to usurp control of VBF to the exclusion of hundreds of other investors. There are more than sufficient allegations of fraud and malice, just based on the information that Founders know today, to support their claims for exemplary damages.

## CONCLUSION

For all the reasons set forth herein, Third-Part Plaintiffs, Leslie Wulf, John E. (Ted) Rea, Bruce Hall, and James Rea, respectfully request that this Court deny Bjorn Thelander's Motion to Dismiss Amended Third Party Complaint Pursuant to Rules 12(b)(2) & 12(b)(6), and award them any and all other relief that it deems necessary and just.

Date:  January 13, 2020            LESLIE WULF, BRUCE HALL,

                          JOHN (TED) REA, JAMES REA


                          By: */s/ Kimberly D. Annello*
                                  Kimberly D. Annello
                                  Texas Bar No. 24093704
                                  Eli D. Pierce
                                  Texas Bar No. 24092972
                                  David Campbell
                                  Texas Bar No. 0369850

Underwood Perkins, P.C.
5420 LBJ Freeway, Suite 1900
Dallas, Texas 75240
Phone: 972.661.5114
Email: kannello@uplawtx.com
epierce@uplawtx.com
dcampbell@uplawtx.com

**Attorneys for Defendants, Leslie Wulf, Bruce Hall, John (Ted) Rea, and James Rea**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 13th day of January, 2020 a true and correct copy of the above and foregoing was served upon counsel of records for all parties via ECF Service.

*/s/ Eli D. Pierce*
Eli D. Pierce

26