UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VEROBLUE FARMS USA, INC., | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 3:19-CV-00764-X |
| LESLIE A. WULF, BRUCE A. HALL, JAMES REA, JOHN E. RAE, KEITH DRIVER, CANACCORD GENUITY LLC, CHRISTINE GAGNE, and SEAN MANIACI, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case is a doozy.  Several individuals founded VeroBlue Farms USA, Inc. (VeroBlue) to revolutionize the farm-raised fish industry.  It did not go well.

VeroBlue went bankrupt and sued its founders, former officer Keith Driver, a New York investment-banking firm, a co-founder's daughter, and a Canadian lawyer who represents a sister company.  VeroBlue's general theories are mismanagement and misrepresentations by its founders, and conspiracy and aiding and abetting by the other defendants.  Its founders, along with several VeroBlue directors, then sued the investor who is now (after a bankruptcy discharge) VeroBlue's only shareholder.  Their third-party complaint brings claims of tortious interference and breach of the founders' termination agreements.

1

There are 10 pending motions at this dismissal phase.  Defendants Leslie Wulf, Bruce Hall, James Rea, and John (Ted) Rea (collectively, "the Founders") and Driver filed motions to dismiss [Doc. Nos. 184 & 180].  But VeroBlue moved to strike portions of these motions to dismiss, and the Court **GRANTS** the motion to strike [Doc. No. 215].  The Founders' arguments on deficient fraud pleading could have been raised in the Founders' first motion to dismiss; therefore, Rule 12(g) bars them as untimely.  As far as the motion to strike pertains to Driver, his detailed factual affidavit is inappropriate at the dismissal stage, and Rule 12(g) also bars his new single-sentence incorporation by reference of the Founders' motion to dismiss.

Of what remains of the Founders' motion to dismiss [Doc. No. 184], the Court **GRANTS IT IN PART**.  The Court holds that VeroBlue has standing to contest the waste of its corporate assets (and not to contest misrepresentations to nonparties).  But VeroBlue's fraud pleading is deficient, and the Court **GRANTS LEAVE** to VeroBlue to correct these deficiencies (within 28 days of this Order) as to the new fraud claims against the Founders.[1]

The Court **GRANTS IN PART** Driver's other dismissal arguments [Doc. No. 180].  VeroBlue failed to plead its fraud allegations against Driver with the required specificity and must cure these defects in its repleading.  As to Driver's argument that a release bars the claims, the Court will defer on such a ruling until VeroBlue has at least repleaded its fraud allegations.

_____

[1] The repleading should only address the deficiencies identified in this Order and not add parties or claims.

As to the Rule 12(b)(3) motion to dismiss [Doc. No. 211] from New York investment-banking firm Canaccord Genuity LLC (Canaccord), there is a mandatory forum-selection clause at play. The Court declines to dismiss the claims against Canaccord but **TRANSFERS** them to the United States District Court for the Southern District of New York.

As to Canadian attorney Sean Maniaci, the Court **GRANTS** his motion to dismiss the claims against him for lack of personal jurisdiction [Doc. No. 206] because his contacts with Texas neither confer general jurisdiction nor give rise to the claims against him.

Three of the third-party defendants have responded to the Founders' third-party complaint: Alder Aqua, Ltd. (Alder), Bjorn Thelander, and Norman McCowan. All three sought to strike and dismiss the third-party complaint [Doc. Nos. 223 & 228]. The Court is obligated to address the three jurisdictional arguments before addressing the motions to strike. First, the Court agrees with Alder's jurisdictional argument that the Court lacks jurisdiction over the Founders' alter ego and contract claims because the Founders never presented these claims to the bankruptcy court (as Alder did with the tortious interference claims). Second, the Court disagrees with Alder's jurisdictional argument that service of process via a solicitor for a British Virgin Islands company was defective under the Hague Convention.[2]  Finally on

---

[2] As a result, the Court **GRANTS IN PART** (as to alter ego and breach of contract claims) and **DENIES IN PART** (as to defective service) Alder's motion to dismiss [Doc. No. 219].

jurisdiction, the Court concludes that it lacks personal jurisdiction over Thelander [Doc. No. 227].

Lastly, the Court **GRANTS** the motions to strike the third-party complaint [Doc. Nos. 223 & 228].  The third-party complaint's tortious interference claims do not seek to make the third-party defendants liable for VeroBlue's claims against the Founders.  As new and independent claims, Rule 14 prohibits the Founders from injecting them into this lawsuit.  As a result of these rulings, the third-party complaint is only operative against the third-party defendants who have not yet responded.

## I. Factual Background

The detailed facts of this case are more suited for a book than the pages of the Federal Supplement.  The Court will address the high points of the alleged facts that are relevant to the many motions this ruling decides.

Leslie Wulf, Bruce Hall, James Rea, and John (Ted) Rea (the Founders), along with Keith Driver, in 2014 founded VeroBlue, which is a sustainable fish-farm business.  The Founders didn't invest their own money in VeroBlue.  In July 2016, Alder's predecessor and FishDish LLC invested $34 million in VeroBlue through a preferred stock purchase.   Dr. Otto Happel is the principal and primary decisionmaker for Alder.  Alder appointed Jens Haarkoetter and Bjorn Thelander as its representatives to the VeroBlue board.  Haarkoetter resigned his position as a director in October 2017, and Thelander served as a director until early 2018.  Eva

4

Ebstein (Dr. Happel's daughter) was appointed a director in June 2017, and Anders Wester was appointed a director upon Haarkoetter's resignation.

When Alder invested in VeroBlue, Amstar Funds (Amstar) also extended VeroBlue a line of credit. Dr. Happel (who controls Alder) also owns and controls Amstar. In exchange, VeroBlue issued warrants to Alder for Amstar debt that could be exercised to obtain additional shares through a separate agreement. By July 2017, VeroBlue had drawn down the Amstar loan, and Amstar extended VeroBlue an additional $13 million loan facility—with Alder receiving more warrants for VeroBlue stock. The Founders allege that Alder stopped VeroBlue from drawing on the second $13 million loan facility, but Alder exercised warrants on both loan facilities. That move enabled Alder to obtain a 54% interest in VeroBlue.

The Founders claim that as of July 2017, Alder so controlled VeroBlue that VeroBlue became the alter ego of Alder. By early 2018, VeroBlue terminated the last of the Founders, who had allegedly misappropriated or squandered over $90 million in debt and equity. VeroBlue filed for bankruptcy that year. By March 2018, VeroBlue investigated and allegedly began discovering the Founders' bad actions.

Specifically, VeroBlue alleges the Founders engaged in over 14 misappropriation schemes over three years. The first bucket of alleged misdeeds was several separate misappropriation events. First, VeroBlue alleges that the Founders transferred 1.25 million shares of stock to another company they owned and controlled for a total of $1.25—when the stock was sold to others around that time for $.90 per share (the BAJJER Stock Sale). Second, VeroBlue claims the Founders used

VeroBlue to repay an alleged debt to American Growth Funding, LLC of $375,000 that benefited them personally and not VeroBlue.  Third, VeroBlue alleges that the Founders spent $107,490.51 for compensation and benefits to a VeroBlue employee to oversee the rebuilding of Wulf's lake house in Texas.  Fourth, VeroBlue claims Wulf authorized VeroBlue to issue 1.5 million shares of stock for no money to a friend's company, which procured additional investors in VeroBlue.  Fifth, the Founders set their compensation at $400,000 annually each (except Driver, whose was $325,000), even though one person salaried at $250,000 annually replaced all five Founders. Fifth, Wulf had VeroBlue pay compensation and benefits of $52,264.28 to his daughter (Gagne) who had no authorization to work in the United States.  Sixth, the Founders incorporated a company (Opposing Flows Aquaculture, Inc.) and had VeroBlue buy tanks from that company, which sold them to VeroBlue at a profit after acquiring them from third parties.  Seventh, the Founders didn't invest their own money in VeroBlue, but they had VeroBlue Canada issue its stock to entities the Founders owned at $0.000001 per share while charging others $0.90 per share.

VeroBlue also alleges that the Founders engaged in other corporate waste, such as purchasing a building for $400,000 in 2016 that could only be sold for $135,000 in 2018, and buying six tractor-trailers to deliver fish despite all customers being local. Finally, VeroBlue alleges a variety of other miscellaneous allegations, such as the Founders improperly reimbursing themselves $496,000 worth of expenses.

The next bucket of alleged wrongdoing is misrepresentations.  VeroBlue alleges that the Founders misrepresented key performance metrics, as well as the abilities of

6

VeroBlue and themselves.  Regarding performance metrics, VeroBlue alleges that the Founders represented to directors false metrics for Feed/Fish Conversion Ratio (how much feed it takes to make a fish gain a pound), density (the population density in the tanks), mortality rates, water quality, and the amount of Earnings Before Interest Taxes Depreciation and Amortization per pound of fish.  VeroBlue claims that Canaccord assisted with these misrepresentations and breaches of fiduciary duty.

VeroBlue also alleges that the Founders continued the misconduct in 2019 after their ouster, including meddling in the bankruptcy proceeding.  As to Canadian attorney Steve Maniaci, VeroBlue alleges he aided and abetted the Founders in the 2019 misconduct and received shares for roughly 50% of the price others paid. Veroblue also alleges the Founders misused other corporate counsel.

The other VeroBlue directors allegedly began questioning the Founders' ability to lead the company in late 2017, when VeroBlue suffered losses.  On October 27, 2017, Hall and Ted Rea both signed a termination agreement that included a purported release of some of VeroBlue's claims against them.  Wulf appears to have signed the agreements for VeroBlue.  The agreements included releases of VeroBlue's claims against, and $400,000 severance payments to, Hall and Ted Rea.  In November or December of 2017, VeroBlue signed a termination agreement with Wulf.[3]  Then-

---

[3] VeroBlue claims this occurred December 1, 2017.  *See* Second Amended Complaint ¶ 225 ("On December 1, 2017, [VeroBlue] terminated Wulf pursuant to a separation agreement[.]") [Doc. No. 159]. The counterclaim alleges this occurred November 6, 2017.  *See* Amended Third-Party Complaint ¶ 44 (alleging that Wulf was terminated as CEO "effective November 6, 2017") [Doc. No. 186].

president McCowan signed for VeroBlue—the agreement contained no release but it called for a $400,000 severance payment and payment of COBRA premiums.

On December 28, 2017, Wulf, on behalf of VeroBlue,[4] signed an agreement terminating Driver's role as an independent contractor. Jackson Walker drafted the agreement, which contained a release, a confidentiality agreement, and an obligation of VeroBlue to pay Driver six installments payments totaling $550,000 and one payment of $500,000 for the cancellation of certain shares in VeroBlue's affiliate. On January 8, 2018, VeroBlue terminated James Rea for "egregious cause" as defined in his employment agreement.

VeroBlue filed suit on July 31, 2018. The live pleading (the second amended complaint) brings the following claims:

(1)     breach of fiduciary duty against the Founders;[5]

(2)     fraudulent concealment against the Founders;

(3)     fraudulent misrepresentation against the Founders;

(4)     constructive fraud against the Founders;

(5)     a Uniform Voidable Transfers Act claim under Iowa Code section 684.4(1)(a) against the Founders;

(6)     a Uniform Voidable Transfers Act claim under Iowa Code section 684.4(1)(b) against the Founders;

(7)     actual fraudulent transfer under Texas law against the Founders;

---

[4] It is strange that Wulf allegedly signed a termination agreement on behalf of a company that had already terminated him.

[5] "The Founders," as used in this opinion and pleadings other than the live complaint, does not include Driver. The live complaint includes Driver among the Founders. The Court treats him separately here because he has separate counsel and makes separate arguments.

8

(8)     constructive fraudulent transfer under Texas law against the Founders;

(9)     civil conspiracy against the Founders;

(10)    aiding and abetting against the Founders;

(11)    unjust enrichment against the Founders;

(12)    equitable accounting against the Founders;

(13)    a declaratory judgment that all transactions are void against the Founders;

(14)    rescission of the termination agreements against Hall, Driver, and Ted Rea;

(15)    a declaratory judgment that VeroBlue owes James Rea no benefits under the employment agreement;

(16)    rescission of James Rea's employment agreement;

(17)    rescission of Wulf's separation agreement;

(18)    a declaratory judgment that VeroBlue owes Wulf no benefits under the separation agreement;

(19)    restitution for benefits paid to Hall, Ted Rea, Driver, and Wulf under their separation and termination agreements;

(20)    conspiracy against Canaccord;

(21)    aiding and abetting conspiracy against Canaccord;

(22)    conspiracy against Gagne;

(23)    aiding and abetting conspiracy against Gagne;

(24)    unjust enrichment against Gagne;

(25)    conspiracy against Maniaci;

(26)    aiding and abetting against Maniaci; and

(27)    violations of the Racketeer Influenced and Corrupt Organizations Act against the Founders.[6]

---

[6] This sentence contains 288 words, 64 parentheses, and 26 semicolons.

VeroBlue also seeks attorney's fees under Iowa and Texas fraudulent transfer laws.

