# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| VEROBLUE FARMS USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:19-cv-00764-X |
| v. | ) | |
| | ) | |
| LESLIE A. WULF, BRUCE A. HALL, | ) | |
| JAMES REA, JOHN E. REA, | ) | |
| KEITH DRIVER, and CHRISTINE | ) | |
| GAGNE, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## <u>THIRD AMENDED COMPLAINT</u>

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ...................................................................................................5

II.  PARTIES................................................................................................................6

III. JURISDICTION AND VENUE ..............................................................................8

IV.  VBF'S ORIGINS, STRUCTURE, AND DISCOVERY OF THE MISCONDUCT .............9

V.   THE FOUNDERS' MISAPPROPRIATION OF VBF ASSETS ...........................14
    A.    BAJJER STOCK SCHEME (HALL, JAMES REA, TED REA)..................................15
    B.    AMERICAN GROWTH FUNDING LOAN SCHEME (HALL, TED REA, AND WULF)........................................................................................16
    C.    WULF LAKE HOUSE SCHEME (WULF, JAMES REA, HALL, TED REA, AND DRIVER)........................................................................................18
    D.    SEDUN PAYMENT SCHEME (WULF)..................................................21
    E.    COMPENSATION SCHEME (WULF, HALL, DRIVER, TED REA, AND JAMES REA) ........................................................................................22
    F.    GAGNE SCHEME (WULF AND JAMES REA)........................................24
    G.    OFA SCHEME (WULF, HALL, TED REA, AND JAMES REA)...............26
    H.    VBF CANADA STOCK SCHEME (WULF, HALL, TED REA, JAMES REA, AND DRIVER) ........................................................................................27
    I.    OTHER MISAPPROPRIATIONS AND WASTE OF VBF FUNDS FOR PERSONAL USE ........................................................................................29

VI.  KEY VBF METRICS AND OTHER MATERIAL FACTS MISREPRESENTED AND/OR CONCEALED BY THE FOUNDERS..........................................................33
    A.    VBF'S TECHNOLOGY ........................................................................34
    B.    VBF'S FCR........................................................................................37
    C.    VBF'S DENSITY................................................................................38
    D.    VBF'S MORTALITY ...........................................................................41
    E.    OTHER MEASUREMENTS OF AN AQUACULTURE BUSINESS'S SUCCESS............44
    F.    VBF SEEKS AND RECEIVES ADDITIONAL INVESTORS AND VBF BOARD MEMBERS ........................................................................................46

VII. THE FOUNDERS' CONCEALMENT..................................................................48
    A.    SEPTEMBER 2014 FITZSIMMONS EMAIL (WULF, DRIVER, TED REA, AND JAMES REA) ........................................................................................49
    B.    NOVEMBER 9, 2014 HINERFELD EMAIL (WULF, DRIVER, TED REA, AND JAMES REA) ........................................................................................55
    C.    JANUARY 7, 2015 TED REA EMAIL (WULF, DRIVER, JAMES REA, AND TED REA)........................................................................................57
    D.    JUNE 2015 MICHAELS EMAIL (WULF, HALL, DRIVER, TED REA, AND JAMES REA) ........................................................................................60

E.     THIRD-PARTY EXPERT DILIGENCE REPORT FORGED AND FALSIFIED BY THE FOUNDERS (WULF DRIVER, HALL, TED REA, AND JAMES REA)................66

F.     JANUARY 28, 2016 DRIVER EMAIL REGARDING MORTALITY (WULF, HALL, DRIVER, TED REA, AND JAMES REA) ....................................96

G.    FEBRUARY 2, 2016 CAMERON ROBINSON EMAIL (WULF, DRIVER, TED REA, AND JAMES REA)..........................................................................99

H.    MARCH 31, 2016-JULY 27, 2017 ACTUAL DATA REGARDING MORTALITY (WULF, HALL, DRIVER, TED REA, AND JAMES REA) .................102

I.      FEBRUARY 6, 2017 THROUGH AUGUST 29, 2017 ACTUAL DATA REGARDING DENSITY (WULF, HALL, DRIVER, TED REA, AND JAMES REA) ...............................................................................................105

J.      JULY 31, 2017 EMAIL FROM JOHN REA TO TED REA (TED REA) ..................109

K.    SEPTEMBER 19, 2017 JAMES REA, WULF, HALL, TED REA EMAIL (WULF, HALL, JAMES REA, AND TED REA)....................................111

L.     OTHER ACTIONS OF THE FOUNDERS IN SUPPORT OF THEIR FRAUDULENT CONCEALMENT FROM FEBRUARY 2015 THROUGH JULY 2016 .......................115

M.   THE FOUNDERS' CONCEALMENT IS STILL ONGOING.......................116

VIII.  THE FOUNDERS' FRAUDULENT MISREPRESENTATIONS...................................118

A.    SEPTEMBER 2014 MARKETING DECK (WULF, HALL, DRIVER, TED REA, AND JAMES REA) .......................................................................118

B.    2014 TO 2015 PERFORMANCE DATA PRESENTATION (WULF, HALL, DRIVER, TED REA, AND JAMES REA) ...............................................123

C.    MAY 2015 VALUATION (WULF, HALL, DRIVER, AND TED REA)...................125

D.    JUNE 2015 OFA PRESENTATION (WULF, HALL, DRIVER, TED REA, AND JAMES REA) .......................................................................127

E.    THE FORGED FTAI REPORTS (WULF, HALL, DRIVER, TED REA, AND JAMES REA) .......................................................................130

F.     AUGUST AND OCTOBER 2015 MARKETING DECKS (FALL 2015 MARKETING DECKS) (WULF, HALL, DRIVER, TED REA, AND JAMES REA) ...............................................................................................132

G.    NOVEMBER 2015 OPERATIONAL DATA PRESENTATION (WULF, HALL, DRIVER, AND TED REA) ..................................................................137

H.    JANUARY 2016 EXECUTIVE SUMMARY AND JANUARY 2016 MARKETING DECK (WULF, HALL, DRIVER, AND TED REA) ............................140

I.      WATER RECIRCULATING FLOW DETAILS, SINGLE TANK WORKUP, AND ANSWER TO QUESTIONS, DOCUMENTS (WULF) ................................146

J.      FEBRUARY 19, 2016 WULF EMAIL (WULF) ....................................149

K.    MARCH 18, 2016 WULF EMAIL (WULF) ........................................151

L.     APRIL 2, 2016 WULF EMAIL REGARDING MARCH 29, 2016 WULF INTERVIEW (WULF) ........................................................................153

M.   APRIL 2016 STOCKING AND HARVEST CHARTS (WULF, HALL, DRIVER, TED REA, AND JAMES REA) ...........................................................155

N.    JUNE 21, 2016 HALL EMAIL (WULF AND HALL) ..................................158

O.    AUGUST 2016 MANAGEMENT UPDATE (WULF, HALL, TED REA, AND JAMES REA) .......................................................................159

P.     SEPTEMBER 2016 MANAGEMENT UPDATE (WULF AND HALL) ......................162

Q.      OCTOBER 2016 MANAGEMENT UPDATE (WULF AND HALL) .........................164
R.      SECOND OCTOBER 2016 MANAGEMENT UPDATE (WULF AND HALL) ............167
S.      DECEMBER 2016 MANAGEMENT UPDATE (WULF AND HALL) .......................169
T.      JANUARY 2017 MODEL (WULF, HALL, TED REA, AND JAMES REA) ..............171
U.      JANUARY 2017 MANAGEMENT UPDATE (WULF, HALL, AND TED REA).........174
V.      FEBRUARY 2017 MANAGEMENT UPDATE (WULF, HALL, TED REA, AND
        JAMES REA) ..................................................................................................177
W.      MARCH 2017 MANAGEMENT UPDATE (WULF AND HALL) ............................179
X.      MAY 2017 MANAGEMENT UPDATE (WULF AND HALL)................................182
Y.      JUNE 2017 MANAGEMENT UPDATE (WULF AND HALL)................................184
Z.      JULY 2017 MANAGEMENT UPDATE (WULF AND HALL)................................186
AA.     AUGUST 2017 MANAGEMENT UPDATE (WULF, HALL, TED REA, AND
        JAMES REA) ..................................................................................................188
BB.     SECOND AUGUST 2017 MANAGEMENT UPDATE (WULF, HALL, TED
        REA, AND JAMES REA) ..................................................................................191
CC.     WULF STATEMENTS AT SEPTEMBER 2017 BOARD OF DIRECTORS
        MEETING (WULF) ..........................................................................................193
DD.     OCTOBER 2017 MANAGEMENT UPDATE (WULF)...........................................195

IX.     ADDITIONAL   FACTS   SUPPORTING   THE   REASONABLE   AND
        DETRIMENTAL RELIANCE OF VBF'S INDEPENDENT BOARD MEMBERS,
        INDEPENDENT OFFICERS, AND SHAREHOLDERS ON THE FOUNDERS'
        MISREPRESENTATIONS ..........................................................................................198

X.      THE FOUNDERS' SCHEMES BEGIN TO UNRAVEL ....................................................200
        A.      VBF RETAINS COUNSEL NOT BEHOLDEN TO THE FOUNDERS TO
                INVESTIGATE THEM ........................................................................................208
        B.      VBF TERMINATES THE FOUNDERS. ...............................................................217

XI.     THE FOUNDERS' MISUSE OF CORPORATE COUNSEL ...........................................221

XII.    WULF, HALL, TED REA, AND JAMES REA'S MISCONDUCT CONTINUES
        INTO THE YEAR 2019 ...............................................................................................225

XIII.   ADDITIONAL FACTS SUPPORTING VBF'S CLAIMS .............................................228

FOR PUNITIVE DAMAGES...............................................................................................228
        A.      THE FOUNDERS' AND CANACCORD'S "REVERSE ENGINEERING" OF VBF
                DATA. .............................................................................................................229
        B.      THE FOUNDERS' OTHER TACTICS DEMONSTRATING WILLFULNESS AND
                CALCULATION. ...............................................................................................235

XIV.    CAUSES OF ACTION..................................................................................................238
        COUNT I  – BREACH OF FIDUCIARY DUTY – ALL FOUNDERS ........................238
        COUNT II  – FRAUDULENT CONCEALMENT – ALL FOUNDERS ......................240
        COUNT III  – FRAUDULENT MISREPRESENTATION – ALL FOUNDERS ..........242
        COUNT IV  – CONSTRUCTIVE FRAUD – ALL FOUNDERS..................................244

COUNT V  – UNIFORM VOIDABLE TRANSFERS ACT (IOWA CODE
   §684.4(1)(a)) – ALL FOUNDERS ........................................................245
COUNT VI  – UNIFORM VOIDABLE TRANSFERS ACT (IOWA CODE
   §684.4(1)(b)) – ALL FOUNDERS ........................................................247
COUNT VII  – ACTUAL FRAUDULENT TRANSFER (TEXAS LAW) – ALL
   FOUNDERS (TEX. BUS. & COMM. CODE § 24.005(a)(1)) ...................248
COUNT VIII  – CONSTRUCTIVE FRAUDULENT TRANSFER (TEXAS
   LAW) – ALL FOUNDERS (TEX. BUS. & COMM. CODE § 24.005(a)(2)) ..........251
COUNT IX  – CIVIL CONSPIRACY – ALL FOUNDERS...........................252
COUNT X  –KNOWING PARTICIPATION IN OR AIDING AND ABETTING
   OF BREACH OF FIDUCIARY DUTIES – ALL FOUNDERS ..............................253
COUNT XI  – UNJUST ENRICHMENT – ALL FOUNDERS.....................254
COUNT XII  – EQUITABLE ACCOUNTING – ALL FOUNDERS ...........254
COUNT XIII  – DECLARATORY JUDGMENT- ALL TRANSACTIONS VOID
   – ALL FOUNDERS...............................................................................256
COUNT XIV  – RESCISSION–TERMINATION AGREEMENTS, SELECTIVE
   PROVISIONS AND DECLARATORY JUDGMENT – HALL, DRIVER,
   TED REA...........................................................................................257
COUNT XV  – DECLARATORY JUDGMENT JAMES REA ...................259
COUNT XVI  – RESCISSION – EMPLOYMENT AGREEMENT – JAMES
   REA...................................................................................................260
COUNT XVII  – RESCISSION – SEPARATION AGREEMENT – WULF.................262
COUNT XVIII  – DECLARATORY JUDGMENT –  SEPARATION
   AGREEMENT – WULF..........................................................................264
COUNT XIX  – RESTITUTION–HALL, TED REA, DRIVER, AND WULF .............264
COUNT XX  – CONSPIRACY – CHRISTINE GAGNE.................................265
COUNT XXI  – KNOWING PARTICIPATION IN BREACH OF FIDUCIARY
   DUTIES – CHRISTINE GAGNE .............................................................266
COUNT XXII  – UNJUST ENRICHMENT – CHRISTINE GAGNE ...........267
COUNT XXXIII– VIOLATIONS OF RACKETEER INFLUENCED AND
   CORRUPT ORGANIZATIONS ACT (RICO) (18 U.S.C. § 1962(c)) –
   FOUNDERS  [formerly COUNT XXVII]....................................................267
   A.    THE RICO "PERSON" AND "ENTERPRISE" .....................................267
   B.    THE PATTERN OF RACKETEERING ACTIVITY...................................269
   C.    PREDICATE ACTS ......................................................................269
   D.    DEFENDANTS CONDUCTED THE ENTERPRISE'S AFFAIRS THROUGH A
         PATTERN OF RACKETEERING ACTIVITY ........................................275
   E.    INJURY TO VBF ......................................................................276

XV.  ATTORNEYS' FEES ..........................................................................278

XVI.  PRAYER........................................................................................278

Plaintiff, VeroBlue Farms USA, Inc. ("VBF"), through its undersigned counsel, complains of Defendants, Leslie A. Wulf ("Wulf"), Bruce A. Hall ("Hall"), James Rea ("James Rea"), John E. ("Ted") Rea, ("Ted Rea"), Keith Driver ("Driver") (Wulf, Hall, James Rea, Ted Rea, and Driver are collectively referred to as the "Founders"), and Christine Gagne ("Gagne"), and alleges as follows:

## I. INTRODUCTION

1.      The Founders founded VBF, a sustainable fish farm ("aquaculture") business, in 2014.  They never invested any of their own money in VBF, but by the time VBF terminated the last of the Founders (in January 2018), they had pilfered and squandered over $90,000,000 in debt and equity of VBF—none of it invested by the Founders. The Founders bankrupted VBF, leading to its filing for Chapter 11 bankruptcy in September 2018 (the "Bankruptcy Proceedings").

2.      The Founders' misconduct includes misappropriations and misuse of VBF's assets and continuous and knowing misrepresentations and concealment relating to VBF's operations, technology, and finances.  This caused VBF, at the direction of the Founders, to sink tens of millions of dollars into what the Founders knew at all relevant times to be a losing proposition, to the benefit of the Founders at VBF's expense.

3.      Overall, the Founders' misconduct falls in two categories: (i) misappropriation of VBF's cash and other assets and (ii) fraudulent misrepresentations and concealment. As to the first category, the Founders (1) drained VBF of assets and looted the company, (2) withdrew significant funds while VBF was in financial trouble, (3) along with Gagne (Wulf's daughter), received money and other assets that belonged to VBF for no reasonably equivalent value, (4) took improper salaries and other benefits from VBF's assets, and (5) ultimately rendered VBF incapable of continued operation, causing at least $5,000,000 in compensatory damages to VBF.

4.      As to the second category, the Founders fraudulently misrepresented VBF's performance and operational metrics, finances, and the amount of technical experience behind VBF, while concealing material and contrary information from VBF's independent officers, independent board members, and shareholders, causing tens of millions in compensatory damages to VBF.  One example, of many, discovered by VBF after it filed its Second Amended Complaint, is Wulf's direct forgery of two reports prepared by a third-party aquaculture consultant, in which he deleted or otherwise changed negative information about VBF, and passed it off as third-party validation of VBF to, Bjorn Thelander, a VBF independent board member, VBF shareholder, and the representative of one of VBF shareholder's largest shareholders, and Ken Lockard, another VBF independent board member and representative of another large VBF shareholder.  VBF believes that Founders Driver, Hall, Ted Rea, and James Rea knew or should have known of this forgery and supported and/or participated in this misconduct.

5.      VBF seeks compensatory damages in the amount of at least $90,000,000, plus punitive damages and other relief.

## II.  PARTIES

6.      VBF is a Nevada corporation with its principal place of business in Webster City, Iowa.  VBF is a citizen of Nevada and Iowa.

7.      Wulf, James Rea, Ted Rea, and Driver are Canadian citizens.

8.      Driver is a Canadian citizen and resides in Calgary, Alberta, Canada. Driver served as an officer (performing the function of Chief Operating Officer for most, if not all of his tenure, even at times when he did not hold that official title) and, employee, (and/or contractor) of VBF from October 1, 2014 through on or about January 13, 2017, when VBF terminated his employment and officer status. Driver continued to serve VBF as an independent contractor through December 2017.  During his tenure at VBF, Driver purported to serve as VBF's chief in-

house aquaculture expert.  Driver previously appeared in this lawsuit through counsel and has not challenged personal jurisdiction.

9.      James Rea, a Canadian citizen, has permanent resident alien status in the United States and is domiciled in Texas.  James Rea served as a director, officer, and employee (and/or consultant) of VBF from October 1, 2014 through on or about January 8, 2018 when VBF terminated his employment (and/or contractor), director, and officer status.  James Rea's function for much of his tenure at VBF was as VBF's Chief Development Officer, in charge of VBF's construction and special projects.  James Rea previously appeared in this lawsuit through counsel and has not challenged personal jurisdiction.

10.     Ted Rea, a Canadian citizen, has permanent resident alien status in the United States and is domiciled in Texas.  Ted Rea served as a director, officer, and employee (and/or consultant) of VBF from October 1, 2014 through on or about October 27, 2017 when VBF terminated his employment (and/or contractor), director, and officer status.  Ted Rea initially served as Director of Business Development and later, VBF's Chief Operating Officer (especially after VBF fired Driver in January 2017) in charge of its production and technology.  Ted Rea previously appeared in this lawsuit through counsel and has not challenged personal jurisdiction.

11.     Hall, is a United States citizen and is domiciled in Texas.  Hall served as a director, officer (Chief Financial Officer during much, if not all, of his tenure at VBF), and employee (and/or consultant) of VBF from October 1, 2014 through on or about October 27, 2017 when VBF terminated his employment (and/or contractor), director, and officer status.  As VBF's Chief Financial Officer, Hall oversaw VBF's financial, tax, internal control, and audit issues.  Hall previously appeared in this lawsuit through counsel and has not challenged personal jurisdiction.

12.     Wulf, a Canadian citizen, has permanent resident alien status in the United States and is domiciled in Texas.  Wulf served as a director, officer (Chief Executive Officer during much, if not all, of his tenure at VBF), and employee (and/or contractor) of VBF from October 1, 2014 through on or about November 6, 2017, when VBF terminated his employment (and/or consultant), director, and officer status.  Wulf previously appeared in this lawsuit through counsel and has not challenged personal jurisdiction.

13.     Gagne is a Canadian citizen whose present whereabouts are unknown to VBF after reasonable investigation.  Gagne is Wulf's daughter who VBF paid during Wulf's tenure for alleged services performed. VBF knew Gagne to be a Canadian citizen during events alleged herein, and it has not confirmed that she has gained U.S. citizenship.  On May 5, 2020, the Court granted VBF's Motion for Substituted Service [Dkt. 273], allowing for service of Gagne through her personal email address and through defendant Wulf.

### III.  JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1) and (2).  Gagne, Wulf, James Rea, Ted Rea, and Driver are citizens of a foreign state and are not domiciled in the same states as VBF; Hall is not a citizen of the same state as VBF; and the amount in controversy exceeds $75,000, exclusive of costs and interest.  Alternatively, this Court has supplemental jurisdiction over Gagne pursuant to 28 U.S.C. § 1367.

15.     The Court also has subject matter jurisdiction over all Defendants pursuant to 28 U.S.C. § 1331 as VBF brings claims against all Defendants pursuant to the United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 28 U.S.C. § 1961.

16.     Venue in this District is proper because the United States District Court for the Northern District of Iowa, on March 27, 2019, transferred this case to this Court. (*VeroBlue Farms USA, Inc. v. Wulf, et al.,* Case No. 18-CV-3047, Iowa Dkt. 50, the "Transfer Order").

17.     This Court has personal jurisdiction over Defendants pursuant to § 17.042(2) of the Texas Civil Practice and Remedies Code, as the Defendants committed torts in part in Texas and further, James Rea, Ted Rea, Hall, and Wulf are domiciled in Texas.

## IV.   VBF'S ORIGINS, STRUCTURE, AND DISCOVERY OF THE MISCONDUCT

18.     The Nelson family of Webster City, Iowa, led by cousins Mark and Jeff Nelson (collectively, the "Nelsons"), started an aquaculture business in Blairsburg, Iowa in 2012, which was known as "Iowa's First."

19.     Effective December 31, 2014, the Nelsons sold their business to VBF (incorporated on September 5, 2014) through a transaction in which the Nelsons and their wives retired $1,200,000 in debt and received stock in VBF.  VBF thereafter operated a sustainable fish farm (aquaculture) business in Webster City, Iowa.  VBF almost exclusively sold a fish species called barramundi.

20.     The Founders controlled VBF from its incorporation until their respective departures from VBF by exerting control over VBF's operations, finances, and data, including in their continuing capacity as VBF directors and/or officers.

21.     Wulf, Hall, Ted Rea, and James Rea, who have lived in the Plano-Dallas, Texas area at relevant times, had extensive joint business relationships prior to VBF, and that has continued since they left VBF.  Further, Wulf, Hall, Ted Rea, and James Rea at times relevant to this case, officed together in Plano, Texas and Webster City, Iowa.  At these locations, Wulf, Hall, Ted Rea, and James Rea officed in the same room, with almost identical setups so that these four Founders could easily collaborate and communicate on various issues.  Driver also officed with Wulf, Hall, Ted Rea, and James Rea in the same room at these locations. The five Founders were in the practice of regularly having breakfast together, normally at the Webster City, Iowa Hy-Vee grocery store which also had a dining area, or restaurants local to Plano, Texas.  Thus, the five

Founders were an extremely close-knit group at times relevant to this case. Regarding VBF, Wulf, Hall, Ted Rea, and James Rea knew what the other was doing at all times relevant to the case. Regarding VBF, Driver knew what Wulf, Hall, Ted Rea, and James Rea were doing at least until January 13, 2017, when his officer status was terminated, although Wulf, Hall, Ted Rea, and James Rea remained in contact with Driver after January 13, 2017 on issues pertaining to VBF.

22.     From May 1, 2014 through December 14, 2015, the VBF Board of Directors ("VBF Board" or, when referring to the directors themselves individually or collectively, "VBF Board Member(s)") consisted solely of a combination of Wulf, Hall, James Rea, and Ted Rea.

23.     Thus, during this time period, VBF acted only through the control of the Founders.

24.     On December 15, 2015, Terry Lyons ("Lyons") became a VBF Board Member. Lyons was also a shareholder of VeroBlue Farms, Inc. ("VBF Canada") (VBF Canada initially owned all VBF shares and is generally referred to as VBF's parent company).

25.     On June 15, 2016, Gregg Sedun ("Sedun") became a VBF Board Member and was also a VBF Canada shareholder.

26.     In July 2016, after the Founders spent over a year seeking tens of millions of dollars in cash investments for VBF, VBF received a large equity investment through a capital increase from two new investors, Alder Capital International Ltd. ("Alder") and FishDish, LLC ("FishDish"). Alder invested approximately $28,000,000, and FishDish invested approximately $6,000,000.

27.     In addition, in July 2016, VBF, through its subsidiaries, became a borrower under a credit facility in the original principal amount of $29,000,000 from Amstar Group, LLC ("Amstar"). The Amstar facility was increased from time to time and as of March 2019, VBF had approximately $54,000,000 in obligations outstanding.

28.     Pursuant to their investments, Alder was entitled to appoint two VBF Board Members and FishDish was entitled to appoint one VBF Board Member.   From July 2016 through January 2018, Alder appointed a combination of the following VBF Board Members: Jens Haarkoetter ("Haarkoetter"), Bjorn Thelander ("Thelander"), Eva Ebstein ("Ebstein"), Anders Wester ("Wester"), and Alan Sutherland ("Sutherland") (collectively, the "Alder Board Members").  FishDish appointed Ken Lockard ("Lockard") as its director from June 2016 through February 2018.  The Alder Board Members, Lyons, and Lockard will collectively be referred to herein as the "Independent Board Members."

29.     Sedun is not included in the definition of "Independent Board Members" because there remain questions as to his involvement in the Founders' misconduct.   Further, VBF's investigation continues as to whether Lyons and Lockard were materially involved in the Founders' misconduct.

30.     Overall, from September 2014 through January 2018, VBF's Board consisted of the following members during the following time periods:

| | | |
|---|---|---|
| a. | Hall | May 1, 2014 through July 1, 2016; |
| b. | Wulf | May 1, 2014 through October 26, 2017; |
| c. | James Rea | May 1, 2014 through June 21, 2017; |
| d. | Ted Rea | September 1, 2014 through March 14, 2015; |
| e. | Lyons* | December 15, 2015 through February 27, 2018; |
| f. | Sedun | June 15, 2016 through January 19, 2018; |
| g. | Lockard* | June 15, 2016 through February 27, 2018; |
| h. | Haarkoetter* | July 1, 2016 through October 24, 2017; |
| i. | Thelander* | July 1, 2016 through March 16, 2018; |
| j. | Ebstein* | June 22, 2017 through March 16, 2018; |
| k. | Wester* | October 26, 2017 through April 13, 2018; and |
| l. | Sutherland* | November 1, 2017 through the present. |

* Independent Board Member.

31.     Even with the addition of these members on the VBF Board, the Founders still controlled VBF.  As alleged below, Sedun acted with the Founders in many respects regarding

their misconduct.  Further, under VBF's July 1, 2016 Amended and Restated Bylaws (VBF could not locate any prior versions), the VBF Board needed a majority vote of a quorum of the VBF Board Members at the meeting to act, and therefore VBF's Board could not act without the approval of the four Founder Board Members at relevant times.  Finally, even when the Founders no longer had full control of the VBF Board, they still controlled VBF's day-to-day operations and controlled the information directed to the VBF Board, as discussed below.

32.     Likewise, VBF employed independent officers at various times, including the following group, collectively referred to as the "Independent Officers":

| Independent Officer and Role at VBF | | Date of Employment |
|---|---|---|
| Wanda Huff ("Huff") (head of Human Resources) | | September 2, 2016 thorugh January 27, 2017 |
| Norman McCowan (McCwoan") (Director of Post Production, and later President) | | June 24, 2017-November 6, 2017 (Director of Post Production), November 6, 2017 through present (President) |
| Al Rodriguez ("Rodriguez") (Controller) | | July 3, 2017 through March 9, 2018 |
| Jim Bruffy ("Bruffy") (Vice President of Marketing) | | September 1, 2015 through July 26, 2018 |

33.     After terminating the Founders, VBF conducted an investigation through which VBF, by February 2018, started to discover the Founders' misconduct alleged herein.[1]  VBF did not know, nor could it have known, of the Founders' misconduct until at least February 2018, especially since the Founders fraudulently concealed their misconduct from VBF, as further alleged herein.

---

[1] In referencing its internal investigation which was conducted through outside counsel, VBF does not intend to waive any protection of the attorney-client privilege or work-product doctrine as to any privileged reports, attorney notes, or other communications and work product between its counsel, Davis Brown, on the one hand, and VBF, its Independent Board Members, and Independent Officers, on the other hand.

34.     It was not until after VBF terminated the last of the Founders in January 2018 that the Founders' grip over VBF, including its data, eased, and VBF was able to investigate the Founders' misconduct with less obstruction.  This permitted VBF to start to learn the depth of the Founders' misconduct, which VBF is still investigating.  VBF could not have been aware of any of the transactions involving payments made to the Founders, or the fraudulent nature of those transactions, until after it terminated the Founders due to the Founders' control of VBF and its data before that time.

35.     VBF has discovered numerous schemes consummated by the Founders starting at VBF's incorporation in 2014 and continuing through the Founders' termination to facilitate the Founders' misappropriations and misuse of VBF's property and resources.  VBF has also discovered numerous instances (and continues to discover further details) of the Founders' fraudulent misrepresentations and concealment regarding VBF's technology, its capabilities (or the lack thereof), and material data based on same, which were used to obtain additional property and resources for VBF that the Founders could then misappropriate and use for their personal benefit.  The Founders accomplished these schemes through fraudulent misrepresentations, concealment, and other failures to adequately inform the Independent Board Members or Independent Officers, who lacked sufficient knowledge and notice of such schemes to discover and redress them.

36.     Indeed, since VBF commenced this action on July 31, 2018, VBF, through continuing investigation and discovery, continues to discover more facts upon which this Third Amended Complaint is based, including, but not limited to, facts learned after VBF filed its Second Amended Complaint.  Prior to this investigation and lawsuit discovery, VBF did not know, nor could it have known, of all of these facts, and how they fit into the Founders' various schemes and

other misconduct, especially because the Founders fraudulently concealed their misconduct from the Independent Board Members, as further alleged herein.

37.    Thus, the discovery rule, fraudulent concealment, and equitable tolling principles apply to any applicable limitations period. *See, e.g.*, *State v. Allan Const. Co*., 851 F.2d 1526, 1528, 1534 (5th Cir. 1988) (holding that acts taken to conceal wrongful conduct and denial of wrongdoing may support the application of fraudulent concealment and reversing the trial court's grant of summary judgment on limitations grounds); *Remmes v. Int'l Flavors & Fragrances, Inc*., 453 F. Supp. 2d 1058, 1067 (N.D. Iowa 2006) ("Under the common law discovery rule, an action does not accrue until the plaintiff knows or in the exercise of reasonable care should have known both the fact of the injury and its cause."); *Rieff v. Evans*, 630 N.W.2d 278, 290 (Iowa 2001), *as amended on denial of reh'g* (July 3, 2001) (holding that fraudulent concealment can toll the applicable statute of limitations and that, in the case of a fiduciary, plaintiff need not plead affirmative concealment and "mere silence may be enough to equal fraudulent concealment"); *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998) (where the discovery rule shifts the date of the "legal injury" from the time the wrongful action occurred to the time when "[plaintiffs] knew or, exercising reasonable diligence, should have known of the facts giving rise to a cause of action").

## V.   THE FOUNDERS' MISAPPROPRIATION OF VBF ASSETS

38.    The first category of the Founders' misconduct addressed in this Third Amended Complaint is their misappropriation of VBF's cash, resources, and other assets. The Founders never invested any of their own money in VBF.  Instead, they conspired and worked together to drain VBF of millions of dollars in cash and other assets during the time they controlled VBF to directly benefit themselves, to the detriment of VBF.  The schemes and amounts misappropriated are subject to VBF's continuing investigation.

14

A.    **BAJJER Stock Scheme (Hall, James Rea, Ted Rea)**

39.    On or around September 18, 2014, while a VBF officers, directors, and/or consultants, Hall, James Rea, Ted Rea, and Wulf each breached their fiduciary duties to VBF by directing VBF to transfer 1,250,000 shares of VBF Canada to BAJJER LLC ("BAJJER"), for a grand total of $1.25 (one dollar and twenty-five cents, in the aggregate, for all of the 1,250,000 shares, or 0.000001 cents per share) (the "BAJJER Stock Scheme"). *See* true and correct copy of the affidavit of John Brobjorg ("Brobjorg"), attached as **Exhibit 1** ¶ 11 (exhibits omitted).

40.    Specifically, on September 18, 2014, Hall, James Rea, and Wulf, as directors of VBF Canada, executed a resolution allotting said shares to BAJJER and setting the stock price at the unconscionably low amount of 0.000001 cents per share. A true and correct copy of documentation regarding this transaction is attached as **Exhibit 2**.

41.    BAJJER is owned and controlled by companies owned and controlled by Hall—BHDH Family, LP ("BHDH"), Wulf—Law Holdings, LLC ("Law Holdings"), and Ted Rea—J2 Family, LP ("J2").

42.    At the time of the transfer, Hall, James Rea, Ted Rea, and Wulf were valuing the shares of VBF Canada at approximately $0.90 a share and requiring others to pay that price for VBF Canada shares. Issuing such shares benefited Hall, Ted Rea, and Wulf (through BAJJER) allowing them to receive, basically for free, what was valued to others at the time as at least $1,125,000 worth of stock, to the detriment of VBF. Therefore, Hall, James Rea, Ted Rea, and Wulf knew that their conduct was wrongful.

43.    Hall, James Rea, Ted Rea, and Wulf should not have engaged in the BAJJER Stock Scheme, which, in and of itself, was a breach of their fiduciary duties.

44.    Further, Hall, James Rea, Ted Rea, and Wulf failed to sufficiently disclose the BAJJER Stock Scheme, and its relation and benefit to themselves personally, to anyone

independent of the Founders who could redress the misconduct on behalf of VBF, including Independent Board Members, Independent Officers, and shareholders.  Hall, James, Rea, Ted Rea, and Wulf each should have made such a disclosure and violated their fiduciary duties in not doing so.

45.     Unfortunately, the Founders' misconduct caused VBF's assets to lose value.

**B.     American Growth Funding Loan Scheme (Hall, Ted Rea, and Wulf)**

46.     On or around July 8, 2016, while VBF officers, directors, and/or consultants, Hall, Ted Rea, and Wulf each breached their fiduciary duties to VBF when VBF paid $375,000 to American Growth Funding, LLC ("AGF" and the "AGF Scheme").  *See* **Ex. 1**, Brobjorg Aff. ¶ 10.

47.     AGF is a factoring/finance lender, and its affiliates have been sued for fraud by the United States Securities and Exchange Commission, in the United States District Court for the Southern District of New York, as summarized in this press release: https://www.sec.gov/news/pressrelease/2016-21.html.  Either BAJJER or BAJJER II, LLC ("BAJJER II"), initially owned AGF.

48.     As alleged above, BAJJER was owned and controlled by BHDH (Hall), Law Holdings (Wulf), and J2 (Ted Rea) at all relevant times.  BAJJER II, was owned and controlled by BHDH (Hall) and J2 (Ted Rea) at all relevant times.

49.     AGF loaned $78,000 to BAJJER II, which grew to $101,000, with interest, and which AGF wrote off as bad debt on or before December 31, 2016.

50.     On or around June 30, 2015, AGF loaned BAJJER $200,000, which BAJJER transferred to VBF.  Hall signed the promissory note relating to the loan on behalf of BAJJER. The promissory note included a $54,000 bonus payment (27% of the transferred amount) plus a 3% monthly interest rate.

51.     Wulf signed at least one extension agreement relating to the loan on January 30, 2016, on behalf of BAJJER.  This agreement states that $260,000 is due from BAJJER on July 30, 2015, and every thirty days thereafter, BAJJER would incur an additional $10,000 owed.

52.     On June 28, 2016, Ralph Johnson ("R. Johnson") for AGF emailed Hall and Ted Rea a draft payoff letter addressed to "Bruce Hall" at "Bajjer, LLC," which noted that, as of July 5, 2016, payoff for the loan would be $373,666.67.

53.     That day, Hall forwarded R. Johnson's email to Ted Rea and stated "[c]hange to Kelly name in Bajjer," indicating Hall's intent to conceal his affiliation with Bajjer. That same day, Ted Rea executed on that intent by directing R. Johnson to "change the name from Bruce [Hall] to Kelly A. Jones" on the payoff letter from AGF to BAJJER, which R. Johnson did.

54.     Wulf, Hall, or Ted Rea, directed, or knew the other(s) was (were) directing, VBF to pay AGF $375,000 on July 8, 2016, even though VBF never had a direct borrowing relationship with AGF and did not benefit from the payment to AGF.  Wulf, Hall, and Ted Rea also knew that the amount paid by VBF was $175,000 (or 87.5%) more than the $200,000 transfer to VBF from BAJJER—meaning that the companies owned and controlled by Hall, Ted Rea, and Wulf (AGF and BAJJER) received the return of principal and an 87.5% return on the money "loaned" in approximately one year and at the expense of VBF (even considering the amount transferred to VBF).

55.     Wulf, Hall, and Ted Rea knew that their conduct was wrongful and should not have engaged in the AGF Scheme, which, in and of itself, was a breach of their fiduciary duties.

56.     Further, Wulf, Hall, and Ted Rea each failed to disclose the AGF Scheme, and its relation and benefit to themselves personally, to anyone independent of the Founders who could redress the misconduct on behalf of VBF, including Independent Board Members, Independent

17

Officers, and shareholders. Wulf, Hall, and Ted Rea each should have made such a disclosure and violated their fiduciary duties in not doing so.

57.     Unfortunately, Wulf, Hall, and Ted Rea's misconduct caused VBF's assets to lose value.

**C.     Wulf Lake House Scheme (Wulf, James Rea, Hall, Ted Rea, and Driver)**

58.     From approximately May 2015 through July 2017, while VBF officers, directors, and/or consultants, Wulf, James Rea, Hall, and Ted Rea, breached their fiduciary duties to VBF by directing, or knowingly allowing others to direct, VBF funds and resources to oversee the reconstruction of a vacation home on a lake in Texas owned by Wulf and located in Gun Barrel City, Texas ("Wulf Lake House" and the "Lake House Scheme"). **Ex. 1**, Brobjorg Aff. ¶ 17.

59.     A fire destroyed the Wulf Lake House in early 2015.

60.     Wulf thereafter rebuilt the Wulf Lake House from in or around May 2015 through in or around July 2017.

61.     The contractor for the reconstruction was Direct Restoration Group, of which James Rea was the President.

62.     VBF employee Tracy Arbanas ("Arbanas") originally performed accounting services on behalf of VBF.  In or around May 2015, she transitioned to a role in construction with James Rea, as she informed Driver and others in a May 12, 2015 email stating that "as of today, I will be transitioning to another position outside of accounting. . . . I will still be involved with VeroBlue, but more along the construction line of things with James [Rea]."

63.     Thereafter, Arbanas oversaw the reconstruction of the Wulf Lake House, and VBF paid her to do so at an annual cost to VBF of approximately $97,500, which encompassed Arbanas's compensation and benefits.

64.     Indeed, as of July 15, 2015, Arbanas's electronic business card referred to her employer as Direct Restoration Group, not VBF, despite her continuing to receive a salary and benefits from VBF.

65.     James Rea, with Wulf's knowledge and direction, authorized Arbanas's work as it related to the Wulf Lake House, to be paid for by VBF.  Hall, Driver, and Ted Rea also knew, including based on the documents referenced in this subsection, of Arbanas's work on the Wulf Lake House at VBF's expense.

66.     For example, on January 19, 2016, Arbanas emailed Wulf, with a copy to James Rea, a document titled "Exhibit C – Addendum LAW Contract," which was an addendum to the contract between Direct Restoration Group (signed by James Rea) and Wulf for the rebuild of the Wulf Hake House.  This addendum showed a revised budget for $409,985.

67.     Also, on July 5, 2016, Wulf emailed Arbanas and James Rea asking for a list of "who is owed what on the [Wulf] [L]ake [H]ouse so I know how much to give you when I get funds and then we can update the paid to date sheet before I go to the bank to get more funds." That day, Arbanas responded to the email and circulated an updated "paid to date sheet."

68.     Further, on July 15, 2015, Arbanas emailed Wulf, Ted Rea, James Rea, and Hall noting that she would move $15,000 from OFA (likely Opposing Flow Aquaculture, an affiliate of some of the Founders, as discussed below, although the Founders transferred VBF money into OFA's account) to Direct Restoration Group, a transfer that Hall and Wulf approved.  This indicates Ted Rea's and Hall's knowledge of the Wulf Lake House Scheme.

69.     In addition to her salary and benefits, VBF also reimbursed Arbanas for housing close to the Lake House and refreshments for the construction crew on this project, of which Wulf, Ted Rea, James Rea, and Hall were aware.  In order for VBF to provide Arbanas with these

reimbursements, Arbanas submitted expense reports to VBF using a formal VBF expense report form.

70.     All told, VBF incurred approximately $107,490.51 for compensation and benefits paid with VBF funds to Arbanas while she was working on the Wulf Lake House and not on VBF projects.

71.     These funds did not benefit VBF, but instead, benefited Wulf and James Rea personally, which was known and intended by Wulf and James Rea.  Further, Hall, and Ted Rea were fully aware that Arbanas was being paid by, and receiving additional benefits from, VBF while working for Wulf and James Rea but not for VBF.  Therefore James Rea, Wulf, Hall, and Ted Rea each knew that their conduct was wrongful.

72.     James Rea, Wulf, Hall, and Ted Rea should not have engaged in the Lake House Scheme, which, in and of itself, was a breach of their fiduciary duties.

73.     Further, James Rea, Wulf, Hall, and Ted Rea each failed to disclose the Lake House Scheme, and its relation and benefit to Wulf and James Rea personally, to anyone independent of the Founders who could redress the misconduct on behalf of VBF, including Independent Board Members, Independent Officers, and shareholders.  James Rea, Wulf, Hall, and Ted Rea each should have made such a disclosure and violated their fiduciary duties in not doing so.

74.     Upon information and belief, Driver was aware that Wulf extracted VBF funds and other assets for the Wulf Lake House at relevant times, and he did nothing to halt the waste of VBF assets in relation to the Wulf Lake House.  Accordingly, Driver also failed to disclose the Lake House Scheme, and its relation and benefit to Wulf and James Rea personally, to anyone independent of the Founders who could redress the misconduct on behalf of VBF, including

Independent Board Members, Independent Officers, and shareholders.  Driver should have made such a disclosure and violated his fiduciary duties in not doing so.

75.     Unfortunately, Wulf, Hall, Ted Rea, James Rea, and Driver's misconduct caused VBF's assets to lose value.

**D.     Sedun Payment Scheme (Wulf)**

76.     On or around July 12, 2016, while a VBF officer, director, and/or consultant, Wulf, breached his fiduciary duty to VBF by orchestrating the "Sedun Payment Scheme."

77.     Sedun has had a social and/or business relationship with some or all of the Founders outside of VBF, which, upon information and belief, preexisted VBF's incorporation.

78.     Sedun, through an entity owned and controlled by Sedun, Alcaron Capital Corp. ("Alcaron"), loaned $200,000 to VBF on December 11, 2015, and another $50,000 to VBF on June 23, 2016.

79.     On July 12, 2016, VBF transferred $328,058.00 to Alcaron, representing about $78,000 (30%) in interest on the $250,000 in loans referenced above, which were repaid in just seven months and less than one month, respectively.

80.     That same day, on July 12, 2016, Wulf authorized VBF Canada to issue 1,500,000 shares of VBF stock to Alcaron, purportedly for Sedun's procurement of other investments in VBF, with Alcaron paying nothing for this stock. The stock was valued at $0.90/share at the time, rendering this allotment of stock to be worth about $1,350,000.

81.     Other Founders knew of this arrangement.  On May 28, 2016, Driver authored, and Hall modified, a letter, dated by them to December 4, 2015, confirming VBF Canada's agreement to grant Sedun 1,500,000 common shares of VBF stock.  A true and correct copy of this letter, along with its corresponding metadata, is attached as **Exhibit 3**.

82.     Two days after VBF's payment of excessive funds to Alcaron and issuance of free stock to Alcaron, Sedun loaned Wulf $225,000 for the Wulf Lake House. Around that time, Wulf promoted Sedun to be a VBF Board Member.

83.     Wulf utilized VBF funds to benefit himself personally, rather than VBF.  Therefore Wulf knew that his conduct was wrongful.

84.     Wulf should not have engaged in the Sedun Payment Scheme, which, in and of itself, was a breach of his fiduciary duties.

85.     Wulf failed to disclose the Sedun Payment Scheme, and its relation and benefit to himself personally, to anyone independent of the Founders who could redress the misconduct on behalf of VBF, including to Independent Board Members, Independent Officers, and shareholders. Wulf should have made such a disclosure and violated his fiduciary duties in not doing so.

86.     Unfortunately, Wulf's misconduct caused caused VBF's assets to lose value.

**E.      Compensation Scheme (Wulf, Hall, Driver, Ted Rea, and James Rea)**

87.     On or around October 29, 2014 and through the duration of their employment, while VBF officers, directors, and/or consultants, Wulf, Hall, James Rea, Ted Rea, and Driver breached their fiduciary duties to VBF by setting compensation for themselves that resulted in gross overpayment ("Compensation Scheme").

88.     Wulf, Hall, James Rea, and Ted Rea entered into Master Service Agreements ("MSA") with VBF Canada in late 2014 or early 2015, which each provided them with $300,000 a year in compensation.

89.     Driver's MSA, entered into in November 2014, provided him with $240,000 a year in compensation.

90.     Then, on July 1, 2016, Wulf, Hall, James Rea, Ted Rea, and Driver terminated those MSAs and set their own compensation from VBF with Wulf, Hall, James Rea, and Ted Rea each

making $400,000 annually and Driver making $325,000 annually, for a total of $1,925,000 per year for all Founders.

91.     For the sake of reference, one person (McCowan) effectively replaced all of the Founders (except arguably Hall, who was replaced by a financial employee, Rodriguez, paid $135,000 annually, but who was not hired until July 3, 2017) in late 2017 when he became VBF's President, and VBF paid him $250,000 per year.   Therefore, the Founders were overpaying themselves at least, and approximately, a total of $1,675,000 per year, even if they had been properly performing their duties, which they were not.

92.     Additionally, VBF paid Wulf, Hall, James Rea, Ted Rea, and Driver each twice their monthly compensation in July 2016.  Wulf, Hall, James Rea, Ted Rea, and Driver were each aware of this double payment.

93.     At the time the Founders grossly overcompensated themselves, the Independent Board Members did not know of Wulf, Hall, James Rea, Ted Rea, and Driver's fraud and other misconduct, and otherwise did not possess sufficient knowledge of Wulf, Hall, James Rea, Ted Rea, and Driver's misconduct to knowingly approve of this excessive compensation.  Wulf, Hall, James Rea, Ted Rea, and Driver not only affirmatively led such Independent Board Members to believe that their compensation was justified based on VBF's actual performance—which Wulf, Hall, James Rea, Ted Rea, and Driver consistently misrepresented as succeeding when each knew VBF was actually failing (and miserably so)—but also concealed material facts from those Independent Board Members.  In other words, Wulf, Hall, James Rea, Ted Rea, and Driver misled the Independent Board Members into believing that their services to VBF were worth $1,925,000 in annual compensation and other benefits.  Therefore Wulf, Hall, James Rea, Ted Rea, and Driver each knew that their conduct was wrongful.

94.     That Wulf, Hall, James Rea, Ted Rea, and Driver were taking millions of dollars in "compensation" from VBF is even more troubling because they had not invested any of their own money in VBF, and as described herein, were they misappropriating and misusing other VBF funds, purposefully mismanaging VBF to benefit themselves and their other companies, and committing and hiding their fraudulent acts from the Independent Board Members, Independent Officers, and shareholders.

95.     Wulf, Hall, James Rea, Ted Rea, and Driver should not have engaged in the Compensation Scheme, which, in and of itself, was a breach of their fiduciary duties.

96.     Further, Wulf, Hall, James Rea, Ted Rea, and Driver each failed to disclose the Compensation Scheme, and its relation and benefit to themselves personally, to anyone independent of the Founders who could redress the misconduct on behalf of VBF, including Independent Board Members, Independent Officers, and shareholders.  Wulf, Hall, James Rea, Ted Rea, and Driver each should have made such a disclosure and violated their fiduciary duties in not doing so.

97.     Unfortunately, the Founders' misconduct caused VBF's assets to lose value.

**F.     Gagne Scheme (Wulf and James Rea)**

98.     On or around September 29, 2016 through November 16, 2017, while VBF officers, directors, and/or consultants, Wulf and James Rea, breached their fiduciary duties to VBF by directing VBF or knowingly allowing VBF to employ Wulf's daughter Christine Gagne ("Gagne"), who was not legally authorized to work in the United States, under a false name (the "Gagne Scheme").  *See* **Ex.** 1, Brobjorg Aff. ¶ 21; *see also* a true and correct copy of the affidavit of Kelsey Clarken, former VBF Human Resources Recruiter, attached as **Exhibit 4** ¶¶ 8-11.

99.     Gagne is Wulf's daughter. Gagne is a Canadian citizen who did not have any legal immigration status to work in the United States during the relevant time period.

100.    VBF, at Wulf's direction, purportedly employed Gagne or contracted with her for alleged services, which Wulf and James Rea knew.  Gagne would often drive from Canada allegedly to work at VBF in Webster City, Iowa.

101.    VBF, at Wulf's direction, paid Gagne not under her real name, but under the name "Ronnie O'Brien" to conceal VBF's payments to her, of which James Rea was aware. *Id.*

102.    Gagne abruptly left VBF in November 2017, when VBF terminated Wulf's employment and other statuses with VBF.  At that time, Gagne, in recognition of her fraudulent employment at VBF, said the following words to those present at VBF's Webster City, Iowa facility at the time: "None of you have ever seen me and you do not know who I am."

103.    At a minimum, VBF, to its detriment, paid approximately $52,264.28 in compensation and benefits to Gagne, which benefited Gagne and Wulf personally.  Further, this and other schemes demonstrate the general manner with which Wulf, Hall, Driver, James Rea, and Ted Rea each played "fast and loose" with applicable laws and regulations to the detriment of VBF and for their own benefit.  Therefore, Wulf and James Rea each knew that their conduct was wrongful.

104.    Wulf and James Rea should not have engaged in the Gagne Scheme, which, in and of itself, was a breach of their fiduciary duties.

105.    Further, Wulf and James Rea each failed to disclose the Gagne Scheme, and its relation and benefit to themselves personally, to anyone independent of the Founders who could redress the misconduct on behalf of VBF, including Independent Board Members, Independent Officers, and shareholders.   Wulf and James Rea each should have made such a disclosure and violated their fiduciary duties in not doing so.

106.    Unfortunately, Wulf and James Rea's misconduct caused caused VBF's assets to lose value.

**G.    OFA Scheme (Wulf, Hall, Ted Rea, and James Rea)**

107.    In around July 2014, while VBF officers, directors, and/or consultants, Wulf, Hall, Ted Rea, James Rea, and Driver breached their fiduciary duties to VBF by using Opposing Flows Aquaculture, Inc. ("OFA" and the "OFA Scheme") to profit themselves and their other companies. **Ex. 1** Brobjorg Aff. ¶ 13.

108.    OFA was incorporated on July 29, 2014 in anticipation of VBF's operations.  Hall, Ted Rea, and James Rea served as officers for OFA.  BHDH (Hall's company), Law Holdings (Wulf's company), J2 (Ted Rea's company), and Seven Hour Holdings Company Inc. ("Seven Hour") (Driver's company) were stockholders in OFA.

109.    VBF grew its fish in tanks that are housed at its farms.  OFA was formed to buy tanks from a third-party and then to resell tanks to VBF at a profit to OFA (as opposed to VBF simply buying its tanks directly from a third-party vendor without any middleman) ("OFA Scheme").

110.    Further, on April 29, 2015, James Rea emailed Ted Rea a spreadsheet titled "OFA Production Cost and Mark Up," which reflected a 63% markup on all sales from OFA to VBF, essentially allowing OFA to collect $19,999 for each tank it sold to VBF.

111.    VBF, at the directions of James Rea, Wulf, Hall, Driver, and Ted Rea, even entered into a "Contract For the Purchase, Manufacture, and Assembly of Opposing Flows Aquaculture Tank Systems" with OFA on September 8, 2015 for 6 tanks at $50,000 per tank.

112.    Rick Sheriff ("Sheriff"), the creator of the alleged technology utilized by VBF (discussed more below) signed the agreement on behalf of OFA, in collusion with the Founders, and Wulf signed the agreement on behalf of VBF.

113.     Of course, it was more beneficial to VBF not to pay OFA a profit as an unnecessary "middleman," thereby benefitting Wulf, Hall, James Rea, Ted Rea, Driver, and their non-VBF companies at the expense of VBF.  Instead, VBF could buy directly from the third party without paying any amount to OFA, which VBF ultimately has done now that it is no longer under the control of Wulf, Hall, James Rea, Ted Rea, and Driver.  Therefore, Wulf, Hall, James Rea, Ted Rea, and Driver each knew that their conduct was wrongful.

114.     VBF has yet to discover whether OFA engaged in any transactions with VBF. Through its count for an equitable accounting, however, VBF seeks a full accounting of OFA from Wulf, Hall, Ted Rea, James Rea, and Driver.

115.     Wulf, Hall, James Rea, Ted Rea, and Driver should not have engaged in the OFA Scheme, which, in and of itself, was a breach of their fiduciary duties.

116.     Further, Wulf, Hall, James Rea, Ted Rea, and Driver each failed to disclose the OFA Scheme, and its relation and benefit to themselves personally, to anyone independent of Wulf, Hall, James Rea, Ted Rea, and Driver who could redress the misconduct on behalf of VBF, including Independent Board Members, Independent Officers, and shareholders.  Wulf, Hall, James Rea, Ted Rea, and Driver each should have made such a disclosure and violated their fiduciary duties in not doing so.

117.     Unfortunately, the Founders' conduct caused VBF's assets to lose value.

**H.     VBF Canada Stock Scheme (Wulf, Hall, Ted Rea, James Rea, and Driver)**

118.     On or about September 18, 2014, while VBF officers, directors, and/or consultants, Wulf, Hall, Ted Rea, James Rea, and Driver each breached their fiduciary duties to VBF by directing or requesting or knowingly allowing others to direct VBF Canada to issue stock to entities that they owned (the "VBF Canada Stock Scheme").  **Ex. 1**, Brobjorg Aff. ¶ 11.

119.    Wulf, Hall, Ted Rea, James Rea, and Driver did not invest any of their own money in VBF or VBF Canada.

120.    Yet, on September 18, 2014, Hall, James Rea, and Wulf, as directors of VBF Canada, authorized VBF Canada (which, at the time owned all VBF stock) to issue VBF Canada stock to entities that Wulf, Hall, Ted Rea, James Rea, and Driver owned for unconscionably low amounts.  *See* **Ex. 2**. Ted Rea was a director of VBF at this time, Driver was an officer of VBF at this time, and both knowingly accepted their stock under the improper circumstances alleged in this section.

121.    Specifically, VBF Canada, at the direction of Hall, James Rea, and Wulf, issued (a) 2,500,000 common shares in VBF Canada at $0.000001 per share to Seven Hours (Driver's entity); (b) 3,600,000 common shares in VBF Canada at $0.000001 per share to BHDH (Hall's entity); (c) 3,300,000 common shares in VBF Canada at $0.000001 per share to J2 (Ted Rea's entity); 3,600,000 common shares in VBF Canada at $0.000001 per share to LAW Holdings (Wulf's entity); and (d) 3,600,000 common shares in VBF Canada at $0.000001 per share to YSKS LLC (James Rea's entity).  Wulf, Hall, Ted Rea, James Rea, and Driver, on behalf of their respective entities, accepted these shares.

122.    At the time of the transfer, Wulf, Hall, Ted Rea, James Rea, and Driver were valuing the shares in VBF Canada at approximately $0.90 per share and requiring others to pay that price for VBF Canada shares.  Issuing such shares benefited Wulf, Hall, Ted Rea, James Rea, and Driver personally to the detriment of VBF.  Therefore, Wulf, Hall, Ted Rea, James Rea, and Driver each knew that their conduct was wrongful.

123.    Wulf, Hall, Ted Rea, James Rea, and Driver should not have engaged in the VBF Canada Stock Scheme, which, in and of itself, was a breach of their fiduciary duties.

124.    Further, Wulf, Hall, Ted Rea, James Rea, and Driver each failed to disclose the VBF Canada Stock Scheme, and its relation and benefit to themselves personally, to anyone independent of Wulf, Hall, Ted Rea, James Rea, and Driver who could redress the misconduct on behalf of VBF, including Independent Board Members, Independent Officers, and shareholders. Wulf, Hall, Ted Rea, James Rea, and Driver each should have made such a disclosure and violated their fiduciary duties in not doing so.

125.    Unfortunately, the Founders' misconduct caused VBF's assets to lose value.

**I.    Other Misappropriations and Waste of VBF Funds for Personal Use**

126.    From around September 2014 through in or around August 2017, while VBF officers, directors, and/or consultants, Wulf, Hall, Ted Rea, James Rea, and Driver each breached their fiduciary duties to VBF through additional misappropriations of VBF funds for their personal use.

127.    Each of the Founders engaged in a variety of other schemes through which they orchestrated VBF's expenditure of its funds or other assets for their own personal benefit or knowingly allowed or assisted another one of the Founders to do so, to VBF's detriment, including, but not limited to, the following:

   a.    On or around September 30, 2014, Wulf charged $2,540 to VBF for travel and other expenses relating to a July 2014 trip by Wulf to Denver, Colorado in relation to a non-VBF business known as ChipMeds, Inc. ("ChipMeds"), and possibly other expenses relating to this entity.

   b.    From November 2014 through at least April 2016, Wulf expensed his personal cell phone bills to VBF for approximately $500-$1200 a month as an alleged company expense. This was well beyond a reasonable amount, or even the amount expensed to VBF by Hall, Driver, Ted Rea and James Rea (approximately $200-$300 a month). Further, Wulf expensed his February 2016 cell phone bill in the amount of $950 twice, of which Hall also was aware.

   c.    James Rea expensed and VBF paid for James Rea's personal living expenses in Ames, Iowa, about forty miles from Webster City, Iowa in or

around July and August 2017. Specifically, in July and August 2017, James Rea submitted a VBF expense report for, among other things, $3,900 for "Corp Housing," $8,836.88 for "furnishings," $1,274.98 for "gas-travel," $1,205.08 for "out of town meals," $2,736.59 for "furnishings," $471.29 for "gas," and $1,950 for "rent."

d.   From VBF's incorporation and through their terminations, VBF paid for exorbitant travel expenses for Wulf, Hall, Driver, James Rea, and Ted Rea that each expensed to travel to or from Canada or Texas to Webster City, Iowa.

e.   VBF paid for personal travel expenses for the Founders and some or all of Founders' wives, including trips to Australia, Norway, London, and Paris. For example, in March 2016 Wulf expensed at least $2,188.96 to VBF for his wife's travel to London and Paris, though neither were related to VBF, of which Hall and Ted Rea were aware.

f.   Directing VBF's controller (Brojborg) to perform accounting services for non-VBF business ventures while on VBF company time and while he was being paid by VBF. For example, Ted Rea solicited Brobjorg, while both were on VBF's payroll, for help with numerous legal invoices for another Founder entity unrelated to VBF "PTR Texas Care." It appears that no other entity paid Brojborg for such work.

g.   VBF paid for furniture from Schooner Realty, owned by Ted and James Rea's parents, which VBF then paid their parents further to transport to the Founders' Webster City home. True and correct copies of the relevant expense reports are attached hereto as **Exhibit 5**. After authorizing or allowing the payments to their parents to transport furniture from Texas to Iowa, James Rea and Ted Rea also used VBF funds to make repairs to the trailer that their parents used.

*See* **Ex. 1**, Brobjorg Aff. ¶¶ 9, 12, 14-15, 18, 23, 27; **Exhibit 6**, a true and correct copy of the affidavit of Curtis Johnson (exhibits omitted), ¶¶ 15-17; *see also* **Ex. 4**, Clarken Aff. ¶¶ 20-21; **Exhibit 7**, a true and correct copy of the affidavit of Mitch Downs, ¶ 13; **Exhibit 8**, a true and correct copy of the affidavit of Haroon Chaudhri, ¶¶ 7-8.

128.   Each of the Founders engaged in a variety of other schemes through which they orchestrated the waste of VBF's funds or other assets or knowingly allowed or assisted another Founder to do so, to VBF's detriment, including, but not limited to, the following:

a.   VBF paid $310,000 for the purchase of a house in Webster City, Iowa, when the house was worth $240,000, if not less, and the home was not necessary for legitimate business reasons given the Founders' maintenance of their residence in Texas or Canada.  Indeed, VBF, through Hall, purchased this home on August 9, 2016 for $310,000 and VBF sold this home on May 25, 2018 for $232,000. True and correct copies of the relevant closing statements are attached as **Exhibit 9**.

b.   Hall caused VBF to pay $400,000 for the purchase of a building and underlying property unnecessary to VBF's business and located in Webster City, Iowa on July 28, 2016, which VBF sold for $135,000 on April 13, 2018. True and correct copies of the relevant closing statements are attached as **Exhibit 10**.

c.   The expenditure of $2,000,000 of VBF's money for the construction of a waste water treatment plant that did not comply with VBF's waste water disposal obligations to Webster City, Iowa.  James Rea led the construction project.

d.   In or around July and August 2016, VBF purchased six tractor-trailers at a total cost to VBF of approximately $375,237.77.  But, at all relevant times, VBF sold live fish to its customers from its Webster City, Iowa facility. VBF did not need to deliver fish to its customers as it was the customer's obligation to arrange for the pick up and transport of live fish from the facility.  Therefore, VBF generally did not need any tractor-trailers.  These tractor-trailers sat dormant at VBF's Webster City, Iowa facilities. Ultimately, after VBF terminated the Founders, VBF was able to sell the tractor-trailers.   Wulf, Ted Rea, and Hall authorized or knew of the purchase.

e.   Twenty-two vehicles for purported "Company use" which cost VBF in excess of $11,000 per month when those vehicles were not necessary for VBF's operations.  Ted Rea, James Rea, and Wulf were each assigned a vehicle and benefited from the use of those vehicles for non-VBF purposes at the expense of VBF.

129.   Also, VBF has recently discovered that Wulf frequently used his VBF laptop to search pornographic, sexual escort, and other deviant websites at relevant times, often during work hours, demonstrating that he spent resources and time purportedly for VBF on decidedly non-VBF activities and raising the possibility that VBF funds were diverted for Wulf's personal expenses

31

relating to these endeavors, which would be revealed by a compliant equitable accounting.  A true and correct copy of a sampling of Wulf's internet search history is attached as **Exhibit 113**.[2]

130.    Further, Wulf's activities in this respect clearly violate VBF's Employee Handbook (the July 2016 version, in effect at the time), which barred employees from using VBF's computers and internet systems for non-business purposes in violation of VBF policies. These policies in turn barred the use of VBF computers and internet systems for "obscene" purposes, with specific examples of "[a]ccessing, receiving, transmitting, downloading, storing, or printing pornographic, obscene or sexually offensive material or information." Wulf did so while he was VBF's Chief Executive Officer, rending this conduct even more egregious.

131.    Perhaps Independent Board Member Lockard said it best at a December 6, 2017 VBF Board meeting when the Founders' misconduct was just starting to come to light—the Founders spent VBF's money "like drunken sailors."  Those same minutes reflect VBF's discovery that just three of the Founders, Wulf, Hall, and James Rea, had run up $496,000 in improper expenses reimbursed by VBF over a mere fifteen-month period.  Wulf, Hall, Driver, Ted Rea, and James Rea took so much money out of VBF that, in order the learn the true depth of their misappropriations and squandering of VBF's funds, VBF requires a full equitable accounting from each of them as to the money received from VBF.

132.    Wulf, Hall, Driver, Ted Rea, and James Rea should not have engaged in the misappropriations of VBF funds for personal use, which, in and of itself, was a breach of their fiduciary duties.

---

[2] VBF is initially filing Exhibit 113 under seal to provide Wulf with the opportunity to maintain the sealing of this document after the parties meet and confer. VBF reserves all rights in this respect and will file a public version of this exhibit if Wulf does not file a motion to seal on or before July 31, 2020, or at any time this Court directs VBF to do so.

133.    Further, Wulf, Hall, Driver, Ted Rea, and James Rea failed to disclose these misappropriation of VBF funds and their relation and benefit to themselves personally, to anyone independent of the Founders who could redress the misconduct on behalf of VBF including Independent Board Members, Independent Officers, and shareholders.  Wulf, Hall, Driver, Ted Rea, and James Rea each should have made such a disclosure and violated their fiduciary duties in not doing so.

134.    Unfortunately, the Founders' misconduct caused VBF's assets to lose value.

### VI.  KEY VBF METRICS AND OTHER MATERIAL FACTS MISREPRESENTED AND/OR CONCEALED BY THE FOUNDERS

135.    Section V alleges schemes by which the Founders misappropriated approximately $5,000,000 to $10,000,000.  However, as alleged, VBF lost a total of at least $90,000,000 under the Founders' reign due to their misrepresentations and omissions related to VBF's tank system and its ability to successfully produce fish, including misrepresentations and omissions of operational data and metrics, technical reports, and third-party input.

136.    The specifics of each misrepresentation and concealment are discussed in further detail in Sections VII and VIII below.  Overall, each of the Founders defrauded VBF and violated his fiduciary duties by misrepresenting and/or concealing material facts relating to VBF's business without regard to VBF's best interests or actual performance, including, but not limited to, forging, and/or otherwise concealing conclusions of aquaculture industry experts that would have exposed VBF's fatal flaws; misrepresenting VBF's actual operational data; overbuilding VBF's facilities; presenting highly flawed and intentionally-manipulated business plans based on false representations of actual or anticipated performance; misrepresenting VBF's technology; misrepresenting and/or recklessly or intentionally mismanaging capital expenditures; misrepresenting and/or recklessly or intentionally mismanaging other financial and operational

issues; purchasing or leasing unnecessary real and personal property; overpaying for real and personal property; and otherwise, in a period of three years, squandering for their own benefit and to the detriment of VBF at least $90,000,000 of VBF's assets and resources.

### A.    VBF's Technology

137.    VBF, as an indoor aquaculture business, relied on indoor tanks ("Tanks") to cultivate and grow its fish.

138.    An aquaculture business's success is highly dependent on its tank system.  Each of the Founders promoted the Opposing Flows Technology ("OFT") created by Sheriff as the best of the best in indoor aquaculture and VBF's "secret sauce."

139.    Indeed, in a July 4, 2016 draft email prepared by Wulf and intended for VBF shareholders, Wulf noted that the "Aqualture industry is a rapidly growing industry and we have a unique 'secret sauce' with our Opposing Flows Aquaculture tank systems."  *See* **Exhibit 11.**

140.    Specifically, VBF's OFT, according to each of the Founders (*see, e.g.,* Sections VIII (A), VIII (D), & VIII(F), VIII(H), VIII(I), VIII(J), VIII(L), recirculated water and provided a sustainable and efficient grow-out system that allowed VBF to have the lowest cost of operations, superior fish growth rates, strong economics, and cleaner tasting fish.  The technology used to grow product sold by an aquaculture business like VBF is crucial. Without properly functioning technology, an aquaculture business cannot successfully grow and sell market quality fish.

141.    The success of an aquaculture business and its technology is measured by several fundamental metrics ("Metrics"), including but not limited to "Feed/Fish Conversion Ratio" ("FCR"), density ("Density"), mortality rates ("Mortality Rates" or "Mortality"), and Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA") (a measure of a business's profitability).

142.     These Metrics are material to directors, officers, management, and shareholders in an aquaculture business because the Metrics show how the business is actually performing, which impacts spending, planning, projections, and/or forecasts.  In a typical aquaculture business, the Metrics are the building blocks of the "bio-plans."  A bio-plan is an aquaculture business's way of organizing its business around the Metrics, based on actual data.  A bio-plan that incorporates actual and traditional financial metrics, such as revenue, costs, and EBITDA can be characterized as a "business plan."

143.     Wulf, Hall, Driver, Ted Rea, and James Rea fraudulently executed a top-down approach when it came to their bio-plans and business plans.  That is, instead of a bottom-up approach of starting with the actual data for the Metrics and drafting plans based on actual data, the Founders started with the conclusions of production and profitability that they knew would procure and maintain interest in VBF from its shareholders, Independent Board Members, and Independent Officers, regardless of existing contrary, actual data that did not support these conclusions.  In other words, the Founders employed a "reverse engineering" approach.

144.     The Founders, throughout their tenure, failed to modify and adjust their business plans according to the actual data and Metrics, because doing so would have exposed their fraud to VBF's shareholders, Independent Board, and Independent Officers.  Therefore, the Founders not only accepted tens of millions of dollars based on their false business plans, but also doubled-down on that fraud rather than coming clean at any time during their tenure.

145.     In reality, the OFT did not—and could not—allow VBF's cultivation process to produce in a manner that would reach VBF's alleged industry-leading Metrics touted by each of the Founders, which each of the Founders knew at all relevant times.  For example, during the time VBF was under Wulf, Hall, Driver, James Rea, and Ted Rea's control, VBF's Tanks experienced

a build-up of ammonia—which is fatal to fish—because VBF's OFT was unable to recirculate sufficiently oxygenated water.  The OFT never performed in the manner the Founders' represented and never had or was capable of the results the Founders' represented.

146.    Thus at the same times that the Founders were representing to those who were or became VBF shareholders, Independent Board Members, and/or Independent Officers that VBF's OFT was a superior, cutting-edge technology that would allow VBF to efficiently and profitably produce fish at the levels represented by the Founders, aquaculture experts were advising the Founders that the OFT had "mixed results" and that the OFT "is not as new as claimed [by the Founders] and multiple companies have gone bankrupt on similar systems."  At these same times, the actual data for the Metrics of VBF's operations, of which the Founders were aware, were showing that the OFT was not working as represented.  Wulf, Hall, Driver, James Rea, and Ted Rea were each aware of these facts and concealed them from VBF shareholders, Independent Board Members, and Independent Officers.

147.    This was consistent with the findings of three acquaculture experts, discussed in more detail below: (i) Dr. Kevin Fitzsimmons ("Dr. Fitzsimmons") in 2014, *see* Section VII(A); (ii) Dr. Anthony Michaels ("Dr. Michaels") in 2015, *see* Section VII(D); and Bill Manci ("Manci") of Fisheries Technologies Associates, Inc. ("FTAI") in 2015, *see* Sections VII(E), VIII(E).  Indeed, as shown below, Wulf deliberately altered Manci's findings to cover up VBF's OFT's faults—a fact of which Driver, Hall, Ted Rea, and James Rea were each likely aware.  Wulf, Hall, Driver, Ted Rea, and James Rea were all aware of Dr. Michael's 2015 findings and Wulf, Driver, Ted Rea, and James Rea (and likely Hall) were all aware of Dr. Fitzsimmons's findings.

148.    These misrepresentations regarding VBF's OFT is material because the success of VBF's business model, and the represented production, sales, and profitability, was dependent on

the OFT.  These misrepresentations shall be referred to as the "OFT Misrepresentation" and it was contained in numerous instances of misrepresentations by each of the Founders. *See* Sections VIII (A), VIII (D), VIII(F), VIII(H), VIII(I), VIII(J), & VIII(L).

      **B.**      **VBF'S FCR**

      149.    In no particular order, the first Metric is the FCR.  The FCR is stated in an equation as to the amount of fish feed (food) an aquaculture business utilizes to grow every pound of fish. The FCR Metric heavily impacts an aquaculture business's profitability, or lack thereof, as spending money on feed increases costs.

      150.    Each of the Founders represented that VBF was consistently achieving an FCR of 1:1, *i.e.*, VBF expended one pound of fish feed for every pound of fish it grew.

      151.    This was false, which each of the Founders knew at all relevant times based on VBF's actual data, which never reflected an FCR even close to 1:1 (and certainly not on the consistent or material basis represented by each of the Founders).

      152.    Yet, notwithstanding VBF's actual Metrics and Dr. Fitzsimmons's 2014 warning regarding the Founders' 1:1 FCR representations (*see* Section VII(A)), each of the Founders continued to represent that VBF had an FCR of 1:1 (*see, e.g.,* Sections VIII(A), VIII(B), VIII(D), VIII(F)-VIII(I), VIII(O)-VIII(S), VIII(U-AA)), including when they based VBF's financial modeling on that false data.

      153.    In June 2017, VBF hired McCowan who shortly thereafter came to suspect that VBF's FCR was not 1:1.  McCowan performed FCR testing and otherwise investigated VBF's FCR.  After the Founders were terminated, McCowan discovered that VBF's real FCR at all relevant times was actually 1.4:1, if not higher, *i.e.*, VBF expended almost one and one-half pounds (not one pound) of fish feed for every pound of fish it grew, which represents significantly increased costs.

154.    Thereafter, McCowan revealed this information to the Independent Board Members.

155.    These misrepresentations regarding VBF's FCR is material because an increase in FCR from 1:1 to 1.4:1 attributes to a 40% increase in a major VBF expense: fish feed.  Thus, any increase in FCR has a tremendously negative impact on VBF's return on investment and would significantly affect the decision of the Independent Board Members as to whether and how to continue VBF's operations, including acquisition and expenditure of funds and decisions regarding the management team.  Ultimately, the FCR was far less efficient than what each of the Founders represented and the impact of this misrepresentation is that VBF was actually spending many times more to feed its fish inventory than each of the Founders represented, which affected reports of VBF's operations and financial situation and projections.   These misrepresentations shall be referred to as the "FCR Misrepresentation" and it was contained in numerous instances of misrepresentations by each of the Founders.  *See* Sections VIII(A), VIII(B), VIII(D), VIII(F)-VIII(I), VIII(O)-(s), VIII (U)-(AA).

C.    **VBF's Density**

156.    The second Metric is Density, which is the amount of fish per Tank that an aquaculture company can safely grow with reasonable Mortality Rates, normally measured by the industry in pounds per gallon of water, but at times expressed by each of the Founders in terms of number of fish per Tank.

157.    The development stages of commercially grown fish can be summarized as: eggs to hatchlings (larvae) to spawn to fry (when the fish is out of its egg and can feed on its own) to fingerlings.  A fingerling has been described as the last phase of the juvenile stage of a fish, before it becomes an adult.  Commercial growers of fish start with fingerlings, and therefore must either grow fingerlings themselves or purchase them from another source.

158.     When the Founders commenced VBF's operations in 2014 to early 2015, each of them knew at all relevant times that harvesting 10,000 to 12,000 fingerlings per Tank was optimal, *i.e.,* after an aquaculture business was up and running for years under experienced operators, operating efficiently, and operating profitably.  Even knowing this, each of the Founders not only made representations that the VBF Tanks were stocking anywhere from 10,000 to 12,000 fingerlings per Tank, but also stated that VBF was successfully stocking 16,000 fingerlings per Tank, and that VBF had a Density of 1:1 pound of fish per gallon of water.  *See, e.g.,* Sections VIII(D), VIII(F)-VIII(H), VIII(M), VIII(O)-VIII(Q), VIII(U)-VIII(AA).

159.     These representations were false, which each of the Founders knew at all relevant times based on VBF's actual data.  After VBF terminated the last of the Founders (James Rea, in January 2018), it learned that VBF's Density was nowhere close to those numbers on a consistent basis, and never on a profitable basis.

160.     The actual VBF data was consistent with the 2015 findings of Manci from FTAI (*see* **Exhibit 20-C**, below) who warned that "0.2-0.7 pounds per gallon are more typical at other facilities with similar production configurations," discussed further below.

161.     Also, Mitch Downs ("Downs"), a former VBF barn manager, stated that as of fall of 2015, his data showed that VBF could only safely introduce 5,000 to 6,000 fish per Tank, and that Wulf consistently tried to futilely push VBF to grow 15,000 to 16,000 fish per Tank (*i.e.,* 16,000 fingerlings per Tank), something Wulf and the other Founders alleged that VBF was actually achieving.  As VBF learned in February 2018, Downs reported his concerns to Driver and Ted Rea. However, the Founders continued to transmit and create Marketing Decks and later management reports to the Independent Board that continued to materially overstate VBF's actual Density data.  *See* **Ex. 7**, Downs Aff. ¶¶ 8-9.

162.    Similarly, Curtis Johnson ("Johnson"), VBF's former operations manager, and one of Driver's subordinates, advised Driver in or around January or February of 2016 that VBF was not stocking 16,000 fish per Tank despite representations by Driver and the other Founders to the contrary, and that it would be impossible for VBF to viably do so.  *See* **Ex. 6**, Johnson Aff.  ¶ 9.

163.    Even if VBF was attempting to stock 16,000 fish per Tank at any given time, there was a significant impact of the Density on fish health (increasing mortality) and water quality, which each of the Founders concealed.  In other words, while it is of course possible to stock 16,000 fish in a Tank no matter how poor the aquaculture business is operationally, more will die in the hands of such a business.  *Id.* ¶ 10.

164.    Density can also be measured in terms of pounds per tank, as opposed to number of fish per tank.  The Founders continuously misrepresented Density in this measure as well. For example, in July 2016 and thereafter, Wulf, Hall, Driver, and Ted Rea represented to Thelander, a VBF shareholder individually, a representative of VBF shareholder Alder, and an Independent Board Member that VBF could produce 35,863 pounds of fish per tank annually, which at that time, and all other times, was contrary to actual Density data available to the Wulf, Hall, Driver, and Ted Rea (and VBF never came anywhere close to achieving this measure of Density).

165.    Also, in July 2016 and thereafter, Wulf, Hall, Driver, and Ted Rea represented to Thelander, a VBF shareholder individually, a representative of VBF shareholder Alder, and an Independent Board Member that VBF could produce 38,100,000 pounds of fish per year, which at that time, and all other times, was contrary to actual data available to the Wulf, Hall, Driver, and Ted Rea.   VBF never came anywhere close to achieving such production numbers, only reaching about 223,000 pounds in 2016, and about 1,100,000 pounds in 2017.

166.    The impact of these Density misrepresentations from a financial perspective is material and significant, including but not limited to, its high correlation with annual production (*i.e.*, a larger represented Density would support a larger represented pounds per production).  The amount of fish VBF would be able to produce and sell goes to the core of VBF's business projections and profitability.   A decrease in Density has a negative impact on VBF's fish production, which impacts VBF's return on investment and would significantly affect the decision of the Independent Board Members whether and how to continue VBF's operations, including acquisition and expenditure of funds and decisions regarding the management team.

167.    Ultimately, VBF's Density was far less than what each of the Founders represented and the impact of these misrepresentations is that VBF was actually producing much less fish than the Founders represented, which affected reports of VBF's operations and financial situation and projections. These misrepresentations shall be referred to as the "Density Misrepresentation" and was contained in numerous instances of misrepresentations by each of the Founders.  *See* Sections VIII(D), VIII(F)-VIII(H), VIII(M), VIII(O)-VIII(Q), VIII(U)-(AA).

### D.    VBF's Mortality

168.    The third Metric is Mortality, which is stated as a percentage of the amount of fish that die in the cultivation process.

169.    Mortality is closely aligned with Density and other Metrics.  For example, many fish will die if an aquaculture business is stocking too many fish per tank.  In that circumstance, the Density number may look positive, but the Mortality, if accurately represented, will be commensurately negative.  The Founders often concealed or skewed the interrelationship amongst the various Metrics to give the false appearance of efficiency and profitability, sometimes telling half-truths and other times outright falsities.

170.    Each of the Founders represented that VBF's Mortality was somewhere around-5%.  *See* Sections VIII(B), VIII(K), VIII(M),VIII(O)-(S), VIII(U)-VIII(W), VIII(AA)-VIII(BB), VIII(DD).  This was false, which each of the Founders knew at all relevant times.  *See* VII(C), VII(H).

171.    After VBF terminated the last of the Founders (James Rea, in January 2018), it learned through its own internal investigation that the actual Mortality was as follows: in 2015 only four of 17 batches were 16,000 or more fish and the Mortality Rate on the four batches was 19.25%;  in 2016, only 8 of 21 batches were 16,000 or more fish and the average Mortality Rate was 38.03% for the 8 batches; in 2017, the standing bio-mass was 164,675 pounds and the average Mortality was 17.2%.  Overall, VBF's investigation shows that in 2015 through July 2016, VBF lost approximately 36% of its fish in all Tanks.

172.    VBF also learned from VBF's former operations manager, Johnson, that when visitors toured VBF's facilities from the summer of 2015 through the summer of 2016, they would view written, recorded data on individual Tanks regarding Density and Mortality data for that particular Tank.  Wulf initially asked Johnson and others to alter the Mortality Rates depicted in this data to make them lower than they actually were to falsely represent Mortality.  When some of Wulf's subordinates refused, VBF employees were instead directed to remove this documentation from the Tanks.  *See* **Ex. 6**, Johnson Aff. ¶ 6.

173.    During that same period, Driver advised VBF fish technicians and other personnel to "be vague" when speaking to others about Mortality and other actual VBF performance Metrics.  *Id.* ¶¶ 7-8.  Later, Wulf, Driver, and Ted Rea limited VBF employees' contact with potentially interested third parties, to avoid VBF employees revealing the truth.

174.    Johnson also reviewed data provided by the Founders, including Driver, which represented, in writing, Mortality Rates "lower than [the operations manager] has ever seen in our system" according to the operations manager.  *Id.* ¶ 12.

175.    In spring 2017, Johnson met with Ted Rea to discuss the manager's concerns about VBF's Mortality Rates at one of its facilities, which "were through the roof." *Id.* ¶ 10.

176.    Further, in the summer of 2017, there were one or more significant "fish loss [death] events" at VBF, especially at its St. Louis facility (collectively, "Fish Loss Events").  Wulf, Hall, and Ted Rea covered up the cause, extent, and frequency of these Fish Loss Events to the Independent Board Members.  For example, in response to a VBF Board Member's direct question in September 2017, Ted Rea misrepresented that Fish Loss Events had been solved.   In fact, the fish mortality problem was not solved and persisted at the time Ted Rea made this misrepresentation.

177.    These misrepresentations regarding VBF's mortality are material because Mortality is a key Metric for the success and profitability of an aquaculture facility.  Every fish that dies before being sold represents wasted costs and unrealized profits for VBF.  An increase in Mortality has a negative impact on VBF's fish production, which impacts VBF's return on investment and would significantly affect the decision of the Independent Board Members whether and how to continue VBF's operations, including acquisition and expenditure of funds and decisions regarding the management team.   Ultimately, VBF's Mortality was far greater than what each of the Founders represented and the impact of these misrepresentations is that VBF was actually producing much less fish than the Founders represented, which affected reports of VBF's operations and financial situation and projections. These misrepresentations shall be referred to as the "Mortality Misrepresentation" and was contained in numerous instances of misrepresentations

by each of the Founders.  *See* Sections VIII(B), VIII(K), VIII(M), VIII(O), VIII(S), VIII(U)-VIII(W), VIII(AA), VIII(BB), VIII(DD).

      E.      **Other Measurements of An Aquaculture Business's Success**

     178.    In addition to the Metrics, a paramount issue in the aquaculture business is the ability to supply and circulate clean water in the cultivation Tanks ("Water Quality").  Fecal matter from the fish and other debris (such as uneaten feed) degrade water quality, and the ability of an aquaculture business to filter such toxic materials and to supply oxygen rich water limited in nitrates is critical to the success of the business.

     179.    Each of the Founders consistently represented that VBF's Water Quality was far better than it was (*see, e.g.,* VIII(A), VIII(F), VIII(H), VIII(I)) though they knew at all relevant times that this was false.  This was especially true because VBF utilized a system that recirculated water after its use back into VBF's system.

     180.    As far as financial performance, each of the Founders made representations as to VBF's actual financials, projections based off actual financials, and VBF's EBITDA per pound of fish.

     181.    Each of the Founders' representations relating to actual financials, projections, and EBITDA were false, which each of the Founders knew based on VBF's actual data and the failure of performance of the OFT technology.  The represented production, sales, and profitability numbers (including EBITDA) were based on assumed Metrics and the performance of the OFT technology that the Founders knew, based on the information within their control, were not being achieved and were not achievable.

     182.    VBF never achieved the actual financials or EBITDA represented, nor could it achieve the projections or EBITDA that each of the Founders touted. Each of the Founders were aware of at all relevant times, based on VBF's actual financial results, that the actual financials

and EBITDA they represented were false and there was no reasonable basis for their projections. In fact, the projections and forecasts that each of the Founders touted were based on data and technology that each of the Founders knew was flawed. Indeed, VBF never came close to meeting any of the forecasts or projections that each of the Founders touted. VBF never made any profit and filed for bankruptcy in 2018.

183.    Further undermining the accuracy of the financial projections, in addition to the fact that the underlying actual data was false, is the fact that VBF's OFT was not performing as represented, which each of the Founders knew. A fundamental assumption behind the financial projections was that VBF's technology, *i.e.*, the OFT, was effective and could sustain a profitable business. In truth, as discussed above, VBF's application of the OFT was fatally flawed, which the Founders knew. Each of the Founders, despite knowing that the OFT could not achieve the outcomes represented for VBF, still presented financial projections based on the OFT achieving such outcomes.

184.    These financial representations are material because company operational and financial decisions are made based upon these projections. These faulty projections gave the false impression that VBF was more viable (because the projections were based on actual data) and that VBF could be more profitable than was ever realistic. Essentially, VBF's "bio-plans" and business plans, prepared by the Founders, were based on invented or manipulated data unrelated to VBF's actual, proven, performance data, which was always available to each of the Founders. A company's actual financial position and reliable forecasts and projections based on same, affect the decision of the Independent Board Members as to whether and how to continue VBF's operations, including acquisition and expenditure of funds and decisions regarding the management team. These misrepresentations shall be referred to as the "Financial

Misrepresentation" and were contained in numerous instances of misrepresentations by each of the Founders. *See* VIII(C), VIII(F), VIII(H), VIII(I), VIII(J), VIII(N), VIII (T), VIII(CC).

185.   Finally, aquaculture is a highly specialized industry, and therefore the technical experience and expertise behind such a business is crucial.  VBF was never backed by individuals with the technical experience and expertise needed to properly run its business, which each of the Founders knew, though they represented otherwise, including that VBF had a "proven" and "seasoned" management team that was supplemented by an "expert" advisory board.  Whether an aquaculture business is backed by those with experience is material and affects the decision of the Independent Board Members whether and how to continue VBF's operations, including acquisition and expenditure of funds and decisions regarding the management team.

186.   From 2014 through their terminations, each of the Founders—instead of investing any of their own money into VBF—raised investments for VBF from others and thereafter lulled those investors and VBF's Independent Board Members, Independent Officers, management, and employees into a false sense of security by misrepresenting, among other things, the above listed Metrics and the capabilities (or lack thereof) of VBF's OFT and by concealing material facts relating to same.

### F.     VBF Seeks and Receives Additional Investors and VBF Board Members

187.   VBF's initial investments were made in VBF Canada, a Canadian entity that initially owed all stock in VBF and was generally referred to as VBF's parent company, in late 2014.  Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers.

188.   Then, in or around January or February of 2015, the Founders retained Canaccord Genuity, LLC ("Canaccord") and National Bank of Canada ("NBC"), investment banking firms,

to help them procure approximately $25,000,000 in additional equity investments and $26,000,0000 in debt investments for VBF.

189.   Canaccord's work began in or around January 2015 and allegedly continued into in or around July 2016.  Canaccord became the sole investment banker for VBF later in 2015, with NBC essentially stepping aside.  Canaccord assigned a team to the Canaccord Project, including, but not limited to, Senior Managing Director (a prominent title at Canaccord) Steve Lobb ("Lobb"), Corporate Bond Manager Mark Pibl ("Pibl"), Senior Investment Banker Jennifer Pardi ("Pardi"), Managing Director Robert Goodman ("Goodman"), Associate-Investment Banking Evan Gabriel ("Gabriel"), Director-European Investment Banking Doran Chernichen ("Chernichen"), and Equity Markets Salesperson Clive Ginsberg ("Ginsberg").

190.   Sometime in or around mid-2015, Lobb left the employ of Canaccord to work for the Founders at VBF, continuing in his same function, and receiving payments from VBF for his purported services (at Wulf and Hall's direction) from May 28, 2015 through June 1, 2016.  This further established the linkage between Canaccord and the Founders, and Lobb continued to be intimately involved in making misrepresentations about VBF, in collaboration with the Founders, as alleged herein as VBF employees or 1099 contractors.  Cannacord, by and through Ginsberg, Pibl, Pardi, and Chernichen remained active on the Canaccord Project for Canaccord after Lobb left Canaccord, including in collaboration with the Founders in disseminating written representations.

191.   Goodman continued with Canaccord after Lobb left VBF.  On May 28, 2015, Goodman executed a consulting agreement with Canaccord through which Goodman continued to be involved in the Canaccord Project on behalf of Canaccord and under Pibl's supervision.

47

192.     Canaccord was involved in misrepresentations and concealment alleged below. On June 5, 2020, this Court transferred VBF's lawsuit against Canaccord to the Southern District of New York (Case No. 1:20-cv-04394-PGG), VBF will therefore refrain from making allegations regarding Canaccord other than as needed to understand and support the allegations against the Founders.

193.     Alder and FishDish made their investments in July 2016.

194.     Alder representatives and VBF Board Members Thelander and Haarkoetter also individually became VBF investors in July 2016.  FishDish was led by VBF Board Member Lockard.

195.     Thereafter, the Founders continued the misrepresentations and concealment as to the Metrics, technology, and financials explained above until the last of the Founders (James Rea) was terminated in January 2018.  In this Third Amended Complaint, VBF alleges only actionable misrepresentations of material facts such as those that were made by one or more of the Founders to the Independent Board Members, the Independent Officers, VBF management and employees, and VBF investors who became actual VBF shareholders (as opposed to the litany of other misrepresentations made to potential investors who never became actual VBF shareholders). Likewise, VBF will allege only concealment of material facts that should have been disclosed to the Independent Board Members, Independent Officers, VBF management, and actual VBF shareholders.

## VII.  THE FOUNDERS' CONCEALMENT

196.     Each of the Founders worked in concert to conceal material facts relating to VBF's Metrics, technology, operations, and financial matters in order to obtain and secure use of funds for VBF that they then looted from VBF through misappropriations and misuse for their own benefit.  In this section, VBF will set forth the instances of each of the Founders' fraudulent

concealment, as opposed to their fraudulent misrepresentations, although there is at times crossover between the two categories as the Founders often concealed the actual facts that contradicted the facts they were misrepresenting, as will be explained as to certain material facts below.  Their fraudulent concealment of material facts also constitutes breaches of fiduciary duty by each of the Founders.

A.    **September 2014 Fitzsimmons Email (Wulf, Driver, Ted Rea, and James Rea)**

197.    On September 9, 2014, Driver sent a version of a September 2014 marketing deck to Dr. Kevin Fitzsimmons, PhD, an aquaculture expert and an alleged member of VBF's "advisory board" (as further addressed below). (This Marketing Deck is not identical to the September 2014 Marketing Deck introduced in Section VIII(A) below, although it contains many similarities.) As used herein, a "Marketing Deck" is a document containing representations regarding VBF's management, Metrics, operations, finances, market, and other material facts.

198.    Between September 15, 2014 and September 17, 2014, Dr. Fitzsimmons emailed Driver comments on this version of the September 2014 Marketing Deck, advising Driver of serious flaws therein ("September 2014 Fitzsimmons Email").  Driver emailed Dr. Fitzsimmons's comments on this version of the September 2014 Marketing Deck to Ted Rea, James Rea, and Wulf on September 17, 2014.  Therefore, Driver, Ted Rea, James Rea, and Wulf were all aware of the September 2014 Fitzsimmons Email.  A true and correct copy of this email exchange, including the version of the September 2014 Marketing Deck that Driver sent to Dr. Fitzsimmons, is attached as **Exhibit 12 A-B**.

199.    This Marketing Deck contained numerous material representations relating to VBF, including its Metrics, financial information, and VBF's OFT that Dr. Fitzsimmons debunked in the September 2014 Fitzsimmons Email:

a.    The Marketing Deck represents that barramundi (the fish species produced by VBF) generally have an FCR of less than 1:1.  **Ex. 12-B**, at 20.  Dr. Fitzsimmons warned Driver that "[a]n FCR of 1 to 1 is also rare. Most farms are much closer to 2 to 1 when they start and edge down to 1 to 1.5 on typical operations."  **Ex. 12-A**.  Notwithstanding Dr. Fitzsimmons's information and warning, Driver, Ted Rea, James Rea, and Wulf continued to represent not only that barramundi have an FCR of 1:1 or less, but eventually, that VBF's actual FCR was 1:1, which was false. *See* Sections VII(D), VIII(A), VIII(B), VIII(D), VIII(F)-(I), VIII(O)-(S), VIII(U)-(AA).

b.    The Marketing Deck represents that OFT has a continual flow of "clean, purified water, eliminating any algae, harmful bacteria, ammonia and nitrates."  **Ex. 12-B** at 27-28.  In response, Dr. Fitzsimmons warned that the "OFT has not developed a good 'scientific' record of removing nitrates, harmful bacteria or off flavors.  At this point, we are having to accept the claims of the developer and a few farmers. It may be true, but I am not aware of any technical, peer reviewed science to support the claims."  **Ex. 12-A**. Yet, Driver, Ted Rea, James Rea, and Wulf continued to circulate this exact misrepresentation throughout their tenure at VBF, including after VBF's own experience showed the OFT representation was not accurate.  *See* Sections VII(D), VIII(A), VIII(D), VIII(F), VIII(H)-(J).

c.    The Marketing Deck represents that VBF was achieving a profit of about 46.59% (dividing the operating costs by revenue).  **Ex. 12-B** at p. 32.  In response, Dr. Fitzsimmons warned that "[s]orry, but I do not buy the EBITDA figure. Never heard of any fish crop with that kind of return…." **Ex. 12-A**.  Driver, Ted Rea, James Rea, and Wulf only somewhat adjusted the EBITDA figures in future representations, as shown below, but such representations were still not grounded in reality and were false. Therefore, Driver, Ted Rea, James Rea and Wulf continued to circulate substantially similar false EBITDA representations throughout their tenure at VBF.

200.    Thus, Driver, Ted Rea, James Rea, and Wulf each knew, as early as September 2014 when they received the September 2014 Fitzsimmons Email, and when VBF was in its infancy, that VBF would likely never achieve an FCR of 1:1 or the EBITDA figures that they represented and knew that the OFT was not the effective technology they made it out to be.  Each of these realities endured throughout the Founders' tenure at VBF.

201.    VBF also discovered further indications that Dr. Fitzsimmons was warning the Founders, in late 2014 and early 2015, about the weaknesses of the OFT, the Founders' touted Metrics, and VBF's business plan in general.  For example, on November 29-30, 2014,

Fitzsimmons emailed William Mebane ("Mebane"), a potential investor and apparent aquaculture expert who never did invest in VBF, in regards to a version of the September 2014 Marketing Deck.  A true and correct copy of this email chain is attached **Exhibit 14.**

202.    In his email to Mebane, Dr. Fitzsimmons listed several criticisms of the September 2014 Marketing Deck and VBF generally and stated that he had already relayed these criticisms to the "Vero Blue guys," referring to the Founders.  For example, Dr. Fitzsimmons stated:

    a.    "I have made several comments to the Vero Blue guys about the presentation that I thought were only weakly supported at this time." Dr. Fitzsimmons, in referencing the "Vero Blue guys," was obviously referencing the Founders, but did not specify which Founders.  However, at a minimum it is reasonable to believe that the "Vero Blue guys" includes Driver, who directly received the 2014 Fitzsimmons Email which Driver then forwarded to Wulf, Ted Rea, and James Rea.

    b.    "The prices for barramundi are optimistic.  My fear is that the limited supply now supports high retail prices and some wholesale. But if farms come on line and / or the Asians start flooding in frozen product (As Australis does already) the prices will drop…."

    c.    "When I was there, multiple heaters and fans were blowing hot air and heat exchange systems. I was not sure how well the energy budget had been worked out. Seemed wildly inefficient to heat so much air instead of water."

    d.    "As a technical advisor I spent a lot of time on these issues on my first trip a couple of weeks ago. I really do not have any answers back from the group yet."

203.    Similarly, on March 23, 2015, Alan Cook ("Cook"), a fish industry executive, emailed Dr. Fitzsimmons about a VBF Marketing Deck.   A true and correct copy of this email is attached as **Exhibit 15.**

204.    In this email, Cook made some stark and negative findings about VBF's operations and finances.  Cook's findings included the following:

    a.    regarding the market for barramundi, Cook stated that the Marketing Deck represented, to Cook as a fish industry expert, "[u]nrealistic expectations regarding long-term pricing for barramundi (a product with very limited US history);"

b.      the Marketing Deck made "[t]roubling and patently false claims about the environmental impacts of net pens [competitors' way of harvesting];"

c.      the Marketing Deck made "[g]ross under-estimations of the complexities of rearing finfish commercially;"

d.      regarding VBF's OFT, the Marketing Deck made "potentially exaggerated claims for the capacities of the rearing system and little, if any, data provided to support those claims;" and

e.      referencing a possible VBF business model at the time that envisioned VBF would outsource its manufacturing process, in part, to local farmers, Cook said he was "really concerned that a project like this will cost a lot of small-scale farmers their investments and discredit US aquaculture generally."

205.    In reply, Dr. Fitzsimmons agreed with Cook's findings and stated that he had "brought each of these points up in our discussions (only two face to face meetings and a couple by email)" and that his "concerns were echoed by others on the advisory board," referring to VBF's advisory board.   Dr. Fitzsimmons did not state which of the Founders received these particular warnings, but the emails refer to at least Driver, and it is likely the other meetings were with Wulf, Hall, Driver, Ted Rea, and James Rea, given Dr. Fitzsimmons's alleged VBF "advisory board" status.

206.    This information and warnings about the market for barramundi, the aquaculture industry, and the OFT were material, and, as the Independent Board Members later learned, true. As alleged herein, the Founders' fraud regarding these issues was persistent throughout their tenure at VBF, and not discovered by VBF until in or around late 2017 to early 2018.

207.    Driver, Ted Rea, James Rea, and Wulf should have each disclosed, but did not disclose, the September 2014 Fitzsimmons Email and the contents thereof, as well as Dr. Fitzsimmons's other warnings, to VBF, including (1) immediately to its shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom they made contradictory representations as discussed in Sections VII(D);

VIII(A), VIII(B), VIII(D), VIII(E)-(J), VIII(L), VIII(N), VIII(O)-(AA), VIII(CC). Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times to whom Driver, Ted Rea, James Rea, and Wulf should have disclosed the September 2014 Fitzsimmons Email and its contents. VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32.   These disclosures should have been made to those who became VBF shareholders after the September 2014 Fitzsimmons Email and after March 23, 2015 (by which time Fitzsimmons had made his other alleged warnings to the Founders), those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of the September 2014 Fitzsimmons Email and Dr. Fitzsimmons's other warnings.

208.    Not only did Driver, Ted Rea, James Rea, and Wulf each conceal the September 2014 Fitzsimmons Email and its contents, as well as Dr. Fitzsimmons's other warnings, they each continued to use the same statements debunked by Dr. Fitzsimmons in future communications to VBF's Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders while continuing to not disclose the September 2014 Fitzsimmons Email and Dr. Fitzsimmons's other warnings, which should have been disclosed in those materials and at that time.   *See* Sections VII(D), VIII(A), VIII(B), VIII(D), VIII(E)-(J), VIII(L), VIII(N), VIII(O)-(AA), VIII(CC).

209.    Driver, Ted Rea, James Rea, and Wulf each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and

shareholders not affiliated with the Founders, did not know of the September 2014 Fitzsimmons Email or its contents or Dr. Fitzsimmons's other warnings and had no opportunity to learn of same other than through Driver, Ted Rea, James Rea, and Wulf.

210.    Driver, Ted Rea, James Rea, and Wulf each knowingly and intentionally concealed the September 2014 Fitzsimmons Email and its contents, starting in September 2014 and throughout their tenure at VBF, and Dr. Fitzsimmons's other warnings as of at least March 23, 2015 (by which time Fitzsimmons had made his other alleged warnings to the Founders) and throughout their tenure at VBF, because they knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about VBF's operations and finances and the actual capabilities of the OFT (or lack thereof) VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operations, (iii) terminated Driver, Ted Rea, James Rea, Hall, and Wulf from their positions with VBF, and (iv) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

211.    VBF relied on Driver, Ted Rea, James Rea, and Wulf to each disclose to it all material facts relating to VBF, including the September 2014 Fitzsimmons Email and its contents and Dr. Fitzsimmons's other warnings, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team.  VBF's reliance was reasonable and justified because Wulf, Driver, Ted Rea, and James Rea were directors and/or officers of VBF at the time they received the September 2014 Fitzsimmons Email and Dr. Fitzsimmons's other warnings.

212.    Instead, Driver, Ted Rea, James Rea, and Wulf's concealment of such material facts allowed Driver, Wulf, Ted Rea, Hall, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**B.    November 9, 2014 Hinerfeld Email (Wulf, Driver, Ted Rea, and James Rea)**

213.    On November 9, 2014, VBF shareholder Stewart Hinerfeld ("Hinerfeld") sent Driver an email, referring to a Marketing Deck prepared by the Founders, most likely the September 2014 Marketing Deck.  Driver then forwarded this email to Wulf, Ted Rea, and James Rea.  A true and correct copy of Hinerfeld's email, and Driver's forwarding email, is attached as **Exhibit 16.**

214.    In his email, referring to a Marketing Deck, Hinerfeld provided the following information and warning:

> Your company is using terms to prospective investors like 48 months and we are out [to]….go public in X amount of time. I believe you may be in violation of SEC rules on enticing people to invest.
>
> Your private placement memo was at best questionable…Being an employee which I never really was of our TEAM would make me vulnerable to the close eye of the law, because of my affiliation.

215.    In response, Ted Rea warned Driver, Wulf, and James Rea to "[s]top poking the hornets [sic] nest," indicating that Ted Rea understood the impact of Hinerfeld's information and warnings and sought to quiet Hinerfeld. This further demonstrates Driver, Wulf, Ted Rea, and James Rea's knowledge of Hinerfeld's information and warning. *Id.*

216.    Hinerfeld's information and warning were material, and as the Independent Board Members and Independent Officer McCowan later learned, true.  The September 2014 Marketing Deck and subsequent Marketing Decks and representations to VBF's Board Members, as reflected in monthly management reports and VBF Board Minutes, contained misrepresentations about VBF, VBF's Metrics, the capabilities of the OFT, VBF's management (*i.e.*, the Founders), the

market for barramundi, and VBF's financials, among other misrepresentations, that endured until the Independent Board Members and Independent Officers began to discover the falsity of the same in or around late 2017 to early 2018.

217.     Driver, Wulf, Ted Rea, and James Rea should have each disclosed, but did not disclose, Hinerfeld's information and warning to VBF, including (1) immediately to its shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders continued to provide questionable Marketing Decks and other materials.  Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times, to whom Driver, Wulf, Ted Rea, and James Rea should have disclosed Hinerfeld's information and warning. VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32.  These disclosures should have been made to those who became VBF shareholders after the November 9, 2014 Hinerfeld email, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of the November 9, 2014 Hinerfeld email.

218.     Driver, Wulf, Ted Rea, and James Rea each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of the November 9, 2014 Hinerfeld email or its contents and had no opportunity to learn of same other than through Driver, Wulf, Ted Rea, and James Rea or Hinerfeld (who did not disclose his November 9, 2014 email to VBF's

Independent Officers and Independent Board Members, or any VBF management and other VBF shareholders not affiliated with the Founders).

219.    Driver, Wulf, Ted Rea, and James Rea each knowingly and intentionally concealed the November 9, 2014 Hinerfeld email and its contents, starting in November 2014 and throughout their tenure at VBF, because they each knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about Hinerfeld's information and warning, VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operations, and (iii) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

220.    VBF relied on Driver, Wulf, Ted Rea, and James Rea to each disclose to it all material facts relating to VBF, including the November 9, 2014 Hinerfeld email and its contents, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team.  VBF's reliance was reasonable and justified because Driver, Wulf, Ted Rea, and James Rea were directors and/or officers of VBF at the time they received the November 9, 2014 Hinerfeld email.

221.    Instead, Driver, Ted Rea, James Rea, and Wulf's concealment of such material facts allowed Driver, Wulf, Ted Rea, Hall, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

C.    **January 7, 2015 Ted Rea Email (Wulf, Driver, James Rea, and Ted Rea)**

222.    On January 7, 2015, Ted Rea informed James Rea, Driver, and Wulf by email that employees at VBF's Buckeye Farm were "arguing that our stocking density, death loss, and gross

poundage per year were unrealistic and not factual."  A true and correct copy of this email is attached as **Exhibit 17.**

223.    Ted Rea, James Rea, Driver, and Wulf each should have disclosed, but did not disclose, this information and warning to VBF, including (1) immediately to its shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders made contradictory representations as discussed below in Sections VIII(A), VIII(D), VIII (F)-(I), VIII(K), VIII(M), VIII(O)-(S), VIII(U)-(BB), VIII(DD). Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times, to whom Ted Rea, James Rea, Driver, and Wulf should have disclosed this information and warning. VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32. These disclosures should have been made to those who became VBF shareholders after the January 7, 2015 Ted Rea email, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of the January 7, 2015 Ted Rea email.

224.    Not only did Ted Rea, James Rea, Driver, and Wulf each conceal this information and warnings, they each continued to misrepresent VBF's Metrics in future communications to VBF's Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders—all while continuing to not disclose the information and warnings contained in Ted Rea's January 7, 2015 email, which should have been disclosed in those materials

and at that time.  *See* Sections VIII(D), VIII(F)-(I), VII(K), VIII(M), VIII(O)-(S), VIII(U)-(BB), VIII(DD).

225.    This information and warnings about the inaccuracy of the Density, Mortality, and production results and projections being reported were material, and as the Independent Board Members later learned, true.  As alleged herein, the Founders' concealment of material facts regarding Density, Mortality, and production results were fraudulent throughout their tenure at VBF, and not discovered by VBF until in or around late 2017 to early 2018.

226.    Ted Rea, James Rea, Driver, and Wulf each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of this information and warning and had no opportunity to learn of same other than through Ted Rea, James Rea, Driver, and Wulf.

227.    Ted Rea, James Rea, Driver, and Wulf each knowingly and intentionally concealed this information and warning, starting in January 2015, and throughout their tenure at VBF, because they knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about this information and warning, VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operation, and (iii) at a minimum increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

228.    VBF relied on Ted Rea, James Rea, Driver, and Wulf to each disclose to it all material facts relating to VBF, including this information and warning, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team.  VBF's reliance was reasonable and justified because Ted Rea, James Rea,

Driver, and Wulf were directors and/or officers of VBF at the time they received this information and warning.

229.     Instead, Ted Rea, James Rea, Driver, and Wulf's concealment of such material facts allowed Driver, Wulf, Ted Rea, Hall, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

### D.     June 2015 Michaels Email (Wulf, Hall, Driver, Ted Rea, and James Rea)

230.     On or about May 6, 2015, Wulf co-authored, with Canaccord, a document entitled "VeroBlue Farms Aquaculture Opportunity Equity Financing Marketing Presentation" ("June 2015 Marketing Deck") that was dated June 7, 2015, and contained representations about VBF's Metrics, operations, and financial information.  A true and correct copy of the June 2015 Marketing Deck is attached as **Exhibit 18-B**. Canaccord assisted in preparing the June 2015 Marketing Deck, as made clear by the "CG-NYC" (Canaccord Genuity-New York City) stamp on the front page.

231.     The June 2015 Marketing Deck represents that it reflects "management's expectations regarding the future growth, results of operations, performance (both operational and financial) and business prospects and opportunities of VBF" and lists VBF management as Wulf, Driver, Ted Rea, Hall, and James Rea.  *Id.* at 3, 48-51. The June 2015 Marketing Deck also lists Wulf, James Rea, and Hall as VBF's Independent Board.  *Id.*

232.     On May 31, 2015, Wulf emailed a version of the June 2015 Marketing Deck to Hall and Driver.  That same day, Wulf copied Ted Rea on an email attaching a version of the June 2015 Marketing Deck to a third party and John Rea (Ted Rea's son and a VBF employee and/or contractor from September 2, 2014 through March 23, 2017).

233.     On June 14, 2015, Wulf copied Ted Rea on an email attaching a version of the June 2015 Marketing Deck, further showing that Wulf, Hall, Driver, Ted Rea and James Rea were each aware of the June 2015 Marketing Deck and the representations therein.

234.    On June 12, 2015, Ginsberg (of Canaccord) provided a version of the June 2015 Marketing Deck to Dr. Michaels.  *See* **Ex. 18-B**.

235.    Ginsberg was introduced to Dr. Michaels, a preeminent aquaculture expert, in or around early June 2015.  Dr. Michaels is an aquaculture consultant and investor who performed diligence on VBF in regards to a possible investment by his firm or other firms.  Ginsberg came to know that Dr. Michaels had extraordinary expertise in the indoor and outdoor aquaculture industry, and at the time there was a dearth of experts as to the indoor aquaculture industry.

236.    In a June 5, 2015 email, Ginsberg introduced Dr. Michaels and his expertise to Wulf.

237.    On June 12, 2015, Ginsberg, Wulf, and Dr. Michaels had a conference call to discuss VBF.  Ginsberg emailed the June 2015 Marketing Deck to Dr. Michaels shortly before the call to prepare Dr. Michaels for the call.

238.    Dr. Michaels reviewed the June 2015 Marketing Deck and on June 15, 2015, emailed Ginsberg findings on the June 2015 Marketing Deck, advising Ginsberg of the multiple significant errors and weaknesses therein. That day, and upon Ginsberg's request, Dr. Michaels specified the errors and weaknesses in the June 2015 Marketing Deck via email ("June 2015 Michaels Email").

239.    Ginsberg forwarded the June 2015 Michaels Email to Wulf on June 16, 2015 and that day, Wulf forwarded the June 2015 Michaels Email to Hall, Driver, Ted Rea, and James Rea, showing that all Founders were aware of the June 2015 Michaels Email.  A true and correct copy of this email exchange is attached as **Exhibit 18-A**.  In his forwarding email, Wulf stated "[s]ee below from the expert. . . . Clive [Ginsberg] thinks he is jealous because he spent 7 years and did nothing in the industry."  *Id.*

240.    At his May 2019 deposition, Ginsberg testified that he never told Wulf that Dr. Michaels was "jealous."  Additionally, Ginsberg stated he never told Wulf that Dr. Michaels "did nothing in the industry," which would have been an outright lie.  Indeed, Dr. Michaels is an aquaculture expert with decades of experience, who has a PhD in an aquaculture discipline, taught aquaculture-related classes at the University of Southern California for about 12 years, has been an investor in the aquaculture business for years, and was described as an aquaculture "expert" by Wulf himself.  Ginsberg confirmed that Dr. Michaels, to his knowledge, had more indoor aquaculture expertise than anyone that reviewed VBF's information.

241.    As pointed out by Dr. Michaels in his June 15 Michaels Email, the June 2015 Marketing Deck contains numerous material representations relating to VBF's Metrics, Water Quality, the OFT, and financial information:

a.    Dr. Michaels warned that the June 2015 Marketing Deck contained "multiple significant errors in the numbers and weaknesses in the [June 2015 Marketing Deck] assumptions, all of which over-inflate the economics and understate the risks."  **Ex. 18-A.**

b.    The June 2015 Marketing Deck represented that the OFT requires "substantially less water than other proteins," that "VBF is adding incoming waste water recirculation equipment that will take usage to 3.2 gallons [sic] water to produce 1 pound of Barramundi fish," and that the "utility consumption of the [OFT] is also lowest in industry of 1.3 KW ($0.11) per pound of production."  **Ex. 18-B** at 26.  The June 2015 Marketing Deck also provided a "Water Recirculating System = Sustainability" flow chart outlining the water cycle process.  *Id.* at 27.  Dr. Michaels found that the June 2015 Marketing Deck's data as to water flow, water oxygenation, and water cleanliness was "almost at the theoretical limits and it is almost impossible to be that close," meaning that the crucial Metrics represented in the June 2015 Marketing Deck were fantasy.  **Ex. 18-A.**  Dr. Michaels also found that the June 2015 Marketing Deck data as to those water issues "is 5 times better than the best that has ever been done commercially, but when compared to the water chemistry-it would kill the fish," *i.e.,* because there would be too many lethal elements in the water.  *Id.*

c.    The June 2015 Marketing Deck represented that VBF's OFT was an "industry-changing and patented fish culturing tank system," and "exclusive technology" that allowed VBF to have the "lowest cost of

operations, industry-leading food conversion of 1:1, superior fish growth rates. . . and strong economics." **Ex. 18-B** at 4.  It further represented that the OFT had "numerous benefits" including a "low utility operating cost," using "blowers, not water pumps," that there was "no need to infuse expensive oxygen in the water as the entire system operates on forced air," that the OFT had a "high density," "lower operating and maintenance cost," that there was "no need or expense to 'create' oxygen and infuse into the water," and that OFT has a continual flow of "clean, purified water, eliminating any algae, harmful bacteria, ammonia and nitrates." *Id.* at 4, 25, 29.  Dr. Michaels warned, referring to the OFT, that "[t]he technology is not as new as claimed and multiple companies have gone bankrupt on similar systems.  The operators of these kind of systems have never met the claimed spec in commercial practice at scale over extended periods." *See* **Ex. 18-A**.

242.    Ginsberg described Dr. Michaels's findings as "very negative feedback."  Further, Ginsberg admitted at his May 2019 deposition that "100 percent" (certainly) these findings should have been disclosed to VBF and its shareholders.  Ginsberg further testified at that deposition that "I would have definitely passed this [Dr. Michaels's findings] onto any of my investor base had they shown any inkling of interest I would have certainly passed it on, yes."  Yet Dr. Michaels's findings were never disclosed to VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders (by the Founders or by Canaccord).

243.    Further, Dr. Michaels's last conclusion turned out to be a prophecy for VBF, which filed for bankruptcy in 2018 based on each of the Founders' fraudulent advancement of the OFT "system" severely criticized in Dr. Michaels's findings.

244.    Wulf, Hall, Driver, Ted Rea, and James Rea each knew, as early as June 2015 that (i) they were over-inflating the economics and understating the risks of VBF, (ii) VBF would likely never achieve the energy and mass flux calculations for oxygen exchange or water use efficiency that they represented (along with Canaccord), (iii) VBF's OFT was not as capable as they made it out to be, and (iv) multiple companies had gone bankrupt utilizing technology similar to VBF's OFT.

245.    Wulf, Hall, Driver, Ted Rea, and James Rea should have each disclosed, but did not disclose, the June 2015 Michaels Email and the contents thereof to VBF, including (1) immediately to its shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders made contradictory representations as discussed in Sections VIII(A), VIII(C), VIII(D)-VIII(F), VIII(H)-(J), VIII(L), VIII(N), VIII(T), VIII(CC).  Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times, to whom Wulf, Hall, Driver, Ted Rea, and James Rea, should have disclosed the June 2015 Michaels email and its contents. VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32.  These disclosures should have been made to those who became VBF shareholders after the Founders' receipt of the June 2015 Michaels Email, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of the June 2015 Michaels Email.

246.    Not only did Driver, Hall, Ted Rea, James Rea, and Wulf each conceal the June 2015 Michaels Email and its contents, they each continued to use the same statements debunked by Dr. Michaels in future communications to VBF's Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders—all while continuing to not disclose the June 2015 Michaels Email, which should have been disclosed in those materials and at that time.  *See* Sections VIII(D)-VIII(F), VIII(H)-(J), VIII(L), VIII(N), VIII(T), VIII(CC).

247.    Wulf, Hall, Driver, Ted Rea, and James Rea each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of the June 2015 Michaels Email or its contents and had no opportunity to learn of same other than through them.

248.    Wulf, Hall, Driver, Ted Rea, and James Rea each knowingly and intentionally concealed the June 2015 Michaels Email and its contents, starting in June 2015 and throughout their tenure at VBF, because they each knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about VBF's Metrics, Water Quality financial information, and the actual capabilities of the OFT (or lack thereof), VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operation, and (iii) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

249.    VBF relied on Wulf, Hall, Driver, Ted Rea, and James Rea to each disclose to it all material facts relating to VBF, including the June 2015 Michaels Email and its contents, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team. VBF's reliance was reasonable and justified because Wulf, Hall, Driver, Ted Rea, and James Rea, were directors and/or officers of VBF at the time they received the June 2015 Michaels Email.

250.    Instead, Wulf, Hall, Driver, Ted Rea, and James Rea's concealment of such material facts allowed them to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

E.      **Third-Party Expert Diligence Report Forged and Falsified by the Founders (Wulf Driver, Hall, Ted Rea, and James Rea)**

251.    Generation Investment Management L.L.P. ("Generation") is a private equity firm that expressed a possible interest in investing in VBF in 2015 and 2016.  Generation retained FTAI, a purported aquaculture industry expert, to perform due diligence tasks regarding VBF.

252.    FTAI, led by Manci, did so, preparing two final reports regarding VBF: (i) a final marketing report dated July 2, 2015 entitled "Market Assessment of Barramundi Production at Vero Blue Farms with a Focus on Iowa's First: *A Due Diligence Assessment Consultation Report*" ("Pre-Forgery FTAI Marketing Report") and (ii) a final technical report also dated July 2, 2015 entitled "Technical Assessment of Barramundi Production at Vero Blue Farms with a Focus on Iowa's First: *A Due Diligence Assessment Consultation Report*" ("Pre-Forgery FTAI Technical Report") (collectively, "Pre-Forgery FTAI Reports").

253.    FTAI performed an independent investigation and also relied in part on data provided by Wulf, Hall, Ted Rea, and Driver. Indeed, Driver had direct contact with Manci as to the drafting of the Pre-Forgery FTAI Reports, as made clear by emails between Driver, Wulf, Ted Rea, and Manci shortly before, and on, July 6, 2015.

254.    Thereafter, without FTAI's knowledge or approval, Wulf converted both of the Pre-Forgery FTAI Reports, which were in final .pdf format, to Word format, and made significant changes to the Pre-Forgery FTAI Reports to create the "Forged FTAI Marketing Report" and the "Forged FTAI Technical Report" (collectively, the "Forged FTAI Reports").  Wulf and Hall then forwarded or made available in a "data room" (the "Data Room") the Forged FTAI Reports to at least two individuals who became VBF directors (Thelander and Lockard) and therefore to two shareholders represented by Thelander and Lockard (Alder and FishDish).  Thelander was also a shareholder of VBF individually.  In doing so, Wulf and Hall concealed the Pre-Forgery FTAI

Reports and falsely passed the Forged FTAI Reports off to Thelander and Lockard as the original FTAI reports.

255.    The Data Room was administered by VBF under the control of the Founders through the use of ShareFile.com software.    ShareFile is essentially an online document repository.  Those in control of the ShareFile can grant access to outside parties, can limit their access to specific folders (data rooms), and can also limit those users' functions (*i.e.*, view and download only).

256.    The Data Room was initially established in or around February 2015 and remained live through around December 2017.  Hall inputted data into the Data Room on behalf of VBF at the time it was under the control of Wulf, Hall, Driver, Ted Rea, and James Rea. Hall appeared to be the primary controller of the Data Room.

257.    The Data Room was accessible to all Independent Board Members, as well as Canaccord, Chris Rausch (an attorney and another representative of FishDish), Amstar, and others. Thelander and Haarkoetter periodically accessed the Data Room, both before and after they were named VBF Independent Board Members, and both before and after Alder became a VBF shareholder and they became VBF shareholders individually.  Rausch accessed the Data Room on May 13, 2016 and possibly other dates.  Thus, by placing materials in the Data Room, the Founders knew that VBF shareholders, Independent Board Members, and Independent Officers would review and rely on those materials.

258.    Upon information and belief, Hall, Driver, Ted Rea, and James Rea each also knew, or participated in, the alteration and/or passing off of the Pre-Forgery FTAI Reports.  At a minimum, Hall, Driver, Ted Rea, and James Rea facilitated the passing off of the Forged FTAI Reports to third parties.  Hall placed one of the Forged FTAI Reports in the Data Room that was

relied upon by Thelander (a VBF director and VBF shareholder) of Alder (a VBF shareholder) and was transmitted to Lockard (a VBF director) of FishDish (a VBF shareholder).

259.     Wulf, Hall, Ted Rea, and James Rea closely collaborated with each other not only as to VBF, but also in other businesses both prior to their tenure at VBF and thereafter.  Further, Wulf, Hall, Ted Rea, and James Rea, for the most part, have been "all for one, and one for all" in their business efforts, fraudulent or otherwise.  Further, Hall, Driver, Ted Rea, and James Rea each knew about the Pre-Forgery FTAI Reports, and their paramount importance to VBF's business, especially Driver who directly interacted with FTAI.  Hall, Ted Rea, James Rea, and Driver therefore likely knew about Wulf's alterations to, and therefore forgeries of, the Pre-Forgery FTAI Reports.

### i.     More Background on the Pre-Forgery FTAI Reports (Wulf, Hall, Driver, Ted Rea, and James Rea)

260.     On June 30, 2015, Julian Curtis ("Curtis") of Generation emailed to Wulf a document titled "Technical and Market Assessment of Barramundi Production at VeroBlue Farms with a Focus on Iowa's First, a Due Diligence Assessment Consultation Report" dated July 2, 2015.  A true and correct copy of Curtis's June 30, 2015 email and its attachment is attached as **Exhibit 19 A-B.**

261.     In his cover email to Wulf, Curtis warned Wulf as follows:

As discussed, please see attached report.  The customer feedback is somewhat disappointing and underwhelming versus the 'low fruit of 10m lbs easy wins'.  A number of comments including: Barramundi is not competing with premium end fish but mid range and needs to be lower pricing point for volume pick up…some musty taste for VBF fish and several saying they are lukewarm competing with premium end fish but mid range and needs to be lower pricing point for volume pick up…some musty taste for VBF fish and several saying they are lukewarm or not likely to buy from VBF (Lee Fish, Aquanor, Fortune Fish.) [sic] Let's have a follow up call with you and Keith [Driver] tomorrow pm once you had a chance to read the report.

262.    Wulf forwarded Curtis's email to Hall, Driver, Ted Rea, and James Rea on June 30, 2015, making all Founders aware of Curtis's email and the information and warnings about VBF based on the Pre-Forgery FTAI Reports contained therein.  A true and correct copy of Wulf's June 30, 2015 forwarding email is attached as **Exhibit 19-A**.

263.    On July 6, 2015, Curtis emailed both Pre-Forgery FTAI Reports to Wulf, Hall, and Driver.  This time, at the request of Driver, the Pre-Forgery FTAI Reports were sent as separate files, not combined, as they were when attached as one report to Curtis's June 30, 2015 email.  Both of the Pre-Forgery FTAI Reports, as attached to Curtis's July 6, 2015 email, were in final, .pdf format. A true and correct copy of the July 6, 2015 email and its attachments are attached as **Exhibits 20 A-C**.

264.    Hall forwarded a copy of Curtis's email, with both Pre-Forgery FTAI Reports attached, to others via email, including Ted Rea and James Rea, making all Founders aware of both Pre-Forgery FTAI Reports.  *Id.*

> **ii.    Pre-Forgery FTAI Marketing Report and Forged FTAI Marketing Report (Wulf, Driver, Hall, Ted Rea, and James Rea)**

265.    The Pre-Forgery FTAI Marketing Report addressed both the market for barramundi in general, and specific customers' feedback on VBF.  VBF had been in business for almost a year by that time, and was preceded by Iowa's First, which was in business for several years by that time.

266.    After receiving the Pre-Forgery FTAI Marketing Report on July 6, 2015, Wulf had the Pre-Forgery FTAI Marketing Report as transmitted by Curtis that day, in .pdf format, converted to Word format.  This was done without the authorization of FTAI, as confirmed in July 2020 by Manci.

267.    Indeed, after receiving the Pre-Forgery FTAI Reports on July 6, 2015, Wulf requested via email that Curtis (of Generation, who retained FTAI), ask Manci and FTAI to modify negative customer information from the Pre-Forgery FTAI Marketing Report. A true and correct copy of that email is attached hereto and incorporated herein as **Exhibit 21**.  Curtis refused Wulf's request, noting that Manci emphasized that the Pre-Forgery FTAI Marketing Report was his final report (as recently confirmed by VBF).  Wulf, with the knowledge and/or participation of Driver, Hall, Ted Rea, and James Rea, nonetheless fraudulently implemented changes to the FTAI Marketing Report themselves without FTAI's knowledge or permission.  Also, as reflected in this email chain, Wulf accepted the Pre-Forgery FTAI Technical Report as final, but then later forged it anyway (as will be further addressed below), with the knowledge and/or participation of Driver, Hall, Ted Rea, and James Rea.

268.    There was no legitimate reason for Wulf, who did not author the .pdf final version of the Pre-Forgery Marketing Report, to convert that report to Word.

269.    According to metadata for the converted Word document, Wulf revised the Pre-Forgery FTAI Marketing Report at least seven times on July 6, 2015:



270.    Through these revisions, Wulf altered and therefore forged the Pre-Forgery FTAI Marketing Report, the result of which will be defined herein as the "Forged FTAI Marketing Report."  A true and correct copy of a redline (comparison document) comparing the Pre-Forgery FTAI Marketing Report to the Forged FTAI Marketing Report is attached as **Exhibit 23.**  Wulf made the following changes to the Pre-Forgery FTAI Marketing Report, resulting in the Forged FTAI Marketing Report.  Wulf's deletions are noted in ~~red font with astrikethrough~~, his additions are noted in **blue and bolded font**, and the unchanged text remains in black font:

**"Table of Contents" section (page 3 of redline):**

VI. Appendices_____~~33~~30

   Appendix 1—~~Questions and answers from 21~~ VeroBlue Farms ~~customers during telephone interviews~~ _____ ~~33~~**Marketing Strategy 30**

   Appendix 2: Specific pricing and notes_____~~69~~36

**"Current Market and Business Status at VeroBlue Farms" section (pages 4-9 of redline):**

**Customer** ~~interviews—Administration of the questionnaire~~

A list of 21 current and potential customers of VeroBlue Farms was provided to the consultant, to be interviewed by telephone. In each interview the questionnaire used was that provided by the Clients.

Telephone interviews were conducted with 11 customers~~, while two customers preferred to respond in written form by e-mail. The remaining eight customers were not available or otherwise unresponsive to repeated attempts to reach them.~~. In our view the response rate achieved of 62 percent is high for this type of survey. ~~Reports on the interaction with each customer are attached (see Appendix1).~~

---

~~VBF reply/rebuttal:~~ The company has a three pronged approach to take their fish to market 1) live fish to primarily Asian markets, 2) regional seafood distributes (including some that may receive some form of regional exclusivity, based on performance), restaurant chains and food distributors like Sysco and USA Foods, and 3) large scale grocery chains (such as Kroger, HyVee, Publix, Safeway, Whole Foods, etc.). Additional niche markets such as branded, seasoned, kosher fillets and Kosher frozen fillets are also being developed.

~~Customer interviews—Summary of the information obtained~~

~~A summary of the information obtained in responses to the questionnaire follows.~~

~~a.Quantities, product forms and sizes~~

~~What quantities of Barramundi do you currently purchase and how often (total lbs./yr.)?~~
~~Highly variable. Some none.~~
~~What product form do you purchase (fillet, gutted, frozen, live)?~~
~~Some live for ethnic markets. Otherwise, fresh and frozen fillets.~~

~~Is fillet/ fish size important?~~
~~Yes.~~

~~Do you manage to source the desired size?~~
~~Not always.~~

~~b.Prices~~

~~What is the price range you've paid in the last 12 months?~~
~~Generally considered that price points need to come down.~~

c. Current supplier

Who is your current supplier?
Live fish from Australis. Fresh and frozen fillets chiefly imported from Indonesia and other Asian countries.

How long have they supplied you for?
Variable, up to as many as 8 years.

d. Purchasing criteria

What is your opinion of the quality of your current barramundi supply?
One Indonesian exporter (FEGA) generally spoken of as providing excellent quality of fillets. Some complaints of inability to obtain the sizes required, also of defects in live fish which increase mortality and reduce shelf life.

Which factors are most important to your buying decision (price, quality, size, local, etc.)?
Virtually all responses were to put quality as the most important factor, followed by size and then price.

What would you like to see improve?
Education of consumers, who are generally unaware of Barramundi.

e. Future demand

What is your opinion of your company's future demand for barramundi (lbs. per year) ?
Mostly positive, subject to quality and workable price point.

Do you see your company's demand for barramundi as generally fungible with other premium white fish (i.e. sea bass, sea bream, halibut, etc.)?
Mostly not. Barramundi is generally considered, in terms of price, a mid-range species.

f. Vero Blue

If Vero Blue were to provide you with Barramundi, would you buy from them? Why?
Some yes, some no.

Would you have any preconditions (e.g. particular certification, minimum quantity).
In most cases, subject to definition of quality and agreement on price point. In one case, subject to agreement of exclusivity in certain markets, since it does not make sense if there is competition between VeroBlue Farms' customer and VeroBlue Farms itself. **See more detail on Appendix 1**

Approximately how much would you buy (lbs./yr.) and at what prices? Many were unable (or did not wish) to answer this question. **Feedback / Observation**

How would you see these volumes scaling in 2016?
Generally positive. Population is growing, ocean fish supply is not, so aquaculture is expected to respond to increased demand.

Would this be to switch from an existing supplier or to meet incremental demand?
Mostly incremental demand.

VBF reply/rebuttal:

**"Demand trends, competition from other groundfish (price, quality, availability), live or fresh fish in relation to frozen fish" Section (pages 23 and 24 of redline):**

271.     In this section, Wulf deleted FTAI's reference to a statement made by VBF in a Marketing Presentation Wulf supplied to FTAI, which was that a purported VBF competitor (Australis) was not as successful as VBF in production.  Wulf's deletion set forth below gives the impression that FTAI actually made this finding about Australis, as opposed to that information coming from Wulf and/or the Marketing Presentation as the source for this comment:

VeroBlue Farms claims that it is able to grow Barramundi to a larger size, which provides a fillet of optimum weight, which Australis is unable to do (VeroBlue Farms, Marketing Presentation), thus giving VeroBlue Farms a competitive advantage.

**"Comments on VeroBlue Farms presentations" Section (pages 26-29 of redline):**

272.     In this section, Wulf deleted a negative finding by FTAI regarding the information (or lack thereof) provided by VBF and also negative information Wulf provided to FTAI.  First, Wulf, deleted the following finding made by FTAI in the Pre-Forgery FTAI Marketing Report:

The presentations would have been more convincing, as a means of demonstrating VeroBlue Farms' experience and expertise, if VeroBlue Farms had provided information on what, in respect of marketing and sales, the company has done and is doing, such as quantities sold by product forms and prices, with details of customers by type, such as wholesalers, processors, restaurants and retailers. In short, these breakdowns and details are somewhat lacking.

273.     Then, Wulf deleted the following negative information that he provided to FTAI:

VBF reply/rebuttal:

5. For many of these customers, they have only been exposed to Australis' fish as American product — which is known to be off-quality.
6. The distributors mentioned the need for POS/education/sales support (already planned), need for quality taste (purge SOP in place), time to broaden sales (planned), need for a differentiator (marketing firm engaged to tell story), and exclusivity for re-distributors (which we will consider in certain regions, based on performance).
7. Asking price will almost always skew towards lower prices with this type of interview process as distributors make their money on the margins. They are also used to Asian product which can have a lower price (refreshed) and our introductory pricing strategy is designed to help with that. In other cases, the pricing was for frozen (possibly 're- freshed') as Fega doesn't do fresh anymore.
8. The market has not yet adjusted to Fega not providing fish anymore and most of these customers have never been approached by VBF and have never tasted our fish.

Please see Appendix 2 for more market-related pricing information.

## Appendix 1 (pages 29 to 56 of the redline):

274.    This section contains the most revisions (deletions) by Wulf.  The original title to this section, as set forth in the Pre-Forgery FTAI Marketing Report, was "Appendix 1-Questions and answers from 21 VeroBlue Farms customers during telephone interviews." Wulf, wanting to delete references to customer feedback, changed the title to "Appendix 1-VBF Marketing Strategy (From VBF)," as demonstrated in the excerpt of the redline below:

Appendix 1—Questions and answers from 21 VeroBlue Farms customers during telephone interviews. Appendix 1— VBF Marketing Strategy (From VBF)

275.    Wulf then deleted and replaced approximately thirty-four pages of customer feedback that was negative, or otherwise contradicted representations by the Founders, all of which will not be pasted (but is fully reflected in **Exhibit 23**).  However, some of the language from the Pre-Forgery FTAI Marketing Report that Wulf deleted includes the following:

Following pages

### Telephone Interview

Date of interview: 23 June 2015
Company name: Lee Fish USA
Person interviewed: Richard Adlem
Title in company: President
Telephone number: 310-642-0680 310-592-3119 (cell phone)
Principal activity: Importer, sells to wholesalers

a)Quantities, product forms and sizes
What quantities of Barramundi do you currently purchase and how often (total lbs. per year)?
Purchase twice/week. Fresh 150,000-160,000 lbs./year, frozen 40,000 lbs./year. Down from prior years, as more supply in the market and cheaper.

b)Prices
What is the price range you've paid in the last 12 months?
Fresh, mid $7.00/lb. delivered to Los Angeles. Frozen, $3.50-4.50/lb. depending on country of origin.

e)Future demand
What is your opinion of your company's future demand for barramundi (lbs. per year) ?This company was the first to import fresh Barramundi, which is now somewhat recognized and used a lot. Does not believe in fish grown in fresh water, as the product profile is not acceptable and shelf life is shorter. Participants **Page 20**
at the Boston Seafood Show found the flavor of Barramundi produced by Australis "miserable".
Do you see your company's demand for barramundi as generally fungible with other premium white fish (i.e. sea bass, sea bream, halibut, etc.)?
It is believed that Barramundi will turn into a commodity, which is not this company's business, so prices will go down and it will not be considered a high-value fish. More farms are coming on (Bali, Northern California). A strong U.S. currency favors overseas exporters.
f)Vero Blue
If VeroBlue were to provide you with Barramundi, would you buy from them? Why?
No. Supply is greater than demand.

How would you see these volumes scaling in 2016?
Volumes currently down about 50% from 2 years ago, on account of competition and undercutting. Anticipates possible unfavorable economic conditions by the end of 2016, so not optimistic.

76

**Telephone Interview**

Date of interview:                23 June 2015
Company name:                 Perishable Distributors of Iowa
Person interviewed:            John Rohrs
Title in company:               Seafood Manager
Telephone number:           515-965-6333
Principal activity:               Distributor

a)Quantities, product forms and sizes
What quantities of Barramundi do you currently purchase and how often (total lbs. per year)?
Just started, about 5,000 pounds so far.
What product form do you purchase (fillet, gutted, frozen, live)?
Fillets, skin-on, fresh

c)Current supplier
Who is your current supplier?
Iowa First/VBF.
How long have they supplied you for?
About 1 year.
d)Purchasing criteria
What is your opinion of the quality of your current barramundi supply?
Mediocre, as VBF does not do its own processing. Problems with trim, also wide range of sizes, so does not get sizes required.

What would you like to see improve?
Quality. Education, since no-one knows the fish. Price point should be 50% lower, in line with tilapia.

Do you see your company's demand for barramundi as generally fungible with other premium white fish (i.e. sea bass, sea bream, halibut, etc.)?
No. Barramundi is not close to high-value well-known species, but is considered mid-scale and consumers do not know it.
f)Vero Blue
If VeroBlue were to provide you with Barramundi, would you buy from them? Why?
Not applicable, as already buying from VBF.

Approximately how much would you buy (lbs. per year) and at what prices?
Cannot say. A tough sell at present price point for an unknown fish.

**Telephone Interview**

Date of interview:                26 June 2015
Company name:                 Aquanor Marketing
Person interviewed:            Eric Kaiser
Title in company:               President
Telephone number:           617-269-6900
Principal activity:               Wholesaler, importer

b)Prices
What is the price range you've paid in the last 12 months?
By air freight. $7.50-8.00/lb. C&F.

c)Current supplier
Who is your current supplier?

None.
How long have they supplied you for?
Bought from FEGA for 3.1/2 years.

d)Purchasing criteria
What is your opinion of the quality of your current barramundi supply?
FEGA's quality was excellent. Flavor very good, better than fish from freshwater tanks.
Which factors are most important to your buying decision (price, quality, size, local etc.)?
Quality is of greatest importance, then sizes and price.

e)Future demand
What is your opinion of your company's future demand for barramundi (lbs. p.a.) ?
Could use, but Barramundi was only a small part of the company's business.
Do you see your company's demand for barramundi as generally fungible with other premium
white fish (i.e. sea bass, sea bream, halibut, etc.)?
People expect lower prices for domestic fish, higher if imported. Barramundi would do better if
the price was lower. For example, tilapia is a fish with less good flavor, but sells well at lower
price.
f)Vero Blue
If Vero Blue were to provide you with Barramundi, would you buy from them? Why?
Probably not, unless Aquanor was given exclusivity in defined markets. Aquanor sells to
distributors all over the country, which is what VBF plans to do, so VBF would sell to the same
customers. Not good to be competing against the supplier.

Telephone Interview
Date of interview: Company name:        Beaver Fishery Person interviewed:   Andy Ip Title in company:
      Owner Telephone number:   416-332-2888 Principal activity:        Live fish wholesaler to Asian
supermarkets and restaurants

b)Prices
What is the price range you've paid in the last 12 months?
Average $4.25/lb.
c)Current supplier
Who is your current supplier?
Australis.

78

f)Vero Blue

 If VeroBlue were to provide you with Barramundi, would you buy from them? Why? Australis reportedly has issues, so the company is interested to work with VBF, but has been told by VBF that it is not ready to do so.

**Telephone Interview**

Date of interview:                          24 June 2015
Company name:                            Fortune Fish & Gourmet
Person interviewed:                       Mark Paliki
Title in company:                          Vice-President of Marketing
Telephone number:                         630-860-7100
Principal activity:                          Processor and distributor The information in this report was not obtained by means of a telephone interview, since Mr. Paliki preferred to respond to the questionnaire by e-mail, from which the answers have been extracted and inserted in this report. He was not available to discuss the questions which he had not answered.

f)Vero Blue

 If Vero Blue were to provide you with Barramundi, would you buy from them? Why? The flavor of Iowa's first Barramundi was off and muddy. They were also too small and the sizing inconsistent for our customers. At this time we would not bring the product on. There would need to be changes at the farm level to improve the taste and sizing of the fish.

**Telephone Interview**

Date of interview:                          24 June 2015
Company name:                            Sweetwater Springs Fish Farm
Person interviewed:                       Andrew Burns
Title in company:                          Director
Telephone number:                         260-437-5401
Principal activity:                          Farm, wholesaler

a)Quantities, product forms and sizes

What quantities of Barramundi do you currently purchase and how often (total lbs. per year)? None at present. Bought some Barramundi from VBF from Keith D and was working to work out the kinks. When Haroon C took over the account, stopped buying.

b)Prices

What is the price range you've paid in the last 12 months? Started at $3.65/lb., then $3.75/lb., picked up at the farm. Haroon C wanted to raise the price to $4.25/lb., at which point stopped buying, chiefly because his customers found a jump of $0.50/lb. too much (he believes that they would have accepted the price point if it had been reached gradually).

d)Purchasing criteria

What is your opinion of the quality of your current barramundi supply? The quality from VBF had improved, but felt that there was still some way to go.

79

> f)Vero Blue
> If VeroBlue were to provide you with Barramundi, would you buy from them? Why?
> Very cautiously. Would be interested to work with VBF again, but had a lot of issues (quality, availability, price).

276.    The changes that Wulf made in the Forged FTAI Marketing Report were material because the quality of the barramundi that VBF had the ability to provide to the market, the price at which it was able to sell the barramundi to the market, the actual market for that barramundi, and the market's reception for barramundi in general and VBF's product specifically all went to the core of the viability of VBF's business and the accuracy of the Metrics, technology, and financial representations.

277.    On May 26, 2016, Wulf emailed the Forged FTAI Marketing Report to Thelander, a representative of Alder and soon-to-be VBF Board Member (in July 2016) and individual VBF shareholder.  A true and correct copy of Wulf's May 26, 2016 email and its attachment is attached as **Exhibit 25 A-B**. In his cover email transmitting the forged report, Wulf does not disclose the Pre-Forgery FTAI Marketing Report or his alterations, and instead states only: "Bjorn, See attached the market report the last 10 pages show the upward trends in pricing," a statement contradicted by contents of the Pre-Forgery FTAI Marketing Report that Wulf deleted.  Further, the Forged FTAI Marketing Report, as attached to Wulf's May 26, 2016 email to Thelander, is entitled "FTAI Report VeroBlue Market 7-6-2015," further giving Thelander the false impression that he was actually receiving FTAI's original work product.  (The Pre-Forgery FTAI Marketing Report was dated July 2, 2015, as was the Forged FTAI Marketing Report, but Wulf, or someone at his direction, entitled the .pdf attached, as can be seen from the "subject" line of this email, as dated "7-6-2015.")

278.    Even as of December 4, 2017, when he was starting to expose the Founders' other fraud, Thelander, referencing a lack of customer feedback data provided by the Founders, still

believed that the Founders had not performed, and were not aware of, "research or studies on the exact demand profile, presentation and pricing for Barramundi," as shown in Thelander's December 4, 2017 "Overview of Major Management Issues," a true and correct copy of which attached as **Exhibit 26**. In fact, the Founders knew that FTAI elicited customer feedback, but had concealed that data from Thelander through Wulf's transmission of the Forged FTAI Marketing Report to Thelander on May 26, 2016, as alleged above.

279.    Similarly, in a February 2, 2016 email, Wulf represented to FishDish members Tom Penaluna ("Penaluna") and Lockard (later a VBF Board Member), that "Generation Investments…engaged a third party to provide a report (which was very favorable) on the OFA tank system (this is available)." A true and correct copy of Wulf's email is attached, as **Exhibit 27 A-D,** *see* **Exhibit 27-D**, p.1.

280.    In this statement, Wulf's reference to the Pre-Forgery FTAI Reports, which, as prepared by FTAI, were not "favorable" to VBF, and were in fact very unfavorable to VBF, constitute a fraudulent misrepresentation of fact. Further, Wulf's reference as to what is "available," would have directed the recipients to the Forged FTAI Reports, which is what Hall actually made available in the Data Room. In these statements, Wulf conceals the original Pre-Forgery FTAI Reports and the fact that he fraudulently adorned those reports with the appearance of favorability to VBF.

281.    Lockard and Penaluna relied on this statement, and reasonably so, as it was a representation that independent third parties, *e.g.*, Generation and FTAI (represented in this email as Generation's "engaged third party"), validated VBF, which was not true. Indeed, in a January 2, 2018 email from Lockard to his fellow FishDish investors, all of whom are named as recipients to this email, Lockard noted that FishDish relied on information regarding VBF "that

the Gore foundation studied and verified information for 6 months prior to our investment."  A true and correct copy of this email is attached as **Exhibit 28**.  The "Gore foundation" is a reference to Generation, as former United States Vice-President Al Gore is involved in Generation, and an indirect reference to the Pre-Forgery FTAI Reports.

282.    Similarly, in a February 19, 2016 email, Wulf represented to Lockard that he had provided Lockard with the Pre-Forgery FTAI Reports (referenced by Wulf as the "due diligence," "independent study" by the "[l]ender/investor," and the "Generation reports").  A true and correct copy of Wulf's February 19, 2016 email is attached as **Exhibit 29**.  In this February 19, 2016 email, Wulf represented that Generation (referred to by Wulf as the "lead equity investor") did "all the heavy lifting DD" (referring to "due diligence"), meaning that Generation, through FTAI and otherwise, had already accomplished extensive due diligence and validated VBF as an investment, which was false.

283.    By circulating, via email and the Data Room, the Forged FTAI Marketing Report, which deleted facts developed by FTAI or provided by VBF that were negative to VBF's marketing, sales, quality control, and other functions, Wulf, Hall, Driver, Ted Rea, and James Rea concealed the true facts of the Pre-Forgery FTAI Marketing Report, and the information and warnings from Curtis's June 30, 2015 email, from Thelander, Lockard, FishDish, Alder, and all other Independent Board Members and Independent Officers, and VBF shareholders not affiliated with the Founders, all of whom should have been advised of these facts at all times during the Founders' tenure at VBF.  Instead, Wulf, by altering the FTAI Marketing Report, and Wulf, Hall, Driver, Ted Rea, and James Rea, by placing or knowingly allowing the Forged FTAI Marketing Report to be placed in the Data Room and otherwise circulated, misrepresented to the recipients

of the report, including, but not limited to Thelander and Alder, that FTAI had not found such negative facts about VBF.

284.     Further, Wulf, Hall, Driver, Ted Rea, and James Rea each concealed Curtis's June 30, 2015 email and its contents and the negative language in the Pre-Forgery FTAI Marketing Report from VBF Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders.  Wulf, Hall, Driver, Ted Rea, and James Rea should have each disclosed, but did not disclose, Curtis's June 30, 2015 email and its contents and the negative language in the Pre-Forgery FTAI Marketing Report to VBF, including (1) immediately to its shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders made contradictory representations as discussed below in Sections VIII(A), VIII(D), VIII(F), VIII(H), VIII(J), VIII(L). Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times, to whom Wulf, Hall, Driver, Ted Rea, and James Rea, should have disclosed Curtis's June 30, 2015 email and its contents). VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32.   These disclosures should have been made to those who became VBF shareholders after Curtis's June 30, 2015 email, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of Curtis's June 30, 2015 email and the Pre-Forgery FTAI Marketing Report.

285.   Wulf and Hall not only circulated the Forged FTAI Marketing Report and concealed the negative language in the Pre-Forgery FTAI Marketing Report, they, along with Driver, Ted Rea, and James Rea, each made affirmative representations contrary to Curtis's June 30, 2015 warning and the negative language in the Pre-Forgery FTAI Marketing Report, misrepresenting that the market for barramundi in general was favorable and further that VBF and its fish received favorable receptions from customers and potential customers, including as to the smell and taste of its fish.   Wulf, Hall, Driver, Ted Rea, and James Rea made these misrepresentations while continuing to not disclose the Pre-Forgery FTAI Marketing Report, which should have been disclosed in those materials and at that time. *See* Sections VIII(D), VIII(F), VIII(H), VIII(J), VIII(L).

286.   Wulf, Hall, Driver, Ted Rea, and James Rea each continued to make similar representations in the "2015 Fall Marketing Decks" (*see* Section VIII(F)) including relating to the taste of VBF's barramundi and that barramundi is a "premium fish around the world." A true and correct copy of the 2015 Fall Marketing Decks are attached as **Exhibit 31** at 31, 41-44 & **Exhibit 32** at 31, 41-44.   The 2015 Fall Marketing Decks also represented that "Barramundi . . . has a demonstrated demand profile in North America" and that "[m]arket risks have been mitigated. VBF has identified market demand for the first 15M pounds of Barramundi." **Exhibit 31** at 4, 6; **Exhibit 32** at 4, 6. Wulf, Hall, Driver, Ted Rea, and James Rea made these misrepresentations while continuing to not disclose the Pre-Forgery FTAI Marketing Report, which should have been disclosed in those materials and at that time.   *See* Section VIII(F).

287.   Similarly, Wulf, Hall, Driver, and Ted Rea each continued these representations in the "January 2016 Marketing Deck" and "January 2016 Executive Summary" (see Section VIII(H)).   A true and correct copy of the January 2016 Marketing Deck is attached as **Exhibit 33,**

at 6, 9 36, 46.  A true and correct copy of the January 2016 Executive Summary is attached as **Exhibit 34**. Wulf, Hall, Driver, and Ted Rea each made these misrepresentations while continuing to not disclose the Pre-Forgery FTAI Marketing Report, which should have been disclosed in those materials and at that time.  *See* Section VIII(H).

288.    Wulf, Hall, Driver, Ted Rea, and James Rea each further perpetuated Wulf's forgery by using the Forged FTAI Marketing Report in various other ways.

289.    For example, the Fall 2015 Marketing Decks (see Section VIII(F)) and January 2016 Marketing Deck (see Section VIII(H)) represent that "two world renown [sic] debt funds" had validated "all of the present operating metrics for full scale commercialization." **Ex. 31** at 5; **Ex. 32** at 5. Similarly, the January 2016 Executive Summary (see Section VIII(H)) states that "[d]ue diligence validated the patented tank system and scalability" (**Ex. 34** at 1) (emphasis added), and the January 2016 Marketing Deck (see Section VIII(H)) states that "[t]he debt providers, in addition to their own due diligence, commissioned third party reports to validate the operating plan, the Opposing Flows Tank system and the scale up risk of the Urban Farm and operation as it goes from the existing 42 tanks to 282 tanks.  The due diligence validated that there is no technology risk in the tank system or scale up risk. . . ."  **Ex. 33** at 8.   These are references to the Forged FTAI Reports.  Wulf, Hall, Driver, Ted Rea, and James Rea made these misrepresentations while continuing to not disclose the Pre-Forgery FTAI Marketing Report, which should have been disclosed in those materials and at that time.

290.    Similarly, in an August 4, 2015 email to a potential investor copying Lobb, Wulf wrote, referencing the Forged FTAI Reports (as the "third part [*sic*] reports"), as follows:

> We are a land based aquaculture [business] doing an expansion on an existing platform in Iowa. This is a $51M expansion we have the debt in place for $26m form [*sic*] Generation (Al Gore Green Fund in UK) the loan doc's are 98% completed…We can get someone up to speed very quickly as we have all the 4 months of DD [due diligence] with Generation

including third part [*sic*] reports that Generation will allow VBF to share with investors groups.

A true and correct copy of this August 4, 2015 email is attached hereto and incorporated herein as **Exhibit 22**.

291.    Likewise a January 5, 2016 email Wulf represented to a potential VBF investor that the extensive due diligence conducted by Generation (through FTAI) validated an investment in VBF.  A true and correct copy of the email in which Wulf made this representation is attached as **Exhibit 35.**

292.    VBF does not allege the August 4, 2015 and January 5, 2016 emails as separate acts of fraudulent concealment or misrepresentation, but instead as further evidence that Wulf was passing the Forged FTAI Reports off to others as authentic, validating of VBF, and prepared by FTAI.

293.    Wulf, Hall, Driver, Ted Rea, and James Rea each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of Curtis's June 30, 2015 Email or its contents or the Pre-Forgery FTAI Marketing Report and had no opportunity to learn of same other than through them.

294.    Wulf, Hall, Driver, Ted Rea, and James Rea each knowingly and intentionally concealed Curtis's June 30, 2015 email and its contents and the Pre-Forgery Marketing Report, starting in June 2015 and throughout their tenure at VBF, because they knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about VBF's barramundi and the market for barramundi in general VBF would have (i) ceased intake of debt and equity investments, (ii) ceased

to expend funds on its continued operation, and (iii) terminated Wulf, Hall, Driver, Ted Rea, and James Rea.

295.    VBF relied on Wulf, Hall, Driver, Ted Rea, and James Rea to disclose to it all material facts relating to VBF, including Curtis's June 30, 2015 email and its contents and the Pre-Forgery FTAI Marketing Report, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team.   VBF's reliance was reasonable and justified because Wulf, Hall, Driver, Ted Rea, and James Rea were directors and/or officers of VBF at the time they received Curtis's June 30, 2015 email and the Pre-Forgery FTAI Marketing Report.

296.    If VBF had known the truth about the market for barramundi, VBF customer feedback, and the quality of the barramundi that VBF was producing, VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operation, and (iii) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

297.    Instead, Wulf, Hall, Driver, Ted Rea, and James Rea's concealment of such material facts allowed them to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

###        iii.     Pre-Forgery FTAI Technical Report and Forged FTAI Technical Report (Wulf, Hall, Driver, and Ted Rea)

298.    On July 6, 2015, Curtis also transmitted the Pre-Forgery FTAI Technical Report, in .pdf format to Wulf, Hall, and Driver noting "in case you have not already seen this."   *See* **Ex. 20 A & C**. Hall forwarded a copy of Curtis's email, along with the Pre-Forgery FTAI Technical

Report to others, including Ted Rea and James Rea, showing that each of the Founders knew of the Pre-Forgery FTAI Technical Report. *Id.*

299.    The Pre-Forgery FTAI Technical Report summarized FTAI's findings as to the technical and operational aspects of VBF.

300.    Wulf had the Pre-Forgery FTAI Technical Report that Curtis transmitted on July 6, 2015 in .pdf format, converted to Word format. This was done without the authorization of FTAI, as confirmed in July 2020 by Manci.

301.    According to the metadata, Wulf revised the Pre-Forgery Technical Report at least seven times between July 6, 2015 and July 30, 2015:



302.    Through these revisions, Wulf altered the Pre-Forgery FTAI Technical Report, the result of which is defined herein as the "Forged FTAI Technical Report." A true and correct copy of a redline (comparison document) comparing the Pre-Forgery FTAI Technical Report to the

Forged FTAI Technical Report is attached as **Exhibit 36.** Wulf, and possibly other Founders for the reasons alleged below, made the following changes to the Pre-Forgery FTAI Technical Report, resulting in the Forged FTAI Technical Report. Wulf's deletions are noted in ~~red font with a strikethrough~~, his additions are noted in **blue and bolded font**, and the unchanged text remains in black font:

### "Current Technical Status" section (pages 4-5 of redline):

303.    In this section Wulf deleted FTAI's negative findings about the ability of VBF's system to filter out potentially lethal fish waste. Wulf's deletions significantly and negatively impacted VBF's profitability, as shown below:

> 4.  Fish feeds contain plant-based ingredients. These ingredients leach tannins and lignins into the production water as feed is consumed and metabolized by fish, leaving a brown stain within the water. Under certain conditions, stained water can produce off flavors in fish flesh, and create product quality issues. If stained production water and off flavor become issues, ultraviolet and/or ozone water filtration can be employed to solve the staining and off flavor problem. **VeroBlue Farms plans to begin routine purging (e.g., fish off of feed, tanks cleaned) and taste-testing during the period of ~~7~~5 days prior to harvest as an additional layer of control to avoid off-flavor that may arise in fish.**
> 5.  At present, rotating drum filters are used to remove solids from production water in the nursery and grow-out facilities. The screens in these filters can capture particles that are 50

> µm in size or larger. ~~These filters also use significant amounts of water for self-cleaning. In our experience, propeller-washed and bubble-washed bead filters perform much better at removing particles down to as small as 5 µm or less, and use much less water for the purpose of self-cleaning. Solids that remain in the production systems and are not removed by the rotating drum filters consume oxygen that would otherwise be available for fish, they potentially can harbor disease-causing organisms, and inhibit beneficial nitrifying bacteria within biological filters—important filtration components within the systems—and reduce their efficiency or induce incomplete biofiltration.~~

### "Opposing Flow Tank (OFT) Technology" section (page 8 of redline):

304.    Through his changes to this section, Wulf completely eliminated FTAI's significant findings that VBF's OFT—which the Founders touted as their "secret sauce"—was not unique and also had mixed results, contrary to the Founders' repeated representations of OFT performance

89

throughout their tenure.  Wulf also changed FTAI's uncertain finding as to whether VBF's OFT was effective in growing to barramundi to a more definite finding that VBF's OFT <u>was</u> effective:

We have seen this technology in use before with mixed results. Water movement within the tanks is significant and thereby requires a fish species that can tolerant flow conditions that are beyond calm and quiescent. Some species are incapable of handling these water flow rates. Barramundi are quite capable swimmers and appear to perform well under these described conditions. Additionally, the internal spaces of the tanks (i.e., spaces not accessible to fish) must be cleaned religiously to avoid clogging with solids and subsequent release of hydrogen sulfide (from insufficient oxidation), nitrite (from incomplete oxidation), or other potentially harmful and toxic byproducts.

Overall, OFT appears to work works with Barramundi at the VeroBlue Farms facilities. However, there is an absolute dependence on the continuing operation of air blowers that supply air to the tanks. Without air, water flow, water filtration, and aeration cease. To put this in perspective, this dependence, while not necessarily typical is not unusual. Many other fish farms are highly dependent on mechanical systems and the electricity that allows them to function. OFT technology in certain respects can be viewed as superior because there are many fewer moving parts (i.e., no conventional water pumps). In essence, it is a more centralized dependence on machines (i.e., the air blowers), and less of a dependence on many machines operating independently. Back-up and emergency systems of course are a requirement under these circumstances, and we will discuss this later in the report.

### "Business Aspects of the Business Plan" section (pages 22-23 of redline):

305.    The Forged FTAI Technical Report is further deceptive in that it leads the reader to believe that FTAI, a third party firm retained by Generation, prepared it, when the Forged FTAI Technical Report was actually altered in significant parts by Wulf.  The Forged FTAI Technical Report also remained dated July 2, 2015, the same date as the Pre-Forgery FTAI Technical Report.

306.    The changes that Wulf made to the Forged FTAI Technical Report are material because the success of VBF's business model was dependent on the technical capabilities and performance of VBF's OFT technology.

307.    Hall uploaded the Forged FTAI Technical Report to the Data Room on March 15, 2016.  A true and correct copy of the Forged FTAI Technical Report as it appeared in the Data

Room as of March 15, 2016 is attached as **Exhibit 37.**  Thelander downloaded the folder that contained this document in the Data Room on May 9, 2016.  The Forged FTAI Technical Report remained in the Data Room as of the date that Alder made its initial purchase of VBF stock for $28,000,000.

308.    On May 13, 2016, Chris Rausch, one of Lockard's attorneys and representative of FishDish member Lockard Construction (Lockard's company), checked into the Data Room.  The Pre-Forgery FTAI Technical Report, as altered by Wulf, was in the Data Room at that time.

309.    Wulf directly altered the Pre-Forgery FTAI Technical Report, manufactured the Forged FTAI Technical Report, and provided the Forged FTAI Technical Report and related concealments and misrepresentations directly to those who became VBF Independent Board Members (Thelander and Lockard) and VBF shareholders (Alder and FishDish).   Upon information and belief, Hall knew that the Pre-Forgery FTAI Technical Report was altered and transformed into the Forged FTAI Technical Report that was provided to VBF Independent Board Members, Independent Officers, and non-Founder-related shareholders because Hall received the Pre-Forgery FTAI Technical Report with the July 6, 2015 email from Curtis (**Ex. 20**) but placed the Forged FTAI Technical Report in the Data Room on March 15, 2016.  Further, Hall had knowledge of the technical issues addressed in the Pre-Forgery FTAI Technical Report in performing his job duties for VBF, and Hall also worked closely with Wulf during that time frame.

310.    Also, upon information and belief, Driver knew that the Pre-Forgery FTAI Technical Report was altered and transformed into the Forged FTAI Technical Report that was provided to VBF Independent Board Members, Independent Officers, and non-Founder-related shareholders because Driver received the Pre-Forgery FTAI Technical Report with the July 6, 2015 email from Curtis, Driver was heavily involved in the technical issues addressed in

the Pre-Forgery FTAI Technical Report in performing his job duties for VBF, and Driver worked closely with Wulf during that time frame.

311.   It is also likely that Ted Rea knew that the Pre-Forgery FTAI Technical Report was altered and transformed into the Forged FTAI Technical Report that was provided to VBF Independent Board Members, Independent Officers, and non-Founder-related shareholders because Ted Rea received the Pre-Forgery FTAI Technical Report on July 6, 2015 from Wulf, Ted Rea had knowledge of the technical issues addressed in the Pre-Forgery FTAI Technical Report in performing his job duties for VBF, and Ted Rea worked closely with Wulf during that time frame.

312.   Similarly, in a January 2, 2018 email to VBF Director Sedun, which Sedun forwarded to VBF Directors Lyons and Lockard the next day, Wulf attempted to defend himself and the other Founders against the then-recent accusations of misconduct by arguing that his provision of the Forged FTAI Reports to Alder (referred to as the "Swiss based family office" in Wulf's block quote below) validated the Founders' misconduct:

> When the Swiss based family office made the decision to go forward with VBF, they asked if they could use the Generation DD [Due Diligence] to speed things up. We provided them with all the information we had given Generation on growth rates and stocking (prepared by Keith Driver the COO at the time).

A true and correct copy of Sedun's January 3, 2018 email to Lockard and Lyons forwarding Wulf's January 2, 2018 email is attached as **Exhibit 38.** Notably, Wulf makes reference to the "Generation DD [Due Diligence]," *i.e.*, one or both Forged FTAI Reports, while failing to disclose in this email that the reports were altered and forged by him.  Further, this email documents Wulf's knowledge that Alder and its appointed Independent Board Members relied on the Forged FTAI Reports, and did so until the Founders' misconduct began to be revealed in late 2017 and early 2018.

313.    By uploading the Forged FTAI Technical Report to the Data Room, in which Wulf deleted facts developed by FTAI that were negative to VBF, Wulf and Hall concealed the true facts in the Pre-Forgery FTAI Technical Report from Thelander, Lockard, FishDish, Alder, and all other Independent Board Members and Independent Officers, and VBF shareholders not affiliated with the Founders, all of whom should have been advised of these facts at all times during the Founders' tenure at VBF.  Instead, Wulf, by creating the Forged FTAI Technical Report, and Hall, Ted Rea, and Driver, by placing or knowingly allowing the Forged FTAI Technical Report to be placed in the Data Room and otherwise circulated, misrepresented to the recipients of the report, including, but not limited to Thelander and Alder, that FTAI had not found such negative facts about VBF.  Wulf, Hall, Driver, and Ted Rea each should have disclosed, but did not disclose the true facts in the Pre-Forgery FTAI Technical Report to VBF, including (1) immediately to its shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders made contradictory representations as discussed below in Sections VIII(A), VIII(D), VIII(F), VIII(H), VIII(J), VIII(L). Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times, to whom Wulf, Hall, Driver, and Ted Rea should have disclosed the true facts of the Pre-Forgery FTAI Technical Report. VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in 28-32. These disclosures should have been made to those who became VBF shareholders after the date of the Pre-Forgery FTAI Technical Report, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent

Board Member Data Room/shared files, and presentations addressing the subjects of the Pre-Forgery FTAI Technical Report.

314.     Wulf and Hall not only circulated the Forged FTAI Technical Report and concealed the actual facts in the Pre-Forgery FTAI Technical Report, they, along with Driver and Ted Rea, each made affirmative representations contrary to the actual facts in the Pre-Forgery FTAI Technical Report.  Wulf, Hall, Driver, and Ted Rea each made these misrepresentations while continuing to not disclose the Pre-Forgery FTAI Technical Report, which should have been disclosed in those materials and at that time.  *See* Sections VIII(D), VIII(F), VIII(H), VIII(J), VIII(L).

### iv.     FTAI Concealed Facts (Wulf, Hall, Driver, Ted Rea, and James Rea)

315.     Wulf, Hall, Driver, Ted Rea, and James Rea should have each disclosed: (a) the existence and content of the Pre-Forged FTAI Reports; (b) that the Pre-Forged FTAI Reports were altered and forged by Wulf; (c) that the Pre-Forged FTAI reports were not FTAI's work product, but instead were the modified work product of Wulf; and (d) the contents of Curtis's June 30, 2015 email accompanying the Pre-Forged FTAI Reports (collectively the "FTAI Concealed Facts").

316.     The FTAI Concealed Facts should have been disclosed, but were not disclosed, to VBF, including (1) immediately to its board members, management, and shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders made contradictory representations as alleged in Sections VIII(A), VIII(D), VIII(F), VIII(H), VIII(J), VIII(L). Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times, to whom Wulf, Hall, Driver, Ted Rea, and James Rea should have disclosed the FTAI Concealed Facts.   VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32.   These

disclosures should have been made to those who became VBF shareholders after the concealment of the FTAI Concealed Facts, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of the FTAI Concealed Facts.

317.    Wulf, Hall, Driver, Ted Rea, and James Rea each failed to disclose the FTAI Concealed Facts to potential investors who became actual VBF shareholders, including, but not limited to, Thelander, Haarkoetter, Alder (by and through Thelander and others), FishDish (by and through Lockard and others); actual VBF shareholders who should have been advised of these material facts after investing; Independent Board Members such as Thelander, Lyons, Ebstein, Haarkoetter, and Lockard; and Independent Officers such as McCowan, who should have been advised of such past negative statements in the performance of their duties with VBF.

318.    Not only did Wulf, Hall, Driver, Ted Rea, and James Rea each conceal the FTAI Concealed Facts, they made affirmative representations contrary to the FTAI Concealed Facts in further communications to VBF's Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders while continuing to not disclose the FTAI Concealed Facts, which should have been disclosed in those materials and at that time.  *See* Sections VIII(D), VIII(F), VIII(H), VIII(J), VIII(L).

319.    Wulf, Hall, Driver, Ted Rea, and James Rea each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of the FTAI Concealed Facts and had no opportunity to learn of same other than through them.

320.     Wulf, Hall, Driver, Ted Rea, and James Rea each knowingly and intentionally concealed the FTAI Concealed Facts, starting in or before June 2015, and throughout their tenure at VBF, because they knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about the FTAI Concealed Facts, VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operation, and (iii) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

321.     VBF relied on Wulf, Hall, Driver, Ted Rea, and James Rea to each disclose to it all material facts relating to VBF, including the FTAI Concealed Facts, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team.  VBF's reliance was reasonable and justified because Wulf, Hall, Driver, Ted Rea, and James Rea were directors and/or officers of VBF at the time they received this information and warning.

322.     Instead, Wulf, Hall, Driver, Ted Rea, and James Rea's concealment of such material facts allowed them to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

### F.     January 28, 2016 Driver Email Regarding Mortality (Wulf, Hall, Driver, Ted Rea, and James Rea)

323.     Driver set forth very serious issues with VBF's Mortality in a January 28, 2016 email to Wulf, Hall, Ted Rea, and James Rea.  A true and correct copy of this email chain is attached as **Exhibit 39**.

324.     Driver's January 28, 2016 email stated in part as follows:

> I have seen the emails circulating with respect to the fish loss at Blairsburg and Buckeye.  I understand the concerns as things are not going well-particularly in a

couple of batches of the fish in a few of the tanks.  We can't seem to get a handle on some tanks….

325.    To some extent, these issues also were reflected in a November 13, 2015 email that Mark Nelson forwarded to Wulf, who in turn forwarded the email to James Rea.  This email contained some stark warnings about VBF's operations such as leaking fish Tanks, collapsing walkways around fish Tanks, and an influx of Bryazoan (invertebrate aquatic animals) that threatened fish health.  A true and correct copy of this email is attached as **Exhibit 40.**

326.    Wulf, Hall, Driver, Ted Rea, and James Rea each should have disclosed, but did not disclose, the information and warnings in the January 28, 2016 Driver email to VBF, including (1) immediately to its then-current Independent Board Member (Lyons), Independent Officers, management, and shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders made contradictory representations as alleged in Sections VIII(K), VIII(M), VIII(O)-(S), VIII(U)-(W), VIII(AA), VIII(BB), VIII(DD).  Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times, to whom Wulf, Hall, Driver, Ted Rea, and James Rea should have disclosed the information and warnings in the January 28, 2016 Driver email. VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32.  These disclosures should have been made to those who became VBF shareholders after Driver's January 28, 2016 email, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of the January 28, 2016 Driver email.

327.    Not only did Wulf, Hall, Driver, Ted Rea, and James Rea each conceal the information and warnings in the January 28, 2016 Driver email, they each continued to misrepresent Mortality in future communications to VBF's Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders while continuing to not disclose the information and warnings in the January 28, 2016 Driver email, which should have been disclosed in those materials and at that time.  *See* Sections VIII(K), VIII(M), VIII(O)-(S), VIII(U)-(W), VIII(AA), VIII(BB), VIII(DD).

328.    Wulf, Hall, Driver, Ted Rea, and James Rea each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of the information and warnings in the January 28, 2016 Driver email and had no opportunity to learn of same other than through them.

329.    Wulf, Hall, Driver, Ted Rea, and James Rea each knowingly and intentionally concealed the information and warnings in the January 28, 2016 Driver email, starting in November 2015, and throughout their tenure at VBF, because they knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew about this information and warnings, VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operation, and (iii) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

330.    VBF relied on Wulf, Hall, Driver, Ted Rea, and James Rea to each disclose to it all material facts relating to VBF, including the information and warnings in the January 28, 2016 Driver email, which were material to VBF's decisions related to operations, raising and

expenditure of corporate funds, and the management team.  VBF's reliance was reasonable and justified because Wulf, Hall, Driver, Ted Rea, and James Rea were directors and/or officers of VBF at the time they received this information and warning.

331.    Instead, Wulf, Hall, Driver, Ted Rea, and James Rea's concealment of such material facts allowed them to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

G.      **February 2, 2016 Cameron Robinson Email (Wulf, Driver, Ted Rea, and James Rea)**

332.    On February 2, 2016, Cameron Robinson ("Robinson"), a consultant with VBF from March 16, 2015 through approximately August or September 2016, emailed Mark Nelson, Sheriff, Wulf, Driver, and Ted Rea, which Ted Rea forwarded to James Rea that same day, containing the subject line "Latest Information on High Death Loss."  A true and correct copy of this email is attached as **Exhibit 41**.

333.    In this email, Robinson explained that the high death loss of fish at the VBF facility was likely due to a certain bacteria.  *Id.*  He also noted that "bacteria is just one of a number of stressors that have been observed recently including very high levels of phosphorus related to bryozoan presence, infrequent ammonia spikes, etc."

334.    Robinson laid out VBF's options, including using medication, which would damage VBF's brand through the loss of a drug and chemical free status, or, to wait it out.  As to the second choice, however, Robinson noted that VBF should "[s]eriously consider density as a primary background stressor making the fish more susceptible to secondary infections, and primary pathogens," and, as a "side note," Robinson added that "our seeking to push stocking density well beyond 0.5 to 0.75 lbs per gallon leaves us more open to these types of issues."  *Id.*

335.   Wulf, Driver, Ted Rea, and James Rea should have each disclosed, but did not disclose, Robinson's material concerns to VBF, including (1) immediately to its current Independent Board Member (Lyons), Independent Officers, management, and shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders made contradictory representations as alleged in Sections VIII(A), VIII(D), VIII (F)-(I), VIII(K), VIII(M), VIII(O)-(S), VIII(U)-(BB), VIII(DD).   Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times, to whom Wulf, Driver, Ted Rea, and James Rea should have disclosed Robinson's concerns.  VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32.  These disclosures should have been made to those who became VBF shareholders after Robinson's February 2, 2016 email, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of Robinson's February 2, 2016 email.

336.   Wulf, Driver, Ted Rea, and James Rea each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of the information and warnings in Robinson's February 2, 2016 email, and had no opportunity to learn of same other than through them.

337.    Not only did Wulf, Driver, Ted Rea, and James Rea each conceal Robinson's information and warnings, they each continued to misrepresent Mortality in future communications to VBF's Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders while continuing to not disclose the information and warnings in Robinson's February 2, 2016 email, which should have been disclosed in those materials and at that time.  *See* Sections VIII(K), VIII(M), VIII(O)-(S), VIII(U)-(BB), VIII(DD).

338.    Wulf, Driver, Ted Rea, and James Rea each knowingly and intentionally concealed this information and warnings in Robinson's February 2, 2016 email, starting in February 2016, and throughout their tenure at VBF, because they knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about this information and warnings, VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operation, and (iii) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

339.    VBF relied on Wulf, Driver, Ted Rea, and James Rea to each disclose to it all material facts relating to VBF, including the information and warnings in Robinson's February 2, 2016 email, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team.  VBF's reliance was reasonable and justified because Wulf, Driver, Ted Rea, and James Rea were directors and/or officers of VBF at the time they received this information and warnings.

340.     Instead, Wulf, Driver, Ted Rea, and James Rea's concealment of such material facts allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**H.     March 31, 2016-July 27, 2017 Actual Data Regarding Mortality (Wulf, Hall, Driver, Ted Rea, and James Rea)**

341.     Internal VBF data revealed that VBF's actual Mortality Rate according to tracked data was in excess of 27% or higher at various times, including but not limited to between August 4, 2016 and March 31, 2017. Indeed, in a July 22, 2016 email, Wulf stated in response to a wish for a good weekend, "[n]ot with a 27% mortality will not be a good weekend."  A true and correct copy of this email chain is attached as **Exhibit 44**.

342.     Wulf, Hall, Driver, Ted Rea, and James Rea were each aware of and had access to VBF's Mortality data, and it was within the job duties of at least Wulf, Driver, Hall, and Ted Rea, during their tenures at VBF, to be informed of and to analyze this data.

343.     In a July 1, 2016 email (the eve of Alder's major investment) that was ultimately forwarded to James Rea and Ted Rea, Robinson lamented: "Why do we periodically keep seeing the same kinds of mortality events regardless of feed (the same thing happened in November 2015)…."  A true and correct copy of this email chain is attached as **Exhibit 43**.

344.     Similarly, that day, VBF employee Mark Nelson warned Hall, Driver, Ted Rea, and James Rea via email that a recent shipment of fingerlings contained fingerlings that were too small, to which Ted Rea replied: "Put them back in the tank!! We cannot afford any more dead fish."  A true and correct copy of this email chain is attached as **Exhibit 61.**

345.     VBF also had issues with keeping competent internal data.  In an August 26, 2016 email to Hall, VBF Controller Brobjorg wrote that VBF has not actually been tracking Mortality; meanwhile, Hall along with Wulf, Driver, Ted Rea, and James Rea were representing low

Mortality Rates in Marketing Decks, Monthly Management Reports, and at Board meetings (*see* Sections VIII(B), VIII(K), VIII(M), VIII(O-S), VIII(U)-(W), VIII(AA)-(BB), VIII(DD)).  A true and correct copy of the email from Brobjorg is attached as **Exhibit 45**.

346.    A December 26, 2016 internal VBF Excel spreadsheet, last saved by Ted Rea on December 30, 2016, showed VBF's Mortality rate to be in excess of 23.57% for 2016 (but it was actually much higher due to VBF's spotty data-gathering methods, which itself was a tactic of concealment of the Founders). A true and correct copy of the spreadsheet is attached as **Exhibit 46**.

347.    A June 29, 2017 email from a VBF employee that was ultimately forwarded to Ted Rea noted VBF's Mortality problem was caused by its poor water quality, further demonstrating Ted Rea's knowledge of this issue. A true and correct copy of the email is attached as **Exhibit 47**.

348.    As documented in a July 27, 2017 email, a VBF employee noted that VBF was unable to ever show that it "can do 500,000 fry [fish]/month…without losing a high number of fish to cannibalism + total loss mortality from bacterial infection most likely due to stocking densities."  A true and correct copy of that email is attached as **Exhibit 48**.  Yet, as can be seen through, for example, minutes for the July 31, 2017 VBF Board meeting, the Founders were not disclosing VBF's actual, and alarming, Mortality Rates and issues even as of that date.  A true and correct copy of those minutes is attached as **Exhibit 49.**

349.    Hall, Driver, Wulf, Ted Rea, and James Rea should have disclosed, but did not disclose, VBF's actual, known Mortality Rates to VBF, including (1) immediately to its current Independent Board Members, Independent Officers, management, and shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders made contradictory representations as alleged in Sections

VIII(B), VIII(K), VIII(M), VIII(O-S), VIII(U)-(W), VIII(AA)-(BB), VIII(DD)).   Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times, to whom Hall, Driver, Wulf, Ted Rea, and James Rea should have disclosed VBF's actual Mortality data.   VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32.   These disclosures should have been made to those who became VBF shareholders after Hall, Driver, Wulf, Ted Rea and James Rea learned of these actual Mortality Rates, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing VBF's actual Mortality Rates.

350.    Not only did Hall, Driver, Wulf, Ted Rea, and James Rea each conceal VBF's actual Mortality Rates, they each continued to misrepresent VBF's actual Mortality in future communications to VBF's Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, while continuing to not disclose VBF's actual Mortality Rates, which should have been disclosed in those materials and at that time. *See* Sections VIII(K), VIII(M), VIII(O-S), VIII(U)-(W), VIII(AA)-(BB), VIII(DD)).

351.    Hall, Driver, Wulf, Ted Rea, and James Rea each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of VBF's actual, known Mortality Rates and had no opportunity to learn of same other than through them.

352.     Hall, Driver, Wulf, Ted Rea, and James Rea each knowingly and intentionally concealed VBF's actual, known Mortality Rates, from the onset of VBF's operations in 2014, and throughout their tenure at VBF, because they each knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about this data, VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operation, and (iii) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

353.     VBF relied on Hall, Driver, Wulf, Ted Rea, and James Rea to each disclose to it all material facts relating to VBF, including VBF's actual, known Mortality Rates, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team.  VBF's reliance was reasonable and justified because Hall, Driver, Wulf, Ted Rea, and James Rea were directors and/or officers of VBF at the time they received this data and information regarding actual Mortality Rates.

354.     Instead, Hall, Driver, Wulf, Ted Rea, and James Rea's concealment of such material facts allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**I.       February 6, 2017 through August 29, 2017 Actual Data Regarding Density (Wulf, Hall, Driver, Ted Rea, and James Rea)**

355.     The Founders intentionally concealed VBF's true Density, as evidenced by an April 29, 2015 email, in which John Rea (Ted Rea's son and a VBF employee and/or contractor from September 2, 2014 through March 23, 2017) asked Ted Rea, Hall, Driver, Wulf, and James Rea for guidance on what they were telling others about VBF's Density to ensure there was a

"clear message." A true and correct copy of that email is attached as **Exhibit 50**. This email further indicates, in context with the other allegations herein, that the Founders were not disclosing the truth about VBF, but instead were creating false narratives.

356.     The internal VBF data that VBF was able to locate on its servers relating to VBF's Density does not support the Founders' Density Misrepresentations. Wulf, Hall, Driver, Ted Rea, and James Rea were each aware of and had access to this data, and it was within the job duties of at least Wulf, Driver, Hall, and Ted Rea, during their tenures at VBF, to be informed of and to analyze this data.

357.     Such data revealed that in certain months in 2017 VBF was not reaching its stocking Density. For example, an Excel file modified on February 8, 2017, represents that VBF's stocking target was 36,000 per six tank pod. As the Founders generally represented Density in terms of fish per tank, this figure presumably represents 6,000 fish per tank, but the Excel file does not specify. The Excel file also represents that in total, VBF was stocking 361,281 fish, which was 1,546,719 fish short of the stocking target represented by the Founders. A true and correct copy of an excerpt of relevant parts of this excel file is attached as **Exhibit 51** (metadata information added as header).

358.     A similar Excel file last saved by Ted Rea on March 24, 2017, represents that VBF's stocking target was 36,000 per six tank pod, but VBF was stocking 424,746 fish in total, and thus was 1,483,254 fish short of the stocking target represented by the Founders. A true and correct copy of an excerpt of relevant parts of this excel file is attached as **Exhibit 52** (metadata information added as header).

359.     Similarly, an Excel file to which Ted Rea is listed as the custodian and that was last modified on July 10, 2017, represents that VBF's stocking target was 36,000 per six tank pod, but VBF was stocking 480,467 fish in total, and thus was 1,427,533 fish short of the stocking target

represented by the Founders. A true and correct copy of an excerpt of relevant parts of this excel file is attached as **Exhibit 53** (metadata information added as header).

360.    An Excel file to which Ted Rea is listed as the custodian and that was last modified on August 29, 2017, represents that VBF's stocking target was 36,000 per six tank pod, but VBF was stocking 437,399 fish in total, and thus was 1,470,601 fish short of the stocking target represented by the Founders.  A true and correct copy of an excerpt of relevant parts of this excel file is attached as **Exhibit 54** (metadata information added as header).

361.    These are only four examples of purported actual data that VBF discovered on its servers that was not disclosed by the Founders to VBF's shareholders, Independent Board Members, and/or Independent Officers.

362.    Wulf, Hall, Driver, Ted Rea, and James Rea should have each disclosed, but did not disclose, VBF's actual, known Density to VBF, including (1) immediately to its board members, management, and shareholders and (2) to those who became VBF Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders made contradictory representations as alleged in Sections VIII(A), VIII(D), VIII (F), VIII(G), VIII(H), VIII(I), VIII(M), VIII(O)-(Q), VIII(U)-(AA).    Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officers, at all relevant times, to whom Wulf, Hall, Driver, Ted Rea, and James Rea should have disclosed the Density actual data. VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32. These disclosures should have been made to those who became VBF shareholders after Wulf, Hall, Driver, Ted Rea, and James Rea learned VBF's actual Density data, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders

as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of VBF's actual Density data.

363.    Not only did Wulf, Hall, Driver, Ted Rea, and James Rea each conceal VBF's actual Density data, they each continued to misrepresent VBF's actual Density in future communications to VBF's Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders while continuing to not disclose VBF's actual Density data as Wulf, Hall, Driver, Ted Rea, and James Rea learned of the same, which should have been disclosed in those materials and at that time. *See* Sections VIII(A), VIII(D), VIII (F), VIII(G), VIII(H), VIII(I), VIII(M), VIII(O)-(Q), VIII(U)-(AA).

364.    Wulf, Hall, Driver, Ted Rea, and James Rea each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of VBF's actual, known Density and had no opportunity to learn of same other than through them.

365.    Wulf, Hall, Driver, Ted Rea, and James Rea each knowingly and intentionally concealed VBF's actual, known Density, from the onset of VBF's operations in 2014, and throughout their tenure at VBF, because they knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about this data, VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operation, and (iii) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

366.    VBF relied on Wulf, Hall, Driver, Ted Rea, and James Rea to each disclose to it all material facts relating to VBF, including VBF's actual, known Density, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team.  VBF's reliance was reasonable and justified because Wulf, Hall, Driver, Ted Rea, and James Rea were directors and/or officers of VBF at the time they received this information.

367.    Instead, Wulf, Hall, Driver, Ted Rea, and James Rea's concealment of such material facts allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**J.      July 31, 2017 Email from John Rea to Ted Rea (Ted Rea)**

368.    John Rea Junior ("John Rea") is Ted Rea's son, who purportedly worked for VBF as an "Independent Grower Representative" from September 2, 2014 through March 23, 2017 (although he apparently remained on VBF's payroll until May 31, 2017).  In a July 1, 2017 email to his father Ted Rea, John Rea, who had come to know of his father's and the other Founders' business practices through working at VBF, wrote as follows:

> Every time you told me there was some money coming in, it eventually went to your brother, father, the ranch, business partners. . . everyone but me…As I saw more of the inner workings of your business dealings and morals, I was surprised to find how loose the definitions were to you of words like lying and misappropriation, but only seemingly when applied to you and your partners' actions.

369.    In this email, John Rea also threatened to expose the Founders' misconduct to the Independent Board Members, but he did not because Ted Rea "made it clear that [he] wanted [John] not to do that because [Ted Rea] and [his] partners would get in trouble and the deal would die."  Further, John Rea stated in this email that "my connection to you is a liability.  I cannot continue to be associated with you in any way when it comes to business."

370.    Ted Rea should have disclosed, but did not disclose, John Rea's statements exposing the Founders' misconduct to VBF, including (1) immediately to its current Independent Board Members, Independent Officers, management, and shareholders and (2) to VBF's Independent Board Members, Independent Officers, and shareholders that came on at a later date. Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada investors, Independent Board Members, and Independent Officers, at all relevant times, to whom Ted Rea should have disclosed John Rea's statements. VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32.  These disclosures should have been made to those who became VBF shareholders after the July 31, 2017 John Rea email, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of the July 31, 2017 John Rea email.

371.    Ted Rea knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of John Rea's statements exposing the Founders' misconduct and had no opportunity to learn of same other than through Ted Rea.

372.    Ted Rea knowingly and intentionally concealed John Rea's statements exposing the Founders' misconduct, from July 2017, and throughout his tenure at VBF, because he knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about these statements, VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued

operation, and (iii) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

373.    VBF relied on Ted Rea to disclose to it all material facts relating to VBF, including John Rea's statements, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team.   VBF's reliance was reasonable and justified because Ted Rea was a director and/or officer of VBF at the time he received John Rea's email.

374.    Instead, Ted Rea's concealment of such material facts allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

K.    **September 19, 2017 James Rea, Wulf, Hall, Ted Rea Email (Wulf, Hall, James Rea, and Ted Rea)**

375.    By September 2017, the Independent Board Members began to become suspicious of Wulf, Hall, Ted Rea, and James Rea. Driver had already been terminated as VBF's chief operating officer and placed on a consulting agreement (although his involvement in VBF appeared to significantly wane later in 2017).   As reflected in the minutes of the VBF Board Meeting for September 12-13, 2017, attached hereto and incorporated herein as **Exhibit 55**:

> Mr. Wulf and the other management team members discussed in detail the previous 12-months of operations, the lack of accomplishments and issues which…have resulted in a 12-month delay in ramping-up to full production. . . .   In particular, among other things, management and the Board discussed the severe fish loss incidents, the causes of the losses and the action plans to resolve the problems, the St. Louis facility water issues and the nursery issues.

376.    Yet, even in the face such suspicions, and direct inquiries from the Independent Board Members, Wulf, Hall, Ted Rea, and James Rea each failed to be transparent and to disclose

their litany of misappropriations, misrepresentations, and acts of concealment of relevant, material information and data over the preceding years.

377.    For example, in response to negative feedback provided by McCowan as to VBF's OFT and water quality issues, James Rea suggested in a September 18, 2017 email to Wulf, Hall, and Ted Rea that they must advise VBF's Independent Board Members that the Founders "have A LOT of work to do to improve Rick's [Sheriff's OFT] system in order to achieve the proposed bio mass stocking plan, which will require some patience and capital." A true and correct copy of this email is attached hereto as **Exhibit 56.**

378.    In response, Hall warned James Rea that advising VBF's Board Members of this issue would be "show stoppers for OH [Otto Happel, whom the Founders believed was affiliated with Alder]. We need to discuss." Therefore, as of September 18, 2017—over three years of VBF operations—Wulf, Hall, James Rea, and Ted Rea were concealing their knowledge of the fatal flaws the OFT as applied by the Founders to VBF from the Independent Board Members.

379.    In further response, Ted Rea echoed Hall's advice to continue to conceal the OFT flaws: "[w]e cannot make the statement that Rick[']s system is flawed. It isn't. . . It was never designed to handle the bio mass we are pushing. . ."

380.    In further response, Hall agreed with Ted Rea's joinder to continue to conceal the problems with the OFT: "Ted, you just put in words exactly what I was thinking."

381.    Wulf, Hall, Ted Rea, and James Rea should have each disclosed, but did not disclose their knowledge that VBF's OFT did not and could not perform as expected and was a failure, which they knew from the outset of VBF in 2014 (*see* Sections VI(A), VII(A), VII(D), VII(E)), to VBF, including (1) immediately to its current Independent Board Members, Independent Officers, management, and shareholders and (2) to those who became VBF

Independent Board Members, Independent Officers, and shareholders at a later date and to whom the Founders made contradictory representations as alleged in Sections VIII(A), VIII(D)-(E), VIII(H)-(J), VIII(L).  Attached as **Exhibit 13** is a demonstrative listing all VBF and VBF Canada shareholders, Independent Board Members, and Independent Officer, at all relevant times, to whom Wulf, Hall, Ted Rea, and James Rea should have disclosed the OFT's fatal flaws.  VBF's Independent Board Members and Independent Officers are also defined along with their relevant times of service in paragraphs 28-32.   These disclosures should have been made to those who became VBF shareholders both before and after the aforementioned September 19, 2017 email chain, those who became Independent Board Members and Independent Officers when they were appointed to those positions and thereafter, shareholders as they acquired VBF stock, and in subsequent management updates, board meetings, board reports, shareholder reports, the shareholder and Independent Board Member Data Room/shared files, and presentations addressing the subjects of the aforementioned September 19, 2017 email chain.

382.    Not only did Driver, Ted Rea, James Rea, and Wulf each conceal their knowledge of the fatal flaws and actual, dismal performance of VBF's OFT, they each continued to misrepresent VBF's OFT in future communications to VBF's Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders while continuing to not disclose the subjects of the aforementioned September 19, 2017 email chain, which should have been disclosed in those materials and at that time.  *See* Sections VIII(A), VIII(D)-(E), VIII(H)-(J), VIII(L).

383.    Wulf, Hall, Ted Rea, and James Rea each knew that VBF, through VBF's Independent Officers and Independent Board Members, along with VBF management and shareholders not affiliated with the Founders, did not know of their knowledge of the fatal flaws

and actual performance of VBF's OFT and had no opportunity to learn of same other than through them.

384.    Wulf, Hall, Ted Rea, and James Rea knowingly and intentionally concealed their knowledge of the fatal flaws and actual performance of VBF's OFT, from the onset of VBF's operations in 2014, and throughout their tenure at VBF, because they knew that if VBF, through its Independent Officers and Independent Board Members, along with VBF shareholders not affiliated with the Founders, knew the truth about the OFT, VBF would have (i) ceased intake of debt and equity investments, (ii) ceased to expend funds on its continued operation, and (iii) at a minimum, increased its oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF, eventually terminating them from their positions once the full extent of their misbehavior was known.

385.    VBF relied on Wulf, Hall, Ted Rea, and James Rea to each disclose to it all material facts relating to VBF, including their knowledge of the fatal flaws and actual performance of VBF's OFT, which were material to VBF's decisions related to operations, raising and expenditure of corporate funds, and the management team.  VBF's reliance was reasonable and justified because Wulf, Hall, Ted Rea, and James Rea were directors and/or officers of VBF at the time they had knowledge of the fatal flaws and actual performance of the OFT.

386.    Instead, Wulf, Hall, Ted Rea, and James Rea's concealment of such material facts about the OFT allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

387.    The next day, in another a September 19, 2017 email chain among Wulf, Lockard, and one of VBF's outside counsel from Jackson Walker, L.L.P. ("Jackson Walker"), a true and correct copy of which is attached as **Exhibit 57**, Wulf complained that "I would [sic] as a director

114

of VBF for you to have a conversation with Rick [Dahlson] on the circle cluster and waste of money and time in having the person in middle of every piece of paper." Wulf was likely complaining about the increasing scrutiny provided by Alder Board Members at that time. Therefore, Wulf escalated tactics against those who were asking questions about the Founders' management of VBF, instead of being transparent with them.

      **L.**      <u>**Other Actions of the Founders in Support of their Fraudulent Concealment from February 2015 through July 2016**</u>

     388.    In this section, VBF alleges further examples of the Founders' manifestations of their intent to conceal material facts from and further false narratives to VBF, through its Independent Officers and Independent Board Members, as well as VBF management and shareholders not affiliated with the Founders.

     389.    In an October 20, 2015 email, a true and correct copy of which is attached as **Exhibit 58**, VBF employee Grace Nelson reported abnormal barramundi fillets at one of VBF's manufacturing facilities (an outsourced farmer/grower called Cardinal Farms). In response to this inquiry, Driver responded "[i]n [the] future, please call – don't email stuff like this please," indicating that Driver sought to eliminate any "paper trail" leading to the truth behind VBF's doomed operations.

     390.    Similarly, in a March 31, 2016 email, a true and correct copy of which is attached as **Exhibit 59**, Driver and Ted Rea discussed who would host a site visit by a potential investor. When Driver suggested that Robinson (a VBF consultant from approximately March 16, 2015 through September 2016 with experience in the aquaculture industry) do so, Ted Rea responded that he did not agree because "I don't trust Cam [Robinson] to not say the wrong thing at the wrong time." Ted Rea also noted that he was still dealing with the "fallout" of another VBF representative telling the truth to another potential investor. This email indicates Ted Rea, recognizing the

potential impact on VBF's assets and resources, operations, and continued control of same by the Founders, crafted false narratives to conceal the true, negative facts about VBF.

391.   Another example of the truth-stifling atmosphere at VBF created by the Founders is an April 17, 2016 email, wherein one VBF employee (Haroon Chaudhri) advised another VBF employee (Robinson) that he should not say anything further about a customer complaint of poor VBF fish quality, especially since Wulf has "already indicated that he is tired of claims and losing money" (*i.e.*, from customers). A true and correct copy of this email chain is attached as **Exhibit 60.**

392.   In a July 22, 2016 email chain amongst all five Founders, which noted significant failings in Driver's aquaculture technical expertise, James Rea stated: "I sincerely value your contribution to this point. You lent an air of scientific credibility to the story and gave our investors' confidence in your knowledge of the business."  A true and correct copy of this email is attached as **Exhibit 62.**  This demonstrates the Founders' tactic of giving the false impression that VBF had competent management and technical expertise, as further alleged herein.

### M.   The Founders' Concealment is Still Ongoing

393.   As alleged herein, VBF has been able to piece together each of the Founder's involvement in various misappropriations of assets as well as concealment and misrepresentations relating to VBF.  However, the Founders' concealment of their fraud is extensive and ongoing.

394.   For example, VBF demanded that Driver return his VBF-issued laptop, but Driver has not done so, claiming that he does not know its whereabouts.

395.   Further, after litigation began, VBF conducted a forensic analysis on Ted Rea, James Rea, Hall, and Wulf's VBF-issued laptops and discovered that these Founders may have attempted to further conceal information from VBF before turning their VBF laptops over to VBF.

396.    Specifically, Ted Rea deleted three folders named "OFA," "BOSS," and "SSi," comprising of 62 files, on November 6, 2017.  He also deleted a third folder named "A Teddy's Desktop" that day, comprising of 2,500 folders holding over 40,000 files.  Also, the "Disk Clean-up application CLEANMGR.exe was run that day on Ted Rea's computer.

397.    James Rea connected multiple devices attached to his laptop and the majority of them were connected during the last two weeks that James Rea, to VBF's knowledge, signed into VBF's network (January 4, 2018 through January 17, 2018).

398.    The analysis of Hall's laptop showed that he deleted over 2,000 files on November 6, 2017 (after VBF terminated him) and that several storage devices (flash drives, external hard drives, an iPhone, and an iPad) were attached to his system between September 5, 2017 and November 15, 2017.

399.    The analysis of Wulf's laptop showed that he deleted 38 items in 2017, the majority of them deleted on November 6, 2017 (the day after VBF terminated him).  Also, several USB storage devices were attached to his laptop between October 18, 2017 and November 12, 2017.  Further, on November 7, 2017, the applications WinHex.exe and FTK Imager.exe were run from a removable device. These applications are commonly used by IT security and digital forensic analysts for various reasons.

400.    VBF has had further issues gathering information in this case.  For example, Canaccord has thus far refused to produce documents in response to a subpoena issued to it over a year ago, and the judge in the related Southern District of New York proceeding recently ruled that Canaccord does not have to respond to the subpoena because discovery should instead proceed in the lawsuit transferred from this Court to the Southern District of New York.  Further, VBF has not discovered all possibly relevant VBF communications in the Founders' possession from their

personal email addresses and text messages, which will be the subject of discovery moving forward.

## VIII.  THE FOUNDERS' FRAUDULENT MISREPRESENTATIONS

401.    Throughout their tenure at VBF, Wulf, Hall, Driver, Ted Rea, and James Rea each made material misrepresentations personally and in concert regarding material matters of VBF's Metrics, technology, operations, and financial matters, in order to obtain and secure use of funds for VBF that they then looted from VBF through misappropriations and misuse for their own benefit.   In this section, VBF will set forth the instances of each Founders' fraudulent misrepresentations, which includes crossover with the Founders' fraudulent concealment of the actual facts that contradicted the facts being misrepresented and establish that the Founders knew these representations to be false or misleading as detailed in Section VII. These fraudulent misrepresentations also each establish breaches of fiduciary duties by each of the Founders.

402.    VBF incorporates all concealment of material facts alleged in Section VII as fraudulent misrepresentations because, by concealing said information and providing contrary information, the Founders were making affirmative misrepresentations about concealed facts.

### A.    September 2014 Marketing Deck (Wulf, Hall, Driver, Ted Rea, and James Rea)

403.    On or about September 15, 2014, Driver created a document entitled VeroBlue Farms Convertible Preferred Offering ("September 2014 Marketing Deck") that contained representations about VBF's operations and financial situation.  A true and correct copy of the September 2014 Marketing Deck is attached as **Exhibit 30**.

404.    The September 2014 Marketing Deck represents that it reflects "management's expectations regarding the future growth, results of operations, performance (both operational and financial) and business prospects and opportunities of VBF" and lists VBF management as Wulf,

Driver, Ted Rea, and James Rea. The September 2014 Marketing Deck also lists Wulf, James Rea, and Hall as VBF board members.

405. On November 2, 2014, Wulf emailed a version of the September 2014 Marketing Deck to John Rea (Ted Rea's son and a VBF employee and/or contractor from September 2, 2014 through March 23, 2017), with a copy to Hall, Driver, Ted Rea, and James Rea showing that all Founders were aware of the September 2014 Marketing Deck and the representations therein.

406. From September 15, 2014 through September 16, 2014, Wulf emailed versions of the September 2014 Marketing Deck to individuals who became actual VBF Canada shareholders on or about September 30, 2014, including but not limited to, Dave Dodgen (with a copy to Ted Rea), Todd Foss, Tim Finucan, Myron Friesen, and Ted Frandson. *See, e.g.,* **Ex. 30**.

407. The September 2014 Marketing Deck contains numerous material misrepresentations relating to VBF's Metrics, management, operations, the OFT, marketing, and financial information, including, but not limited to, the following:

    a.    VBF has a "proven onshore, indoor fish farming platform in Webster City, Iowa." **Ex. 30** at 5. This, however, was false because there was nothing proven about VBF or its predecessor (Iowa's First). For example, as of September 2014, Driver, Ted Rea, James Rea, and Wulf were each aware, through the September 2014 Fitzsimmons Email that the OFT—the technology at the core of VBF's potential success—was deeply flawed. VBF would never succeed without a successful tank system. This OFT Misrepresentation was further discussed in Sections VI(A), VII(A), VII(K). As such, Wulf, Hall, Driver, Ted Rea, and James Rea each knew that VBF's indoor fish farming platform was not "proven." Further, VBF never made any profit, including at the time that this misrepresentation was made, which Wulf, Hall, Driver, Ted Rea, and James Rea each knew. It was a losing proposition from the start, which is likely why none of the Founders invested any of their own money in VBF. This misrepresentation is material because a board member, manager of a business, or shareholder will treat a business and its management differently depending on whether it is "proven."

    b.    VBF's "[o]perations management" is teamed with "aquaculture industry experts" and that there was an aquaculture-experienced "[a]dvisory board" behind VBF. **Ex. 30** at 5. This was also false, and Wulf, Hall, Driver, Ted

Rea, and James Rea each knew it to be false.  In reality, Wulf, Hall, Driver, Ted Rea, and James Rea, as they each knew, had little to no relevant aquaculture experience, and they each ignored expert advice and expert opinions when such advice was provided to them, such as the advice from Dr. Fitzsimmons (a member of this so-called "advisory board") and Dr. Michaels.  *See* Sections VII(A), VII(D). In fact, this alleged "advisory board" appears to have had little to no involvement in VBF, another fact known by Wulf, Hall, Driver, Ted Rea, and James Rea, as they were the ones who would have called on the advisory board.  Indeed, in a December 16, 2016 email that VBF did not discover until after it filed the Second Amended Complaint, Ted Rea, copying Wulf, Hall, and James Rea, admitted to a VBF employee that he and his co-Founders had failed in managing VBF to that point when he acknowledged that "[t]here is no doubt many of the farm issues had been building up, and should have / could have also been avoided with proper oversight."  A true and correct copy of this email is attached hereto as **Exhibit 63.**  It is material whether VBF—an aquaculture farm—is run by management with experience in aquaculture or, alternatively, properly guided by individuals in the aquaculture field as it goes to the proper operation and likelihood of success of the aquaculture venture.  In this case, contrary to the representations, VBF had neither.

c.     VBF had a "[l]ow cost of operations, industry-leading food conversion and superior fish growth rates resulting in extremely strong economics." **Ex. 30** at 5.  This too was false, as VBF's FCR was not "industry leading"; it was abysmal at that time and relevant times thereafter. VBF's growth rates were also abysmal at that time and all relevant times thereafter.  Nor did VBF have "extremely strong economics" at that time or any time thereafter, as it never made a profit and filed for bankruptcy a short time later.  This was further discussed as to the FCR Misrepresentation in Sections VI(B) and as the Financial Misrepresentation in Section VI(E). Wulf, Hall, Driver, Ted Rea, and James Rea each knew at all relevant times that the FCR Misrepresentation and growth rate representations were contrary to VBF's actual performance and metrics as they had first-hand knowledge of such information given their positions at VBF.  *See* Sections VI(B) and VI(C). Further this OFT Misrepresentation was false, which each of the Founders knew.  *See* Sections VI(A), VII(A), VII(K).   These representations are material because these are key metrics to the success and profitability of an aquaculture facility.

d.     Barramundi commands a premium price.  **Ex. 30** at 6.  This was false, as barramundi is commoditized like many other types of fish, and barramundi never had the market demand represented or assumed in any financial forecasts.  Wulf, Hall, Driver, Ted Rea, and James Rea each knew this to be false, based on their knowledge of VBF's actual sales at all times. This representation is material as the key to VBF's success and profitability is the demand for and price of its final product.

e.    Each VBF OFT Tank can produce 20,000 pounds of fish per year and that VBF had the capacity to produce in excess of 4.3 million pounds per year. **Ex. 30** at 6, 27.  This was false, as VBF's actual production was about 73,000 for 2015 (and even less in 2014), about 223,000 pounds in 2016, and about 1,100,000 pounds in 2017, as each of the Founders knew based on VBF's actual data. Wulf, Hall, Driver, Ted Rea, and James Rea each knew that VBF was not achieving such amounts when they made these representations and also knew that VBF could never realistically achieve such numbers. The impact of this representation from a financial perspective is material.  The amount of fish VBF would be able to produce and sell goes to the core of VBF's business projections and profitability.

f.    Barramundi have an FCR on a commercial pallet diet of less than 1:1.  **Ex. 30** at 20.  This FCR Misrepresentation was false, as Wulf, Hall, Driver, Ted Rea, and James Rea each knew, including through the September 2014 Fitzsimmons Email.  *See* Sections VI(B), VII(A).

g.    The landed cost of barramundi fry in Iowa is US $.28 per Fry.  **Ex. 30** at 24.  This was false, as the actual cost of fry (when a fish is out of its egg and able to feed itself) was about $0.40 per fry.   Wulf, Hall, Driver, Ted Rea, and James Rea each knew this based on VBF's own purchases of barramundi fry.  This representation is material because the price at which VBF is able to purchase its fry for goes to the very core of VBF's business projections and profitability.

h.    VBF's OFT had numerous benefits including, a "[v]ery low operating cost as there are no pumps and no need to infuse expensive oxygen," and "high density placement."  Further, the document represents that there is "no need or expense to 'create' oxygen to feed into the water" and that OFT has a continual flow of "clean purified water, eliminating any algae, harmful bacteria, ammonia and nitrates" and the fish leave very little food or fish waste in the water, giving the fish a higher fillet yield and cleaner taste.  **Ex. 30** at 27-28.  This was false and debunked by Dr. Fitzsimmons in September 2014 who stated that "OFT has not developed a good 'scientific' record of removing nitrates, harmful bacteria or off flavors. . . I am not aware of any technical, peer reviewed science to support the claims."  *See* **Ex. 12-A**.  Wulf, Hall, Driver, Ted Rea, and James Rea each knew of Dr. Fitzsimmons's statements and that the OFT could never be as successful as they represented them to be.  This representation is material because the success of VBF's business model was dependent on the OFT.

408.    VBF relied on the misrepresentations contained in the September 2014 Marketing Deck, including through its shareholders Dave Dodgen, Todd Foss, Tim Finucan, Myron Friesen, and Ted Frandson and because, at the time the September 2014 Marketing Deck was created and

distributed, VBF was under the complete control of the Founders and had no Independent Board Members.  The misrepresentations contained in the September 2014 Marketing Deck were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

409.   VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Driver, Ted Rea, and James Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

410.   As a result of VBF's reliance on the misrepresentations contained in the September 2014 Marketing Deck, VBF continued to take in debt and equity investments, continued to expend funds on continued operations and continued to employee Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Driver, Ted Rea, and James Rea each intended when they made these material misrepresentations.  Indeed, in June 2017, VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false.  McCowan reported his suspicions to the Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

411.   Wulf, Hall, Driver, Ted Rea, and James Rea each knowingly and intentionally made the misrepresentations listed in the September 2014 Marketing Deck because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders—lulling them into a false sense that their investments were secure and that VBF was being run properly, and (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others.

412.     Wulf, Hall, Driver, Ted Rea, and James Rea's misrepresentations allowed them to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**B.      2014 to 2015 Performance Data Presentation (Wulf, Hall, Driver, Ted Rea, and James Rea)**

413.     On or about March 26, 2015, Driver authored a document entitled "Opposing Flows Aquaculture Tank System Performance Data November 2014 to April 2015" ("2014 to 2015 Performance Data Presentation") that contained representations about VBF's operations.  A true and correct copy of the 2014 to 2015 Performance Data Presentation is attached as **Exhibit 64**.

414.     The 2014 to 2015 Performance Data Presentation was based on alleged data from Iowa's First and represents that it reflects performance data based on actual "operational data and taking into account conservatism throughout calculations." *Id.*

415.     On April 2, 2015, Driver emailed a version of the 2014 to 2015 Performance Data Presentation to Hall and Wulf.  That day, Hall forwarded that email, including the 2014 to 2015 Performance Data Presentation, to James Rea and Ted Rea, showing that all Founders were aware of the 2014 to 2015 Performance Data Presentation and the representations therein.

416.     On November 5, 2017, Wulf forwarded an email containing the 2014 to 2015 Performance Data Presentation to McCowan (at that time a VBF officer), demonstrating that Wulf continued to make the misrepresentations contained therein even until the date of his termination by VBF.  More importantly, however, the misrepresentations contained in this document are representative of the FCR and Mortality Misrepresentations made by each of the Founders to VBF throughout each of the Founders' tenure at VBF.

417.     The 2014 to 2015 Performance Data Presentation contains several material misrepresentations relating to VBF and VBF's OFT, including, but not limited to, the following:

>          a.      First, this document represents that VBF was achieving an actual FCR of 1.04:1. *Id.* at 6 (the represented FCR in different versions of this document

was 1.03:1 to 1:04:1).  This FCR Misrepresentation was material and false, which Wulf, Hall, Driver, Ted Rea, and James Rea each knew. *See* Sections VI(B), VII(A).

b.   Second, the 2014 to 2015 Performance Data Presentation represented VBF's mortality rate to be zero percent.  *Id.*  This Mortality Misrepresentation was material and false, which Wulf, Hall, Driver, Ted Rea, and James Rea knew. *See* Sections VI(D), VII(C), VII(F)-(H).

418.   VBF relied on the misrepresentations contained in the 2014 to 2015 Performance Data Presentation including through its Independent Officer McCowan.

419.   VBF's reliance was reasonable and justified because those making the misrepresentations consistent with the misrepresentations contained in the 2014 to 2015 Performance Data Representation, Wulf, Hall, Driver, Ted Rea, and James Rea were directors and/or officers of VBF at the time they made the misrepresentations.

420.   As a result of VBF's reliance on the misrepresentations contained in the 2014 to 2015 Performance Data Presentation, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Driver, Ted Rea, and James Rea each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

421.   Wulf, Hall, Driver, Ted Rea, and James Rea each knowingly and intentionally made the misrepresentations listed in the 2014 to 2015 Performance Data Presentation because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of

corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, and (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others.

422.    Wulf, Hall, Driver, Ted Rea, and James Rea' misrepresentations allowed them to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

C.    **May 2015 Valuation (Wulf, Hall, Driver, and Ted Rea)**

423.    On or about May 31, 2015, Wulf authored a document titled "VeroBlue Farms Per-Money Valuation" that contained representations about VBF's financial situation ("May 2015 Valuation").  A true and correct copy of the May 2015 Valuation is attached as **Exhibit 65**.

424.    On May 31, 2015, Wulf emailed the May 2015 Valuation to Hall, various Canaccord employees, including Ginsberg and Goodman, and to NBC.  *Id.*  On June 4, 2015, Wulf emailed a version of the May 2015 Valuation, with a copy to Ted Rea, and Hall, and others, although with slightly different numbers.  On August 20, 2015, Wulf emailed a version of the May 2015 Valuation, copying Hall and Driver, although with slightly different numbers.  Therefore, Wulf, Hall, Driver, and Ted Rea were each aware of May 2015 Valuation and the representations (or similar representations) therein.

425.    Wulf emailed a version of the May 2015 Valuation to third parties and on September 19, 2015, forwarded that email, along with the May 2015 Valuation, to Lyons, a VBF shareholder at the time who later became an Independent Board Member in December 2015. Further, Thelander eventually received a version of the May 2015 Valuation sometime in 2016.

426.    The May 2015 Valuation misrepresented that VBF had a "Pre-Money Valuation" of $33,329,035 at that time.  (Earlier versions contained a similar "Pre-Money Valuation" of $32,523,313 and demonstrated that Canaccord was soliciting up to $25,000,000 in equity investments.) The May 2015 Valuation memorialized that VBF was soliciting $30,000,000 in

"New Cash" at $1.00 per share.  The valuation was material as it was purportedly based in part on data of VBF's then-current operations and finances, and would be a significant valuation for consideration by VBF's shareholders and those who received it and became future VBF Independent Board Members such as Thelander.  This valuation was false.  VBF never made any profit, including at the time that this misrepresentation was made, which Wulf, Hall, Driver, and Ted Rea each knew.

427.    VBF relied on the misrepresentations contained in the May 2015 Valuation, including through its then shareholder and future Independent Board Member Lyons, and Thelander.  The misrepresentations in the May 2015 Valuation were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds (including specifically funds sought through the use of the May 2015 Valuation), and its management.

428.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Driver, and Ted Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

429.    As a result of VBF's reliance on the misrepresentations contained in the May 2015 Valuation, VBF continued to (i) take in debt and equity investments, (ii) expend funds on continued operations, and (iii) employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Driver, and Ted Rea intended when they each made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their

termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

430.    Driver, Ted Rea, Hall, and Wulf each knowingly and intentionally made the misrepresentations listed in the May 2015 Valuation because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders—lulling them into a false sense that their investments were secure and that VBF was being run properly, and (3) ensure that non-insider VBF management and employees did not question their management of VBF to others.

431.    Driver, Ted Rea, Hall and Wulf's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**D.    June 2015 OFA Presentation (Wulf, Hall, Driver, Ted Rea, and James Rea)**

432.    On or about June 5, 2015, Driver authored a document entitled "VeroBlue Farms Opposing Flows Aquaculture's FG-6 Recirculating Tank System" ("June 2015 OFA Presentation") that contained representations about VBF's operations.  A true and correct copy of the June 2015 OFA Presentation is attached as **Exhibit 66**.

433.    On June 5, 2015, Wulf emailed a version of the June 2015 OFA Presentation to James Rea.  The same day, James Rea emailed a version of the June 2015 OFA Presentation, with his review and comments, to Hall, Wulf, and Ted Rea, showing that all Founders were aware of the June 2015 OFA Presentation and the representations therein.

434.    On or about June 5, 2015, Hall uploaded a version of the June 2015 OFA Presentation to the Data Room, to which Alder had access.  Specifically, on or about May 9, 2016, Thelander, a VBF Board Member as of July 2016, and a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, downloaded the folder that

contained the June 2015 OFA Presentation from the Data Room, confirming Alder's receipt of same.

435.     The June 2015 OFA Presentation contains numerous material misrepresentations relating to VBF's Metrics and VBF's OFT, including, but not limited to, the following:

a.     This document represents that the average feed conversion ratio was "1:1 pound of feed per pound of weight gain." **Ex. 66** at p. 4. This FCR Misrepresentation was material and false, which Wulf, Hall, Driver, Ted Rea, and James Rea each knew. *See* Sections VI(B), VII(A).

b.     The June 2015 OFA Presentation represented that VBF Tanks were stocking "16,000 fingerlings (40-60 gram) per pod every two months" (**Ex. 66** at p. 4) and that VBF's stocking density was "1:1 pound of fish per gallon of water." This Density Misrepresentation was material and false, which Wulf, Hall, Driver, Ted Rea, and James Rea each knew. *See* Sections VI(C), VII(C), VII(G), VII(I). For example, actual VBF data available to the Founders at all relevant times showed that, at best, VBF was starting with 10,000 fingerlings (and frequently less) in its Tanks, almost 40% less than the 16,000 represented. Yet Wulf, Hall, Driver, Ted Rea, and James Rea continued to over-exaggerate actual Density data that they knew was false. *See* Sections VIII(F)-(I), VIII(M), VIII(O)-(Q), VIII(U)-(AA).

c.     The June 2015 OFA Presentation represented that the OFT was the "Highest Quality RSA Aquaculture System on the Market," a "complete turn-key modular system" with "minimal operating costs," that it used "[b]lowers," instead of pumps, was "low maintenance," had "extremely low" "electricity costs," and is "[e]xtremely [e]conomical to [o]perate." **Ex. 66** at p. 2. This document also represents utility operating costs of 1.3 KW and the "lowest water consumption." *Id.* at p. 4. This document also provided a "Water Recirculating System Mapping" flow chart outlining the water cycle process." *Id.* at p. 5. This OFT Misrepresentation was material and false, which Wulf, Hall, Driver, Ted Rea, and James Rea knew, including through the September 2014 Fitzsimmons Email and June 2015 Michaels Email. *See* Sections VI(A), VII(A), VII(D), VII(E), VII(K).

436.     VBF, relied on the misrepresentations contained in the June 2015 OFA Presentation, including through, Thelander, a VBF Board Member as of July 2016, a representative of Alder who also became a VBF shareholder in July 2016, and a VBF shareholder individually. The misrepresentations in the June 2015 OFA Presentation were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds.

437.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Driver, Ted Rea, and James Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

438.    As a result of VBF's reliance on the misrepresentations contained in the June 2015 OFA Presentation, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Driver, Ted Rea, and James Rea each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

439.    Wulf, Hall, Driver, Ted Rea, and James Rea each knowingly and intentionally made the misrepresentations listed in the June 2015 OFA Presentation because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders—lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince Independent Board Members that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

440.    Wulf, Hall, Driver, Ted Rea, and James Rea's misrepresentations allowed them to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

### E.      The Forged FTAI Reports (Wulf, Hall, Driver, Ted Rea, and James Rea)

441.    In Section VII(E) above, VBF addresses how the true contents of the Pre-Forgery FTAI Reports were concealed from Thelander, Alder, Lockard, FishDish, all Independent Board Members, Independent Officers, and VBF shareholders not affiliated with the Founders, all of whom should have been advised by the Founders of the true contents of the Pre-Forgery FTAI Reports, at all times throughout the Founders' tenure at VBF.

442.    However, the Forged FTAI Reports also include fraudulent misrepresentations generated by Wulf's forgery that was also, upon information and belief, known to Hall, Driver, Ted Rea, and James Rea. Alternatively, Hall, Driver, Ted Rea, and James Rea each facilitated Wulf's forgery and the passing off of the Forged FTAI Reports to third parties. *See* Section VII(E) The misrepresentations included in the Forged FTAI Reports are addressed in this section.

443.    By creating and circulating (or knowingly allowing the creation and circulation of) the Forged FTAI Marketing Report, which deleted facts developed by FTAI that were negative to VBF's marketing, sales, quality control, and other functions, as summarized by Curtis in his June 30, 2015 email, Wulf, Hall, Driver, Ted Rea, and James Rea made representations contrary to the Pre-Forgery FTAI Marketing Report and Curtis's warning in his June 30, 2015 email to Wulf regarding the extremely negative feedback about VBF contained in the FTAI Pre-Forgery Marketing Report. *See* **Exhibit 19-A**.   Instead, Wulf, Hall, Driver, Ted Rea, and James Rea misrepresented to the recipients of the report, including all those with access to the Data Room, and specifically Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually and Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016, and Alder and FishDish, who become shareholders, that FTAI had not found such material

and negative facts about VBF and also misrepresented that the Forged FTAI Marketing Report was the complete work product and opinions of a third-party consultant. *See* Section VII(E)(ii).

444.    By creating and circulating (or knowingly allowing the creation and circulation of) the Forged FTAI Technical Report, which altered facts developed by FTAI that were materially negative to VBF's operations and OFT technology and altered opinions of FTAI related to VBF's OFT, Wulf made representations contrary to the Pre-Forgery FTAI Technical Report.  Wulf, by altering the FTAI Technical Report, misrepresented to the recipients of the report, including all those with access to the Data Room, and specifically Thelander (who became a VBF shareholder) and Lockard, who became Independent Board Members, and Alder and FishDish, who became shareholders, that FTAI had not found such negative facts about VBF and also misrepresented that the Forged FTAI Technical Report was the complete work product and opinions of a third-party consultant. *See* Section VII(E)(iii).

445.    VBF relied on the misrepresentations contained in the Forged FTAI Reports, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, and Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016. The misrepresentations in the Forged FTAI Reports were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

446.    VBF's reliance was reasonable and justified because Wulf, Hall, Driver, Ted Rea, and James Rea were directors and/or officers of VBF at the time that they made the misrepresentations.

447.    As a result of VBF's reliance on the misrepresentations contained in the Forged FTAI Reports, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf intended when he made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

448.    Wulf, Hall, Driver, Ted Rea, and James Rea each knowingly and intentionally made the misrepresentations listed in the FTAI Marketing Report because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince VBF's Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

449.    Wulf, Hall, Driver, Ted Rea, and James Rea's misrepresentations allowed them to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

F.    **August and October 2015 Marketing Decks (Fall 2015 Marketing Decks) (Wulf, Hall, Driver, Ted Rea, and James Rea)**

450.    On or about August 22, 2015, Wulf authored a document entitled "Onshore – Indoor Aquaculture Opportunity Equity Financing Marketing Presentation," which was eventually

dated August 23, 2015 ("August 2015 Marketing Deck") and October 1, 2015 ("October 2015 Marketing Deck" and collectively the "Fall 2015 Marketing Decks") that contained representations about VBF's operations and financial situation. The August 2015 and October 2015 Marketing Decks appear to be different versions of the same document.  The misrepresentations alleged below were the same in both documents, as were all other versions of same referenced in this section, with the exception an earlier version of this document represented that tank sales "could be $5M a year in EBIDIT [sic]."

451.    Further, Hall, Driver, Ted Rea, and James Rea also knew of and had input into the Fall 2015 Marketing Decks. The Fall 2015 Marketing Decks, by their terms, reflect "management's expectations regarding the future growth, results of operations, performance (both operational and financial) and business prospects and opportunities of VBF" (*id.* at p. 3) and lists VBF management as Wulf, Driver, Hall, Ted Rea, and James Rea.  The Fall 2015 Marketing Decks also lists Wulf, James Rea, and Hall as VBF board members.

452.    On September 30, 2015, Wulf emailed a version of the Fall 2015 Marketing Decks to Ted Rea.

453.    On October 14, 2015, Wulf emailed a version of the Fall 2015 Marketing Decks to a third party, with a copy to Hall, Driver, Bruffy, and others.

454.    On October 20, 2015, Laura Miller, Lockard's sister-in-law, emailed a version of the Fall 2015 Marketing Decks to Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016, after Miller received it from Jason Trainor (of NBC, also retained by VBF to solicit investments on VBF's behalf).

455.    The Fall 2015 Marketing Decks contains numerous material misrepresentations relating to VBF's Metrics, VBF, VBF's management, VBF's OFT, marketing, and financial information, including, but not limited to, the following:

a.    that VBF had an "existing, proven, onshore, indoor fish farming platform." **Exhibits 31 & 32**, p. 4).  This was material and false when it was made in the September 2014 Marketing Deck (*see* Section VIII(A)) and continued to be material and false in the Fall 2015 Marketing Decks.  Further, at this time Wulf, Hall, Driver, Ted Rea, and James Rea were also aware of the June 2015 Michaels Email (*see* Section (VII(D)) and July 2015 FTAI Reports, which Wulf had altered (*see* Section VII(E)).

b.    that VBF had the "lowest cost of operations, industry-leading food conversion of 1:1, superior fish growth rates of market ready fish in 6 months" (**Exhibits 31 & 32,**, p. 4) and a "strong fish growth performance and industry low food conversion ratio of 1:1 in the OFA tank system." **Exhibits 31 & 32**, p. 6. This was material and false when it was made in the September 2014 Marketing Deck (*see* Section VIII(A)) and continued to be material and false in the Fall 2015 Marketing Decks.  Further, at this time Wulf, Hall, Driver, Ted Rea, and James Rea were also aware of the September 2014 Fitzsimmons Email (*see* Section VII(A)), the June 2015 Michaels Email (*see* Section (VII(D)) and July 2015 FTAI Reports, which Wulf had altered (*see* Section VII(E)).  This was further discussed as the FCR Misrepresentation in Section VI(B) and as the OFT Misrepresentation in Sections VI(A) and VI(K).

c.    that "in a six tank modular pod, VBF has modeled stocking with 10,000 fish.  However, VBF has successfully been stocking a six tank pod with 16,000 fish or a 60% increase, representing $11M in additional EBIDTA" (**Exhibit** 31 & **Exhibit 32**, p. 11. This Density Misrepresentation was material and false, which Wulf, Hall, Driver, Ted Rea, and James Rea knew. Sections VI(C), VII(C), VII(G), VII(I). For example, actual VBF data available to the Founders at all relevant times showed that, at best, VBF was starting with 10,000 fingerlings. *Id.*

d.    that VBF had increased to "840,000 pounds of production and a 57% increase" (**Exhibit** 31 & **Exhibit 32,** p. 6) and that there was an "[e]xpansion of Iowa's First proven platform to 240 tanks and 4.8 M pounds of fish." **Exhibit 31 & Exhibit 32**, p. 8. This too was false. Wulf, Hall, Driver, Ted Rea, and James Rea knew that VBF was not achieving such amounts when they made these representations and also knew that VBF could never realistically achieve such numbers. In reality, VBF's actual production was about 73,000 for 2015, which Wulf, Hall, Driver, Ted Rea, and James Rea knew based on VBF's actual data. Indeed, total production from VBF's inception as of October 1, 2015 was only about

134

183,000 pounds. The impact of this representation from a financial perspective is material. How many fish VBF would be able to produce and sell goes to the core of VBF's business projections and profitability. This was further discussed as the Density Misrepresentation in Sections VI(C), VII(C), VII(I).

e.     that VBF's OFT has a continual flow of "clean, purified water, eliminating any algae, harmful bacteria, ammonia and nitrates," (**Exhibit 31** &; **Exhibit 32**, p. 31), and has lowered VBF's operating costs in part by using blowers and not pumps (**Exhibit 31** & **Exhibit 32,** p. 30), has a "[v]ery low utility operating costs of 1.3 KW (US$0.11) per pound – by using blowers, not water pumps" and "[n]o need to infuse expensive oxygen into the water as the entire system operates on forced air" and "high density placement." **Exhibit 31** & **Exhibit 32,** p. 30 (same but noting "US$0.15" instead). Further, the decks represent that there was "no need or expense to 'create' oxygen and infuse into the water." *Id.* Similarly, the Fall 2015 Marketing Decks contained a Water Recirculating System Chart. **Exhibit 31**, p. 27; **Exhibit 32**, p. 27. This misrepresentation was false in the 2014 September Marketing Deck (*see* Section VII(A)) and continued to be false here. This OFT Misrepresentation was further discussed in Sections VI(A), VII(A), VII(D), VII(K), including through the September 2014 Fitzsimmons Email and the June 2015 Michaels Email.

f.     that "there is a 500M pound white fish shortage in North America" (**Exhibit 31** & **Exhibit 32,** p. 4) and that "[m]arket risks have been mitigated. VBF has identified definite market demand for the first 15M pounds of Barramundi." **Exhibit 31 & Exhibit 32,** p. 6. This is false, as barramundi is commoditized like many other types of fish, and barramundi never had the market demand represented or assumed in any financial forecasts. Wulf, Hall, Driver, Ted Rea, and James Rea, knew this to be false, based on their knowledge of VBF's actual sales at all times, and through the Pre-Forgery FTAI Marketing Report and Curtis's June 30, 2015 email. *See* Section VII(E)(ii). There was no such demand nor had VBF identified any market demand for the first 15 million pounds of barramundi. Indeed, the largest barramundi seller as far as VBF knows has sold, at relevant times, only 6,000 pounds per week. This representation was material as the key to VBF's success and profitability is whether there is a demand for its final product.

g.     that VBF had a "proven and seasoned management team" teamed with an expert advisory board. **Exhibit 31** & **Exhibit 32,** p. 5, 52-56. This was false and material when made in the September 2014 Marketing Deck and continued to be false here. *See* Section VIII(A).

h.     that "the [VBF's] operation has been successfully producing fish for three (3) years and has validated all the operating parameters and performance data for VBF commercialization of the operation." **Exhibit 31** & **Exhibit**

**32,** p. 28.  This representation was false.   Wulf, Hall, Driver, James Rea, and Ted Rea knew that VBF was not meeting previous projections and the actual data did not support these representations. This was further discussed as the Density Misrepresentation (*see* Sections VI(C), VII(C)), the FCR Misrepresentation (*see* Sections VI(B)), the Mortality Misrepresentation (*see* Section VI(D), VII(C)), the OFT Misrepresentation (*see* Section VI(A), VII(K)) and through the September 2014 Fitzsimmons Email (*see* Section VII(A)), the June 2015 Michaels Email (*see* Section VII(D)), and the FTAI Reports (*see* Section VII(E)). This representation is material as it gives the impression that VBF and its technology was successful when it was really a disastrous failure.

i. The Fall 2015 Marketing Decks represented that VBF was operating with 45% gross margins (**Exhibit 31** & **Exhibit 32,** p. 5) and that VBF would achieve $1.59 EBITDA/pound and 20,000 pounds per Tank/year for $7.632 million in EBITDA if VBF had 240 Tanks, which it did (**Exhibit 31** & **Exhibit 32,** p. 13).   These material financial representation were false, which each of the Founders knew as discussed as the Density Misrepresentation (*see* Sections VI(C), VII(C)) and in the Financial Misrepresentation (*see* Section VI(E), VII(A), VII(C)).

456.    VBF relied on the misrepresentations contained in the Fall 2015 Marketing Decks, including through its through Lockard a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016, and VBF Independent Officer Jim Bruffy. The misrepresentations in the Fall 2015 Marketing Decks were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds.

457.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Driver, James Rea, and Ted Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

458.    As a result of VBF's reliance on the misrepresentations contained in the Fall 2015 Marketing Decks, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Driver, and Ted Rea each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who,

later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

459.    Each of the Founders knowingly and intentionally made the misrepresentations listed in the Fall 2015 Marketing Decks because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

460.    Wulf, Hall, Driver, Ted Rea, and James Rea's misrepresentations allowed them to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

G.    **November 2015 Operational Data Presentation (Wulf, Hall, Driver, and Ted Rea)**

461.    On or about November 5, 2015, Wulf emailed a document entitled "VeroBlue Farms Operational Data" ("November 2015 Operational Data Presentation") to a third party, with a copy to Hall and Driver, noting that Driver had added another slide to the document. The November 2015 Operational Data Presentation contained representations about VBF's operations and financial situation.

462.    On November 29, 2016, Wulf emailed a version of the November 2015 Operational Data Presentation to Ted Rea, showing that Wulf, Hall, Driver, and Ted Rea had input into or at

least were aware of the November 2015 Operational Data Presentation and the representations therein.

463.    On or about December 9, 2015, Hall uploaded a version of the November 2015 Operational Data Presentation to the Data Room, to which Alder had access, Specifically, on or about May 9, 2016, Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, downloaded the folder that contained this document from the Data Room, confirming Alder's receipt of same. A true and correct copy of the November 2015 Operational Data Presentation is attached hereto as **Exhibit 67**.

464.    The November 2015 Operational Data Presentation contains numerous material misrepresentations relating to VBF's Metrics and VBF's OFT, including, but not limited to, the following:

      a.     that data from VBF's internal software system supported an FCR of "1:03:1 or lower." **Ex. 67** at 2. This FCR Misrepresentation was material and false, which Wulf, Ted Rea, Hall, and Driver knew.  *See* Sections VI(B), VII(A).

      b.     that data from VBF's internal software system supported a Density "originally with 10,000 fish per tank, but VBF had validated stocking up to 16,000 fish per tank, a 60% increase." **Ex. 67** at 2.  This Density Misrepresentation was material and false, which Wulf, Ted Rea, Hall, and Driver knew.  *See* Sections VI(C), VII(C).

465.    VBF relied on the misrepresentations contained in the November 2015 Operational Data Presentation, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and an individual VBF shareholder. The misrepresentations in the November 2015 Operational Data Presentation were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

466.     VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Driver, and Ted Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

467.     As a result of VBF's reliance on the misrepresentations contained in the November 2015 Operational Data, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Driver, and Ted Rea each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

468.     Driver, Ted Rea, Hall and Wulf each knowingly and intentionally made the misrepresentations listed in the November 2015 Operational Data because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

469.    Driver, Ted Rea, Hall and Wulf's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**H.    January 2016 Executive Summary and January 2016 Marketing Deck (Wulf, Hall, Driver, and Ted Rea)**

470.    On or about February 23, 2016, a document entitled "VeroBlue Farms Inc. – Executive Summary and dated January 2016" ("January 2016 Executive Summary") was created.

471.    On or about April 12, 2016, a document entitled Aquaculture Opportunity Equity Financing and dated January 1, 2016 ("January 2016 Marketing Deck") was created.

472.    The January 2016 Executive Summary and January 2016 Marketing Deck contained representations about VBF's operations and financial situation.  *See* **Ex. 33**, January 2016 Marketing Deck; *see* also **Ex. 34**, January 2016 Executive Summary.

473.    On December 17, 2015, Wulf emailed a version of the January 2016 Executive Summary and January 2016 Marketing Deck to a third party, copying Driver and Hall. On January 21, 2016, Wulf emailed a version of the January 2016 Executive Summary and January 2016 Marketing Deck to a third party, copying Ted Rea and Hall.  Therefore, Wulf, Hall, Driver, and Ted Rea were involved in and aware of the January 2016 Executive Summary and January 2016 Marketing Deck and the representations contained therein.

474.    On December 18, 2015, Wulf emailed a version of the January 2016 Executive Summary and January 2016 Marketing Deck to Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016, with a copy to Robert Smith, a future VBF shareholder through FishDish, and Hall.

475.    On January 1, January 6, and February 1, 2016, Wulf forwarded versions of the January 2016 Executive Summary and January 2016 Marketing Deck to Lockard, who in turn

forwarded to FishDish investors Brian Bouck, Kevin Harberts, Wade Arnold, Kathy McCoy, Mark Bawden, Chris Nelson, and Sam Buser on or about February 23, 2016. Eventually, the January 2016 Marketing Deck was included as an exhibit to FishDish's operating agreement, which was signed by all FishDish members, which includes those named above and also FishDish members Chris Nelson, Robert Smith, Mark Bawden, Dan Simmons, Doug Reichard, Penaluna, John Walker, Misty Clary, Amy Lockard, J. McCoy, Mel Martin, Daniel Lee Simmons, Kathy McCoy, and Chris Rausch.

476. On April 12, 2016, Hall uploaded the January 2016 Executive Summary and January 2016 Marketing Deck to the Data Room to which Alder had access, confirming Alder's receipt of same. *See* **Exs. 33 & 34**.

477. The January 2016 Executive Summary and January 2016 Marketing Deck, which were often circulated together, contain numerous material misrepresentations relating to VBF, VBF's Metrics, VBF's management, VBF's operations, VBF's OFT, marketing, and financial information, including, but not limited to, the following:

a.   VBF's "Model assumes 12,000 fish per tank (currently stocking 16,000 fish per tank) or equivalent of ~$8 million of potential incremental annual EBITDA." **Ex. 34** at 2. Similarly, the January 2016 Marketing Deck represents that "in a six tank modular pod, VBF has modeled stocking with 12,000 fish. However, VBF has successfully been stocking a six tank pod with 16,000 fish or a 34% increase over the model stocking." **Ex. 33** at 15. This Density Misrepresentation was material and false, which Wulf, Ted Rea, Hall, and Driver each knew. *See* Sections VI(C), VII(C).

b.   VBF would achieve an estimated rate of return of 36% and 72% for investors by the end of year 2 and year 3, respectively and projects "EBITDA growing to $18 million in year 2 and $37 million in year 3." **Ex. 34** at 1. This Financial Misrepresentation was material and false, which Wulf, Ted Rea, Hall, and Driver each knew. *See* Sections VI(E), VII(A), VII(C).

c.   One of VBF's facilities had been "successfully growing Barramundi…since 2012." **Ex. 34** at 1. Further, the January 2016 Marketing Deck represents "the [o]peration has been successfully producing fish for three (3) years and

has validated all the operating parameters and performance data for VBF commercialization of the operation." **Ex. 33 at** 34. This representation was material and false when each of the Founders made it in the Fall 2015 Marketing Decks (*see* Section VIII(F)) and continued to be false in the January 2016 Marketing Deck and January 2016 Executive Summary, as evidenced by the fact that VBF was not actually attaining a profit and not attaining the Metric statistics represented by the Founders.

d.    "VBF Insiders have invested $8 million in new capital into the Company in over last year.[3]" *Id.* (emphasis in original). This was material and false. Ted Rea, Hall, Wulf, and Driver knew that neither they, nor James Rea, had invested any capital in VBF. This representation is material as it gives the impression that Ted Rea, Hall, Wulf, Driver, and James Rea had "skin in the game" and enough faith in VBF's potential to invest $8 million dollars of their own money, when in fact, they did not.

e.    "VBF has an established client base of current customers and robust demand (annualized expected product of approximate 3 million pounds at the end of the first year vs. over 500 million pounds of high quality fish consumed per year in US)." **Ex. 34** at 1. This is false, as barramundi is commoditized like many other types of fish, and barramundi never had the market demand represented or assumed in any financial forecasts. Wulf, Hall, Driver, and Ted Rea each knew this to be false, based on their knowledge of VBF's actual sales at all times and through the FTAI Report and Curtis's June 30, 2015 email regarding the same. *See* Section VII(E). This representation is material as the key to VBF's success and profitability is whether there is a demand for its final product.

f.    The January 2016 Executive Summary represents that "VBF has exclusive rights to the patented fish culturing OF tank system," which had been validated by "[d]ue diligence." **Ex. 34** at 1-2 (emphasis in original). This OFT Misrepresentation was material and false, which Wulf, Hall, Ted Rea, and Driver knew. *See* Sections VI(A), VII(A), VI(D), VII(E), VII(K).

g.    VBF's OFT allowed "VBF to have the lowest cost of operations, industry leading feed conversion ratio of 1:1, and superior growth rates (market ready fish in 6 months). **Ex. 34** at 1-2; **Ex. 33** at 6, 8. This representation was material and false, when Wulf, Hall, Driver, Ted Rea, and James Rea each made it in the September 2014 Marketing Deck (*see* Section VIII(A)) and the Fall 2015 Marketing Decks (*see* Section VIII(F)) and continued to be false in the January 2016 Executive Summary and January 2016 Marketing Deck, at which point Wulf, Hall, Driver, Ted Rea, and James Rea also were aware of the June 2015 Michaels Email (*see* Section VII(D)), which noted that companies had gone bankrupt on similar systems, and

---

[3] Prior versions of this document circulated represented that insiders only invested $6 million.

through the July 2015 FTAI Reports (*see* Section VII(E)), which Wulf altered.

h.   VBF had an FCR of 1:1.   **Ex. 34** at 2; **Ex. 33** at 6.   This FCR Misrepresentation was material and false, which Wulf, Ted Rea, Hall, and Driver each knew. *See* Sections VI(B), VII(A).

i.   VBF has a "proven onshore/indoor fish farming platform in Webster City, Iowa." **Ex. 34** at 1; **Ex. 33 at 6**.   This material misrepresentation was false when Wulf, Hall, Driver, Ted Rea, and James Rea each made it in the September 2014 Marketing Deck (*see* Section VIII(A)), and continued to be false in the January 2016 Executive Summary and January 2016 Marketing Deck, at which point Wulf, Hall, Driver, Ted Rea, and James Rea also were each aware of the June 2015 Michaels Email (*see* Section VII(D)), which noted that companies had gone bankrupt on similar systems, and through the July 2015 FTAI Reports (*see* Section VII(E)), which Wulf altered.

j.   VBF has a "proven and seasoned management team," teamed with an expert advisory board." **Ex. 33** at 8, 57-61.   This representation was material and false when Wulf, Hall, Driver, Ted Rea, and James Rea each made in the September 2014 Marketing Deck (*see* Section VIII(A)) and in the Fall 2015 Marketing Decks (*see* Section VIII(F)) and continued to be false in the January 2016 Executive Summary and January 2016 Marketing Deck.

k.   VBF's OFT has numerous benefits including, a "[v]ery low utility operating costs of 1.3 KW (US$0.15) per pound – by using blowers, not water pumps" and "[n]o need to infuse expensive oxygen into the water as the entire system operates on forced air" and "high density placement."   Further, there "no need or expense to 'create' oxygen to infuse into the water" and that OFT has a continual flow of "clean, purified water, eliminating any algae, harmful bacteria, ammonia and nitrates" and "the fish leav[e] very little food or fish waste in the water, giving the fish a higher fillet yield and cleaner taste as compared to fish grown in the wild."   **Ex. 33** at 35-36. Further that VBF's OFT used substantially less water, is "environmentally sustainable and extremely efficient," and that VBF's OFT allows for high density growth.   *Id.* at 32, 35.   This representation was material and false in the September 2014 Marketing Deck (*see* Section VIII(A)), the Fall 2015 Marketing Decks (*see* Section VIII(F)) and continued to be material and false here.   This OFT Misrepresentation was further discussed in Sections VI(A), VII(A), VI(D), VII(E), and VII(K), including through the September 2014 Fitzsimmons email and the June 2015 Michaels Email.

l.   "[T]here is a 500M pound white fish shortage in North America" (**Ex. 33** at 6) and that "[m]arket risks have been mitigated.   VBF has identified definite market demand for the first 15M pounds of Barramundi."   **Ex. 33** at 9.   This representation was material and false when each of the Founders

made it in the Fall 2015 Marketing Decks (*see* Section VIII(F)), and continued to be false in the January 2016 Executive Summary and January 2016 Marketing Deck.

m.     "The debt providers, in addition to their own due diligence, commissioned third party reports to validate the operating plan, Opposing Flows Tank system and the scale up risk of the Urban Farm and operation as it goes from the existing 42 tanks to 282 tanks.  The due diligence validated that there is no technology risk in the tank system or scale up risk. . ."  **Ex. 33** at 8.  This representation was material and false as the "commissioned third party reports" referred to the Forged FTAI Reports. *See* Section VII(E). This OFT Misrepresentation was further discussed in Sections VI(A), VII(A), VI(D), VII(E), and VII(K), including through the September 2014 Fitzsimmons email and the June 2015 Michaels Email.

n.     VBF was operating with 45% gross margins. **Ex. 33** at 8.  This Financial Misrepresentation was material and false, which Wulf, Ted Rea, Hall, and Driver each knew. *See* Sections VI(E), VII(A), VII(C).

o.     VBF had increased its Tanks in the past year from 18 to 42 tanks, representing "940,000 pounds of production and a 57% increase." **Ex. 33** at 9.  This representation was material and false in the 2015 Fall Marketing Deck (*see* Section VIII(F)), when each of the Founders represented that VBF had increased to 840,000 pounds of production and a 57% increase," and this even more inflated number is material and false in the January 2016 Marketing Deck.

478.     VBF relied on the misrepresentations contained in the January 2016 Executive Summary and January 2016 Marketing Deck, including through Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016, FishDish members Chris Nelson, Brian Bouck, Kevin Harberts, Wade Arnold, and Sam Buser, Robert Smith, Mark Bawden, Dan Simmons, Doug Reichard, Penaluna, John Walker, Misty Clary, Amy Lockard, J. McCoy, Mel Martin, Daniel Lee Simmons, Kathy McCoy, and Chris Rausch (as representative of FishDish member Lockard Industries), and Alder (through its counsel Ron Levin). The misrepresentations in the January 2016 Executive Summary and January 2016 Marketing Deck were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

479.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Driver, and Ted Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

480.    As a result of VBF's reliance on the misrepresentations contained in the January 2016 Executive Summary and January 2016 Marketing Deck, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Driver, and Ted Rea each intended when they made these material misrepresentations. Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

481.    Driver, Ted Rea, Hall and Wulf each knowingly and intentionally made the misrepresentations listed in the January 2016 Executive Summary and January 2016 Marketing Deck because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

482.     Wulf, Hall, Driver, and Ted Rea's misrepresentations allowed Wulf, Hall, Driver,

Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF

assets and resources.

### I.     Water Recirculating Flow Details, Single Tank Workup, and Answer to Questions, Documents (Wulf)

483.     On February 2, 2016, Wulf emailed three attachments, entitled "Water

Recirculating Flow and Details" (created February 2, 2016), "Single Tank Workup" (created

January 21, 2016 by Wulf) and "Answer to Questions" (created February 1, 2016 and modified

February 2, 2016) to Lockard, a VBF Board Member as of June 2016 and a manager of FishDish

who became a VBF shareholder in July 2016, and FishDish member Penaluna, copying Hall and

Driver.  *See* **Exhibit 27 A-D**.

484.     Through his February 1, 2016 email, and the attachments thereto, Wulf, with the

full knowledge of Hall and Driver, made the following material misrepresentations relating to

VBF's Metrics, VBF's OFT, and financial information:

> a.     The Single Tank Workup represents that VBF has FCR of 1:1.  **Exhibit 27-C.** Wulf, copying Hall and Driver, made similar misrepresentations in the Answers to Questions document, in which he represented that VBF had "strong fish growth performance and an industry low feed conversion ratio of 1:1 in the OFA tank system," which Wulf said was represented in "all the materials provided" to these shareholders, and that VBF's 1:1 FCR was "at the top of the industry."  **Exhibit 27-D**, p. 4.  This FCR Misrepresentation was material and false, which Wulf, Hall, and Driver each knew. *See* Section VI(B) and VII(A).

> b.     The Single Tank Workup represents that VBF could successfully grow 32,812 pounds of fish per tank, per year, at a profit of $76,965 per tank per year.  **Exhibit 27-C**.  This Density Misrepresentation and Financial Misrepresentation were material and false, which Wulf, Hall, and Driver each knew.  *See* Sections VI(C), VI(E), VII(A), VII(C).

> c.     As to financial issues, the Single Tank Workup represents that VBF had achieved gross margins of 45%, and that in the next four years VBF would achieve annual gross margins of $18,369,501 to $52,493,503.  **Exhibit 27-**

**C.** This Financial Misrepresentation was material and false, which Wulf, Hall, and Driver each knew. *See* Sections VI(E), VII(A), VII(C).

d.   The Answers to Questions document represents that VBF's OFT was superior technology ("we have not located any other tank system or process that rivals the OFA system…As a result, we have a significant economic and operation [*sic*] advantage over other systems). **Exhibit 27-D**, p. 2**.** This OFT Misrepresentation was material and false, which Wulf, Hall, and Driver each knew. *See* Sections VI(A), VII(A), VI(D), VII(E), VII(K).

e.   The Answers to Questions document represents that VBF's water supply would be sourced by the Jordan Aquifer, which Wulf represented would supply VBF with "30 consecutive years" of water. **Exhibit 27-D**, p. 2. This was false, and Wulf, Hall, and Driver each knew it to be false because they knew that VBF had not solidified any right to use the Jordan Aquifer and never did so. This representation is material because where an aquaculture farm sources its water and how long that source will provide water impacts the profitability and success of the farm. This is especially true for VBF, as most of its facilities were landlocked and not close to abundant natural water supplies. The Jordan Aquifer was closer in proximity to VBF's Iowa locations and had far superior water quality and availability than the next closest aquifer, the Mississippian. Ultimately, VBF was forced to use water from the City of Webster City's wells, which was not as abundant of a water supply, and not as natural.

f.   The Answers to Questions document represents that VBF had no issues disposing of fish feces so that it would not harm its fish's health ("There is very little feces as stated above…). **Exhibit 27-D**, p. 5**.** This was false, and Wulf, Hall, and Driver each knew this statement to be false at the time, based on actual data available to them, including VBF's high Mortality Rates, caused in part by VBF's failure to protect its fish from feces. *See* Sections VI(D), VII(C), VII(F), VII(H). This representation is material as an aquaculture farm's ability to dispose of fish feces safety impacts the profitability and success of the farm.

485.   VBF relied on the misrepresentations contained in the Water Recirculating Flow and Details, Single Tank Workup, and Answer to Questions documents, including through Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016, and Penaluna, a FishDish shareholder. The misrepresentations in the Water Recirculating Flow and Details, Single Tank Workup, and Answer to Questions documents were material to VBF's decisions regarding continued operations, intake and expenditure of VBF

corporate funds (including specifically funds sought through the use of the May 2015 Valuation), and its management.

486.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, and Driver, were directors and/or officers of VBF at the time they made the misrepresentations.

487.    As a result of VBF's reliance on the misrepresentations contained in the Water Recirculating Flow and Details, Single Tank Workup, and Answer to Questions documents, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, and Driver each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

488.    Driver, Hall and Wulf each knowingly and intentionally made the misrepresentations listed in the Water Recirculating Flow and Details, Single Tank Workup, and Answer to Questions documents because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members

and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

489.    Wulf, Hall, and Driver's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

### J.    February 19, 2016 Wulf Email (Wulf)

490.    In a February 19, 2016 email forwarded by Wulf to Lockard, Wulf made further misrepresentations to Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016.  A true and correct copy of Wulf's February 19, 2016 email is attached as **Exhibit 68**.

491.    Wulf, through his February 19, 2016 email, made the following material misrepresentations to Lockard relating to VBF's Metrics, its management, VBF's OFT, and financial information:

> a.    that "[t]he existing aquaculture platform has been operating for 4 years and during the last year that the VBF group has been in control, there is a 46% operating margin."  This Financial Misrepresentation was material and false, which Wulf knew.  *See* Section VI(E), VII(A), VII(C).

> b.    that Generation confirmed that there was "no scale up risk" to VBF, likely a reference to VBF's expansion to more Tanks (and therefore, VBF's representations of performance as to existing Tanks were represented by Wulf to be replicated as VBF expanded).  Similarly, Wulf represented the superiority of the OFT in this email ("VBF would not be in the Aquaculture space…if it had not discovered the proprietary and patented OFA tank system and process-http://opposingflowsaquaculture.com").  This OFT Misrepresentation was material and false, which Wulf knew.  *See* Sections VI(A), VII(A), VI(D), VII(E), VII(K).  If VBF could not successfully "scale up," which it could not with the faulty OFT, it would not reach its projected production numbers. Further, Generation made no such findings and indeed, FTAI had negative findings relating to the OFT that Wulf had in his possession at this time. *See* Section VII(E).

> c.    that Generation "vetted the VBF management team backgrounds and are confident that they can handle the scheduled rollout of the VBF aquaculture

operations." This was false and Wulf knew it to be false. In reality, the Founders, as Wulf knew, had little to no relevant aquaculture experience and they shunned advice from experts when such advice was provided to them, such as the advice from Dr. Fitzsimmons (a member of this so-called "advisory board") (*see* Section VII(A)), Dr. Michaels (*see* Section VII(D), and FTAI (*see* Section VII(E)). Further, Generation had not made any such finding, as Wulf knew (*see* Section VII(E)). Further, this representation is material because whether VBF—an aquaculture farm—is run by management with experience in aquaculture or, alternatively, properly guided by individuals in the aquaculture field goes to the proper operation and likelihood of success of the aquaculture venture.

492.    VBF relied on the misrepresentations contained in the February 19, 2016 email, including through Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016. The misrepresentations in the February 19, 2016 email were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

493.    VBF's reliance was reasonable and justified because Wulf was a director and/or officer of VBF at the time he made the misrepresentations.

494.    As a result of VBF's reliance on the misrepresentations contained in the February 19, 2016 email, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf intended when he made these material misrepresentations. Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

495.    Wulf knowingly and intentionally made the misrepresentations listed in the February 19, 2016 email because he knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question their management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

496.    Wulf's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

### K.    March 18, 2016 Wulf Email (Wulf)

497.    On March 8, 2016, Wulf forwarded to Lockard and Lyons an email he wrote to a potential VBF investor.  A true and correct copy of Wulf's March 18, 2016 email is attached as **Exhibit 69**.

498.    In this email, and by virtue of forwarding it to Lockard and Lyons, Wulf misrepresented to Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016, and Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder, that VBF's Mortality Rate was 3% to 5%.  This Mortality Misrepresentation was material and false, which Wulf knew. *See* Sections VI(D), VII(C), VII(F), VII(G), VII(H).

499.    VBF relied on the misrepresentation contained in the March 18, 2016 email, including through Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016 and Lyons, a VBF Board Member as of December 15, 2015, and VBF shareholder.  The misrepresentation in the March 18, 2016 email was material

to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management

500.    VBF's reliance was reasonable and justified because Wulf was a director and/or officer of VBF at the time that he made the misrepresentation.

501.    As a result of VBF's reliance on the misrepresentation contained in the March 18, 2016 email, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf intended when he made this material misrepresentation. Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

502.    Wulf knowingly and intentionally made the misrepresentation listed in the March 18, 2016 email because he knew that the representation would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

503.    Wulf's misrepresentation allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**L.    April 2, 2016 Wulf Email Regarding March 29, 2016 Wulf Interview (Wulf)**

504.    In an April 2, 2016 email, Wulf forwarded to Lockard an interview conducted of him by seafoodsource.com.  A true and correct copy of this email and the attached article is attached as **Exhibit 70**.

505.    By   emailing   the   interview   to   Lockard,   Wulf   made   the   following misrepresentations:

a.    In response to the interview question: "What's the demand for barramundi and how has it changed?" Wulf answered as follows in relevant part:  "The demand for quality whitefish remains strong in North America…As consumers are discovering the taste, texture, and nutritional benefits of barramundi, demand is growing and it's compounded by the void created by other barramundi suppliers who have pulled out of the market.  We see the first 15 million pounds (live weight) of barramundi as the low-hanging fruit in the marketplace."   This is false, as barramundi is commoditized like many other types of fish, and barramundi never had the market demand represented or assumed in any financial forecasts. Wulf knew this to be false, based on his knowledge of VBF's actual sales at all times and through the Pre-Forgery FTAI Marketing Report and Curtis's June 30, 2015 email regarding the same. *See* Section VII(E)(ii).  There was no such demand nor had VBF identified any market demand for the first 15 million pounds of barramundi.  Indeed, the largest barramundi seller as far as VBF knows has sold, at relevant times, only 6,000 pounds per week.  This representation is material as the key to VBF's success and profitability is whether there is a demand for its final product.

b.    In response to the interview question:  "Your aquaculture tanks operate on a system of 'opposing flows.' What improvements do these tanks offer over other aquaculture systems?" Wulf answered: "The opposing flows technology has a number of benefits to promote fish health and welfare and driver our business.  There are no pumps, which reduces the operating costs for our operations.  An integrated air-lift and aeration system results in higher dissolved oxygen from the air, which means we don't need to add oxygen to the system.  The movement of water provides the fish with flow and exercise to improve feed conversion, while the water flow removes waste from the system without removing feed.  When it's time to purge fish we are able to isolate individual tanks, which reduces stress on the fish.  And finally,   the   system's   configuration   supports   bio-security,   standarized

operating procedures and overall predictability and efficiency." This OFT Misrepresentation was material and false, which Wulf knew. *See* Sections VI(A), VII(A), VI(D), VII(E), VII(K).

506.    VBF relied on the misrepresentations contained in the interview, including through Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016. The misrepresentations in the interview were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

507.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, was a director and/or officer of VBF at the time that he made the misrepresentations.

508.    As a result of VBF's reliance on the misrepresentations contained in the April 2, 2016 email, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf intended when he made these material misrepresentations. Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

509.    Wulf knowingly and intentionally made the misrepresentations listed in the April 2, 2016 email because he knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-

154

insider VBF management and employees did not question the Founder's management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

510.     Wulf's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**M.     April 2016 Stocking and Harvest Charts (Wulf, Hall, Driver, Ted Rea, and James Rea)**

511.     On or about April 2, 2016, Wulf authored a document entitled "VBF – OFA Tank Stocking and Harvest Chart" ("April 2016 Stocking and Harvest Chart I").  A true and correct copy of the April 2016 Stocking and Harvest Chart I is attached as **Exhibit 71** (metadata information added as header).

512.     On April 2, 2016, Wulf emailed a version of the April 2016 Stocking and Harvest Chart I to Hall.  Therefore, Hall was aware of the April 2016 Stocking and Harvest Chart I and its representations.

513.     On May 15, 2016, Wulf emailed an updated version of the April 2016 Stocking and Harvest Chart to Hall, Ted Rea, Driver, and James Rea, noting that certain alterations were made ("April 2016 Stocking and Harvest Chart II").  Therefore, all Founders were aware of the April 2016 Stocking and Harvest Chart II and its representations.

514.     On April 2, 2016, Hall uploaded the April 2016 Stocking and Harvest Chart I to the Data Room to which Alder had access, confirming Alder's receipt of same. *See* **Exhibits 71** (metadata information added as header).

515.     On May 4, 2016, Wulf emailed a version of the April 2016 Stocking and Harvest Chart I to Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually.

516.     On May 16, 2016, Wulf emailed a version of the April 2016 Stocking and Harvest Chart II to Thelander.  A true and correct copy Wulf's May 16, 2016 email and the April 2016 Stocking and Harvest Chart II is attached as **Exhibit 72** (metadata information added as header).

517.     On May 18, 2016, Wulf emailed a version of the April 2016 Stocking and Harvest Chart II to Ted Rea, Hall, James Rea, Katie Olson (a VBF employee), Matt Clarken (a VBF employee), and Robinson.

518.     The April 2016 Stocking and Harvest Charts I and II contain material misrepresentations relating to VBF's Metrics and VBF's OFT, including, but not limited to, the following:

    a.     The April 2016 Stocking and Harvest Chart I represents that VBF's Mortality Rate was 3%.  This Mortality Misrepresentation was material and false, which Wulf, Hall, Driver, Ted Rea, and James Rea each knew. *See* Sections VI(D), VII(C), VII(G)-VII(H).

    b.     The April 2016 Stocking and Harvest Chart I represents VBF "start[s] stocking first round at 12,000, the 16,000 for subsequent harvests." **Exhibit 71.**  The April 2016 Stocking and Harvest Chart II breaks down Density for fillets and live haul, representing that for live haul VBF "start[s] stocking first round at 12,000, then 16,000 for subsequent harvests."  **Exhibit 72**. This Density Misrepresentation was material and false, which Wulf, Hall, Driver, Ted Rea, and James Rea each knew. For example, actual VBF data available to the Founders at all relevant times showed that, at best, VBF was starting with 10,000 fingerlings. *See* Sections VI(C), VII(C), VII(G).

519.     VBF relied on the misrepresentations contained in the April 2016 Stocking and Harvest Charts, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually and VBF employees Matt Clarken and Robinson. The misrepresentations in the April

2016 Stocking and Harvest Charts were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

520.     VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Driver, Ted Rea, and James Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

521.     As a result of VBF's reliance on the misrepresentations contained in the April 2016 Stocking and Harvest Charts, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Driver, Ted Rea, and James Rea each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

522.     Each of the Founders knowingly and intentionally made the misrepresentations listed in the April 2016 Stocking and Harvest Charts because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

523.    Wulf, Hall, Driver, Ted Rea, and James Rea's misrepresentations allowed them to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**N.    June 21, 2016 Hall Email (Wulf and Hall)**

524.    On June 21, 2016, Hall emailed Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, projections, copying Wulf, which showed that VBF's EBITDA, by 2020, would be $75,000,000 (with VBF's EBITDA incrementally rising in the interim).  A true and correct copy of Hall's June 21, 2016 email is attached as **Exhibit 73.**

525.    Similarly, on July 5, 2016, Thelander inquired of Wulf via email whether VBF's projections for EBITDA for the years 2017-2020 growing to the tens of millions of dollars were correct, and Wulf did not advise to the contrary.  A true and correct copy of Thelander's July 5, 2016 email is attached as **Exhibit 74.**

526.    These representations of expected positive EBITDA in the 2017 through 2020 time frame, let alone in the tens of millions of dollars, were material and false, which Wulf and Hall knew. *See* Section VI(E), VII(A), VII(C). VBF never achieved any profit, let alone close to the tens of millions of dollars as represented by Hall and Wulf to Thelander.

527.    VBF relied on the misrepresentations contained in these emails, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually. The misrepresentations in these emails were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

528.    VBF and Alder's reliance was reasonable and justified because those making the misrepresentations, Wulf and Hall, were directors and/or officers of VBF at the time they made the misrepresentations.

529.     As a result of VBF's reliance on Wulf and Hall's representations, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf and Hall each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

530.     Hall and Wulf each knowingly and intentionally made the misrepresentations to Thelander because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

531.     The Founders' misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**O.     August 2016 Management Update (Wulf, Hall, Ted Rea, and James Rea)**

532.     On or about August 31, 2016, Wulf authored a document entitled "Monthly Management Update, dated August 31, 2016" ("August 2016 Management Update") that

contained representations about VBF's operations and financial situation.  A true and correct copy of the August 2016 Management Update is attached as **Exhibit 75-1.**

533.    On August 31, 2016, Wulf emailed a version of the August 2016 Management Update to Hall.

534.    On August 31, 2016, Hall emailed a version of the August 2016 Management Update to Wulf, along with other documents, which Wulf then forwarded to Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, and Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually.

535.    That day, Wulf also sent the August 2016 Management Update to Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016; Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder; Thelander; and Haarkoetter, as well as James Rea and Hall.  James Rea forwarded that email to Ted Rea and Hall, noting that they needed to do a better job of proof-reading and thus, showing that Wulf, Hall, James Rea, and Ted Rea were each aware of the August 2016 Management Update and the representations therein.

536.    The August 2016 Management Update was also made available to the VBF Board of Directors through a shared folder (ShareFile) by Bruce Hall on August 31, 2016, to which VBF Board Members had access.

537.    The August 2016 Management Update contains numerous material misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

a.      that VBF's FCR was 1.01.  *Id.* p. 2. This FCR Misrepresentation was material and false, which Wulf, Hall, James Rea, and Ted Rea each knew. *See* Section VI(B) and VII(A).

b.      that one of VBF's facilities was stocking "16,000 fish per tank." *Id*. This Density Misrepresentation was material and false, which Wulf, Hall, James Rea, and Ted Rea each knew. *See* Sections VI(C), VII(C), VII(G).

c.      that VBF's Mortality Rate was 4%. *Id.* This Mortality Misrepresentation was material and false, which Wulf, Hall, James Rea, and Ted Rea each knew. *See* Sections VI(D), VII(C), VII(F)-VII(H).

538.    VBF relied on the misrepresentations contained in the August 2016 Management Update, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016; and Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder. The misrepresentations in the August 2016 Management Update were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

539.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Ted Rea, and James Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

540.    As a result of VBF's reliance on the misrepresentations contained in the August 2016 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Ted Rea, and James Rea each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan,

who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

541.    Wulf, Hall, Ted Rea, and James Rea each knowingly and intentionally made the misrepresentations listed in the August 2016 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

542.    Wulf, Hall, Ted Rea, and James Rea's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

### P.    September 2016 Management Update (Wulf and Hall)

543.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update, dated September 30, 2016" ("September 2016 Management Update") that contained VBF's August 31, 2016 operational and financial update.  A true and correct copy of the September 2016 Management Update is attached as **Exhibit 75-2**.

544.    The September 2016 Management Update was also made available to the VBF Board of Directors through a shared folder (ShareFile) by Hall on September 27, 2016. Specifically, Thelander, a VBF Board Member as of July 2016, a representative of Alder who

became a VBF shareholder in July 2016, and a VBF shareholder individually, accessed the

September 2016 Management Update through that shared folder (ShareFile) on or about October

5, 2016 and October 6, 2016.

545.     The   September   2016   Management   Update   contains   numerous   material

misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

    a.    that VBF's FCR was 1.01 on August 31, 2016. *Id.*, p. 2.  This FCR
          Misrepresentation was material and false, which Wulf and Hall each knew.
          *See* Section VI(B) and VII(A).

    b.    that one of VBF's facilities was stocking "16,000 *fish per six pack tank
          configuration*." *Id.* (emphasis added). This Density Misrepresentation was
          material and false, which Wulf and Hall each knew. *See* Sections VI(C),
          VII(C), VII(G).

    c.    that VBF's Mortality Rate was 7.48%.  *Id*.  This Mortality
          Misrepresentation was material and false, which Wulf and Hall each knew.
          *See* Sections VI(D), VII(C), VII(F)-VII(H).

546.     VBF relied on the misrepresentations contained in the September Management

Update, including through Thelander, a VBF Board Member as of July 2016, a representative of

Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, and

Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF

shareholder in July 2016, and a VBF shareholder individually

547.     VBF's   reliance   was   reasonable   and   justified   because   those   making   the

misrepresentations, Wulf and Hall, were directors and/or officers of VBF at the time they made

the misrepresentations.

548.     As a result of VBF's reliance on the misrepresentations contained in the September

Management Update, VBF continued to take in debt and equity investments, continued to expend

funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James

Rea with little oversight, which was what Wulf and Hall each intended when they made these

material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

549.    Hall and Wulf each knowingly and intentionally made the misrepresentations listed in the September Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

550.    Wulf and Hall's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**Q.    October 2016 Management Update (Wulf and Hall)**

551.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update and dated October 31, 2016" ("October 2016 Management Update") that contained VBF's October 31, 2016 operational update and September 30, 2016 financial update.  A true and correct copy of the October 2016 Management Update is attached as **Exhibit 75-3**.

552.    On October 24, 2016, Wulf modified and emailed a version of the October 2016 Management Update to Hall, showing that Wulf and Hall each were aware of the October 2016 Management Update and the representations therein.

553.    On October 28, 2016, Wulf modified and emailed a version of the October 2016 Management Update to Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder, and Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016.

554.    The October 2016 Management Update was also made available to the VBF Board through a shared folder (ShareFile) by Hall on or about October 28, 2016.

555.    The October 2016 Management Update contains numerous material misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

      a.    that VBF's FCR was 1.01 as of September 30, 2016. *Id.* This FCR Misrepresentation was material and false, which Wulf and Hall each knew. *See* Section VI(B) and VII(A).

      b.    that VBF achieved Density of "16,000 fish per six pack tank configuration." *Id.* This Density Misrepresentation was material and false, which Wulf and Hall each knew. *See* Sections VI(C), VII(C), VII(G).

      c.    that VBF's Mortality Rate was 8.44%. *Id.* This Mortality Misrepresentation was material and false, which Wulf and Hall each knew. *See* Sections VI(D), VII(C), VII(F)-VII(H).

556.    VBF relied on the misrepresentations contained in the October 2016 Management Update, including through Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder and Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016. The misrepresentations in the October 2016 Management Update were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

165

557.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf and Hall, were directors and/or officers of VBF at the time they made the misrepresentations.

558.    As a result of VBF's reliance on the misrepresentations contained in the October 2016 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf and Hall each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

559.    Wulf and Hall each knowingly and intentionally made the misrepresentations listed in the October 2016 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

560.    Wulf and Hall's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**R.    Second October 2016 Management Update (Wulf and Hall)**

561.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update dated October 31, 2016" ("Second October 2016 Management Update") that contained VBF's November 30, 2016 operational update and September 30, 2016 financial update.  A true and correct copy of the Second October 2016 Management Update is attached as **Exhibit 75-4**.

562.    On November 22, 2016, Wulf modified and emailed a version of the Second October 2016 Management Update to Hall, showing that Wulf and Hall each were aware of the Second October 2016 Management Update and the representations therein.

563.    On November 28, 2016, Hall emailed a version of the Second October 2016 Management Update to Wulf who then forwarded that email, and the Second October 2016 Management Update to Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder, and Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016.

564.    The Second October 2016 Management Update was also made available to the VBF Board through a shared folder (ShareFile) by Hall on November 25, 2016.  Specifically, Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, accessed the Second October 2016 Management Update through the shared folder (ShareFile) on or about November 29, 2016 and December 5, 2016.

565.    The Second October 2016 Management Update contains several material misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

      a.     that VBF had an FCR of 1.01. *Id.*, p. 2. This FCR Misrepresentation was material and false, which Wulf and Hall each knew. *See* Section VI(B) and VII(A).

      b.     that VBF's Mortality Rate was 5.04%. *Id.* This Mortality Misrepresentation was material and false, which Wulf and Hall each knew. *See* Sections VI(D), VII(C), VII(F)-VII(H).

566.    VBF relied on the misrepresentations contained in the Second October 2016 Management Update, including through Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder and Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016. The misrepresentations in the Second October 2016 Management Update were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

567.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf and Hall, were directors and/or officers of VBF at the time they made the misrepresentations.

568.    As a result of VBF's reliance on the misrepresentations contained in the Second October 2016 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf and Hall each intended when they made these material misrepresentations. Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

569.     Wulf and Hall each knowingly and intentionally made the misrepresentations listed in the Second October 2016 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

570.     Wulf and Hall's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**S.     December 2016 Management Update (Wulf and Hall)**

571.     Wulf authored a document entitled "VeroBlue Farms Monthly Management Update," dated December 31, 2016 ("December 2016 Management Update") that contained VBF's January 31, 2017 operational update and December 31, 2016 financial update.  A true and correct copy of the December 2016 Management Update is attached as **Exhibit 75-5**.

572.     On January 31, 2017, Wulf modified and emailed a version of the December 2016 Management Update to Hall, showing that Wulf and Hall each were aware of the December 2016 Management Update and the representations therein.

573.     The December 2016 Management Update was made available to the Board of Directors on January 31, 2017 through a shared folder (ShareFile) by Hall.  Specifically, Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, accessed the December 2016

Management Update through the shared folder (ShareFile) on or about February 1, 2017 and March 2, 2017.

574.    Further, on April 19, 2016, Hall emailed a version of the December 2016 Management Update to Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, and Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, copying Wulf.

575.    The December 2016 Management Update contains numerous material misrepresentations relating VBF's Metrics, including, but not limited to, the following:

      a.    that VBF had an FCR of 1.01. *Id.*, p. 2. This FCR Misrepresentation was material and false, which Wulf and Hall each knew. *See* Section VI(B) and VII(A).

      b.    that VBF's Mortality Rate was 5.2%. *Id.* This Mortality Misrepresentation was material and false, which Wulf and Hall each knew. *See* Sections VI(D), VII(C), VII(F)-VII(H).

576.    VBF relied on the misrepresentations contained in the December 2016 Management Update, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, and Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually. The misrepresentations in the December 2016 Management Update were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

577.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf and Hall, were directors and/or officers of VBF at the time they made the misrepresentations.

578.     As a result of VBF's reliance on the misrepresentations contained in the December 2016 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf and Hall each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

579.     Wulf and Hall each knowingly and intentionally made the misrepresentations listed in the December 2016 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

580.     Wulf and Hall's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**T.      January 2017 Model (Wulf, Hall, Ted Rea, and James Rea)**

581.     On or about January 15, 2017, Hall modified a document entitled "VBF Projections-Updated Consolidated Model – 1-15-2017-Final" ("January 2017 Model") that

contained representations about VBF's operations and financial situation.  A true and correct copy of the January 2017 Model is attached as **Exhibit 76**.

582.    On January 15, 2017, Wulf emailed a version of the January 2017 Model to Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, and Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, with a copy to Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder, and Hall.  Wulf forwarded the email to Ted Rea and James Rea that day. *Id.* Therefore, Wulf, Hall, Ted Rea, and James Rea each participated in or were fully aware of the January 2017 Model and its representations.

583.    That day, Wulf also forwarded the January 15, 2017 email, along with the January 2017 Model, to Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016, who forwarded both to Robert Smith, a FishDish shareholder.

584.    The January 2017 Model contains numerous material misrepresentations relating to VBF' financial forecasts both for that same year, 2017, and for others, including, but not limited to, the following:

- 2017 Revenue: $15,141,620
- 2017 Cost of Sales: $5,912,373
- 2017 Total Expenses: $15,142,812
- 2017 Net Income (Loss): $2,989, 287
- 2017 EBITDA: $4,449,599

- 2018 Revenue: $56,869,366
- 2018 Cost of Sales: $19,235,719
- 2018 Total Expenses: $27,164,337
- 2018 Net Income (Loss): $30, 881,962
- 2018 EBITDA: $32,675,553

585.    These Financial Misrepresentations were false, which Wulf, Ted Rea, James Rea, and Hall each knew. *See* Section VI(E), VII(A), VII(C). These representations were material because company operational and financial decisions are made based upon these projections. These faulty projections gave the false impression that VBF could be more profitable than it ever actually could be.

586.    VBF relied on the misrepresentations contained in the January 2017 Model, including through Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016; Robert Smith, a FishDish shareholder; Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; and Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually. The misrepresentations in the January 2017 Model were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

587.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Ted Rea, and James Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

588.    As a result of VBF's reliance on the misrepresentations contained in the January 2017 Model, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Ted Rea, and James Rea each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea,

and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

589.    Ted Rea, James Rea, Hall and Wulf each knowingly and intentionally made the misrepresentations listed in the January 2017 Model because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

590.    Wulf, Hall, Ted Rea, James Rea's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**U.    January 2017 Management Update (Wulf, Hall, and Ted Rea)**

591.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update," dated January 31, 2017 ("January 2017 Management Update") that contained VBF's February 28, 2017 operational update and January 31, 2017 financial update.  A true and correct copy of the January 2017 Management Update is attached as **Exhibit 75-6**.

592.    On February 28, 2017, Wulf emailed a version of the January 2017 Management Update to Hall.

593.    On March 16, 2017, Hall emailed a version of the January 2017 Management Update to Ted Rea, showing that Wulf, Hall, and Ted Rea each were aware of the January 2017 Management Update and the representations therein.

594.    The January 2017 Management Update was also made available to the VBF Board of Directors through a shared folder (ShareFile) by Hall on March 1, 2017. Specifically, Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, accessed the January 2017 Management Update through that shared folder (ShareFile) on or about March 2, 2017.

595.    On March 2, 2017, Wulf emailed a version of the January 2017 Management Update to Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder, and Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016.

596.    The   January   2017   Management   Update   contains   numerous   material misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

   a.    that VBF had an FCR of 1.01. *Id.* at 2. This FCR Misrepresentation was material and false, which Wulf, Ted Rea, and Hall each knew. *See* Section VI(B) and VII(A).

   b.    that VBF's Mortality Rate was 2.78%. *Id.* This Mortality Misrepresentation was material and false, which Wulf, Ted Rea, and Hall each knew. *See* Sections VI(D), VII(C), VII(F)-VII(H).

   c.    that "with water stabilized we [VBF] are back to 12,000 first stocking and 14,000 forward stocking." *Id.* This Density Misrepresentation was material and false, which Wulf, Ted Rea, and Hall each knew. *See* Sections VI(C), VII(C), VII(G).

597.    VBF relied on the misrepresentations contained in the January 2017 Management Update, including through Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder; Lockard, a VBF Board Member as of June 2016 and a manager of FishDish

who became a VBF shareholder in July 2016; and Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually. The misrepresentations in the January 2017 Management Update were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

598.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Ted Rea, and Hall, were directors and/or officers of VBF at the time they made the misrepresentations.

599.    As a result of VBF's reliance on the misrepresentations contained in the January 2017 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Ted Rea, and Hall each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

600.    Hall, Ted Rea, and Wulf each knowingly and intentionally made the misrepresentations listed in the January 2017 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees

did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

601.    Wulf, Ted Rea, and Hall's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

### V.    February 2017 Management Update (Wulf, Hall, Ted Rea, and James Rea)

602.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update," dated February 28, 2017 ("February 2017 Management Update") that contained VBF's March 31, 2017 operational update and February 28, 2017 financial update.  A true and correct copy of the February 2017 Management Update is attached as **Exhibit 75-7**.

603.    On April 3, 2017, Ted Rea emailed a version of the February 2017 Management Update to Hall although no mortality rate was listed yet.

604.    On April 6, 2017, Wulf emailed a version of the February 2017 Management Update to Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016; and Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder, and also to James Rea, and Hall, showing that Wulf, James Rea, and Hall were aware of the February 2017 Management Update and the representations therein, and that Ted Rea was aware of at least parts of it.

605.    The February 2017 Management Update was also made available to the VBF Board of Directors through a shared folder (ShareFile) by Hall on April 3, 2017.

606.   The February 2017 Management Update contains numerous material misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

a.   that VBF had an FCR of 1.03. *Id.* at 2. This FCR Misrepresentation was material and false, which Wulf, James Rea, Ted Rea, and Hall each knew. *See* Section VI(B) and VII(A).

b.   that VBF's Mortality, system wide, was 2.54%. *Id.* This Mortality Misrepresentation was material and false, which Wulf, James Rea, and Hall each knew. *See* Sections VI(D), VII(C), VII(F)-VII(H).

c.   that "with water stabilized we [VBF] are back to 12,000 first stocking and 14,000 forward stocking." *Id.* This Density Misrepresentation was material and false, which Wulf, James Rea, Ted Rea, and Hall each knew. *See* Sections VI(C), VII(C), VII(G), VII(I).

607.   VBF relied on the misrepresentations contained in the February 2017 Management Update, including through Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder; Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016; Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; and Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually. The misrepresentations in the February 2017 Management Update were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

608.   VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Ted Rea, and James Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

609.   As a result of VBF's reliance on the misrepresentations contained in the February 2017 Management Update, VBF continued to take in debt and equity investments, continued to

expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Ted Rea, James Rea, Hall and Wulf each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

610.    Ted Rea, James Rea, Hall and Wulf each knowingly and intentionally made the misrepresentations listed in the February 2017 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

611.    Wulf, Hall, Ted Rea, and James Rea's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

W.    **March 2017 Management Update (Wulf and Hall)**

612.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update," dated March 31, 2017 ("March 2017 Management Update") that contained VBF's April 26, 2017 operational update and March 31, 2017 financial update.  A true and correct copy of the March 2017 Management Update is attached as **Exhibit 75-8**.

179

613.     On April 27, 2017, Wulf emailed a version of the March 2017 Management Update to Hall.

614.     On April 27, 2017, Wulf emailed a version of the March 2017 Management Update to Ted Rea and James Rea, showing that Wulf, Hall, Ted Rea, and James Rea were aware of the March 2017 Management Update and the representations therein.

615.     The March 2017 Management Update was also made available to the VBF Board of Directors through a shared folder (ShareFile) by Hall on April 28, 2017, to which the VBF Board Members had access.

616.     The March 2017 Management Update contains numerous material misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

a.     that VBF had an FCR of 1.03. *Id*. at p. 2. This FCR Misrepresentation was material and false, which Wulf, James Rea, Ted Rea, and Hall each knew. *See* Section VI(B) and VII(A).

b.     that VBF's Mortality Rate was 3.55%. *Id*. This Mortality Misrepresentation was material and false, which Wulf, James Rea, Ted Rea, and Hall each knew. *See* Sections VI(D), VII(C), VII(F)-VII(H).

c.     that "with water stabilized we [VBF] are back to 12,000 first stocking and 14,000 forward stocking." *Id*.  This Density Misrepresentation was material and false, which Wulf, James Rea, Ted Rea, and Hall each knew. *See* Sections VI(C), VII(C), VII(G), VII(I).

617.     VBF, through its Independent Board Members, along with VBF shareholders not affiliated with the Founders, relied on the misrepresentations contained in the March 2017 Management Update. The misrepresentations in the March 2017 Management Update were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

618.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Ted Rea, and James Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

619.    As a result of VBF's reliance on the misrepresentations contained in the March 2017 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Ted Rea, and James Rea each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

620.    Ted Rea, James Rea, Hall and Wulf each knowingly and intentionally made the misrepresentations listed in the March 2017 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

621.     Wulf, Hall, Ted Rea, and James Rea's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**X.      May 2017 Management Update (Wulf and Hall)**

622.     Wulf authored a document entitled "VeroBlue Farms Monthly Management Update," dated May 31, 2017 ("May 2017 Management Update") that contained VBF's May 31, 2017 operational update and April 30, 2017 financial update.  A true and correct copy of the May 2017 Management Update is attached as **Exhibit 75-9**.

623.     On June 4, 2017, Wulf emailed a version of the May 2017 Management Update to Hall.

624.     The May 2017 Management Update was also made available to the VBF Board of Directors through a shared folder (ShareFile) by Hall on June 4, 2017. Specifically, Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, accessed the May 2017 Management Update through that shared folder (ShareFile) on or about August 29, 2017.

625.     The   May   2017   Management   Update   contains   numerous   material misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

   a.     that VBF had an FCR of 1.03. *Id.* at p. 2. This FCR Misrepresentation was material and false, which Wulf and Hall each knew. *See* Section VI(B) and VII(A).

   b.     that "with water stabilized we [VBF] are back to 12,000 first stocking and 14,000 forward stocking." *Id*. This Density Misrepresentation was material and false, which Wulf and Hall each knew. *See* Sections VI(C), VII(C), VII(G), VII(I).

626.     VBF relied on the misrepresentations contained in the May 2017 Management Update, including through Thelander, a VBF Board Member as of July 2016, a representative of

Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually. The misrepresentations in the May 2017 Management Update were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

627.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf and Hall, were directors and/or officers of VBF at the time they made the misrepresentations.

628.    As a result of VBF's reliance on the misrepresentations contained in the May 2017 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf and Hall each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

629.    Hall and Wulf each knowingly and intentionally made the misrepresentations listed in the May 2017 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members

and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

630.    Wulf and Hall's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

### Y.    June 2017 Management Update (Wulf and Hall)

631.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update," dated June 30, 2017 ("June 2017 Management Update") that contained VBF's June 30, 2017 operational update and May 31, 2017 financial update.  A true and correct copy of the June 2017 Management Update is attached as **Exhibit 75-10**.

632.    On July 11, 2017, Wulf emailed a version of the June 2017 Management Update to Hall.

633.    The June 2017 Management Update was also made available to the VBF Board of Directors through a shared folder (ShareFile) by Hall on July 11, 2017.  Specifically, Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, accessed the June 2017 Management Update through that shared folder (ShareFile) on or about July 17, 2017 and August 29, 2017.

634.    The June 2017 Management Update contains numerous material misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

      a.      that VBF's FCR of 1.02.  *Id.* at p. 2. This FCR Misrepresentation was material and false, which Wulf and Hall each knew. *See* Section VI(B) and VII(A).

      b.      that "with water stabilized, we [VBF] are back to 12,000 first stocking and 14,000 forward stocking." *Id.*  This Density Misrepresentation was material and false, which Wulf and Hall each knew. *See* Sections VI(C), VII(C), VII(G), VII(I).

635.    VBF relied on the misrepresentations contained in the June 2017 Management Update, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually. The misrepresentations in the June 2017 Management Update were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

636.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf and Hall, were directors and/or officers of VBF at the time they made the misrepresentations.

637.    As a result of VBF's reliance on the misrepresentations contained in the June 2017 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf and Hall each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

638.    Hall and Wulf each knowingly and intentionally made the misrepresentations listed in the June 2017 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was

being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

639.    Wulf and Hall's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**Z.    July 2017 Management Update (Wulf and Hall)**

640.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update, dated July 31, 2017" ("July 2017 Management Update") that contained VBF's July 31, 2017 operational update and June 30, 2017 financial update.  A true and correct copy of the July 2017 Management Update is attached as **Exhibit 75-11**.

641.    On August 8, 2017, Wulf emailed a version of the July 2017 Management Update to Hall.

642.    The July 2017 Management Update was also made available to the VBF Board of Directors through a shared folder (ShareFile) by Hall on August 8, 2017.  Specifically, Thelander, Alder representative and VBF Board Member and shareholder, accessed the July 2017 Management Update through that shared folder (ShareFile) on or about August 29, 2017.

643.    The July 2017 Management Update contains numerous material misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

> a.    that VBF's FCR was 1.02. *Id.* at p. 2. This FCR Misrepresentation was material and false, which Wulf and Hall each knew. *See* Section VI(B) and VII(A).
>
> b.    that "with water stabilized, we [VBF] are back to 12,000 first stocking and 14,000 forward stocking." *Id.*  This Density Misrepresentation was material

and false, which Wulf and Hall each knew. *See* Sections VI(C), VII(C), VII(G), VII(I).

644.    VBF relied on the misrepresentations contained in the July 2017 Management Update, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually. The misrepresentations in the July 2017 Management Update were material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

645.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf and Hall, were directors and/or officers of VBF at the time they made the misrepresentations.

646.    As a result of VBF's reliance on the misrepresentations contained in the July 2017 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf and Hall each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

647.    Wulf and Hall each knowingly and intentionally made the misrepresentations listed in the July 2017 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current

shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

648.    Wulf and Hall's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

### AA.    August 2017 Management Update (Wulf, Hall, Ted Rea, and James Rea)

649.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update," dated August 31, 2017 ("August 2017 Management Update") that contained VBF's August 31, 2017 operational update and July 31, 2017 financial update.  A true and correct copy of the August 2017 Management Update is attached as **Exhibit 75-12**.

650.    The August 2017 Management Update was also made available to the VBF Board of Directors through a shared folder (ShareFile) by Hall on September 5, 2017. Specifically, Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, accessed the August 2017 Management Update through that shared folder (ShareFile) on or about September 6, 2017 and September 26, 2017.

651.    Further, on September 26, 2017, Thelander emailed Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; Ebstein, a VBF Board Member as of June 2017 and a representative of Alder who became a VBF shareholder in July 2016; Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016;

and Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder, along and Wulf and Hall, a version of the August 2017 Management Update that he had downloaded from the shared folder (ShareFile), noting that they had discussed same during the last board meeting. Wulf forwarded Thelander's email, including the August 2017 Management Update, to James Rea and Ted Rea, showing that Wulf, Hall, James Rea, and Ted Rea, were aware of the August 2017 Management Update and the representations therein.

652.   The August 2017 Management Update contains numerous material misrepresentations relating to VBF's Metrics, including, but not limited to, the following:

    a.   that VBF's FCR was 1.03. *Id.* at p. 2. This FCR Misrepresentation was material and false, which Wulf, James Rea, Ted Rea, and Hall each knew. *See* Section VI(B) and VII(A).

    b.   that VBF's Mortality Rate was 2.108%. *Id.* at p. 2. This Mortality Misrepresentation was material and false, which Wulf, James Rea, Ted Rea, and Hall each knew. *See* Sections VI(D), VII(C), VII(F)-VII(H).

    c.   This document represents that "with water stabilized, we [VBF] are back to 12,000 first stocking and 14,000 forward stocking." *Id.* at p. 2. This Density Misrepresentation was material and false, which Wulf, James Rea, Ted Rea, and Hall each knew. *See* Sections VI(C), VII(C), VII(G), VII(I).

653.   VBF relied on the misrepresentations contained in the August 2017 Management Update, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; Ebstein, a VBF Board Member as of June 2017 and a representative of Alder who became a VBF shareholder in July 2016; Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016; and Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder. The misrepresentations in the August 2017 Management Update were material to

VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

654.    VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Hall, Ted Rea, and James Rea, were directors and/or officers of VBF at the time they made the misrepresentations.

655.    As a result of VBF's reliance on the misrepresentations contained in the August 2017 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Hall, Ted Rea, and James Rea each intended when they made these material misrepresentations.  Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

656.    Wulf, Hall, James Rea, and Ted Rea each knowingly and intentionally made the misrepresentations listed in the August 2017 Management Update because each knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

657.    Wulf, Hall, James Rea, and Ted Rea's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**BB.    Second August 2017 Management Update (Wulf, Hall, Ted Rea, and James Rea)**

658.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update," dated August 31, 2017 ("Second August 2017 Management Update") that contained VBF's September 30, 2017 operational update and August 31, 2017 financial update.  A true and correct copy of the Second August 2017 Management Update is attached as **Exhibit 75-13**.

659.    On October 4, 2017, Hall emailed a version of the Second August 2017 Management Update to Wulf, Ted Rea, and James Rea, showing that Wulf, Hall, Ted Rea, and James Rea were each aware of the Second August 2017 Management Update.

660.    The Second August 2017 Management Update was also made available to the VBF Board of Directors through a shared folder (ShareFile) by Hall on October 4, 2017. Specifically, Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, accessed the Second August 2017 Management Update through that shared folder (ShareFile) on or about October 24, 2017.

661.    The Second August 2017 Management Update represents that VBF's Mortality Rate was 3.565%.  *Id.* at p. 2.  This Mortality Misrepresentation was material and false, which Wulf, James Rea, Ted Rea, and Hall each knew. *See* Sections VI(D), VII(C), VII(F)-VII(H).

662.    VBF relied on the misrepresentation contained in the Second August 2017 Management Update, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually.

663. VBF's reliance was reasonable and justified because those making the misrepresentations, Wulf, Ted Rea, James Rea, and Hall, were directors and/or officers of VBF at the time they made the misrepresentation.

664. As a result of VBF's reliance on the misrepresentation contained in the Second August 2017 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf, Ted Rea, James Rea, and Hall each intended when they made that material misrepresentation. Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

665. Wulf, Hall, Ted Rea, and James Rea each knowingly and intentionally made the misrepresentation listed in the Second August 2017 Management Update because each knew that the representation would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

666.    Wulf, Hall, Ted Rea, and James Rea's misrepresentation allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**CC.    Wulf Statements at September 2017 Board of Directors Meeting (Wulf)**

667.    On September 20, 2017 Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016, emailed his fellow FishDish members a report that included statements made by Wulf at a recent September 12-13, 2017 VBF Board of Director's meeting, and follow-up statements made by Wulf.  A true and correct copy of Lockard's September 20, 2017 email is attached as **Exhibit 77**.

668.    As evident by that email, Wulf made the following misrepresentations to Lockard and the other attendees at the September 12-13, 2017 VBF Board meeting, which included Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016; Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder; Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; and Ebstein, a VBF Board Member as of June 22, 2017 and a representative of Alder who became a VBF shareholder in July 2016, and Lockard transmitted Wulf's misrepresentations to FishDish:

a.      that VBF, even as of September 2017, was in a good financial position, so much so that Wulf, on behalf of VBF, was looking to acquire another company in the $20,000,000 range, an acquisition that Wulf represented to Lockard "would be accretive" to VBF.  Wulf's representation that VBF was in good enough financial position to buy another company for $20,000,000 was false when made, and Wulf knew it to be false as he knew that VBF was failing operationally and financially and had no reasonable prospects of success.  This representation was material as it goes to the core of VBF's

business and profitability. This was further discussed as the Financial Misrepresentation in Sections VI(E), VII(A), VII(C).

b. that VBF'S EBIDTA would rise to $27,000,000 by 2019 and $71,000,000 by 2020 (consistent with representations that Wulf made to Thelander in June 2016, *see* Section VIII(N)). This Financial Misrepresentation was material and false, which Wulf knew. *See* Section VI(E), VII(A), VII(C).

c. that the Founders continued to be skilled in managing VBF. Wulf's representation of the Founders' competent management, which was made by Wulf and the other Founders from the outset of VBF, was false when made, as the Founders not only were incompetent in managing an aquaculture business, they fraudulently mismanaged VBF as alleged herein, and concealed the information and warnings from multiple aquaculture experts (Drs. Fitzsimmons and Michaels, and FTAI, for example) that revealed the Founders' incompetence. Wulf knew this representation was false when made in September 2017, and at all other times similar misrepresentations were made, as Wulf had the actual data and negative statements in his possession at all relevant times. It is material whether VBF—an aquaculture farm—is run by management with experience in aquaculture or, alternatively, properly guided by individuals in the aquaculture field, as it goes to the proper operation and likelihood of success of the aquaculture venture.

669. VBF relied on Wulf's misrepresentations, including through Haarkoetter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016; Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder; Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; and Ebstein, a VBF Board Member as of June 22, 2017 and a representative of Alder who became a VBF shareholder in July 2016.

670. VBF's reliance was reasonable and justified because Wulf was a director and/or officer of VBF at the time he made the misrepresentations.

671. As a result of VBF's reliance on the misrepresentations, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to

employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf intended when he made these material misrepresentations. Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

672.    Wulf knowingly and intentionally made the misrepresentations above because he knew that those representations would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

673.    Wulf's misrepresentations allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

**DD.    October 2017 Management Update (Wulf)**

674.    Wulf authored a document entitled "VeroBlue Farms Monthly Management Update," dated October 31, 2017 ("October 2017 Management Update") that contained VBF's November 30, 2017 operational update and October 31, 2017 financial update. A true and correct copy of the October 2017 Management Update is attached as **Exhibit 75-14**.

675.    The October 2017 Management Update was made available to the VBF Board of Directors through a shared folder (ShareFile) on December 4, 2017. Specifically, Thelander, a

VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, accessed the Second August 2017 Management Update through that shared folder (ShareFile) on or about December 5, 2017.

676.    Further, on December 5, 2017, Thelander emailed the October 2017 Management Update to Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder; Ebstein, a VBF Board Member as of June 2017 and a representative of Alder who became a VBF shareholder in July 2016; Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016; Sutherland, a VBF Board Member as of November 2017 and a representative of Alder who became a VBF shareholder in July 2016; Wester, a VBF Board Member as of October 2017 and a representative of Alder who became a VBF shareholder in July 2016; and VBF Independent Officer McCowan, noting that he had just downloaded the report.

677.    The October 2017 Management Update represents that VBF had a monthly Mortality Rate of only 1.09%. *Id.* at p. 2. This Mortality Misrepresentation was material and false, which Wulf knew. *See* Sections VI(D), VII(C), VII(F)-VII(H).

678.    VBF relied on the misrepresentation contained in the October 2017 Management Update, including through Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually; Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder; Ebstein, a VBF Board Member as of June 2017 and a representative of Alder who became a VBF shareholder in July 2016; Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016; Sutherland, a VBF Board Member as of November 2017 and a representative of Alder who became a VBF shareholder in July 2016; Wester, a VBF Board

Member as of October 2017 and a representative of Alder who became a VBF shareholder in July 2016; and VBF Independent Officer McCowan. The misrepresentation in the October 2017 Management Update was material to VBF's decisions regarding continued operations, intake and expenditure of VBF corporate funds, and its management.

679.    VBF's reliance was reasonable and justified because Wulf was a director and/or officer of VBF at the time he made the misrepresentation.

680.    As a result of VBF's reliance on the misrepresentation contained in the October 2017 Management Update, VBF continued to take in debt and equity investments, continued to expend funds on continued operations, and continued to employ Wulf, Hall, Driver, Ted Rea, and James Rea with little oversight, which was what Wulf intended when he made these material misrepresentations.   Indeed, in June 2017 VBF hired McCowan, who, later in 2017, came to suspect that a number of the representations made by Wulf, Hall, Driver, Ted Rea, and James Rea were false, and reported his suspicions to the then Independent Board Members, which resulted in an investigation of Wulf, Hall, Driver, Ted Rea, and James Rea and ultimately, their termination (although Driver was terminated as an employee in January 2017, he remained as a VBF consultant until December 2017).

681.    Wulf knowingly and intentionally made the misrepresentation listed in the October 2017 Management Update because he knew that the representation would (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that

VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF.

682.     Wulf's misrepresentations allowed the Wulf, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

## IX.  ADDITIONAL FACTS SUPPORTING THE REASONABLE AND DETRIMENTAL RELIANCE OF VBF'S INDEPENDENT BOARD MEMBERS, INDEPENDENT OFFICERS, AND SHAREHOLDERS ON THE FOUNDERS' MISREPRESENTATIONS

683.     VBF's shareholders, Independent Board Members, and Independent Officers were entitled to rely on each of the Founders' communications to them and entitled to expect and assume that each of the Founders disclosed all material matters relating to VBF. It also is clear, as alleged above as to each act of concealment and misrepresentation, and as further shown below, that VBF's shareholders, Independent Board Members, and Independent Officers indeed relied on each of the Founders' representations.

684.     Lockard, a VBF Board Member as of June 2016 and through February 2018, and a manager of FishDish who became a VBF shareholder in July 2016, relied on the Founders' continuing misrepresentations as evidenced by Lockard's January 18, 2016 email to fellow FishDish shareholder Terry Creech ("Creech"), in which Lockard told Creech that his confidence in the Founders "and their operational skills and the technology continue[s] to build."  A true and correct copy of Lockard's January 18, 2016 email is attached as **Exhibit 78.**

685.     In a February 10, 2016 email, Lockard advised all of FishDish's members that he has "grown more positive about the opportunity" at VBF and that "Les [Wulf] has been great, answering many questions from investors." A true and correct copy of Lockard's February 10, 2016 email is attached as **Exhibit 79.**

686.     In a February 13, 2016 email, Lockard expressed his thoughts about VBF based on the Founders' representations to him:  "I am putting in 1.3 million.  That is a lot for me.  At the

end of the day I believe this is one of those 10X opportunities."  A true and correct copy of

Lockard's February 13, 2016 email is attached as **Exhibit 80**.

687.    Lockard continued to rely on the Founders and their misrepresentations as late as

November 3, 2017, as shown in an email to fellow VBF Board Members Thelander and Ebstein:

> This morning I meet with Les [Wulf] and James [Rea] here in my office.  I had
> some really hard questions that needed to be answered.  So after two hours of
> questions and answers, I have a sense of optimism, in the sense that James [Rea]
> and Les [Wulf] are putting together a plan they believe can be unfolded to us by
> next Friday the 10th.  In short James [Rea] believes he can run four different
> systems through year end 12/31, that will give us a decisive direction to head with
> our OFA system.  They are open to cutting overhead and whatever else they must
> do…Les [Wulf] and James [Rea] truly believe they can make this a profitable
> business.  I told them they have lost a lot of trust, don't be expecting it to come
> back over night.

A true and correct copy of Lockard's November 3, 2017 email is attached as **Exhibit 81.**

688.    Just four days later, however, Lockard acknowledged the failure of VBF under the

Founders' leadership in a November 7, 2017 email to FishDish shareholders, which reported

VeroBlue's firing of Wulf, noting that "[t]he board lost faith in Mr. Wulf's projections and

management of the company."  A true and correct copy of Lockard's November 7, 2017 email is

attached as **Exhibit 82.**

689.    In response, FishDish member Misty Clary, noting how Wulf's representations had

induced Lockard to lead FishDish's $6,000,000 investment into VBF, stated:  "I know you

originally thought quite a lot of Les [Wulf] when we started this process."  In reply, Lockard said:

"We should talk on the phone, just too much to cover in an email.  The long and short is, we lost

confidence in business plan projections and day to day management."  This is just one of many

indicia of Lockard's and FishDish's reliance on Wulf and the other Founders' fraudulent

misrepresentations from early 2016 into November 2017.

690.    Thelander, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, and a VBF shareholder individually, similarly relied on the Founders' various misrepresentations, as demonstrated by Alder's initial investment of $28,000,000 after Thelander received diligence materials from the Founders, including, but not limited to, the Forged FTAI Reports, and in part by his July 11, 2016 email to Sedun, in which Thelander expressed that Alder would not have bought VBF stock had Thelander not believed that VBF "has the potential to revolutionize land based aquaculture," demonstrating that Thelander had relied upon the Founders' various statements about VBF's alleged superior and industry-leading OFT.  A true and correct copy of Thelander's July 11, 2016 email is attached as **Exhibit 83.**

691.    Alder's reliance can also be seen in its continued infusion of cash into VBF as late as September 2017 (and before VBF began to discover the Founders' fraud and other misconduct in February 2018), during which time Alder infused on September 19, 2017 and again on September 26, 2017, an additional $730,000 and $165,000, respectively, into VBF's bank account.

692.    Further evidencing the continuing reliance of the Independent Board Members on Wulf, Hall, Ted Rea, and James Rea's representations while concealing the true and disastrous facts of VBF's business from the Independent Board Members, is the fact that these four Founders continued to be employed by VBF as of September 20, 2017.

## X.  THE FOUNDERS' SCHEMES BEGIN TO UNRAVEL

693.    Starting in late 2017, the Independent Board Members started to become concerned about the Founders' abilities to lead and execute the business, although, as discussed above, they did not have enough information at that time to fully understand the nature and extent of the Founders' fraud.

694.    Even as late as September 2017, despite knowing that VBF was and always would be a miserable failure, Wulf, Hall, Ted Rea, and James Rea were soliciting more funds from VBF's

shareholders and Independent Board to grow VBF. Before doing so, the Independent Board insisted that the Founders commission a third party review of VBF's operations, which was accomplished by technical consultant Pranger Enterprises ("Pranger").

695.     The results of Pranger's investigation are summarized in a true and correct copy of a September 24, 2017 letter report from Nick Pranger of Pranger to Wulf, attached as **Exhibit 118** ("Pranger Report").   Pranger reviewed VBF's OFT and operations, and made the following findings, among others: (a) "Pranger Enterprises' Recommendation [is] to Stop Recirculating Aquaculture Construction;" (b) "Based on our current knowledge, site visits and the separate attached report, we strongly recommend stopping all future recirculating aquaculture construction activities, purchases and expansions until further studies on system capacity can be completed. Deciding to offer this recommendation was not taken lightly and should not be construed as our intent to be disruptive or disrespectful to the existing staff or their past efforts;" and, (c) "It is alarming that the system malfunctioned at one-third of the intended biomass and this coupled with our experience of these types of systems, compelled us to offer this letter before future systems with the same problems are constructed."

696.     The Pranger Report was merely the latest in a string of negative feedback from aquaculture experts that Wulf, Hall, Ted Rea, James Rea, and Driver had concealed from VBF's shareholders, Independent Board Members, and Independent Officers throughout their tenure at VBF, dating from (as far as VBF currently knows, there could be more) Dr. Fitzsimmons's 2014 and 2015 criticisms, Dr. Michaels's 2015 criticisms, and FTAI's 2015 criticisms. Although Driver was no longer a VBF officer as of the date of the Pranger Report, he remained a VBF consultant and also remained in contact with Wulf, Hall, Ted Rea, and James Rea. Therefore, it is likely that Driver knew of the Pranger Report.

697.    Once again, Wulf, Hall, Ted Rea, and James Rea were not forthcoming with the Pranger Report to the Independent Board, even when the Independent Board knew it was in progress, demonstrating the Founders' steadfast aversion to transparency.  In a September 28, 2017 email chain among Thelander, Lockard, Wulf, Hall, James Rea, Ted Rea, and other Independent Board Members, Thelander documented his growing suspicions regarding the Founders' management of VBF, directing the following statement to Lockard:

> Ken [Lockard]: I am now convinced that we have an extremely serious issue at hand here with regard to the underlying aquaculture knowledge and fish husbandry. I'm referring to the continuous production problems in St. Louis and the Urban Farm which in my mind are due to a lack of fundamental knowledge of mass balance calculations for our OFA system with regards to DO, TAN, Nitrogen, Ammonia…., Until we have INDEPENDENT verification that the system is properly dimensioned and has the right equipment, we cannot go on covering these incredible losses and simply hope for the best.

A true and correct copy of this email chain is attached as **Exhibit 84** (emphasis in original).

698.    Thelander further stated, referencing the Pranger Report, which itself was concealed from the Independent Board Members by Wulf, Hall, Ted Rea, and James Rea for a period of time:  "I want to see the Pranger report and the original mass balance calculations supposedly made by Keith Driver more than two years ago…When we have these, I suggest a Board Meeting via telephone as soon as possible to discuss this and among other things immediately stop spending or committing further capex. We must pull the emergency brake here and get to the root cause of our production issues."

699.    In reply, Ted Rea insisted that the Founders "have been totally transparent in our reporting to the board" and continued to vouch for VBF's OFT, which Ted Rea knew to be a failure, per the OFT Misrepresentation (*See* Sections VI(A), VII(A), VI(D), VII(E), VII(K)), including the severe and fatal criticisms from outside experts such as Dr. Michaels, Dr. Fitzsimmons, FTAI, and others, and the forgery of the FTAI (in the Pre-Forgery FTAI Reports).

Ted Rea further warned "[t]o stop this business at this point is a mistake" and even asked for increased capital infusions into VBF.

700.     In reply to Ted Rea's statement, and statements made thereafter, Thelander stated:

If you won't show me the Pranger report, then send me the original mass balance calculations done by Keith Driver/Cameron Robinson and the one done by Sudheesh.  If you don't know or understand the parameters, then increasing the budget to add additional equipment to stabilize the system may not help if it's the wrong equipment. It's like shooting in the dark. We can't continue like this.

***
Sadly, I'm afraid it's pretty clear that you have <u>not</u> been totally transparent to the Board as you say in your email below. I looked up Pranger Enterprises on the internet and got Nick's [Pranger's] cell number through PA and spoke to him about two hours ago.

As it turns out, he did provide you with a first update and recommendations report already on the 24th of September. He in fact did do a Mass Balance calculation based on the targeted bio mass, and most importantly of all, he did write a strongly worded recommendation to "<u>stop all future recirculating aquaculture construction, purchases and expansions until further studies on system capacity can be completed.</u>"  I think it can't get much clearer than this.

You have also indicated that feeding would have been the biggest cause for the event, while Nick Pranger points out that there are systemic problems. For you to recommend to continue capex investments knowing these fundamental doubts in respect of systemic issues speaks for itself."

By your own admission, you also do not have the original mass balance calculations on how to achieve the targeted bio mass which I think is pretty shocking in and of itself.

I will forward the email and reports from Nick Pranger immediately in a following email.

*Id.*  (emphasis and quotations in original).

701.     By November 6, 2017, as reflected in VBF Board minutes of that date attached hereto and incorporated herein as **Exhibit 85**, pp. 1-2, all Independent Board Members (Thelander, Ebstein, Wester, Lockard, and Lyons), except for Sedun (who abstained) voted to remove Wulf as

203

VBF's chief executive officer and to fire him, naming McCowan as VBF's interim chief executive officer.

702.    On November 10, 2017, James Rea sent an email to Mark Nelson, Jeff Nelson, and individuals at another company, stating that VBF has "decided to lower the stocking density in the nursery and it is very unlikely that we will have anywhere close to 4.8 million fish on the property at this stage."  *See* **Exhibit 86**.  In a follow up email on November 11, 2017, James Rea informed the recipients of his previous email and also McCowan, and others that "we have revised bio plan stocking numbers and they are much lower than our original estimate of 4,800,000 fish per year." *Id.*

703.    On December 4, 2017, VBF Board Member Thelander circulated to his fellow board members a document entitled "Overview of Major Management Issues" ("Thelander Memo") that outlined twenty-seven areas of concern.  *See* **Exhibit 26**, Thelander Memo. Thelander, in this memo, outlined the Founders' conduct that he was just discovering, including, but not limited to, the following:

a.    Referring to the Founders' misrepresentations and/or concealment regarding Density, the Founders engaged in "[i]ntentional use of theoretically impossible stocking plan densities in the original as well as subsequent business plans.  Peak of 126 kgs/m3, when original system was designed for max. 80kgs/m3…Thereby manipulated assumptions and factual mistakes in delivered business plan and board material."

b.    Referring to the Founders' misrepresentations and/or concealment regarding VBF's OFT, Thelander found there to be "[e]lementary design flaws in Urban Farm, *e.g.*, for feed conveyor system causing 18% feed loss and organic system overload, unsuitable drum-filters for removing TSS [Total Suspended Solids, which can harm the fish], lack of DO in system [Dissolved Oxygen, which enables increased density].

c.    Referring to the Founders' misrepresentations and/or concealment regarding VBF's financials, the Founders "[t]otally missed business plan by having [in actuality] minimal monthly revenues, inflated expenses and more than $1mUSD monthly burn rate, extending well into 2018…Virtually no expense and purchase order control and massive unnecessary spending.  For

              instance; 22 company cars, a house, 2 large trailer trucks, travel and entertainment expenses completely out of control ($40k for trip to Australia).  22 credit cards improperly used.  Fully furnished rental house for James [Rea] in Ames."

    d.      Referring to the Founders' misappropriations and/or squandering of VBF funds, there was "[n]o reason [for the Founders] to set up a Dallas office other than to accommodate senior management's [the Founders] choice to live there, causing also high commuting costs."

    e.      Referring in part to the Founders' misrepresentations and/or concealment of VBF's Mortality Rate, the Founders had been "[c]overing up very large and repeated death losses of both fingerlings as well as grow-out fish, particularly in St Louis, despite being specifically asked at September board meeting."

    f.       Referring in part to the Founders' misrepresentations and/or concealment regarding their management skills and experience, as well as reliance on the "advisory board," "[m]any problems and issues brought up through operations to top management, but then disregarded by them and not disseminated and general lack of transparency and communications of seriousness of problems to everyone in the company as well as to the Board…Purchasing properties and buildings in and around Webster City that have no use."

    g.      Referring to Wulf's misappropriations in regards to compensation to his daughter, and his concealment of the same, "[f]lagrant nepotism (more than a dozen members of Nelson, Rea and Wulf family and friends, *e.g.* Les [Wulf] hiring his own daughter without US work permit and using boy friend's social security [number]."

704.    Just two days later, at a December 6, 2017 VBF Board meeting, Lockard, Thelander, and Lyons expressed their shock and surprise of learning of the Founders' extensive fraud:

    a.      In reference to the Thelander Memo, the minutes reflect that the Founders "have put the company in a very serious situation.  Mr. Thelander made the comment that the Alder Aqua Ltd Directors are in a state of shock and disbelief, of the scale of the wrongdoing, as well as Management's complete disregard for company funds.  Moreover, the Management put forward totally unrealistic business plans, without substance, and continued to paint a picture to the Board that was a far cry from reality." *Id.* at p. 2.

    b.      Referring to the items raised in the Thelander Memo and the Founders' repeated misrepresentations and concealment regarding FCR, the minutes

reflect that "Mr. Lyons shared these concerns and made reference to Management's reporting of FCR at 1.03, which was clearly misleading, and seemingly intentionally so." *Id.*

c.   Referring to the Founders' misappropriations and their concealment thereof, the minutes reflect that "Mr. Lockard commented he is also feeling a state of shock, and commented that the Management spent money 'like drunken sailors' and shared his recent discussion with Mr. Finucan, who had raised the question if the Board would take legal actions against Management." *Id.*

705.   A true and correct copy of the December 6, 2017 VBF Board meeting minutes are attached as **Exhibit 87**.  These minutes not only reflect the Independent Board Members' then-recent and evolving discovery of the Founders' extensive fraudulent misrepresentations, concealment, and misrepresentations, but also the depth of these Independent Board Members' reliance thereon.

706.   In a December 13 through December 19, 2017 email chain, attached hereto and incorporated herein as **Exhibit 88** at p. 1, Brobjorg, VBF's controller, reflected his frustration in being unable to determine why so much of VBF's live inventory (barramundi) was written off in November 2017, demonstrating that VBF was still "in the dark" for the most part as to the Founders' misconduct as of this date.

707.   By December 21, 2017, as evidenced by VBF Board Minutes attached hereto and incorporated herein as **Exhibit 89**, the Independent Board Members asked McCowan if he found any data to "support the claims in the original investment case," referring to the Founders' various representations and claims regarding VBF's OFT, Metrics, operations, and finances.  In response, the minutes reflect McCowan's confirmation that upon his review of various data, "nothing exists to substantiate these claims--it is a flawed design. The manifestation of this is that every time the stocking density has exceeded 40 kg/m3, the system crashes with massive fish mortality as a result."

708.    In a December 28, 2017 email chain between the Independent Board Members, McCowan, and others, a true and correct copy of which is attached as **Exhibit 90**, Ebstein noted as follows:  "[t]he Board should be dismayed to learn that after more than $80 million has been poured into the company, its value is now only $6 million pre-debt."  It was the non-Alder directors that controlled the board-and the management of VBF-during 2016 and most of 2017, until the web of misinformation, and thus possibly fraudulent behavior, has been pierced by the most unwelcomed investigative questions from Alder designated directors.

709.    Within one month, on January 2, 2018, Lockard further expressed his then-recent discovery of the Founders' misconduct in a report to his fellow FishDish members (all who are named as recipients to the email. *See* **Exhibit 28**.

> This is a hard New Year's message, the long and short of it is, we were all mislead by Les [Wulf] and his team.  What do I mean by that? The biomass density of fish being grown was never as our CEO [Wulf] and his team stated.  Les [Wulf] was telling us we were going to achieve 126 kg of biomass per cubic meter of water, in fact he never got above 40 kg."
>
> ***
>
> How this [sic] did happen and why was it not found out more quickly? The issue, we were in grow out stage of getting tanks filled with conditioned water and fish.  So we are seeing the expense side of the ledger for growing the fish, fish food, overhead, etc.  So expense numbers are within the business plan budget.  However we are still selling fish out of the barns that most all of you had a chance to walk through, those numbers were consistently not meeting budget.  We were getting many excuses until we (the board) started to dig, more and more questions were raised.  The truth was not being told to us by the management team of four that put this whole deal together (they were all fired).

710.    VBF Board Minutes dated January 16, 2018, a true and correct copy of which is attached as **Exhibit 24**, at pp. 1-2, reflect McCowan's findings that VBF was not attaining the $9.00 per pound price for its fillets represented by the Founders, and that barramundi were actually selling at $3.95 per pound at that time; that VBF's farm in Blairsburg, Iowa did not have the required permitting from the Iowa Department of Natural Resources to hold fish; that the Founders

represented that VBF's water recycling system successfully recycled 98% of the water that flowed through the system when it was actually 50%; and that VBF's then-current cash burn rate was $890,000 per month.

711.     Further, in and after February 2018, McCowan began to discover significant flaws with VBF's bio-plans and related business plans.  For example, in one instance, McCowan discovered that the Founders' last plans contained a gap in the growth cycle of VBF's barramundi, documenting growth up to a certain fish weight (by way of illustration, two grams) with the next documentation picking it up at another fish weight (by way of illustration, thirty grams) with an obvious gap in between (by way of illustration, twenty-eight grams), deleting several weeks of the growth cycle to fraudulently portray that VBF's production cycle was shorter and more efficient than reality.

712.     As reflected in the January 19, 2018 VBF Board Minutes, a true and correct copy of which is attached as **Exhibit 91**, at pp. 1-3, Sedun resigned as a VBF Board Member and the remainder of the VBF Independent Board Members authorized new outside counsel (the Des Moines, Iowa-based Davis Brown Law Firm, "Davis Brown") to document VBF's termination of Wulf and James Rea for "egregious cause" in light of VBF's then-developing discovery of the Founders' misconduct.

A.     **VBF Retains Counsel Not Beholden to the Founders to Investigate Them**

713.     However, it was not until in or around February 2018 that VBF's Independent Board, especially those appointed by Alder, began to discover the Founders' fraud and other misconduct through the investigation of Davis Brown, as evidenced by affidavits obtained by Davis Brown that month.

714.     Outside counsel to VBF (not Jackson Walker or VBF's other outside counsel, Cassels Brock & Blackwell LLP, "Cassels Brock," whom the Independent Board Members no

longer trusted as these firms were far too intertwined with the Founders) began to investigate the Founders' misconduct in early 2018, and at that time obtained several affidavits from then-current or former VBF employees who further revealed the Founders' misconduct to the Independent Board Members at VBF at that time through such affidavits.

### 1.      Brobjorg Affidavit (February, 19 2018)

715.      Former VBF Controller Brobjorg executed an affidavit on February 5, 2018. *See* **Exhibit 1.**

716.      In regards to the Founders' misappropriations, Brobjorg (a) averred that Wulf suspiciously expensed monthly cell phone bills of $900 to $1,200 to VBF, refusing to provide documentation of the same when other officers' monthly expenses were typically in the $200-$300 range; (b) averred that Wulf expensed one of his cell phone bills for $950 for the month of February 2016 not once but twice to VBF; (c) corroborated the allegations herein regarding the Founders' misappropriations pertaining to BAJJER, BAJJER II, and AGF (discovered by Brobjorg in mid-2017), through which AGF appeared to enjoy an 87% annual interest rate from its "loan" to VBF; (d) corroborated the questionable VBF stock transactions alleged herein regarding BAJJER and benefitting Hall, Wulf, and Ted Rea personally with free VBF stock; (e) corroborated the allegations herein regarding ChipMeds; (f) corroborated the questionable OFA entity, which appeared to Brobjorg to be established by each of the Founders to benefit themselves personally at VBF's expense; (g) averred that Wulf expensed $14,374.44 to VBF as to his personal automobile, a 2007 Saturn Outlook with 177,455 miles on it and worth an estimated $1,400; (h) corroborated that Wulf caused VBF to overpay Sedun $53,056 in interest on his alleged "loan" and Sedun's questionable acquisition of VBF stock; (i) corroborated, as to the Wulf Lake House, that Wulf had difficulties in financing construction personally, that the reconstruction spanned roughly two years; (j) averred that James Rea and Arbanas helped Wulf rebuild the Wulf Lake

House and that VBF paid Arbanas to manage the reconstruction of the Wulf Lake House; (k) corroborated Wulf's expensing of other personal items to VBF; (l) corroborated that each of the Founders caused VBF to double-pay them in July 2016; and that Wulf, Hall, Ted Rea, and James Rea "'sold' VBF investors on a business model that was severely flawed/exaggerated,'" including misrepresentations regarding VBF's actual data regarding Density and FCR, and that he brought his concerns to the attention of Hall and Ted Rea, who ignored his concerns; (m) corroborated the allegations herein regarding Gagne and that the Founders otherwise played "fast and loose" with federal and state employee wage laws; (n) averred that Hall signed false "Compliance Certificates" to VBF's then-lender, Amstar; (o) corroborated the allegations herein regarding the Founders' Webster City home and James Rea's Ames, Iowa house funded by VBF; and (p) averred that the Founders improperly expensed to VBF their use of Brobjorg's time for their other, non-VBF business interests. *Id.*

## 2.   Jim Bruffy Affidavit (February 5, 2018)

717.   Bruffy was VBF's former Vice-President of Marketing, directly reporting to Driver, and then Wulf, and then Ted Rea, while mostly interacting with Wulf.  A true and correct copy of the affidavit of Jim Bruffy is attached as **Exhibit 92** (exhibits omitted).

718.   As to the market for barramundi, Bruffy averred that Wulf continued to mislead "investors and potential investors" that VBF was attaining $9.00 to $10.35 per pound for fillets, a figure which was built into VBF's modeling also provided to VBF shareholders and later Independent Board Members.

719.   Bruffy also averred that:

> 12.   Other than the formal presentations I did with him, Mr. Wulf had a strict rule prohibiting me from talking directly to investors about the pricing of our fish at market, or any other topics.  All pricing questions had to go through Mr. Wulf, or Keith Driver, and/or Mr. Ted Rea.  I believe Mr. Wulf

did not want me to talk to investors directly to allow Mr. Wulf to control all communication.

### 3.      Curtis Johnson Affidavit (February 6, 2018)

720.    Johnson was VBF's former Operations Manager, directly reporting to Driver, and then to Ted Rea.  Most of his interactions were with Driver, Ted Rea, and James Rea, although he had a "few" with Wulf.  A true and correct copy of Johnson's Affidavit is attached as **Exhibit 6**.

721.    In regards to Mortality and Density, Johnson averred as follows:

6.      I thought Mr. Wulf misled potential investors about our fish mortality rates.  When potential investors came through the fish barns from the summer of 2015 to the summer of 2016, they would view the documents (sheets of paper) on the end of the fish tanks regarding how many fish were in the tanks and the mortality rate of the tanks.  Mr. Wulf initially asked us to alter the actual mortality numbers of the fish in the tanks to make the mortality rates appear lower than they actually were.  We did not feel comfortable doing so.  Instead we were asked to remove the documents from the tanks before investors came through the barns.  That way, we did not feel we were lying to investors, despite whatever Mr. Wulf had told them.

7.      I believe Keith Driver was similarly misleading investors and potential investors regarding mortality rates.  An investor or potential investor came through the fish barn and asked Urban Farm Manager Mitch Downs about the fish mortality rate or system expectations.  Mr. Downs answered the question honestly.  The honest answer raised red flags with the investor or potential investor.  Shortly thereafter, Mr. Driver had a meeting with all fish technicians and barn personnel.  I was at the meeting.  Mr. Driver told us to be careful what we say to investors and to "be vague" when we spoke to them about mortality rates and system performance.

8.      My understanding is that Mr. Driver told us to be vague because he was making representations to investors and potential investors that he did not want us to undercut with the truth.

9.      In January or February of 2016, Mr. Driver was walking a group of potential investors through the fish barns.  Mr. Driver told the potential investors we could stock 16,000 fish in a tank.  The truth is that 16,000 fish in the tank could never be viable.  I had many discussions with Mr. Driver about the fact that he could not build a production plant on those large stocking density numbers.

211

10.     I sat down with Ted Rea in the spring of 2017. We were stocking the Buckeye fish farm with more fish than it could handle. As a result, mortality rates at Buckeye were through the roof. Fish were dying because they were overstocked. Ted Rea told me that we had to have 12,000 fish per tank. I tried to explain to him that "you cannot grow fish on paper." At that density, the fish will die. Ted Rea's response was that he believed putting extra equipment like a protein skimmer and an oxygen concentrator in the system would fix the density problems. At this time, there was no proof it would help.

11.     I have reviewed Keith Driver's 2015 PowerPoint presentation to potential investors . . . The document shows the growth rates for VBF's fish. There are suspicious red flags in Mr. Driver's data. It is strange that he keeps track of the fish in ounces. We keep track of them in grams. At the very end stage of growth, we keep track of them in pounds because that is how we sell them. I had to take Mr. Driver's data and convert it to something usable. I put the data into a spreadsheet. It is also attached to this affidavit. My biggest concern with Mr. Driver's data is that he is starting with fish that weigh 59 grams. We get our fish at 0.2 grams of weight. Mr. Driver has no data on fish growth from 0.2 grams to 59 grams. He is calling the growth beginning at 59 grams "stage one" in tank 13, but really our fish start stage one at 0.2 grams.

12.     VBF gets its fish from Mainstream, a company that supplies us with a growth model for their fish. There are significant differences from what the Mainstream data shows and what Mr. Driver's data shows.

13.     The other issue that I see with Mr. Driver's data is the low mortality rates. Some of his mortality rates are lower than I have ever seen in our system. For example, I have not seen a tank go more than a few days, the longest stretch being five days, without losing a fish. Mr. Driver shows a 1.3% mortality rate over the span of 39 days. That's a loss of approximately four fish per day. A more realistic fish loss is 20 or more fish per day, which is closer to a 5% or more mortality rate at this size and stocking.

14.     Based on my calculation, there are 42 days difference in "fish grow out" data from Mr. Driver versus the grow out data from Mainstream. That means Mr. Driver's model shows the growth of a fingerling fish to market weight 6 weeks faster than our supplier's model for growth of the same fish. I believe Mr. Driver's data is flawed.

722.    In regards to the Founders' misappropriation of VBF funds for their personal

expenses, Johnson averred as follows:

16.     VBF purchased Les Wulf, James Rea, and Ted Rea each their own Ford Explorer to use when visiting Iowa from Texas or Canada. The former

managers would leave their Explorers parked at the Des Moines Airport when they were not in use, which was often.  Mr. Wulf would only come to Iowa every two to three months.  VBF paid the exorbitant airport parking charges for their vehicles.

17.     VBF's "corporate house" in Webster City is just around the corner from my house.  I was told Mr. Wulf knocked on my former neighbor, Scott Ely's, door and asked him what he wanted for his house.  Mr. Ely said $300,000.  Mr. Wulf supposedly offered him $315,000 for the house if he moved out in month.  Scott Ely had not lived there for one year and he purchased the house for around $240,000 to $250,000.

**4.      Mitch Downs Affidavit (February 6, 2018)**

723.     Downs was VBF's former Urban Farm Barn Manager, directly reporting to Driver, and then to Ted Rea.  Most of his interactions were with Driver and Ted Rea.  A true and correct copy of Downs Affidavit is attached as **Exhibit 7**.

724.     In regards to Density, Downs averred as follows:

5.     I thought Ted Rea and Keith Driver were misleading potential investors.  In my opinion, what they were telling investors regarding how many fish could be put in a tank at a given time was skewed from what was actually possible.

6.     With regard to the fish density numbers, Mr. Driver and Ted Rea were selling three quarters of a pound per gallon density.  At VBF, we were steadily closer to a quarter to 0.3 pounds per gallon.  In my experience, any higher density than that would cause significant problems.

7.     In Fall of 2015, when Mr. Driver was the Operations Director, I saw growth models and spreadsheets of stocking plans with the numbers reflecting the model of three quarters of a pound per gallon density.  I had conversations with Mr. Driver and Ted Rea about the fact that those numbers were not realistic.  I told Mr. Driver we were having trouble with density at the VBF farm.

8.     The fish stocking plan was to introduce 15,000 fingerling fish into each tank.  My own calculation showed we could safely introduce only 5,000 to 6,000 fingerlings into each tank.

9.     I reported to Mr. Driver and Ted Rea what I thought was an accurate portrayal of the density numbers.  Their general reply was, "Well, we've been to other farms and they can do it, so why can't we?"  Basically, Mr. Driver and Ted Rea did not believe what I was saying.

10.    Mr. Driver told me that we would purchase a new piece of equipment to help with density.  We tried several pieces of new equipment.  The new equipment would never even get us close to Mr. Driver's density numbers.  Mr. Wulf would always push Mr. Driver's 15,000 fish density number to 20,000 or more.

11.    Potential investors came to tour the fish farms and it made me nervous.  The investors would ask how many fish are in the tank and how big they are.  We would have to dance around the actual number because Mr. Driver had previously directed us to "be vague" when talking to investors about fish performance data.

12.    Al Gore's investment group [referencing Generation] sent a professor from UC Davis to do a due diligence review on the Buckeye Farm.  The professor was asking me detailed questions and I felt cornered.  I thus told the professor the truthful answers to his questions.  Immediately after this, VBF called a meeting where we barn workers were reprimanded and told that we were not to converse with potential investors any more.  Only Keith Driver, Les Wulf, Bruce Hall, Ted Rea, James Rea, and Cam Robinson were allowed to discuss details with investors.  This seemed strange to me.

725.    In sub-paragraph 11 directly above, Downs avers to another of the Founders' tactics, shielding others from actual VBF data.  This tactic was not only applied to investors, but also VBF Independent Board Members.  For example, in or around May 2017, Wulf complained to Lyons (then Chairman of VBF's Board) that Haarkoetter was overstepping his position as VBF Board Member by attempting to contact VBF employees directly regarding VBF's actual data.  Further, Wulf made similar complaints to Lockard later in 2017 about Haarkoetter's accessing the Data Room.  Thus, the Founders not only concealed and misrepresented VBF's actual data, they aggressively obstructed the Independent Board Members from investigating the same.

**5.    Kelsey Clarken Affidavit (February 6, 2018)**

726.    Kelsey Clarken ("Clarken") was VBF's former Human Resources Recruiter.  *See* **Exhibit 4**, Clarken Affidavit.

727.    In regards to Wulf's misappropriation of VBF funds to benefit his daughter, Gagne, Clarken averred as follows:

214

6.      One issue I saw as fraudulent in my capacity in working in HR was Mr. Wulf's hiring of his daughter, Christine Gagne, to work at VBF from approximately October/November of 2016 to November of 2017. I first met Ms. Gagne when Wanda Huff was the HR director. I was reporting to Ms. Huff at the time. At this time, VBF had 1099 construction contractors.

7.      One day, Christine Gagne's boyfriend, Ronnie O'Brien, came to the VBF office to work as a 1099 contractor. He completed paperwork in my office which consisted of completing an I-9 Form and a Tax ID form. Then, about a month after Mr. O'Brien started to work for VBF, I heard Christine Gagne began working at VBF.

8.      Ms. Gagne worked as the secretary for the construction team and was in charge of the tools. She did not come into the VBF office or fill out any 1099 paperwork or employment paperwork. I was informed by either Ms. Huff or John Brobjorg that VBF was going to pay Ms. Gagne with a 1099. Originally, Ms. Gagne turned in her time cards with her name on them. Then, Ms. Huff told me that Ms. Gagne could not have her name on the time cards. Mr. Brobjorg told me that VBF was going to pay Ms. Gagne as "Ronnie O'Brien II." This meant that each pay period, VBF paid two pay checks to Ronnie O'Brien. We knew that one paycheck was for Christine Gagne and the other paycheck was for Ronnie O'Brien, even though both were under the name of Ronnie O'Brien. When Mr. O'Brien was fired from VBF, Ms. Gagne continued to work for VBF and receive paychecks in the name of Ronnie O'Brien.

9.      Ms. Gagne would drive VBF vehicles back and forth to Canada from Webster City, Iowa. She drove VBF vehicles without a valid driver's license in the United States. As Ms. Gagne did not have a driver's license, she was not covered on VBF's insurance policy.

10.     I was nervous from the beginning about Christine Gagne's employment with VBF because I process payroll. My father and I had a conversation with Mr. Wulf about the fact that we did not feel comfortable sacrificing our reputation for HR tasks that could put us in situations of personal liability. During the conversation, Mr. Wulf assured us that we were "not liable for anything pertaining to HR" matters. This meeting with Mr. Wulf took place at a coffee shop in Webster City.

11.     Ms. Gagne left the company abruptly in November of 2017. I remember her last day at VBF. Ms. Gagne had her own office at VBF. One day, she came rushing into her office, grabbed her computer and said, "None of you have ever seen me and you do not know who I am!" There is no I-9 documentation regarding Ms. Gagne ever being employed at VBF in the Webster City office.

12.     While she was at the office on her last day, Katie Olson called Ms. Gagne on behalf of Mr. Wulf and told her not to call her father. This was because the Board was starting to investigate her father, Mr. Wulf. The Board did not know about Ms. Gagne's employment at VBF.

14.     When Wanda Huff was fired, she wrote a letter to the Board and exposed at least the Christine Gagne situation and the mis-categorized 1099 situation. Ms. Huff also sent this letter to VBF's largest shareholder's lawyer. After this letter, James and Ted Rea asked me to build a case against Ms. Huff. James and Ted Rea amplified the situation to make Ms. Huff look like she was the "bad guy" and that she was "crazy" and "lost her mind." I think Ms. Huff's supposed mental health issues may have been caused by what she was seeing and dealing with in the VBF office. I believe aside from this, she still had mental issues that would and did prevent her from appropriately carrying out her responsibilities as HR Director. Ms. Huff was with VBF from July of 2016 to the end of November of 2016.

728.    In regards to Density, Clarken averred as follows:

18.     I believe there was fraud concerning the stocking density of the fish in VBF tanks. My husband, along with Curtis Johnson, and Mitch Downs, discussed with me their concerns over the stocking density. I am aware that it was a constant struggle to get their point across to Keith Driver about Mr. Driver's overstated stocking density.

729.    In regards to the Founders' misuse of VBF funds for their personal expenses, Clarken averred as follows:

21.     Another example of excessive spending was the purchase of VBF vehicles for Les Wulf, Ted and James Rea. To my knowledge, they would drive the vehicles for their personal use. When the vehicles were not used, they would keep them in the parking lot at the Des Moines Airport and pay for the airport parking with VBF funds.

730.    In regards the imminent danger that the Founders will swindle other investors, directors, officers, and companies, Clarken averred as follows:

22.     I am aware that someone from previous management asked my father, Mark Nelson, to go into business with them after they left VBF. I do not know all of the specifics. I do know that at least Ted Rea has a business venture that he wanted my dad to join him in. Ted Rea told my dad that he has "outside funding" for this venture. To my knowledge, the new business venture with the previous management, to include at least Ted Rea, involves fish hydrolysate.

216

B.     **VBF Terminates the Founders**.

1.     **Termination of Hall and Ted Rea**

731.    By late 2017, with VBF's mounting losses, the Independent Board Members recommended that Hall and Ted Rea be fired.  On or about October 27, 2017, Hall executed a "Termination Agreement," which included, among other things, a purported release of some of VBF's claims against Hall.  Wulf, one of Hall's co-conspirators, executed Hall's Termination Agreement ("Hall's Termination Agreement") purportedly on behalf of VBF.

732.    On the same day, Ted Rea executed a "Termination Agreement," which included, among other things, a purported release of some of VBF's claims against Ted Rea.  Wulf executed Ted Rea's Termination Agreement ("Ted Rea's Termination Agreement") purportedly on behalf of VBF.

733.    Jackson Walker, now believed to be the longstanding counsel for Wulf, Hall, Ted Rea, and James Rea, outside of VBF, drafted and reviewed these agreements purportedly as VBF's counsel.  True and correct copies of these agreements are attached as **Exhibit 93**.  VBF knew of no separate counsel representing Ted Rea as to Ted Rea's Termination Agreement or Hall as to Hall's Termination Agreement.  Therefore, it appears that Jackson Walker essentially represented, or at least had existing professional relationships with, both parties to Ted Rea's Termination Agreement, VBF and Ted Rea, and both parties to Hall's Termination Agreement, VBF and Hall.

734.    The purported release in Hall's Termination Agreement and Ted Rea's Termination Agreement provides:

> Except for the covenants and agreements of [Hall/Ted Rea] provided for in this Agreement, the Company, on its own behalf and on behalf of the other Company Releasees, hereby irrevocably and unconditionally release, acquit and forever discharge the [Hall/Ted Rea] Releasers from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever,

217

known or unknown (the "Company Releasee Claims") which the Company Releasees now have, own, hold, or to which the Company Releasees at any time heretofore had, owned or held against each of the [Hall Releasers/Ted Rea Releasers]. The Company Releasees represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any Company Releasee Claim or any portion thereof or interest therein.

*Id.* at ¶ 4(b).

735.    The Termination Agreements also included severance payments to both Hall and Ted Rea in the amount of $400,000 each.

736.    At the time that the Termination Agreements for Hall and Ted Rea were executed, VBF had not yet discovered the fraudulent acts committed by the Founders because the Founders had actively and fraudulently concealed their conduct.

### 2.    Termination of Keith Driver

737.    Driver worked along with the other Founders from the inception of VBF. Between approximately July 1, 2016 and January 13, 2017, Driver was the Chief Operating Officer of VBF.

738.    On January 13, 2017, Driver executed a Business Relationship Restructuring Agreement and Consulting Agreement ("Driver's Termination Agreement") that changed Driver's role with VBF to an independent contractor.  Wulf executed Driver's Termination Agreement purportedly on behalf of VBF.  A true and correct copy of this document is attached as **Exhibit 94**.

739.    Jackson Walker drafted and reviewed this agreement purportedly as VBF's counsel.  However, for the reasons alleged in Section XI below and otherwise herein, Jackson Walker was not truly independent counsel for VBF, and had divided loyalties to the Founders.

740.    VBF terminated Driver's independent contractor relationship on or about December 28, 2017.

741.    Driver's Termination Agreement provided for six installments payments totalling $550,000 and one payment of $500,000 for the cancellation of certain shares in VBF's affiliate.

742.    Driver's Termination Agreement also contained a purported release provision as follows:

> (b)    As a material inducement to Driver and Driver Co. to enter into this Agreement, and except for the covenants and agreements of Driver and Driver Co. provided for in this Agreement, VBF USA and VBF Canada, on their own behalf and on behalf of the other VBF Releasees, hereby irrevocably ad unconditionally release, acquit, and forever discharge the Driver Releasers from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown (the "VBF Releasee Claims") which the VBF Releasees now have, own, hold, or to which the VBF Releasees at any time heretofore had, owned or held against each of the Driver Releasers, including, without limitation, the Egregious Cause Claims.  The VBF Releasees represent that they have not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any VBF Releasee Claim or any portion thereof or interest therein.

*See id.* at ¶ 4(b) (collectively the purported release and severance provisions in Hall's Termination Agreement, Ted Rea's Termination Agreement, and Driver's Termination Agreement are hereinafter referred to as the "Release and Severance Provisions").

743.    In Driver's Termination Agreement, Driver also agreed to a confidentiality provision prohibiting him from disclosing confidential information "in a fiduciary capacity for the benefit of" VBF except in furtherance of Driver's duties under the Consulting Agreement or required by law to so disclose.  *See id.* at ¶ 4(a).

744.    At the time that Driver's Termination Agreement was executed, including, but not limited to, as alleged in Section X above, VBF had not yet discovered the extent of the fraudulent acts committed by the Founders, and those of Driver in particular, because the Founders, including Driver, had actively and fraudulently concealed their conduct.

### 3.     Termination of Wulf

745.     On November 6, 2017, VBF terminated Wulf, and on December 1, 2017 VBF and Wulf executed Wulf's separation agreement ("Wulf Separation Agreement").  VBF did not afford a release provision to Wulf as the Independent Board was become increasingly suspicious of the Founders.  At this time, however, VBF had yet to learn the true nature of the Founders' misconduct. A true and correct copy of the Wulf Separation Agreement is attached as **Exhibit 95**.  Jackson Walker also drafted the Wulf Separation Agreement, and VBF knows of no other counsel separately representing Wulf. Therefore, conflict problems also were also present as to the Wulf Separation Agreement.

746.     The Wulf Separation Agreement contemplates that Wulf would be paid a settlement totaling $400,000 and that VBF would continue to pay COBRA premiums for the lesser of either 12 months or the duration of such COBRA coverage.

### 4.     Termination of James Rea

747.     On or about July 1, 2016, VBF and James Rea entered into an Employment Agreement ("Employment Agreement"), which provided that James Rea could be terminated "by the Company for Cause."  A true and correct copy of this document is attached as **Exhibit 96**.  If he was so terminated, James Rea was not entitled to receive certain benefits including "accrued employment entitlements" which included (1) James Rea's base salary through the date of termination, and (2) any previously vested benefits, such as retirement benefits and vacation pay. Jackson Walker drafted and reviewed this agreement purportedly as VBF's counsel.

748.     At various times between July 1, 2016 and January 8, 2018, as described previously, James Rea committed various acts constituting "Egregious Cause" as defined in the Employment Agreement including (1) the commission of a crime of moral turpitude, or the commission of any other willful act or willful omission involving dishonesty or fraud with respect to VBF, (2)

breaches of the Employment Agreement and/or gross neglect of James Rea's duties, and (3) damage to or misappropriation or conversion of any funds or assets of the Company.

749.    By January 8, 2018, VBF was aware that James Rea charged personal expenditures to VBF's business account, and it terminated his employment for Egregious Cause.  Because of his termination for Egregious Cause, VBF did not owe James Rea accrued employment entitlements.  Further, VBF did not enter into a termination agreement with James Rea, as it did with the other Founders, due to the Founders' misconduct that was coming to light at this point.

## XI.  THE FOUNDERS' MISUSE OF CORPORATE COUNSEL

750.    Jackson Walker actively represented VBF from in or around 2014 through in or around early 2018.  All told, VBF paid Jackson Walker about $1,483,287.87 for its representation of VBF.  It also had in excess of 18,000 documents in its file relating to VBF, totalling over 100,000 pages.

751.    Through Jackson Walker, acting as VBF's counsel, Wulf, Hall, James Rea, and Ted Rea orchestrated the drafting of improper purported release provisions to which Ted Rea, Hall, and Driver claim a benefit.

752.    Upon information and belief, Wulf, Hall, James Rea, and Ted Rea retained Jackson Walker (and its partner Rick Dahlson referred to herein as "Dahlson") to represent VBF and had a preexisting relationship with the firm, and Wulf, Hall, James Rea, and Ted Rea have continued their relationship with Jackson Walker outside of the firm's representation of VBF.  In a January 31, 2019 email, in response to an inquiry from VBF, Jackson Walker disclosed as follows: "Mr. Dahlson has had contact with Les Wulf, but only regarding subjects other than VeroBlue."  A true and correct copy of this document is attached as **Exhibit 97**.

753.    One example of the closeness of the Jackson Walker-Founders relationship is Jackson Walker's transmittal of the Founders' misrepresentations to third parties.  On May 8, 2015,

Wulf emailed Dahlson a version of the June 2015 Marketing Deck, discussed above, thanking Dahlson for his "assistance is [sic] circulating this to groups you feel could have interest in the equity."  On May 12, 2015, Dahlson forwarded the June 2015 Marketing Deck to certain contacts who may have interest in investing in VBF.  *See* a true and correct copy of the May 8, 2015 email from Wulf and one of Dahlson's May 12, 2015 forwards attached as **Exhibit 98**. Dahlson forwarded the June 2015 Marketing Deck to multiple other contacts that same day.   Therefore, Jackson Walker was more than just the Founders' hand-picked counsel for VBF.

754.    Similarly, on February 23, 2016, Wulf provided Dahlson a version of the January 2016 Marketing Deck and January 2016 Executive Summary, which Dahlson forwarded on to one of his contacts asking if he knew of "any family office that might have an interest in investing" in VBF and noting that VBF had "[g]reat technology," was raising equity, and that Generation had already committed debt." A true and correct copy of the February 23, 2016 transmittal email is attached as **Exhibit 99**.

755.    By January 19, 2018, as alleged, VBF changed its outside counsel from Jackson Walker (and Cassels Brock) to Davis Brown, at the same time that VBF had terminated the last of the Founders (James Rea).

756.    On October 24, 2018, McCowan, as VBF's President, requested that Jackson Walker turn over all of VBF's client files to VBF.  A true and correct copy of this request is attached as **Exhibit 100**.

757.    In response, Jackson Walker stated that before producing certain documents it first needed to consult with Wulf, Hall, James Rea, Driver, and Ted Rea, although they had long since left the employ of VBF, based on a privilege that Wulf, Hall, James Rea, Driver, and Ted Rea could claim as to VBF files.  This marks the first time that VBF's Independent Board Members

and Independent Officers learned that Jackson Walker had loyalties, and divided ones at that, to Wulf, Hall, James Rea, Driver, or Ted Rea and VBF.  Jackson Walker thereafter began producing documents but did not complete production of the documents it was willing to produce until February 8, 2019.   A true and correct copy of this document is attached as **Exhibit 101**.

758.   The Independent Board Members were unaware of the nature and extent of Jackson Walker's attorney-client and other relationships with Wulf, Hall, James Rea, Driver, and Ted Rea at the time that Jackson Walker prepared Driver, Hall, Wulf, and Ted Rea's Termination Agreements, which Driver, Hall, Wulf, and Ted Rea now claim to benefit them to the detriment of VBF.

759.   As part of its production, Jackson Walker produced invoices showing the firm's representation of VBF on a variety of issues, as VBF's outside general counsel, from on or about September 8, 2014 through on or about January 10, 2018.  These dates coincide with, Hall, Wulf, James Rea, Driver's, and Ted Rea's reign over VBF.

760.   On February 8, 2019, after much delay, Jackson Walker produced additional documents, but withheld from VBF hundreds of documents from the firm's files for its representation of VBF.  VBF strenuously objected to its own counsel's withholding of files from the firm's own client, VBF.  VBF also had to insist on Jackson Walker providing a privilege log that it had readily available.

761.   The privilege log provided by Jackson Walker in February 2019 revealed the following about the documents that Jackson Walker initially withheld from its own client (VBF): (a) the documents are dated March 20, 2015 through July 6, 2016, well within the September 2014 through January 2018 time frame that Jackson Walker represented VBF (and Jackson Walker has never, to VBF's knowledge, withdrawn from its representation of VBF); (b) the documents were

all sent, received, or generated by Jackson Walker in its representation of VBF (as they were logged in response to VBF's request for their files); and (c) some of the documents are communications, drafts, or other documents relating to the very employment agreements that Driver, Hall, Wulf, and Ted Rea have put at issue as to various aspects of this case.  A true and correct copy of this privilege log is attached as **Exhibit 102**.

762.    Jackson Walker's grounds for withholding documents from its own client, VBF, in Jackson Walker's own VBF client files, was based on an attorney-client privilege that Jackson Walker and the Founders have claimed as to their relationship, as opposed to Jackson Walker's relationship to VBF.

763.    VBF filed an adversary complaint against Jackson Walker in the Bankruptcy Proceedings seeking turnover of VBF's client files.  In an April 24, 2020 ruling in that case, the United States Bankruptcy Court for the Northern District of Iowa resolved that proceeding, in which Wulf, Hall, Ted Rea, and James Rea participated by filing a brief leading to ruling.  In that brief, Wulf, Hall, Ted Rea, and James Rea argued that they and Driver were entitled to assert the attorney-client privilege as to their VBF communications with Jackson Walker against VBF.

764.    The bankruptcy court ruled that: (a) Jackson Walker must turn over further VBF client files to VBF (which Jackson Walker has now accomplished); and (b) that Jackson Walker may withhold from VBF approximately one thousand documents (largely emails and attachments thereto) between Jackson Walker and any of the Founders despite the fact that such communications were generated in the course of Jackson Walker's representation of VBF (and VBF paid Jackson Walker's fees for the work reflected in such withheld communications).  *See VeroBlue Farms USA, Inc., et al, v. Jackson Walker LLP*, Case No. 19-09014, United States Bankruptcy Court for the Northern District of Iowa, Dkt. 25.  Thus, this ruling confirmed that

Jackson Walker did withhold documents from its own client, VBF, to which VBF was entitled, but that other documents in the Jackson Walker client files for VBF can be withheld from VBF due to Jackson Walker's close relationship to the Founders which warranted the protection of the attorney-client privilege.

765.    Jackson Walker therefore had a conflict-of-interest that was not disclosed to the Independent Board, and the Independent Board never executed any waiver of Jackson Walker's conflict-of-interest.  Jackson Walker's conflict was perhaps most acute when it represented VBF in negotiating and drafting the Driver, Hall, Wulf, and Ted Rea's Termination Agreements, three of which contain alleged release provisions that are now cited by Jackson Walker's clients (Hall and Ted Rea) against Jackson Walker's other client, VBF.  Although Driver did purport to have counsel other than Jackson Walker representing him as to his Termination Agreement, Jackson Walker still had divided loyalties when representing VBF as to that agreement, given Driver's close relationship with the other Founders and Jackson Walker, as documented in the bankruptcy court's ruling entitling Driver to claim an attorney-client privilege against VBF as to communications he had with Jackson Walker regarding VBF.

## XII.  WULF, HALL, TED REA, AND JAMES REA'S MISCONDUCT CONTINUES INTO THE YEAR 2019

766.    On September 21, 2018, VBF and affiliated entities ("Bankruptcy Debtors") filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court for the Northern District of Iowa, *In re VeroBlue Farms USA, Inc., et al.*, Case No. 18-01297 (the "Bankruptcy Proceedings").

767.    Shortly thereafter, Wulf, Hall, James Rea, and Ted Rea sought to surreptitiously interfere in the Bankruptcy Proceedings.  They sought a dismissal of this case, against them and Driver, through the Bankruptcy Proceedings, for zero consideration to VBF.  This demonstrates the desperate, calculated, and premeditated means that Wulf, Hall, James Rea, and Ted Rea will

undertake to obfuscate their misconduct, seeking the dismissal of a claim for tens of millions in compensatory damages, for nothing.  They attempted interference in the Bankruptcy Proceedings in several ways.

768.    The first way was through the unsecured creditors committee ("Creditors Committee").  On December 18, 2018, counsel for the Creditors Committee submitted a "Notice of Challenge" to VBF and the other Bankruptcy Debtors in the Bankruptcy Proceedings ("Challenge Notice").   Through the Challenge Notice, the Creditors Committee purported to challenge certain bankruptcy actions and sought a dismissal of this lawsuit, for zero consideration to VBF, based on a series of allegations, many of them false.  Two days later, the Challenge Notice was also adopted by the "Ad Hoc Committee of Equityholders" ("AHC"), which was a non-sanctioned group of shareholders mostly concocted by the Founders.

769.    The Challenge Notice was later withdrawn by the Creditors Committee, who never acted on it, and for good reason.  VBF confirmed that the Challenge Notice was prepared based on falsities and half-truths that Wulf, Hall, James Rea, and Ted Rea provided to the Creditors Committee's counsel about this case.

770.    Indeed, it seemed strange to VBF that the Creditors Committee and AHC would seek the dismissal of this case in its Challenge Notice with no recovery to VBF.  Thus, on January 9, 2019, VBF's counsel met with the Creditors Committee's counsel to discuss the Challenge Notice, at which time counsel acknowledged that Wulf, Hall, James Rea, and Ted Rea were the impetus of the Challenge Notice and that Wulf, Hall, James Rea, and Ted Rea were the source of background information for that document.

771.    In another attempt to interfere, Wulf, Hall, James Rea, and Ted Rea retained the Chicago law firm of Horwood Marcus & Berk Chartered ("HMB") to represent them in the

Bankruptcy Proceedings.  In a bankruptcy filing, HMB represented that "HMB has previously provided limited services to Ted Rea, James Rea, Bruce Hall, and Leslie Wulf (the "Founding Shareholders") for several weeks in conjunction with these Chapter 11 proceedings…."  Wulf, Hall, James Rea, and Ted Rea have also at times represented to courts that they are members of the AHC, which attempted to meddle in the Bankruptcy Proceedings even when the Creditors Committee refused to do so, based on the same meritless claims that were ultimately rejected by the Creditors Committee, as set forth above.  Wulf, Hall, James Rea, and Ted Rea or HMB, however, have also denied that Wulf, Hall, James Rea, and Ted Rea were ever members of the AHC in other representations to the bankruptcy court and this Court.

772.    For example, in Wulf, Hall, James Rea, and Ted Rea's February 24, 2019 Motion to Quash in this case, (Iowa Dkt. 37-1 at 10, as this case was transferred to this Court from the United States District Court for the Northern District of Iowa, the "Iowa Court"), the Founders represented as follows:

> HMB was Defendants' [Wulf, Hall, James Rea, and Ted Rea's] individual counsel in the Bankruptcy Case from November 8 through December 18, 2018 . . . since December 18, 2018, Defendants have been members of the Equityholders' Committee [AHC] that HMB and the Beecher Firm now represent, therefore, all [of the Founders' or their counsel's] communications related to the Equityholders' Committee's investigation of VBF and its challenges to VBF's reorganization plan are also privileged.

773.    Wulf, Hall, James Rea, and Ted Rea made other representations in that Motion, to the Iowa Court, that they "are members of the Equityholders' Committee (AHC)" (*Id*. at 11); that "HMB was Defendants' individual counsel and now represents Defendants as members of the Equityholders' Committee in the Bankruptcy Case" (*Id*. at 9); and that "HMB [is] Counsel to the Ad Hoc Committee of Equityholders, including Defendants" (*Id* at 4). Thus, Wulf, Hall, James Rea, and Ted Rea flatly admitted that they were part of the AHC, led by Wulf, Hall, James Rea, and Ted Rea's own counsel, HMB.  The AHC, therefore, was nothing more than Wulf, Hall, James

227

Rea, and Ted Rea's vehicle to attempt to surreptitiously manipulate the Bankruptcy Proceeding to their benefit. Again, this demonstrates Wulf, Hall, James Rea, and Ted Rea's premeditated meddling in the Bankruptcy Proceeding to gain a dismissal of this case.

774.    In a February 27, 2019 filing submitted in the Bankruptcy Proceeding, however, an HMB attorney verified under oath as follows: "None of the Founding Shareholders [Wulf, Hall, James Rea, and Ted Rea] are members of the Equity Committee …." Bankruptcy Proceeding, Dkt. 42-1 at p. 151, ¶ 5, verified statement of Aaron L. Hammer, specifically stated under penalties of perjury; *see also id.* at p. 150, ¶ 1, which certifies under oath that "Exhibit A" thereto lists all AHC members, and Exhibit A thereto, at pp. 154-158, does not list the Founders as AHC members.

775.    Later, in a March 18, 2019 filing in this case, Wulf, Hall, James Rea, and Ted Rea contradicted their previous representations to the Iowa Court (and now this Court) that they were AHC members: "Defendants are not currently represented by HMB as counsel to the Equityholders' Committee in VBF's Bankruptcy Case. Defendants are not and have not been members of the Equityholders' Committee." Iowa Dkt. 46 at 2.

776.    Thus, Wulf, Hall, James Rea, and Ted Rea and their counsel have made contradictory representations to this Court's predecessor in this case (the Iowa Court) and the bankruptcy court, and the latter court has taken notice of these contradictory representations. Ultimately, on March 22, 2019, the bankruptcy court barred the AHC from acting in the Bankruptcy Proceeding after VBF and its co-Bankruptcy Debtors raised these and other issues with the court. Bankruptcy Proceeding, Dkt. 398.

### XIII.  ADDITIONAL FACTS SUPPORTING VBF'S CLAIMS FOR PUNITIVE DAMAGES

777.    The Founders' willful, premeditated, calculated, and egregious acts alleged previously, consisting of stealing funds from VBF, lying about VBF's Metrics and other material

facts, hiding material facts, and even forgery as evidenced in the Forged FTAI Reports, are more than enough to support VBF's claims for punitive damages against each of the Founders and Gagne. However, in this section, VBF submits additional facts supporting its request for punitive damages.

A.    **The Founders' and Canaccord's "Reverse Engineering" of VBF Data.**

778.    On April 3, 2015, Driver, through an email of that date represented to the State of Iowa Department of Natural Resources that VBF's barramundi were then achieving "FCRs in the range of 1.03, without adjustment for death loss," an outright falsity, demonstrating that Driver was even willing to make misrepresentations to the government, showing the depth of Driver's fraudulent intent. A true and correct copy of this email is attached as **Exhibit 104.**

779.    On the heels of Dr. Fitzsimmons's negative comments in 2014, Dr. Michaels's harsh criticisms of VBF in June 2015, and the Founders' receipt of the Pre-Forgery FTAI Reports in July 2015, which were negative about VBF's ability to continue in operations, the Founders should have "stopped the bleeding" and ended VBF's continuing operations.

780.    Instead, in the summer of 2015 the Founders, in the middle of attempting to raise equity and debt investments for VBF, doubled-down on their fraud, with Canaccord's assistance. Canaccord was tasked with assisting the Founders in raising debt and equity for VBF.

781.    First, Wulf, Hall, and Canaccord furthered their plan to "reverse engineer" desirable Metrics and financial information, meaning that Wulf, Hall, and Canaccord started from the top down, with representations that would procure interest in VBF, without regard to whether VBF's actual data supported such data, rather from the bottom up, *i.e.*, with transparent representations that were based on VBF's actual data.

782.    An example occurred on June 20, 2015, when Goodman emailed Wulf, copying Lobb and Hall, to discuss how to improve VBF's EBITDA. Specifically, Goodman stated that "I

think if we list the assumptions that are conservative and show the impact of each on performance we can address this.  For instance, change from assumed stocking density of 5,000 to 8,000 per tank would improve EBITDA" by certain multiples ("June 2015 Goodman Email").  A true and correct copy of the June 2015 Goodman Email is attached hereto as **Exhibit 105**.

783.    Goodman prepared the June 2015 Goodman Email in response to a prior email from Lobb that noted that two potential investors were interested in VBF "but share a concern about the cost of the debt and how it may impact VBF's ability to operate." *Id.*

784.    Goodman's statement demonstrates the technique utilized by Canaccord and the Founders of starting with the numbers that Wulf, Hall, and the other Founders wanted to represent to the marketplace and others without regard to actual and contrary VBF data and reality, which was negative and did not support the numbers and other facts that they wanted to represent.

785.    Indeed, later that day, Wulf emailed Goodman, copying Lobb, a draft email to address a potential investor's concerns regarding debt.  As for stocking density, Wulf noted "[i]n the base modeling we used 10,000 fish for stocking but today we are stocking at 16,000 a 6000 [sic] difference or a 11,500 per years increase in pounds produced out of each tank (see EBITDA increase in chart below)."

786.    Only hours later Goodman emailed Wulf, copying Lobb, a revised draft email  that elaborated on the stocking density section so that it read "[i]n the base model we assume 10,000 fish for stocking. . . . Today, we are stocking at 16,000 fish in the first tank, for an average harvest per tank of approximately 58% greater than assumed in the model.  The only incremental cost is the feed and fingerling [sic] (see EBITDA increase in chart below)."  ("Wulf and Goodman June 2015 Email").  A true and correct copy of this email exchange is attached as **Exhibit 106**.

787.   This plan was likely created in response to Wulf's disappointment in the interest (or lack thereof) VBF was receiving from the financial market while trying to raise equity and debt funds in the summer of 2015.

788.   Indeed, on June 22, 2015, Wulf sent an email with the subject line "VBF Process Equity/Debt" ("Wulf June 22, 2015 Email") to Mark Pibl of Canaccord, copying Goodman and Hall.  In the Wulf June 22, 2015 Email, Wulf expressed disappointment in the financial market's lack of interest in VBF at an equity roadshow in New York that Canaccord and Wulf led in order to find an equity investor for VBF.  A true and correct copy of the Wulf June 22, 2015 Email is attached as **Exhibit 107.**

789.   Wulf's disappointment was also reflected by the fact Canaccord only had one equity meeting in NYC whereas there were 16 equity meetings in Toronto, as Wulf explained in the Wulf June 22, 2015 Email.  Wulf "thought that with NYC being a much bigger financial market then [sic] Toronto that [VBF] would have gotten more traction then [sic] one meeting or interest party in NYC." *Id.*

790.   To try and artificially drum up investor interest in VBF, Wulf advised Ginsberg to advise potential VBF investors of "the story we over [sic] 50% book full," meaning that Wulf advised Ginsberg to represent to others that VBF had commitments to 50% of its targeted equity investment, then $25,000,000 (or $12,500,000 in represented commitments).  *See* July 7, 2015 to July 10, 2015, email chain between Wulf, Ginsberg, Lobb, Pibl, and another Canaccord representative ("July 2015 Email Chain"), a true and correct copy of which is attached as **Exhibit 108.**  Wulf, Ginsberg, Lobb, and Pibl knew this was false and that VBF had no such commitments at that time.

791.    The Founders also put into action Goodman's plan to artificially increase VBF's stocking density, without any actual data to support doing so, into action.

792.    On or about June 25, 2014, Hall authored an Excel file entitled "Assumptions-Barramundi Excel File" ("Master Model").

793.    The Master Model contains assumptions related to VBF's Metrics and other financial information that Wulf, Hall, Driver, Ted Rea, and James Rea manipulated, as described below.

794.    Initially, after Wulf, Hall, Driver, Ted Rea, and James Rea, were terminated, VBF discovered two drastically different versions of the Master Model, both dated June 30, 2015, which were both represented to be based on actual data.  In one model, the Master Model Excel File represented that VBF could produce 20,000 pounds of fish per year per Tank ("Model 1").  The other model represented VBF's pounds of production per year to be 34,650 per Tank ("Model 2"). True and correct copies of Model 1 and Model 2 are attached as **Exhibit 109** (metadata added as header).

795.    Upon further investigation, VBF discovered the evolution of the Master Model over time.

796.    First, Wulf, Hall, Driver, and Ted Rea were each aware, in July and August of 2015, of the existence of Model 1, which represented that VBF could produce 20,000 pounds of fish per year per Tank, because on July 29, 2015, Hall emailed a version of Model 1 to a third party copying Ted Rea and on August 19, 2015, Wulf emailed a version of Model 1 to a third party, copying Hall and Driver.

797.    However, after reviewing data from VBF's servers, VBF has to date found no indication that any Founder provided any version of Model 1 to any Independent Board Members or to FishDish, Alder, or any of their representatives.

798.    Instead, from December 18, 2015 through August 31, 2016, Wulf and Hall provided versions of the Master Model with inflated numbers to Independent Board Members, FishDish, Alder and their representatives (Thelander, Haarkoetter, and Lockard).  Driver, Ted Rea, and James Rea, were also aware of these shared inflated versions, as shown below.

799.    On August 3, 2015, Hall emailed Wulf and Ted Rea a version of Model 2, which represented that VBF could produce 34,650 pounds of fish per year per Tank, which Ted Rea forwarded to James Rea.

800.    On December 18, 2015, Wulf emailed a version of the Master Model to Lockard, a VBF Board Member as of June 2016 and a manager of FishDish who became a VBF shareholder in July 2016, with a copy to Robert Smith, a FishDish shareholder, and Hall. This version of the Master Model represented that VBF produced 25,830 pounds of fish per year per Tank and had an FCR of 1:1 ("Model 3").  A true and correct copy of Model 3 is attached hereto as **Exhibit 110** (metadata added as header).

801.    On March 21, 2016, Wulf emailed a version of Model 3 to a third party, copying Hall, Driver, Ted Rea, and James Rea.

802.    On April 16, 2016, Wulf emailed a version of Model 3 to Thelander, with a copy to Hall.

803.    On June 22, 2016, Wulf emailed a version of the Master Model to Lockard. This version of the Master Model represented that VBF produced 28,158 pounds of fish per year per

Tank and had an FCR of 1:1 ("Model 4").  A true and correct copy of Model 4 and the transmittal email are attached hereto as **Exhibit 111** (metadata added as header).

804.    On July 5, 2016, Thelander emailed Wulf and Hall a version of the Master Model that Thelander received from them, asking that they confirm that that version, among other documents, was the most updated version.  This version of the Master Model represented that VBF produced 35,863 pounds of fish per year per Tank and had an FCR of 1:1 ("Model 5").  A true and correct copy of Model 5 and the transmittal email are attached hereto as **Exhibit 74**.

805.    On July 6, 2016, Wulf emailed Model 5 to Lyons, a VBF Board Member as of December 2015 who was also a VBF shareholder, with a copy to Hall.

806.    On August 31, 2016, Hall uploaded a version of Model 4 to the Data Room, to which Alder had access, confirming Alder's receipt of same.  Specifically, on or about May 31, 2016, Thelander, a representative of Alder who soon thereafter became a VBF shareholder and Independent Board Member, downloaded the folder that contained a substantially similar version of this document from the Data Room.

807.    Model 1, when compared to Models 2-5, reflects the fraudulent "reverse engineering" technique discussed in the June 2015 Goodman Email whereby each of the Founders start with the numbers or other facts that they wanted to represent to the marketplace and others without regard to actual VBF data and reality, which was negative and contrary.

808.    Ginsberg, at his May 2019 deposition, described Goodman's manipulation of density set forth in the June 2015 Goodman Email as a way to "juice up the numbers."  The Founders, as reflected in Models 2-5, apparently continued in this *modus operandi*, misrepresenting actual VBF data and "juicing up the numbers," to show Alder, FishDish, and the Independent Board Members throughout their tenure at VBF.

809.    Wulf and Hall knew, as early as June 2015 that the EBITDA figures that they represented were inaccurate and did not comport with actual and contrary data.  However, they engaged in the reverse engineering described above anyhow and shared the representations resulting therefrom.

810.    Wulf, Hall, Driver, Ted Rea, and James Rea's reverse engineering allowed them to (1) incentivize VBF to raise and allow expenditure of corporate funds, (2) placate current shareholders–lulling them into a false sense that their investments were secure and that VBF was being run properly, (3) ensure that non-insider VBF management and employees did not question the Founders' management of VBF to others, and (4) convince the Independent Board Members and Independent Officers that VBF should continue to operate, raise and extend corporate funds, and support the Founders' continued management of VBF, all of which ultimately allowed Wulf, Hall, Driver, Ted Rea, and James Rea to raise, waste, and misappropriate tens of millions of dollars in VBF assets and resources.

811.    Even while the Founders were concealing and/or misrepresenting material facts about VBF and misappropriating VBF's assets, on April 24, 2017 Wulf emailed Lockard soliciting Lockard to raise investor funds for VeroLube Inc., another one of Wulf, Hall, Ted Rea, and James Rea's promotions, a company that allegedly recycled oil byproducts. A true and correct copy of the April 24, 2017 email is attached as **Exhibit 112.**

## B.    The Founders' Other Tactics Demonstrating Willfulness and Calculation.

812.    Wulf, despite being the ringleader of the Founders' fraudulent tactics and other misconduct, attempted to throw Ted Rea "under the bus" in a November 5, 2017 text message to Lockard, which is pasted below.  In this text message, Wulf references McCowan ("Normand [*sic*]") and Ted Rea ("Ted").  Contrary to Wulf's fraudulent statement to Lockard in his text below, Wulf knew of Ted Rea's fraud all along—they were partners in the scheme:

813.    In March 2018, the Nelson family, who sold Iowa's First to the Founders in what

became VBF, wrote in relevant part as follows in a letter attached hereto and incorporated herein

as **Exhibit 103** (referring to the Defendants as the "Dallas Group" or "con artists"):

> We are writing this letter to convey messages to you that we feel like over the course
> of the last two years, have been lost in translation, or perhaps were never translated
> at all.   As a family who feels the pains and joys of being in business together so
> deeply, we felt we needed to reach out to you in hopes that you will understand our
> sincerity and truthfulness.   Nothing is more painful than feeling like your name,
> your dignity, and your dedication, has been conformed to a group of con artists….
>
> We truly feel that the Dallas group lied, manipulated, and took advantage of not
> only our family's good will, but the good will of our many friends and community
> members who invested their hard-earned money into this business.
>
> …   From very early on in our venture with the Dallas group, we felt our knowledge,
> information, and expertise was ignored, dismissed, and even hid from you, your
> team, and members of the board.   However, it wasn't until after these individuals
> were terminated that we fully understood the magnitude of their corruption and
> deceitfulness.   It was a betrayal unlike any other.
>
> It's important for us to place emphasis on the fact that because we live in a small,
> rural community, it has been and will be our reputation on the line.   To many,
> VeroBlue Farms is the Nelson family.   When bills are not paid to local vendors,
> these businesses call Jeff or Mark.   The Nelsons are a century old farm in Hamilton
> County, meaning many of these relationships go back over decades and decades.
> Unfortunately, it won't be the Dallas group who must worry about rebuilding trust
> and repute amongst the community, it will be our family.   We've built such strong
> relationships with our employees and co-workers because it is what comes natural
> for us.   When we bring these people into our homes for holidays, spot them a couple
> hundred dollars to make it until payday, or simply treat them like they are a part of
> our family, it is because we genuinely care.   VeroBlue Farms has employed some
> of the hardest, most dedicated workers a company could have.   As we let more and
> more employees go, we are mourning with them, but also mourning the loss of
> something we all felt so proud to call our own.   Many of these people uprooted their
> whole lives to move to Iowa to accomplish a common dream.   Just like us, they

were lied to and manipulated by the Dallas group.  Just like the Nelsons, they were
ignored, pushed aside, and even fired for wanting to convince the Dallas partners
of the VeroBlue Farms business model reality.

These statements not only support VBF's claims for punitive damages, but the applicability of the
discovery rule as to the statute of limitations, to the extent that is necessary (which VBF submits
it is not).

814.    Similarly, in early 2019, even after they were all fired by VBF and VBF filed for
Chapter 11 Bankruptcy after the Founders stole and squandered over $90,000,000, the Founders
were still attempting to raise investor funds for other investments, including but not limited to
Symfonia Ventures ("Symfonia"), the promotion of which is evidenced by a February 11, 2019
email from Finn & Co., a purported investment banking firm, attached hereto and incorporated
herein as **Exhibit 114**, which states in relevant part as follows:

Merger and Acquisition Assignments:

(1) Fish/Aquaculture Companies: We have formed joint ventures to acquire and/or
'green field' companies or projects engaged in the Agriculture/Aquaculture arena,
both in North America and Asia. The name of this new venture is Symfonia
Ventures. This is a Dallas, TX based operating company/fund that seeks
acquisitions of businesses engaged in any field of agriculture but of most
importance is that the entity has a new technology or process that is the principal
asset of their business model. Symfonia, as an extension of these activities, has a
prominent China based partner that will join with us on many of our China and
South East Asian agriculture ventures.

815.    Wulf, Hall, and Ted Rea are involved as principals of Symfonia, as documented in
a corporate profile attached hereto and incorporated as **Exhibit 115**.

816.    Similarly, around that same time frame, early 2019, Wulf, Hall, Ted Rea, and James
Rea were promoting another investment called MAPL Yield Fund, Ltd. ("MAPL").  A true and
correct copy of the promotional materials regarding MAPL is attached as **Exhibit 116**.  Wulf is
identified by name in these promotional materials, and by description of the principals to MAPL
(the "four partners" referenced on the last page of the materials).

237

817.    MAPL is a REIT (real estate investment trust) investment vehicle led by Wulf, Hall, Ted Rea, and James Rea to invest in mortgages on industrial condominiums in the Dallas area. The promotional materials contain some of the same types of statements as VBF's Marketing Decks, including that an investment in MAPL is "de-risked."

818.    Wulf solicited Lockard to invest in MAPL through February 20 and March 1, 2019 emails attached hereto and incorporated herein as **Exhibit 117** (in the February 20, 2019 email Wulf references the MAPL promotional materials attached hereto as **Exhibit 116** and claims "I have three large investment banks wanting to do the deal," another fraudster-like pressure tactic employed by Wulf.).

819.    Upon information and belief, Wulf, Hall, Ted Rea, and James Rea, possibly through Symfonia, are attempting to participate in a Federal Opportunity Zone in Gun Barrel, Texas (the same town where the Wulf Lake House is located) established by the United States Tax Cuts and Jobs Act of 2017.

## XIV.  CAUSES OF ACTION

### COUNT I – BREACH OF FIDUCIARY DUTY – ALL FOUNDERS

820.    VBF adopts and reincorporates paragraphs 1 through 819.

821.    Wulf, Hall, Driver, Ted Rea, and James Rea each owed fiduciary duties to VBF from in or around October 1, 2014, when they came to control VBF and served as officers and directors, through and including January 2018, when the last of the Founders was terminated as an employee, contractor, officer, and/or director of VBF.  The specific dates of each Founder's membership on VBF's Board is listed in paragraph [27], and the specific dates of each Founder's holding of an officer position is listed in paragraphs [8-12].

822.     Wulf, Hall, Driver, Ted Rea, and James Rea's fiduciary duties to VBF included, but were not limited to, those of loyalty, good faith, candor, to restrain from self-dealing, integrity, fair and honest dealing, due care, and full disclosure.

823.     Wulf, Hall, Driver, Ted Rea, and James Rea each breached their fiduciary duties of loyalty, good faith, candor, to restrain from self-dealing, integrity, fair and honest dealing, due care, full disclosure, and others, to VBF in one or more of the following ways, which depleted VBF of funds, rendered VBF's operations untenable, and caused the demise and subsequent bankruptcy of VBF:

a.      by misappropriating VBF funds for their personal benefit;

b.      by misappropriating other VBF assets and resources for their personal benefit;

c.      by misappropriating VBF Canada's stock for their personal benefit;

d.      by self-dealing and by concealing their self-dealing from VBF;

e.      by grossly reckless and/or intentional misuse and waste of corporate assets;

f.      by continuously and systematically concealing and/or misrepresenting VBF's Metrics, VBF's financial information, VBF's management competence and experience, and VBF's technology to Independent Board Members, Independent Officers, VBF shareholders, and other VBF management and personnel;

g.      by grossly reckless and/or intentional failure to act in the best interests and to the sole benefit of VBF; and

h.      by otherwise breaching their fiduciary duties to VBF, including but not limited to other misconduct that depleted VBF of funds, rendered VBF's operation untenable, and caused the demise and subsequent bankruptcy of VBF.

824.     VBF suffered injuries as a direct and proximate result of each of Wulf, Hall, Driver, Ted Rea, and James Rea's breaches of their fiduciary duties, and Wulf, Hall, Driver, Ted Rea, and James Rea each gained a personal benefit from such breaches.  VBF's compensatory damages are in excess of $90,000,000.

825.   Further, at least some of Wulf, Hall, Driver, Ted Rea, and James Rea's breaches of their fiduciary duties have been willful and egregious, and involved malice and fraud.  Therefore, punitive damages are warranted against Wulf, Hall, Driver, Ted Rea, and James Rea and in favor of VBF, in an amount to be determined at trial.  Additionally, Wulf, Hall, Driver, Ted Rea, and James Rea's self-dealing transactions with VBF are presumed invalid, and the burden of proof lays with Wulf, Hall, Driver, Ted Rea, and James Rea to prove the fairness of such transactions by clear and convincing evidence.  Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

## COUNT II – FRAUDULENT CONCEALMENT – ALL FOUNDERS

826.   VBF adopts and reincorporates paragraphs 1 through 819.

827.   Wulf, Hall, Driver, Ted Rea, and James Rea each concealed from VBF or failed to disclose to VBF material facts including, but not limited to, the following, as alleged *supra*:

   a.   the BAJJER Stock Scheme;

   b.   the AGF Scheme;

   c.   the Lake House Scheme;

   d.   the Sedun Payment Scheme;

   e.   the Compensation Scheme;

   f.   the Gagne Scheme;

   g.   the OFA Scheme;

   h.   the VBF Canada Stock Scheme;

   i.   their other misappropriations of VBF funds and other assets and resources for personal use, including as alleged in Section V;

   j.   negative information and data regarding each of the following, including those that contradicted their factual misrepresentations, including as set forth in Section VII:

      i.     FCR,

      ii.    Density,

     iii.   Mortality Rates,

     iv.   Water Quality,

     v.    EBITDA, VBF's valuation, and other financial Metrics,

     vi.   theirs and VBF's technical experience and competence ,

    vii.  the alteration and forging of the FTAI Reports,

   viii.  the market and demand for barramundi;

     ix.   the quality of VBF's barramundi;

     x.    VBF's OFT, and

k.     other material facts that would have revealed the existence of the Founders' misconduct.

828.    Wulf, Hall, Driver, Ted Rea, and James Rea, as fiduciaries to VBF, each owed VBF a duty to disclose these material facts to VBF, including to Independent VBF Board Members, Independent VBF Officers, VBF shareholders, and other VBF management and personnel. Further, Wulf, Hall, Driver, Ted Rea, and James Rea each created false impressions through partial disclosures and voluntarily disclosed some related information, also leading to a duty to disclose the whole truth of these material facts to VBF.

829.    Wulf, Hall, Driver, Ted Rea, and James Rea knew that VBF lacked knowledge of these concealed material facts until at least after VBF terminated Wulf, Hall, Driver, Ted Rea, and James Rea at the respective dates set forth in paragraphs [8-12].  The Founders each intended to induce VBF to refrain from attempting to halt Wulf, Hall, Driver, Ted Rea, and James Rea's misconduct, mismanagement, and corporate waste by concealing these material facts from VBF.

830.    Wulf, Hall, Driver, Ted Rea, and James Rea were each deliberately silent when they had a duty to speak. Wulf, Hall, Driver, Ted Rea, and James Rea each knowingly failed to

disclose these material facts to VBF knowing full well that VBF would not approve of their misconduct, mismanagement, and corporate waste and would take actions such as ceasing to take in debt and equity investments, ceasing or reducing expenditure of funds, ceasing or reducing operations, and terminating or at a minimum increasing oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF.  In doing so, Wulf, Hall, Driver, Ted Rea, and James Rea each intended to stop VBF from taking such actions,

831.    VBF justifiably relied on Wulf, Hall, Driver, Ted Rea, and James Rea's failure to disclose these material facts given their status as fiduciaries to VBF and did not take such actions. Further, as Wulf, Hall, Driver, Ted Rea, and James Rea each knew, VBF did not have opportunities equal to Wulf, Hall, Driver, Ted Rea, and James Rea to discover their misconduct until after Wulf, Hall, Driver, Ted Rea, and James Rea were ousted from their control of and positions at VBF.

832.    VBF suffered injuries as a direct and proximate result of Wulf, Hall, Driver, Ted Rea, and James Rea's fraudulent concealment.  VBF's compensatory damages are in excess of $90,000,000.

833.    Further, Wulf, Hall, Driver, Ted Rea, and James Rea's fraudulent concealment of material facts has been willful and egregious, and involved malice and fraud.  Therefore, punitive damages are warranted against Wulf, Hall, Driver, Ted Rea, and James Rea and in favor of VBF, in an amount to be determined at trial.  Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

### COUNT III – FRAUDULENT MISREPRESENTATION – ALL FOUNDERS

834.    VBF adopts and reincorporates paragraphs 1 through 819.

835. Pleading in the alternative, Wulf, Hall, Driver, Ted Rea, and James Rea's silence in the face of each of their duties to disclose information to VBF, constitutes fraudulent misrepresentation of the material facts alleged in Count II.

836. Wulf, Hall, Driver, Ted Rea, and James Rea each made false representations to VBF (through then-current or those who became Independent Board Members, Independent Officers, VBF shareholders, and other VBF management and personnel) of material facts as to the following, including as set forth in Section VIII:

a.  VBF's Metrics;

b.  FCR Misrepresentations;

c.  Density Misrepresentations;

d.  Mortality Misrepresentations;

e.  OFT Misrepresentations;

f.  Water Quality Misrepresentations;

g.  Financial Misrepresentations;

h.  the market and demand for barramundi;

i.  the Pre-Forgery FTAI Reports and Forged FTAI Reports;

j.  VBF management; and

k.  VBF sales and marketing.

837. Wulf, Hall, Driver, Ted Rea, and James Rea each knew that their misrepresentations of material facts, including their failures to disclose material facts to VBF, were false or alternatively made by them in reckless disregard of the truth.

838. Wulf, Hall, Driver, Ted Rea, and James Rea each intended to deceive VBF and to induce VBF to refrain from taking actions that would halt or attempt to halt Wulf, Hall, Driver, Ted Rea, and James Rea's misconduct, mismanagement, and corporate waste, such as VBF ceasing

to take in debt and equity investments, ceasing or reducing expenditure of funds, ceasing or reducing operations, and terminating or at a minimum increasing oversight of Wulf, Hall, Driver, Ted Rea, and James Rea's management of VBF.

839.    VBF justifiably and detrimentally relied on Wulf, Hall, Driver, Ted Rea, and James Rea's misrepresentations given their status as fiduciaries to VBF and did not take such actions.

840.    VBF suffered injuries as a direct and proximate result of Wulf, Hall, Driver, Ted Rea, and James Rea's fraudulent misrepresentations.  VBF's compensatory damages are in excess of $90,000,000.

841.    Further, Wulf, Hall, Driver, Ted Rea, and James Rea's fraudulent misrepresentations have been willful and egregious, and involved malice and fraud.  Therefore, punitive damages are warranted against Wulf, Hall, Driver, Ted Rea, and James Rea and in favor of VBF, in an amount to be determined at trial.  Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

### COUNT IV – CONSTRUCTIVE FRAUD – ALL FOUNDERS

842.    VBF adopts and reincorporates paragraphs 1 through 819.

843.    Wulf, Hall, Driver, Ted Rea, and James Rea's misconduct, described in Counts I, II, and III, committed while they were fiduciaries to VBF and that tended to deceive or cause injury to VBF, constitutes constructive fraud regardless of their intent.

844.    VBF suffered injuries as a direct and proximate result of Wulf, Hall, Driver, Ted Rea, and James Rea's constructive fraud.  VBF's compensatory damages are in excess of $90,000,000.

## COUNT V – UNIFORM VOIDABLE TRANSFERS ACT
## (IOWA CODE §684.4(1)(a)) – ALL FOUNDERS

845.    VBF adopts and incorporates paragraphs 1 through 819.

846.    VBF seeks to void transfers made to Wulf, Hall, Driver, Ted Rea, and James Rea, including transfers from 2014 to 2018 related to:

      a.      the BAJJER Stock Scheme;

      b.      the AGF Scheme;

      c.      the Lake House Scheme;

      d.      the Sedun Payment Scheme;

      e.      the Compensation Scheme;

      f.      the Gagne Scheme;

      g.      the OFA Scheme;

      h.      the VBF Canada Stock Scheme; and

      i.      other misappropriations of VBF funds or other assets or resources for Wulf, Hall, Driver, Ted Rea, and James Rea's personal use, including as described in Section V(I).

847.    VBF made or authorized transfers of assets and stock totaling (and VBF's investigation is ongoing) (the "Transfers"):

      a.      at least $4,562,498 to Wulf;

      b.      at least $4,747,333 to Hall;

      c.      at least $4,365,000 to James Rea;

      d.      at least $4,487,410 to Ted Rea; and

      e.      at least $3,389,501 to Driver.

848.    The transfers were made with the actual intent to hinder, delay, or defraud VBF, demonstrated by, among other things, that:

a. The transfers consisted of misappropriations of VBF funds and other assets and resources for Wulf, Hall, Driver, Ted Rea, and James Rea's personal benefit;

b. Wulf, Hall, Driver, Ted Rea, and James Rea each made the fraudulent misrepresentations described in Count III to mislead VBF and its creditors and procure the Transfers;

c. Wulf, Hall, Driver, Ted Rea, and James Rea each made the fraudulent concealment described in Count II to mislead VBF and its creditors and procure the Transfers;

d. The Transfers were to insiders Wulf, Hall, Driver, Ted Rea, and James Rea or to family members or related entities of Wulf, Hall, Driver, Ted Rea, James Rea;

e. The Transfers occurred after or around the time VBF was insolvent;

f. A number of the Transfers occurred both before and after substantial debts were incurred;

g. The consideration, if any, received by VBF for the Transfers was not reasonably equivalent in value; and

h. Wulf, Hall, Driver, Ted Rea, and James Rea have retained possession or control of the property transferred after the Transfer.

849. The Transfers totaled at least $21,500,000 million in assets and/or stock to Wulf, Hall, Driver, Ted Rea, and James Rea during the period from 2014 to 2018.

850. VBF's claims arose before or shortly after the Transfers were made, and VBF brought this claim within a reasonable time after the transfers could reasonably have been discovered.

851. Moreover, VBF was insolvent or became insolvent shortly after the Transfers were made. Specifically, due to the fraudulent schemes and concealed and misrepresented facts related to the VBF business as a whole described above, VBF was insolvent from the beginning of that scheme and the commencement of the concealment and misrepresentations set forth in Counts II and III. Wulf, Hall, Driver, Ted Rea, and James Rea generated significant funds through the

concealment and misrepresentations set forth in Counts II and III, which funds were diverted to Wulf, Hall, Driver, Ted Rea, and James Rea through the Transfers.

852.     Further, VBF did not received consideration that was reasonably equivalent to the amount of monies in the Transfers.

853.     Therefore, VBF has the right to avoid the Transfers under Section 684.4(1)(a) of the Iowa Code.  VBF should recover all assets wrongfully transferred to Wulf, Hall, Driver, Ted Rea, and James Rea from 2014 to 2018.

**COUNT VI – UNIFORM VOIDABLE TRANSFERS ACT
(IOWA CODE §684.4(1)(b)) – ALL FOUNDERS**

854.     VBF adopts and reincorporates paragraphs 1 through 819.

855.     Pleading in the alternative to Count V, VBF made or authorized the Transfers described in Count V totaling (and VBF's investigation is ongoing):

      a.      at least $4,562,498 to Wulf;

      b.      at least $4,747,333 to Hall;

      c.      at least $4,365,000 to James Rea;

      d.      at least $4,487,410 to Ted Rea; and

      e.      at least $3,389,501 to Driver.

856.     VBF did not receive a reasonably equivalent value in exchange for the Transfers, and VBF seeks to void them under Section 684.4(1)(b) of Iowa law.

857.     Further, because Wulf, Hall, Driver, Ted Rea, and James Rea's services to VBF, in whatever form, were premised on maintenance and perpetuation of the fraudulent schemes set forth herein, they did not contribute any value in exchange for the Transfers.

858.    At the time of the Transfers, VBF was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to its business.

859.    At the time of the Transfers, Wulf, Hall, Driver, Ted Rea, and James Rea intended VBF to incur or believed that VBF would incur, debts beyond its ability to pay as they became due.

860.    Moreover, VBF was insolvent or became insolvent shortly after the Transfers were made.  Specifically, due to the fraudulent schemes and concealed and misrepresented facts related to the VBF business as a whole described above, VBF was insolvent from the beginning of that scheme and the commencement of the concealment and misrepresentations set forth in Counts II and III.  Wulf, Hall, Driver, Ted Rea, and James Rea generated significant funds through the concealment and misrepresentations set forth in Counts II and III, which funds were diverted to Wulf, Hall, Driver, Ted Rea, and James Rea through the Transfers.

861.    Therefore, VBF has the right to avoid the Transfers under Section 684.4(1)(b) of the Iowa Code.  VBF should recover amounts paid to Wulf, Hall, Driver, Ted Rea, and James Rea described herein from 2014 to 2018.

### COUNT VII – ACTUAL FRAUDULENT TRANSFER (TEXAS LAW) – ALL FOUNDERS (TEX. BUS. & COMM. CODE § 24.005(a)(1))

862.    VBF adopts and reincorporates paragraphs 1 through 819.

863.    Pleading in the alternative to Counts V and VI[4], VBF seeks to avoid transfers made to Wulf, Hall, Driver, Ted Rea, and James Rea, including transfers from 2014 to 2018 related to:

    a.    the BAJJER Stock Scheme;

---

[4] VBF alleges statutory fraud claims under Texas law in the event that this Court rules that Texas law applies, which it should not.  VBF affirmatively states that this case is covered by Iowa law.

b.  the AGF Scheme;

c.  the Lake House Scheme;

d.  the Sedun Payment Scheme;

e.  the Compensation Scheme;

f.  the Gagne Scheme;

g.  the OFA Scheme;

h.  the VBF Canada Stock Scheme; and

i.  other misappropriations of VBF funds or other assets or resources for Wulf, Hall, Driver, Ted Rea, and James Rea's personal use, including as described in Section V(I).

864.  VBF made or authorized transfers of assets and stock totaling (and VBF's investigation is ongoing) (the "Transfers"):

a.  at least $4,562,498 to Wulf;

b.  at least $4,747,333 to Hall;

c.  at least $4,365,000 to James Rea;

d.  at least $4,487,410 to Ted Rea; and

e.  at least $3,389,501 to Driver.

865.  The Transfers were made with the actual intent to hinder, delay, or defraud VBF, demonstrated by, among other things, that:

a.  the Transfers consisted of misappropriation of VBF funds and other assets and resources for Wulf, Hall, Driver, Ted Rea, and James Rea's personal benefit;

b.  Wulf, Hall, Driver, Ted Rea, and James Rea each made the fraudulent misrepresentations described in Count III to mislead VBF and its creditors and procure the Transfers;

c.  Wulf, Hall, Driver, Ted Rea, and James Rea each made the fraudulent concealment described in Count II to mislead VBF and its creditors and procure the Transfers;

d. the Transfers were to insiders Wulf, Hall, Driver, Ted Rea, and James Rea or to family members or related entities of Wulf, Hall, Driver, Ted Rea, James Rea;

e. the Transfers occurred after or around the time VBF was insolvent;

f. a number of the Transfers occurred both before and after substantial debts were incurred;

g. the consideration, if any, received by VBF for the Transfers was not reasonably equivalent in value; and

h. Wulf, Hall, Driver, Ted Rea, and James Rea have retained poessesion or control of the property transferred after the Transfers.

866. As alleged above, the Transfers totaled at least $21,500,000 million in assets and/or stock to Wulf, Hall, Driver, Ted Rea, and James Rea during the period from 2014 to 2018.

867. VBF's claims arose before or shortly after the Transfers were made, and VBF brought this claim within a reasonable time after the transfers could reasonably have been discovered.

868. Moreover, VBF was insolvent or became insolvent shortly after the Transfers were made. Specifically, due to the fraudulent schemes and concealed and misrepresented facts related to the VBF business as a whole described above, VBF was insolvent from the beginning of that scheme and the commencement of the concealment and misrepresentations set forth in Counts II and III. Wulf, Hall, Driver, Ted Rea, and James Rea generated significant funds through the concealment and misrepresentations set forth in Counts II and III, which funds were diverted to Wulf, Hall, Driver, Ted Rea, and James Rea through the Transfers.

869. Further, VBF did not receive consideration that was reasonably equivalent to the amount of monies in the Transfers.

870.     Therefore, VBF has the right to avoid the Transfers under Section 24.005(a)(1) of the Texas Business and Commerce Code.  VBF should recover all assets wrongfully transferred to Wulf, Hall, Driver, Ted Rea, and James Rea from 2014 to 2018.

## COUNT VIII – CONSTRUCTIVE FRAUDULENT TRANSFER (TEXAS LAW) – ALL FOUNDERS (TEX. BUS. & COMM. CODE § 24.005(a)(2))

871.     VBF adopts and reincorporates paragraphs 1 through 819.

872.     Pleading in the alternative to Counts VI and VII[5], VBF made or authorized the Transfers described in Count VII totaling (and VBF's investigation is ongoing):

     a.     at least $4,562,498 to Wulf;

     b.     at least $4,747,333 to Hall;

     c.     at least $4,365,000 to James Rea;

     d.     at least $4,487,410 to Ted Rea; and

     e.     at least $3,389,501 to Driver.

873.     VBF did not receive reasonably equivalent value in exchange for the Transfers, and VBF to void them under Texas state fraudulent transfer law.  Tex. Bus. & Comm. Code § 24.005(a)(2).

874.     Further, because Wulf, Hall, Driver, Ted Rea, and James Rea's services to the company, in whatever form, were premised on maintenance and perpetuation of the fraudulent schemes, they did not contribute any value in exchange for the Transfers.

875.     At the time of the Transfers, VBF was engaged or was about to engage in transactions for which its remaining assets were unreasonably small in relation to its business.

---

[5] VBF alleges statutory fraud claims under Texas law in the event that this Court rules that Texas law applies, which it should not.  VBF affirmatively states that this case is governed by Iowa law.

876.     At the time of the Transfers, Wulf, Hall, Driver, Ted Rea, and James Rea intended VBF to incur or believed that VBF would incur, debts beyond its ability to pay as they became due.

877.     Moreover, VBF was insolvent or became insolvent shortly after the transfers to Wulf, Hall, Driver, Ted Rea, and James Rea were made.  Specifically, due to the fraudulent schemes and concealed and misrepresented facts related to the VBF business as a whole described above, VBF was insolvent from the beginning of that scheme and the commencement of the concealment misrepresentations set forth in Counts II and III.  Wulf, Hall, Driver, Ted Rea, and James Rea generated significant funds through the concealment and misrepresentations set forth in Counts II and III, which funds were diverted to Wulf, Hall, Driver, Ted Rea, and James Rea through the Transfers.

878.     Therefore, VBF has the right to avoid the Transfers under Section 24.005(a)(2) of the Texas Business and Commerce Code.  VBF should recover amounts paid to Wulf, Hall, Driver, Ted Rea, and James Rea described herein from 2014 to 2018.

## COUNT IX – CIVIL CONSPIRACY – ALL FOUNDERS

879.     VBF adopts and reincorporates paragraphs 1 through 819.

880.     From the outset of their misconduct alleged herein, but at the latest in or around September 2014 when they learned of Dr. Fitzsimmons's criticisms of the September 2014 Marketing Deck through and including March 18, 2019 when Wulf, Hall, Ted Rea, and James Rea were meddling in the Bankruptcy Proceedings, Wulf, Hall, Driver, Ted Rea, and James Rea had a meeting of the minds with each other and agreed to engage in the breaches of fiduciary duties and actual and constructive fraud alleged in Counts I through VIII, for their personal benefit and to cause harm to VBF, while concealing the same from VBF and/or making fraudulent misrepresentations to VBF (the "Conspiracy").

881.     Wulf, Hall, Driver, Ted Rea, and James Rea's aim, through the Conspiracy, was to accomplish the unlawful objective of personally benefiting themselves at the expense of VBF, while concealing the same from VBF, and/or making fraudulent misrepresentations to VBF as described in Counts I through VIII.

882.     Through the Conspiracy and the overt, unlawful actions alleged herein, Wulf, Hall, Driver, Ted Rea, and James Rea each facilitated and accomplished their breaches of fiduciary duty, fraudulent concealment, constructive fraud, fraudulent misrepresentations, and fraudulent transfers described in Counts I through VIII.

883.     VBF suffered injuries as a direct and proximate result of Wulf, Hall, Driver, Ted Rea, and James Rea's Conspiracy.  VBF's compensatory damages are in excess of $90,000,000.

884.     Further, at least some of Wulf, Hall, Driver, Ted Rea, and James Rea's misconduct was willful and egregious, and involved malice and fraud.  Therefore punitive damages against are warranted against Wulf, Hall, Driver, Ted Rea, and James Rea and in favor of VBF, in an amount to be determined at trial. Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

## COUNT X –KNOWING PARTICIPATION IN OR AIDING AND ABETTING OF BREACH OF FIDUCIARY DUTIES – ALL FOUNDERS

885.     VBF adopts and reincorporates paragraphs 1 through 819.

886.     From the outset of their misconduct alleged herein, Wulf, Hall, Driver, Ted Rea, and James Rea knowingly and substantially assisted each other in their breaches of fiduciary duties alleged in Count I, for each of their personal benefit, while concealing the same from VBF, including through its Independent Board Members, Independent Officers, shareholders, and other

management and personnel.  Wulf, Hall, Driver, Ted Rea, and James Rea each knew that he and the others owed VBF fiduciary duties due to their positions as officers and/or directors.

887.    VBF suffered injuries as a direct and proximate result of Wulf, Hall, Driver, Ted Rea, and James Rea's knowing participation in breach of each other's fiduciary duties.  VBF's compensatory damages are in excess of $90,000,000.

888.    Further, Wulf, Hall, Driver, Ted Rea, and James Rea's misconduct was willful and egregious, and involved malice and fraud.  Therefore punitive damages against Wulf, Hall, Driver, Ted Rea, and James Rea and in favor of VBF are warranted, in an amount to be determined at trial.  Also, Hall and Ted Rea have verbally advised at least one third party that they are "judgment proof," or words to that effect, implying that they could commit wrongful acts without recourse.

889.    To the extent Iowa law applies, this Count is "Aiding and Abetting of Breaches of Fiduciary Duties," a cause of action which has substantially the same elements as Texas's "Knowing Participation" cause of action.

## COUNT XI – UNJUST ENRICHMENT – ALL FOUNDERS

890.    VBF adopts and reincorporates paragraphs 1 through 819.

891.    VBF has conferred millions of dollars' worth of benefit upon Wulf, Hall, Driver, Ted Rea, and James Rea due to their fraud or taking undue advantage, for which Wulf, Hall, Driver, Ted Rea, and James Rea have not compensated VBF.  It would be unjust and contrary to principles of equity and good conscience to allow Wulf, Hall, Driver, Ted Rea, and James Rea to retain this benefit conferred upon them by VBF without just consideration as Wulf, Hall, Driver, Ted Rea, and James Rea have been unjustly enriched at VBF's expense.

## COUNT XII – EQUITABLE ACCOUNTING – ALL FOUNDERS

892.    VBF adopts and reincorporates paragraphs 1 through 819.

893.    VBF cannot attain pertinent information to fully account for the tens of millions of dollars misappropriated and squandered by Wulf, Hall, Driver, Ted Rea, and James Rea through ordinary discovery procedures such as those permitted by Federal Rules of Civil Procedure 26, 33, 34, 36, and 45.  Wulf, Hall, Driver, Ted Rea, and James Rea's concealment was integral to their misconduct, and therefore they cannot possibly be trusted to provide full and complete information through traditional discovery methods.

894.    Additionally, upon information and belief, Wulf, Hall, Driver, Ted Rea, and James Rea and those friendly to them have spoliated data, or otherwise cannot be trusted in discovery. Simply put, Wulf, Hall, Driver, Ted Rea, and James Rea should be required to "show us the money" through an equitable accounting since only they truly know the extent of their massive and complex fraud.

895.    Discovery to date has also revealed accounts utilized by Wulf, Hall, Driver, Ted Rea, and James Rea so complex that adequate relief cannot be obtained at law.  VBF has to date been able to receive partial compliance on a subpoena to Wells Fargo Bank, which held VBF accounts during Wulf, Hall, Driver, Ted Rea, and James Rea's reign and the personal accounts of Wulf.  The information produced by Wells Fargo to date reveals numerous wire transfers to and from unknown accounts, and other transactions that appear suspicious.  It will virtually impossible for VBF to painstakingly piece together the various documentation from Wulf, Hall, Driver, Ted Rea, and James Rea and numerous third parties to fully document the "money in" and "money out" of VBF during the Founders' tenure at VBF.

896.    Therefore, as a result of Wulf, Hall, Driver, Ted Rea, and James Rea's fiduciary duties to account to VBF, breaches of fiduciary duties, fraud, and unjust enrichment, as well as the existence of complex mutual accounts and the inadequacy of discovery, VBF is entitled to an order

requiring Wulf, Hall, Driver, Ted Rea, and James Rea to account for every dollar deposited, received, or otherwise transferred to or from VBF or any of its affiliates and Wulf, Hall, Driver, Ted Rea, or James Rea (or others such as family members and related entities on behalf of the Founders) from on or before October 1, 2014 through January 31, 2018, and entering a judgment against Wulf, Hall, Driver, Ted Rea, and James Rea as to any amounts for which they cannot account, or which are shown by the accounting to have been misappropriated by them.

897.    Pleading in the alternative, money damages are inadequate to VBF because VBF cannot fully learn the extent of Wulf, Hall, Driver, Ted Rea, and James Rea's misconduct, of which they have superior knowledge, without an accounting.

## COUNT XIII – DECLARATORY JUDGMENT-
## ALL TRANSACTIONS VOID – ALL FOUNDERS

898.    VBF adopts and reincorporates paragraphs 1 through 819.

899.    VBF disputes the validity of any and all transactions in which VBF was involved wherein Wulf, Hall, Driver, Ted Rea, and James Rea personally benefitted, or which were otherwise improper, including the funds and other assets that were misappropriated for grossly inadequate consideration, if any, including as described in Section V.

900.    Pursuant to 28 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and Wulf, Hall, Driver, Ted Rea, and James Rea on the other hand, as to such transactions, wherein VBF asserts that all such transactions should be declared null and void ab initio, whereas Wulf, Hall, Driver, Ted Rea, and James Rea presumably seek to uphold these transactions.

901.    Therefore, VBF seeks a declaration that the transactions described in Section V, the MSAs, the Employment Agreements, and the Termination Agreements should be declared null and void *ab initio*.

**COUNT XIV – RESCISSION–TERMINATION AGREEMENTS, SELECTIVE PROVISIONS AND DECLARATORY JUDGMENT – HALL, DRIVER, TED REA**

902.    VBF adopts and reincorporates paragraphs 1 through 819.

903.    When Hall, Ted Rea, and Driver's Termination Agreements (collectively, the "Termination Agreements") were entered into, neither VBF nor the Independent Board Members knew or could have known of those Defendants' breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting of) each other's breaches of fiduciary duties, or unjust enrichment, and, in fact, believed to be true all the material misrepresentations that Hall, Ted Rea, and Driver relayed to cover up their breaches of fiduciary duty, fraud, and unjust enrichment.

904.    Both VBF and the Independent Board Members relied on what they only later realized were material misrepresentations and/or the absence of material facts concealed from them when VBF executed the Termination Agreements.

905.    Indeed, Hall, Ted Rea, and Driver intended that VBF and the Independent Board Members rely on their material misrepresentations and concealment of their breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting of) each other's breaches of fiduciary duties, and unjust enrichment in order to secure the Termination Agreements and especially the Release and Severance Provisions.

906.    Had VBF and/or the Independent Board Members known the true facts of Hall, Ted Rea, and Driver's breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting of) each other's breaches of fiduciary duties, and unjust enrichment, VBF would not have entered into the Termination Agreements, and especially the Release and Severance Provisions.

907.    Because the true facts of Hall, Ted Rea, and Driver's breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting of) each other's breaches of fiduciary duties, and unjust enrichment, were concealed and never revealed and were the subject of material misrepresentations to VBF or the Independent Board Members (as described in Counts I through VIII and XI), the Termination Agreements are voidable.

908.    VBF has retained no benefits under the Termination Agreements. Only after the Termination Agreements were signed – by Defendant Wulf purportedly on behalf of VBF – did VBF begin to uncover Wulf, Hall, Driver, Ted Rea, and James Rea's misconduct described in Counts I through XI that caused misappropriation and other waste of over $90,000,000 of VBF's corporate assets and led to its ultimate demise and bankruptcy.

909.    By March 2018, VBF discovered some of the misconduct alleged herein against Hall, Ted Rea, and Driver, and VBF initiated this action in July 2018.  After VBF filed this lawsuit, it has continued to discover more facts of Wulf, Hall, Driver, Ted Rea, and James Rea's misconduct and concealment of the same to VBF and the Independent Board Members, and the investigation is ongoing.

910.    VBF has no adequate remedy at law if the Termination Agreements are not rescinded because those agreements purport to release some of VBF's claims against Hall, Ted Rea, and Driver.

911.    Rescission of the Termination Agreements is necessary to avoid Hall, Ted Rea's, and Driver's unjust enrichment as all three have benefited from their respective Termination Agreements, including the Release and Severance Provisions therein.

912.    VBF would suffer substantial harm and injury if the Termination Agreements are not rescinded because, if deemed enforceable, the Termination Agreements and its provisions,

especially the Release and Severance Provisions, would purportedly preclude VBF from bringing at least some claims against Hall, Ted Rea, and Driver for VBF's damages.

913.    Based on the egregious conduct herein, damages, as well as rescission, are warranted to accomplish full justice in an amount to be proven at trial.

914.    Pleading in the alternative, to the extent the Court deems the Release and Severance Provisions of the Termination Agreements to be divisible, VBF seeks partial rescission of the Release and Severance Provisions only.

915.    Pleading in the alternative, to the extent the Court deems rescission of the Termination Agreements or its provisions inappropriate, and because there exists an actual controversy between VBF and Hall, Ted Rea, and Driver pursuant to 28 U.S.C. § 2201, VBF, which has a tangible legal benefit in bringing this action against the Hall, Ted Rea, and Driver, seeks a declaration that each of the Termination Agreements and their Release and Severance Provisions are null and void *ab initio.*

## COUNT XV – DECLARATORY JUDGMENT
## JAMES REA

916.    VBF adopts and reincorporates paragraphs 1 through 819.

917.    On one or more occasions, James Rea misappropriated funds or assets of the Company, committed willful acts or omissions of dishonesty or fraud, and was in gross neglect of his duties to VBF between 2014 and January 2018 in breach of his Employment Agreement, including as described in Counts I through VIII.  These actions by James Rea constituted "Egregious Cause" as defined in the Employment Agreement.

918.    As a result of James Rea's misconduct, VBF has been damaged in at least the amounts paid by VBF to James Rea purportedly under the Employment Agreement and the amounts from VBF that James Rea misappropriated or converted to his own personal benefit,

including as set forth in Counts V through VIII, and in addition to tens of millions of dollars representing the looting of VBF and the devaluation of VBF caused by his mismanagement and other corporate waste.

919.   VBF has a tangible legal benefit in not being obligated to confer any benefit on James Rea under the Employment Agreement as it was procured by fraud and breaches of fiduciary duty, among other misconduct, and if ever valid, was appropriately terminated for "Egregious Cause."

920.   Pursuant to 28 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and James Rea on the other hand, as to whether James Rea committed "Egregious Cause."

921.   Therefore, VBF seeks a declaration that James Rea committed acts that constitute "Egregious Cause" under the Employment Agreement.

<u>**COUNT XVI – RESCISSION –**</u>
<u>**EMPLOYMENT AGREEMENT – JAMES REA**</u>

922.   VBF adopts and reincorporates paragraphs 1 through 819.

923.   When James Rea's Employment Agreement was entered into, neither VBF nor the Independent Board Members knew or could have known of his breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting of) each other's breaches of fiduciary duties, or unjust enrichment, and, in fact, believed to be true all the material misrepresentations that he relayed to cover up his breaches of fiduciary duty, fraud, and unjust enrichment.

924.   Both VBF and the Independent Board Members relied on what they only later realized were material misrepresentations in executing the Employment Agreement.

925.    James Rea intended that VBF and the Independent Board Members rely on his material misrepresentations and concealment of his breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting of) each other's breaches of fiduciary duties, and unjust enrichment in order to secure the Employment Agreement.

926.    Had VBF and/or the Independent Board Members known the true facts of James Rea's breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting of) each other's breaches of fiduciary duties, and unjust enrichment, VBF would not have entered into the Employment Agreement.

927.    Because the true facts of James Rea's breaches of fiduciary duty, fraud, and unjust enrichment were concealed and never revealed and were the subject of material misrepresentations to VBF or the Independent Board Members (as described in Counts I through VIII and XI), the Employment Agreement is voidable.

928.    VBF has retained no benefits under the Employment Agreement.  Less than two years after signing the Employment Agreement, VBF began to uncover James Rea's misconduct described in Counts I through XI that caused misappropriation and other waste of over $90,000,000 of VBF's corporate assets and led to its ultimate demise and bankruptcy.

929.    By January 2018, VBF discovered some of the misconduct alleged herein against James Rea, and VBF initiated this action in July 2018.  After VBF filed this lawsuit, it has continued to discover more facts of James Rea's misconduct and concealment of the same to VBF and the Independent Board Members, and the investigation is ongoing.

930.    VBF has no adequate remedy at law if the Employment Agreement is not rescinded because that agreement purports to have provided benefits to James Rea that were procured by

fraud and other misconduct. Rescission and/or renunciation of the Employment Agreement is necessary to avoid James Rea's unjust enrichment.

931.     Based on the egregious conduct herein, damages, as well as rescission, are warranted to accomplish full justice in an amount to be proven at trial.

932.     Pleading in the alternative, to the extent the Court deems rescission of the Employment Agreement, and because there exists an actual controversy between VBF and James Rea pursuant to 28 U.S.C. § 2201, VBF, which has a tangible legal benefit in bringing this action against James Rea, seeks a declaration that the Employment Agreement is null and void *ab initio.*

## COUNT XVII – RESCISSION – SEPARATION AGREEMENT – WULF

933.     VBF adopts and reincorporates paragraphs 1 through 819.

934.     When the Wulf Separation Agreement was entered into, neither VBF nor its Independent Board Members knew or could have known of his breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting of) each other's breaches of fiduciary duties, or unjust enrichment, and, in fact, believed to be true all the material misrepresentations that Wulf relayed to cover up his breaches of fiduciary duty, fraud, and unjust enrichment.

935.     Both VBF and the Independent Board Members relied on what they only later realized were material misrepresentations in executing the Wulf Separation Agreement.

936.     Indeed, Wulf intended that VBF and the Independent Board Members rely on his material misrepresentations and concealment of his breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting of) each other's breaches of fiduciary duties, and unjust enrichment in order to secure the Wulf Separation Agreement.

937.     Had VBF and/or its Independent Board Members known the true facts of Wulf's breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting

of) each other's breaches of fiduciary duties, and unjust enrichment, VBF would not have entered into the Wulf Separation Agreement.

938.    Because the true facts of Wulf's breaches of fiduciary duty, fraud, Conspiracy, Knowing Participation in (or Aiding and Abetting of) each other's breaches of fiduciary duties, and unjust enrichment were concealed and never revealed and were the subject of material misrepresentations to VBF or its Independent Board Members (as described in Counts I through VIII and XI), the Wulf Separation Agreement is voidable.

939.    VBF has retained no benefits under the Wulf Separation Agreement.  After signing the Wulf Separation Agreement, VBF began to uncover the Wulf's misconduct described in Counts I through XI that caused misappropriation and other waste of over $90,000,000 of VBF's corporate assets and led to its ultimate demise and bankruptcy.

940.    By March 2018, VBF discovered some of the misconduct alleged herein against Wulf, and VBF initiated this action in July 2018.  After VBF filed this lawsuit, it has continued to discover more facts of Wulf's various schemes, other misconduct, and fraudulent concealment of the same to VBF and the Independent Board Members, and the investigation is ongoing.

941.    VBF has no adequate remedy at law if the Wulf Separation Agreement is not rescinded because that agreement purports to provide a severance payment to Wulf that was procured by fraud and other misconduct.

942.    Rescission of the Wulf Separation Agreement is necessary to avoid Wulf's unjust enrichment as he has benefited from it, including the severance provisions therein.

943.    VBF would suffer substantial harm and injury if the Wulf Separation Agreement is not rescinded.

944.    Based on the egregious conduct herein, damages, as well as rescission, are warranted to accomplish full justice in an amount to be proven at trial.

### COUNT XVIII – DECLARATORY JUDGMENT –
### SEPARATION AGREEMENT – WULF

945.    VBF adopts and reincorporates paragraphs 1 through 819.

946.    As a result of Wulf's misconduct, VBF has been damaged in at least the amounts paid by VBF to Wulf purportedly under the Wulf Separation Agreement and the amounts from VBF that Wulf misappropriated or converted to his own personal benefit, including as set forth in Counts V through VIII, and in addition to tens of millions of dollars representing the looting of VBF and the devaluation of VBF caused by his mismanagement and other corporate waste.

947.    Pleading in the alternative, VBF has a tangible legal benefit in not being obligated in any way under the Wulf Separation Agreement as the benefits therein were procured by fraud and breaches of fiduciary duty, among other misconduct.

948.    Pursuant to 28 U.S.C. § 2201, there is an actual controversy between VBF, on the one hand, and Wulf on the other hand, as to the benefits under the Wulf Separation Agreement, wherein VBF asserts that Wulf is not entitled to recover any benefits under the Wulf Separation Agreement, and Wulf presumably seeks to recover benefits under the Wulf Separation Agreement.

949.    Therefore, VBF seeks a declaration that VBF does not owe any benefits to Wulf under the Wulf Separate Agreement and that the Wulf Separation Agreement is null and void *ab initio*.

### COUNT XIX – RESTITUTION–HALL, TED REA, DRIVER, AND WULF

950.    VBF adopts and reincorporates paragraphs 1 through 819.

951.    The Termination Agreements, the Wulf Separation Agreement, or the provisions therein are not valid as they were procured by fraud, breaches of fiduciary duty, and other misconduct as set forth in Counts XIV, XVII, and XVIII.

952.    Defendants Hall, Ted Rea, Driver, and Wulf wrongfully received benefits, including money, pursuant to the Termination Agreements and the Wulf Separation Agreement.

953.    It would be unjust and contrary to principles of equity and good conscience to allow the defendants named herein to retain the benefits or the value thereof conferred upon them by VBF.

954.    The benefits received by Hall, Ted Rea, Driver, and Wulf pursuant to the Termination Agreements or the Wulf Separation Agreement rightfully belong to VBF in equity and good conscience.

### <u>COUNT XX – CONSPIRACY – CHRISTINE GAGNE</u>

955.    VBF adopts and reincorporates paragraphs 1 through 819.

956.    Wulf, James Rea, and Gagne had a meeting of the minds with each other and agreed to engage in a conspiracy for their personal benefit and to cause harm to VBF by employing and/or compensating Gagne with VBF funds while she was without any legal immigration status to work in the United States ("<u>Gagne Conspiracy</u>"), while concealing the same from VBF and the Independent Board Members.

957.    Wulf, James Rea, and Gagne's aim, through the Gagne Conspiracy, was to accomplish the unlawful objective of personally benefiting Wulf and Gagne at the expense of VBF, while concealing the same from VBF and its Independent Board Members.

958.    Through the Gagne Conspiracy and the overt, unlawful actions described herein, Wulf, James Rea, and Gagne facilitation and accomplished the resulting breaches of fiduciary duty and fraudulent concealment.

959.     VBF suffered injuries as a direct and proximate result of the Gagne Conspiracy in at least the amount of funds improperly paid to Gagne by VBF.

960.     Further, Gagne's misconduct was willful and egregious, and involved malice and fraud, as evidenced by, for example, her statements to VBF employees alleged herein, and warrants punitive damages against Gagne and in favor of VBF, in an amount to be determined at trial.

### COUNT XXI – KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTIES – CHRISTINE GAGNE

961.     VBF adopts and reincorporates paragraphs 1 through 819.

962.     Wulf, and James Rea each owed fiduciary duties to VBF as set forth in Count I.

963.     Gagne knew of each of Wulf and James Rea's fiduciary relationship to VBF.

964.     By receiving monies from VBF while she was without any legal immigration status to work in the United States and knowingly receiving those monies under another person's name, Gagne was aware that she was substantially participating in the breach of Wulf, James Rea's fiduciary duties to VBF.

965.     Gagne also concealed the breaches of fiduciary duty and her participation in the same from VBF's Independent Board Members.

966.     VBF suffered injuries as a direct and proximate result of Gagne's knowing participation in Wulf and James Rea's breaches of fiduciary duty.

967.     Because of Gagne's substantial assistance to Wulf and James Rea, VBF's compensatory damages for Gagne's misconduct are, individually and/or in the aggregate with the other claims, more likely than not in excess of $75,000.

968.     Further, Gagne's knowing participation and substantial assistance to Wulf and James Rea was willful and egregious, and involved malice and fraud, and therefore, punitive damages are warranted against Gagne and in favor of VBF, in an amount to be determined at trial.

## COUNT XXII – UNJUST ENRICHMENT – CHRISTINE GAGNE

969.    VBF adopts and reincorporates paragraphs 1 through 810.

970.    VBF, at Wulf's direction and due to each of Wulf and James Rea's fraud or taking undue advantage of VBF, conferred VBF funds to Gagne as compensation and benefits for alleged services Gagne provided to VBF.

971.    It would be unjust and contrary to principles of equity and good conscience to allow Gagne to retain the benefits conferred upon her by VBF, which she wrongfully secured, as she has been unjustly enriched at VBF's expense and to its detriment.

## COUNT XXXIII– VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) (18 U.S.C. § 1962(c)) – FOUNDERS [formerly COUNT XXVII]

972.    VBF adopts and incorporates paragraphs 1 through 819.

### A.    The RICO "Person" and "Enterprise"

973.    Each of Wulf, Hall, Driver, Ted Rea, and James Rea is a "person," as that term is defined in 18 U.S.C. § 1961(3).

974.    VBF is a Racketeer Influenced and Corrupt Organizations ("RICO") enterprise. Specifically, VBF was formed as a sustainable fish farm business but was instead controlled by Wulf, Hall, Driver, Ted Rea, and James Rea as an abused corporate enterprise and ultimately a victim of Wulf, Hall, Driver, Ted Rea, and James Rea' schemes.  Wulf, Hall, Driver, Ted Rea, and James Rea directed the affairs of VBF, the RICO enterprise, as part of their scheme to loot and defraud VBF.

975.    Collectively, Wulf, Hall, Driver, Ted Rea, and James Rea form an "enterprise" or "enterprises" as defined by 18 U.S.C. § 1961(4) ("Enterprise").  Wulf, Hall, Driver, Ted Rea, and James Rea have been associated in fact outside of VBF, and have functioned outside of VBF in an organized fashion, having a joint purpose of acting together for each other's benefit in VBF and

other businesses, for the purposes of enriching themselves at the expense of VBF by engaging in the fraudulent scheme alleged above, and Wulf, Hall, Driver, Ted Rea, and James Rea have therefore had business and, upon information and belief, personal relationships with each other outside of VBF over an extended period of time.  Each member conducted the affairs of the enterprises through a pattern of racketeering activity—namely, mail fraud and wire fraud, perpetrated through email and other electronic transmissions, phone calls, and wire transfers, including as described in Sections V, VI, VII, and VIII and Counts I through VIII.

976.    Further, Wulf, Hall, Driver, Ted Rea, and James Rea, or Wulf, Hall, Driver, Ted Rea, and James Rea through VBF, acted as an enterprise as to VBF, orchestrating their joint misconduct over an approximate three year period.  Additionally, Wulf, Hall, Driver, Ted Rea, and James Rea misused VBF itself as an instrumentality not to accomplish VBF's legitimate business, but instead to conduct the illegal acts set forth herein.

977.    Therefore, VBF was not a beneficiary of the Enterprise, but instead its victim, misused by Wulf, Hall, Driver, Ted Rea, and James Rea as a passive instrumentality to accomplish their misconduct, as they controlled VBF at relevant times.

978.    At all times material to the allegations stated herein, the Enterprise was engaged in, or had some effect upon, interstate commerce as VBF has done business in various states, including, but not limited to, Illinois, Iowa, Texas, New York, Florida, and Canada and VBF shareholders reside in multiple states.

979.    As alleged herein, the Enterprise's purpose was to serve as the vehicle through which Wulf, Hall, Driver, Ted Rea, and James Rea implemented their continuous and ongoing scheme to defraud, loot, and injure VBF.  The intended purpose of Wulf, Hall, Driver, Ted Rea, and James Rea's scheme was to misappropriate tens of millions of dollars from VBF.

### B.      The Pattern of Racketeering Activity

980.      Wulf, Hall, Driver, Ted Rea, and James Rea directed the affairs of VBF and the association-in-fact enterprise as part of the scheme to defraud, loot, and injure VBF.

981.      Wulf, Hall, Driver, Ted Rea, and James Rea served as the executives of VBF and were the primary decision makers.  As alleged above in Section IV, they made all major decisions concerning the marketing, finances, and day-to-day operations of VBF.  Wulf, Hall, Driver, Ted Rea, and James Rea were each heavily involved in the fraudulent concealment from and fraudulent misrepresentations to VBF, including to the Independent Board Members, Independent Officers, shareholders, and other VBF personnel and as described in Sections VII and VIII and Counts I through III.  Nonetheless, Wulf, Hall, Driver, Ted Rea, and James Rea devised and participated in a plan to use the fraudulent concealment and fraudulent misrepresentations to generate funds for VBF that could then be misappropriated for the benefit of Wulf, Hall, Driver, Ted Rea, and James Rea and not for the benefit of VBF.  Moreover, Wulf, Hall, Driver, Ted Rea, and James Rea conspired and acted outside of their positions at VBF to accomplish the scheme that defrauded, looted, and injured VBF.

982.      Wulf, Hall, Driver, Ted Rea, and James Rea, by and through the Enterprise, committed at least two related acts of racketeering activity which occurred within ten years of each other within the meaning of  18 U.S.C. § 1961(5), as alleged in more detail in the next sub-section.

### C.      Predicate Acts

983.      Between September 5, 2014 and through at least December 18, 2018 (the date of the Challenge Notice), Wulf, Hall, Driver, Ted Rea, and James Rea executed their unlawful racketeering activity targeted at VBF through the following mailings and interstate wires (*e.g.*, electronic mail, electronic submissions, telephone calls, and wire transfers).   Each such

communication is a discrete violation of 18 U.S.C. §§ 1341 (mail fraud) or 1343 (wire fraud) and

a "predicate act" of racketeering activity pursuant to 18 U.S.C. § 1961(1) (the "<u>Predicate Acts</u>"):

a.    Emails from September 15, 2014 through September 16, 2014 to individuals who became actual VBF Canada shareholders on September 30, 2014, including but not limited to Dave Dodgen, Todd Foss, Tim Finucan, Myron Friesen, and Ted Frandson, transmitting the September 2014 Marketing Deck, including those emails alleged in Section VIII(A);

b.    Emails to McCowan, a VBF officer at the time, on November 5, 2017, transmitting the 2014 to 2015 Performance Data Presentation, including those emails alleged in Section VIII(B);

c.    Emails to Lyons, a VBF shareholder at the time who later became an Independent Board Member in December 2015, on September 19, 2015, transmitting the May 2015 Valuation, including those emails alleged in Section VIII(C);

d.    Transmitting the June 2015 OFA Presentation, through uploading it to the Data Room on June 5, 2015, where individuals, such as, Thelander, a VBF Board Member as of July 2016, a representative of Alder who also became a VBF shareholder in July 2016, and a VBF shareholder individually, downloaded such document, including those transmissions alleged in Section VIII(D);

e.    Emails to Thelander, on May 26, 2016, transmitting the Forged FTAI Marketing Report, including those emails alleged in Section VII(E)(ii);

f.    Transmitting the Forged FTAI Technical Report, through uploading it to the Data Room on March 15, 2016, where individuals, such as, Thelander and Chris Rausch, Lockard's attorneys (Lockard being a future VBF Board Member as of June 2016 and manager of FishDish, who became a VBF shareholder in July 2016), and a representative of FishDish member Lockard Construction (Lockard's company), downloaded (or could download) such document, including those transmissions alleged in Section VII(E)(iii);

g.    Emails to Bruffy, an Independent Officer, on October 14, 2015, transmitting the Fall 2015 Marketing Decks, including those emails alleged in Section VIII(F);

h.    Transmitting the November 2015 Operational Data Presentation through uploading it to the Data Room on December 9, 2015, where individuals such as Thelander, downloaded such document, including those transmissions alleged in Section VIII(G);

i.  Emails to Lockard and Robert Smith, a future VBF shareholder through FishDish, on December 18, 2015 (and again to Lockard in early 2015) transmitting the January 2016 Executive Summary and January 2016 Marketing Deck, including those emails alleged in Section VIII(H);

j.  Emails to Lockard on February 2, 2016, transmitting the Water Recirculating Flow Details, Single Tank Workup, and Answer to Questions documents, including those emails alleged in Section VIII(I);

k.  Emails to Lockard on February 19, 2016, transmitting certain information, including those emails alleged in Section VIII(J);

l.  Emails to Lockard and Lyons on March 18, 2016, transmitting certain information, including those emails alleged in Section VIII(K);

m.  Emails to Lockard on April 2, 2016, transmitting certain information, including those emails alleged in Section VIII(L);

n.  Emails to Thelander on May 4, 2016 and again on May 16, 2016, and to Katie Olson and Matt Clarken (VBF employees and/or former employees) and Robinson (a former VBF consultant) on May 16, 2016, transmitting the April 2016 Stocking and Harvest Charts, including those emails alleged in Section VIII(M);

o.  Emails to Thelander June 21, 2016, transmitting certain information, including those emails alleged in Section VIII(N);

p.  Emails to Thelander, Lockard, Lyons, and Haarkotter, a VBF Board Member as of July 2016, a representative of Alder who became a VBF shareholder in July 2016, on August 31, 2016, transmitting the August 2016 Management Update, including those emails alleged in Section VIII(O);

q.  Transmitting the September 2016 Management Update through uploading it to a shared folder (ShareFile) on September 27, 2016, where individuals such as Thelander, downloaded such document, including those transmissions alleged in Section VIII(P);

r.  Emails to Lyons and Lockard on October 28, 2016, transmitting the October 2016 Management Update, including those emails alleged in Section VIII(Q);

s.  Transmitting the Second October 2016 Management Update through uploading it to a shared folder (ShareFile) on November 25, 2016, where individuals such as Thelander, downloaded such document, and emails to Lyons and Lockard on November 28, 2016, transmitting the document, including those transmissions and emails alleged in Section VIII(R);

t.     Transmitting the December 2016 Management Update through uploading it to a shared folder (ShareFile) on January 31, 2017, where individuals such as Thelander, downloaded such document, and emails to Haarkoetter on April 19, 2016, transmitting the document, including those transmissions and emails alleged in Section VIII(S);

u.     Emails Thelander, Haarkoetter, Lyons, and Lockard, on January 15, 2017, transmitting the January 2017 Model, including those emails alleged in Section VIII(T);

v.     Transmitting the January 2017 Management Update through uploading it to a shared folder (ShareFile) on March 1, 2017, where individuals such as Thelander, downloaded such document, and emails to Lyons and Lockard on March 2, 2016, transmitting the document, including those transmissions and emails alleged in Section VIII(U);

w.     Emails to Thelander, Haarkoetter, Lockard, and Lyons on April 6, 2017, transmitting the February 2017 Management Update, including those emails alleged in Section VIII(V);

x.     Transmitting the March 2017 Management Update through uploading it to a shared folder (ShareFile) on April 28, 2017, including those transmissions alleged in Section VIII(W);

y.     Transmitting the May 2017 Management Update through uploading it to a shared folder (ShareFile) on June 4, 2017, where individuals such as Thelander, downloaded such document, including those transmissions alleged in Section VIII(X);

z.     Transmitting the June 2017 Management Update through uploading it to a shared folder (ShareFile) on July 11, 2017, where individuals such as Thelander, downloaded such document, including those transmissions alleged in Section VIII(Y);

aa.     Transmitting the July 2017 Management Update through uploading it to a shared folder (ShareFile) on August 8, 2017, where individuals such as Thelander, downloaded such document, including those transmissions alleged in Section VIII(Z);

bb.     Transmitting the August 2017 Management Update through uploading it to a shared folder (ShareFile) on September 5, 2017, where individuals such as Thelander, downloaded such document, including those transmissions alleged in Section VIII(AA);

cc.     Transmitting the Second August 2017 Management Update through uploading it to a shared folder (ShareFile) on October 4, 2017, where individuals such as Thelander, downloaded such document, including those transmissions alleged in Section VIII(AA);

dd.   The Founders' "reverse engineering" of data, including as shown through December 18, 2015 and March 21, 2016, emails to Lockard, Robert Smith, and Thelander transmitting Model 3, June 22, 2016 emails to Lockard transmitting Model 4, July 6, 2016 emails to Lyons transmitting Model 5, and transmitting Model 4 through uploading it to the Data Room on August 31, 2016, including those transmissions alleged in Section XIII(A);

ee.   Wire transfers of funds to and from VBF related to the misappropriations, including as described in Section V; and

ff.   Any and all other electronic mails, electronic submissions, telephone calls, and wire transfers made by or caused to be made by Wulf, Hall, Driver, Ted Rea, or James Rea for the purpose of executing the fraudulent acts and fraudulent scheme described herein.

984.   Wulf, Hall, Driver, Ted Rea, and James Rea distributed Board materials, shareholder materials, marketing materials, supposed third-party reports, contracts, email communications, and other documents containing material misrepresentations related to VBF's Metrics, finances, management, operations, and technology that were transmitted by mail and/or wire in interstate commerce.

985.   In reality, Wulf, Hall, Driver, Ted Rea, and James Rea misrepresented and concealed their misconduct through such communications.

986.   The Predicate Acts were directed to various audiences, including VBF, Independent Board Members, Independent Officers, VBF shareholders, and other VBF personnel. The recipients of each Predicate Act are described in detail in Section V, VII, and VIII.

987.   Each of the Predicate Acts includes statements that were knowingly false and/or made with reckless indifference as to their truth or falsity, and was made with intent to fraudulently induce VBF to refrain from attempting to halt Wulf, Hall, Driver, Ted Rea, and James Rea's misconduct by concealing these material facts from VBF.

988.   These Predicate Acts consisted of communications and transmissions through the mail and across the interstate wires. They were intended to, and did in fact, directly or indirectly

affect the Enterprise, by allowing it to obtain funds and other assets for VBF that were then misappropriated and looted.  The Predicate Acts also served to protect the positions of Wulf, Hall, Driver, Ted Rea, and James Rea so that they could continue to control VBF's finances and operations, thereby ensuring the continuation of the fraudulent scheme allowing them to loot VBF funds and other assets.

989.    Wulf, Hall, Driver, Ted Rea, and James Rea's repeated violation of 18 U.S.C. §§ 1341 (mail fraud) or 1343 (wire fraud) occurred over a period of several years, commencing in 2014, and was continuous throughout the relevant time period (*i.e.*, on or before September 2014 through at least November 2017, if not later).

990.    The Predicate Acts were related and connected to the same unlawful scheme or artifice to fund VBF, loot VBF, and ultimately defraud VBF, which was devised and executed by Wulf, Hall, Driver, Ted Rea, and James Rea to continually conduct or participate in the conduct of the affairs of the Enterprise.

991.    Accordingly, Wulf, Hall, Driver, Ted Rea, and James Rea's pattern of racketeering activity consisted of multiple Predicate Acts that victimized VBF. The Predicate Acts occurred and extended over a substantial period of time constituting a close-ended scheme.  Pleading in the alternative, the Predicate Acts constituted an open-ended scheme as they occurred over a substantial period of time and threaten continuing criminal conduct due to the involvement of at least Wulf, Hall, Ted Rea, and James Rea in continuing suspect business enterprises.

992.    Wulf, Hall, Driver, Ted Rea, and James Rea pattern of racketeering activity is further evidenced by the number of Predicate Acts and the variety of the Predicate Acts.

993.    VBF made or authorized transfers of assets and stock (as described above in Section V and Counts V through VIII) totaling (and VBF's investigation is ongoing):

      a.      at least $4,562,498 to Wulf;

      b.      at least $4,747,333 to Hall;

      c.      at least $4,365,000 to James Rea;

      d.      at least $4,487,410 to Ted Rea; and

      e.      at least $3,389,501 to Driver.

994.    Wulf, Hall, Driver, Ted Rea, and James Rea also directed all distributions made by VBF.  Instead of leaving sufficient funds in VBF to conduct day-to-day operations, Wulf, Hall, Driver, Ted Rea, and James Rea looted the company through misappropriation of funds and self-dealing.  These funds were diverted from VBF to Wulf, Hall, Driver, Ted Rea, and James Rea.  These distributions were effectuated through the United States mail and by wire in interstate commerce, in furtherance of the fraudulent scheme alleged herein.  This conduct caused injury to VBF's business, as it resulted in, among other things, VBF owing millions of dollars without sufficient funds to account for such debt.

    **D.**    **Defendants Conducted the Enterprise's Affairs through a Pattern of Racketeering Activity**

995.    At all relevant times, Wulf, Hall, Driver, Ted Rea, and James Rea were associated with the Enterprise as the parties in control of the Enterprise and VBF.  Wulf, Hall, Driver, Ted Rea, and James Rea exercised continuous authority over the Enterprise on an ongoing basis, up through and including November 2017.

996.    Wulf, Hall, Driver, Ted Rea, and James Rea conducted the affairs of VBF and the association-in-fact enterprise through a pattern of racketeering activity:  namely, mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.

997.    Wulf, Hall, Driver, Ted Rea, and James Rea furthered their scheme by transferring funds to themselves via wire on multiple occasions, including paying themselves sums of money

in compensation and bonuses.  Additionally, some combination of Wulf, Hall, Driver, Ted Rea, and James Rea authorized and requested payments related to the BAJJER Stock Scheme, the American Growth Funding Loan Scheme, the Wulf Lake House Scheme, the Sedun Payment Scheme, the Gagne Scheme, the OFA Scheme, the VBF Canada Stock Scheme, and other improper payments to loot VBF and its resources, and payments made for these schemes were made by wire or mail.  The particular Defendant(s) involved in each of these schemes and improper payments are detailed in Section V.

998.    At all relevant times, Wulf, Hall, Driver, Ted Rea, and James Rea's association with the Enterprise facilitated their commission of the Predicate Acts comprising a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).

999.    Wulf, Hall, Driver, Ted Rea, and James Rea committed or caused to be committed the Predicate Acts, acts of mail or wire fraud, as the means by which they conducted, or participated in the conduct of the Enterprise's affairs for the intended purpose of misappropriating funds and other assets from VBF.

1000.   Wulf, Hall, Driver, Ted Rea, and James Rea used mail and wire over a continuous period of years, establishing a pattern of racketeering activity.

**E.    Injury to VBF**

1001.   As a direct and proximate result of Wulf, Hall, Driver, Ted Rea, and James Rea's racketeering activities, VBF suffered actual damages in the amount of at least $90,000,000.  VBF has been directly, purposefully, and foreseeably injured in its business and property by reason of Wulf, Hall, Driver, Ted Rea, and James Rea's violation of 18 U.S.C. § 1962(c).  VBF is a "person" who has suffered a compensable injury as a result of Wulf, Hall, Driver, Ted Rea, and James Rea's unlawful activity, as defined in 18 U.S.C. § 1964(c).

1002.   Pursuant to 18 U.S.C. § 1964(c), VBF is entitled to recover three times the actual damages that it has sustained as a direct and proximate cause of the Enterprise's unlawful racketeering activity, amounting to at least $240,000,000, as well as VBF's reasonable attorney's fees and litigation expenses.

1003.   The intended, direct and foreseeable consequence of Wulf, Hall, Driver, Ted Rea, and James Rea's unlawful racketeering activity, as described above, was and is to injure VBF's business or property by, among other things, extracting tens of millions of dollars of from VBF. The unlawful racketeering activity allowed Wulf, Hall, Driver, Ted Rea, and James Rea to obtain funds and other assets for VBF that they then misappropriated and looted.   The unlawful racketeering activity also served to protect the positions of Wulf, Hall, Driver, Ted Rea, and James Rea so that they could continue to control VBF's finances and operations, thereby ensuring the continuation of the fraudulent scheme allowing them to loot VBF funds and other assets.

1004.   As a result of Wulf, Hall, Driver, Ted Rea, and James Rea's racketeering activity and scheme to defraud, VBF has suffered damages in excess of the minimum jurisdictional limit of this Court, for which it seeks recovery.   VBF has suffered injury to its business and property as a result of Wulf, Hall, Driver, Ted Rea, and James Rea's conduct of VBF through a pattern of racketeering activity.

1005.   The misappropriation of funds and self-dealing perpetrated by Wulf, Hall, Driver, Ted Rea, and James Rea have depleted VBF of funds that could have been used to continue to operate its business and pay its creditors.   VBF was injured by Wulf, Hall, Driver, Ted Rea, and James Rea's fraudulent and racketeering activity because it looted the company and prevented the business from continuing to operate.

1006.   VBF is entitled to treble damages and attorneys' fees based upon Wulf, Hall, Driver, Ted Rea, and James Rea's violation of 18 U.S.C. § 1962(c).

1007.   VBF did not discover its injuries resulting from Wulf, Hall, Driver, Ted Rea, and James Rea's pattern of racketeering activity until in or around March 2018.

## XV.   **ATTORNEYS' FEES**

1008.   VBF is entitled to recover reasonable and necessary attorney's fees and costs for the claim against Defendants.

1009.   Specifically, in addition to RICO, as alleged herein, under Iowa's fraudulent transfer law, the Court may award any other relief the circumstances may require (*see* Iowa Code § 684.7) and under Texas's fraudulent transfer law, Plaintiff may be awarded attorneys' fees and costs as are equitable and just (*see* TEX. BUS. & COMM. CODE § 24.013).

## XVI.   **PRAYER**

WHEREFORE, Plaintiff, VeroBlue Farms USA, Inc., respectfully requests the following relief:

1010.   That this Court enter judgment in its favor and against the Defendants, jointly and severally, in an amount in excess of $75,000, but to be determined at trial, as actual and consequential damages, including but not limited to compensatory damages representing the devaluation of Plaintiff due to Defendants Leslie A. Wulf's, Bruce A. Hall's, James Rea's, John E. Rea's, and Keith Driver's breaches of fiduciary duty, fraud, mismanagement, misappropriation, waste of corporate assets, and other misconduct described herein, punitive damages due to Defendants' fraudulent and malicious conduct, costs, allowable pre-judgment and post-judgment interest at the highest rates allowed by law; and disgorgement of compensation and any other amounts unjustly retained by Defendants;

1011. That VBF be awarded treble damages and attorneys' fees based under the Founders' violation of 18 U.S.C. §1962(c);

1012. That Defendants Leslie A. Wulf, Bruce A. Hall, James Rea, John E. Rea, and Keith Driver be ordered to return all funds received from VBF as a result of the conduct described herein, and that judgment be entered against them and in favor of VBF for the total amount transferred to them. In the case that the funds were spent to acquire any real or personal property, VBF requests that a constructive trust be imposed upon the property, and an order that such property must immediately be turned over to VBF;

1013. That Defendants Leslie A. Wulf, Bruce A. Hall, James Rea, John E. Rea, and Keith Driver be required to produce an equitable accounting detailing every dollar deposited, received, or otherwise transferred to or from VBF or any of its affiliates to or from Defendants between October 1, 2014 and January 31, 2018, and entering a judgment against Defendants as to any amounts for which Defendants cannot account, or which are shown by the accounting to have been misappropriated by Defendants;

1014. That this Court rescind the Termination Agreements of Defendants Bruce A. Hall, John E. Rea, and Keith Driver and the Wulf Separation Agreement of Defendant Leslie A. Wulf and return the parties to their *status quo ante* before those agreements were entered into;

1015. That this Court enter a judgment declaring that the Release and Severance Provisions in the Termination Agreements are null and void *ab initio*, and that Defendants Bruce A. Hall, John E. Rea, and Keith Driver are not entitled to rely on the Release and Severance Provisions to avoid the claims asserted against them by VBF and award other relief deemed just;

1016.   That this Court enter a judgment declaring that the benefits under the Employment Agreement between VBF and Defendant James Rea are null and void *ab initio*, and that Defendant James Rea is not entitled to rely thereon, and awarding other relief deemed just;

1017.   That this Court enter a judgment declaring that the benefits under the Wulf Separation Agreement between VBF and Defendant Leslie A. Wulf are null and void *ab initio*, and that Defendant Wulf is not entitled to rely thereon, and awarding other relief deemed just;

1018.   That this Court enter judgment in its favor and against Defendant Christine Gagne, in an amount in excess of $75,000, but to be determined at trial, as compensatory damages for the Founders-Gagne Conspiracy and aiding and abetting the Founders' Conspiracy, plus punitive damages, costs, allowable pre- and post-judgment interest, the imposition of a constructive trust, and other relief deemed just;

1019.   That Defendant Christine Gagne be ordered to return all funds received from VBF as a result of the conduct described herein, and that judgment be entered against her and in favor of VBF for the total amount transferred to her;

1020.   That VBF be awarded attorneys' fees and costs; and

1021.   That VBF be awarded any other relief, both special and general, to which it may be justly entitled.

Dated: July 27, 2020

/s/ *Nicole L. Williams*

ATTORNEYS FOR PLAINTIFF

Nicole L. Williams
Texas Bar No. 24041784
nwilliams@thompsoncoburn.com
Jasmine S. Wynton
Texas Bar No. 24090481
jwynton@thompsoncoburn.com

**THOMPSON COBURN LLP**
1919 McKinney Avenue, Suite 100
Dallas, Texas 75201

/s/ *Robert H. Lang*
Robert H. Lang
(appearing *pro hac vice*)
rhlang@thompsoncoburn.com
Caroline Pritikin
(appearing *pro hac vice*)
cpritikin@thompsoncoburn.com

**THOMPSON COBURN LLP**
55 East Monroe, 37th Floor
Chicago, IL 60603
312-346-7500

***ATTORNEYS FOR PLAINTIFF***
***VEROBLUE FARMS USA, INC.***