IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VEROBLUE FARMS USA INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:19-cv-764-X |
| | § | |
| LESLIE A. WULF, ET AL., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**[1]

Defendants Leslie A. Wulf ("Wulf"), Bruce A. Hall ("Hall"), James Rea ("James"), and John E. Rea ("Ted") (collectively, the "Founders") have filed a Motion to Exclude the Expert Testimony of Brandi Kleinman, *see* Dkt. No. 492 (the "Kleinman Motion"), whom Plaintiff VeroBlue Farms USA, Inc. has designated as a damages expert.

In the Kleinman Motion, the Founders assert that "the opinions, analysis, and testimony of Plaintiff VeroBlue Farms USA, Inc.'s ('VBF') purported damages expert, Kleinman, should be struck, limited, or excluded as unreliable and irrelevant under [Federal Rule of Evidence] 702 and *Daubert*," where "[a]n expert's opinion is not

---

[1] Under § 205(a)(5) of the E-Government Act of 2002 and the definition of "written opinion" adopted by the Judicial Conference of the United States, this is a "written opinion[] issued by the court" because it "sets forth a reasoned explanation for [the] court's decision." It has been written, however, primarily for the parties, to decide issues presented in this case, and not for publication in an official reporter, and should be understood accordingly.

admissible unless the expert is qualified, and the opinions offered are 'relevant and reliable,'" and "[t]he party offering an expert's opinion has the burden to establish that: (1) the expert is qualified; (2) the testimony is based upon a reliable foundation; and (3) the testimony is relevant to the issues in the case." Dkt. No. 492 at 2 (cleaned up).

According to the Founders, "Kleinman's opinions are flawed and contrary to governing law, and VBF cannot show that her opinions and testimony are either relevant or reliable, both of which are prerequisites to admissibility." *Id.* The Founders argue:

> Assume McDonald's Corporation has never had any value, its assets have never had any value, and it has never been able to generate a profit. Assume further that all of McDonald's officers and directors allegedly failed to disclose certain information and made misstatements/faulty projections about its prospects for growth and profitability to third parties, who then through loans and investments contributed approximately $100 million to the company and affiliates. Now assume that McDonald's subsequently sues those officers and directors for their false statements and failure to disclose information to the investors and lenders. Finally, assume McDonald's seeks the entirety of the $100 million that the third parties invested in and loaned to the company as damages to the company. Sounds ridiculous? Indeed, but this hypothetical is exactly the opinion that Plaintiff VeroBlue Farms USA, Inc.'s ("VBF") expert, Brandi Kleinman ("Kleinman"), offers here.
>
> Kleinman claims that VBF was worthless and had no value from its inception. Kleinman next regurgitates VBF's allegations of fraud and concludes that this alleged fraud caused damages to VBF. She then adds up the total debt and equity invested in VBF (and its parent company, VeroBlue Farms, Inc. ("VBF Canada") and subsidiary companies) since inception – nearly $93 million – and "opines" that VBF has been damaged in that amount, effectively lumping all of the alleged misrepresentations together, and lumping all of the Founders together. Worse yet, Kleinman simply repeats the allegations and evidence hand-

selected by VBF and concludes – without any analysis – that every dollar that came into VBF or its affiliates was lost due to the Founders' misconduct (without tying any damages to any specific act or defendant). Texas law does not allow for experts to employ the "just trust me" method of calculating damages advanced by Kleinman. Her unsubstantiated damage model is replete with relevance and reliability issues. If Kleinman's reasoning is followed, a company that has been worthless since its inception is suddenly worth $93 million.

Continuing with her adding-machine methodology, Kleinman next adds up (1) every cent that the Founders or non-party related Entities received as compensation or expense reimbursement, and (2) amounts spent by VBF that Kleinman somehow concludes did not provide value to VBF (even where those amounts were not paid to the Founders). Kleinman characterizes the entirety of those funds – 9,026,004 – as damages attributable to what she calls the "Founders' Misappropriations." Having already concluded that every dollar invested in or loaned to VBF or its affiliates damaged VBF, Kleinman takes it one step further. She concludes that dollars out, to the extent those dollars directly or indirectly benefited the Founders or were arbitrarily determined by Kleinman to be "excessive and/or improper," also damaged VBF. Kleinman then double counts when she adds her debt/equity calculation ($93,076,564) with her misappropriation calculation ($9,026,004) to come up with VBF's total damages = $102,102,568 (more money than the company ever received or brought in), which she then offsets by the $10 million VBF's assets sold for in its bankruptcy. This damage model does not even come close to passing muster.

Unrelated to her damage model, Kleinman also compares a set of VBF 2016 financial projections that were not even part of any transaction with investors, delving into topics such as fish density and fish mortality rates, to information prepared by VBF's purported "aquaculture expert." In doing so, she "opines" that VBF (via the Founders) unrealistically overstated its projected EBITDA. To whom? "[T]hose who became VBF shareholders and directors," i.e., parties that later invested in or loaned money to VBF. Much like Kleinman's debt/equity damage number, she perpetuates the fallacy of a shareholder/investor lawsuit trying to wear the disguise of the company.

*Id.* at 1-3.

According to the Founders, Kleinman's October 2021 Expert Report (the

"Report") proffers three primary opinions:

- Her **Debt Received + Equity Received = Damages Opinion**: "I conclude to a reasonable degree of certainty that VBF's damages caused by the Founders' devaluation and waste of VBF's assets are at least $93,076,564, which represents what I have identified as the total debt and equity investment in VBF[.]"
- Her **Every Penny to the Founders = VBF Damages Opinion**: "Additionally, I conclude to a reasonable degree of certainty that the damages caused by the Founders relating to misappropriations are at least $9,026,004."
- Her **VBF Misrepresented EBITDA to Itself Opinion**: "Based upon my investigation and based upon the Whitehair Report, the Founders misrepresented VBF's Metrics including Density, FCR and Mortality Rate, among others, in Marketing Decks and VBF Financial Models, which were presented or made available to those who became VBF shareholders and directors. The projected EBITDA in the 2016 Model, which was provided or made available to the Corporate Investors and Independent Board Members, was overstated by 96% as a result of the Founders misrepresentations just related to Density and FCR achieved from April 2015 through June 2016."

Kleinman then purports to tie it all together with a damage model of over $102 million by adding her Debt Received + Equity Received = Damages Opinion to her Every Penny to the Founders = Damages Opinion, offset by the $10 million sale of VBF's assets in bankruptcy:

I conclude to a reasonable degree of certainty that VBF's total damages caused by the Founders are $102,102,568. Upon deducting the $10.0 million for the sale of VBF's assets to Natural Shrimp, I conclude to a reasonable degree of certainty that VBF's net damages are at least $92,102,568

*Id.* at 5-6 (cleaned up).