Not to be outdone, the Founders filed a third-party complaint against seven third-party defendants: Eva Ebstein, Jens Haarkoetter, Bjorn Thelander, Anders Wester, Norman McCowan, Dr. Otto Happel, and Alder (collectively "the Alder defendants"). Alder was the lead (and now is the only) investor in VeroBlue, and Ebstein, Haarkoetter, Thelander, and Wester were representatives of Alder. Before the VeroBlue bankruptcy, they were representatives of Amstar—VeroBlue's largest lender. McCowan is the current CEO of VeroBlue. Happel is allegedly the principal and primary decisionmaker for Alder and Amstar. The Founders claim that "Ebstein, Haarkoetter, Wester, and Thelander intentionally used their multiple positions as directors of [VeroBlue], and as representatives of Alder and Amstar to induce [VeroBlue], with the assistance of McCowan, to breach its obligations to Founder Plaintiffs under their respective employment and severance agreements."[7] They claim their ouster from the company and VeroBlue's failure to meet its obligations under their termination agreements were in response to the Founders alerting the board to sexual harassment allegations against Haarkoetter.

Specifically, the third-party complaint brings the following claims:

(1)     tortious interference with Hall's termination agreement against all third-party defendants;

(2)     tortious interference with Ted Rea's termination agreement against all third-party defendants;

---

[7] Third-Party Complaint, at 2. This case originated in Iowa, but the federal court transferred it to the Northern District of Texas because of forum-selection clauses in a number of the agreements.

10

(3)     tortious interference with Wulf's separation agreement against all third-party defendants;

(4)     tortious interference with James Rea's employment agreement against all third-party defendants;

(5)     alter ego against Alder;

(6)     breach of the Hall termination agreement against Alder as the alter ego of VeroBlue;

(7)     breach of the Ted Rea termination agreement against Alder as the alter ego of VeroBlue;

(8)     breach of the Wulf separation agreement against Alder as the alter ego of VeroBlue; and

(9)     breach of the James Rea employment agreement against Alder as the alter ego of VeroBlue.

All pending motions are ripe for the Court's review and decision.

## II. Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), the Court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[8]  To survive a motion to dismiss, the movant must allege enough facts "to state a claim to relief that is plausible on its face."[9]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[10]  "The plausibility standard is not akin to a 'probability requirement,' but

---

[8] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

[9] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[10] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

11

it asks for more than a sheer possibility that a defendant has acted unlawfully."[11] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"[12]

But this is no normal complaint, and, thus, no normal motions to dismiss. This is a fraud case. For fraud, Federal Rule of Civil Procedure 9(b) requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake."[13] "Rule 9(b) requires the complaint to lay out the "who, what, when, where, why, and how the false statements were made and to whom they were made."[14] "To plead an omission with sufficient particularity, plaintiff must specifically plead when a given disclosure should have been made."[15]

This case also involves motions to strike a third-party complaint under Rule 14, a motion-to-dismiss argument for lack of standing under Rule 12(b)(1), motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a motion to dismiss for failure to bring the case in the proper venue under Rule 12(b)(3), and a motion to dismiss for defective service under Rule 12(b)(5).[16] The Court will address the legal standards for non-Rule 12(b)(6) issues when discussing those arguments.

---

[11] *Id. See also Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

[12] *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

[13] FED. R. CIV. P. 9(b).

[14] *Askanase v. Fatjo*, 130 F.3d 657, 676 (5th Cir. 1997).

[15] *Masel v. Villarreal*, 924 F.3d 734, 749 (5th Cir. 2019).

[16] Rules 12(b)(4) and (b)(7) must feel excluded.

### III.  Application

This Order decides 10 pending motions.  First, the Founders moved to dismiss—arguing lack of standing, insufficient fraud pleading, and Iowa choice of law [Doc. No. 184].  Second, Driver moved on his own to dismiss—arguing a release bars the claims and the complaint insufficiently pleads fraud [Doc. No. 180].  Third, VeroBlue moved to strike parts of the Founders' and Driver's motions to dismiss [Doc. No. 215].  Fourth, Canaccord moved to dismiss for lack of personal jurisdiction, failure to state a claim, and for filing in the wrong venue [Doc. No. 211].  Fifth, Maniaci moved to dismiss for lack of personal jurisdiction [Doc. No. 206].  Sixth and seventh, Alder moved to dismiss [Doc. No. 219] and moved to strike the third-party complaint [Doc. No. 223].  Eighth, Thelander and McCowan filed a joint motion to strike the third-party complaint [Doc. No. 228].  Ninth, Thelander moved to dismiss the third-party complaint for failure to state a claim and for lack of jurisdiction [Doc. No. 227].  And tenth, McCowan moved to dismiss the third-party complaint [Doc. No. 229].  The Court takes each motion in turn, mindful of its duty to address jurisdictional arguments before reaching merits arguments.

A.  Motion to Strike the Founders' and Driver's Motions to Dismiss [Doc. No. 215]

Before the Court can consider the Founders' and Driver's motions to dismiss, it must resolve VeroBlue's motion to strike them.  Here, VeroBlue seeks to strike: (1) Driver's incorporation by reference of the Founders' motion to dismiss; (2) Driver's declaration in support of his motion to dismiss; and (3) the Founders' newly raised arguments in the Founders' motion to dismiss the second amended complaint that

13

could have been raised in their motion to dismiss the first amended complaint. Driver responds that VeroBlue waived the affidavit argument by not objecting when Driver filed the affidavit with two prior motions to dismiss. And the Founders respond that their arguments are allowed because, among other things, the Court dismissed as moot their earlier motion to dismiss. The Court agrees with VeroBlue and grants the motion to strike regarding the Founders and Driver.

Both Driver and the Founders have a Rule 12(g)(2) problem. Rule 12(g)(2) says, "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."[17] And Rule 12(h)(2) says, "Failure to state a claim upon which relief can be granted . . . may be raised: (A) in any pleading allowed or ordered under Rule 7(a) [such as an answer]; (B) by a motion under Rule 12(c) [for judgment on the pleadings]; or (C) at trial."[18] The Fifth Circuit interprets Rule 12(g) in this manner:

> If a party seeks dismissal in a pretrial motion based on any of the defenses set out in Rule 12(b), he must include in such motion any other defense or objection then available which Rule 12 permits to be raised by motion. If the party omits such defense or objection, Rule 12(g) precludes him from making a further motion seeking dismissal based on the omitted defense or objection.[19]

---

[17] FED. R. CIV. P. 12(g)(2).

[18] *Id.* 12(h)(2).

[19] *Albany Ins. Co. v. Almacenadora Somex, S.A.*, 5 F.3d 907, 909 (5th Cir. 1993).

At least one sister court in Texas has acknowledged that the strictures of Rule 12(g)(2) do not apply when the Court dismisses as moot the previous motion to dismiss due to the filing of an amended complaint.[20]

Those principles bar new arguments that Driver and the Founders raise in their motions to dismiss because they could have raised them in earlier motions to dismiss. For example, Driver filed earlier motions to dismiss [Doc. Nos. 20 & 67]. His only new argument in this motion to dismiss [Doc. No. 180] is a single sentence incorporating by reference the arguments in the Founders' motion to dismiss [Doc. No. 184]. Regardless if that would bust the page limits as VeroBlue contends, more fundamentally Driver is using that sentence to raise arguments he could have raised earlier. And while the Court previously dismissed Driver's second motion to dismiss as moot due to the filing of an amended complaint [Doc. No. 161], there was no such ruling mooting and setting a clean slate as to Driver's original motion to dismiss. Instead, the federal district court in Iowa granted it, transferring this case to this Court [Doc. No. 50]. Under Rule 12(g), Driver's chance to raise his Rule-12 arguments was in his first Rule-12 motion.[21] His additional argument (the single-sentence incorporation by reference of the Founders' dismissal arguments) is untimely.

---

[20] *See Stoffels ex rel., SBC Concession Plan v. SBC Commc'ns, Inc.*, 430 F. Supp. 2d 642, 648 (W.D. Tex. 2006) (holding that the order dismissing original motion to dismiss upon the filing of an amended complaint made "clear that the Court considered Plaintiffs' Amended Complaint to wipe the slate clean, and to provide Defendants a new, unobstructed opportunity to submit a 12(b)(6) motion").

[21] Timing is the issue, regardless if there would be a page-limit issue. As a result of this ruling that Rule 12(g) forecloses Driver's new arguments, the Court need not reach Driver's request to file an amended motion to dismiss that complies with the Court's page limits.

Likewise, the Founders moved to dismiss the original complaint under Rule 12(b)(3) for improper venue [Doc. No. 19]. The federal district court in Iowa agreed and transferred the case to this Court [Doc. No. 50]. The Court did not moot the Founders' original motion to dismiss, and the Court provided no language manifesting an intent to wipe the motion-to-dismiss slate clean. The amended complaint remained intact, and the Founders chose to answer the complaint when it was transferred to this Court [Doc. No. 66]. Under Rule 12(g), the Founders' time to raise their Rule 12 arguments was in their first Rule-12 motion.

The Founders respond that the second amended complaint so substantially changed the previous complaint that Rule 12(g) shouldn't control. But the Founders seek it both ways here. In responding to the motion to strike their motion to dismiss, they say the second amended complaint is too long (such that their first motion to dismiss could not have raised these arguments). And in their motion to dismiss, they say the complaint is too short (and that it needs more fraud pleading and civil RICO specificity). But the amended complaint (to which their original motion to dismiss responded) raised claims for breach of fiduciary duty, fraudulent concealment, fraudulent misrepresentation, constructive fraud, civil conspiracy, aiding and abetting, unjust enrichment, equitable accounting, and a declaratory judgment. The Founders' newly raised arguments on specificity of fraud and civil RICO pleading applied with even more force to the shorter amended complaint than to the second amended complaint. Accordingly, the Court grants VeroBlue's motion to strike the portions of the Founders' motion to dismiss that raise arguments for claims that

16

VeroBlue filed in its amended complaint (the subject of the Founders' first motion to dismiss).[22]

Lastly, the Court addresses the motion to strike Driver's affidavit attached to his motion to dismiss. VeroBlue argues that only pleadings and attachments count at the motion to dismiss phase. Driver responds that he attached, without objection, the affidavit to his two prior motions to dismiss. The Court agrees with VeroBlue.

Jurisdictional motions to dismiss or motions to transfer can look to evidence outside the motions, but motions for failure to state a claim generally cannot. And the latter is what Driver filed—arguing that a release bars VeroBlue's claims, and that the claims fail to meet the fraud pleading standard. And so, the Court must limit its inquiry to the complaint, the complaint's attachments, and documents referred to in the complaint that are central to the complaint's claims.[23] Driver's affidavit is not among those materials. Accordingly, the Court grants VeroBlue's motion to strike Driver's affidavit.

---

[22] The claims that were in both the amended complaint and second amended complaint are: Count 1 for breach of fiduciary duty; Count 2 for fraudulent concealment; Count 3 for fraudulent misrepresentation against the Founders; Count 4 for constructive fraud against the Founders; Count 9 for civil conspiracy; Count 10 for aiding and abetting against the Founders; Count 11 for unjust enrichment; Count 12 for equitable accounting against the Founders; and Count 13 for a declaratory judgment.

[23] *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) ("In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto. . . . We note approvingly, however, that various other circuits have specifically allowed that [d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." (citations and quotation marks omitted) (alteration in original)).

### B.  The Founders' Motion to Dismiss [Doc. No. 184]

The Founders argue in their motion to dismiss that: (1) the complaint fails to plead fraud claims with the required specificity; (2) the complaint omits key elements of a civil RICO claim; (3) VeroBlue lacks standing to pursue losses from misrepresentations to third parties; and (4) the complaint fails to show how Iowa law applies.  VeroBlue responds that it adequately pled its fraud and civil RICO claims, and that there is no conflict of law, and so choice of law is irrelevant at this point.

#### 1.  Standing

The Court is compelled to address any jurisdictional arguments first.  If the Court lacks jurisdiction (due to lack of standing), then the Court has no authority to reach a Rule 12(b)(6) merits argument.[24]  Under Rule 12(b)(1), the Court can dismiss for lack of subject-matter jurisdiction on the complaint alone.[25]  There are two ways a movant can challenge—and two ways the Court can consider—subject-matter jurisdiction under Rule 12(b)(1):

> When challenging subject matter jurisdiction under Rule 12(b)(1), a party can make either a facial attack or a factual attack.  If the party merely brings a Rule 12(b)(1) motion, it is considered a facial attack, and the court looks only at the sufficiency of the allegations in the pleading, assuming them to be true.  If the allegations are sufficient to allege jurisdiction, the court must deny the motion.  A party may make a factual attack on subject matter jurisdiction by submitting evidence, such as affidavits or testimony.  When a movant provides evidence factually attacking subject matter jurisdiction, the party attempting to

---

[24] *See Lewis v. Knutson*, 699 F.2d 230, 237 (5th Cir. 1983) ("[I]f the jurisdictional challenge does not implicate the merits of the cause of action, the jurisdictional basis must survive both facial and factual attacks before the district court can address the merits of the claim.").