And, the Founders argue, "Kleinman produced an untimely supplemental report with an entirely new opinion on solvency six days before her deposition," Dkt. No. 493 at 3, which "untimely opinion contains an entirely new solvency opinion

despite not relying on any new information," *id.* at 23 – more specifically, the Founders assert, "[u]sing a discredited balance sheet method, Kleinman opined that VBF was always insolvent and then bootstraps that to her original opinion that every dollar VBF obtained or spent constituted waste," *id.* at 3. According to the Founders, "[a]lthough the deadline for VBF to serve its expert reports was October 18, 2021, the Supplemental Report was served five months late and added a completely new opinion that was not based on any new information [–] VBF Was Always Insolvent Opinion: Kleinman claims that 'VBF was insolvent from at least August 2014 through June 2016.... After that time, ... the consolidated balance sheet would likely show that VBF was insolvent for additional periods after July 2016.' The opinions in the Supplemental Report were (1) a summary of expenses incurred by VBF totaling $45 million and (2) a regurgitation of insolvency tests with conclusory statements that VBF met the 'balance sheet test.' The only document that Kleinman cited for her opinions in the Supplemental Report was transaction details that she used for her original Report." *Id.* at 6-7 (cleaned up).

The Founders assert that their Kleinman Motion

> is not even a close call. Kleinman's opinions cannot sniff at relevance and reliability when they rely on a fatally flawed damage model. VBF's lawsuit in search of a theory has hit its breaking point with Kleinman's theory of damages.
>
> The Court should grant this motion in its entirety. If the Court does as to the $93 million-damage claim, most of VBF's claims will lack evidence of damages. [As pleaded in VBF's Third Amended Complaint ("TAC") (ECF No. 296), VBF attributes its $93 million allegedly obtained by the Founders' fraud as damages to support its claims for breach of fiduciary duty (¶ 824); fraudulent concealment (¶ 832); fraudulent

misrepresentation (¶ 840); constructive fraud (¶ 844); civil conspiracy (¶ 883); aiding and abetting (¶ 887); and RICO (¶ 1,001).] If the Court grants this motion as to both the $93 million debt/equity damages and the $9,026,004 "misappropriation" damages, this case is over. If the Court leaves some or all of Kleinman's "misappropriation" damages opinion, the Court can address the disconnect between those damages and VBF's claims in the Founders' Motion for Summary Judgment, which is filed concurrently with this motion..

*Id.* at 3 & n.1 (footnote omitted). "While the Founders' concurrently filed motion for summary judgment addresses each of VBF's claims individually, for purposes of this motion, the Founders focus primarily on fraud because VBF exclusively alleges fraudulent conduct caused $90 million in investment and because Kleinman anchors her $93 million damages opinion exclusively to fraudulent conduct." *Id.* at 5 n.14.

The Founders seek an order "that Ms. Kleinman's opinions, testimony, and analysis is struck from the record and excluded in its entirety" and "that Ms. Kleinman is precluded from offering any testimony concerning alleged damages of Plaintiff VeroBlue Farms USA, Inc. at or during the trial of the above-styled cause, whether by live testimony, deposition testimony, affidavit, declaration, or otherwise." Dkt. No. 492-1 at 1.

Defendant Keith Driver filed a Notice of Joinder in Defendant Leslie A. Wulf, Bruce A. Hall, James Rea, and John E. Rea's Motion to Exclude Expert Testimony of Brandi Kleinman, *see* Dkt. No. 464, in which Driver "adopts, joins in and incorporates by reference as if fully set forth herein the Founder Defendants' Motion to Exclude (Dkt. No. 463) in all respects" and "adopts as his own all of the Founder Defendants' factual assertions, allegations, evidence, positions, arguments, contentions,

objections, oppositions, citations to legal authority, and requests for relief contained in the Founder Defendants' Motion to Exclude," *id.* at 1. (The Court granted he Founders' motion for leave [Dkt. No. 463] to file the Kleinman Motion, *see* Dkt. No. 487, after which the Kleinman Motion was filed along with its supporting brief and appendix, *see* Dkt. Nos. 492, 493, & 494.)

VBF filed a response to the Kleinman Motion, *see* Dkt, No. 508, arguing that

[t]he Founders seek to exclude VBF's financial expert Brandi Kleinman ("Kleinman") from providing any testimony in this case. But their entire Motion mischaracterizes her report, her calculations, and the relevant legal standard. At its core, the [Kleinman Motion] rehashes legal arguments the Founders already made and lost at the motion to dismiss stage, and the Founders' criticisms of Kleinman's expert opinions go to the potential weight they should be afforded by the jury, not to their admissibility. Kleinman is a Certified Public Accountant with a designation of Certified in Financial Forensics form the American Institute of Certified Public Accountants who is qualified as a financial and damages expert. She has been retained as a testifying expert in these areas many times and (unlike the Founders' financial expert, Gary Durham), and has never been excluded by a court in whole or in part. As explained below, her opinions are reliable and relevant to the claims asserted by VBF; she appropriately relies on data and evidence, as well as on other expert opinions, to support her conclusions; and her testimony will assist the trier of fact in understanding the complex financial fraud and breaches of fiduciary duty that inflicted more than $90 million in damages on VBF. The [Kleinman Motion] should be denied.

*Id.* at 1-2 (footnotes omitted).

More specifically, VBF explains that

Kleinman is a Certified Public Accountant and Certified Financial Forensic Accountant. She has over twenty years of general finance, accounting, and consulting experience, including in providing forensic accounting and litigation support services. She specializes in developing and analyzing damage claims, conducting fraud and forensic accounting

investigations, and evaluating complex data sets involved in financial misrepresentation, tortious interference, fraud, and breach of contract claims. Kleinman has developed and analyzed loss calculations under a variety of damages theories across many industries, including the agribusiness, construction, real estate, high-tech, energy, manufacturing, and telecommunications industries, among others. Neither she nor any of her opinions have ever been stricken or excluded by a court.

....

Kleinman's opinions in this case relate to two measures of damages to VBF, as well as an analysis of the Founders' overstatement of EBITDA and VBF's overall financial condition throughout the relevant time period. The first measure of damages on which she opines is VBF's losses due to the Founders' devaluation and waste of VBF's assets, which Kleinman concludes are at least $93,076,564. VBF alleges that the Founders' misconduct devalued and wasted all of VBF's assets, ultimately resulting in VBF's filing for Chapter 11 Bankruptcy on September 21, 2018. Kleinman opines that if VBF is correct, the Founders wasted all of VBF's assets – which is reflected by the total debt and equity taken in by VBF that became VBF's assets. That amount is offset by the value received for those assets, which Kleinman opines is reflected in the $10 million that VBF received for the sale of its remaining assets (other than this lawsuit) in a transaction with third party Natural Shrimp following the bankruptcy. The second measure of damages is specifically-identified misappropriations of certain of VBF's assets for the personal benefit of the Founders in the amount of at least $9,026,004. Kleinman also opines that VBF's EBITDA while under the control of the Founders was artificially inflated and misrepresented the actual financial data and position of the company and that VBF was insolvent from at least 2014.