[25] *See Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981) ("A motion to dismiss for lack of subject matter jurisdiction, Rule 12(b)(1), can be based on the lack of jurisdiction on the face of the complaint.").

invoke jurisdiction must submit evidence and prove by a preponderance of the evidence that the court has jurisdiction.[26]

The Founders submitted no evidence to controvert VeroBlue's allegations of jurisdiction, and so the Court construes the argument as a facial rather than factual attack.

The Founders claim that the live complaint lacks allegations of injuries to VeroBlue and instead alleges injuries to potential or actual investors, lenders, and interested third parties. VeroBlue responds that it was injured by the alleged conduct, which squandered up to $90 million of its resources.

These arguments beg the question of just who VeroBlue is and whether it can sue its founders for fraud. Typically, we see such actions as derivative shareholders suits, where Federal Rule Civil Procedure 23.1 allows a shareholder to sue one who aggrieved the corporation when the corporation chooses not to act.[27] Despite its frequency, this is the exception and not the rule. Rule 23.1 deems these shareholders to be standing in the shoes of the corporation.[28] Two Texas court of appeals cases

---

[26] *Reneker v. Offill*, 2009 WL 804134, at *3 (N.D. Tex. Mar. 26, 2009) (Fitzwater, C.J.) (quotation marks omitted).

[27] *See* FED. R. CIV. P. 23.1 ("This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce.").

[28] *See id.* 23.1(a) ("The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in *enforcing the right of the corporation or association*." (emphasis added)).

make clear the general rule that the corporation may sue its directors for mismanagement.[29]  And the same basic rule exists in Iowa.[30]

Here, VeroBlue alleges injury from a wasting of its own assets.[31]  VeroBlue's complaint does appear to contain stray factual allegations such as misstatements to potential investors who did not invest.  These are not actionable by VeroBlue.[32]  The Court requires VeroBlue to replead due to insufficient fraud pleading, as explained below.  The Court directs VeroBlue to remove from its new pleading allegations of fraud where VeroBlue was not the recipient of the fraudulent statement.[33]

## 2.  Pleading Fraud with Particularity

Pleading fraud under "Rule 9(b) requires the who, what, when, where, and how to be laid out in the complaint."[34]  Perhaps this is due to the heightened sensitivity to

---

[29] *See, e.g., Mary E. Bivins Found. v. Highland Capital Mgmt. L.P.*, 451 S.W.3d 104, 115 (Tex. App.—Dallas 2014, no pet.) ("[A]ny cause of action lay with the Fund to sue on its own behalf to recover for the benefit of all its creditors."); *Sutton v. Reagan & Gee*, 405 S.W.2d 828, 835 (Tex. Civ. App.—San Antonio 1966, writ. ref'd n.r.e.) ("Since the breach in mismanagement cases is of a duty owed to the corporation, and the primary injury is to the corporation, the right to recover therefor may be regarded as a corporate asset.").

[30] *See Adolf Gobel, Inc. v. Skipworth*, 3 N.W.2d 551, 554 (Iowa 1942) ("It is obvious that the defendant, as president and director, was in a fiduciary relationship to the bank. . . .  For any willful breach of trust or misapplication of the corporate funds, or for any gross neglect of or inattention to his official duties, he was responsible to the corporation." (quoting *Farmers' Sav. Bank v. Kaufmann*, 207 N.W. 764, 765 (Iowa 1926))).

[31] *See* Second Amended Complaint ¶¶ 25–53 (describing multiple instances of alleged misappropriation by the Founders resulting in depletion of $5–10 million of VeroBlue's assets).

[32] If a tree falls in the woods, that doesn't mean VeroBlue can sue.  But if the tree hit VeroBlue, then VeroBlue would have standing.

[33] The parties debated this issue in terms of whether Rule 9 (governing fraud) requires pleading who heard the fraud.  While the Fifth Circuit does require pleading of to whom the statement was made, more fundamentally this is argument a component of standing.  For example, if the Founders lied to Frodo Baggins, VeroBlue lacks the injury to have standing under Article III.  Baggins would have that injury.  *See supra* note 32.

[34] *Pipefitters Local No. 636*, 499 F. App'x at 349 (quotation marks omitted).

labeling someone a fraudster, and that statements made in court are not actionable as defamation. The Court must address three threshold issues before reaching the substance of the deficient fraud pleading argument.

First, as explained earlier in this Order, the Court holds that several of the Founders' motion-to-dismiss arguments are barred because they should have been brought in their original motion to dismiss. And so, the Court will only consider the Founders' dismissal arguments as to the new claims in the second amended complaint.

The second threshold issue is whether Rule 9 applies to fraudulent transfer claims. The Court concludes that Rule 9 applies to actual fraudulent transfer claims but not to constructive fraudulent transfer claims. While the Fifth Circuit has not decided the issue,[35] judges in the Northern District of Texas have held that some fraudulent transfer causes of action that do not have elements of a fraudulent state of mind are not subject to Rule 9.[36] Of course, this depends on the fraudulent transfer claim the plaintiff brings. Claims under Texas Business and Commerce Code section

---

[35] *See Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 118 (5th Cir. 2019) (observing that the Fifth Circuit has "not previously addressed the question of whether an actual fraudulent transfer claim is subject to Rule 9(b)'s heightened pleading requirements").

[36] *See Life Partners Creditors' Tr. v. Black Diamond Lifeplan Fund*, 2017 WL 9934885, at *5 (N.D. Tex. Nov. 27, 2017) (O'Connor, J.) ("In the parallel suit against Pardo, this Court refused to apply Rule 9(b) to fraudulent transfer claims, citing as persuasive the reasoning of two additional precedents in this District."); *Janvey v. Alguire*, 846 F. Supp. 2d 662, 676 (N.D. Tex. 2011) (Godbey, J.) (not applying Rule 9 to fraudulent transfer claims); *U.S. Bank Ass'n v. Verizon Comm., Inc.*, 2012 WL 3100778, at *11 (N.D. Tex. July 31, 2012) (Fish, J.) (declining to hold fraudulent transfer claims under Texas law to the Rule 9 standard because "fraud is simply not an aspect of a fraudulent transfer claim").

24.005(a)(1) require "actual intent to hinder, delay, or defraud" a creditor or debtor.[37]
Here, the fraudulent-transfer claims and their intent are:

- Count 5, the Iowa Uniform Voidable Transfers Act section 684.4(1)(a) (which requires actual intent);[38]

- Count 6, the Iowa Uniform Voidable Transfers Act section 684.4(1)(b) (which doesn't require actual intent);[39]

- Count 7, the Actual Texas Fraudulent Transfer under Texas Business and Commerce Code section 24.005(a)(1) (which requires actual intent);[40] and

- Count 8, the Constructive Texas Fraudulent Transfer under Texas Business and Commerce Code section 24.005(a)(2) (which doesn't require actual intent).[41]

As a result, the claims for fraudulent transfer under Iowa law and constructive transfer under Texas law require no showing of fraudulent intent and are not subject to Rule 9's heightened pleading requirement.

---

[37] TEX. BUS. & COM. CODE § 24.005(a)(1).  *See E. Poultry Distribs., Inc. v. Yarto Puez*, 2001 WL 34664163, at *2 (N.D. Tex. Dec. 3, 2001) (Lynn, J.) ("If the fraudulent transfer statute Plaintiffs want the Court to apply requires intent to defraud, the enhanced pleading requirements of Rule 9(b) apply; if the statute allows for fraudulent transfer without intent to defraud, however, only the general pleading rules of Rule 8(a) must be satisfied.").

[38] The statute requires an "actual intent to hinder, delay, or defraud" a creditor or debtor, IA. ST. § 684.4(1)(a), which the live complaint alleges.  *See* Second Amended Complaint ¶ 258.

[39] The statute requires no actual intent to hinder, delay, or defraud, IA. ST. § 684.4(1)(b), and the live complaint alleges no such intent.  *See* Second Amended Complaint ¶¶ 263–70.

[40] The statute requires an "actual intent to hinder, delay, or defraud," TEX. BUS. & COM. CODE § 24.005(a)(1), which the live complaint alleges.  *See* Second Amended Complaint ¶ 274.

[41] The statute requires no actual intent to hinder, delay, or defraud, TEX. BUS. & COM. CODE § 24.005(a)(2), and the live complaint alleges no such intent.  *See* Second Amended Complaint ¶¶ 280–88.

The third and final threshold matter is a dispute regarding whether Rule 9's heightened pleading requirement for fraud applies to other claims (such as rescission, restitution, or a declaratory judgment). The Founders say yes and VeroBlue says no. The Courts holds that it depends on the facts, and these facts indicate these ancillary equity claims include and are inextricably intertwined with fraud allegations. Therefore, these claims sound in fraud and must be pled with Rule 9 specificity. The case law indicates that what triggers specific pleading for fraud claims is not the label attached to the claims but the substance of the allegations.[42] If the allegations in a claim are not labeled "fraud," but are labeled as such things like "unjust enrichment,"[43] "negligent misrepresentation,"[44] or "conspiracy,"[45] then Rule 9 applies to those claims.

Here, VeroBlue has claims for rescission (of termination, separation, and employment agreements for Hall, Driver, Ted Rea, James Rea, and Wulf), restitution (for benefits paid to Hall, Ted Rea, Driver, and Wulf), and declaratory judgments (that VeroBlue owes James Rea and Wulf no benefits under their agreements) that are not styled as fraud claims. But all these claims include specific factual assertions of

---

[42] *See Lone Star Ladies Inv. Club v. Schlotzsky's Inc*., 238 F.3d 363, 369 (5th Cir. 2001) (refusing to apply Rule 9 to "those claims do not 'sound in fraud'").

[43] *See Chau v. Aviva Life & Annuity Co*., 2011 WL 1990446, at *8 (N.D. Tex. May. 20, 2011) (Boyle, J.) (applying Rule 9 to unjust enrichment allegations that were "grounded in fraud").

[44] *See JPA, Inc. v. USF Processors Trading Corp., Inc.*, 2005 WL 8158446, at *3 (N.D. Tex. July 15, 2005) (Solis, J.) (applying Rule 9 to unjust enrichment allegations that sounded in fraud).

[45] *See Smith v. HSBC Bank*, 2015 WL 12911463, at *4 (N.D. Tex. Aug. 6, 2015) (Solis, J.) (applying Rule 9 to conspiracy allegations that sounded in fraud).

fraudulent conduct in the body of the count.[46]  Because VeroBlue's equitable claims rely on fraud allegations, the Court will include them in its assessment of whether the claims satisfy Rule 9.

As a result, the Court must address the following claims that are subject to Rule 9 (including equitable claims sounding in fraud but not fraudulent transfer claims with no intent requirement) but were newly filed (such that the Court can consider the arguments in the unstruck portions of the motion to dismiss).  These claims are:

- Count 5, a Uniform Voidable Transfers Act claims under Iowa Code § 684.4(1)(a) against the Founders;
- Count 7, actual fraudulent transfer under Texas law against the Founders;
- Count 14, rescission of the termination agreements against Hall, Driver, and Ted Rea;
- Count 15, a declaratory judgment that VeroBlue owes James Rea no benefits under the employment agreement;
- Count 16, rescission of James Rea's employment agreement;
- Count 17, rescission of Wulf's separation agreement;
- Count 18, a declaratory judgment that VeroBlue owes Wulf no benefits under the separation agreement; and

---

[46] *See, e.g.*, Second Amended Complaint ¶ 312 (rescission claim for Hall, Driver, and Ted Rea termination agreements alleging that "Hall, Ted Rea, and Driver intended that [VeroBlue] and its disinterested board members rely on their material misrepresentations and each defendant's failure to disclose the true facts of their fraud in order to secure the Termination Agreements"); *id.* ¶ 324 (declaratory judgment against James Rea alleging that he "misappropriated funds or assets of the Company, committed willful acts or omissions of dishonesty or fraud, and was in gross neglect of his duties to [VeroBlue] between 2014 and January 2018 in breach of his Employment Agreement").

- Count 19, restitution for benefits paid to Hall, Ted Rea, Driver, and Wulf under their separation and termination agreements.

The Court will only address the Founders' fraud pleading arguments as to these claims.

The Founders argue the live complaint: (1) contains impermissible group pleading; (2) fails to identify when or where the purported misrepresentations took place; (3) fails to allege who heard or received the misrepresentations; and (4) fails to allege reliance on the misrepresentations. VeroBlue responds that its second amended complaint is legally sufficient. The Court finds VeroBlue's fraud pleading to be deficient.

The Fifth Circuit makes clear that the Public Securities Litigation Reform Act's language governing securities fraud claims is inconsistent with group pleading. This is because the Act requires that "untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'"[47] This is not a securities fraud case. But importantly, the Fifth Circuit also makes clear that "this court has never adopted the 'group pleading' doctrine, even before the [Public Securities Litigation Reform Act]. While the [Public Securities Litigation Reform Act] does not explicitly abolish the doctrine, it was not necessary to do so because Congress never made this judicial

---

[47] *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 364 (5th Cir. 2004) (quoting 15 U.S.C. § 78u–4(b)).