To render her opinions, Kleinman conducted a forensic accounting of VBF's books and records (including VBF's QuickBooks and NetSuite data, which is financial management software used by many businesses) to identify transactions that improperly wasted VBF's assets and/or diverted money from VBF to the Founders, entities they owned or controlled, and their family members or close friends. As part of that analysis, Kleinman created a summary document titled "VBF Transaction Detail" from the QuickBooks files, the NetSuite general ledger, and the 2018 detailed transaction ledger that were produced by VBF. The VBF Transaction Detail contains a listing of every accounting transaction that was recorded in the QuickBooks files, the NetSuite general ledger, or the 2018 detailed transaction ledger that were

produced by VBF. Kleinman exported detailed transaction information and reports, including balance sheets, directly out of the QuickBooks system that was used by all VBF entities as part of her forensic accounting analysis. Kleinman also reviewed multiple financial models created by the Founders.

There is nothing unusual or improper about the analyses conducted by Kleinman. Her conclusions are based on her examination of VBF's financial data, her extensive experience as a CPA and forensic accountant, presentations and models created by the Founders, conclusions of other experts (who have not been challenged by the Founders), and evidence indicating those presentations and models were false and based on false data – including expert conclusions solicited by the Founders themselves. She relied on standard types of data and evidence, and relied on actual statements and evidence adduced from discovery in this case.

*Id.* at 3-5 (footnotes omitted).

As to Driver's Notice of Joinder, VBF specifically asserts that,

[a]lthough styled as a "Notice," Driver's filing is a motion because it seeks affirmative relief. It is therefore subject to both this Court's order requiring the parties to seek leave before filing any non-dispositive motions, and Local Civil Rule 7.1's conference requirement for motions to strike. Driver did not comply with either. Nor does Driver's notice satisfy Rule 7(b)(1)(B)'s requirement that "a motion 'state with particularity the grounds for seeking the order.'" Driver's decision to file only a one-page "notice" incorporating another party's briefing by reference – before that brief was even filed – also ignores this Court's instructions in the May 6, 2020 hearing, that all parties "brief up" their arguments. Driver did not brief any of his arguments at all, and his "Notice of Joinder" should be disregarded.

*Id.* at 25 (cleaned up); *see also id.* at 1 n.1 ("Driver improperly seeks to join the Founders' Motion via a one-page 'Notice' that he filed without leave of court, before the Founders' Motion was even filed, and without conferring with VBF. It should not be considered by this Court.").

The Founders filed a reply, *see* Dkt, No. 524, arguing that

VBF's Response to the [Kleinman Motion] (ECF No. 508) ("Response") only highlights VBF's serious standing problem. There is a complete disconnect between VBF's alleged damages and the alleged wrongful conduct on which it is based. On one hand, VBF complains of alleged misstatements and non-disclosures made to third parties before July 2016 that brought money into VBF (which would have benefited VBF). On the other, VBF tries to fix its standing problem by arguing that it is only seeking to recover funds that were wasted or taken by the Founders. VBF's problem is that its damage theory of alleged waste and misappropriation has no connection to (a) the conduct it complains of or (b) Kleinman's $93 million damage model that simply adds up the debt and equity that came into the company.

VBF's Response does not eliminate the flaws with Kleinman's models set forth in the [Kleinman Motion]. First, while VBF contends that Kleinman's $93 million damage model measures VBF's out-of-pocket damages caused by the Founders, Kleinman's Report and deposition establish that no such analysis took place. Namely, Kleinman fails to identify the specific transactions where the $93 million was spent that she contends were waste and provide the value received at the time of each transaction. Under Texas law, these two components are required to calculate out-of-pocket damages. Kleinman therefore applies a flawed methodology that will not assist the jury.

Likewise, Kleinman's $9 million calculation fails to measure out-of-pocket damages because Kleinman again fails to calculate the value received at the time the alleged misappropriations took place. Kleinman also attempts to provide opinions related to executive compensation, real estate, and vehicles even though she has no expertise in those areas. VBF also completely ignores the double counting in Kleinman's two models. Kleinman's $9 million model therefore will not assist the jury in measuring out-of-pocket damages.

Finally, Kleinman's opinions related to EBITDA and solvency fare no better. VBF does not dispute that Kleinman's opinions on EDITDA are based on a financial model that VBF never used. VBF ignores that Kleinman failed to provide any opinions related to the valuation of VBF's assets during the relevant period, which VBF admits is a critical element in determining solvency.

*Id.* at 1-2.

United States District Judge Brantley Starr has referred the Kleinman Motion

to the undersigned United States magistrate judge for a hearing, if necessary, and

determination under 28 U.S.C. § 636(b). *See* Dkt. No. 532; *see also Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 346 n.2 (5th Cir. 2020) (the admissibility of an expert report is "a non-dispositive matter," which can be "'referred to a magistrate judge to hear and decide'" under Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b)(1)(A)).

For the reasons explained below, the Court denies the Founder's Motion to Exclude the Expert Testimony of Brandi Kleinman [Dkt. No. 492] and Defendant Keith Driver's Notice of Joinder in Defendant Leslie A. Wulf, Bruce A. Hall, James Rea, and John E. Rea's Motion to Exclude Expert Testimony of Brandi Kleinman [Dkt. No. 464].

### Background and Legal Standards

The parties and the Court are familiar with the background of this case, so the Court will not repeat it here. *See VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633 (N.D. Tex. 2020).

> As Judge Starr recently laid out,
>
> Federal Rule of Evidence 702 governs the admissibility of expert testimony as evidence. Rule 702 permits opinion testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education" if the expert's knowledge will assist the trier of fact, and (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case."

*Ramos v. Home Depot Inc.*, No. 3:20-cv-1768-X, 2022 WL 615023, at *1 (N.D. Tex. Mar. 1, 2022) (cleaned up).

"In its gatekeeping role, the Court determines the admissibility of expert testimony based on Rule 702 and [*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993),] and its progeny." *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 800 (N.D. Tex. 2018), *aff'd*, No. 3:11-cv-3296-L, 2018 WL 2064126 (N.D. Tex. May 2, 2018). Under Rule 702 and *Daubert*,

> [a]s a gatekeeper, this Court must permit only reliable and relevant testimony from qualified witnesses to be admitted as expert testimony. The party offering the expert testimony has the burden of proof, by a preponderance of evidence, to show that the testimony is reliable and relevant.

*Ramos*, 2022 WL 615023, at *1 (cleaned up). And "*Daubert*'s general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Applying this analytical framework under Rule 702 and *Daubert*, a "court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Galvez v. KLLM Transp. Servs., LLC*, 575 F. Supp. 3d 748, 759 (N.D. Tex. 2021).

"First, an expert must be qualified. Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his knowledge, skill, experience, training or education." *Aircraft Holding Sols., LLC v. Learjet, Inc.*, No. 3:18-cv-823-D, 2022 WL 3019795, at *5 (N.D.