25

creation law to begin with."[48]  The Court is unable to find whether the Fifth Circuit established that group pleading is permissible for non-securities fraud claims (when it is not for securities fraud claims).  And this is logical, given that such fraud claims also require such specific pleading as "who" made the statement and their state of mind.[49]  Such a doctrine would "'permit[] an inference of wrongdoing not based on defendant's conduct[.]'"[50]  This does not mean, however, that a fraud claim can only name one defendant.  Unless a specific statute says otherwise—and none does here— then "plaintiffs are permitted under federal procedure to allege that more than one defendant (i.e., a group of named defendants) committed the same alleged act."[51]

Here, the fraud-based claims (that the unstruck portions of the motion-to-dismiss challenge) have headings saying they are "Against All Founders."  And the text of such claims allege the transfers were made "with actual intent to . . . defraud"[52] VeroBlue under various listed schemes, such as the BAJJER stock scheme.  The claims incorporate by reference the factual background.  But the factual background itself often fails to illuminate who made the fraudulent statements and what their state of mind was at the time.  For example, the BAJJER stock scheme factual background alleges that BAJJER "is owned or controlled by some or all of the

---

[48] *Id.*

[49] *See Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (providing the elements of fraud and the pleading requirements in the Fifth Circuit).

[50] *Southland Sec.*, 365 F.3d at 364 (quoting *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1350 (S.D. Cal. 1998)).

[51] *Clapper v. Am. Realty Inv'rs, Inc.*, 2015 WL 3504856, at *4 (N.D. Tex. June 3, 2015) (Fitzwater, J.).

[52] Second Amended Complaint ¶¶ 258, 274.

Founders" and that "the Founders directed [VeroBlue] to transfer 1,250,000 shares" to BAJJER for $1.25 total.[53]  The complaint neither says which of the Founders directed the transfer nor does it illuminate that person's state of mind.  This is not to say that VeroBlue does not know how to plead fraud with particularity or lacks the information to do so.  For example, part of the fraud allegations relates to the remodeling of Wulf's Texas lake house allegedly on VeroBlue's dime.  VeroBlue alleges the specific VeroBlue employee who oversaw the work (Tracy Arbanas) and the VeroBlue director who authorized the work (James Rea).  Given that the formerly disinterested directors now control VeroBlue, VeroBlue presumably has access to its own records.

VeroBlue responds to the Founders' fraud pleading arguments with two primary assertions.  The first is that group pleading is permissible because the Founders acted in concert, and VeroBlue has claims for civil conspiracy and aiding and abetting.  The Court is unaware of any authority that allows plaintiffs to so easily circumvent Rule 9, and VeroBlue certainly has not supplied any such authority.  If pleading a conspiracy is all it took to circumvent Rule 9, courts would never hear of Rule 9 again.  And if saying "you are a fraudster" is not enough, then saying "y'all are fraudsters"[54] likewise falls short of Rule 9's standards—notwithstanding the inestimable power of the word "y'all."

---

[53] *Id.* ¶¶ 26–27.

[54] Or, if addressing a group of three or more, "All y'all are fraudsters."

Group pleading of fraud isn't the only fraud pleading issue.  Other deficiencies exist, including failing to identify when misrepresentations took place and where they occurred.  VeroBlue's response is largely that the fraud pleading standard is relaxed when that information is peculiarly within the hands of the defendants.  While there is a relaxed fraud pleading standard,[55] it does not apply here because VeroBlue can only sue for the fraud the defendants perpetrated on it, and now that the disinterested directors control VeroBlue, VeroBlue should be able to know what statements were false or what material omissions were made.  If there were ever a case to not relax the fraud pleading standard, this is it.[56]

In short, the Court does not believe that labeling a group as fraudsters—and then seeking discovery to tighten the allegations after the fact—is consistent with the Fifth Circuit's view of Rule 9's heightened fraud pleading requirements.  Accordingly, the Court grants the Founders' motion to dismiss VeroBlue's new fraud claims.  But the Court will allow VeroBlue a final opportunity to replead—within 28 days of this Order—the fraud claims at issue to comply with Rule 9.[57]

---

[55] *See U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) ("Although we have held that fraud may be pled on information and belief under such circumstances, we have also warned that this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.  In addition, even where allegations are based on information and belief, the complaint must set forth a factual basis for such belief." (quotation marks and citation omitted)).

[56] The Founders also argue VeroBlue failed to plead reliance.  But reliance is only an element of fraudulent concealment (Count 2) and fraudulent misrepresentation (Count 3).  Those were original claims, and the Court granted the motion to strike these dismissal arguments.  But, when repleading, VeroBlue should be mindful that such deficiencies could preclude such a claim from going to trial.  *See infra* note 57.

[57] It is true that because the Court struck the dismissal arguments relating to the original claims, those original claims would survive the dismissal stage even if VeroBlue's next and final pleading is still deficient.  But structurally, VeroBlue's fraud claims (original and new alike), all

### 3.  Civil RICO

The Founders also make several arguments about the pleading deficiency of the civil RICO claim.  But this was an original claim, and the Court struck this portion of the motion to dismiss because the Founders should have raised the argument in their original motion to dismiss.   Thus, the Court will not address pleading deficiencies in the civil RICO claim.  However, VeroBlue should be mindful of the claimed deficiencies as it repleads its new fraud claims.[58]

### 4.  Choice of Law

The Founders lastly claim that the Court should dismiss the case because the live complaint fails to adequately plead choice of law.  The Court disagrees.  The Fifth Circuit has settled that "[a] court sitting in diversity need not conduct a choice-of-law analysis when there is no conflict of law."[59]  There is no conflict between Iowa and Texas law on the topics the Court addresses today.  Iowa and Texas law both allow corporations to sue for their injuries.  Both allow constructive fraudulent transfer claims to not require proof of fraudulent intent.  Both require actual fraudulent transfer claims to have proof of fraudulent intent.  Because no party has shown a material difference in Texas and Iowa law, it would be premature for the Court to

---

incorporate the same factual allegations.  So VeroBlue's curing of deficiencies for the new fraud claims should hopefully cure any lingering deficiencies with the original fraud claims that the defendants are barred from moving to dismiss.

[58] *See supra* note 57.

[59] *Cypress/Spanish Ft. I, L.P. v. Professional Serv. Inds., Inc.*, 814 F. Supp. 2d 698, 708 (N.D. Tex. 2011) (Boyle, J.) (citing *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990)).

dismiss the live complaint for failure to demonstrate what it does not yet need to demonstrate.

### C.  Driver's Motion to Dismiss [Doc. No. 180]

On to Driver's motion to dismiss.  It contends that Driver's termination letter released all of VeroBlue's known and unknown claims against him.  It also argues that the live complaint attempts to circumvent this by group pleading Driver in with deficiently pled claims against the Founders for their alleged actions after his release. VeroBlue responds that its claims are properly pled, the allegations against Driver aren't within the scope of the release, and, in any event, the release was fraudulently procured.

The Court will address fraud pleading first and then the release.  Driver says that the fraud claims fail to allege what Driver actually did.  Instead, he says, they lump him into the group "the Founders" and claim the Founders committed fraud (and raising most allegations as occurring after Driver's employment was terminated).  The Court believes that Driver's argument goes too far inasmuch as it would call for dismissing VeroBlue's complaint on the simple basis that each claim incorporated all factual allegations.  While it is annoying, this defect is not fatal.  The key question is whether VeroBlue pled the specific requirements of Rule 9 as to Driver.  There are some specific allegations as to Driver, such as the allegation that the Founders caused VeroBlue to transfer 2.5 million shares to a company Driver owned for $.000001 per share when the shares were worth $.90 per share at the time. But as with the defects the Court identified in assessing the Founders' motion to

dismiss, the complaint does not say that Driver caused this allegedly fraudulent share transfer.  Likewise, other fraud pleading deficiencies exist as to Driver, such as identifying when misrepresentations or omissions took place and where they occurred.[60]  And VeroBlue is now uniquely positioned to have access to such information.[61]

Regarding the release, the Court concludes it is premature to rule on this issue. VeroBlue has raised the prospect that Driver procured the release through fraud.  A court may rescind releases a party obtained by fraud.[62]  Federal Rule of Civil Procedure 8(c) draws a distinction between affirmative defenses and avoidances of affirmative defenses, but it makes clear that both must be affirmatively pled: "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . fraud[.]"[63]  This Court routinely requires the

---

[60] As with the Founders' motion to dismiss, there is a dispute between Driver and VeroBlue on whether Rule 9 requires pleading to whom the allegedly fraudulent statements were made.  The Fifth Circuit has held that Rule 9 requires "who, what, when, where, why, and how the false statements were made *and to whom they were made*." *Askanase*, 130 F.3d at 676 (emphasis added).  Even if Rule 9 didn't require pleading to whom the statements were made, Article III standing does because VeroBlue as the plaintiff must be the injured party—the recipient who relied on the fraudulent statements.  VeroBlue's repleading must omit allegations that Driver made allegedly fraudulent statements or omissions to entities other than the plaintiff.

[61] Driver spent much of his reply arguing that the release adequately disclaimed reliance under Texas law.  But that briefing neither cited the seminal case in Texas on disclaimer of reliance in a contract—*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323 (Tex. 2011)—nor was it responsive to an argument made in Driver's motion to dismiss or VeroBlue's response. Thankfully, VeroBlue's supplemental brief does cite *Italian Cowboy*.  Regardless, the raising of the issue in the reply means the Court will not consider the argument at this stage.

[62] *See Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990) ("Under Texas law, a release is a contract and is subject to avoidance, on grounds such as fraud or mistake, just like any other contract."); *Shalla v. Shalla*, 23 N.W.2d 814, 822–23 (Iowa 1946) ("'A court of equity will not permit a party to take and enjoy the benefits of ignorance or mistake of law on the part of another party who knew and who did not correct.")

[63] FED. R. CIV. P. 8(c)(1).

31

avoidance of affirmative defenses to be pled affirmatively and separately, and for those pleadings to comply with the requirements of *Twombly*, *Iqbal*, and (if applicable) Rule 9 for fraud-based avoidances.[64]

Here, however, VeroBlue seeks rescission of Driver's termination agreement in Count 14 due to fraud, and it seeks restitution under Count 19 due to fraud. Accordingly, VeroBlue's claims function as an avoidance of an affirmative defense and comply with Rule 8(c). But given that VeroBlue wants to avoid the release because it was allegedly obtained through fraud, it must still meet the requirements of Rule 9. It has not met the requirements of Rule 9 on how Driver fraudulently procured his termination agreement. But because VeroBlue will replead, the Court can reassess this deficiency in VeroBlue's final pleading.

Accordingly, the Court grants Driver's motion to dismiss VeroBlue's fraud claims.[65] But the Court will allow VeroBlue a final opportunity—within 28 days of this Order—to replead the claims at issue to comply with Rule 9.

---

[64] When such fraud-based avoidances are properly raised, it is premature to resolve them at the motion-to-dismiss phase. Here, Driver also argues that VeroBlue knew of the fraud by 2017 and terminated Driver in January 2017, indicating they cannot rely on their fraud theory for Driver. But viewing "by 2017" in the light most favorable to VeroBlue, VeroBlue could have meant during 2017 and not before January 1, 2017. VeroBlue should use more precise language in its final pleading to enable the Court to assess whether the fraud avoidance of the release affirmative defense complies with Rule 9.

[65] Because Driver has raised fraud pleading arguments all along, Rule 12 does not limit the scope of his argument as to only newly raised fraud claims (as it does for the Founders). And as the Court addressed previously, VeroBlue's equity claims still sound in fraud and are held to the pleading standard under Rule 9. As a result, this ruling applies to all of VeroBlue's claims against Driver.

D.  Canaccord's Motion to Dismiss [Doc. No. 211]

Canaccord's motion to dismiss argues: (1) the Court lacks personal jurisdiction over Canaccord; (2) a release bars the claims between the VeroBlue and Canaccord; (3) the complaint fails to state a claim for relief; and (4) the forum selection clause in the agreement between VeroBlue and Canaccord requires this case to be in New York. VeroBlue responds that: (1) Canaccord's physical presence in Texas confers jurisdiction; (2) the release and failure-to-state-a-claim arguments are based on documents Canaccord attaches that are not permissible at the dismissal stage; and (3) the only remedy for a forum selection clause is transfer, not dismissal.  The Court holds that the mandatory forum-selection clause requires a transfer of this case under 28 U.S.C. § 1404 (rather than a dismissal under Rule 12(b)(3)) to the United States District Court for the Southern District of New York.

While the Court agrees with VeroBlue that dismissal is inappropriate under recent guidance from the Supreme Court of the United States, that same guidance mandates a transfer of the claims against Canaccord without any regard to the convenience of the parties.  The Supreme Court made clear in 2013 that "[a]lthough a forum-selection clause does not render venue in a court 'wrong' or 'improper' within the meaning of § 1406(a) or Rule 12(b)(3), the clause may be enforced through a motion to transfer under § 1404(a)."[66]  Further, "[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the

---

[66] *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 59 (2013).

forum specified in that clause.  Only under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied."[67]

The Supreme Court clarified that there are three variations to the section 1404 analysis when a forum-selection clause is at issue.[68]  First, "the plaintiff's choice of forum merits no weight."[69]  Second, "a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests."[70]  Third, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations."[71]

Procedurally, the presence of a forum-selection clause carries a distinct burden: "the party acting in violation of the forum-selection clause . . . must bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer."[72]  What remains then is the public-interest factors, which include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case

---

[67] *Id.* at 62.