Tex. July 29, 2022) (cleaned up). "The distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Holcombe*, 516 F. Supp. 3d at 679-80 (cleaned up); *accord Arnold v. Allied Van Lines, Inc.*, No. SA-21-CV-00438-XR, 2022 WL 2392875, at *18 (W.D. Tex. July 1, 2022) ("Testimony regarding first-hand, historical perceptions constitutes lay, not expert, opinion testimony."). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Aircraft Holding*, 2022 WL 3019795, at *5 (cleaned up).

And, if the expert is qualified, "Rule 702 charges trial courts to act as gate-keepers, making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. Expert testimony must be both relevant and reliable to be admissible." *Hall v. State*, No. CV H-21-1769, 2022 WL 2990912, at *4 (S.D. Tex. July 28, 2022) (cleaned up).

> Expert testimony is relevant if it assists the trier of fact in understanding the evidence or determining a fact in issue. Federal Rule of Evidence 401 further clarifies that relevant evidence is evidence that has "any tendency to make a fact more or less probable than it would be without evidence" and "is of consequence in determining the action."

*Id.* (cleaned up). "Relevance depends upon whether [the expert's] reasoning or methodology properly can be applied to the facts in issue." *Aircraft Holding*, 2022 WL

3019795, at *6 (cleaned up). "To be relevant, the expert's reasoning or methodology [must] be properly applied to the facts in issue." *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022) (cleaned up).

"When performing [the required gate-keeping Rule 702 and *Daubert*] analysis, the court's main focus should be on determining whether the expert's opinion will assist the trier of fact." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019). "Assisting the trier of fact means the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument," but "the helpfulness threshold is low: it is principally ... a matter of relevance." *Id.* at 293-94 (cleaned up).

As to reliability, the required "analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia," and "mandates that expert opinion be grounded in the methods and procedures of science." *Jacked Up*, 291 F. Supp. 3d at 801 (cleaned up). "Expert evidence that is not reliable at each and every step is not admissible." *Jacked Up*, 807 F. App'x at 348 (cleaned up). "Expert testimony is reliable if the reasoning or methodology underlying the testimony is scientifically valid." *Ramos*, 2022 WL 615023, at *1 (cleaned up).

"Such testimony must be more than subjective belief or unsupported speculation." *Id.* (cleaned up). "In other words, this Court need not admit testimony that is connected to existing data only by the ipse dixit [– that is, an unproven and unsupported assertion resting only on the authority –] of the expert." *Id.* (cleaned up).

"[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Holcombe*, 516 F. Supp. 3d at 687 (cleaned up).

"Experts are permitted to rely on assumptions when reaching their opinions," but "those assumptions must have some factual basis in the record and an underlying rationale." *Jacked Up*, 291 F. Supp. 3d at 807-07 (cleaned up). "But there is no requirement that an expert derive his opinion from firsthand knowledge or observation." *Id.* at 801 (cleaned up). More specifically, "[e]xperts are permitted to assume the fact of liability and opine about the extent of damages," and "[a]n expert's reliance on assumptions does not itself make the expert opinion unreliable or inadmissible." *ENGlobal U.S. Inc. v. Native Am. Servs. Corp.*, No. CV H-16-2746, 2018 WL 1877015, at *8 (S.D. Tex. Apr. 19, 2018) (cleaned up).

And Federal Rule of Evidence 703 "permit[s] an expert witness to base his opinion on 'facts or data ... that the expert has been made aware of or personally observed' and to opine [and based his opinion] on inadmissible evidence if 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'" *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 269 & n.10 (cleaned up). More specifically, courts have concluded that, although a party's damages expert "did not personally observe the facts or data in [another expert's report], as a damages expert, he may rely on hearsay, including other expert reports, in forming his opinions." *ENGlobal*, 2018 WL 1877015, at *11 (cleaned up).

Still, "Rule 702 and *Daubert* require an expert witness independently to validate or assess the basis for his or her assumptions," and "[t]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable," which "requires some objective, independent validation of the expert's methodology." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 268 (cleaned up).

"Although the basis of an expert's opinion usually goes to the weight and not the admissibility of expert testimony, in some cases the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. In the words of the Third Circuit, the suggestion that the reasonableness of an expert's reliance on facts or data to form his opinion is somehow an inappropriate inquiry under Rule 702 results from an unduly myopic interpretation of Rule 702 and ignores the mandate of *Daubert* that the district court must act as a gatekeeper." *Jacked Up*, 807 F. App'x at 348 (cleaned up). "In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Id.* at 348-49 (cleaned up). "The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 268 (cleaned up).

-16-

"The Court normally analyzes questions of reliability using the five nonexclusive factors known as the *Daubert* factors, [which are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community]." *Ramos*, 2022 WL 615023, at *1 & n.11 (cleaned up). "But these factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Kim v. Nationwide Mut. Ins. Co.*, No. 3:21-cv-345-D, 2022 WL 2670393, at *5 (N.D. Tex. July 11, 2022) (cleaned up). "The point of this inquiry is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Holcombe*, 516 F. Supp. 3d at 674 (cleaned up).

"The Court also does not need to admit testimony based on indisputably wrong facts." *Ramos*, 2022 WL 615023, at *1 (cleaned up). "The Fifth Circuit has recognized that [t]he *Daubert* reliability analysis applies to, among other things, 'the facts underlying the expert's opinion,'" and "an opinion based on insufficient, erroneous information, fails the reliability standard." *Jacked Up*, 291 F. Supp. 3d at 802 (cleaned up). "And although the *Daubert* reliability analysis is flexible and the

proponent of the expert evidence need not satisfy every one of its factors, the existence of sufficient facts ... is in all instances mandatory." *Id.* (cleaned up).

But, "[i]n conducting its analysis, the Court focuses on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology." *Ramos*, 2022 WL 615023, at *1 (cleaned up). A motion to exclude is not properly based on an "objection that goes to whether [the proffered expert's] opinion is correct, not whether it is reliable," where "[t]he proponent need not prove to the judge that the expert's testimony is correct, but," rather, "by a preponderance of the evidence that the testimony is reliable." *Aircraft Holding*, 2022 WL 3019795, at *8 (cleaned up). "Even when a court rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable." *United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019), as revised (Aug. 9, 2019) (cleaned up). And, so, "[w]hen the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *ENGlobal*, 2018 WL 1877015, at *8 (cleaned up).

The Court cannot accept arguments that "urge[] the Court to establish an unattainable goalpost, essentially arguing that each item of expert testimony is unreliable insofar as it fails to conclusively prove [the expert testimony's proponent's] theory of its case or an element of a claim or defense," and thereby "confus[e] admissibility with sufficiency, and sufficiency with certainty." *Holcombe*, 516 F.