[68] *Id.* at 63.

[69] *Id.*

[70] *Id.* at 64.

[71] *Id.*

[72] *Id.* at 67.

in a forum that is at home with the law."[73]   Finally, this Court observes that, based on the Supreme Court's guidance on the proper remedy, district courts routinely transfer—rather than dismiss—when a party files a Rule 12(b)(3) motion due to a forum-selection clause.[74]

With this legal background in mind, the Court turns to the forum selection clause between Canaccord and VeroBlue.   That agreement states: "[T]he parties hereto consent to the exclusive jurisdiction and venue of the state and federal courts of the State of New York, located in Manhattan."[75]   VeroBlue's only response to this mandatory clause is that a Rule 12(b)(3) motion on a forum-selection clause should not result in dismissal.   But VeroBlue fails to acknowledge that courts routinely grant transfers under section 1404 in response to a Rule 12(b)(3) motion for dismissal based on a forum-selection clause.   And so, VeroBlue has not carried its "burden of showing that public-interest factors overwhelmingly disfavor a transfer."[76]   Indeed, it could not, given that the agreement between Canaccord and VeroBlue also selects New

---

[73] *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 767 (5th Cir. 2016) (quotation marks omitted) (alteration in original).

[74] *See, e.g., LeBlanc v. C.R. England, Inc.*, 961 F. Supp. 2d 819, 827 (N.D. Tex. 2013) (Boyle, J.) ("[T]he moving party's choice of procedural mechanisms—Rule 12(b)(3) or § 1404(a)—does not dictate the court's choice of analytical tools.").

[75] Appendix to Canaccord's Motion to Dismiss, Exhibit A (Private Placement Engagement Agreement), at Appx. 13 (Canaccord-VeroBlue Agreement) [Doc. No. 213].   That agreement also contemplates any "action" or "claim" "brought by or against any person . . . in connection with or as a result of . . . any untrue statement or alleged untrue statement of a material fact contained in any Materials, or any omission or alleged omission to state therein a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading." *Id.* at Appx. 12.

[76] *Atl. Marine*, 571 U.S. at 67.

York for choice of law,[77] that New York courts have the greatest familiarity with that law, that New York has a stronger interest than Texas in resolving this dispute, and that congestion exists at both courts. Instead, the Court gives the agreed-upon forum-selection clause the "controlling weight" it is due and finds no extraordinary circumstances that warrant setting it aside.[78]

At oral argument, VeroBlue raised two additional arguments: (1) Canaccord did not sign the agreement containing the forum-selection clause, and (2) the agreement was fraudulent because a Founder signed it when continuing to perpetrate a fraud on the company. Even assuming these arguments were not waived by only raising them at the hearing, neither argument is availing. First, VeroBlue signed the agreement, and, under New York law, agreements need only be signed by the party the agreement will be enforced against.[79] Second, a general invocation of fraud should not so lightly bust up an agreement. VeroBlue is essentially claiming that everything the Founders touched was fraudulent, and they touched this, and so this too must be fraudulent. But fraud pleading must be very specific thing. And these are the most general allegations one can possibly make to assert that the forum-selection clause was procured with fraud.[80] The Court will not proceed to essentially hold a trial on

---

[77] *See* Canaccord-VeroBlue Agreement at Appx. 13 (specifying that the agreement "shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein and, in connection therewith").

[78] *Atl. Marine*, 571 U.S. at 60.

[79] *See Palmer v. Gould*, 144 N.Y. 671, 678 (N.Y. 1895) ("[T]he case is similar to one where the agreement, though only signed by the one party, may, nevertheless, be enforced against him by the other[.]").

[80] Actually, VeroBlue's briefing argued the release was procured through fraud. At oral argument, it cross-applied its generic fraud allegations to the forum-selection clause as well. Even

busting up a forum-selection clause from vague allegations of fraud involving a party the Court may well not have personal jurisdiction over. New York courts are more than equipped to resolve any issues of fraud in a court with personal jurisdiction over Canaccord.

Accordingly, under section 1404, the Court grants Canaccord's motion to dismiss in part, severs the claims against Canaccord, and transfers them to the United States District Court for the Southern District of New York.[81]

### E. Maniaci's Motion to Dismiss [Doc. No. 206]

Maniaci's motion to dismiss is purely personal—jurisdiction, that is. Maniaci is a Canadian citizen who argues the Court lacks general or specific jurisdiction over him. VeroBlue responds that Maniaci purposefully established minimum contacts with Texas by aiding and abetting the Texas-based Founders, by communicating into Texas while representing VeroBlue, and by indirectly owning VeroBlue stock. The Court agrees with Maniaci.

Legally, Federal Rule of Civil Procedure 12(b)(2) authorizes a district court to dismiss an action for lack of personal jurisdiction. And on such a motion, the plaintiff bears the burden of establishing a prima-facie case for jurisdiction over the nonresident defendant.[82] If a plaintiff makes that prima-facie case, the burden shifts

---

assuming this is proper, the generic invocation of the talisman of fraud cannot set aside an agreement to try this case in New York.

[81] As a result, the Court need not reach Canaccord's remaining arguments.

[82] *See Ham v. La Cienega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993) ("Plaintiffs typically carry the burden of proof on personal jurisdiction by making a *prima facie* showing.").

to the defendant to present "a compelling case that the presence of some other consideration would render jurisdiction unreasonable."[83]   The Court may resolve jurisdictional facts by looking to "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."[84]   And the Court need only accept as true the complaint's uncontroverted allegations if those allegations are not conclusory.[85]

Additionally, a "federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution."[86]   The Texas long-arm statute reaches to the limits of federal due process, which means the court must determine whether (1) the "defendant has established 'minimum contacts' with the forum state"; and (2) "the exercise of jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.'"[87]   The minimum-contacts prong is satisfied when a defendant

---

[83] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

[84] *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).

[85] *See Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (noting that the district court in the case "correctly held that the prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted").

[86] *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 418 (5th Cir. 1993).

[87] *Id*. (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[88]

Courts subdivide the minimum-contacts inquiry into specific and personal jurisdiction.[89]  General personal jurisdiction exists when the nonresident defendant's contacts with the forum state (even if unrelated to the lawsuit) are continuous, systematic, and substantial.[90]  By contrast, specific jurisdiction is only appropriate when the defendant's contacts with the forum state arise from, or are directly related to, the cause of action.[91]  "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation."[92]  "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."[93]  Accordingly, "the relationship must arise out of contacts that the defendant *himself* creates with the forum State."[94]

---

[88] *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

[89] *Marathon Oil Co. v. A.G. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999).

[90] *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984) ("When a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant.").

[91] *See id*. at 414 n.8 ("It has been said that when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum, the State is exercising 'specific jurisdiction' over the defendant.").

[92] *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (quotation marks omitted).

[93] *Id*. at 284.

[94] *Id*.

If the plaintiff establishes minimum contacts, "the burden shifts to defendant to show that the assertion of jurisdiction would be unfair."[95]  When evaluating whether the exercise of personal jurisdiction over the defendants would be unfair, courts examine a number of factors, including: (1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering social policies.[96]

Here, Maniaci is a Canadian citizen who practices law in the Business Law Group at Cassels Brock & Blackwell LLP.  His employer's three offices (Toronto, Ontario; Calgary, Alberta; and Vancouver, British Columbia) are all in Canada. Maniaci never represented clients who were Texas entities, but he did represent VeroBlue, which has a Texas office and whose founders live in Texas.  Maniaci has never traveled to Texas to meet with VeroBlue representatives, has never attended depositions, hearings, or trials in Texas, and has not solicited legal work in Texas. (Maniaci is definitely missing out on the joys of connections with Texas.[97])  The live complaint alleges that Maniaci interfered in the bankruptcy proceedings when he

---

[95] *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 245 (5th Cir. 2008).

[96] *See Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Ca., Solano Cnty*, 480 U.S. 102, 113 (1987) (listing factors to determine "the reasonableness of the exercise of jurisdiction" in each case involving personal jurisdiction).

[97] In the words of Lyle Lovett, "That's right, you're not from Texas.  Texas wants you anyway." *See* Wikipedia, That's Right (You're Not from Texas), *available at* https://en.wikipedia.org/wiki/That's_Right_(You're_Not_from_Texas) (last updated on July 29, 2019). In this case, Maniaci's lack of contacts with Texas make Texas's want for him subservient to the Constitution's Due Process Clause.  The Court laments that Maniaci is missing the joys of hearing Lyle Lovett at Gruene Hall and eating deep-fried everything at the State Fair of Texas.

sent a letter on his firm letterhead to other VeroBlue shareholders, ostensibly to garner opposition to the bankruptcy debtor's plan. Maniaci's firm disavowed that the letter was legal advice approved by the firm. The complaint makes claims against Maniaci for conspiracy with the Founders and aiding and abetting the Founders.

Applying those principles to these facts, the Court must first assess minimum contacts for general jurisdiction and then for specific jurisdiction. There is little argument for general personal jurisdiction over Maniaci in Texas. Simply put, Maniaci has precious few contacts with this forum, and certainly not ones that would rise to the level of rendering Maniaci "at home" in Texas. In other words, Maniaci would likely never be seen wearing this t-shirt:



And so it comes as no surprise that VeroBlue does not contend in its response that there is general personal jurisdiction over Maniaci.[98]

---

[98] Maniaci's fact pattern is diametrically opposed to, say, a U.S. Senator who renounced his Canadian citizenship, having always considered Texas to be home.

To then establish minimum contacts, VeroBlue must show that this lawsuit arose from or directly relates to the contacts Maniaci himself created with Texas, and that connection must be substantial.[99]   VeroBlue has not carried this burden for making its prima-facia case.   Generically, the live complaint asserts that all defendants "committed torts in part in Texas."[100]   But the Court cannot credit that conclusory, group allegation to set aside the Constitution.[101]

The specific allegations against Maniaci fall into four buckets.   The first bucket is the acts of Maniaci as a lawyer.   Maniaci represented VeroBlue's Canadian parent corporation—VeroBlue Farms, Inc. (referred to as VeroBlue Canada).   Maniaci's affidavit swears that neither his firm nor he himself "have ever represented [VeroBlue] USA."[102]   VeroBlue points out that one of Maniaci's colleagues swore otherwise in proofs of claim in the VeroBlue bankruptcy proceeding in an attempt to get paid for legal bills totaling $275,349.21.[103]   Maniaci's firm filed those proofs of claim in November 2018, attaching legal invoices pertaining to VeroBlue Canada. Invoices attached to the proof of claim listed Maniaci and others at his firm doing

---

[99] *See Walden*, 571 U.S. at 283–84 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.").

[100] Second Amended Complaint ¶ 17.

[101] *See, e.g., Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980) ("The Minnesota court also attempted to attribute State Farm's contacts to Rush by considering the 'defending parties' together and aggregating their forum contacts in determining whether it had jurisdiction.  The result was the assertion of jurisdiction over Rush based solely on the activities of State Farm.  Such a result is plainly unconstitutional.").

[102] Affidavit of Sean Maniaci ¶ 26 [Doc. No. 208].

[103] Appendix for VeroBlue's Response to Maniaci's Motion to Dismiss, Tab A-35 (CBB's November 7, 2019 Answers to Interrogatories in Adversary Action Related to the Bankruptcy Proceeding), at Appx. 357 (claiming Maniaci assisted with drafting proofs of claim) [Doc. No. 247-7].

legal work on restructuring. In February 2019, the amended disclosure statement for VeroBlue's Chapter 11 reorganization (signed by VeroBlue's current president, McCowan) nowhere mentions an executory contract between VeroBlue and Maniaci or his firm.[104] In August 2019, Maniaci's firm filed a withdrawal of its claims without providing its rationale for withdrawal. After the debtors objected, the firm filed a response stating that its withdrawal was because the invoices were for VeroBlue Canada. Specifically, the response stated that the firm

> has and continues to take the straightforward demonstrable position that [the firm] is a Canadian law firm that employs Canadian attorneys that represented Canadian clients (including Veroblue Farms Inc., a Canadian corporation), that performed legal services in Toronto, Ontario, Canada and that its files with respect to those Canadian clients are not the property of the Debtors, none of whom have ever been clients of [the firm].[105]

The bankruptcy court granted the withdrawal after a telephonic hearing.

Maniaci's contacts as a lawyer do not meet the refined test for nonresident-lawyer contacts sufficient to confer specific jurisdiction. For specific jurisdiction, "a nonresident attorney's act of entering into an attorney-client relationship with a Texas resident, standing alone, does not provide the minimum contacts necessary to

---

[104] *See* Affidavit of Michael D. Schwartz, Exhibit A (Amended Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of VeroBlue Farms USA, Inc. and its Affiliated Debtors), at 25–26 ("Any Executory Contract or unexpired lease that has not yet expired by its own terms on or prior to the Effective Date . . . shall be deemed rejected by the Debtors, in the entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such rejection pursuant to section 365(a) and 1123 of the Bankruptcy Code.") [Doc. No. 265-1].