Supp. 3d at 675 (cleaned up). That "is not the standard for admissibility," or "even the standard for success on the merits," and "[i]t is not the Court's role, in the context of a *Daubert* motion, to judge the conclusions that an expert's analysis generates; the ultimate arbiter of disputes between conflicting opinions is the trier of fact." *Id.*

"If, however, there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered, the court may exclude the testimony as unreliable." *Kim*, 2022 WL 2670393, at *5 (cleaned up). For example, "the Court may exclude [an expert witness's] analysis if the studies that he relies on are so dissimilar to the facts presented that [the expert witness's] opinions cannot be sufficiently supported by the studies." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up). "But the notion that expert testimony is only admissible to the extent that it is based on studies of identical individuals under identical circumstances would not only turn the 'flexible' inquiry envisioned under Rule 702 on its head, but such rigid constructions of reliability and relevance would defeat the very purpose of expert testimony: to help the trier of fact understand and evaluate the evidence." *Id.* at 676-77 (cleaned up).

The "evidentiary gates [provided by Rule 702 and *Daubert*] exist to keep out error that may impermissibly affect the jury" and "to protect juries from unreliable and irrelevant expert testimony." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 264, 268. But "[t]he court's inquiry is flexible in that [t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *Aircraft Holding*, 2022 WL 3019795, at *6 (cleaned up). And, "[p]articularly in a

-19-

jury trial setting, the court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role – the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration. Thus, [w]hile the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, the rejection of expert testimony is the exception rather than the rule." *United States v. Perry*, 35 F.4th 293, 330 (5th Cir. 2022) (cleaned up).

And "[t]he Fifth Circuit has noted that [a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration," and, "[a]ccordingly, [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Ramos*, 2022 WL 615023, at *3 (cleaned up). Generally, an opposing party's "doubts about the bases for [an expert's] opinions do not render his opinions so unsupported as to create 'too great an analytical gap' between the evidence he relies on and his opinions." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up).

As to allegedly untimely supplemental expert reports, Federal Rule of Civil Procedure 26(e)(1) provides that "[a] party who has made a disclosure under Rule 26(a)... must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure... is incomplete or

incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court."

"[T]he line between supplemental opinions and new opinions is not always clear, and the decision regarding how to make the distinction ... depends on the facts of the case." *Aircraft Holding*, 2022 WL 3019795, at *2 (cleaned up). But "[c]ourts routinely reject untimely 'supplemental' expert testimony where the opinions are based upon information available prior to the deadline for expert disclosures and disclosure 'departs from [or] expands upon [the] original report in [any] material respects." *Holcombe v. United States*, 516 F. Supp. 3d 660, 670 (W.D. Tex. 2021) (cleaned up). "The purpose of supplementary disclosures is just that – to supplement. Such disclosures are not intended to provide an extension of the expert designation and report production deadline." *Aircraft Holding*, 2022 WL 3019795, at *2 (cleaned up). "Thus [w]hen the analysis and opinions in the second report [are] largely new rather than supplementary, they cannot qualify as a supplemental expert report under Rule 26(e)." *Id.* (cleaned up).

And, even if an allegedly supplemental report is untimely, "[i]n assessing whether to permit testimony based on an untimely supplemental expert report, the court, in exercising its discretion, considers (1) the explanation for making the supplemental disclosure at the time it is made; (2) the importance of the supplemental information to the proposed testimony of the expert, and the expert's

importance to the litigation; (3) potential prejudice to an opposing party; and (4) the availability of a continuance to mitigate any prejudice." *Id.* at *3 n.3 (cleaned up).

**Analysis**

## I.   Kleinman's Damages Opinions

The Founders ask the Court to exclude Kleinman's opinions in their entirety, but the Founders address the opinions separately as Kleinman's (1) Debt Received + Equity Received = Damages Opinion, (2) Every Penny to the Founders = Damages Opinion, and (3) VBF Misrepresented EBITDA to Itself Opinion.

As explained above, the Court should not, in its gatekeeping role under Rule 702 and *Daubert*, exclude a proffered expert witness's opinion or testimony because (1) it is not correct; (2) it contradicts other expert testimony or relies on a sets of facts that conflicts with that relied on by contradictory expert testimony, even if that contradictory expert testimony has been found to be reliable; or (3) it does not conclusively prove the proponent's theory of its case or an element of a claim or defense.

But the Court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.

And the party offering the expert testimony bears the burden of proof, by a preponderance of evidence, to show that a qualified expert's testimony is relevant (that is, the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, and the expert's

-22-

reasoning or methodology properly can be applied to the facts in issue) and reliable (that is, the testimony is based on sufficient facts or data and is the product of reliable principles and methods).

The Court should exclude expert testimony where (1) the expert cannot bring to the jury, on a matter of relevance, more than the lawyers can offer in argument; (2) the expert testimony is based only on subjective belief or unsupported speculation or is connected to existing data only by the unproven assertion of the expert, resting solely on the expert's authority; (3) there is simply too great an analytical gap between the basis for the expert opinion and the opinion proffered (such as if the studies that the expert relies on are so dissimilar to the facts presented that the expert's opinions cannot be sufficiently supported by the studies); (4) the expert testimony is based on indisputably wrong or erroneous or insufficient facts; (5) the proponent fails to provide some objective, independent validation of the expert's methodology; (6) the source on which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion; or (7) the expert relies on assumptions that have no factual basis in the record or no underlying rationale.

VBF has met its burden as to each of Kleinman's damages opinions, as explained below.

### A. Kleinman's Debt Received + Equity Received = Damages Opinion

According to the Founders,

Kleinman's Debt [Received] + Equity [Received] = Damages Opinion –
that VBF suffered $93,076,564 in devaluation and waste damages –

must be excluded based on relevance and reliability. Kleinman's opinion is irrelevant because: (1) it is not damages to VBF; (2) it is the wrong measure of damages; and (3) it contains improper causation testimony. Kleinman's opinion is unreliable because of fatal flaws in her calculation and she double counts the same money coming in and coming out of VBF.

Dkt. No. 493 at 8 (cleaned up).

Taking up the third and final relevance argument first, VBF responds that Kleinman "has not been identified as an expert on causation for VBF's claims, nor is VBF offering her testimony for that purpose." Dkt. No. 508 at 13 (footnote omitted). As the Founders explain in reply, the Court therefore prohibits Kleinman from providing any testimony or opinions pertaining to causation. *See* Dkt. No. 524 at 9. But, as VBF correctly notes, "Kleinman assumed VBF will prove liability, and she is permitted to do so," where "[i]t is perfectly permissible for an expert to assume liability (of which causation is an element) and simply focus on the issue of damages." Dkt. No. 508 at 13 (cleaned up).

As to the first relevance argument, the Founders cannot seek to exclude VBF's damages expert because they disagree with VBF's position – which Judge Starr has to this point declined to dismiss – on whether VBF standing to recover its claimed damages here. *See* Dkt. No. 291 at 19-20. Just as Kleinman's opinion cannot be excluded because the Founders contend that it is not correct, Kleinman's opinion cannot be excluded because the Founders believe she is opining "on alleged damages that as a matter of law VBF cannot recover." Dkt. No. 493 at 11.