[105] *Id.*, Exhibit B (Cassels Brock & Blackwell LLP's Response to Debtors' Objection to Withdrawal of Claims) ¶ 5 [Doc. No. 265-3].

support personal jurisdiction over the nonresident attorney."[106]  And performing legal analysis in another state about Texas law and communicating that into Texas is likewise insufficient to establish specific jurisdiction.[107]  What matters for personal jurisdiction is that a nonresident lawyers "performance must be due in Texas."[108]  The Fifth Circuit has found personal jurisdiction over a nonresident lawyer when the lawyer considered his Texas client a major client, his firm represented the Texas company for eight years, he was present for a number of meetings in Texas, and he represented the company on a matter in federal court in Texas for three years.[109]

This Court certainly does not condone Maniaci's firm's filing of bankruptcy claims for an entity it later admitted in that proceeding (and in this proceeding) that it did not represent.   But contrary to VeroBlue's assertions, misconduct in a bankruptcy court in Iowa does not create personal jurisdiction over Maniaci in Texas. And it is for the bankruptcy court to determine the appropriate remedy, if any, for the erroneous filing of the claims.   That aside, Maniaci made communications into Texas as the Founders lived and worked here.   And he performed legal services in Canada

---

[106] *Gray, Ritter & Graham, PC v. Goldman Phipps PLLC*, 511 S.W.3d 639, 657 (Tex. App.— Corpus Christi 2015, pet. denied).

[107] *See Markette v. X–Ray X–Press Corp.*, 240 S.W.3d 464, 468–69 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (concluding an out-of-state attorney's legal advice about Texas law was "still insufficient to establish personal jurisdiction").

[108] *Gray, Ritter & Graham*, 511 S.W.3d at 658 (quoting *Lisitsa v. Flit*, 419 S.W.3d 672, 680 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

[109] *Trinity Indus., Inc. v. Myers & Assocs., Ltd.*, 41 F.3d 229, 231 (5th Cir. 1995) ("These contacts amount to a substantial connection with Texas and cannot accurately be characterized as random, fortuitous, or incidental.  Rather, they indicate that the defendants deliberately availed themselves of the benefits of an ongoing relationship with a Texas client and reasonably should have anticipated the possibility of being haled into court in Texas for claims arising out of or related to that relationship." (citation omitted)).

for a parent company whose subsidiary had a Texas office.  VeroBlue claims that Maniaci failed to distinguish his work for VeroBlue and his work for VeroBlue Canada, and that he mailed invoices on multiple occasions to VeroBlue's Plano address.  But Maniaci filed an affidavit with the Court indicating that he did not perform legal services in Texas or for a Texas company.  And nothing in VeroBlue's briefing or evidence demonstrates otherwise.  This is not the same as performing legal services in Texas, which is the proper test for personal jurisdiction over a nonresident lawyer.[110]

The second bucket of Maniaci's contacts is his ownership interest in VeroBlue Canada.  Maniaci and an entity he controls (Sailstreet Capital, Inc.) do own stock in VeroBlue Canada.  His ownership in VeroBlue Canada gives him a right to exercise his option to buy stock in VeroBlue—which he has not exercised.  The issue here is specific personal jurisdiction, which requires the claims against Maniaci to arise from the contacts with Texas.  These are contacts with a Canadian corporation—not contacts with Texas.  Yes, VeroBlue Canada is related to VeroBlue.  And VeroBlue has contacts with Texas.  But by this logic, Maniaci is related to Canada; and through NAFTA, Canada has contacts with the United States; and Texas is in the United States.  This may well be the methodology for "Six Degrees of Kevin Bacon," and the Supreme Court's practice for aggregating under the Commerce Clause,[111] but it is not

---

[110] *See Gray, Ritter & Graham*, 511 S.W.3d at 657 (discussing the standard for personal jurisdiction over nonresident lawyers as being that "performance must be due in Texas").

[111] *See generally Wickard v. Filburn*, 317 U.S. 111 (1942) (finding that growing wheat in your backyard for personal consumption substantially affects interstate commerce, thereby subjecting the activity to federal regulation).

the Supreme Court's methodology for jurisdictional contacts under the Due Process Clause. Maniaci's ownership in a Canadian corporation does not give rise to personal jurisdiction in Texas.

The third bucket of contacts is Maniaci's filing of a certificate of formation with the Texas Secretary of State for Opposing Flow Aquaculture, Inc. That entity was responsible for VeroBlue's much acclaimed opposing-flow technology that helped it raise capital. The certificate lists the address of VeroBlue's Plano office as the principal address for Opposing Flow Aquaculture, Inc. An amended certificate of formation removed Maniaci, prior to any meetings or actions by the company. Maniaci's signature on the original certificate of formation does not constitute Maniaci purposefully availing himself. At most, one who signs a certificate of formation before his exclusion in an amended certificate is akin to a corporate director or officer of a company incorporated in a particular jurisdiction. The Supreme Court has made clear that such facts go to the choice-of-law analysis but do not constitute purposefully availing oneself.[112] In any event, the Court concludes that Maniaci's

---

[112] This is known as the fiduciary-shield doctrine, which generally prohibits the exercise of jurisdiction over a company director or officer for their contacts with a forum involving representation of the company. *See Shaffer v. Heitner*, 433 U.S. 186, 215 (1977) ("Appellee suggests that by accepting positions as officers or directors of a Delaware corporation, appellants performed the acts required by *Hanson v. Denckla*. . . . [T]his line of reasoning establishes only that it is appropriate for Delaware law to govern the obligations of appellants to Greyhound and its stockholders. It does not demonstrate that appellants have purposefully avail(ed themselves) of the privilege of conducting activities within the forum State[.]" (quotation marks omitted) (alteration in original)). *See Ragan & Massey, Inc. v. Voluntary Purchasing Grps, Inc.*, 2009 WL 3157468, at *6 (E.D. Tex. Sept. 28, 2009) (holding that a corporate director's presence at 10 board meetings in Texas was insufficient to confer personal jurisdiction) (citing *Shaffer*, 433 U.S. at 215).

46

filing of the certificate and then removal before any meetings or action would not make it reasonably foreseeable for Maniaci to be haled into court in Texas.[113]

The fourth and final bucket of Maniaci's contacts is a letter to shareholders during VeroBlue's bankruptcy proceeding.  VeroBlue claims this letter was designed to garner opposition to the bankruptcy debtor's plan and, on information and belief, was sent to at least one shareholder in Texas.  VeroBlue complains that Maniaci's letter disclosed that he was a minority shareholder but failed to disclose that he served as counsel to VeroBlue.  On that topic, Maniaci's firm indicated the letter was not sent with the knowledge of management and should not have been issued on firm letterhead.

The Court agrees with VeroBlue that the test for jurisdiction over a nonresident lawyer is inappropriate for analyzing whether Maniaci's letter confers jurisdiction (because the letter was in Maniaci's capacity as a shareholder and not as a lawyer).  And so, the question is whether under a typical minimum-contacts analysis for specific jurisdiction Maniaci's letter caused a harm in Texas that VeroBlue can sue for.  It didn't.  VeroBlue claims there was one Texas recipient of the letter.  The appendix citation lists Gregory Pearl of Dallas as the only Texan shareholder of VeroBlue.  The Texas Supreme Court has held that one may not be subject to jurisdiction in Texas courts merely for directing a tort at Texas from afar.[114]

---

[113] *See Shaffer*, 433 U.S. at 216 (holding that corporate officers and directors of a Delaware corporation who officed in a different state "had no reason to expect to be haled before a Delaware court").

[114] *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005) (reaffirming that the Texas Supreme Court has "expressly rejected jurisdiction based solely upon the

Even though such rulings are based upon the Due Process Clause, the Fifth Circuit has not yet adopted this approach.  Instead, the Fifth Circuit has held that a single communication constituting an intentional tort can confer specific jurisdiction.[115]  The Fifth Circuit believes such isolated communications are purposeful availment which ends the first step of the minimum-contacts inquiry.[116]  Importantly, under Supreme Court and Fifth Circuit precedent, there must be proof that "the tort-feasor knows that the brunt of the injury will be felt by a particular resident in the forum[.]"[117]

This analysis requires courts to go claim by claim to see if the forum contacts (Maniaci's letter) give rise to the claim.[118]  Here, the two claims against Maniaci are for conspiracy and aiding and abetting.  The conspiracy claim focuses on Maniaci assisting the Founders while they controlled VeroBlue.[119]  There is one stray allegation that is broader: "Further, Maniaci's misconduct was willful and egregious,

---

effects or consequences of an alleged conspiracy in the forum state" (quotation marks and citation omitted)).

[115] *See Lewis v. Fresne*, 252 F.3d 352, 358–59 (5th Cir. 2001) (holding that a "single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted").

[116] *See id.* at 359 ("Recently, this Court explained that '[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment.'" (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) (alteration in original)).

[117] *Southmark Corp. v. Life Inv'rs, Inc.*, 851 F.2d 763, 772 (5th Cir. 1988) (citing *Calder v. Jones*, 465 U.S. 783, 789–90 (1984)).

[118] *See, e.g., Eagle Metal Prods., LLC v. Keymark Enters.*, LLC, 651 F. Supp. 2d 577, 587 (N.D. Tex. 2009) (Lynn, J.) (assessing claim by claim whether Texas contacts gave rise to various tort claims).

[119] *See* Second Amended Complaint ¶ 389 ("The Founders and Maniaci's aim, through the Founders-Maniaci Conspiracy, was to accomplish the unlawful objective of personally benefiting the Founders and Maniaci at the expense of [VeroBlue], while concealing the same from [VeroBlue], and/or making fraudulent misrepresentations to [VeroBlue] and its disinterested board members in the face of the Founders' duties of disclosure.").

or at least wanton, and warrants punitive damages in an amount to be determined at trial as it continues into 2019 through the Bankruptcy Proceedings."[120]  Charitably understood, that pleading means that the alleged misconduct continued in the bankruptcy proceeding (not just that the damages continued to mount during the bankruptcy proceeding).  The aiding and abetting claim contains similar allegations to the conspiracy count, claiming that Maniaci's misconduct occurred "through the Bankruptcy Proceedings" and more specifically alleges that "his recent efforts to solicit clients to join the Ad Hoc Committee of equity investors in [VeroBlue]'s Bankruptcy Proceedings" are evidence of willful conduct supporting punitive damages.[121]  If these allegations are true, VeroBlue still fails to show that Maniaci knew the brunt of the injury would be felt by the particular resident in the forum now bringing the claim.  And, in any event, Pearl was the injured Texan.  VeroBlue is the one claiming the injury.   But VeroBlue is not a Texas resident.[122]  Because the defendant claiming to feel the brunt of Maniaci's conduct is not a Texas resident, and the only person who is a Texas resident is not a plaintiff, VeroBlue has failed to make its prima-facia case that the Court has personal, specific jurisdiction over Maniaci.

Viewed another way, VeroBlue is upset that it had additional effort in the bankruptcy proceeding in Iowa because of the Founders and Maniaci.   This frustration is understandable, but it is up to the bankruptcy proceeding to redress

---

[120] *Id.* ¶ 392.

[121] *Id.* ¶¶ 392, 399.

[122] VeroBlue's live complaint makes clear that "[VeroBlue] is a Nevada corporation with its principal place of business in Webster City, Iowa.  [VeroBlue] is a citizen of Nevada and Iowa."  *Id.* ¶ 4.

that issue.  A Nevada/Iowa resident's frustration over a Canadian letter aimed at an Iowa bankruptcy proceeding doesn't create personal jurisdiction over the Canadian in Texas.[123]

### F.  Third Party Complaint [Doc. No. 186]

The Founders (Wulf, Hall, Ted Rea, and James Rea) also brought a third-party complaint against Ebstein, Haarkoetter, Thelander, Wester, McCowan, Dr. Hapel, and Alder.  Of these third-party defendants, only Alder, Thelander, and McCowan (collectively, "third-party defendants") have appeared so far.  Alder filed a motion to strike [Doc. No. 223] and a motion to dismiss [Doc. No. 219] the third-party complaint. That motion to dismiss contains a Rule 12(b)(1) jurisdictional argument that the alter ego breach claims are property of the bankruptcy estate, and a Rule 12(b)(5) jurisdictional argument on defective service under the Hague Convention.  Thelander and McCowan filed a joint motion to strike the third-party complaint [Doc. No. 228]. And they separately filed motions to dismiss raising Rule 12(b)(6) arguments for failure to state a claim.  Thelander filed a motion to dismiss the third-party complaint [Doc. No. 227], contending the Court lacks personal jurisdiction over him under Rule 12(b)(2) and raising six merits defects in the tortious interference claim under Rule 12(b)(6).  Finally, McCowan filed a motion to dismiss the third-party complaint [Doc. No. 229], raising the same six Rule 12(b)(6) arguments as Thelander.

---

[123] Because Maniaci lacks sufficient minimum contacts with Texas, the Court need not wade through whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice.  *See Ruston Gas Turbines*, 9 F.3d at 418 (saying that "[b]oth prongs of the due process test must be met" if the district court is to "exercise personal jurisdiction" over a nonresident defendant).