The second relevance argument is the Founders' strongest argument and the one which their reply focuses. The Founders assert that "Kleinman failed to determine the value received at the proper time for any assets or transactions in her $93 million damage model," where (the Founders assert) Texas law requires for out-of-pocket damages measured by the difference between the amount the buyer paid and the value of the property that the buyer received. Dkt. No. 524 at 2-5. The Founders argue that "Kleinman does not even attempt to calculate out-of-pocket damages" – and, "[i]nstead, she counts the money that came into VBF (or its affiliates), which has nothing to do with alleged waste of assets or out-of-pocket damages," and "simply: (a) added up the total debt and equity that she contends came into VBF (or its affiliates); (b) assumed that all of it was wasted by the Founders; and (c) gave a credit of $10 million for the 2020 sale of certain assets that took place three years after the last Founder departed VBF." *Id.* at 2-3 (cleaned up). According to the Founders, "[b]y focusing on the money that came into VBF (or its affiliates) through debt or equity, Kleinman's model does not evaluate VBF's out-of-pocket damages because she fails to calculate (a) the funds VBF spent in each transaction that she contends constitute waste by the Founders of the $93 million and (b) the purported value VBF received at the time of each transaction." *Id.* at 3 (cleaned up).

VBF's response on this argument is essentially that the Founders are not raising proper *Daubert* exclusion arguments but rather taking issue with Kleinman's choice of factual inputs – that is, the bases and sources – for her out-of-pocket

-25-

damages calculation and the correctness of her ultimate conclusion on the damages amount. And the Court agrees.

The Founders criticize Kleinman's Debt Received + Equity Received = Damages Opinion as irrelevant because "Kleinman simply sponsors VBF's theory that every dollar that came into VBF was wasted by the Founders without providing any analysis to assist the jury in evaluating VBF's claimed damages." Dkt. No. 524 at 3. But Kleinman has provided a financial analysis – however thin the Founders may believe it to be – that applies the facts that the Founders assert support their claim and accompanying damages theory to the damages calculation methodology that Kleinman presents.

The Founders' arguments that what VBF is seeking is not a proper measure of damages may be a summary judgment argument – as the Founders in fact are pressing, *see* Dkt. No. 470 at 18-25 – and fodder for cross-examination at any trial. But they do not persuade the Court that VBF has failed to show that Kleinman's opinion cannot assist the trier of fact in understanding the evidence or determining a fact in issue and is therefore relevant for purpose of Rule 702 and *Daubert*. *See Puga*, 922 F.3d at 293-94.

As for reliability, the Founders' arguments – including the alleged double counting between the Debt Received + Equity Received = Damages Opinion and the) Every Penny to the Founders = Damages Opinion – again attack the bases and sources of Kleinman's Debt Received + Equity Received = Damages Opinion. The

-26-

Founders' arguments go to the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration, where the Founders' doubts about the bases for this opinion do not render it so unsupported as to create too great an analytical gap between the evidence on which Kleinman relies and her opinion. *See Ramos*, 2022 WL 615023, at \*3; *Holcombe*, 516 F. Supp. 3d at 675.

### B. Kleinman's Every Penny to the Founders = Damages Opinion

According to the Founders, "[i]n her $9 million damage model, Kleinman identifies certain transactions that she states constitute misappropriations (which VBF contends are out-of-pocket damages)" – specifically including "(a) every dollar of the Founders' compensation and reimbursed expenses from 2014 to January 2018, (b) interest payments made under certain loan transactions with third parties, (c) purchase of corporate housing, vehicles, and trucks and trailers used by VBF, (d) the salary for one employee related to Wulf, and (e) the lease expense for VBF's corporate office." Dkt. No. 524 at 7; *see also* Dkt. No. 508 at 4 ("The second measure of damages is specifically-identified misappropriations of certain of VBF's assets for the personal benefit of the Founders in the amount of at least $9,026,004." (footnote omitted)).

The Founders contend that

> Kleinman's Every Penny to the Founders = Damages Opinion – that every penny paid to the Founders or spent by the Founders in their role as VBF's directors [constitute misappropriations and are recoverable as out-of-pocket damages] – must be excluded because it (1) double counts fraud and misappropriation damages; (2) ignores key undisputed facts about timing and where money was paid; and (3) Kleinman lacks any expertise in aquaculture.

-27-

Dkt. No. 493 at 19 (cleaned up).

The Founders first assert that "Kleinman double counts when she adds the total amount invested in and loaned to VBF – i.e., her Debt Received + Equity Received = Damages Opinion – to the amount allegedly misappropriated." *Id.* (cleaned up). They argue that "her damages are the aggregate amount of money ever received by or loaned to VBF, she says VBF never made any profits, so, all of the 'misappropriated' funds came from funds received by VBF and were double counted by Kleinman" and that "Kleinman's Every Penny to the Founders = Damages Opinion should be excluded" because "it is based on an unreliable method." *Id.* at 20.

But this criticism does not go to the reliability of Kleinman's method but to a challenge to her consistency across several proffered damages models. That goes to the weight to be assigned to her opinions in support of those damages models and is a matter for cross-examination.

The Founder next assert that "Kleinman's misappropriation methodology also contains inherent unreliability based on the timing and recipients of payments," where (1) "she ignores that the Founders were solely in control of VBF until July 7, 2016, and disregards that 'misappropriations' occurred before that date" and (2) she "ignores that before July 7, 2016, all expenditures were disclosed to and approved by VBF's officers and directors because they were the Founders," and "VBF was a wholly-owned subsidiary during this timeframe and damages would have inured to the parent company, VBF Canada." *Id.* at 20 (cleaned up). According to the Founders,

"Kleinman flatly ignores the impact of the $2.8 million above in addition to other sums that were expended and approved before July 7, 2016, making her entire opinion unreliable on this topic." *Id.* at 20-21.

VBF responds that "Kleinman's more than $9 million misappropriations calculation is a specific calculation of monies wrongfully taken from VBF to benefit the Founders." Dkt. No. 508 at 18. The Founders reply that, "[w]hile Kleinman identifies specific transactions that she contends make up the misappropriations (unlike her $93 million damage model), VBF ignores the critical flaws with this model that render it unreliable." Dkt. No. 524 at 7.

But these are again challenges based on questions relating to the bases and sources of Kleinman's opinion and her ultimate conclusion on the amount of damages under this model, but they do not render it so unsupported as to create too great an analytical gap between the evidence on which Kleinman relies and her opinion.