Procedurally, the Court must consider jurisdiction arguments first under Rules 12(b)(1), (b)(2), and (b)(5) before considering the motions to strike under Rule 14 and the motions to dismiss under Rule 12(b)(6).

### 1. Rules 12(b)(1), (b)(2), and (b)(5) Jurisdictional Arguments

Alder contends that the alter ego breach claims (Counts 5–9) are property of the bankruptcy estate and that service was defective.[124]  Thelander argues that the Court lacks personal jurisdiction over him.  The Court takes each in turn.

Alder is a British Virgin Islands entity that invested significant sums in VeroBlue.  When VeroBlue filed for bankruptcy, Alder served as the plan sponsor, injected additional capital, and became VeroBlue's only shareholder through the plan of reorganization.  The Founders bring a mix of tort and contract claims in the third-party complaint, seeking to hold Alder liable for VeroBlue's alleged breaches of termination agreements with the Founders.  But Alder claims in its motion to dismiss that the debtor-in-possession in the VeroBlue bankruptcy had exclusive standing to bring these claims.  The Founders respond that the plan of reorganization expressly excluded the Founders' claims from the discharge and releases.

---

[124] The Court appreciates Alder's helpful briefing, explaining that district courts have addressed, and can address, Rule 14 motions to strike before Rule 12(b)(5) motions on defective service. Alder's rationale is that a Rule 12(b)(5) defective service argument, if believed, would simply postpone the Court getting to the inevitable Rule 14 motion to strike.  As concerned as the Court is with efficiency, the Court is more concerned with principle—if the Court lacks jurisdiction because of defective service, it lacks the power to wade into a Rule 14 motion to strike.  In any event, the principled approach does not hinder judicial economy here because the Court concludes service was proper under Rule 12(b)(5) but Rule 14 bars the third-party complaint.

The Court agrees with Alder.  The Fifth Circuit's general rule is that "alter ego claims are the property of the estate within the meaning of the Bankruptcy Code."[125] This imposes a notice requirement that one satisfies by proceeding in the bankruptcy court or obtaining leave from the bankruptcy court to proceed in an independent lawsuit.[126]  When, as here, the entity raising the bankruptcy argument is the alleged alter ego, the Fifth Circuit has declined to extend these rules further because it "would mean that allegedly liable 'alter egos' could escape liability should the trustee for a 'shell' corporation which it (the alleged 'alter ego') has thrown into bankruptcy simply choose not to prosecute a potentially meritorious 'alter ego' claim."[127]  But the Fifth Circuit still requires either proceeding in the bankruptcy court or with leave of the bankruptcy court in such situations.[128]  To the extent Texas law underlying the Fifth Circuit precedent controlled that outcome, the other possible choice of law on this question is Nevada law, which would yield the same outcome.[129]

---

[125] *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1285 (5th Cir. 1988) (quotation marks omitted).

[126] *See, e.g., id.* (noting that "Gibraltar sought and obtained leave, over LDBrinkman Corp.'s vigorous objection, in both the bankruptcy proceedings and the court below, to prosecute the third amended complaint, thereby satisfying the notice requirement expressed in *S.I. Acquisition*. 817 F.2d at 1154 n.13").

[127] *Id.* at 1286.

[128] *See id.* ("We decline to convert the recognized shield for the debtor's estate into a shield for potentially liable 'alter egos'; should the bankruptcy trustee decline the gauntlet, the veil-piercing sword is available to tort claimants or contract creditors, should they choose to attack in the bankruptcy proceeding or, with the bankruptcy court's leave, in another forum.").

[129] *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2nd Cir. 1993) (holding that the "law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders").  VeroBlue is incorporated in Nevada.  In *S.I. Acquisition*, the Fifth Circuit acknowledged that Nevada law "is identical to Texas law" in that corporations can assert alter ego against themselves.  817 F.2d at 1153.  In any event, the bankruptcy court notice requirement this issue turns on is an issue of federal procedure rather than state substantive law.  *See id.* at 1154 n.13 (noting that available recourses went through the bankruptcy court); *In re River Hills Apartments*

Here, the Founders objected to the plan of reorganization to preserve their ability to defend and prosecute this specific proceeding.  At the point they objected, they noted (1) this case was pending, (2) this case had been transferred to this Court, and (3) they had filed third-party claims for tortious interference against Ebstein, Thelander, Wester, Haarkoetter, Happel, and Alder.  At the time, the third-party complaint only had claims for tortious interference (and not claims against Alder for alter ego and breach of contract).  The Founders concern was that, "[i]f confirmed, the Amended Plan will allow [VeroBlue] to pursue claims against the Founder Parties without allowing the Founder Parties to assert affirmative defenses against the Debtors and the third-party claims against certain Non-Debtor Releasees."[130]  This was because section 9.14 of the reorganization plan at that time would have released VeroBlue from all claims and causes of action, and section 9.15 would have released holders of claims against VeroBlue in light of the consideration under the plan.  VeroBlue agreed to the Founders' proposed modification of the reorganization plan, which provides:

- For Section 9.14: "Notwithstanding any provision in the Plan, upon entry of the Confirmation Order, parties in the litigation pending as 19-CV-764 in the United States District Court for the Northern District of Texas may, to the full extent the Bankruptcy Code permits, plead any and all defenses for an amount up to but not exceeding any recovery that

---

*Fund*, 813 F.2d 702, 706 (5th Cir. 1987) (interpreting the notice requirement as pursuant to the bankruptcy stay statute, at 11 U.S.C. § 362(a)).

[130] Appendix to Founders' Response to Alder's Motion to Dismiss Third-Party Complaint, Exhibit A (Objection of Wulf, Hall, Ted Rea, and James Rea to Amended Joint Chapter 11 Plan of Reorganization of VeroBlue and its Affiliated Debtors), at Appx. 4 [Doc. No. 251-1].

may be obtained by the Debtors, without prejudice to each parties' rights
to dispute such claims."[131]

- For Section 9.15: "For the avoidance of doubt, Section 9.15 does not apply
  to the claims of any party to the litigation pending as 19-CV-764 in the
  United States District Court for the Northern District of Texas, provided
  that such party does not receive payment or distribution under the
  Plan."[132]

Of course, the scope of the amended plan carves out the claims in the original
third-party complaint for tortious interference. The question is whether it also carves
out the then not-yet-filed alter ego claims for breach of contract. The Court concludes
it does not. While the Founders make the argument that, textually, the plan
modifications might encompass future claims by existing parties, this argument
steamrolls the Fifth Circuit's requirement for the bankruptcy court to grant leave for
the claims or try them itself. The purpose of that requirement is that the "creditors
would receive notice of [the Founders'] allegations and hopefully prevent any
preferential benefit to any one creditor."[133] True, the Founders gave notice through
their objection of what was (the defense against VeroBlue and the tortious
interference claims against the third party defendants). It gave no notice of what was

---

[131] Appendix to Alder's Motion to Dismiss Third-Party Complaint, Exhibit 3 (Bankruptcy Court
Order, including VeroBlue Reorganization Plan), at Appx. 196–97 [Doc. No. 221].

[132] *Id.* at Appx. 196. The bankruptcy court incorporated these modifications through its
confirmation order. *Id.* at Appx. 61 ("The Court notes that objections regarding the scope of release
provisions were resolved during the hearing, as set forth on the record. The Court finds that the release
provisions, as amended, are appropriate and concludes the release provisions are not in conflict with
the provisions of the Bankruptcy Code.").

[133] *S.I. Acquisition.* 817 F.2d at 1154 n.13.

yet to come (the alter ego and breach claims).  Although this is an alternative way of seeking the same relief, it seems even more to violate the Fifth Circuit's command. The whole point of the automatic stay in bankruptcy is to protect the estate from claims while resolving the debtor's reorganization.  Allowing an alter ego claim because an entity is essentially the debtor is even more grounds to require notice in the bankruptcy court than for tort claims against third parties.  The failure to give notice through the bankruptcy proceeding and obtain leave of court (and the resulting bankruptcy discharge) deprives the Founders of standing to assert Counts 5–9 of the amended third-party complaint.

The second jurisdictional argument is that this Court lacks personal jurisdiction over Thelander.  Counts 1–4 of the third-party complaint allege tortious interference against Thelander for allegedly inducing VeroBlue to (1) sue Hall and Ted Rea, (2) refuse to pay Wulf his severance, and (3) terminate James Rea and refuse to pay his severance.  Thelander argues his contacts with Texas are so sporadic that they do not confer general jurisdiction and the tortious interference claims do not arise from them.  The Founders respond that Thelander's contacts are extensive enough to make him aware he could be haled into court in Texas, he purposely availed himself of Texas laws, and the tortious interference claims arise from his Texas contacts.  The Court fully laid out the legal standard for personal jurisdiction above regarding Maniaci's motion to dismiss and need not rehash it here.

Factually, Thelander is a Swedish national residing in London.  Thelander's Texas contacts fall into two buckets—one for VeroBlue subsidiaries and another for

VeroBlue itself.  A series of corporate filings list Thelander as a director of VeroBlue subsidiaries that had a Texas office.  The first is a written consent appointing Thelander as an "Investor Director" of VBF IP, Inc.—a Texas corporation.  VeroBlue is the sole shareholder of VBF IP, Inc.  VBF IP, Inc. lists its office address in Plano, Texas, and the written consent references the Texas Business and Commerce Code four times.  The second filing was VBF IP, Inc.'s amended certificate of formation, which listed Thelander's address as the corporate address in Plano.  Another VeroBlue subsidiary is Iowa's First, Inc., which (as expected) is an Iowa corporation. But the restated articles of incorporation filed in Iowa list Thelander's address as Plano. And Iowa's First, Inc.'s application for authority to transact business in Illinois lists another Plano address for Thelander.

The second bucket of contacts involves VeroBlue.  First, Alder's stock purchase agreement with VeroBlue identified Plano as the location of the VeroBlue offices and required Thelander to sign an indemnification agreement as part of the transaction. Thelander participated in multiple board meetings that were initiated by conference call from Plano.  This included phone participation in an October 2017 board meeting where the directors (particularly Thelander) discussed terminating Hall and Ted Rea. Thelander helped draft those termination agreements, which called for Texas choice of law.  And he communicated with Ebstein and Wester about whether VeroBlue was obligated to make payments under the termination agreements.  Thelander also communicated with Wulf in a manner indicating that Thelander was the lead

representative of VeroBlue to negotiate Wulf's termination—also governed by Texas law and with a Texas forum selection clause.

The Founders argue Thelander's Texas connections are substantial and indicate that he purposefully availed himself of Texas law, such that general jurisdiction is proper. But the Supreme Court has made clear that positions as an officer or director of a corporation are appropriate for consideration in a choice-of-law analysis, not a purposeful-availment analysis.[134] And the Fifth Circuit has crystalized the fiduciary-shield doctrine, which provides that "an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has in personam jurisdiction over the corporation."[135]

An exception the Court must address, however, is when a defendant is sued for his own tortious conduct which had reasonably foreseeable consequences in Texas. The Fifth Circuit's seminal case for this exception is *Donovan v. Grim Hotel Co.*[136] In *Donovan*, the Fifth Circuit reviewed personal jurisdiction over a nonresident corporate president, Charles Alberding, who "hired the managers" for five Texas

---

[134] *See Shaffer*, 433 U.S. at 215 ("Appellee suggests that by accepting positions as officers or directors of a Delaware corporation, appellants performed the acts required by *Hanson v. Denckla*. . . . [T]his line of reasoning establishes only that it is appropriate for Delaware law to govern the obligations of appellants to Greyhound and its stockholders. It does not demonstrate that appellants have 'purposefully avail(ed themselves) of the privilege of conducting activities within the forum State[.]'" (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (alteration in original)). *See also Ragan*, 2009 WL 3157468, at *6 (holding that a corporate director's presence at 10 board meetings in Texas was insufficient to confer personal jurisdiction) (citing *Shaffer*, 433 U.S. at 215).

[135] *Stuart*, 772 F.2d at 1197.

[136] 747 F.2d 966 (5th Cir. 1984).

hotels, "regularly travelled to Texas in connection with the operation of the Texas hotels," "made personal loans to the Texas hotel corporations," and "personally signed loan agreements for Texas hotel improvements."[137]  The Fifth Circuit observed that, "[m]ost importantly, Alberding is sued for violations of the federal statute, under which he is statutorily characterized as an employer and is personally responsible for defaults because of his substantial personal control of the terms and conditions of the Texas employee's work in Texas."[138]  In the end, the Fifth Circuit held that "his Texas-connected acts that produced injurious effects to the Texas-based employees cannot, as a matter of law or fact, be regarded as performed solely in his corporate capacity."[139]  The *Donovan* Court never specified if its ruling or the exception to the fiduciary-shield doctrine was rooted in the defendant's substantial connections to Texas or the fact that federal and state fair-wages laws made him personally liable for the acts he was sued for.

Fortunately, the Fifth Circuit clarified this in *General Retail Services, Inc. v. Wireless Toyz Franchise, LLC* in 2007.[140]  There, the Fifth Circuit summed up *Donavan*'s application to that case: "So while the fiduciary-shield doctrine could prohibit this court from ascribing acts of the [defendant corporation] to [the officer], it does not prohibit [the officer] from being held personally liable for his own tortious

---

[137] *Id.* at 973.