The Founders finally contend that Kleinman also has no expertise – by designation or qualification – in aquaculture" and "cannot testify whether payments the Founders caused to be made – on the aquaculture business or for employee and director compensation – are recoverable." Dkt. No. 493 at 21; *see also* Dkt. No. 524 at 8 (arguing that "Kleinman is not an expert in executive compensation, interpreting loan documents, real estate valuation, or aquaculture" and "does not have unique expertise to determine which transactions are improper").

But VBF responds that it "has not designated Kleinman as an aquaculture expert, and Kleinman does not purport to testify as one" but, rather, as "a CPA, forensic accountant (with an AICPA certification), and financial and damages expert." Dkt. No. 508 at 14 (cleaned up). According to VBF, "Kleinman's opinions, while addressing a company in the aquaculture industry, are not about aquaculture" but, rather, "about EBITDA, financial modeling, financial condition, financial practices (including compensation), and damages, which are all within the scope of her expertise and can be applied to any industry." *Id.* (cleaned up).

VBF persuasively argues that Kleinman "does not need to have expertise in aquaculture in order to opine as a financial and damages expert regarding VBF's finances" and that "[i]t is permissible for a financial expert to testify regarding financial issues of different industries, especially where, as here, Kleinman consulted with VBF's designated aquaculture expert (who has not been challenged by the Founders)," and "as to specific company transactions she addresses, such as executive compensation." *Id.* at 14-15 (cleaned up).

The Court agrees and finds that VBF has shown that Kleinman is qualified to testify by virtue of her knowledge, skill, experience, training, or education as to these damages opinions.

### C. Kleinman's VBF Misrepresented EBITDA to Itself Opinion

As VBF explains, "Kleinman also opines that VBF's EBITDA while under the control of the Founders was artificially inflated and misrepresented the actual financial data and position of the company." Dkt. No. 508 at 4.

According to the Founders,

Kleinman's VBF Misrepresented EBITDA to Itself Opinion concerns VBF's projected EBITDA in a random 2016 Model. It is unclear what the point of this testimony even is and Kleinman fails to use financial projections that were part of the 2016 stock purchase agreement….

Kleinman concluded that the EBITDA in the 2016 Model was overstated by 96% because of misrepresentations related to fish density and FCR between April 2015 and June 2016. Kleinman testified that EBITDA was overstated by 96% due to the Founders' alleged misrepresentations regarding aquaculture metrics. This opinion is premised on alleged misrepresentations and/or concealments about the aquaculture business where Kleinman has zero expertise. Her assumptions are all improperly premised on the Whitehair Report.

In addition to her lack of expertise to support this opinion, she assumes that the 2016 EBITDA model was relied on by investors and creditors – not VBF. Kleinman could not identify anyone at VBF that relied on the 2016 Model she used. Nor could she identify any investors or creditors who relied on it. Even if she could, it would still be improper for her to testify about injuries to investors and creditors that are not parties to this suit.

Multiple unfounded assumptions underlie Kleinman's VBF Misrepresented EBITDA to Itself Opinion. This degree of speculation requires the exclusion of her opinion. Taking each of the alleged misrepresentations at a granular level – as required at trial – requires competent evidence and independent factfinding, neither of which Kleinman can provide. If VBF contends the Founders' aquaculture business decisions were flawed and the business information concerning it were misrepresented or concealed in the 2016 Model, VBF must establish each individual misrepresentation or concealment by competent evidence. Kleinman lacks the expertise to testify that the Founders misrepresented and/or concealed aquaculture metrics such that projected EBITDA was affected by a specific percentage.

Dkt. No. 493 at 21-23 (cleaned up).

VBF responds that

[t]he Founders attempt to discredit Kleinman's EBITDA analysis by arguing she used a "random 2016 Model" for her EBITDA calculation and "fail[ed] to use financial projections that were part of the 2016 stock purchase agreement." Mot. at 21-22. This is incorrect. As Kleinman testified, she used the 2016 Model because it was "the model sent to all of the investors prior to closing" of the Stock Purchase Agreement ("SPA") and when it was sent, it was noted that this was an updated version, "meaning it would supersede other information that was previously sent." She also reviewed multiple models before determining which one was most appropriate for her analysis.

The "business plan" or "projections" that the Founders claim Kleinman should have used instead is a three-page Executive Summary containing only a snapshot summarizing data that is similar to the information contained, with more detail, in the financial models that Kleinman used as part of her analysis. The Founders' suggestion that Kleinman should have relied on a summary of data rather than the underlying data itself is absurd. The Founders' "business plan" also contains inaccurate information that makes clear it is not reliable for any expert to rely upon. Regardless, Kleinman did review and consider the "financial projections" in the Executive Summary, as well as an identical copy of the Executive Summary itself. She simply chose not to rely upon it for her analysis and to go directly to the underlying data, and this decision was reasonable. In any event, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned to that opinion rather than its admissibility and should be left for the jury's consideration."

Dkt. No. 524 at 9 (cleaned up).

But, the Founders argue, "VBF does not dispute that Kleinman's opinions on EDITDA are based on a financial model that VBF never used," and "VBF ignores that Kleinman failed to provide any opinions related to the valuation of VBF's assets during the relevant period, which VBF admits is a critical element in determining solvency." Dkt. No. 524 at 2. In reply, the Founders assert that

> [t]he most obvious problem with Kleinman opining that VBF misrepresented its EBITDA is she admits VBF is seeking damages based on alleged misconduct that resulted in investments in VBF (putting aside the illogical notion that VBF could have misrepresented EBITDA to itself). If one can get past that, Kleinman then double faults by looking at the wrong model. The undisputed evidence establishes that she used a 2016 Model that was never used by VBF as its projected model (for potential investors). The Stock Purchase Agreement ("SPA") that brought the money into VBF included a completely different model. VBF contends that Kleinman relied on the 2016 Model because it was the underlying data for the model attached to the SPA. But these two models were completely different, including vastly different EBIDTA projections. Supposed expert analysis of a model never used by VBF is not only irrelevant, but also does not assist the jury.

Dkt. No. 524 at 9 (cleaned up).

First, for the reasons that VBF persuasively asserts, *see* Dkt. No. 508 at 15-15, the Court cannot accept the argument that Kleinman improperly relied on Whitehair's report, which the Founders have not challenged under Rule 702, *see ENGlobal*, 2018 WL 1877015, at *11.

Second, the Founders' challenges, at bottom, are to Kleinman's selection of bases and sources for her damages opinion and conflate attacks on to VBF's ability to prove the Founders' alleged liability on VBF's liability theory with challenges to Kleinman's testifying to a damages model while permissibly assuming VBF's liability. *See ENGlobal*, 2018 WL 1877015, at *8. Again, the Founders' arguments that what VBF is seeking is not a proper measure of damages could perhaps be a summary judgment argument or a basis for vigorous cross-examination at any trial but do not persuade the Court that VBF has failed to show that Kleinman's opinion

cannot assist the trier of fact in understanding the evidence or determining a fact in issue and is therefore relevant for purpose of Rule 702 and *Daubert*.