[138] *Id.*

[139] *Id.*

[140] 255 Fed. App'x 775 (5th Cir. 2007).

conduct simply because he is an officer of a corporation."[141]  The Fifth Circuit found that the officer in that case sent marketing materials with alleged misrepresentations into Texas, triggering the path for the smallest of contacts needed for specific jurisdiction under Fifth Circuit precedent.[142]

It seems then that the fiduciary-shield doctrine and personal-tort exception might simply be the application of specific jurisdiction: did the Founders sue Thelander over *his* Texas contacts instead of VeroBlue's Texas contacts?  The first thing this doctrine and exception make clear as to Thelander is that general jurisdiction (through purposeful availment) does not exist because there is no indication that Thelander himself signed these corporate filings (to enable a purposeful-availment argument).  Second, the Court concludes Thelander's contacts are insufficient to confer specific jurisdiction.  Essentially, the Founders claim that Thelander incited VeroBlue to breach the termination agreements between VeroBlue and the Founders.  But even if those termination agreements had been between *Thelander* and the Founders, that would not have established specific jurisdiction. The Fifth Circuit says that it "is well established that merely contracting with a

---

[141] *Id*. at 795.

[142] *See id*. ("General Retail established that Simtob purposefully directed his activities to Texas because he created and intentionally sent the Offering Circular to Texas.  Because General Retail's alleged injuries arise from those contacts, namely, the Offering Circular, Simtob has sufficient minimum contacts with Texas.").

resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction."[143]   Likewise, the Fifth Circuit

> has repeatedly held that the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant.[144]

These contract-specific fact patterns all contained more jurisdictional contacts than Thelander possesses here.   Instead, Thelander's Texas contacts focus on the creation of a contract—not the breach of the contract or interference with it.   And so, it cannot be said that the tortious interference claims "arise from" Thelander's Texas contacts.   This analysis also complies with the Fifth Circuit's articulation in *General Retail Services* of the tort exception to the fiduciary-shield doctrine for corporate directors: the tort must arise from the defendant's forum contacts.   Here, the Founders nowhere mention Thelander's contacts with Texas which amounted to tortious interference.   As a result, the Court lacks personal jurisdiction over Thelander and grants his motion to dismiss under Rule 12(b)(2).

The third and final jurisdictional issue is whether the Founders served Alder properly.   Alder contends service was defective because it was not made through the

---

[143] *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004) (quotation marks omitted).

[144] *Id*.  *See, e.g.*, *Stuart*, 772 F.2d at 1194 ("Considering the totality of the facts of this case, we conclude that the inference of purposeful availment necessary to support the exercise of personal jurisdiction over Spademan is not supported.  The random use of interstate commerce to negotiate and close a particular contract, the isolated shipment of goods to the forum at the instigation of the resident plaintiffs, and the mailing of payments to the forum do not constitute the minimum contacts necessary to constitutionally exercise jurisdiction over Spademan.").

designated authority for paragraph 10(c) service under the Hague Convention.  The Founders respond that service through a British Virgin Islands solicitor was proper. The Court agrees with the Founders.

Alder is a British Virgin Islands company.  Federal Rule of Civil Procedure 4(f) governs service on foreign entities.  It allows service by (1) any "internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention"; (2) "if there is not an internationally agreed means, or if an international agreement allows but does not specific other means," by several ways "reasonably calculated to give notice"; or (3) "any other means not prohibited by international agreement," if directed by the court.[145]  The United Kingdom extended application of the Hague Convention to the British Virgin Islands.[146]  And its declarations to paragraph 10(c) of the Hague Convention provide that "documents for service through official channels will be accepted in the United Kingdom only by the central or additional authorities and only from judicial, consular or diplomatic officers of other Contracting States. . . .*"[147]  The asterisk is in the declarations and indicates that the "declaration does not preclude any person in another Contracting State who is interested in a judicial proceeding (including his

---

[145] FED. R. CIV. P. 4(f).

[146] Hague Conference on Private International Law, Extensions, 14: Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, *available at* https://www.hcch.net/en/instruments/conventions/status-table/extensions/?cid=17&mid=427 (last visited June 3, 2020).

[147] Hague Conference on Private International Law, United Kingdom—Central Authority & Practical Information, *available at* https://www.hcch.net/en/states/authorities/details3/?aid=278 (last visited June 3, 2020).

lawyer) from effecting service in the United Kingdom 'directly' through a competent person other than a judicial officer or official, e.g., a solicitor."[148]  The Supreme Court has held that compliance with the Hague Convention is "mandatory in all cases to which it applies[.]"[149]

Here, Leslie-Ann Theodore swore that she personally served the documents as agent for Susan V. Demers, Esq., "a solicitor admitted to practice in the British Virgin Islands and thus a competent person within the meaning of Article 10(c) [of the Hague Convention]."[150]  And so, the Founders served through a solicitor, which complies with the United Kingdom declarations to the Hague Convention.  Accordingly, the Court denies Alder's motion to dismiss under Rule 12(b)(5) for insufficient service of process.

## 2.  Motions to Strike

After resolving the jurisdictional attacks on the third-party complaint, the Court turns to the motions to strike the third-party complaint under Rule 14.  Alder [Doc. No. 224], and McCowan and the now-dismissed Thelander[151] [Doc. No. 228], contend the Court should strike the complaint because third-party complaints are only proper to assign liability under the complaint, which this third-party complaint arguably does not do.  The Founders respond that the third-party claims are to assign

---

[148] *Id.*

[149] *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988).

[150] Affidavit of Service Upon Third-Party Defendant Alder ¶ 2 [Doc. No. 156].

[151] Given that the Court lacks personal jurisdiction over Thelander, it need not assess this secondary argument.

liability under VeroBlue's claims for rescission, declaratory judgment, and restitution. The Court agrees with Alder and McCowan.

Federal Rule of Civil Procedure 14 provides that a "defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it."[152] The third-party summons frames this secondary liability by notifying the third-party defendant that the "third-party plaintiff is making [a] claim against [the third-party defendant] to pay part or all of what the defendant may owe to the plaintiff[.]"[153] The Fifth Circuit has fleshed out what Rule 14's derivative-liability requirement means. The Fifth Circuit maintains that the assertion of third-party claims "under Rule 14 requires that the liability of the third party be dependent upon the outcome of the main claim."[154] "[W]hen the defendant's right against the third party is merely an outgrowth of the same core of facts which determines the plaintiff's claim, impleader is properly used to reduce litigation by having one lawsuit do the work of two."[155] By contrast, "an entirely separate and independent claim cannot be maintained against a third party under Rule 14, even though it does arise out of the same general set of facts as the main claim."[156] And the Fifth Circuit established a limited exception for when "the liability of the [defendants and third-party defendant] is an either/or proposition as a result

---

[152] FED. R. CIV. P. 14(a)(1).

[153] Summons on a Third-Party Complaint to Alder, at 1 [Doc. No. 94].

[154] *United States v. Joe Grasso & Son, Inc.*, 380 F.2d 749, 752 (5th Cir. 1967).

[155] *Id.* at 751 (quotation marks omitted).

[156] *Id.*

of the law or the facts[.]"[157]   Rule 14 allows any party to "move to strike the third-party claim, to sever it, or to try it separately."[158]

Lower courts have enforced these principles to strike third-party claims that were independent, even if the same set of facts was underlying the primary and third-party claims.   For example, in *Continental Western Casualty Company v. Steel Stadiums, Ltd.*,[159] this Court struck third-party claims that arose from the same underlying facts but involved a separate agreement that was allegedly breached.[160]

More on point, *American Express Travel Related Services Company, Inc. v. Beaumont*[161] involved American Express suing Linda Beaumont for failing to pay her $674,249.82 credit card bill.[162]   Beaumont responded with third-party claims against an art dealer for common law fraud, breach of fiduciary duty, and deceptive trade practices for allegedly posting fraudulent charges to her card.[163]   In adopting the U.S. Magistrate Judge's findings, conclusions, and recommendation, this Court determined that that the deceptive-trade-practice claim was separate and independent from American Express's claims against Beaumont and that Rule 14

---

[157] *Id.* at 752.   The Fifth Circuit held this exception inapplicable in *Joe Grasso* because the third-party-defendant ship crewmen might not have been employees of Grasso or the ship captains and instead might have been independent contractors.   *See generally id.*

[158] FED. R. CIV. P. 14(a)(4).

[159] 2011 WL 13228951 (N.D. Tex. Apr. 4, 2011) (Solis, J.).

[160] *Id.* at *2.

[161] 2002 WL 31298867 (N.D. Tex. Oct. 9, 2002) (Buchmeyer, J.).

[162] *See id.* at *1 (providing and adopting findings, conclusions, and recommendation of magistrate judge).   This case also demonstrates that American Express does actually offer cards without credit limits.

[163] *Id.*

barred it.[164]  Regarding the fraud and fiduciary duty claims, this Court determined that there was no possibility of secondary liability to the art dealer because American Express could only win its primary claim if it proved Beaumont did not authorize the charges or timely notify American Express of the fraud.[165]  If that occurred, Beaumont could not then argue that the art dealer breached her agreement with American Express through fraud or breach of a fiduciary duty.[166]

Likewise, in *TRC & Associates v. NuScience Corp.*,[167] the plaintiff sued the defendants for fraud and RICO violations.[168]  One defendant brought third-party claims against the plaintiff's controlling shareholder, which the U.S. District Court for the Central District of California dismissed because the agreement between the defendant and the controlling shareholder was "in no way central to the disposition of [the plaintiff's] claims against [the defendant]" and "[t]he fact that [the shareholder] may have breached an employment agreement . . . does not make [the defendant] any less liable for the alleged fraudulent conduct[.]"[169]

Here, the third-party claims are independent and not proper under Rule 14. The primary claims the Founders seek to shift liability on involve VeroBlue seeking (1) rescission of the Founders' termination agreements, (2) a declaratory judgment

---

[164] *Id.* at *2.

[165] *Id.*

[166] *Id.*

[167] 2014 WL 211781 (C.D. Cal. Jan. 13, 2014) (Wright, J.).

[168] *Id.* at *1.

[169] *Id.* at *3.

that VeroBlue owes the Founders nothing further under the termination agreements, and (3) restitution for benefits VeroBlue paid under the agreements.  If VeroBlue wins, the agreements are gone and VeroBlue gets back what it paid under them.  In the third-party claims, the Founders argue that Alder and McCowan incited VeroBlue to sue over the agreements.  But this is not derivative liability.  If the Founders owe money back to VeroBlue, it would be because the Founders were at fault for mismanagement and self-dealing (not because Alder and McCowan urged VeroBlue to sue the Founders).  These third-party claims would only be proper if the Founders alleged that Alder and McCowan are the ones who caused them to mismanage VeroBlue (not caused VeroBlue to break up with them).  Yes, these third-party claims hinge on similar underlying facts as the primary claims.  But Rule 14 only allows that broader test for claims that third-party defendants bring.[170]  It does not allow defendants to bring such broad claims against third parties.  Because the Founders' claims against Alder and McCowan are independent instead of derivative, the claims violate Rule 14 and the Court grants the motions to strike.  As a result, the Court need not reach Alder and McCowan's Rule 12(b)(6) arguments that the tortious interference claims against them fail to state a claim.

---

[170] *See* Fed. R. Civ. P. 14(a)(2)(D) ("The person served with the summons and third-party complaint—the 'third-party defendant': . . . may also assert against the plaintiff any claim arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff.").

IV. Conclusion

To recap, the Court **GRANTS** VeroBlue's motion to strike arguments that the Founders could have raised earlier, Driver's joinder in the Founders' dismissal arguments, and Driver's affidavit [Doc. No. 215].  The Court **GRANTS IN PART** the Founders' motion to dismiss [Doc. No. 184], holds that VeroBlue insufficiently pled its fraud allegations in its new claims, and requires VeroBlue to replead within 28 days.  The Court **GRANTS IN PART** Driver's motion to dismiss [Doc. No. 180] on the ground that VeroBlue has insufficiently pled fraud, which VeroBlue should address in its repleading.  The Court **GRANTS** Canaccord's motion to dismiss [Doc. No. 211] in part and severs and transfers the claims against Canaccord to the United States District Court for the Southern District of New York under section 1404 pursuant to the forum-selection clause.  And the Court **GRANTS** Maniaci's motion to dismiss for lack of personal jurisdiction [Doc. No. 207].

As to the third-party complaint, the Court **GRANTS IN PART** Alder's motion to dismiss [Doc. No. 219] on the ground that the Court lacks jurisdiction for alter ego and breach of contract claims against Alder that the Founders failed to present to the bankruptcy court before discharge.  But the Court **DENIES** Alder's motion to dismiss argument that service was defective [Doc. No. 219].  Further, the Court **GRANTS** Thelander's motion to dismiss for lack of personal jurisdiction [Doc. No. 227].  Lastly, the Court **GRANTS** the motions to strike the third-party complaint [Doc. Nos. 223 & 228].

**IT IS SO ORDERED** this 5th day of June 2020.


BRANTLEY STARR
UNITED STATES DISTRICT JUDGE