## II.   Kleinman's Supplemental Report and VBF Was Always Insolvent Opinion

For the reasons that the Founders persuasively explain in the opening Kleinman Motion, Kleinman's supplemental report contains an untimely expert opinion that is based on information available prior to the deadline for expert disclosures and that departs from her original report in material respects. VBF's assertion that "Kleinman opined in her Amended Report that 'VBF lost money in each and every month of its existence and was insolvent the majority of this time' and was designated by VBF as an expert on its 'financial condition,'" Dkt. No. 508 at 21-22 (cleaned up), does that change that.

But that is not the end of the analysis. Even if an allegedly supplemental report is untimely, to assess whether to permit testimony based on an untimely supplemental expert report, the Court, in exercising its discretion, considers (1) the explanation for making the supplemental disclosure at the time it is made; (2) the importance of the supplemental information to the proposed testimony of the expert, and the expert's importance to the litigation; (3) potential prejudice to an opposing party; and (4) the availability of a continuance to mitigate any prejudice.

And VBF persuasively explains – and the Founders' reply does nothing to convince otherwise – that those "factors weigh in favor of permitting Kleinman to testify about VBF's insolvency at trial," where her "testimony goes directly to an

element of VBF's fraudulent transfer claims"; "[p]ermitting Kleinman's testimony would not result in unfair prejudice to the Founders," since "[t]hey had notice of VBF's position and Kleinman's opinion well before expert discovery end[ed], they questioned her about it during her deposition, and they have had months to continue conducting expert discovery since receiving the Supplemental Kleinman Report"; and "there is no need for a continuance because there has been no prejudice." Dkt. No. 508 at 23 (cleaned up).

But, Founders argue, "[e]ven if the Court considered the substance of [Kleinman's VBF Was Always Insolvent Opinion], her 'valuation' contained no analysis of any of VBF's assets" and, instead

> utilized the "balance sheet test" and concluded that because VBF's consolidated balance sheets show VBF never made a profit, VBF never had any value. According to Kleinman, no valuation of VBF's assets was necessary. This despite the Supplemental Report acknowledging that "[t]he 'balance sheet test' generally renders an entity insolvent when its debts are greater than its assets at a fair valuation." Kleinman does no valuation, much less a fair one, and instead took intercompany financials at face value: "Based on VBF's consolidated balance sheet prepared at the time the Founders were in control." Kleinman admitted that she relied on "how [the debts and assets] were reflected in VBF's financial statements." In other words, Kleinman can take the word of those she repeatedly calls fraudsters when it is convenient for her result-oriented opinion.
>
> The two leading treatises on the subject reject using the company's own book value or balance sheet test for a business. One states, "[A]ccounting book value is not a business valuation method at all...." The other is equally dismissive: "[W]ith the possible exception of certain financial institutions, a historically based accounting balance sheet will almost always bear little relationship to value." Courts that consider the balance-sheet test for a business "quickly recognize that a fair valuation cannot be ascertained by looking solely at the balance sheets." Judge Posner explained the flaw in this approach: "[I]t would

mean that every individual or firm that had contingent liabilities greater than his or its net assets was insolvent – something no one believes." Kleinman's VBF Was Insolvent Opinion begins and ends with a $0 valuation for VBF based solely on a balance sheet test – an unreliable method. Therefore, it should be excluded.

Dkt. No. 493 at 24-25 (cleaned up).

VBF responds that, while "[t]he Founders attack Kleinman's use of a 'balance

sheet test' to determine insolvency,"

> Texas law defines "insolvency" as existing when "the sum of the debtor's debts is greater than all of the debtor's assts at a fair valuation." The federal test also relies on a "fair valuation." "Courts often refer to this test as a balance sheet test, and then engage in the 'fair valuation' of the debts and property shown on the balance sheet, as required by the statute."
>
> The Founders contend that Kleinman is required to perform an independent fair market valuation of each of VBF's individual assets as part of her evaluation of solvency. Mot. at 3, 24-25. But VBF is not aware of any such requirement, nor does the Motion cite any cases supporting such a requirement. Moreover, Kleinman's analysis did account for the fair market value of VBF's assets, through the third-party Natural Shrimp transaction and the statement made to the Bankruptcy Court by VBF. Kleinman testified that the $10 million purchase of VBF's remaining assets by Natural Shrimp represented the value of VBF's assets after the Founders' misappropriations. Her report also includes this transaction.
>
> The Founders rely on an out-of-context quotation from *In the Matter of Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988) and the imprimatur of Judge Posner. But *Xonics* merely stands for the proposition that, in a balance sheet test for solvency, the value of contingent liabilities should not be face value, and should be discounted based on the likelihood of the contingency's occurrence. Contingent liabilities are not what made VBF insolvent; thus, the holding in *Xonics* is inapplicable. In any event, this challenge goes to the weight of Kleinman's opinion, not its admissibility.

Dkt. No. 508 at 20-21 (cleaned up).

The Founders reply that

-36-

the fundamental flaw with Kleinman's methodology is she did no valuation of VBF's assets and liabilities during the relevant period. As VBF acknowledges, "Texas law defines 'insolvency' as existing when 'the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation'" and the federal test is the same. The issue is not the definition of insolvency. The issue is that the definition of insolvency requires an assessment of the "fair valuation" of assets, which Kleinman admits she did not do. Using a company's own book value or balance sheets to determine the fair valuation of assets has been rejected.

Trying to salvage Kleinman's opinion, VBF contends that Kleinman did in fact "account for the fair market value of VBF's assets, through the third-party Natural Shrimp transaction." But Kleinman opines that VBF was insolvent during the Founders' tenures at VBF, which was from 2014 to 2018. The sale of some of VBF's assets in December 2020 has no bearing on the fair market valuation of those assets during the relevant time periods of 2014 to January 2018. Kleinman therefore has wholly failed to provide an opinion that will assist the jury.

Dkt. No. 524 at 10 (cleaned up).

These challenges again address the bases and sources for Kleinman's damages opinion. And this is not an instance in which – notwithstanding some other experts' views on the appropriateness of attributing a company's value to what is shown on its balance sheets or accounting book value – Kleinman has so failed to explain her reliance on these sources as to raise this challenge from one to the weight to be afforded her opinions to one properly targeting its admissibility. *See Jacked Up*, 807 F. App'x at 348-49.

## III.   Keith Driver's Joinder in the Kleinman Motion

Even if Driver's joinder is procedurally proper, the substance of his requested relief will be denied for the same reasons laid out above.

**Conclusion**

For the reasons above, the Court denies the Founder's Motion to Exclude the

Expert Testimony of Brandi Kleinman [Dkt. No. 492] and Defendant Keith Driver's

Notice of Joinder in Defendant Leslie A. Wulf, Bruce A. Hall, James Rea, and John

E. Rea's Motion to Exclude Expert Testimony of Brandi Kleinman [Dkt. No. 464].

SO ORDERED.

DATED: January 20, 2023

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE